CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
  crichman@gibsondunn.com
VICTORIA C. GRANDA (D.C. Bar No. 1673034; *pro hac vice*)
  vgranda@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

DANIEL G. SWANSON (SBN 116556)
  dswanson@gibsondunn.com
DANA LYNN CRAIG (SBN 251865)
  dcraig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY (SBN 268644)
  chigney@gibsondunn.com
ELI M. LAZARUS (SBN 284082)
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>APPLE INC., a California corporation,<br><br>        Defendant. | CASE NO. 4:22-cv-04437-YGR<br><br>**DEFENDANT APPLE INC.'S MOTION TO DISMISS**<br><br>**Hearing:**<br>Date:      January 24, 2023<br>Time:      2:00 p.m.<br>Place:     Courtroom 1<br>Judge:    Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn & Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 24, 2023 at 2:00 p.m. before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, defendant Apple Inc. ("Apple") moves this Court to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), with prejudice, the claims, in whole, or alternatively, in part, brought by plaintiffs Société du Figaro, SAS, L'Équipe 24/24 SAS, and le GESTE.  Apple's motion is based on the grounds that (1) plaintiffs' foreign-sales claims are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a; (2) plaintiffs lack Article III standing to challenge, and fail to state a claim challenging, Apple's App Tracking Transparency functionality; (3) plaintiff le GESTE lacks Article III and statutory standing; (4) all claims are time-barred or barred by laches; (5) plaintiffs fail to state a claim challenging communications restrictions; and (6) plaintiffs fail to state a claim for restitution.

This motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the Declaration of Caeli A. Higney, the pleadings and papers on file, and the argument received by the Court.

GIBSON, DUNN & CRUTCHER LLP
Daniel G. Swanson
Cynthia E. Richman
Caeli A. Higney
Dana Lynn Craig
Eli M. Lazarus
Victoria C. Granda

By: */s/ Cynthia E. Richman*

*Attorneys for Defendant Apple Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 3

    A.  *Cameron* and the Present Dispute .............................................................. 3

    B.  The Plaintiffs and Proposed Classes ........................................................... 4

    C.  The Complaint's Allegations ....................................................................... 5

III.    LEGAL STANDARDS......................................................................................... 7

IV.     PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA ..................... 7

    A.  Apple's Services Facilitating French Developers' Foreign-Storefront Sales Involve Nonimport Trade or Commerce with Foreign Nations Under the FTAIA ........................................................................................................... 8

    B.  The Foreign-Storefront Claims Do Not Qualify For An FTAIA Exception............... 11

        1.  Plaintiffs' claims do not arise from any alleged effect on U.S. exports.......... 11

        2.  Plaintiffs' claims do not arise from any alleged effect on U.S. domestic commerce ....................................................................................................... 11

    C.  State Antitrust Law Does Not Reach Foreign Commerce ........................................... 13

    D.  International Comity Favors Dismissal........................................................................ 14

V.      PLAINTIFFS ARE BARRED FROM CHALLENGING ATT ............................................. 14

VI.     PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS ........................ 16

    A.  Le GESTE Lacks Article III Standing ........................................................................ 16

        1.  Plaintiffs have not identified any member of le GESTE with standing.......... 17

        2.  Plaintiffs have not alleged, and cannot establish, that this litigation is germane to le GESTE's purpose ..................................................................... 17

        3.  Le GESTE may not seek damages on behalf of its members ........................ 18

    B.  Le GESTE Lacks Statutory Standing........................................................................... 19

        1.  Le GESTE cannot seek relief under the Clayton Act ..................................... 19

        2.  Le GESTE cannot seek relief under the UCL or Cartwright Act ................... 20

VII.    PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES...................... 20

    A.  Plaintiffs' Sherman Act Claims Are Untimely Or Barred By Laches ........................ 21

    B.  Plaintiffs' UCL Claims Are Barred As Untimely Or By Laches................................. 23

Gibson, Dunn & Crutcher LLP

1

C.    Plaintiffs' Cartwright Act Claims Are Untimely ......................................................... 24

2

VIII.   PLAINTIFFS' CLAIMS AGAINST COMMUNICATIONS RESTRICTIONS FAIL ......... 25

3

IX.    PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED ........................................... 25

4

X.    CONCLUSION ................................................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS
CASE NO 4:22-CV-04437-YGR

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
465 F.3d 1123 (9th Cir. 2006)................................................................................................17

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Sup. Ct.*,
46 Cal. 4th 993 (2009) .........................................................................................................20

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531 (6th Cir. 2021) ................................................................................................19

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*,
713 F.3d 1187 (9th Cir. 2013)..............................................................................................17

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*,
950 F.2d 1401 (9th Cir. 1991)..............................................................................................18

*Associated Gen. Contractors v. Otter Tail Power*,
611 F. 2d 684 (8th Cir. 1979)...............................................................................................17

*Aurora Enters., Inc. v. Nat'l Broadcasting Co.*,
688 F.2d 689 (9th Cir. 1982).................................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................................7, 10

*Blix Inc. v. Apple Inc.*,
2021 WL 2895654 (D. Del. July 9, 2021) ...........................................................................15

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)..............................................................................................15

*California v. Texas*,
141 S. Ct. 2104 (2021) .........................................................................................................15

*In re Capacitors Antitrust Litig.*,
2018 WL 4558265 (N.D. Cal. Sept. 20, 2018) ............................................................9, 11, 13

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986)..............................................................................................................20

*Cetacean Cmty. v. Bush*,
386 F.3d 1169 (9th Cir. 2004).................................................................................................7

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .................................................................................................24

Gibson, Dunn &
Crutcher LLP

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................................... 15

*Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*,
    452 F. Supp. 2d 924 (N.D. Cal. 2006) ...........................................................................17, 20

*Coronavirus Reporter v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)...................................................................... 1

*Cortez v. Purolator Air Filtration Prod. Co.*,
    23 Cal. 4th 163 (2000) ....................................................................................................... 23

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001)............................................................................................... 24

*Darensburg v. Metro. Transp. Comm'n*,
    611 F. Supp. 2d 994 (N.D. Cal. 2009) ............................................................................... 17

*David Orgell, Inc. v. Geary's Stores, Inc.*,
    640 F.2d 936 (9th Cir. 1981)............................................................................................... 22

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    392 F. Supp. 3d 1074 (N.D. Cal. June 20, 2019) ............................................................... 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
    546 F.3d 981 (9th Cir. 2008)...........................................................................................9, 12

*Electroglas, Inc. v. Dynatex Corp.*,
    497 F. Supp. 97 (N.D. Cal. 1980) ...................................................................................... 21

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
    417 F.3d 1267 (D.C. Cir. 2005) ......................................................................................... 12

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ..................................................................1, 9, 13, 25

*F. Hoffmann-La Roche Ltd v. Empagran SA*,
    542 U.S. 155 (2004).................................................................................................8, 9, 12, 14

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*,
    2005 WL 1629813 (N.D. Cal. July 8, 2005)....................................................................... 19

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..................................................................... 9

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
    503 U.S. 60 (1992)............................................................................................................... 25

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..........................................................................................15, 16

v

*G & G Closed Circuit Events, LLC v. Nguyen*,
  2013 WL 2558151 (N.D. Cal. June 10, 2013) ...................................................................24

*Hameed v. IHOP Franchising LLC*,
  520 F. App'x 520 (9th Cir. 2013) ......................................................................................23

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993) ...........................................................................................................11

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
  961 F. 3d 731 (5th Cir. 2020) ............................................................................................14

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ...........................................................................................................17

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
  518 F.2d 913 (9th Cir. 1975) .............................................................................................22

*In re Intel Microprocessor Antitrust Lit.*,
  452 F.Supp. 2d 555 (D. Del. 2006) ...................................................................................13

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) .............................................................................................24

*Julian v. TTE Tech., Inc.*,
  2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ..................................................................25

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) .............................................................................................7

*Lavoho, LLC v. Apple Inc.*,
  71 F. Supp. 3d 395 (S.D.N.Y. 2014) .................................................................................10

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ..............................................................................................10

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................................15

*Med. Ass'n of the State of Alabama v. Schweiker*,
  554 F. Supp. 955 (M.D. Ala. 1983) ..................................................................................18

*Motorola Mobility LLC v. AU Optronics Corp.*,
  775 F.3d 816 (7th Cir. 2015)...............................................................................................9

*In re N. Sea Brent Crude Oil Futures Litig.*,
  256 F. Supp. 3d 298 (S.D.N.Y. 2017)...............................................................................12

*Nationwide Biweekly Admin, Inc. v. Sup. Ct.*,
  9 Cal. 5th 279 (2020) ........................................................................................................25

Gibson, Dunn &
Crutcher LLP

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ...........................................................................................25

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ....................................................................................9, 16

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) ...........................................................................22

*Openiano v. Hartford Life & Annuity Ins. Co.*,
829 F. App'x 829 (9th Cir. 2020) .........................................................................5

*Pace Indus., Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) .........................................................................21, 22

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ................................................................................9

*Polaroid Corp. v. Disney*,
862 F.2d 987 (3d Cir. 1988) ...............................................................................18

*Racek v. Rady Children's Hosp. of San Diego*,
2012 WL 2947881 (Cal. Ct. App. July 20, 2012) ..............................................16

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................1

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ...............................................................23

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
133 Cal. App. 4th 1277 (2005) ...........................................................................13

*Ryan v. Microsoft Corp.*,
147 F. Supp. 3d 868 (N.D. Cal. 2015) ...............................................................24

*Sanner v. Bd of Trade of City of Chicago*,
62 F.3d 918 (7th Cir. 1995) ................................................................................19

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ..............................................................................25

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......................................................................................7, 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) ...................................................13

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ...........................................................................................17

vii

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,*
      830 F.2d 1374 (7th Cir. 1987) ...................................................................................... 18

*UAW v. Brock,*
      477 U.S. 274 (1986) ...................................................................................................... 18

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.,*
      2013 WL 368365 (N.D. Cal. Jan. 29, 2013) .................................................................. 13

*United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.,*
      517 U.S. 544 (1996) ................................................................................................. 19, 20

*United States v. Hui Hsiung,*
      778 F.3d 738 (9th Cir. 2015) .......................................................................................... 8

*United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.,*
      919 F.2d 1398 (9th Cir. 1990) ....................................................................................... 18

*US Airways, Inc. v. Sabre Holdings Corp.,*
      105 F. Supp. 3d 265 (S.D.N.Y. 2015) ............................................................................ 21

*Warth v. Seldin,*
      422 U.S. 490 (1975) ....................................................................................................... 20

*Whitaker v. Sherwood Mgmt. Co.,*
      2022 WL 2357003 (N.D. Cal. June 30, 2022) ............................................................... 13

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.,*
      588 F.3d 659 (9th Cir. 2009) ........................................................................................... 7

STATUTES

15 U.S.C. § 6a ........................................................................................................... 2, 11, 12

15 U.S.C § 7 ....................................................................................................................... 19

15 U.S.C. § 15(a) ................................................................................................................ 19

15 U.S.C. § 15b ............................................................................................................ 21, 22

15 U.S.C. § 26 .................................................................................................................... 19

1941 Cal. Stat. 1836 ........................................................................................................... 20

Cal. Bus. & Prof. Code § 16700 *et seq.* .......................................................................... 13

Cal. Bus. & Prof. Code § 16750(a) .................................................................................... 20

Cal. Bus. & Prof. Code § 16750.1 ..................................................................................... 24

Cal. Bus. & Prof. Code § 17200 *et seq.* .......................................................................... 13

Cal. Bus. & Prof. Code § 17204 ...........................................................................20

Cal. Bus. & Prof. Code § 17208 ...........................................................................23

Clayton Antitrust Act of 1914, Pub. L. No. 63-212, § 16, 38 Stat. 730..................20

H.R. Rep. No. 97-686 (1982)...................................................................................9

**OTHER AUTHORITIES**

"App Store Pricing, Effective August 2021,"
    https://itunespartner.apple.com/assets/downloads/072821-Apps-Pricing-SAfr-UK-EUR.pdf.........6

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2013) ...........................................10

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (5th ed. 2022) ....................................8, 9, 13

**RULES**

Fed. R. Civ. P. 12(b)(1)...........................................................................................7

Fed. R. Civ. P. 12(b)(6)...........................................................................................7

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. I, § 8, cl. 3...................................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Court dismiss the complaint with prejudice because:

1.      plaintiffs' claims based on foreign sales are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a;

2.      plaintiffs lack Article III standing to challenge, and fail to state a claim challenging, Apple's App Tracking Transparency functionality;

3.      plaintiff le GESTE lacks Article III and statutory standing to sue;

4.      plaintiffs' claims are barred by the statute of limitations and laches;

5.      plaintiffs fail to state a claim challenging alleged communications restrictions; and

6.      plaintiffs fail to state a claim for restitution?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

On July 15, 2022, "in accordance with the terms of the Settlement," this Court entered final judgment in *Cameron, et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), a putative class action brought by U.S. iOS app developers.  *See* Amended Final Judgment, *Cameron* Dkt. 494; Consolidated Complaint, *Cameron* Dkt. 53 ("*Cameron* Compl.").  Barely two weeks later, "fresh off the heels of [that] hard-won settlement with Apple," plaintiffs, represented by the same counsel as the putative class in *Cameron*,[1] filed this almost identical lawsuit.  *See* Apple's Request for Judicial Notice in Support of Motion to Dismiss ("RJN"), Ex. A, Hagens Berman Press Release.

Indeed, plaintiffs allege the same single-brand markets that have been considered and rejected by this Court and others.  *See, e.g.*, *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107-09 (N.D. Cal. 2022); *Coronavirus Reporter v. Apple Inc.*, 2021 WL 5936910, at *8-13 (N.D. Cal. Nov. 30, 2021); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021-26 (N.D. Cal. 2021).  They challenge the same conduct—Apple's centralized system of app distribution and the App Store's 30% commission— at issue in *Cameron*, and carefully analyzed by this Court following a three-week trial in *Epic*.  They quote from this Court's decision in *Epic* when supportive of their positions, *see, e.g.*, Compl. ¶¶ 11-12,

---

[1] The complaint here also lists as plaintiffs' counsel a French lawyer who has not demonstrated any basis for appearing in this matter under L.R. 11-3.

but ignore the portions that undermine their claims.  And, notwithstanding plaintiffs' counsel's prior assertion that the structural relief obtained through the *Cameron* settlement "will benefit the Settlement Class (*and other developers*)," Motion for Preliminary Approval of Class Action Settlement, *Cameron* Dkt. 396, at 20 (emphasis added), the present complaint claims the alleged conduct "will never abate unless Apple is called to account for its unlawful behavior," Compl. ¶ 26.

There is only one meaningful difference between the instant case and *Cameron*:  this action purports to advance the interests of putative classes of "France-resident iOS developers" and seeks relief related to their transactions on non-U.S. Apple storefronts.  *Id.* ¶¶ 4, 210, 214-17.  The complaint, in passing, also criticizes as anticompetitive Apple's App Tracking Transparency ("ATT"), which gives consumers the ability to opt out of certain third-party tracking.  *Id.* ¶¶ 187-92.  Neither of these differences suffices to give rise to a new, timely developer action subject to the proper jurisdiction of this Court.  Rather, plaintiffs' litigation opportunism falters for several reasons:

*First*, plaintiffs' claims are barred by the Foreign Trade Antitrust Improvement Act ("FTAIA"), 15 U.S.C. § 6a.  Transactions between French developers and foreign consumers, made on foreign App Store storefronts, in foreign currency, and through a foreign Apple entity are foreign nonimport commerce, not subject to any FTAIA exception.  Dismissing these bellwether foreign claims will surely conserve judicial resources.

*Second*, plaintiffs lack standing to challenge ATT, a pro-consumer and privacy-enhancing feature that does not (and cannot) give rise to any injury in fact to plaintiffs.  Even if plaintiffs could allege harm to themselves from ATT, their allegations still fail as a matter of law because they do not allege that any such harm injures *competition* nor do they define any relevant market for such a claim.

*Third*, plaintiff le GESTE specifically lacks standing to bring any claims because it is not an app developer.  Rather, it is a self-described association of "online publishers" that lists on its website a diverse array of members such as Google, several French law firms, magazines, consulting businesses, and an adult entertainment company.  Le GESTE cannot satisfy Article III standing as an association either:  Plaintiffs have not identified any member of le GESTE with standing, and they have not alleged that this litigation is germane to le GESTE's purpose.  It lacks statutory standing too: neither federal nor state antitrust or unfair competition laws provide a right of action to an uninjured

party.  Le GESTE must be dismissed from this lawsuit.

*Fourth*, plaintiffs' claims are untimely.  The App Store opened in 2008, and in-app purchase ("IAP") was introduced a year later.  Filed in late 2022, this complaint comes 38 months after plaintiffs' counsel filed the *Cameron* case and 11 months after they requested preliminary approval to settle that case.[2]  Their delay should not be rewarded.

*Fifth*, plaintiffs' challenge to alleged communications restrictions is implausible.  The App Store Review Guidelines permit developers to communicate about non-IAP purchasing methods.

*Sixth*, restitution is unavailable to plaintiffs.  They have not alleged that damages would be inadequate to rectify any alleged injuries.

This complaint should be dismissed with prejudice.

## II.   BACKGROUND

### A.   *Cameron* and the Present Dispute

On June 4, 2019, plaintiffs' counsel Hagens Berman Sobol Shapiro LLP filed the complaint in *Cameron, et al. v. Apple Inc.*  A consolidated amended complaint followed on September 30, 2019.  *Cameron* Compl.  Over a year after filing their initial complaint, the *Cameron* plaintiffs notified the Court of a potential further amendment to encompass foreign transactions.  Case Management Conference Statement, *Cameron* Dkt. 99, at 2.  Yet the *Cameron* plaintiffs quickly abandoned that posture after Apple indicated it would oppose the amendment because such "transactions 'involv[e] trade or commerce with foreign nations' within the meaning of the Foreign Trade Antitrust Improvement Act, 15 U.S.C. 6a."  *Id*.  The *Cameron* plaintiffs and Apple ultimately entered a settlement which was finally approved by the Court on June 10, 2022.  Order Approving Settlement, *Cameron* Dkt. 491 ("*Cameron* Settlement").[3]

Two years after it declined to seek expansion of the *Cameron* lawsuit to encompass foreign

---

[2] Apple preserved its statute of limitations defense in *Cameron*.  *See* Answer, *Cameron* Dkt. 74, at 21-22.

[3] The settlement agreement, signed by the same counsel appearing here, requires various adjustments to the App Store, including changes applying outside the U.S.  *See*, *e.g*, *Cameron* Settlement, at § 5.1.4 (price point expansion), § 5.1.6 (annual transparency report).  It also included an "express[] agree[ment]" to the appropriateness of Apple's commission structure." *Id.* § 5.2.

Gibson, Dunn &
Crutcher LLP

transactions, Hagens Berman filed the instant lawsuit.  Recognizing that the allegations in this case overlap almost entirely with other cases pending before the Court, plaintiffs moved to relate this case to *Cameron*, *Epic*, and *In re Apple iPhone Antitrust Litigation*, Case. No. 4:11-cv-06714-YGR (N.D. Cal.) ("*Pepper*").  *See* Plaintiffs' Motion to Relate, *Pepper* Dkt. 660.  Plaintiffs explained that "each of these matters is based on claims . . . that same-defendant Apple has violated U.S. federal antitrust and related state law by way of its policies and practices relating to its iOS App Store," that the "actions concern substantially the same parties," and "the same sort of transactions or events—iOS developer payments for Apple's provision of iOS app-distribution or IAP (in-app payment for digital in-app product) services."  *Id.* at 2-3.  This Court granted the order, relating the case to *Pepper* and *Epic*.  Dkt. 28; *see also* Dkt. 29 (order reassigning case).

## B.      The Plaintiffs and Proposed Classes

Plaintiff Société du Figaro, SAS, is a French company and the developer of the iOS Figaro news app and in-app product (a content subscription), among other apps.  Compl. ¶ 33.  Plaintiff L'Équipe 24/24 SAS is a French company and the developer of the L'Équipe sports-news and streaming app and in-app products (content subscriptions), among other apps.  *Id.* ¶ 42.  Both Figaro and L'Équipe are party to Apple's Developer Program License Agreement ("DPLA").  *Id.* ¶¶ 33, 42.  Plaintiff le GESTE is "an association of publishers of online content and service[s] based in Paris, France."  *Id.* ¶ 51.  Plaintiffs do not allege that le GESTE is an app developer, but rather that "[v]arious members [of this association] have developed iOS apps and in-app products available for sale in or via the App Store since May 2018 (and prior to that date)."  *Id.*  The complaint, however, does not identify any such members.

Figaro and L'Équipe seek to represent "[a]ll current or former France-resident persons or entities that paid Apple a commission (or fee or royalty) of greater than 15% for iOS app-distribution or IAP services with respect to any paid, non-zero-priced iOS app or paid, non-zero-priced in-app content (including subscriptions) sold in or via the iOS App Store (or, in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise."  Compl. ¶¶ 214, 216.  Le GESTE seeks to represent "[a]ll current or former France-resident persons or entities (or, at minimum, le GESTE iOS-developer members) whose iOS apps or

in-app products were sold or otherwise distributed in or via the App Store (or in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise, regardless of whether the person or entity paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services." *Id.* ¶¶ 215, 217.

### C.    The Complaint's Allegations

Plaintiffs allege that Apple exports services to developers in France:  "Apple sells its iOS app-distribution and IAP services to developers across . . . international lines . . . from . . . California and the United States."  Compl. ¶ 201.[4]  They also allege that "France-based iOS developers buy the referenced iOS app-distribution and IAP services not from a . . . foreign affiliate of Apple Inc., but from the company in the U.S."  *Id.* ¶ 231(e).  However, that allegation is directly contradicted, and thus rendered implausible, by the actual terms of plaintiffs' transactions on the App Store pursuant to the DPLA, attached to plaintiffs' complaint.  *See Openiano v. Hartford Life & Annuity Ins. Co.*, 829 F. App'x 829, 830 (9th Cir. 2020) ("[W]here attached exhibits contradict allegations in the complaint, the court need not accept such allegations as true." (quotation marks and citation omitted)).  Under Schedule 2 of the DPLA, an app developer appoints different Apple entities as agent or commissionaire for distribution of their apps and collection of consumer payments depending on jurisdiction of the App Store storefront at issue.  *See* Compl. Ex. A, Sched. 2, Ex. A (Compl. PDF p. 200).  Pursuant to those terms, app developers appoint an Irish company, "Apple Distribution International Ltd., as [] commissionaire for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in . . . France."  *Id.* § 2; *see also id.*  Compl. Ex. A, Attach. 9 & Sched. 3, Ex. C at pp. 163, 212 (Apple Distribution International Ltd. is located in the Republic of Ireland).  Accordingly, that Irish entity—not Apple Inc.—collected commissions on developers' sales through the French App Store storefront.  *See id.*; *see also* Compl. Ex. A, Sched. 2, §§ 1.1, 3.4, 3.5.  Plaintiffs further allege that Figaro, L'Équipe, and any developer members of le GESTE (collectively, the "Developer Plaintiffs") have distributed app-related content through both the App Store's U.S.

---

[4] Plaintiffs refer to "iOS" as shorthand to include Apple services and policies related to iOS apps, iPadOS apps, watchOS apps, and any iPhone or iPad apps or in-app products sold for use on Apple Silicon Macs.  Compl. ¶ 4 n.3.

Gibson, Dunn &
Crutcher LLP

storefront to consumers in the United States and through App Store storefronts outside the United States to foreign consumers.  Compl. ¶¶ 34, 43, 52, 233.

Under the DPLA, the availability and features of apps depend on the country in which the consumer resides and from which the consumer accesses the App Store.  A consumer account can access only one storefront at a time, and while consumers may change their storefront country or region, the process involves several conditions and steps, including to maintain access to previously downloaded content.  *See* Compl. Ex. A, Sched. 1, § 1.2.  Meanwhile, developers can, but are not required to, sell in multiple storefronts.  *See* Compl. Ex. A, Sched. 2 § 2.1 & Sched. 3 § 2.3.  Content is offered in locally used currency to consumers who have adopted a given storefront.  *See* Compl. Ex. A, Sched. 2 § 3.1; *see also* Compl. ¶ 17 n.20 (citing "App Store Pricing, Effective August 2021," https://itunespartner.apple.com/assets/downloads/072821-Apps-Pricing-SAfr-UK-EUR.pdf).  Pricing tiers vary depending on country and currency.  *See id.*

As in related lawsuits, plaintiffs' fundamental grievances flow from the design of the App Store, namely Apple's prohibition on sideloading (downloading of software from outside the App Store) and its requirement that developers use IAP if they choose to monetize their apps through the sale of digital goods and services.  *See*, *e.g.*, Compl. ¶¶ 2, 67, 71.  Plaintiffs claim that these design decisions have allowed Apple to wield monopoly power in a "market for iOS app-distribution and IAP services."  *Id.* ¶ 2.[5]  According to the complaint, Apple's purported monopoly in its own technology has allowed it to charge a "default supracompetitive 30% commission . . . *for 14 years now*," *i.e.*, since the moment the App Store opened.  *Id.* ¶ 15.  Plaintiffs do not challenge Apple's lower 15% commission rate as anticompetitive.  *Id.* ¶¶ 15 n.18, 117 (discussing Apple's Small Business Program, Video Partner Program, and auto-renewable subscriptions policy).[6]  The only (minor) update to these well-trodden

---

[5] As in *Cameron*, plaintiffs here assert an alternative characterization under which Apple has "monopsony power—i.e., buy-side monopoly power." *Figaro* Compl., Dkt. 1, ¶ 25; *Cameron* Compl. ¶ 6 (same).  While monopoly and monopsony are quite different things, plaintiffs treat this as a mere semantic difference.  *See Figaro* Compl., Dkt. 1, ¶ 98 (the "circumstances and effects" under the monopsony characterization "are essentially the same as with monopoly or attempted monopoly"); *Cameron* Compl. ¶ 56 (same).

[6] Plaintiffs seek damages on behalf of only those developers who paid a commission to Apple "of *greater* than 15%," Compl. ¶¶ 214, 216 (emphasis added), and they do not expressly seek to enjoin the

*(Cont'd on next page)*

claims is an attack on Apple's recently implemented App Tracking Transparency ("ATT") that allows consumers to opt out of certain third-party tracking.  *Id.* ¶¶ 187, 189.  Although plaintiffs allege no relevant market related to advertising, plaintiffs assert that ATT has a resulted in increased demand for Apple's App Store Search Ads, which, in turn, has resulted in higher advertising prices.  *Id.* ¶ 191.

## III.  LEGAL STANDARDS

A complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555; *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 669 (9th Cir. 2009) ("[C]laimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts.").  Adherence to this standard is particularly critical in antitrust cases, *Twombly*, 550 U.S. at 558-59, and those that "fail[] to plead the necessary evidentiary facts" are ripe for dismissal "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008).

A district court must dismiss an action that fails to establish subject-matter jurisdiction.  Fed. R. Civ. P 12(b)(1).  To establish subject-matter jurisdiction for any federal action, a plaintiff must allege that it satisfies each requirement for standing under Article III of the U.S. Constitution.  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  A plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*

## IV.  PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA

Plaintiffs' claims based on *foreign*-storefront sales by *foreign* app developers to *foreign*

---

15% rate.  Although plaintiffs' definition of the class that le GESTE seeks to represent might be read to include developers who have paid a 15% (or lower) rate, *id.* ¶ 215, it should not be read this way when plaintiffs have not alleged that the 15% commission rate causes any harm.  To the extent that the Court reads the complaint as challenging 15% commission rates, plaintiffs are barred from doing so because they do not allege that they paid that commission or were harmed by it.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (explaining that a plaintiff must clearly allege facts demonstrating that it has suffered an injury in fact to satisfy Article III standing).

Gibson, Dunn &
Crutcher LLP

7

consumers—with distribution services provided by a *foreign* Apple entity—are outside the reach of U.S. antitrust laws under the FTAIA.  Through the FTAIA, "Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm."  *F. Hoffmann-La Roche Ltd v. Empagran SA*, 542 U.S. 155, 166 (2004).  The FTAIA "plac[es] *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach" unless "the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'"  *Id.* at 162.

Because the FTAIA is "a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations," a plaintiff challenging conduct involving nonimport foreign trade or commerce "must plead . . . the requirements for [an] exception to the FTAIA."  *United States v. Hui Hsiung*, 778 F.3d 738, 751, 756 (9th Cir. 2015); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 272 (5th ed. 2022) (A "plaintiff [has] to plead specific facts showing that the United States antitrust laws apply to the conduct in question under the terms of the FTAIA.").  Plaintiffs fail to meet this burden:  their foreign-storefront sales claims are clearly barred by the FTAIA, *see*, *infra*, at IV.A, and they do not plead a plausible basis for an exception from the statute, *see*, *infra*, at IV.B.

A.    **Apple's Services Facilitating French Developers' Foreign-Storefront Sales Involve Nonimport Trade or Commerce with Foreign Nations Under the FTAIA**

Plaintiffs acknowledge that they allege trade or commerce with foreign nations.  *See* Compl. ¶ 201 ("The activities of Apple as alleged in this complaint were within the flow of, and substantially affected . . . trade or commerce with foreign nations").[7]  Indeed, the bulk of their case rests on Apple's alleged restraint of wholly foreign transactions.[8]  *See* Compl. ¶¶ 17 n.20, 34, 43, 52; *id.* Ex. A, Sched.

---

[7] Plaintiffs also allege that "interstate commerce" is implicated. *Id.*  This motion addresses the FTAIA's application to foreign transactions only, but Apple reserves the right on a developed factual record to contest the viability under the FTAIA of French developer transactions through the U.S. storefront.

[8] Although the complaint describes the trade or commerce at issue as "distribution services," as this Court acknowledged in *Epic*, the "Supreme Court has seemingly resolved the question:  two-sided

*(Cont'd on next page)*

2, Ex. A, § 2.

Plaintiffs assert that "the FTAIA does not bar plaintiffs' claims" arising from transactions with U.S. consumers, Compl. ¶ 233, but whether that is so—a question reserved for a later date—the FTAIA clearly bars claims arising from plaintiffs' foreign-storefront sales.  Those sales should be considered separately from U.S. storefront sales because "the focus of the [FTAIA] is on *transactions*, not on the identity or nationality of the parties."  Areeda & Hovenkamp, Antitrust Law 272 (5th ed. 2022) (emphasis added); *see also* H.R. Rep. No. 97-686, at 9-10 (1982) ("[a] *transaction* between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws." (emphasis added)).  When faced with conduct allegedly involving multiple types of transactions, courts frequently analyze them by category and dismiss those claims barred by the FTAIA.  *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) (analyzing transactions by category based on where products were bought and delivered); *In re Capacitors Antitrust Litig.*, 2018 WL 4558265, at *7 (N.D. Cal. Sept. 20, 2018) (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *11 (S.D.N.Y. Sept. 20, 2016) (analyzing financial transactions by category in partially granting motion to dismiss under Rule 12(b)(6) and the FTAIA).

Short shrift may be made of the complaint's suggestion that the FTAIA does not apply to foreign transactions because the DPLA contains a U.S. choice-of-law provision.  *See* Compl. ¶¶ 226, 231(h).  That is wrong, of course, because the FTAIA is part of U.S. law, from which plaintiffs urge the Court to diverge.  The plaintiff in *Lotes Co. v. Hon Hai Precision Industry Co.* similarly asserted that defendants had waived FTAIA defenses through a contract containing U.S. choice-of-law and

---

transaction platforms sell transactions.  In two-sided markets, a seller 'offers different products or services to two different groups who both depend on the platform to intermediate between them.' [*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018).]  Here, try as [they] might, [plaintiffs] cannot avoid the obvious.  Plaintiff[s] only sell[] to iOS users through the App Store on Apple's platform.  No other channel exists for the transaction to characterize the market as one involving 'distribution services.'"  *Epic*, 559 F. Supp. 3d at 1016; *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022).  Regardless, whether labeled as "distribution services" or "two-sided transaction services," the commerce at issue in this motion is foreign.  *See Empagran*, 542 U.S. at 163 (quoting H.R. Rep. No. 97-686, at 10 (1982)) (discussing "wholly foreign transactions" as outside the reach of the U.S. antitrust law); *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 986 (9th Cir. 2008) (the FTAIA "clarifies that U.S. antitrust laws concern the protection of '*American* consumers and *American* exporters, not foreign consumers or producers'" (emphasis in original; citation omitted)).

Gibson, Dunn &
Crutcher LLP

forem-selection clauses.   753 F.3d 395, 408-09 (2d Cir. 2014).   The court explained that "these contractual provisions do not waive any statutory requirements or otherwise alter the scope of the signatories' legal obligations.   Put differently, the . . . Agreement affirms that the defendants must abide by the Sherman Act to the extent it properly applies.   But the defendants remain free to argue that, under the FTAIA, the Sherman Act does not apply to or regulate the conduct at issue in this case."   *Id.* The DPLA's choice-of-law provision only affirms that the FTAIA—U.S. law—applies here.

Plaintiffs also allege that "there is no 'conduct involving trade or commerce (other than import trade or import commerce) with foreign nations'" because Developer Plaintiffs allegedly buy services from Apple "in America."   Compl. ¶¶ 4, 227.   They allege that "their antitrust injuries were suffered in the U.S. domestic market . . . just as if they were U.S. residents."   *Id.* ¶ 228.   But these allegations are contradicted by the contract attached to the complaint, *see id.* Ex. A, Sched. 2, Ex. A, § 2, and are otherwise unsupported legal conclusions entitled to no deference, *see Twombly*, 550 U.S. at 555 ("[O]n a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." (quotation marks and citation omitted)).   Developer Plaintiffs are not U.S. residents; they are "France-resident iOS developers" who use rights licensed from Apple to develop apps *in France.*[9] Compl. ¶ 4.   And their sales on foreign storefronts, like the one serving French consumers, are supported by "distribution services" not from Apple Inc. in the United States but from an Apple entity in Ireland, Apple Distribution International Ltd.   *See* Compl. Ex. A, Sched. 2, Ex. A, § 2.   Thus, the sales about which plaintiffs complain are between Ireland and France—in other words, wholly foreign.

Even if Apple Inc. were assumed to provide those distribution services, then such sales from a U.S. company to foreign-resident app developers would be exports—not domestic commerce.   *See Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395, 398 (S.D.N.Y. 2014) ("'Export commerce' is generally understood to be commerce between a United States seller and foreign buyer in which the goods flow from the United States to a foreign country.") (citing Areeda & Hovenkamp, Antitrust Law 304 (4th

---

[9] Developers pay $99 annually to participate in Apple's Developer Program and use its intellectual property in developing their apps.   Compl. Ex. A § 8.   Setting aside the failure to allege anything anticompetitive in charging a nominal fee for a valuable program, plaintiffs' protest that the fee "cuts into funds available to market [] wares" abroad fails to allege antitrust injury in the U.S.   Compl. ¶ 148.

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

ed. 2013)).  And Congress passed the FTAIA to "exempt from the Sherman Act export transactions that did not injure the United States economy."  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 n.23 (1993).  Stripped of conclusory legal assertions, the complaint alleges nothing but independent foreign injury with respect to Developer Plaintiffs' foreign-storefront sales.[10]

### B.     The Foreign-Storefront Claims Do Not Qualify For An FTAIA Exception

The FTAIA has an exception where challenged conduct has a direct, substantial, and reasonably foreseeable effect on exports, and that effect injures a *plaintiff's* export business and gives rise to its claim.  And the FTAIA also creates an exception where challenged conduct has a direct, substantial, and reasonably foreseeable effect on U.S. domestic or import commerce, and that effect gives rise to the plaintiff's claim.  Plaintiffs' foreign-storefront sales qualify for neither of these exceptions.

### 1.     Plaintiffs' claims do not arise from any alleged effect on U.S. exports

A Sherman Act claim based on conduct adversely affecting export commerce can arise only for "injury to [plaintiff's] export business *in the United States*."  15 U.S.C. § 6a (emphasis added).  But plaintiffs are not U.S. exporters.  Instead, their case centers on alleged "distribution services" provided by a foreign Apple entity to developers *in France*.  *See* Compl. Ex. A, Sched. 2, Ex. A, § 2.  Even if one (wrongly) accepts plaintiffs' conclusory assertion and ignores the DPLA's actual terms, then the conduct involves, at most, exports of services by Apple Inc. to French developers.  *See* Compl. ¶¶ 201, 231(e).  Either way, France-resident Developer Plaintiffs do not qualify for the FTAIA's export exception because they do not allege that *they* have any (much less any injured) business exporting from the U.S.  *See Capacitors*, 2018 WL 4558265, at *7 (claims regarding products "sold and shipped by a defendant entity in the United States to a Foreign [plaintiff]" are barred by the FTAIA).

### 2.     Plaintiffs' claims do not arise from any alleged effect on U.S. domestic commerce

A second FTAIA exception requires that the conduct involving foreign trade must have a direct, substantial, and reasonably foreseeable effect on U.S. domestic or import commerce, *and* that effect

---

[10] Plaintiffs' alternative characterization of the allegedly monopolistic conduct as monopsonistic does not save their foreign-sales claims from the FTAIA.  Assuming *arguendo* that Apple is the buyer of Developer Plaintiffs' apps, it would only "buy" them when they are sold:  in a *foreign* transaction where the app travels to the foreign consumer.  The app does not move in U.S. domestic or import commerce.

Gibson, Dunn &
Crutcher LLP

1    must "give[] rise to" plaintiff's claim.  15 U.S.C. § 6a.  To "give rise to" a claim, the effect must have

2    a "direct or proximate causal relationship" to that claim.  *DRAM*, 546 F.3d at 988.

3        Plaintiffs allege that Apple "has imposed supracompetitive pricing and anticompetitive terms

4    on iOS developers generally, whether they reside in France or elsewhere," Compl. ¶ 229, and regardless

5    of what storefront they sell through, *id.* ¶ 210.  In *Empagran*, the Supreme Court held that the FTAIA's

6    "gives rise to" requirement is not satisfied when "conduct significantly and adversely affects both

7    customers outside the United States and customers within the United States, but the adverse foreign

8    effect is independent of any adverse domestic effect."  542 U.S. at 164, 173-75.  The same holds true

9    here, where the alleged foreign effects and domestic effects are independent of each other.  Plaintiffs

10   do not identify any plausible direct (much less substantial or foreseeable) effect on U.S. domestic

11   commerce (or imports) that flows from the alleged restraints on foreign-storefront transactions.  Even

12   assuming such an effect *arguendo*, it could not plausibly "give rise" to plaintiffs' foreign-storefront

13   claims.  Something more than an arguable linkage is required, and even but-for causation does not

14   suffice.  In *DRAM*, for example, which involved price-fixing for fungible physical products, the

15   plaintiff alleged that collusive U.S. prices "gave rise to" collusively-fixed foreign prices because the

16   latter could not be sustained without the former.  The Ninth Circuit held that to be legally insufficient

17   under the applicable standard of proximate causation and affirmed dismissal.  *DRAM*, 546 F.3d 981;

18   *see also Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) (holding

19   that at most "but-for," not proximate, causation could be shown by "arbitrage" allegations that fixed

20   foreign prices for fungible products could not be sustained without high prices in the U.S.).

21       Nor can plaintiffs' foreign-storefront claims be saved by their unsupported allegations that the

22   Developer Plaintiffs buy services from Apple in a "global market" or (in the alternative) a U.S.

23   market.[11]  Compl. ¶¶ 82, 228.  Whether an FTAIA exception applies is controlled by the (alleged) facts

24   about the commerce at issue—not by the plaintiffs' alleged definition of the relevant market, especially

25   when the market allegation "is a legal conclusion, not a factual one."  *In re N. Sea Brent Crude Oil*

26

27   _____

28   [11] Plaintiffs themselves draw a distinction between market definition and the reach of the Sherman Act,
     *see* Compl. ¶ 204 n.201, suggesting their recognition that allegations about market definition cannot
     control the scope of the Sherman Act.

Gibson, Dunn &
Crutcher LLP

*Futures Litig.*, 256 F. Supp. 3d 298, 312 (S.D.N.Y. 2017), *aff'd sub nom.*, *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir. 2019); *see also In re Intel Microprocessor Antitrust Lit.*, 452 F.Supp. 2d 555, 561 (D. Del. 2006) ("While the Court understands the nature of a global market, the allegations of foreign conduct here result in nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple effects.'").  "[T]he focus of the [FTAIA] is on *transactions*," not alleged market definitions. Areeda & Hovenkamp, Antitrust Law 272 (5th ed. 2022) (emphasis added).  Accordingly, the FTAIA exceptions do not save plaintiffs' foreign-storefront claims.

### C.     State Antitrust Law Does Not Reach Foreign Commerce

Courts have concluded that the FTAIA applies to state-law claims, reasoning that a contrary position would infringe on Congress's "express power to 'regulate Commerce with foreign Nations,'" and frustrate the congressional purpose of the FTAIA.  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313, at *4 (N.D. Cal. Dec. 31, 2010) (citing U.S. Const. Art. I, § 8, cl. 3); *see also Capacitors*, 2018 WL 4558265, at *2 (recognizing that "the FTAIA govern[s plaintiffs'] state antitrust and consumer protection claims in the same way it applies to claims under the Sherman Act.").  Plaintiffs acknowledge that the FTAIA can "affect, bar or limit plaintiffs' state-law claims." Compl. ¶ 235.  Accordingly, plaintiffs' California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and California's Unfair Competition Law ("UCL"), *id.* §§ 17200 *et seq.*, claims must be dismissed to the extent they are based on foreign transactions.  Compl. ¶¶ 262-81.[12]

Even without regard to the FTAIA, the Cartwright Act does not reach extraterritorial conduct. *See Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2013 WL 368365, at *9 (N.D. Cal. Jan. 29, 2013) (Cartwright Act is meant to protect against "anticompetitive conduct that causes injury in California") (quoting *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1281-82 (2005)).  Similarly, "the UCL does not apply extraterritorially."  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. June 20, 2019); *see also Epic*, 559 F. Supp. 3d at 1058 (issuing a nationwide

---

[12] Indeed, if the Court dismisses plaintiffs' Sherman Act claims for any reason, it should decline to exercise supplemental jurisdiction over any remaining California law claims.  *See*, *e.g.*, *Whitaker v. Sherwood Mgmt. Co.*, 2022 WL 2357003, at *1 (N.D. Cal. June 30, 2022).

Gibson, Dunn &
Crutcher LLP

1   injunction, given a lack of "authority that an injunction could issue globally based upon a violation of

2   California's UCL"). Plaintiffs' state-law claims concerning foreign sales therefore fail.

3         **D.      International Comity Favors Dismissal**

4         Dismissal of plaintiffs' foreign-sales claims under the FTAIA is also consistent with the respect

5   for comity. In *Empagran*, the Supreme Court construed the FTAIA "to avoid unreasonable interference

6   with the sovereign authority of other nations," including "a foreign nation's ability independently to

7   regulate its own commercial affairs." 542 U.S. at 164-65. Allowing this complaint would also invite

8   a flood of cases from abroad, particularly as plaintiffs may forum-shop with an eye toward treble

9   damages. *See* RJN, Ex. A, Hagens Berman Press Release (quoting Steve Berman stating that Hagens

10  Berman is "ready to get back in the ring" and "happy to see iOS developers from other countries

11  seeking the same justice . . . achieve[d] for U.S. developers"). The complaint's citations to EU and

12  other non-U.S. investigations and precedents underscore the ability of other nations to regulate their

13  own commerce (or not) as they deem appropriate. *See* Compl. ¶¶ 87-88, 168, 189. Comity counsels

14  against imposing U.S. antitrust law on such commerce within or among foreign nations.

15  **V.      PLAINTIFFS ARE BARRED FROM CHALLENGING ATT**

16        The Court should dismiss any claims challenging Apple's App Tracking Transparency ("ATT")

17  functionality, which plaintiffs acknowledge on its face is "good for end-user consumers because it gives

18  them more choice as to third-party tracking of personal data," by allowing them to make an independent

19  decision to opt-out of certain third-party tracking. Compl. ¶ 187. Plaintiffs assert that ATT *may* be

20  anticompetitive, relying heavily on a publication of a UK regulator applying a UK legal framework,

21  including "a UK data protection law perspective." *Id.* ¶ 190 n.183; *see also* ¶¶ 187-91 nn.177-84, 186.

22  *Cf. Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F. 3d 731, 740 n.4 (5th Cir. 2020) ("It's not clear

23  why we should credit the self-interested, untested allegations of a regulatory body made while wielding

24  the dual role of prosecutor and judge."). Plaintiffs complain that ATT allegedly hampers developers'

25  ability to gain revenue through advertising based on consumer data (targeted advertising), but they fail

26  at the threshold to establish standing, or to state a valid claim under U.S. law.

27        First, because there are no allegations that any plaintiff or member of le GESTE engages in

28  targeted advertising—nor that any plaintiff or member of le GESTE would be "unfairly robbed of their

ability to monetize their work"—plaintiffs lack standing to challenge ATT.  Plaintiffs assert that ATT might make some of Apple's auction-based App Store Search Ads more expensive, but there are no allegations that plaintiffs (or any member of le GESTE) even pay for search advertising, much less that ATT has caused them to pay more.  Compl. ¶ 191.  Accordingly, plaintiffs have not pleaded causal injury in fact.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) ("[T]he 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured." (quotation marks and citation omitted)).

Plaintiffs only speculate about the impact of ATT on certain unidentified developers who use targeted advertising or pay for search advertising.  Plaintiffs surmise that allegedly affected (but unidentified) developers *might* have different options in the absence of Apple's restrictions.  Compl. ¶¶ 189-91.  Speculation about not having "real choices," *id.* ¶ 191, is not a sufficient injury for Article III standing.  *See Lujan*, 504 U.S. at 563-67.  And a plaintiff cannot meet the Article III injury requirement when its theory of harm relies "on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (where injury is contingent on actions of third parties, a plaintiff must prove that they would "react in predictable ways").  Here, any alleged harm that might be linked to ATT depends on a lengthy chain of causation mediated entirely by the unknown "choice[s]" made by consumers when presented with "the option to opt-out of certain third-party tracking." Compl. ¶ 189; *see id.* ¶ 187 n.177 ("[T]he way [ATT] has been implemented . . . *may* distort *user choice*[.]" (emphases added) (quotation marks and citation omitted)).

Second, plaintiffs cannot allege *antitrust* injury stemming from ATT.  The purported "harm to iOS developers by [Apple's] denying them the opportunity to *choose* other means to get paid for their work," Compl. ¶ 191 & at 59, is not an antitrust injury—especially when, as here, it flows from Apple offering *more choice* to consumers.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) ("Allegations that conduct 'has the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition because both effects are fully consistent with a free, competitive market.'" (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (brackets and ellipsis omitted)); *see also Blix Inc. v. Apple Inc.*, 2021 WL 2895654, at *4

Gibson, Dunn &
Crutcher LLP

1  (D. Del. July 9, 2021) (conduct is not anticompetitive where "Apple actually *expands* consumer choice"

2  (emphasis added)).

3        Third, plaintiffs allege that ATT affects developers' advertising practices*, see* Compl. ¶¶ 188-

4  89, 191, which requires the definition and analysis of alleged effects in an *advertising* market, but

5  allege no relevant advertising market.  Instead, plaintiffs rely on an entirely different market consisting

6  of "iOS-app distribution and IAP services."  *See id.* ¶¶ 202-12. Because the relevant market alleged in

7  the complaint does not relate to advertising, and challenged conduct in any antitrust claim must match

8  the alleged relevant market, plaintiffs fail to state claims arising from ATT.  *See Am. Express*, 138 S.

9  Ct. at 2285 ("Without a definition of the market there is no way to measure the defendant's ability to

10  lessen or destroy competition." (brackets, quotation marks, and citation omitted)); *Qualcomm*, 969 F.3d

11  at 992 ("A threshold step in any antitrust case is to accurately define the relevant market"); *Racek v.*

12  *Rady Children's Hosp. of San Diego*, 2012 WL 2947881, at *6 (Cal. Ct. App. July 20, 2012)

13  (dismissing UCL claim for failure to allege "injury to competition in any relevant market").

14  Accordingly, the Court should dismiss plaintiffs' claims challenging ATT for lack of subject-matter

15  jurisdiction and for failure to state a claim.

16  **VI.   PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS**

17        The Court should dismiss le GESTE from this action.  First, le GESTE does not satisfy the

18  requirements for Article III standing, either on its own or based on its membership under the doctrine

19  of associational standing.  Second, it lacks statutory standing to bring any of its claims.

20       **A.   Le GESTE Lacks Article III Standing**

21        The complaint does not plausibly allege that le GESTE, an association, suffered any injury in

22  fact or faces the threat of injury from the alleged anticompetitive conduct because plaintiffs do not

23  allege that le GESTE is an app developer.[13]  Lacking Article III standing, *see Spokeo*, 578 U.S. at 338,

24  le GESTE's claims must be dismissed unless it can establish associational standing, which requires a

25  showing that "(a) [an association's] members would otherwise have standing to sue in their own right;

26  _____

27  [13] The complaint alludes to including le GESTE among the allegedly injured developers by referring
to "plaintiffs."  *See* Compl. ¶ 59; *see also id.* ¶ 188.  But the specific allegations about le GESTE make

28  clear that it is not a developer, *see, e.g., id.* ¶ 51, and the complaint addresses only alleged "harm that
Apple has caused to France-resident iOS developers," *id.* ¶ 4.

Gibson, Dunn &
Crutcher LLP

(b) the interests it seeks to protect are germane to [its] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Le GESTE fails the *Hunt* test.

### 1.    Plaintiffs have not identified any member of le GESTE with standing

Le GESTE cannot satisfy the first requirement of the *Hunt* test because plaintiffs failed to identify, with sufficient particularity (or at all), even one member of the association that suffered harm. Unless "*all* the members of an organization are affected by the challenged activity"—which plaintiffs do not allege—"plaintiff-organizations [are required] to make specific allegations establishing that at least one *identified* member ha[s] suffered or w[ill] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (second emphasis added); *see Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (dismissing appeal because association did not allege that "at least one *identified member* had suffered or would suffer harm").  Plaintiffs vaguely reference "[c]ertain" "iOS-developer members" of le GESTE, Compl. ¶ 51, but alleging "only vague categories of members that might suffer harm" or have suffered harm "is insufficient." *Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 934 (N.D. Cal. 2006) (concluding that "a single cryptic sentence about [the association's] members' identities" did not suffice).  Without allegations concerning any specific le GESTE members who were allegedly injured by Apple's conduct, plaintiffs have not provided Apple with "fair notice," as required by Federal Rule of Civil Procedure 8(a)(2), "about who is seeking to haul [it] into court." *Id.* at 935.

### 2.    Plaintiffs have not alleged, and cannot establish, that this litigation is germane to le GESTE's purpose

Plaintiffs do not—and cannot—allege that this litigation is germane to any purpose of le GESTE.  Germaneness requires that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together," *Darensburg v. Metro. Transp. Comm'n*, 611 F. Supp. 2d 994, 1038 (N.D. Cal. 2009) (quotation marks and citation omitted), because associational standing "turn[s] on the fiction that an individual member authorizes the group to sue on [its] behalf," *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006).  Plaintiffs fail to allege what le GESTE's purpose is, or how this litigation is pertinent

Gibson, Dunn &
Crutcher LLP

to it.  *See Associated Gen. Contractors v. Otter Tail Power*, 611 F. 2d 684, 691 (8th Cir. 1979).  Regardless, le GESTE purports to be an association of *online publishers*, Compl. ¶ 51, and no purpose of such an association could be related to antitrust litigation for *app developers*—even if some of those online publishers happen to be app developers too.  *See Med. Ass'n of the State of Alabama v. Schweiker*, 554 F. Supp. 955, 965 (M.D. Ala. 1983) ("Members . . . joined [a medical] association because they were physicians, not because they were taxpayers.").

Furthermore, conflicts among the members of le GESTE make clear that this litigation cannot be germane to its purpose.  While associational standing in the Ninth Circuit does not require strict unanimity among an association's members, *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1408-09 (9th Cir. 1991), the conflicts here go well beyond not satisfying Rule 23 commonality, *see id.* at 1409 (relying on *UAW v. Brock*, 477 U.S. 274, 289 (1986), which rejected arguments that members of an association wishing to litigate together may proceed only under Rule 23).  Le GESTE publicizes that Google, for example, is among its members, *see* RJN, Ex. B, GESTE *Les Membres*, yet assails Google throughout the complaint for conduct similar to Apple's, *see*, *e.g.*, Compl. ¶¶ 106, 108 & n.92, 125, 189.  Associational standing should not be "granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members."  *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir. 1988).  The interests of the entities that le GESTE lists online as its members are too diverse to make le GESTE an appropriate vehicle for this case.  *See generally* RJN, Ex. B (its wide-ranging membership appears to include magazine publications, numerous law firms, and even an adult entertainment company).  These conflicts, at a minimum, evince that this litigation is not germane to le GESTE's purpose.  *See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1380-81 (7th Cir. 1987).

### 3.     Le GESTE may not seek damages on behalf of its members

It is unclear whether le GESTE seeks any monetary relief.  *Compare* Compl. ¶ 237 (alleging that plaintiffs are entitled to monetary relief under California law) *with id.* ¶¶ 56, 125, 217, 240 (seeking only injunctive relief on behalf of le GESTE's developer members).  But to the extent it does, le GESTE is barred from doing so because monetary damages require the participation of each allegedly injured member.  *See United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*,

Gibson, Dunn & Crutcher LLP

919 F.2d 1398, 1400 (9th Cir. 1990).  It is only when Congress has expressly permitted an association to pursue monetary relief on behalf of its members that courts have allowed one to do so.  *Cf. United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556-58 (1996).  Congress has foreclosed such an option here.  *See Sanner v. Bd of Trade of City of Chicago*, 62 F.3d 918, 923 (7th Cir. 1995) (rejecting associational standing for plaintiff-association seeking Section 4 damages).

### B.      Le GESTE Lacks Statutory Standing

#### 1.      Le GESTE cannot seek relief under the Clayton Act

Even if the associational-standing doctrine allowed le GESTE to sue under Article III, the federal antitrust laws do not provide it a vehicle to do so.  *See Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *3 (N.D. Cal. July 8, 2005) (rejecting associational standing in antitrust case given Supreme Court directive that antitrust plaintiffs must prove that they have suffered or face the threat of antitrust injury).  As for monetary relief, Section 4 of the Clayton Act allows only a "person who [is] *injured* in *his* business or property by reason of anything forbidden in the antitrust laws" to sue for damages.  15 U.S.C. § 15(a) (emphases added).  A "person" is defined to include an "association[]," *id.* § 7, making clear that a plaintiff-association must be injured in *its* business to bring suit under Section 4.  Because Section 4 requires that a plaintiff itself have suffered an injury to pursue relief, and le GESTE does not allege that it is an app developer that has suffered injury, le GESTE cannot maintain a Section 4 claim.

Similarly, Section 16 of the Clayton Act—which permits "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws"—does not contemplate granting a right of action to associations that do not face threatened injury *themselves*.  15 U.S.C. § 26.  First, "threatened loss or damage" must have the same meaning in relation to an "association" as it does to a "person, firm, [or] corporation"—that is, "threatened loss or damage" that the "association" faces.  Second, if an association relying on the standing of one member obtains injunctive relief, that relief would not be "against threatened loss or damage" faced by the plaintiff-association, creating a mismatch between the injury and relief that was not contemplated by Section 16.  *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 540 (6th Cir. 2021) ("Associational standing . . . creates an inherent mismatch between the plaintiff and the

Gibson, Dunn &
Crutcher LLP

remedy."). Third, there is no indication that Congress intended for associations that were not injured themselves to be permitted to sue on behalf of their members. *See* Clayton Antitrust Act of 1914, Pub. L. No. 63-212, § 16, 38 Stat. 730, 737. Indeed, the Clayton Act was passed over half a century before the Supreme Court "first squarely recognized an organization's standing to bring . . . suit" under the "modern doctrine of associational standing" in *Warth v. Seldin*, 422 U.S. 490, 511 (1975). *United Food & Comm. Workers*, 517 U.S. at 552, 558 (addressing a 1988 statute that expressly granted authority to unions to sue on behalf of their members). And fourth, the Supreme Court has explained that Sections 4 and 16 are "best understood as providing *complementary* remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (emphasis added). It would be anomalous for Section 4 to require that a plaintiff have actually suffered an antitrust injury, but for Section 16 to permit a plaintiff-association to avoid that requirement.

### 2. Le GESTE cannot seek relief under the UCL or Cartwright Act

Regardless of whether this Court concludes that le GESTE has associational standing for the purpose of satisfying Article III standing, le GESTE cannot maintain its UCL claim because associational standing is not available under the UCL. *See Amalgamated Transit Union, Local 1756, AFL-CIO v. Sup. Ct.*, 46 Cal. 4th 993, 1003-05 (2009). The UCL, as amended in 2004, expressly requires that a plaintiff have "suffered '*injury in fact*,'" *id.* at 1004 (quoting Cal. Bus. & Prof. Code § 17204) (emphasis in *Amalgamated Transit*), which is "inconsistent with the federal doctrine of associational standing," *id.*; *see also Coalition for ICANN Transparency*, 452 F. Supp. 2d at 939.

Le GESTE's Cartwright Act claim also fails because that law, enacted in 1941, provides a right of action to only "[a] person . . . *injured* in *his or her business or property*" by a Cartwright Act violation. Cal. Bus. & Prof. Code § 16750(a) (emphasis added); *see also* 1941 Cal. Stat. 1836. The California Supreme Court's holding in *Amalgamated Transit* squarely applies to this statutory language as well. Accordingly, le GESTE's UCL and Cartwright Act claims must be dismissed.

## VII. PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES

This complaint is too late—prejudicially so. The limitations periods applicable to plaintiffs' claims for damages under the Sherman Act (regardless of the storefront implicated) ran out years ago, and their claims for injunctive relief are barred by laches because this undue delay has prejudiced

1    Apple.  For the same reasons, their UCL and Cartwright Act claims are time-barred.[14]

2        **A.      Plaintiffs' Sherman Act Claims Are Untimely Or Barred By Laches**

3        Plaintiffs sat on their claims for over a decade, deferring filing them even longer than the U.S.

4    developers who filed their putative class action in 2019.  These plaintiffs are now too late, as a four-

5    year statute of limitations applies to federal antitrust claims for damages.  15 U.S.C. § 15b.

6        "A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant

7    and the statute of limitations runs from the commission of the act."  *Pace Indus., Inc. v. Three Phoenix*

8    *Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  Here, plaintiffs allege that the Developer Plaintiffs have been

9    injured by Apple's "determination that it be the sole provider of iOS app-distribution and IAP services."

10   Compl. ¶ 170; *see also id.* ¶ 71 (challenging "Apple's anticompetitive fiat").  According to plaintiffs,

11   by "[s]hutting out competition," Apple "monopolized the market for iOS app-distribution and IAP

12   services."  *Id.* ¶ 89 & at 25; *see also id.* ¶ 67 ("Apple determined that it would shut out competition in

13   distribution of native apps" and "willfully excluded all competition in the field"); *id.* ¶ 107 (similar).

14   In other words, the Developer Plaintiffs' alleged antitrust injury stems from Apple's decisions to

15   implement its distribution and IAP restrictions.[15]  Apple made those decisions in 2008 and 2009.  *See*

16   *id.* ¶¶ 15 n.19, 40, 49, 55, 66, 71.  The claims in this complaint therefore expired long ago.

17       The Developer Plaintiffs could have brought this complaint as soon as they became subject to

18   the DPLA to develop and launch their apps on the App Store.[16]  Compl. ¶¶ 40, 49, 55.  According to

19   plaintiffs, Apple improperly "boxed out all potential competition deliberately, by way of technical

20   means and adhesive contract."  Compl. ¶ 170.  Yet plaintiffs failed to mention *when* those technical

21   means or adhesive contract were applied to Figaro or L'Équipe (or any of the unidentified developer

22   members of le GESTE), causing the purported injury.  "Where the alleged anticompetitive harm arises

23   from a contract, . . . the cause of action accrues on the date the contract takes effect."  *US Airways, Inc.*

24   *v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 276-77 (S.D.N.Y. 2015); *see also Electroglas, Inc. v.*

---

[14] Plaintiffs fail to allege any basis for tolling any applicable statute of limitations.  Indeed, plaintiffs give *no* justification for waiting until 2022 to file.

[15] Any claims arising from ATT are barred, for the reasons set forth above.  *See supra*, at V.

[16] As previously explained, le GESTE cannot seek damages on behalf of its members.

Gibson, Dunn &
Crutcher LLP

*Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980) (deciding that "any harm to competition occurred and was complete" with the act "foreclosing" competition). In fact, Figaro executed the DPLA on January 19, 2009, and L'Équipe on May 18, 2009. *See* RJN, Ex. C, Record of Figaro's Execution of the DPLA; *id.*, Ex. D, Record of L'Équipe's Execution of the DPLA. Therefore, any alleged injuries stemming from Apple's restrictions were felt at the latest in 2009, meaning that the limitations periods closed four years later in 2013—nearly a decade before plaintiffs filed this complaint.

The continuing-violation doctrine cannot salvage plaintiffs' Sherman Act damages claims. Plaintiffs characterize their claims as ongoing monopoly maintenance or attempt to monopolize, Compl. ¶¶ 241-61, or as Apple's paying artificially low wholesale prices, *id.* ¶¶ 38, 47, 55, 60, 98. But the gist of plaintiffs' claims is the challenge to product design and licensing decisions made when the iPhone, and later the App Store, were introduced. Regardless, under the continuing-violation doctrine, a limitations period for Sherman Act claims restarts with every "overt act" of the defendant *only* if it (1) is "a new and independent act that is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating injury on the plaintiff." *Pace Indus.*, 813 F.2d at 238. "[N]ot every act by an antitrust defendant is sufficient to restart the statute of limitations." *Aurora Enters., Inc. v. Nat'l Broadcasting Co.*, 688 F.2d 689, 694 (9th Cir. 1982). Here, no "new and independent" acts caused "new and accumulating injury" to Figaro and L'Équipe in the last four years. The challenged restrictions applied to these developers in 2009, and they have asserted no material change in the terms of the DPLA or in Apple's business design since then that would give rise to an antitrust claim that they could not have asserted in 2009. The mere annual rollover of the DPLA does not constitute a "new" and "independent" act that could restart the limitations period. *See*, *e.g.*, *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981) (holding statute of limitations did not restart where subsequent refusals to deal were only "reaffirmation[s] of the original decision not to deal with the plaintiff").

Plaintiffs' claims for injunctive relief under the Sherman Act are also too late. Such claims are subject to the doctrine of laches. *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975). Under laches, courts look to the four-year statute of limitations for antitrust damages claims, 15 U.S.C. § 15b, as a "guideline" to compute the period of delay. *Id.* at 928; *see also Oliver v.*

Gibson, Dunn &
Crutcher LLP

*SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).  Using that guideline, plaintiffs' Sherman Act claims for injunctive relief are late for the same reasons the damages claims are untimely.  Plus, under any metric, plaintiffs' delay is unreasonable.  Plaintiffs waited to see the litigation tactics of other plaintiffs—those in *Epic* and *Cameron*—and Apple, and the rulings of this Court, before bringing their copycat claims.  It is inequitable to reward this wait-and-see approach.  *See*, *e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 991-92, 996 (N.D. Cal. 2020).

Apple is prejudiced by plaintiffs' delay.  The complaint makes clear that Apple has operated its business for many years on a model that includes the challenged restrictions.  *See*, *e.g.*, Compl. ¶ 15 (alleging the restrictions have allowed Apple to charge a 30% commission "*for 14 years*"), ¶ 69 (discussing App Store sales between 2008 and 2021), ¶¶ 114-15 (discussing Apple's business model "[s]ince July 2008").  And as discussed above, Apple recently settled *Cameron*, a nearly identical U.S. developer class action.  *See Cameron* Settlement.  Relitigating issues from *Cameron* (and *Epic*) undoubtedly prejudices Apple.

## B.    Plaintiffs' UCL Claims Are Barred As Untimely Or By Laches

To the extent that plaintiffs' UCL claims are directed toward the same conduct as their Sherman Act claims, the UCL claims are untimely too.  As with Sherman Act damages claims, a four-year statute of limitation applies to any UCL action.  *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 179 (2000) (citing Cal. Bus. & Prof. Code § 17208).

Plaintiffs' request for injunctive relief under the UCL to undo alleged anti-steering provisions is also too late.  Compl. ¶¶ 94, 269.  Any alleged harm would have stemmed from Apple's decision to implement an alleged anti-steering provision in the App Store Review Guidelines, which plaintiffs do not allege occurred within the four years preceding the filing of this complaint—indeed, the complaint contemplates that developers agreed to these provisions well before then.  *See id.* ¶ 94; *see also Hameed v. IHOP Franchising LLC*, 520 F. App'x 520, 522 (9th Cir. 2013) (no continuing violation under UCL when "alleged unfairness stems not from a course of conduct, but from the terms of the initial contract").  Because more than four years have passed since Apple required that developers, including Figaro and L'Équipe, agree to any anti-steering provisions, UCL claims based on these provisions are too old to bring now.

Gibson, Dunn &
Crutcher LLP

Even if the Court determines plaintiffs' claims were filed within the limitations period, their UCL claims are barred by laches. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 842 (9th Cir. 2002); *G & G Closed Circuit Events, LLC v. Nguyen*, 2013 WL 2558151, at *3 (N.D. Cal. June 10, 2013) (holding that "laches may apply to the UCL cause of action, particularly since Plaintiff requests injunctive relief," "regardless of Plaintiff's argument that this action was filed within the UCL's statute of limitations"); *see also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001) ("[L]aches may sometimes bar a statutorily timely claim."). Plaintiffs' delay in bringing their UCL claims was unreasonable. Figaro and L'Équipe knew, or should have known, about their UCL claims as soon as any alleged anti-steering provisions were applied to them, long before August 1, 2018. *See Danjaq*, 263 F.3d at 952 ("the relevant delay [for laches] is the period from when the plaintiffs knew (or should have known) of the allegedly infringing conduct"). Plaintiffs offer *no* excuse for this years-long delay. *See Jarrow Formulas*, 304 F.3d at 839. As explained above, the delay prejudices Apple.

### C.    Plaintiffs' Cartwright Act Claims Are Untimely

Like their Sherman Act and UCL claims, Plaintiffs' claims for injunctive relief and damages under the Cartwright Act are untimely. Cartwright Act claims are also subject to a four-year statute of limitations. Cal. Bus. & Prof. Code § 16750.1. Plaintiffs' Cartwright Act claims are based on an alleged combination created by Apple's requirement that app developers enter the DPLA. Compl. ¶¶ 273-81.[17] Thus, these claims stem from Apple's decision to require adherence to the DPLA, and, *at the latest*, from each of the Developer Plaintiffs' becoming party to the DPLA. As discussed, Figaro and L'Équipe have sat on these claims since at least 2009. *See supra* at 22. Plaintiffs do not allege "separate" or "recurring invasions," which would allow the continuous accrual doctrine to apply so that plaintiffs could restart the limitations periods for their Cartwright Act claims. *See Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 895-96 (N.D. Cal. 2015) (quotation marks and citation omitted).

---

[17] Plaintiffs' Cartwright Act claims also fail because a claim under that statute requires a "combination" of more than one actor. Plaintiffs allege that Apple "coerced" the Developer Plaintiffs into a combination, but the Act does not recognize "coercion" or "combination" where a party creates terms and refuses to deal with others who do not adhere to them. *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 372 (2001); RJN, Ex. E, *Beverage* Order at 9-11; Ex. F, *Beverage* Order at 5-7.

Gibson, Dunn &
Crutcher LLP

## VIII.   PLAINTIFFS' CLAIMS AGAINST COMMUNICATIONS RESTRICTIONS FAIL

Seeking to take selective advantage of a portion of this Court's ruling in *Epic*, plaintiffs bring an "unfairness" claim under the UCL against alleged anti-steering provisions in the App Store Review Guidelines.  *See* Compl. ¶ 94 & n.81 (citing *Epic*, 559 F. Supp. 3d at 1058), ¶ 269.  But their allegations that developers "cannot not [sic] tell end-users within its app that they could acquire and pay for content outside the app," *id.* ¶ 94 (citing Compl., Ex. B, ¶ 3.1.3), are not plausible.  The Guidelines attached to the complaint state, "Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase."  Compl., Ex. B, ¶ 3.1.3.[18]  The Court should dismiss plaintiffs' claims relying on allegations that Apple prevents developers from communicating with consumers about acquiring and paying for content outside an app.

## IX.   PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED

Finally, it is well established that equitable relief is unavailable unless a plaintiff demonstrates that a legal remedy is inadequate.  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75-76 (1992); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  Plaintiffs seek restitution under the UCL—an equitable remedy, *see Nationwide Biweekly Admin, Inc. v. Sup. Ct.*, 9 Cal. 5th 279, 292 (2020)—or in equity generally without any explanation as to why damages (which they also seek) are inadequate to redress the alleged harms.  *See* Compl. at p. 84.  Because plaintiffs fail to explain why damages are inadequate, restitution is not an available remedy.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020) (restitution barred where plaintiffs "failed to explain how restitution could be different from damages.").

## X.   CONCLUSION

The Court should dismiss the complaint in whole, or alternatively, in part, with prejudice.

//

//

//

//

---

[18] Plaintiffs' counsel is well aware of the language in this provision, as it implemented the *Cameron* settlement agreement.  *See Cameron* Settlement, at § 5.1.3.

1    Dated:  October 28, 2022                     GIBSON, DUNN & CRUTCHER LLP
                                                  Daniel G. Swanson
2                                                 Cynthia E. Richman
                                                  Caeli A. Higney
3                                                 Dana Lynn Craig
                                                  Eli M. Lazarus
4                                                 Victoria C. Granda

5                                          By: */s/ Cynthia E. Richman*

6                                          *Attorneys for Defendant Apple Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28