CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
    crichman@gibsondunn.com
VICTORIA C. GRANDA (D.C. Bar No. 1673034; *pro hac vice*)
    vgranda@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

DANIEL G. SWANSON (SBN 116556)
    dswanson@gibsondunn.com
DANA LYNN CRAIG (SBN 251865)
    dcraig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY (SBN 268644)
    chigney@gibsondunn.com
ELI M. LAZARUS (SBN 284082)
    elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>APPLE INC., a California corporation,<br><br>            Defendant. | CASE NO. 4:22-cv-04437-YGR<br><br>**DECLARATION OF CAELI A. HIGNEY IN SUPPORT OF APPLE INC.'S REQUEST FOR JUDICIAL NOTICE**<br><br>_____<br><br>**Hearing:**<br>Date:       January 24, 2023<br>Time:       2:00 p.m.<br>Place:      Courtroom 1<br>Judge:      Hon. Yvonne Gonzalez Rogers |

I, CAELI A. HIGNEY, declare as follows:

1.      I am an attorney duly licensed by the State Bar of California and admitted to practice before this Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, and I represent Apple Inc. ("Apple") in the above-captioned case.  I make this declaration in support of Apple's concurrently filed request for judicial notice.  I have personal knowledge of the facts stated in this declaration and, if called upon, could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the August 1, 2022 press release *France-Based iOS Developers Team up with U.S. Firm Hagens Berman in Antitrust Class-Action Lawsuit Against Apple's App Store Fees* on the website of plaintiffs' counsel's law firm Hagens Berman Sobol Shapiro LLP.  I accessed this press release on October 26, 2022 at the web address       https://www.hbsslaw.com/press/apple-ios-app-developers-france/france-based-ios-developers-team-up-with-us-firm-hagens-berman-in-antitrust-class-action-lawsuit-against-apples-app-store-fees and selected the "PDF" option.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the web page "Les Membres" from the publicly available website of plaintiff le GESTE.  I accessed this webpage on October 26, 2022, at the web address https://www.geste.fr/les-membres.

4.      Attached hereto as **Exhibit C** is a true and correct copy of Apple's record showing the date in which plaintiff Société du Figaro, SAS executed Apple's Developer Program License Agreement ("DPLA").  Based on speaking with the responsible Apple employee and witnessing the process, I understand that this record was produced by searching for the records of developer Société du Figaro on Apple's App Developer Administration Tool, which contains a history of all DPLAs (among other agreements) that a registered developer has agreed to, including the date and time at which the agreement was executed.

5.      Attached hereto as **Exhibit D** is a true and correct copy of Apple's record showing the date in which plaintiff L'Équipe 24/24 SAS executed Apple's Developer Program License Agreement.  Based on speaking with the responsible Apple employee and witnessing the process, I understand that this record was produced by searching for the records of developer L'Équipe

24/24 on Apple's App Developer Administration Tool, which contains a history of all DPLAs (among other agreements) that a registered developer has agreed to, including the date and time at which the agreement was executed.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the Order Concerning Defendant Apple Inc.'s Demurrer to Plaintiffs' Complaint, entered on February 4, 2022, in *Beverage v. Apple Inc.*, Case No. 20CV370535 (Cal. Sup. Ct., Santa Clara Cnty).

7.      Attached hereto as **Exhibit F** is a true and correct copy of the Order Concerning Defendant Apple Inc.'s Demurrer to Plaintiffs' Second Amended Complaint, entered on August 29, 2022, in *Beverage v. Apple Inc.*, Case No. 20CV370535 (Cal. Sup. Ct., Santa Clara Cnty).

I declare under penalty of perjury that the foregoing is true and correct.  This declaration is executed on this 28th day of October, 2022, in San Francisco, California.


GIBSON, DUNN & CRUTCHER LLP


By:   */s/  Caeli A. Higney*
        Caeli A. Higney

1

## **ATTORNEY ATTESTATION**

2          I, Cynthia E. Richman, am the ECF user whose identification and password are being used

3   to file the foregoing document.  Pursuant to Civil Local Rule 5-1(h)(3) regarding signatures, I

4   attest that concurrence in the filing of this document has been obtained.

5   Dated: October 28, 2022

6                                                      GIBSON, DUNN & CRUTCHER LLP

7

8                                              By:   */s/  Cynthia E. Richman*

9                                                      Cynthia E. Richman
                                                       1050 Connecticut Avenue, N.W.
10                                                     Washington, DC 20036-5306
                                                       Telephone:  202.955.8500
11                                                     Facsimile:  202.467.0539

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

HAGENS BERMAN

# Apple iOS App Developers – France

### France-Based iOS Developers Team up with U.S. Firm Hagens Berman in Antitrust Class-Action Lawsuit Against Apple's App Store Fees

Aug 01, 2022 | View Case Page (https://www.hbsslaw.com/cases/apple-ios-app-developers-france)

### Law firm that secured $100 million settlement for U.S. iOS developers now representing France-based plaintiffs in twin lawsuit regarding App Store policies and fees

**SAN JOSE, Calif. –** The same law firm that recently secured a $100 million settlement against Apple regarding its anticompetitive App Store policies (https://www.hbsslaw.com/cases/apple-ios-app-developers) is now representing France-based iOS developers (https://www.hbsslaw.com/cases/apple-ios-app-developers-france) for the same issues in a new antitrust lawsuit filed today in California federal court by Hagens Berman in association with Paris-based antitrust lawyer Fayrouze Masmi-Dazi.

"We're fresh off the heels of our hard-won settlement with Apple and ready to get back in the ring," said Steve Berman, managing partner of Hagens Berman and an attorney representing the proposed class of iOS developers. "Our firm is happy to see iOS developers from other countries seeking the same justice we were able to achieve for U.S. developers. We believe they too have been wrongfully subjected to the stifling policies of Apple's App Store, and we intend to hold Apple to the law."

"Le GESTE and its members are indeed at the forefront of several initiatives and battles for a more balanced and fair functioning of the digital world in France and in Europe. In its nature and magnitude, today's action shows our determination to seek such changes and redress," said Bertrand Gié, Le GESTE's president and head of digital at Le Figaro and Emmanuel Alix, GESTE's vice president and head of digital at L'Equipe.

If you are a France-based iOS developer, find out more about the lawsuit by emailing fmasmi-Dazi@outlook.com (mailto:fmasmi-Dazi@outlook.com).

"Apple's policies hamper and chill innovation and choice for consumers using the iOS App Store. To a global problem, there shall be a global solution. I believe we can build solid bridges to conceive impactful actions, for we shall leave no room for impunity," said Fayrouze Masmi-Dazi, Le GESTE's antitrust attorney and an attorney representing the proposed class of iOS developers in association with Steve Berman.

If you are a France-based iOS developer, find out more about the lawsuit by contacting Fayrouze Masmi-Dazi at 06 27 96 28 65 or [fmasmi-Dazi@outlook.com (mailto:fmasmi-Dazi@outlook.com)](mailto:fmasmi-Dazi@outlook.com).

Berman also led his firm to win a suit against Apple and various publishing companies in 2016 that settled for a total of [$560 million on behalf of e-book purchasers (https://www.hbsslaw.com/cases/e-books-antitrust-litigation)](https://www.hbsslaw.com/cases/e-books-antitrust-litigation) forced to pay artificially high prices due to Apple and the publishing companies' colluded price-fixing. That suit went to the Supreme Court, where the Court ruled against Apple. The firm also recently filed a [$1 billion case against Apple regarding antitrust policies within Apple Pay. (https://www.hbsslaw.com/cases/apple-pay-payment-card-issuer-antitrust)](https://www.hbsslaw.com/cases/apple-pay-payment-card-issuer-antitrust) Additionally, Hagens Berman took Google to court on behalf of Android app developers using the Google Play Store, achieving a [$90 million settlement (https://www.hbsslaw.com/cases/google-play-store-app-developers)](https://www.hbsslaw.com/cases/google-play-store-app-developers) on behalf of the class.

## Apple Antitrust Déjà Vu

Today's filed lawsuit against Apple accuses it of the same antitrust overpricing in its App Store functionality and in-app purchase (IAP) services and seeks to represent France-based iOS developers that were subjected to Apple's high commissions, fees and other policies.

The class action's named plaintiffs include Société du Figaro (developer of the Figaro news app and IAP subscriptions), L'Équipe 24/24 (developer of L'Équipe sports news and streaming app, and IAP subscriptions) and le GESTE, a French association comprised of France-based publishers of online content and services, including iOS developers. Plaintiffs claim they purchased overpriced iOS app-distribution and IAP services.

"Apple has behaved as alleged herein in a willful attempt to obtain a monopoly in the global market," the lawsuit states. "There is no valid business necessity or pro-competitive justification for Apple's conduct."

The case was filed in the U.S. District Court for the Northern District of California, bringing the France-based developers' claims to Apple's homecourt. It accuses Apple of engaging in anticompetitive practices in mandating only one app store for iOS devices, which set the stage for Apple to abuse its market power.

For almost 14 years, Apple has levied a default 30 percent commission on paid app and digital in-app product sales conducted through the App Store and in iOS apps acquired from the App Store, according to the lawsuit.

"This suit aims to compel Apple to play by the rules and end its abuse of iOS developers—purchaser-participants in the U.S. domestic market for these services—by way of its violations of U.S. antitrust and California fair-competition law," the complaint begins.

Apple also requires developers to pay it an annual fee if they want their apps and in-app products to be considered by Apple for distribution in the App Store. This is especially damaging to smaller and new developers. Putting all iOS apps into one marketplace also means consumers never see most apps, attorneys say, stifling competition and innovation. According to a legal filing made by Apple last year, there were at that time more than 2 million apps available on the App Store.

The lawsuit representing France-based iOS developers seeks to force Apple to end its abusive monopoly and allow competition in the distribution of iOS apps and related products, to get rid of pricing mandates, and to reimburse developers for overcharges made through abuse of its monopoly power.

The lawsuit states, "Plaintiffs are not alone in their view of Apple's anti-competitive behavior. In October 2020 the U.S. House Judiciary Subcommittee on Antitrust released a report in which the authors concluded, among other things, that Apple is a willful monopolist in its operation of the App Store and by way of its IAP product."

## The Preceding Developer Settlement

In 2021, the firm secured its $100 million settlement on behalf of U.S. iOS developers, which resulted in the creation of a Small Developer Assistance Fund and important changes to App Store policies and practices.

In that settlement, small U.S. iOS developers – those with less than $1 million in App Store proceeds through all associated developer accounts per calendar year from June 4, 2015 to Apr. 26, 2021 – can receive payments ranging from minimums of $250 to $30,000 or more, based on historic participation in the iOS App Store ecosystem.

In addition to monetary relief, the settlement brought changes to App Store policies and practices for U.S. iOS developers as they relate to App Store search results, app and in-app product price points, appeals from rejections of apps and transparency. Small U.S. iOS developers also will benefit from a pledge that for at least three years following court approval of the settlement, Apple will not raise the 15% commission rate that applies for those participating in its Small Business Program.

Among other benefits of the settlement, Apple will permit all U.S. iOS developers to communicate with their customers outside their apps about purchasing methods other than Apple's IAP system. Apple also will remove the prohibition against U.S. developers using information obtained within their apps to communicate with their customers outside their apps about the use of purchasing methods other than IAP, subject to consumer consent and opt-out safeguards.

[Read more about the class-action lawsuit against Apple in California court on behalf of France-based iOS developers. (https://www.hbsslaw.com/cases/apple-ios-app-developers-france)](https://www.hbsslaw.com/cases/apple-ios-app-developers-france)

**About Hagens Berman (http://www.hbsslaw.com/)**

Hagens Berman is a global plaintiffs' rights complex litigation law firm with a tenacious drive for achieving real results for those harmed by corporate negligence and fraud. Since its founding in 1993, the firm's determination has earned it numerous national accolades, awards and titles of "Most Feared Plaintiff's Firm," MVPs and Trailblazers of class-action law. More about the law firm and its successes can be found at hbsslaw.com (http://www.hbsslaw.com/). Follow the firm for updates and news at @ClassActionLaw (https://www.twitter.com/classactionlaw).

**Media Contacts**

Ashley Klann (US)

pr@hbsslaw.com (mailto:pr@hbsslaw.com)

206-268-9363

Fayrouze Masmi-Dazi (FR)

fmasmi-Dazi@outlook.com (mailto:fmasmi-Dazi@outlook.com)

06 27 96 28 65

---

*Hagens Berman purchases advertisements on search engines, social media sites and other websites. Transmission of the information contained or available through this website is not intended to create, and receipt does not constitute, an attorney-client relationship. If you seek legal advice or representation by Hagens Berman, you must first enter a formal agreement. All information contained in any transmission is confidential and Hagens Berman agrees to protect information against unauthorized use, publication or disclosure. This site is regulated by the Washington Rules of Professional Conduct.*

# EXHIBIT B





















































































































Les images qui vous parlent















































































































































Contactez-nous pour plus de renseignements

© 2021 Le Geste – Mentions Légales – Vie Privée – Cookies – Plan de Site – Politique de Confidentialité – Designed by LEXAN

# EXHIBIT C

**Administration Tool**

**Team: Societe du Figaro**

Team ID: 9D97AGMF8X

Type: Company/Organization

Program: Apple Developer Program: (renewed)

Team Status: Active

Team | Identifiers | Domains | Benefits | Orders | TSI | Certificates | Devices | History | Invitations | iTC | Members | Provisioning Profiles | Comments | Keys | Services

**History**

Certificate | Device | Identifier | Team | Benefits | Agreement

**Agreement History**

| Agreement Name | Date Live | Status | Accepted/Rejected On |
|---|---|---|---|
| iPhone Developer Program License Agreement | 2008–10–20 T01:00:00 PDT | Accepted | 2009–01–19 T07:20:13 PST |
| iPhone Developer Program License Agreement | 2009–03–17 T11:00:00 PDT | Accepted | 2009–04–20 T07:08:59 PDT |
| iPhone Developer Program License Agreement | 2009–06–08 T10:00:00 PDT | Accepted | 2009–06–09 T01:37:33 PDT |
| iPhone Developer Program License Agreement | 2009–10–15 T10:00:00 PDT | Accepted | 2009–10–16 T07:38:46 PDT |
| iPhone Developer Program License Agreement | 2010–01–22 T00:00:00 PST | Accepted | 2010–03–04 T09:33:36 PST |
| iPhone Developer Program License Agreement | 2010–04–08 T00:00:00 PDT | Accepted | 2010–04–13 T06:48:20 PDT |
| iPhone Developer Program License Agreement | 2010–06–07 T12:00:00 PDT | Accepted | 2010–06–09 T06:38:55 PDT |
| iOS Developer Program License Agreement | 2010–09–09 T05:30:00 PDT | Accepted | 2010–09–10 T05:34:14 PDT |
| iOS Developer Program License Agreement | 2011–02–15 T05:30:00 PST | Accepted | 2011–02–16 T01:24:57 PST |
| iOS Developer Program License Agreement | 2011–06–06 T01:00:00 PDT | Accepted | 2011–06–07 T01:14:03 PDT |
| iOS Developer Program License Agreement | 2011–07–13 T10:00:00 PDT | Accepted | 2011–07–19 T01:25:35 PDT |
| iOS Developer Program License Agreement | 2011–10–04 T01:00:00 PDT | Accepted | 2011–10–05 T01:30:18 PDT |
| iOS Developer Program License Agreement | 2012–06–11 T03:00:00 PDT | Accepted | 2012–06–21 T03:38:40 PDT |
| iOS Developer Program License Agreement | 2012–09–12 T04:00:00 PDT | Accepted | 2012–09–13 T02:59:30 PDT |
| iOS Developer Program License Agreement | 2013–06–10 T00:00:01 PDT | Accepted | 2013–06–11 T00:22:43 PDT |
| iOS Developer Program License Agreement | 2014–06–02 T00:00:01 PDT | Accepted | 2014–06–02 T12:30:23 PDT |
| iOS Developer Program License Agreement | 2014–09–09 T00:00:01 PDT | Accepted | 2014–09–09 T13:46:42 PDT |
| iOS Developer Program License Agreement | 2015–03–09 T00:00:01 PDT | Accepted | 2015–03–10 T03:31:37 PDT |
| Apple Developer Program License Agreement | 2015–06–07 T18:21:00 PDT | Accepted | 2015–06–08 T23:30:02 PDT |
| Apple Developer Program License Agreement | 2015–07–27 T17:00:00 PDT | Accepted | 2015–08–25 T00:10:08 PDT |
| Apple Developer Program License Agreement | 2015–09–09 T10:00:00 PDT | Accepted | 2015–09–15 T04:54:48 PDT |
| Apple Developer Program License Agreement | 2016–06–13 T07:00:01 PDT | Accepted | 2016–06–14 T02:57:14 PDT |
| Apple Developer Program License Agreement | 2016–09–21 T09:00:00 PDT | Accepted | 2016–09–23 T01:14:48 PDT |
| Account Holder Transferor Agreement | 2011–10–18 T20:43:46 PDT | Accepted | 2017–01–30 T08:44:22 PST |
| Account Holder Transferee Agreement | 2011–10–18 T20:43:46 PDT | Accepted | 2017–01–30 T08:45:18 PST |
| Apple Developer Program License Agreement | 2017–03–01 T08:00:00 PST | Accepted | 2017–03–16 T03:49:41 PDT |
| Apple Developer Program License Agreement | 2017–06–05 T09:00:00 PDT | Accepted | 2017–06–15 T08:26:04 PDT |
| Apple Developer Program License Agreement | 2017–09–19 T09:45:00 PDT | Accepted | 2017–09–22 T02:10:32 PDT |
| Apple Developer Program License Agreement | 2018–04–02 T09:00:00 PDT | Accepted | 2018–04–11 T04:47:39 PDT |
| Apple Developer Program License Agreement | 2018–06–04 T09:00:00 PDT | Accepted | 2018–06–06 T23:22:08 PDT |
| Apple Developer Program License Agreement | 2018–10–19 T09:00:00 PDT | Accepted | 2018–10–24 T01:28:41 PDT |
| Apple Developer Program License Agreement | 2019–06–03 T09:00:00 PDT | Accepted | 2019–06–17 T01:29:44 PDT |
| Apple Developer Program License Agreement | 2019–10–28 T09:00:00 PDT | Accepted | 2019–11–03 T23:24:05 PST |
| Apple Developer Program License Agreement | 2020–03–23 T09:00:00 PDT | Accepted | 2020–04–01 T07:58:14 PDT |
| Apple Developer Program License Agreement | 2020–06–22 T11:51:29 PDT | Accepted | 2020–07–08 T01:40:28 PDT |
| Apple Developer Program License Agreement | 2021–06–07 T09:40:15 PDT | Accepted | 2021–06–17 T23:57:11 PDT |
| Apple Pay Platform Web Merchant Terms and Conditions | 2019–01–17 T07:00:00 PST | Accepted | 2021–10–04 T01:00:12 PDT |
| Apple Developer Program License Agreement | 2021–12–13 T11:17:04 PST | Accepted | 2021–12–23 T05:21:06 PDT |
| Apple Developer Program License Agreement | 2022–06–06 T10:02:10 PDT | Accepted | 2022–06–20 T23:38:46 PDT |

Copyright © 2022 Apple Inc. All rights reserved.   Terms of Use  |   Privacy Policy

# EXHIBIT D

**Administration Tool**

Kook Cho | Orders | Search Enrollment | Search DUNS Info | Search Team/Developer | Fraud List | Memberships | Log Out

**Team: L'Equipe 24/24**

Team ID: 2RS852URZ4

Type: Company/Organization

Program: Apple Developer Program: (autoRenewed)

Team Status: Active

Team | Identifiers | Domains | Benefits | Orders | TSI | Certificates | Devices | History | Invitations | iTC | Members | Provisioning Profiles | Comments | Keys | Services

**History**

Certificate | Device | Identifier | Team | Benefits | Agreement

### Agreement History

| Agreement Name | Date Live | Status | Accepted/Rejected On |
|---|---|---|---|
| iPhone Developer Program License Agreement | 2009-03-17 T11:00:00 PDT | Accepted | 2009-05-18 T00:19:50 PDT |
| iPhone Developer Program License Agreement | 2009-06-08 T10:00:00 PDT | Accepted | 2009-06-09 T00:49:16 PDT |
| iPhone Developer Program License Agreement | 2009-10-15 T10:00:00 PDT | Accepted | 2009-10-26 T07:21:59 PDT |
| iPhone Developer Program License Agreement | 2010-01-22 T00:00:00 PST | Accepted | 2010-01-28 T00:43:54 PST |
| iPhone Developer Program License Agreement | 2010-04-08 T00:00:00 PDT | Accepted | 2010-04-09 T06:57:36 PDT |
| iPhone Developer Program License Agreement | 2010-06-07 T12:00:00 PDT | Accepted | 2010-06-08 T03:35:35 PDT |
| iOS Developer Program License Agreement | 2010-09-09 T05:30:00 PDT | Accepted | 2010-09-20 T09:15:01 PDT |
| iOS Developer Program License Agreement | 2011-02-15 T05:30:00 PST | Accepted | 2011-02-17 T02:12:11 PST |
| iOS Developer Program License Agreement | 2011-06-06 T01:00:00 PDT | Accepted | 2011-06-07 T03:28:15 PDT |
| iOS Developer Program License Agreement | 2011-07-13 T10:00:00 PDT | Accepted | 2011-07-15 T01:31:30 PDT |
| iOS Developer Program License Agreement | 2011-10-04 T01:00:00 PDT | Accepted | 2011-10-06 T01:01:46 PDT |
| Account Holder Transferor Agreement | 2011-10-18 T20:43:46 PDT | Accepted | 2011-12-26 T01:49:20 PST |
| Account Holder Transferee Agreement | 2011-10-18 T20:43:46 PDT | Accepted | 2011-12-26 T02:03:22 PDT |
| iOS Developer Program License Agreement | 2012-06-11 T03:00:00 PDT | Accepted | 2012-06-16 T00:01:48 PDT |
| iOS Developer Program License Agreement | 2012-09-12 T04:00:00 PDT | Accepted | 2012-09-17 T00:38:08 PDT |
| iOS Developer Program License Agreement | 2013-06-10 T00:00:01 PDT | Accepted | 2013-06-11 T00:32:18 PDT |
| iOS Developer Program License Agreement | 2014-06-02 T00:00:01 PDT | Accepted | 2014-06-04 T13:16:33 PDT |
| iOS Developer Program License Agreement | 2014-09-09 T00:00:01 PDT | Accepted | 2014-09-11 T03:01:35 PDT |
| iOS Developer Program License Agreement | 2015-03-09 T00:00:01 PDT | Accepted | 2015-03-10 T09:08:28 PDT |
| Apple Developer Program License Agreement | 2015-06-07 T18:21:00 PDT | Accepted | 2015-06-10 T07:58:36 PDT |
| Apple Developer Program License Agreement | 2015-07-27 T17:00:00 PDT | Accepted | 2015-08-03 T09:05:23 PDT |
| Apple Developer Program License Agreement | 2015-09-09 T10:00:00 PDT | Accepted | 2015-09-14 T07:47:19 PDT |
| Apple Developer Program License Agreement | 2016-06-13 T07:00:01 PDT | Accepted | 2016-06-20 T09:48:05 PDT |
| Apple Developer Program License Agreement | 2016-09-21 T09:00:00 PDT | Accepted | 2016-09-23 T04:42:01 PDT |
| Apple Developer Program License Agreement | 2017-03-01 T08:00:00 PST | Accepted | 2017-03-03 T01:47:30 PST |
| Apple Developer Program License Agreement | 2017-06-05 T09:00:00 PDT | Accepted | 2017-06-06 T01:28:25 PDT |
| Apple Developer Program License Agreement | 2017-09-19 T09:45:00 PDT | Accepted | 2017-09-20 T10:15:13 PDT |
| Apple Developer Program License Agreement | 2018-04-02 T09:00:00 PDT | Accepted | 2018-04-10 T06:33:53 PDT |
| Apple Developer Program License Agreement | 2018-06-04 T09:00:00 PDT | Accepted | 2018-06-05 T08:05:05 PDT |
| Apple Developer Program License Agreement | 2018-10-19 T09:00:00 PDT | Accepted | 2018-10-26 T01:06:18 PDT |
| Apple Developer Program License Agreement | 2019-06-03 T09:00:00 PDT | Accepted | 2019-06-04 T03:06:37 PDT |
| Apple Developer Program License Agreement | 2019-10-28 T09:00:00 PDT | Accepted | 2019-10-31 T06:43:04 PDT |
| Apple Developer Program License Agreement | 2020-03-23 T09:00:00 PDT | Accepted | 2020-03-26 T02:12:35 PDT |
| Apple Developer Program License Agreement | 2020-06-22 T11:51:29 PDT | Accepted | 2020-07-09 T01:15:47 PDT |
| Monza Terms | 2020-06-18 T11:22:00 PDT | Accepted | 2020-10-19 T03:01:30 PDT |
| Monza Terms | 2020-06-18 T11:22:00 PDT | Accepted | 2020-10-19 T03:04:09 PDT |
| Monza Terms | 2020-06-18 T11:22:00 PDT | Accepted | 2020-10-20 T03:29:36 PDT |
| Apple Developer Program License Agreement | 2021-06-07 T09:40:15 PDT | Accepted | 2021-06-11 T15:17:28 PDT |
| Apple Developer Program License Agreement | 2021-12-13 T11:17:04 PST | Accepted | 2021-12-16 T07:57:43 PST |
| Apple Developer Program License Agreement | 2022-06-06 T10:02:10 PDT | Accepted | 2022-06-14 T08:13:48 PDT |

Copyright © 2022 Apple Inc. All rights reserved.   Terms of Use  |  Privacy Policy

# EXHIBIT E

1
2
3
4
5
6
7

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 2/4/2022 9:31 AM
Reviewed By: R. Walker
Case #20CV370535
Envelope: 8216559**

8        **SUPERIOR COURT OF CALIFORNIA**

9        **COUNTY OF SANTA CLARA**

10

11   MICHELLE BEVERAGE, et al.,            Case No.: 20CV370535

12                 Plaintiffs,             **ORDER CONCERNING DEFENDANT
13                                         APPLE INC.'S DEMURRER TO
        vs.                                PLAINTIFFS' COMPLAINT**
14
15   APPLE INC., et al.,

16                 Defendants.

17

18        Plaintiffs bring this action against Defendant Apple Inc. on behalf of a putative class of

19   California consumers.  They challenge Apple's removal of the social and gaming software

20   application "Fortnite" from its application marketplace (the "App Store") and Apple's related

21   alleged abuse of monopolistic power.

22        Following a pause on merits-related proceedings to allow the parties to address the post-

23   trial decision in a related federal case, *Epic Games Inc. v. Apple Inc*. (N.D. Cal., No. 4:20-CV-

24   05640) ("*Epic*"), Plaintiffs filed the operative First Amended Class Action Complaint ("FAC").

25   Apple now demurs to each cause of action in the FAC for failure to state a claim.  (Code Civ.

26   Proc., § 430.10, subd. (e).)  Plaintiffs oppose the demurrer in its entirety.

27

28

                                              1

The Court issued a tentative ruling on February 2, 2022, and no one appeared at the hearing on February 3 to contest it.  The Court now issues its final order, which SUSTAINS the demurrer with 60 days' leave to amend.

## I.   BACKGROUND

### A.   Factual

Fortnite is a social and gaming application or "app" created by Epic Games, Inc. ("Epic").  Using the app, dozens of participants compete individually or in teams to be the last one standing at the end of a game.  (FAC, ¶ 47.)  Spectators are a major part of the experience, with sometimes hundreds of thousands watching either in the app or on websites like twitch.tv. (*Ibid.*)  A feature called "CrossPlay" allows users to interact with others using Fortnite on different platforms, such as PC, Mac, XboxOne, and PlayStation 4.  (*Id.*, ¶ 49.)  A significant part of Fortnite's fun and appeal comes from grouping up with friends or random teammates, which also lets users show off their characters and the unique ways they have customized them. (*Id.*, ¶ 48.)  Users may purchase digital currency ("V-Bucks") to buy digital goods including costumes for playable characters.  (*Id.*, ¶¶ 50–51.)  For users of Apple's mobile operating system, iOS, these transactions have occurred through Apple's in-app purchase system (IAP). (*Id.*, ¶ 50.)  Apple takes a thirty percent cut, as it typically does for all in-app purchases on iOS devices.  (*Ibid.*)

Fortnite was released for iOS in April 2018, and was advertised as being the same as Fortnite on PC, Mac, and console platforms, with the "same gameplay, same map, same content, same weekly updates."  (FAC, ¶¶ 52–53.)  The app became immensely popular: by May 2020, it reached $1 billion in revenue from mobile (mostly iOS) and attracted a cumulative total of 350 million users—roughly three percent of the world's population.  (*Id.*, ¶¶ 54–55.)

Plaintiffs allege that Apple has a total monopoly on the legal distribution of apps to iOS devices and considerable market power in the mobile device market as a whole, and has abused its dominance through its actions towards Fortnite and its related policies and practices.  (*Id.*, ¶¶ 62–114.)

Citing to filings in *Epic*, Plaintiffs allege that on June 30, 2020, Epic's CEO contacted Apple's leadership to propose new features related to Fortnight, including an Epic payment processing system and Epic's own app store within the iOS ecosystem.  (FAC, ¶ 115.)  Apple swiftly and completely rejected these ideas via its legal team.  (*Id.*, ¶ 116.)  Epic informed Apple that it would nonetheless proceed to launch a direct payment system via Fortnite on iOS devices.  (*Id.*, ¶ 118.)  Apple responded by unilaterally removing Fortnite from the App Store, preventing users from downloading the app or updating it as updates are released.  (*Id.*, ¶ 119.)  Epic filed suit against Apple in the Northern District of California.  (*Id.*, ¶ 122.)

Despite the issuance of what Plaintiffs characterize an adverse opinion in *Epic*, Apple refuses to reinstate Fortnite on the App Store.  (FAC, ¶ 125.)  It has stated it will refuse to even consider reinstating Fortnite until the complete resolution of the appeals process, and has applied for a stay of the "baseline" injunctive relief provided by the federal court.[1]  (*Id.*, ¶¶ 127–128.)

Based on these allegations, Plaintiffs bring this action on behalf of a putative class of "[a]ll California citizens that (a) possess, own, or have access to an iOS Device manufactured by Apple; (b) have downloaded the Fortnite application onto their iOS Device; and (c) have purchased digital currency or goods within the Fortnite application utilizing Apple's in-app purchase system."  (FAC, ¶ 131.)  Plaintiffs "seek[] to obtain, in one proceeding, before one trier of fact, a ruling on Apple's unjust and unfair use of power to raise prices for consumers on the App Store in the mobile gaming market."  (*Id.*, ¶ 134.)

The complaint asserts the following causes of action: (1) violation of the Cartwright Act, Business & Professions Code section 16700 et seq.; (2) violation of the Unfair Competition Law ("UCL"), Business & Professions Code section 17200 et seq., "unlawful" prong; (3) violation of the UCL, "unfair" prong; and (4) breach of the implied covenant of good faith and fair dealing.

---

[1] That stay was granted as to one portion of the permanent injunction.  (See *Epic Games, Inc. v. Apple, Inc.* (9th Cir. Dec. 8, 2021, Nos. 21-16506, 21-16695) 2021 U.S. App. LEXIS 36191, at *1–2.)

1

**B.     Procedural**

2      Plaintiffs filed this action on September 17, 2020.  The initial discovery stay was lifted on

3  February 18, 2021, and the parties began to meet and confer about discovery.  Apple filed a

4  demurrer, which was scheduled to be heard in July 2021.

5      The related action in *Epic* was filed by Epic on August 13, 2020.  In that case, Epic

6  alleged violations of federal and state antitrust laws and the UCL based upon Apple's operation

7  of its App Store.  (*Epic Games, Inc. v. Apple Inc*. (N.D.Cal. Sep. 10, 2021, No. 4:20-cv-05640-

8  YGR) 2021 U.S.Dist.LEXIS 172303, at *10 ("*Epic* Trial Decision").)

9      The Court denied Apple's motion to stay this entire action in favor of *Epic* in an order

10  filed on May 5, 2021.  But it suggested that it would be beneficial for the parties and the Court to

11  review the decision in *Epic* before conducting any merits-related proceedings in this case—

12  including on Apple's demurrer.  The parties agreed to delay full briefing and hearing of the

13  demurrer until after the decision in *Epic* issued.

14      The *Epic* Trial Decision issued on September 10, 2021.[2]  Plaintiffs filed the FAC on

15  October 12, addressing that decision as they deemed appropriate.  Apple has again demurred.

16  **II.     REQUESTS FOR JUDICIAL NOTICE**

17      Both Apple and Plaintiffs request judicial notice of agreements, guidelines, and other

18  materials published to Apple's website, the contents of which are undisputed.  The parties do not

19  oppose one another's requests, and the Court GRANTS them.  (See Evid. Code, § 452, subd. (h);

20  *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285, fn. 3 ["Since the contents of the letter and

21  media release form the basis of the allegations in the complaint, it is essential that we evaluate

22  the complaint by reference to these documents."].)

23  **III.     LEGAL STANDARD**

24      A demurrer tests the legal sufficiency of the complaint.  (*Chen v. PayPal, Inc*. (2021) 61

25  Cal.App.5th 559, 568.)  Consequently, it "reaches only to the contents of the pleading and such

26  matters as may be considered under the doctrine of judicial notice."  (*Weil v. Barthel* (1955) 45

27

28

---

[2] Apple appealed the *Epic* Trial Decision, and its appeal remains pending.

4

Cal.2d 835, 837; see also Code Civ. Proc., § 430.30, subd. (a.).)  "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. … [T]he facts alleged in the pleading are deemed to be true, however improbable they may be."  (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the Court must liberally construe the allegations of the complaint, with a view to substantial justice between the parties.  (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.)  Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact."  (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.)  A demurrer will succeed where the allegations and matters subject to judicial notice clearly disclose a defense or bar to recovery.  (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.)

## IV.   THE *EPIC* TRIAL DECISION

The *Epic* Trial Decision is too long to be addressed in detail here, but the Court will summarize its key findings.  As to the antitrust claims in that case, the federal court defined the relevant market as "digital mobile gaming transactions," and found that the record at trial did not ultimately support the conclusion "that Apple is a monopolist under either federal or state antitrust laws."  (*Epic* Trial Decision at *12.)

> While the Court finds that Apple enjoys considerable market share of over 55% and extraordinarily high profit margins, these factors alone do not show antitrust conduct. … The final trial record did not include evidence of other critical factors, such as barriers to entry and conduct decreasing output or decreasing innovation in the relevant market. The Court does not find that it is impossible; only that Epic Games failed in its burden to demonstrate Apple is an illegal monopolist.

(*Epic* Trial Decision at *12–13.)

But as to the claim under the "unfair" prong of the UCL, the trial court held "that Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice. When coupled with Apple's incipient antitrust violations, these anti-steering provisions

are anticompetitive and a nationwide remedy to eliminate those provisions is warranted." (*Epic* Trial Decision at *13.)  The court accordingly held that

> a nationwide injunction shall issue enjoining Apple from prohibiting developers to include in their:
>
>> Apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP.
>
> Nor may Apple prohibit developers from:
>
>> Communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

(*Epic* Trial Decision at *303.)

## IV.    DISCUSSION

Apple demurs to the FAC on the following grounds: (1) Plaintiffs are not entitled to an injunction forcing Fortnite back onto the App Store because such relief is foreclosed by federal law; (2) the Cartwright Act cause of action fails to plead a relevant market, concerted action, cognizable anticompetitive conduct, or separate products under a tying theory; (3) the UCL claims fail with the Cartwright Act claim and "because Plaintiffs have not satisfied basic pleading standards"; and (4) the claim for breach of the implied covenant of good faith and fair dealing fails to identify the contractual terms at issue, and is foreclosed by the express terms and limitations of liability in the Media Services Terms and Conditions between Plaintiffs and Apple, the only contract that could be at issue.

Before addressing the issue of relief, the Court will address whether the FAC otherwise states a cause of action.

### A.    The First Cause of Action Under the Cartwright Act and the Second Cause of Action Under the UCL "Unlawful" Prong

The Cartwright Act, contained in Business and Professions Code section 16700, et seq., generally codifies the common law prohibition against restraint of trade.  (*G.H.I.I. v. MTS,*

*Inc.* (1983) 147 Cal.App.3d 256, 264 (*G.H.I.I.*).)[3]  Recovery is provided where the activities of a combination of capital, skill, or acts by two or more persons result in a restraint of trade.  (*Id.* at pp. 264–265, citing Bus. & Prof. Code, §§ 16720 [defining a "trust" for purposes of the Act] & 16750 [establishing a private right of action].)  "In order to maintain a cause of action for such combination in restraint of trade, the complaint must allege: The formation and operation of the conspiracy; the illegal acts done pursuant thereto; a purpose to restrain trade; and the damage caused by such acts."  (*Id.* at p. 265; see also *Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 492–493 (*Marsh*).)

> Our high court demands a "high degree of particularity in the pleading of Cartwright Act violations. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 326–328 [(*Chicago Title*)].)"  Consequently, generalized allegations of civil antitrust violations are usually insufficient and the unlawful combination or conspiracy must be alleged with specificity. … [G]eneral allegations of a conspiracy unaccompanied by a statement of facts constituting the conspiracy and explaining its objectives and impact in restraint of trade will not suffice.  …

> At the same time, as with any demurrer, the material allegations of an antitrust cause of action are deemed admitted and assumed to be true, while the general rule of pleading that a complaint must be given liberal construction in order to achieve substantial justice between the parties is applicable.

---

[3] "The Cartwright Act is patterned after the federal Sherman Antitrust Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former."  (*G.H.I.I., supra*, 147 Cal.App.3d at p. 265 [citing cases].)  But notably, "the Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2)," and it thus "applies only to a 'combination' involving 'two or more persons' (§ 16720), not to unilateral conduct." (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1386.)  Notably, *Apple Inc. v. Pepper* (2019) ___U.S.___ [139 S.Ct. 1514, 1520, 203 L.Ed.2d 802, 808], which is cited in the FAC, was alleged under Section 2 of the Sherman Act.

1   (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 265–266, citations omitted.)

2       Ultimately (unless a per se framework applies),[4] an antitrust plaintiff "must prove that the

3   defendant's conduct harmed competition in the relevant market and that any procompetitive

4   justifications for the conduct did not outweigh that harm," applying the "rule of reason."

5   (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2020) 55 Cal.App.5th 381,

6   396, citing *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672 (*Exxon*).)  In analyzing

7   the pleadings, "the identification of the relevant market should be treated as a matter of law…."

8   (*Marsh, supra*, 200 Cal.App.4th at p. 499.)

9       Here, Plaintiffs allege that Apple has violated the Cartwright Act "by maintaining

10   complete control of the approval of all software and/or applications listed in the App Store

11   marketplace, maintaining an unreasonably high 30% fee for all purchases of apps on the App

12   Store and digital purchases within said apps, and … barring creation of separate app store fronts

13   on iOS Devices," as well as by "disallow[ing] developers and firms from maintaining their own

14   payment system within apps …."   (FAC, ¶¶ 145–146.)

15           1.    *Failure to Plead a Relevant Market*

16       Apple first contends that Plaintiffs fail to allege a relevant market, complaining that the

17   FAC refers to ten different markets.[5]  Plaintiffs respond that many of these references, for

18   example, those that address the mobile phone or mobile phone operating system markets, are

19   merely for background purposes.  This is a fair reading of the FAC.  However, even where

20   Plaintiffs expressly allege the relevant market for antitrust purposes, their framing of it is not

---

23   [4] "Historically, some combinations, such as agreements to fix prices, divide markets, or tie the

24   purchase of one product or service to another, as well as certain boycotts, have been considered
unreasonable per se and, therefore, illegal." (*Ben-E-Lect v. Anthem Blue Cross Life & Health

25   Ins. Co.* (2020) 51 Cal.App.5th 867, 872–873.)

26   [5] Apple notes that "[t]he FAC references: a 'mobile operating system market,' (FAC ¶ 65); a
'mobile gaming purchases market,' (*id*); a 'mobile phone market,' (*id*. ¶ 72); a 'mobile device

27   market,' (*id*.); an 'App Store market,' (*id*. ¶ 79); an 'app distribution market,' (*id*. ¶ 81); a
'purchasing market on iOS,' (*id*. ¶ 93); an 'iOS device market,' (*id*. ¶ 98); the 'App Store

28   marketplace,' (*id*. ¶ 145); 'the mobile gaming market,' (*id*.); and 'the market for in-app
purchases,' (*id*. ¶ 162)."

consistent.  (See, e.g., FAC, ¶¶ 145 ["mobile gaming market"], 149 ["the App Store marketplace, a valid antitrust market"].)

In opposition to Apple's motion, Plaintiffs state that the relevant market is "digital mobile gaming transactions," consistent with the marketplace defined in the *Epic* Trial Decision.  This phrase is found nowhere in the FAC, but it is close to the "mobile gaming market" to which the FAC does repeatedly refer.  It is fair to read the FAC to allege that this is the relevant market, and the Court will focus its analysis on this market rather than the "App Store market" to which many of Apple's arguments on demurrer are addressed (since Plaintiffs do not defend an "App Store market" theory on opposition).

While Apple contends that any "mobile gaming market" is not described in sufficient detail in the FAC, the Court does not read *Marsh* and *Chicago Title* to require the level of detail demanded by Apple at the pleading stage in every case.  Like those authorities, the Court will read the FAC liberally to assess whether it states a claim.  (See *Chicago Title, supra*, 69 Cal.2d at pp. 325–326 [while noting that market was not specifically defined in the complaint, going on to analyze why a theory based on defendants' control of the "title insurance market" failed based on the allegations and facts subject to judicial notice]; *Marsh, supra*, 200 Cal.App.4th at p. 499 [similarly analyzing the merits of the claim with reference to the relevant market; "the circumstances described in the pleadings show that Appellant has been able to retain privileges to practice at other outpatient facilities … [and] do not support her claim she has been wholly excluded from practice in the relevant market area (since it is undisputed that San Diego … has a number of hospital facilities within the immediate area)"].)

### 2.    *Failure to Allege Bilateral Conduct*

"It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business. An antitrust case must be based upon conspiratorial rather than unilateral conduct."  (G.*H.I.I., supra*, 147 Cal.App.3d at pp. 267–268, citations omitted.)  "It is also established, however, that a necessary 'conspiracy' or 'combination' cognizable as an antitrust action is formed where a trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses.  If a

1    'single trader' pressures customers or dealers into pricing arrangements, an unlawful

2    combination is established, irrespective of any monopoly or conspiracy, and despite the

3    recognized right of a trader to determine with whom it will deal." (*Id.* at p. 268.)

4            Here, Plaintiffs contend that they allege bilateral conduct based on the theory that Apple

5    coerces developers to pay its 30 percent fee and abide by other terms described in the FAC.  But

6    "coercion" in this context requires something more than a simple policy that business partners

7    agree to certain terms.  "[A]n illegal combination may be found where a supplier secures

8    compliance with announced policies in restraint of trade by means which go beyond mere

9    announcement of policy and the refusal to deal," for example, by "tak[ing] 'affirmative action' to

10   bring about the involuntary acquiescence of its dealers…." (*Kolling v. Dow Jones & Co.* (1982)

11   137 Cal.App.3d 709, 721.)  This might include "threatening commands" aimed at price-fixing.

12   (*Id.* at pp. 721–722.)  Or it could include a "boycott" to extract price concessions.  (*G.H.I.I.,*

13   *supra*, 147 Cal.App.3d at pp. 263, fn. 3, 269 [contrasting adequate allegations of one record

14   store's boycott of distributors accompanied by threats with inadequate allegations as to other

15   stores that apparently obtained favorable terms from distributors "in an atmosphere of free

16   competition"].)

17           Coercion must be alleged with specificity.  (See *Freeman v. San Diego Assn. of*

18   *Realtors* (1999) 77 Cal.App.4th 171, 196 (*Freeman*).)  And critically, under the so-called

19   *Colgate* doctrine, coercion does not include the mere "announcement" of a policy and refusal to

20   deal with those who do not comply, even when coupled with "measures to monitor compliance

21   that do not interfere with … freedom of choice." (*Chavez v. Whirlpool Corp.* (2001) 93

22   Cal.App.4th 363, 373 (*Chavez*).)  Accordingly, in *Chavez*, allegations "that Whirlpool

23   announced [a] price policy prescribing minimum resale prices … and informed retailers that it

24   would refuse to sell products to any retailer who did not comply," and "would monitor the

25   retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and

26   sending 'mystery shoppers' to retail stores," were deemed "insufficient to establish a coerced

27   agreement in violation of the Cartwright Act…." (*Ibid.*)

28

10

The theory urged by Plaintiffs here is indistinguishable from the announcement plus monitoring theory alleged in *Chavez*:

> As put forth in the FAC, Plaintiffs alleged that Apple entered into agreements with both consumers and developers, forcing them to abide by Apple's terms and conditions in order to have access to the Mobile Gaming Purchases Marketplace. (FAC ¶ 152.)  Any violation of these rules would lead to the removal of an app or the voiding of a consumer's warranty. (FAC ¶ 79, 81.)

(Opp'n, at p. 7.)  This amounts to open, unilateral conduct by Apple, essentially a "take it or leave it" deal—not threats, boycotts or other such "affirmative action" to coerce developers into a conspiracy with Apple against others.  (See *Epic* Trial Decision at *251–252 [finding Apple's agreements with developers demonstrated only unilateral conduct]; see also *Freeman, supra,* 77 Cal.App.4th at p. 200 ["[t]he law is clear that unilateral pricing decisions do not violate section 1 of the Sherman Act"].)

In arguing to the contrary, Plaintiffs rely heavily on a preliminary trial court ruling in federal antitrust litigation against Qualcomm.  But there, the agreements at issue barred manufacturers (OEMs, including Apple) from sourcing modem chips from other suppliers by imposing excessive penalties, which "led to exclusivity and effectively shut Qualcomm's competitors out of the market."  (*In re Qualcomm Antitrust Litig.* (N.D.Cal. 2017) 292 F. Supp. 3d 948, 974–975.)  And critically, the opinion distinguished *Chavez* based on allegations "that Qualcomm employed its superior market power *and threatened to withhold chips* if OEMs did not agree to Qualcomm's licensing terms." (*Id.* at pp. 976–977.)  Nothing like that is alleged here.[6]

### 3.   *Conclusion*

Plaintiffs fail to state a claim under the Cartwright Act because the conduct they allege in restraint of trade is Apple's unilateral conduct.  So the Court does not need to address Apple's remaining arguments about this claim.

---

[6] Apple notes that the district court's eventual ruling against Qualcomm in this case was reversed on appeal.  (See *FTC v. Qualcomm Inc.* (9th Cir. 2020) 969 F.3d 974.)

Plaintiffs' second cause of action for violation of the UCL's "unlawful" prong is based on their Cartwright Act claim, and fails for the same reason.

Apple's demurrer to both of these claims is SUSTAINED with 60 days' leave to amend.

**B.    The Third of Action Under the UCL "Unfair" Prong**

In their third cause of action under the UCL's "unfair" prong, Plaintiffs allege that Apple's practices were unfair because (1) they caused consumers to pay unfairly inflated prices for goods sold inside Fortnight and (2) "Anti-steering provisions by Apple prevented consumers from receiving information, … preventing them from being fully educated about options, including purchase options" and preventing them "from attributing the cost to the platform versus the developer." (FAC, ¶¶ 178–183.) Apple's unfair practices caused Plaintiffs and the putative class "to pay supra-competitive and artificially-inflated prices for digital goods and currency within the Fortnite app." (FAC, ¶ 176.)

Apple contends that this claim must fail because "the predicate acts are not actionable," Plaintiffs have an adequate remedy at law, and Plaintiffs have no available remedy under the UCL.

### 1.    *Actionable Conduct*

Apple's first argument regarding "actionable conduct" is that because Plaintiffs fail to state a claim under the Cartwright Act, they cannot state a UCL "unfair prong" claim, either.

As noted by Plaintiffs, there are varying standards in the appellate courts as to what constitutes an "unfair" act or practice under the UCL in the consumer context. (See *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 303, fn. 10 [describing, but not resolving, split of authority].) One line of appellate decisions has adopted a "balancing" test, which requires a court to examine the challenged practice's "impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718, internal quotation marks omitted.) Another line of decisions has adopted a "tethering test," requiring that "the public policy which is a predicate to [a consumer unfair competition action under the 'unfair' prong of the UCL] must be 'tethered' to specific constitutional, statutory or regulatory

provisions." (*Gregory v. Albertson's, Inc*. (2002) 104 Cal.App.4th 845, 854.)  A final line of decisions has adopted a "section 5 test," namely that: "(1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided."  (*Camacho v. Automobile Club of Southern California* (2006) 142 Ca1.App.4th 1394, 1403.)

But *Chavez* held that regardless of which test applies in the consumer context, "we conclude as a matter of law that conduct that the courts have determined to be permissible under the *Colgate* doctrine cannot be deemed 'unfair' under the unfair competition law."  (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Subsequent California authorities are in accord.  (See *Drum v. San Fernando Valley Bar Assn*. (2010) 182 Cal.App.4th 247, 255 [citing *Chavez* for the proposition that the fact "that a unilateral resale price policy is 'not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers' under the UCL," affirming judgment for defendant on  demurrer emphasizing its unilateral conduct]; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 93 (*SC*) [citing *Chavez* for the proposition that " '[i]f the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers' "; sustaining judgment for defendant on demurrer]; *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240 [citing *Chavez* for the same proposition as *SC* and sustaining judgment for defendant on summary adjudication].)

Here, Plaintiffs' theories both depend on unilateral conduct by Apple that is protected by the *Colgate* doctrine.  This includes the "anti-steering" theory.  (See, e.g., FAC, ¶ 69 ["Developers are forced into non-negotiable contracts if they wish to do business on the App Store — these developers are required to use Apple's In-App Purchase system and may not include [any] alternative payment solutions in the app whatsoever.  They cannot steer users to alternative payment methods outside the app, as apps and their metadata may not include

buttons, external links, or other calls to action that direct customers to purchasing methods other than Apple's In-App Purchase system."].)[7]

Per *Chavez* and the other authorities cites above, Plaintiffs' UCL "unfair" prong claim must also fail.

### 2.   *Conclusion*

The Court SUSTAINS Apple's demurrer to the third cause of action under the UCL's "unfair" prong, also with 60 days' leave to amend.

### C.   The Fourth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing arises from Apple's "terms and conditions," which they allege that they and other putative class members agreed to in order to use the App Store.  (FAC, ¶ 188.)  Plaintiffs allege that they performed their duties under the terms and conditions, but Apple unfairly and in bad faith (1) "restrict[ed] payment options for in-app purchases, resulting in Plaintiffs and the Class paying an inflated price for purchases within Fortnite" and (2) "refus[es] to reinstate Fortnite onto the App Store, and is thus acting in bad faith by deliberately acting to deprive Plaintiffs and the Class of the use of Fortnite and any digital goods found within, and further by interfering with Plaintiffs and the Class use of the Fortnite application downloaded through the App Store." (*Id.* at ¶¶ 191–194.)

Apple contends that Plaintiffs fail to specify the "terms and conditions" upon which this claim is based, and the only terms upon which it could be based expressly permit the conduct at issue.  On opposition, Plaintiffs are non-committal about what "terms and conditions" this claim is based on.  But Plaintiffs' own authority emphasizes that "[t]he implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation."  (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1204 (*Avidity*), citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 (*Foley*).)  "[T]he scope of conduct prohibited by the

---

[7] While the *Epic* Trial Decision found a UCL "unfair prong" violation based on the "anti-steering" theory, its discussion of *Chavez* was cursory, and it did not address *Chavez*'s application of the other California authorities cited above.

covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Avidity, supra,* 221 Cal.App.4th at p. 1204, quoting *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc*. (1992) 2 Cal.4th 342, 373.)  "[S]ince the covenant is an implied term in the contract," the contract is a prerequisite.  (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49.)  And to state a claim for breach of contract, the terms of the contract must be alleged in some manner.  (See *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 270, fn. 1 [taking judicial notice of terms of operative contract that were not pleaded as required].)

In the Court's view, applying these authorities, Plaintiffs must at least allege what "terms and conditions" their claim for breach of the implied covenant arises from.  Apple's demurrer to this claim is therefore SUSTAINED, but the Court will give Plaintiffs 60 days' leave to amend.

## V.       CONCLUSION

As discussed above, each cause of action in the FAC fails to state a claim.  On this basis, Apple's demurrer is SUSTAINED with 60 days' leave to amend.  The Court therefore does not need to address Apple's arguments regarding permissible remedies in this case.

**IT IS SO ORDERED.**

Date:           February 4, 2022

_____
The Honorable Sunil R. Kulkarni
Judge of the Superior Court

15

# EXHIBIT F

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 8/29/2022 1:48 PM
Reviewed By: R. Walker
Case #20CV370535
Envelope: 9832131**

ORDER ON SUBMITTED MATTER

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| MICHELLE BEVERAGE, et al., | Case No.:  20CV370535 |
| Plaintiffs, | **ORDER CONCERNING APPLE INC.'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| v. | |
| APPLE INC., et al., | |
| Defendants. | |

Plaintiffs bring this action against Defendant Apple Inc. on behalf of a putative class of California consumers.  They challenge Apple's removal of the social and gaming software application "Fortnite" from its application marketplace (the "App Store") and Apple's related alleged abuse of monopolistic power.

Following a pause on merits-related proceedings to allow the parties to address the post-trial decision in a related federal case, *Epic Games Inc. v. Apple Inc*. (N.D. Cal., No. 4:20-CV-05640) ("*Epic*"), Plaintiffs filed a First Amended Class Action Complaint ("FAC").[1]  Apple demurred, and in an order filed on February 4, 2022 ("February Order"), the Court sustained its demurrer with leave to amend.  The Court held that Plaintiffs failed to state a claim under the

---

[1] An appeal of the trial court's decision in *Epic* is pending.

Cartwright Act because, under the *Colgate* doctrine, the conduct they alleged in restraint of trade was Apple's unilateral conduct. Applying *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375 (*Chavez*), the Court held that because the *Colgate* doctrine permitted Apple's conduct, that same conduct could not be deemed unfair under the Unfair Competition Law, Business & Professions Code section 17200 et seq. (the "UCL").

Plaintiffs filed the operative Second Amended Class Action Complaint ("SAC") on April 5, 2022. The SAC adds new allegations to support the claims for violation of the Cartwright Act and of the unlawful and unfair prongs of the UCL.[2] Apple again demurs, urging that the new allegations do not avoid the *Colgate* doctrine and all three causes of action otherwise fail to state a claim. (Code Civ. Proc., § 430.10, subd. (e).) Plaintiffs oppose the demurrer.

The Court issued a tentative ruling on August 24, 2022. It heard oral argument on August 25 and took the matter under submission. The Court now issues its final order, which again SUSTAINS Apple's demurrer, this time without leave to amend.

## I.    THE SAC'S NEW ALLEGATIONS

The February Order summarizes Plaintiffs' allegations in the FAC at length, and that summary is not repeated here. As reflected in the redline attached to Apple's demurrer, the SAC largely repeats these allegations, relying on a handful of new ones to avoid the application of the *Colgate* doctrine. This order will focus on Plaintiffs' new allegations, although the Court has taken a fresh look at the previous allegations as well.

As an initial matter, the SAC now specifically defines the "Relevant Market" as the market for "mobile gaming transactions." (SAC, ¶ 5.) (The February Order had assumed this was the case.) Plaintiffs allege that the App Store marketplace "makes up roughly half of the Relevant Market as a whole." (*Id.*, ¶ 16.) Plaintiffs also include additional context about potential legislation and regulatory action in the United States and other countries "targeted at big tech companies like Apple," in-app payment systems, and/or Apple specifically. (*Id.*, ¶¶ 102–106.)

---

[2] The SAC omits a claim for breach of the implied covenant of good faith and fair dealing that was included in the FAC.

The most significant new allegations in the SAC concern asserted retaliatory/coercive conduct by Apple.  According to Plaintiffs, these new allegations show more than just the mere "announcement" of a policy and refusal to deal with those who do not comply (*Chavez, supra,* 93 Cal.App.4th at p. 373); rather, they bring this case outside the *Colgate* doctrine.  Those allegations are:

119. "Rubbing salt in the wound of its current adversary Epic Games, the Apple App Store is promoting Fortnite's biggest competitor, PlayerUnknown's Battlegrounds, a day after Fortnite Season 4 began. Apple is striking back after Epic's attempts to use its massive fanbase to pressure the tech giant in their ongoing legal battle." [This is a quotation from a news article.)]  This promotion occurred the same day Apple said they would terminate Epic's developer account related to Fortnite, on both the App Store and on Twitter.

120. Apple is seeking to amplify harm on Epic for challenging its unfair business practices by heavily promoting competitors and making an example of Epic. Essentially, Apple is coercing Epic and any future dissenters by directly promoting the biggest competitor of its biggest dissenter. Apple retaliated against Epic for breaking its rules — going above and beyond the punitive measures available to it contractually. This serves as a message that not only will Apple remove you from the App Store, they will directly assist your closest competitors.

121.  Apple did not satisfy itself with promoting Epic's biggest mobile competitor, but even threatened Unreal Engine's existence on the app store, a system non-Epic companies license from Epic to develop video game and other applications on iOS, among numerous other uses. This threat goes well above and beyond any simple "refusal to deal" with Epic — it would have prevented anyone independently contracting with Epic to develop their applications from hosting

those applications on the App Store. Instead of Apple refusing to deal with Epic, Apple would have forced everyone else to follow their iron will.

122. The Unreal developer account is part of the same developer account as Fortnite — Apple threatened to terminate an account completely independent of Fortnite and the conduct leading to its removal in an attempt to punish and retaliate against Epic for trying to escape its anticompetitive fee.

123. Apple considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases, showing how Apple coerces developers to play by their rules via more than just economic pressure. In an email with Apple employees, Apple seemed to want to find ways to torpedo Netflix's test removal of in-app purchases, wanting to deliberately sabotage it to keep them in the IAP ecosystem.

124. In the US District Court for the District of Columbia, a coalition of app developers moved to quash Apple's subpoenas in connection to antitrust lawsuits, claiming that the disclosure of the information Apple requested would leave them open to retaliation for their role in the coalition — a clear risk as shown by Apple's treatment of Epic.

Below, the Court will address whether these new allegations make a difference.

## II.    LEGAL STANDARD

A demurrer tests the legal sufficiency of the complaint.  (*Chen v. PayPal, Inc*. (2021) 61 Cal.App.5th 559, 568.)  Consequently, it "reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice."  (*Weil v. Barthel* (1955) 45 Cal.2d 835, 837; see also Code Civ. Proc., § 430.30, subd. (a).)  "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he

describes the defendant's conduct. … Thus, … the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the allegations of the complaint must be liberally construed, with a view to substantial justice between the parties. (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.)  Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.)  A demurrer will succeed where the allegations and matters subject to judicial notice clearly disclose a defense or bar to recovery. (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.)

## III.     CARTWRIGHT ACT AND DERIVATIVE UCL UNLAWFUL CLAIM

As summarized in the February Order, recovery under the Cartwright Act "is provided where the activities of a combination of capital, skill, or acts by two or more persons result in a restraint of trade. ([*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256,] 264–265 [(*G.H.I.I.*)], citing Bus. & Prof. Code, §§ 16720 [defining a 'trust' for purposes of the Act] & 16750 [establishing a private right of action].)" (February Order, p. 7.)

> "It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business.  An antitrust case must be based upon conspiratorial rather than unilateral conduct." (G.*H.I.I., supra*, 147 Cal.App.3d at pp. 267–268, citations omitted.)   "It is also established, however, that a necessary 'conspiracy' or 'combination' cognizable as an antitrust action is formed where a trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses.  If a 'single trader' pressures customers or dealers into pricing arrangements, an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a trader to determine with whom it will deal." (*Id.* at p. 268.)

(February Order, pp. 9–10.)

Coercion in this context

requires something more than a simple policy that business partners agree to certain terms.  "[A]n illegal combination may be found where a supplier secures compliance with announced policies in restraint of trade by means which go beyond mere announcement of policy and the refusal to deal," for example, by "tak[ing] 'affirmative action' to bring about the involuntary acquiescence of its dealers…."  (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 721 [*Kolling*].)  This might include "threatening commands" aimed at price-fixing.  (*Id.* at pp. 721–722.)  Or it could include a "boycott" to extract price concessions.  (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 263, fn. 3, 269 [contrasting adequate allegations of one record store's boycott of distributors accompanied by threats with inadequate allegations as to other stores that apparently obtained favorable terms from distributors "in an atmosphere of free competition"].)

Coercion must be alleged with specificity.  (See *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 196 (*Freeman*).)  And critically, under the so-called *Colgate* doctrine, coercion does not include the mere "announcement" of a policy and refusal to deal with those who do not comply, even when coupled with "measures to monitor compliance that do not interfere with … freedom of choice."  (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 373 (*Chavez*).)  Accordingly, in *Chavez*, allegations "that Whirlpool announced [a] price policy prescribing minimum resale prices … and informed retailers that it would refuse to sell products to any retailer who did not comply," and "would monitor the retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and sending 'mystery shoppers' to retail stores," were deemed "insufficient to establish a coerced agreement in violation of the Cartwright Act…."  (*Ibid.*)

6

1  (February Order, p. 10.)

2  The Court found the FAC's allegations that Apple forces developers to pay its 30 percent

3  fee and abide by other terms stated in its contracts with them "amounts to open, unilateral

4  conduct by Apple, essentially a 'take it or leave it' deal—not threats, boycotts or other such

5  'affirmative action' to coerce developers into a conspiracy with Apple against others." (February

6  Order, p. 11.) Despite Plaintiffs' renewed emphasis on *Kolling* and on *In re Qualcomm Antitrust*

7  *Litig.* (N.D.Cal. 2017) 292 F. Supp. 3d 948 (*Qualcomm*), the Court stands by this analysis.

8      **A.**   ***Kolling* and *Qualcomm***

9  In *Kolling*, a newspaper publisher coerced retailers and distributors to sell its papers at

10  lower, "suggested" retail prices. (See *Kolling, supra*, 137 Cal.App.3d at pp. 713–714.) The

11  publisher did not openly require distributors to abide by its suggested prices, but "dealt with

12  'dissident' distributors by strongly suggesting a price roll back. Given the company's vastly

13  superior bargaining strength, such 'suggestions' were in fact thinly disguised and threatening

14  commands," and some distributors unwillingly lowered their prices while at least one was

15  terminated for refusing to do so. (*Kolling, supra*, 137 Cal.App.3d at p. 722.) While *Kolling*

16  emphasized the publisher's bargaining strength and ability to terminate distributors, it did not

17  suggest that these factors could turn a "mere announcement of policy and the refusal to deal" (*id.*

18  at p. 721) into an illegal combination. Rather, *Kolling* expressly considered evidence on these

19  points "in the light of [the publisher's] price-fixing policy and the intimidating 'suggestions'

20  made to recalcitrant distributors…." (*Id.* at p. 722.)

21  In *Qualcomm*,[3] the district court found coercion was pleaded through detailed allegations

22  of a multi-pronged campaign by Qualcomm to force cellphone handset manufacturers ("OEM"s),

23  _____

24  [3] In a footnote, the February Order noted Apple's statement "that the district court's eventual
ruling against Qualcomm in this case was reversed on appeal. (See *FTC v. Qualcomm Inc.* (9th

25  Cir. 2020) 969 F.3d 974 [('*FTC v. Qualcomm*')].)" (See Apple's 12/22/21 Reply, p. 10.)
Plaintiffs correctly point out that *FTC v. Qualcomm* is not the same case as the *Qualcomm*

26  consumer action discussed above—but the two matters are closely related because they address
the same practices by Qualcomm. For that reason, the Ninth Circuit directed the district court in

27  *Qualcomm* to "reconsider the viability of Plaintiffs' claims given *FTC v. Qualcomm*."
(*Stromberg v. Qualcomm Inc.* (9th Cir. 2021) 14 F.4th 1059, 1063 (*Stromberg*).) As the Ninth

28  Circuit explained, "[w]e concluded in *FTC v. Qualcomm* that Qualcomm's SEP licensing

including Apple, to agree to unreasonable and anticompetitive licensing terms.  (See *Qualcomm, supra*, 292 F. Supp. 3d at pp. 958–962 [summarizing allegations].)  The campaign involved Qualcomm's leveraging of its dominance in the modem chip market to extract unfair licensing fees in the separate market for standard essential patents ("SEP"s), as well as its pressuring of Apple into exclusive dealing arrangements in part by offering a rebate of some of these excessive royalties.  (See *ibid.*)  *Qualcomm* acknowledged *Chavez*'s holding that "allegations that the defendant refused to deal with dealers who did not comply with a resale price policy and used 'other unspecified 'threats, coercion, intimidation and boycott' to cause the dealers to comply" were insufficient to show coercion.  (*Qualcomm, supra*, 292 F. Supp. 3d at p. 976.)  But it explained that the allegations before it were "significantly more detailed," emphasizing allegations that Qualcomm "employed its superior market power and *threatened to withhold chips* if OEMs did not agree to Qualcomm's licensing terms."  (*Ibid.*, italics added.)  As with *Kolling*, *Qualcomm* did not hold that a mere announcement of terms and refusal to deal became coercive simply by virtue of Qualcomm's power in the relevant market.  Rather, *Qualcomm*'s leveraging of its power in interrelated markets was the required "affirmative action."

With that requirement in mind, the Court turns to the new allegations in the SAC.

## B. New Allegations

The SAC newly alleges that on the same day Apple said it would terminate Epic's developer account related to Fortnite and a day after Fortnite Season 4 began, Apple promoted Fortnite's biggest competitor.  (SAC, ¶ 119.)  Plaintiffs characterize this as "retaliat[ion] against Epic for breaking its rules — going above and beyond the punitive measures available to it contractually."  (*Id.*, ¶ 120.)  Similarly, Apple "threatened to terminate" Epic's Unreal developer account "in an attempt to punish and retaliate against Epic for trying to escape its anticompetitive fee."  (*Id.*, ¶ 122.)

---

practices, the same practices complained of here, are lawful and not anticompetitive. [Citation.] Because Plaintiffs' arguments in this case overlap with those brought in *FTC v. Qualcomm*, there would have to be some extraordinary difference for Plaintiffs' claims here to not fail as a matter of law…."  (*Id.* at p. 1075.)

These types of actions might constitute "affirmative action" (see *Kolling, supra,* 137 Cal.App.3d at 721) in a different context. (The Court takes no position on the issue.) But even if these actions were considered affirmative actions under *Kolling*, there is a significant timing problem here. Plaintiffs themselves characterize these actions as "retaliat[ion]" for Epic's decision to launch its own payment system in violation of its agreements with Apple—not an attempt to coerce Epic to comply. And significantly, Plaintiffs bring this action on behalf of a putative class of *Fortnite* users who purchased digital currency or goods using Apple's in-app purchase system. While Apple's "retaliat[ory]" actions towards Epic might coerce future developers to do what Apple wants, it does not appear that Fortnite users could have been harmed by Apple's alleged retaliation against Epic *after* Epic had decided to openly break with Apple.

The other new allegations fare no better. The SAC alleges that Apple "considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases" (SAC, ¶ 123), but there is no indication that Epic or anyone else knew about this at the time, or that Apple ever followed through. And the SAC's vague allegation that "a coalition of app developers" moved to quash Apple's subpoenas in certain antitrust lawsuits out of fear of retaliation (*id.*, ¶ 124) again appears to relate to events *after* Epic broke with Apple, which could not have impacted Epic or Fortnite users. The Court understands Plaintiffs' argument that these other situations could provide evidence a coercive atmosphere, but again, there is a timing problem. The SAC itself suggests that the fears of the "coalition" are justified "by Apple's treatment of Epic." (*Id.*, ¶ 124.) Plaintiffs' allegations do not show that a coercive atmosphere existed during a timeframe that would have impacted Fortnite users who made purchases using Apple's in-app purchase system.

As for Plaintiffs' old allegations that were carried over into the SAC, the Court stands by its previous analysis.

### C.    Conclusion

The SAC still fails to plead facts avoiding the *Colgate* doctrine. And Plaintiffs did not explain in their papers how they could amend their complaint to do so. At oral argument, they

1    argued they could broaden the class definition to include all App Store users.  But such a

2    broadening—even if it were to overcome the *Chavez* and *Colgate* issues identified above—

3    would transmogrify Plaintiffs' claims into something far removed from the subject matter of this

4    complaint, which is how Apple's treatment of Epic hurt Fortnite users specifically.

5         Therefore, the Court will sustain Apple's demurrer to the Cartwright Act claim without

6    leave to amend.   The same goes for the derivative claim under the UCL's "unlawful" prong.

7    (See *Camsi IV v. Hunter Technology Corp*. (1991) 230 Cal.App.3d 1525, 1542 ["absent an

8    effective request for leave to amend in specified ways," it is an abuse of discretion to deny leave

9    to amend "only if a potentially effective amendment were both apparent and consistent with the

10   plaintiff's theory of the case"].)

11   **IV.    UCL UNFAIR PRONG**

12        That leaves the third cause of action under the UCL's "unfair" prong, which is unchanged

13   from the FAC aside from some new (but essentially repetitive) details and legal conclusions.  In

14   the February Order, the Court explained that *Chavez* and subsequent authorities have held "as a

15   matter of law that conduct that the courts have determined to be permissible under the *Colgate*

16   doctrine cannot be deemed 'unfair' under the unfair competition law."  (*Chavez, supra*, 93

17   Cal.App.4th at p. 375.)  Plaintiffs suggest that the Court should reconsider this holding, but the

18   Court is not persuaded by their argument.  Notably, while Plaintiffs urge the Court to apply the

19   standard stated in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999)

20   20 Cal.4th 163 (*Cel-Tech*) to their allegations, *Chavez* held that even if *Cel-Tech* applied in

21   consumer (as opposed to competitor) actions, it *supported* the conclusion that conduct allowed

22   under the *Colgate* doctrine should not be deemed "unfair":

23        If the same conduct is alleged to be both an antitrust violation and an "unfair"

24        business act or practice for the same reason--because it unreasonably restrains

25        competition and harms consumers--the determination that the conduct is not an

26        unreasonable restraint of trade necessarily implies that the conduct is not "unfair"

27        toward consumers.   To permit a separate inquiry into essentially the same

28        question under the unfair competition law would only invite conflict and

uncertainty and could lead to the enjoining of procompetitive conduct. (See *Cel-Tech*, *supra*, 20 Cal. 4th at p. 185.)

(*Chavez, supra*, 93 Cal.App.4th at p. 375.)  The Court will follow *Chavez* here.

Plaintiffs further urge that their "anti-steering" theory is not subject to the *Colgate* doctrine.  But they provide no reasoning to support this conclusion and cite no authorities addressing the application of the *Colgate* doctrine to similar practices—rather, they merely cite general authorities concerning First Amendment protection of commercial speech (*Bates v. State Bar of Ariz.* (1977) 433 U.S. 350), the standard governing violations of Section 5 of the FTC Act (15 U.S.C. § 45) (*FTC v. Neovi, Inc.* (9th Cir. 2010) 604 F.3d 1150), and unrelated antitrust issues (*Eastman Kodak Co. v. Image Tech. Servs.* (1992) 504 U.S. 451, 472–477 [finding question of fact on issue of power in a "tying market" based on evidence concerning information costs and other subjects]).

Plaintiffs fail to persuade the Court to take a different approach to this claim than it did in the February Order, or to plead any new facts or provide any new authority supporting their theory.  The Court will sustain Apple's demurrer without leave to amend as to this claim, too.

## V.   CONCLUSION

The Court SUSTAINS WITHOUT LEAVE TO AMEND Apple's demurrer, as to all three causes of action in the SAC.  Plaintiffs fail to state a cause of action that avoids *Chavez* and the *Colgate* doctrine.  For this reason, the Court does not need to address Apple's other arguments in support of its demurrer.

**IT IS SO ORDERED.**

Date:      August 29, 2022

_____

The Honorable Sunil R. Kulkarni
Judge of the Superior Court

11