Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
abigailp@hbsslaw.com

Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com

*Attorneys for Plaintiffs Société du Figaro, SAS;*
*L'Équipe 24/24 SAS; le GESTE; and the*
*Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated,<br><br>                              Plaintiffs,<br><br>     v.<br><br>APPLE INC., a California corporation,<br><br>                              Defendant. | No. 4:22-cv-04437-YGR<br><br>PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA UNFAIR COMPETITION LAW, AND CALIFORNIA CARTWRIGHT ACT<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ..................................................................................................1

        A.      Apple's willful, anticompetitive, and unjustifiable monopoly ......................3

        B.      Alternatively, Apple's willful, anticompetitive, and unjustifiable
                monopsony ................................................................................................11

        C.      Requested redress ....................................................................................12

II.     JURISDICTION .................................................................................................12

III.    VENUE ...............................................................................................................12

IV.     PARTIES ............................................................................................................13

        A.      The Plaintiffs ............................................................................................13

                1.      Individual Developers ...................................................................13

                        a.      Figaro ................................................................................13

                        b.      L'Équipe ............................................................................16

                2.      Association—Le GESTE ..............................................................19

        B.      The Defendant ..........................................................................................23

V.      RELEVANT FACTS ...........................................................................................23

        A.      As They Must, iOS Developers Distribute Their Native Apps and
                Digital In-App Products in or via Apple's App Store, Or in Apps
                Acquired Therefrom, On Apple's Terms ....................................................25

                1.      Inception of the App Store .............................................................25

                2.      The scale of the App Store ............................................................25

                3.      Plaintiffs' and the classes' iOS device-specific digital
                        products .......................................................................................27

                4.      How iOS app and in-app product distribution works ....................28

        B.      Apple has willfully monopolized the market for iOS app-
                distribution and IAP services.....................................................................30

                1.      The market ....................................................................................31

                        a.      The geographic market .....................................................31

                        b.      The product market............................................................31

2.      Apple's willful acquisition of monopoly market power ................................33

C.    Alternatively, Apple has willfully attempted to acquire monopoly market power. ..........................................................................35

D.    Alternatively, Apple has willfully acquired monopsony market power, or has willfully attempted to acquire it ................................35

E.    By Apple's purposeful, exclusionary design, no entity applies market constraints. ........................................................36

F.    Apple's willful practices with respect to the iOS App Store are especially grievous and effective as to the market for iOS app-distribution and IAP services, where already there are high barriers to entry. ....................................................................38

G.    Apple offers an overblown excuse for its brazenly anticompetitive behavior. ......................................................................39

H.    In an illustration and exercise of its monopoly power, Apple unfairly taxes iOS app and in-app product distribution ..............................41

1.      Apple's supracompetitive default commission ............................41

2.      Commission rates charged at other stores ................................44

a.    Epic Games Store ................................................44

b.    Bandcamp ........................................................46

c.    Google Play ......................................................46

d.    Chrome Web Store ................................................47

e.    Microsoft Store ................................................47

f.    Amazon Appstore ................................................49

g.    Shopify ..........................................................50

3.      Apple's maximization of its super-high commission by pricing mandates ................................................50

4.      Apple's added annual fee ..........................................52

5.      Apple's supracompetitive profits ....................................52

I.    Alternatively, as a retailer, Apple has underpaid developers. ....................54

J.    The lack of competition has diminished the quality of Apple's services. ........................................................54

1.      Slow payments ....................................................54

2.      Inferior refunds ..................................................55

3. Other interference in the relationship between developers and end-users ...................................................................................56

K. Nor does the potential for web apps alleviate the harm to plaintiffs or competition ...........................................................................56

L. Apple's deliberate and unlawful practices harm competition, iOS developers, and end-user consumers of iOS apps and in-app products, too. ....................................................................................58

1. Apple's harm to competition and iOS developers, as well as end-user consumers, including by depression of output .............59

2. Apple's stifling of innovation ..................................................61

3. Apple's harm to iOS developers by denying them the opportunity to choose other means to get paid for their work .........................................................................................65

a. Apple's refusal to allow others to innovate in the market ...............65

b. Apple's ATT program .....................................................65

M. Apple's admission that iOS developers have antitrust standing to bring this suit ..................................................................................67

VI. TRADE OR COMMERCE AMONG THE SEVERAL STATES, OR WITH FOREIGN NATIONS ....................................................................70

VII. RELEVANT MARKET ...................................................................70

VIII. CLASS ALLEGATIONS ................................................................73

A. U.S. federal-law classes ...........................................................73

B. State-law, *i.e.*, California-law, Classes ....................................74

C. Elements .................................................................................76

IX. APPLICABILITY OF U.S. FEDERAL ANTITRUST LAW ..................79

X. APPLICABILITY OF CALIFORNIA LAW ........................................85

XI. CLAIMS FOR RELIEF ...................................................................86

FIRST CAUSE OF ACTION:  VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION OF THE IOS APP-DISTRIBUTION AND IAP SERVICES MARKET (15 U.S.C. § 2) .....................................................87

SECOND CAUSE OF ACTION:  VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF THE IOS APP-DISTRIBUTION AND IAP SERVICES MARKET (15 U.S.C. § 2) .................................88

THIRD CAUSE OF ACTION:  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION ACT (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*) .........................90

1

     A.     Apple has behaved unlawfully ...................................................................90

     B.     Apple has behaved unfairly .......................................................................91

FOURTH CAUSE OF ACTION:  VIOLATION OF THE CALIFORNIA
     CARTWRIGHT ACT (CA. BUS & PROF. CODE §§ 16700 *ET SEQ.*) ............................92

PRAYER FOR RELIEF ...............................................................................................94

JURY TRIAL DEMANDED .........................................................................................95

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    For their first amended complaint against defendant Apple Inc. (Apple), plaintiffs and iOS

2    developers Société du Figaro, SAS and L'Équipe 24/24 SAS (collectively, Individual Developers),

3    together with plaintiff le GESTE, a French association comprised of and representing certain France-

4    resident publishers of online content and services, including certain France-resident iOS developers,

5    allege and pray as follows:

6                                    **I.      INTRODUCTION**

7    1.     iOS developers create the applications and in-app add-ons that bring Apple mobile

8    devices, including its Apple-branded iPhones, iPads, and iPod touch music players[1], to life. Their

9    apps allow users to socialize with others, to edit documents, to make exercise more fun, to meditate,

10   and so much more. Their in-app products, including enhanced or extra features, game add-ons,

11   services, and content subscriptions,[2] make their applications more useful and fun. Because there are

12   probably more than one billion iOS devices in operation worldwide, the end-user market for apps

13   and digital in-app products is colossal as well. So, then, is the market for iOS app-distribution and in-

14   app purchase (IAP) services. This suit concerns these services, the provision of which Apple has

15   unlawfully monopolized to the detriment of plaintiffs and the proposed classes.

16   2.     By Apple's design, including technical and contractual means, there is one regular

17   outlet for the distribution of iOS native apps: its own App Store. Also, with minor exceptions, Apple

18   mandates the use of its IAP services for digital add-ons to iOS native apps, whether sold directly in

---

[1] Apple recently announced that it is discontinuing production of the iPod touch. Further, as discussed later, plaintiffs' claims also cover watchOS digital products.

[2] Apple states that "[t]here are four types of in-app purchases, and you can offer multiple types within your app." (*E.g.*, "In-app purchase," available at: https://developer.apple.com/in-app-purchase/ (last accessed Nov. 29, 2022).). These include consumables, non-consumables, auto-renewable subscriptions, and non-renewing subscriptions. (*Id.*) Throughout this complaint the term "in-app product" refers to such *digital* or virtual items, among others. Apple charges developers a commission on the sale of non-zero-priced digital in-app products when the sale is made in or via an app acquired from the App Store or in or via the App Store directly. (*See, e.g.*, Ex. A (Developer Program License Agreement (DPLA)), ¶ 7.2 and Schedule 2 thereto, ¶ 3.4; Ex. B (App Store Review Guidelines (Developer Guidelines)), Sec. 3.1.1 ("If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase. . . .").)

the App Store, or in apps acquired from the App Store. Thus, Apple has willfully excluded competition and usurped the market (or markets) for iOS app-distribution and IAP services.

3.      Apple is a U.S. company, and the App Store is thoroughly U.S.-based and conducted. As demonstrated in Sec. IX below and throughout this complaint, Apple runs the App Store, contracts with developers, takes in their products, sets commissions, sets and enforces policies and practices for developers, and conducts other App Store-related business with developers, in and from the United States.

4.      Apple solicits developers worldwide to fill the App Store with their iOS apps and compatible digital products. To do so, and to sell their in-app products, these developers, wherever they reside, buy Apple's iOS app-distribution and IAP services in America, in transactions in U.S. commerce, at globally applicable prices, set by the U.S. company Apple Inc.[3] That is, they pay the supracompetitive commissions that Apple the monopolist sets in the U.S. and charges to U.S.- and non-U.S.-resident developers alike.

5.      Plaintiffs bring their suit in this Court pursuant to the choice-of-law, forum, and venue terms contractually specified by Apple. Apple's U.S.-domestic conduct, and the U.S.-domestic effects thereof, have proximately and directly caused harm to France-resident iOS developers as alleged herein. Further, Apple's own contracts designate France-resident iOS developers as U.S.

---

[3] For the sake of brevity, plaintiffs refer to iOS, iOS developers, the iOS App Store, Apple's iOS app-distribution and IAP services throughout this complaint. But plaintiffs' and putative class members' claims cover services related to the distribution of all apps and in-app products (whether purchased in-app or directly from the App Store) for which Apple mandates the use and purchase of its App Store-related distribution and IAP services. Thus, plaintiffs' complaint also covers services related to apps and in-app products for: (a) the iPad (including those powered by iPad OS) and (b) Apple Watch (powered by watchOS) are included by reference, as are (c) iMessage apps and in-app products and (d) Phone and iPad apps and in-app products sold for use on Apple Silicon Macs. (*See, e.g.*, "App Store Support," and links therein, available at: https://support.apple.com/apps (last accessed Nov. 29, 2022); "iMessage Apps and Stickers," available at: https://developer.apple.com/imessage/ (last accessed Nov. 29, 2022); "In-app purchase," available at: https://developer.apple.com/in-app-purchase/ ("Offer extra content and features — including digital goods, subscriptions, and premium content — directly within your app through in-app purchases on all Apple platforms. You can even promote and offer in-app purchases directly on the App Store.") (last accessed Nov. 29, 2022); "Manage availability of iPhone and iPad Apps on Apple Silicon Macs," available at: https://help.apple.com/app-store-connect/#/dev2de8e790b (last accessed Nov. 29, 2022).)

1   exporters, giving rise to another basis for liability under U.S. antitrust law. Thus, plaintiffs' claims,

2   including those related to digital-product sales to France-resident end-user consumers, lie within the

3   scope of the American law that Apple has designated for this suit, notwithstanding, and per, the

4   Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a.

5         6.     Accordingly, as remedies, plaintiffs seek monetary and injunctive relief under U.S.

6   federal and California state law, on their own behalf and on behalf of the classes of French-resident

7   iOS developers they seek to represent.

8   **A.**    **Apple's willful, anticompetitive, and unjustifiable monopoly**

9         7.     Except in very limited circumstances, app developers, in order to convey their device-

10  compatible native apps to users of Apple-branded mobile devices, must utilize Apple's iOS app-

11  distribution services. And except in very limited circumstances, app developers, in order to sell non-

12  zero-priced native apps to end-users, must pay Apple what it opts to charge for these services.

13  Further, if these developers wish to sell in-app digital products to these users, either through the App

14  Store directly, or from within apps acquired from the App Store, they must, except in limited

15  circumstances, use Apple's IAP services and pay Apple what it determines to charge.

16        8.     Buyers of Apple-branded mobile devices never agree with Apple to purchase their

17  apps solely from Apple's iOS App Store. Nonetheless, Apple restricts such buyers in almost all cases

18  to doing so. Similarly, in almost all cases, end-user in-app-purchase transactions must be made

19  through the App Store or in apps acquired therefrom.

20        9.     Apple, therefore, has cornered the market on iOS app distribution and IAP services—

21  but not because it has beaten all comers by building the best app store or selling the best services.

22  Rather, Apple has deliberately built its monopoly by excluding competition, barring all would-be

23  competitors through technical means and contracts with developers. Thus, it has acquired and

24  maintained monopoly power in the market for iOS app distribution and IAP services[4] willfully.

25

26

27

28

---

[4] Alternatively, as alleged herein, Apple is a *de facto* monopsonist given its status as the sole retailer, in its iOS App Store (or in apps acquired therefrom), of the app developers' digital products.

10.     Among the justifications that Apple proffers for its behavior is security. Supposedly, it competes with respect to iOS devices in part by offering some sort of *unique* security regime for iOS apps and in-app products. That is, no potential rival could possibly offer sufficient security in the distribution of iOS apps and in-app products, or in the services related thereto. Yet Apple never touts studies which would indicate that iOS device owners bought their products because Apple mandates *one* app store—its own—and the sole use of its distribution and IAP services.

11.     Furthermore, Apple already allows open distribution for its MacOS desktop and laptop devices.[5] As to these products, which consumers use for mission-critical work every day, Apple has established an alternative distribution model that allows competition. Apple's Mac App Store is but one place where Mac apps are made available for sale. Yet it regularly speaks to the safety of Macs, including in light of the protection systems it has set up for MacOS apps—systems it could replicate for iOS app and in-app product distribution[6]:

**Safely open apps on your Mac**

macOS includes a technology called Gatekeeper, that's designed to ensure that only trusted software runs on your Mac.

The safest place to get apps for your Mac is the App Store. Apple reviews each app in the App Store before it's accepted and signs it to ensure that it hasn't been tampered with or altered. If there's ever a problem with an app, Apple can quickly remove it from the store.

If you download and install apps from the internet or directly from a developer, macOS continues to protect your Mac. When you install Mac apps, plug-ins, and installer packages from outside the App Store, macOS checks the Developer ID signature to verify that the software is from an identified developer and that it has not been altered. By default, macOS Catalina and later also requires software to be notarized, so you can be confident that the software you run on your Mac doesn't contain known malware. Before opening downloaded software for the first time, macOS requests your approval to make sure you aren't misled into running software you didn't expect.

\*\*\*

**Privacy protections**

macOS has been designed to keep users and their data safe while respecting their privacy.

---

[5] *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1008-09 (N.D. Cal. 2021) (*Epic Games*).

[6] *See, e.g.*, *id.*

> Gatekeeper performs online checks to verify if an app contains known malware and whether the developer's signing certificate is revoked. We have never combined data from these checks with information about Apple users or their devices. We do not use data from these checks to learn what individual users are launching or running on their devices.
>
> Notarization checks if the app contains known malware using an encrypted connection that is resilient to server failures.[7]

12.   There is no sign that the Mac ecosystem is in danger of crumbling, or that it has been commercially inhibited, due to the availability of developer and end-user choice. To the contrary, Apple promises that "over the next year [it] will introduce several changes to its security checks," including adding "[a] new preference for users to opt out of these security protections."[8]

13.   Apple certainly could devise a system iOS app and in-app product distribution that permits competition while allowing it to continue its safety narrative. As the court observed in *Epic Games, Inc. v. Apple Inc.*, following trial:

> under a "notarization" model, Apple could continue to review apps without limiting distribution. The notarization model is currently used on macOS. There, Apple scans apps using automatic tools and "notarizes" them as safe before they can be distributed without a warning. Apps can still be distributed through the Mac store (with complete app review) or with a warning if not notarized, but notarization provides a "third path" between full app review and unrestricted distribution. In theory, notarization review could be expanded to include some of the checks Apple currently performs in the App Store, such as human review.[9]

14.   In fact, Apple already allows limited enterprise distribution for iOS devices. This program has not crashed safety, or the safety narrative, for iPhones. What is more, it could be expanded, or a similar model adopted, for alternative app stores. As the court noted in *Epic Games*:

> under an "enterprise program" model, Apple could focus on certifying app stores instead of apps. The Enterprise Program is an existing model for distributing apps on iOS where companies apply to distribute apps within its organization. Apple reviews the company and, if conditions are met, gives it a certificate that allows it to sign apps for distribution. Although the program has occasionally been abused, it shows that Apple could shift its review from apps to app stores, while continuing to impose standards for privacy and security.[10]

---

[7] "Safely open apps on your Mac," available at: https://support.apple.com/en-us/HT202491 (last accessed Nov. 29, 2022).

[8] *Id.*

[9] *Epic Games*, 559 F. Supp. 3d at 1008.

[10] *Id.* (citation omitted).

1   Further, per the *Epic Games* court: "it is difficult to imagine that Microsoft would be a source of

2   malware for iOS users."[11]

3         15.    In reality, Apple is content to keep a world-wide end-user base of over a billion

4   devices to itself,[12] if allowed, by incanting the shibboleth of "safety," whatever the exaggerations.

5         16.    Plaintiffs are not alone in their view of Apple's anticompetitive behavior. In October

6   2020 the U.S. House Judiciary Subcommittee on Antitrust released a report[13] in which the authors

7   concluded, among other things, that Apple is a willful monopolist in its operation of the App Store,[14]

8   and by way of its IAP product. The authors also concluded that Apple abuses its market power by

9   "charg[ing] supra-competitive prices within the App Store."[15] And they found, after a long,

10   extensive, and detail-oriented investigation, that "[i]n the absence of competition, Apple's monopoly

11   power over software distribution to iOS devices has resulted in harm to competitors and competition,

12   reducing quality and innovation among app developers, and increasing prices and reducing choices

13   for consumers."[16]

14         17.    More specifically, Apple's market, or monopoly, power has allowed it to charge

15   developers a default supracompetitive 30% commission[17] on the sale of paid apps[18] *for 14 years now*,

16

---

17   [11] *Id.* at n.544.

18   [12] "Together we turn apps into opportunities," available at: https://www.apple.com/app-store/developing-for-the-app-store/ (last accessed Nov. 29, 2022) (stating, as to its five platforms, "We make it easy to reach over 1.5 billion Apple devices.").

19
20   [13] "Investigation of Competition in Digital Markets – Majority Staff Report and Recommendations," U.S. House Subcomm. on Antitrust, etc., Oct. 6, 2020, available at: https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf (last accessed Nov. 29, 2022).

21

22   [14] *See, e.g., id.* at 16 ("Apple has significant and durable market power in the mobile operating system market. Apple's dominance in this market, where it controls the iOS mobile operating system that runs on Apple mobile devices, has enabled it to control all software distribution to iOS devices. As a result, Apple exerts monopoly power in the mobile app store market, controlling access to more than 100 million iPhones and iPads in the U.S.").

23
24

25   [15] *Id.* at 17.

   [16] *Id.*

26   [17] Plaintiffs alternatively refer to Apple's commission as a fee.

27   [18] More recently, as discussed in ¶ 117 below, Apple has established a Small Business Program, which lowers the commission rate for apps and in-app products under certain circumstances, and up

28

despite the inevitable accrual of experience and economies of scale. Similarly, Apple has imposed the same default supracompetitive commission on digital in-app purchases for nearly as many years, notwithstanding these accruals.[19]

18.     Additionally, Apple requires that all iOS developers, including French-resident developers, pay a USD $99 (or equivalent) fee annually if they wish to sell their products through the App Store.

19.     Further, Apple dictates minimum and greater price points, such that iOS developers cannot offer paid digital products at less than, for example, USD $.99, or at price points ending in anything other than USD $.99 (or, in general, their analogues/equivalents at foreign App Store digital "storefronts," such as the French iOS App Store digital storefront[20]). In fact, in a recent exercise of its monopoly market power, Apple mandated that end-user pricing in "Euro territories" (such as France) would be subject to 20% increases.[21] For example, Apple would override a France-based developer who had selected a €.99 price from Apple's mandatory pricing tiers for an iOS app or in-app product; that price can no longer be charged. Instead, Apple unilaterally substituted a €1.19

---

to a specific dollar value, to 15% for qualified developers. (*See, e.g.*, "App Store Small Business Program," available at: https://developer.apple.com/app-store/small-business-program/ (last accessed Nov. 29, 2022).) Another current exception is auto-renewable subscriptions, where the rate drops to 15% after a year if the subscription remains in place for that long. (*E.g.*, "Auto-renewable Subscriptions," available at: https://developer.apple.com/app-store/subscriptions/ (last accessed Nov. 29, 2022).)

[19] *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 991 ("[I]n 2009, Apple introduced IAP using the same 30% commission.").

[20] *See, e.g.*, "App Store Pricing, Effective August 2021," available at: https://itunespartner .apple.com/assets/downloads/072821-Apps-Pricing-SAfr-UK-EUR.pdf (last accessed Nov. 29, 2022) (setting forth, *e.g.*, pricing in Euros for storefronts such as the French iOS App Store storefront).

[21] "Upcoming price and tax changes for apps and in-app purchases," Apple Developer, Sept. 19, 2022, available at: https://developer.apple.com/news/?id=e1b1hcmv&1663640181 (last accessed Nov. 29, 2022) ("As early as October 5, 2022, prices of apps and in-app purchases (excluding auto-renewable subscriptions) on the App Store will increase in Chile, Egypt, Japan, Malaysia, Pakistan, Poland, South Korea, Sweden, Vietnam, and all territories that use the euro currency. . . . Once these changes go into effect, the Pricing and Availability section of My Apps will be updated. You can change the price of your apps and in-app purchases (including auto-renewable subscriptions) at any time in App Store Connect. If you offer subscriptions, you can choose to preserve prices for existing subscribers.").

1   price.[22] The same holds for pricing heretofore at €999.99; it would be increased, per Apple's fiat, to

2   €1,199.99.[23]

3          20.     Even so, these mandated end-user price increases are a function of Apple's policy to

4   keep end-user prices at the same supracompetitive rate imposed from Apple Inc.'s U.S.

5   headquarters.[24]

6          21.     Thus, while Apple is fond of pointing to impressive-sounding sales numbers and

7   dollars earned by developers, nonetheless, the foregoing—its exorbitant fee for distribution (or retail-

8   sales) and IAP services, coupled with its USD $99 (or equivalent) annual fee and pricing mandates—

9   have cut unlawfully into what would and should have been developers' earnings in a competitive

10  atmosphere.

11         22.     Also, Apple's overly expensive default 30% commission, its USD $99 (or equivalent)

12  annual developer fee, and its pricing mandates have depressed output of paid apps and in-app-

13  products, such that sales of iOS app-distribution and IAP services are likewise depressed. End-users

14  of apps and in-app products favor low-priced or free apps.[25] Developers and would-be developers

15  who are or were able to earn only the default 70% on the dollar (or other currency) on each paid app

16  or in-app product, and who must pay the USD $99 (or equivalent) annual fee for their digital

17  products to be sold in or via the App Store (or in or via apps acquired therefrom), must consider

18

19  [22] "App Store Pricing, Effective October 2022," available at:

20  https://developer.apple.com/support/downloads/price-tier-updates/App-Store-Price-Tier-Updates-October-2022.pdf (last accessed Nov. 29, 2022).

21  [23] *Id.*

22  [24] *See, e.g.*, "Exchange Rate Changes Will Affect App Store Prices in Certain Regions," Apple
    Developer, Sept. 30, 2019, available at: https://developer.apple.com/news/?id=09302019a (last
23  accessed Nov. 29, 2022) ("*When taxes or foreign exchange rates change, we sometimes need to
    update prices on the App Store*. In the next few days, prices of apps on the App Store and in-app
24  purchases (excluding auto-renewable subscriptions) will increase in Kazakhstan and Sweden due to
    changes in foreign exchange rates.") (emphasis added); "Euro forecast: Will EUR recover?"
25  *Capital.com*, Nov. 28, 2022 update, available at: https://capital.com/euro-forecast (last accessed Nov.
    29, 2022) ("The euro (EUR) has tumbled close to 9% against the US dollar (USD) year-to-date
26  (YTD) [with accompanying chart showing a sharper drop to a Sept. 19, 2022 exchange rate of
    .99711 vs. USD] as the economic outlook in Europe has deteriorated on the back of the energy crisis
27  triggered by Russia's invasion of Ukraine.") .

28  [25] *See* n.174, *infra*.

whether to spend the effort, time, and energy that is required to design and program an app or related product; bring it to market in the single store available; and endeavor to recoup costs and make a reasonable profit. For many, the calculus, including financial investments, makes no economic sense. And so they do not proceed. This state of affairs, which is ongoing, leads to less output in iOS app-distribution and IAP services.

23.     Furthermore, for those who nonetheless soldier on towards offering paid iOS digital products, another output-depressing scenario presents itself: discoverability. The sheer number of apps in the App Store—"1.8M[illion] apps available worldwide,"[26] with over 2 million available recently[27]—together with the number of new weekly entrants,[28] means that most apps and in-app products, however good and innovative, will never be seen by consumers. Because there are *so many* apps available in the *one* iOS App Store that exists (due to Apple's usurpation of the entire marketplace), huge numbers of apps necessarily get lost. Apps buried among the 1.8 million available apps do not sell because no one finds them, leading to less sales of iOS app-distribution and IAP services for apps and in-app products.

---

[26] This is Apple's present statement as to the number of apps in the App Store. ("The apps you love. From a place you can trust," App Store, available at: https://www.apple.com/app-store/ (last accessed Nov. 29, 2022).)

[27] Apple told the U.S. Supreme Court in August 2018 that as of then, "there [we]re over 2 million apps offered through the App Store." (Brief of Petitioner Apple Inc., submitted Aug. 10, 2018, in *Apple Inc. v. Pepper*, U.S. Sup. Ct. No. 17-204 (Apple Sup. Ct. Pet. Br.) at 9 (emphasis deleted).) And the *Epic Games v. Apple* court noted more recently: "Though Apple has removed over 2 million outdated apps, and rejected those not meeting the Guidelines, the App Store still [contains another] 2 million apps . . . ." *Epic Games*, 559 F. Supp. 3d at 948 (correction to inverted word order in original).

[28] According to a piece available as of June 2019 at Apple's website, it reviewed an astounding "100k" apps *weekly*. ("App Store—Overview," available at: https://web.archive.org/web/20190601044511/https://www.apple.com/ios/app-store/principles-practices/ (last accessed Nov. 29, 2022).) It said that of these, it approved 60% and rejects 40%, and it rejects the 40% mostly for "minor bugs, followed by privacy concerns." (*Id.*) Further, it said it provided an avenue for appeal of sorts to those whose apps are rejected. (*Id.*)

Apple continues to report that it reviews "100k" apps weekly. ("The apps you love. From a place you can trust," App Store, available at: https://www.apple.com/app-store/) (last accessed Nov. 29, 2022).)

24.     If Apple did not shut out all competition from access to iOS device owners, there would be more stores that could feature more apps, as well as stores that would specialize in certain kinds of apps. Also, competitors would find new ways, including by way of leveraging existing technology or inventing other and better means, to bring more apps to the attention of iOS device owners. Additionally, such competitors would motivate Apple to make its own App Store more usable and functional, where currently it has no such incentive from competitors. In other words, competition would bring more and better means to pair end-users with the applications and in-app products they are looking for, need, or want. Thus, competition would boost output in retail sales of apps and in-app products—and in the sale of iOS app-distribution and IAP services. The only real solution for the current output-depressing condition wrought by Apple is to allow other providers of distribution (and retail) services to compete, so that more apps and in-app products can be seen and acquired.

25.     Individual Developers and le GESTE iOS-developer members participated in the domestic market for iOS app-distribution and IAP services as consumers. As the U.S. Supreme Court has determined, Apple is a bottleneck intermediary. That is, Apple, through its iOS App Store, sells apps to end-users, *i.e.*, consumers of apps (and in-app products).[29] And, by its own characterizations and admissions, it sells iOS app-distribution and IAP services to iOS developers, including Individual Developers, and le GESTE iOS-developer members.[30]

26.     Here, Individual Developers and le GESTE iOS-developer members purchased overpriced iOS app-distribution and IAP services domestically, in the U.S., from Apple, an American company whose App Store business is conducted in the United States, subject to Apple's uniform terms. They also paid Apple's annual fee, and were subject to Apple's pricing terms, in the domestic U.S. market. As to pricing and otherwise, not only were Apple's terms imposed on plaintiffs (or le GESTE's iOS-developer members) in the U.S. domestic market, given the ways that

---

[29] *See, e.g.*, *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521, 1525 (2019).

[30] *E.g.*, ¶¶ 78-79, *infra*.

1    Apple conducts its business, but also, some France-resident iOS developers sell apps and in-app

2    products to American end-users of iOS devices, out of the U.S. digital App Store storefront.

3        27.    Because of their participation in the U.S. domestic marketplace as consumers of

4    Apple's services, plaintiff Individual Developer and le GESTE, along with le GESTE's iOS-

5    developer members, were injured directly by the U.S. domestic effects of Apple's willful

6    monopolization (or monopsonization) of the relevant market (or submarket), and its overcharges and

7    other abuses, just as their American iOS developer counterparts were injured.

8    **B.    Alternatively, Apple's willful, anticompetitive, and unjustifiable monopsony**

9        28.    There is another way to view Apple's acquisition and abuse of anticompetitive market

10   power. Alternatively, by way of the same anticompetitive conduct described above, Apple has

11   improperly attained and exercised monopsony power—*i.e.*, buy-side monopoly power[31]—as the sole

12   retailer of iOS apps and in-app products. It uses this immense power to force iOS developers to take

13   70% on the dollar for their paid products by way of subtracting its supracompetitive default 30%

14   commission.[32] This practice is analogous to a monopsonist retailer paying artificially low wholesale

15   prices to its suppliers. In both paradigms, a competitive market would yield better post-commission

16   or wholesale prices for, and fairer profit on, developers' digital products. It also would mean higher,

17   and fairer, profits for developers as Apple's USD $.99 (or equivalent) and end-in-USD $.99 (or

18   analogue/equivalent) pricing mandates were extinguished by competitive forces, such that

19   developers could price at lower and different price points in order to maximize volumes. (Of course,

20   in the world as actually affected by Apple's anticompetitive behavior, Apple's pricing mandates

21   were firmly in place.)

22

23   _____

     [31] As the Supreme Court has put it:

24       Monopsony power is market power on the buy side of the market. Blair & Harrison,
         Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991). As such, a

25       monopsony is to the buy side of the market what a monopoly is to the sell side and is
         sometimes colloquially called a 'buyer's monopoly.' *See id.*, at 301, 320; Piraino, A

26       Proposed Antitrust Approach to Buyers' Competitive Conduct, 56 Hastings L.J. 1121,
         1125 (2005)."

27   *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007).

28       [32] Again, the current exception is long-term subscriptions, after the first year. (*See* n.18, *supra*.)

FIRST AMENDED CLASS ACTION COMPLAINT - 11
Case No.: 4:22-cv-04437-YGR
011083-11/2086911 V1

1    **C.      Requested redress**

2             29.      Apple's anticompetitive behavior has harmed French-resident iOS developers, both as

3    to sales of their apps and in-app products, in or via whichever App Store storefront, as described

4    herein. Plaintiffs, on their own behalf and that of similarly situated developers, seek monetary

5    recovery and injunctive relief for harm caused by, and with respect to, Apple's violations of U.S. and

6    California antitrust and unfair-competition laws—harm that persists and will never abate unless

7    Apple is called to account for its unlawful behavior.

8                                       **II.      JURISDICTION**

9             30.      This Court has subject matter jurisdiction over this matter pursuant to the Class

10   Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(b), because the proposed classes consist of 100

11   or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest;

12   and, given the residency of iOS developers and the as alleged herein, at least one member of each

13   class of plaintiffs is a citizen or subject of a foreign state while the defendant, Apple, is a citizen of a

14   U.S. State.

15            31.      Furthermore, this Court has federal question jurisdiction pursuant to the federal

16   antitrust law invoked herein, including the Sherman Act and Clayton Antitrust Act. *E.g.*, 28 U.S.C.

17   § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

18                                        **III.     VENUE**

19            32.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (d)

20   because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this

21   judicial district, because Apple resides in this district, and because of Apple's contacts with this

22   district.

23            33.      There also is a venue provision specifying this judicial district in the operative

24   contract with iOS developers.[33]

25            34.      Furthermore, Apple's principal place of business is in this judicial district, and it is

26   believed, and therefore alleged, that a substantial amount of the conduct of which plaintiffs complain

27   _____

28   [33] *See* Ex. A, ¶ 14.10.

FIRST AMENDED CLASS ACTION COMPLAINT - 12
Case No.: 4:22-cv-04437-YGR
011083-11/2086911 V1

occurred here. For example, Phil Schiller, the company's high-ranking Apple Fellow, whose purview includes the App Store,[34] has had his office at Apple's headquarters in Cupertino, California, at times pertinent to plaintiffs' claims.[35] Therefore, decisions regarding the App Store and policy implementations giving rise to plaintiffs' claims were made at, and emanate from, that California location. Also, Apple has marketed, advertised, and sold affected iOS devices, upon which iOS apps and in-app products run, within this judicial district.

35.     <u>Divisional Assignment</u>: Assignment of this action to the San Jose Division is proper because defendant Apple's headquarters is located in Cupertino, California. Since the initial Complaint was filed, the matter has been assigned to the Hon. Yvonne Gonzalez Rogers in the Oakland Division of this Court.

## IV.     PARTIES

### A.     The Plaintiffs

#### 1.     Individual Developers

##### a.     Figaro

36.     Plaintiff Société du Figaro, SAS (Figaro), a French simplified joint-stock company, is a French resident with its principal place of business in Paris, France. It is the developer of the iOS Figaro news app and in app-product (*i.e.*, its related content subscriptions), among others. Figaro is a party to Apple's DPLA. This agreement (with pertinent schedule(s) or exhibit(s) thereto) specifies

---

[34] *See, e.g.*, "Phil Schiller, Apple Fellow," available at: https://www.apple.com/leadership/phil-schiller/ ("Phil Schiller is an Apple Fellow, responsible for leading the App Store and Apple Events.") (last accessed Nov. 29, 2022); "Apple's Phil Schiller is now in charge of the App Store," *The Verge*, Dec. 1, 2015, available at: https://www.theverge.com/2015/12/17/10412204/apple-phil-schiller-now-leads-app-store (last accessed Nov. 29, 2022).

[35] *E.g.*, "Apple to host annual Worldwide Developers Conference June 3-7 in San Jose," Mar. 14, 2019, available at: https://www.apple.com/newsroom/2019/03/apple-to-host-annual-worldwide-developers-conference-june-3-7-in-san-jose/ (quoting Mr. Schiller, and listing Cupertino, CA, at the top of the release) (last accessed Nov. 29, 2022); "Contacting Apple," https://www.apple.com/contact/ (listing Apple's "Corporate Address" as One Apple Park Way Cupertino, CA 95014) (last accessed Nov. 29, 2022).

the commission rates, pricing mandates,[36] and certain other mandates at issue in this suit. Also, in order to be permitted to make its apps available in the App Store, and to sell non-zero priced subscriptions through its apps, Figaro has paid Apple's mandatory developer fee, initially and thereafter on an annual basis—per Apple, "[e]nrollment is 99 USD (or in local currency where available) per membership year"[37]—including in 2018 and beyond.

37.     Furthermore, in order to be eligible to make its apps available in the App Store, and to sell non-zero-priced in-app products through its apps, Figaro, like all similarly situated iOS developers, must renew the DPLA every year:

> **11.1 Term**
> The Term of this Agreement shall extend until the one (1) year anniversary of the original activation date of Your Program account. Thereafter, subject to Your payment of annual renewal fees and compliance with the terms of this Agreement, the Term will automatically renew for successive one (1) year terms, unless sooner terminated in accordance with this Agreement.[38]

This periodic renewal entails payment of the annual fee. There is no mere rollover of the agreement from one year to the next; each renewal is a discrete, new, and independent event.[39] Thus, Apple's anticompetitive behavior and offenses, mandates, and application of supracompetitive pricing apply, take place, and occur anew and separately with the inception of each annual term at minimum.

38.     Figaro makes its iOS apps and in-app products available in the App Store (or, as to its in-app products, in apps acquired therefrom). By default,[40] the apps of Figaro and other similarly

---

[36] Regarding pricing, *see* Ex. A, Schedule 2, ¶ 3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool, which may be updated from time to time by Apple.").

[37] "Choosing a Membership," available at: https://developer.apple.com/support/compare-memberships/ (last accessed Nov. 29, 2022).

[38] Ex. A, ¶ 11.1.

[39] *See also, e.g.*, Declaration of Caeli A. Higney in Support of Apple Inc.'s Request for Judicial Notice, ECF No. 42-1 in the instant matter (Higney Decl.) Ex. C ("Agreement History" prepared by Apple from its records, showing Figaro's *separate and discrete* entries into Apple agreements on periodic bases, with columns entitled "Date Live" and "Accepted/Rejected On").

[40] "Select regions for your app," App Store Connect Help, available at: https://help.apple.com/app-store-connect/#/devcdda55918 ("By default, all locations are selected, making your app available on the App Store around the world. You can deselect regions where you

1   situated developers are available in all territories, countries, or regions where the App Store is

2   available. Figaro's iOS digital products are available to App Store consumer end-users in France and

3   the United States, among other places.[41] Further, as alleged herein, Figaro has used, and uses,

4   Apple's iOS app-distribution and IAP services, pursuant to Apple's adhesive agreements, practices,

5   and policies. And, of course, Figaro has paid Apple's supracompetitive commissions on its non-zero-

6   priced digital in-app products.

7        39.   Figaro's native apps and in-app products for iOS mobile devices were developed in

8   the Swift or Objective-C programming language (though referenced herein, for the sake of

9   conciseness, as iOS apps and in-app products). Both of these programming languages are different

10   from the programming language(s) used to develop native apps and in-app products for Android OS

11   or other mobile OS devices.

12        40.   Figaro's last sale(s) of its app in or via the App Store occurred in the calendar year

13   2022. Figaro has paid Apple's commission, including its supracompetitive default 30% commission,

14   on at least some of its sales.

15        41.   The U.S. Apple Inc. entity paid Figaro from sums paid by end-user consumers,

16   whichever the App Store storefront they accessed.

17        42.   Alternatively, Apple Inc. paid Figaro what amounts to an artificially low wholesale

18   price for digital products sold in or via the App Store (or in or via apps acquired therefrom).

19        43.   Furthermore, Figaro's sales have been subject to Apple's requirement that app and in-

20   app transactions be priced at a minimum of USD $.99 (or its equivalent,[42] with a very recent

21

22   _____

23   don't want your app for sale and select regions again at any time.") (last accessed Dec. 1, 2022); *see also, e.g.*, "Localization," available at: https://developer.apple.com/localization/ ("The App Store is

24   available in 175 regions and 40 languages to make it easy for users around the world to discover and download your app.") (last accessed Nov. 29, 2022).

25   [41] *See, e.g.*, "What Is Localization?" App Store Connect Help, available at: https://help.apple.com/xcode/mac/current/#/deve2bc11fab ("In App Store Connect, you can select

26   territories where your app will be available on the App Store, as well as localize the App Store information. Then you localize your app in Xcode so those users experience your app in their own

27   native language, region, and culture.") (last accessed Dec. 1, 2022).

28   [42] *E.g.*, its equivalent in EUR.

specification of €1.19, as alleged herein), as well as its end-in-USD $.99 pricing mandate (or their analogues or equivalents). Figaro would try price points that end in sums other than what Apple has mandated, as well as sales of digital products at price points below USD $.99 (or its analogue or equivalent), in efforts to achieve maximum sales, if Apple allowed it to do so—though it still would face the discoverability issues caused by cramming millions of apps into one app store.

44.     In order to reach consumers of iOS devices, Figaro required iOS distribution services (and not iOS or other OS distribution services). Because Apple excluded all competition for iOS distribution services, Figaro had no choice but to agree to Apple's adhesive and anticompetitive contractual terms, and to pay what Apple demanded for its iOS app-distribution and IAP services, *i.e.*, its supracompetitive 30% commission on sales of its content. (Alternatively, Apple paid Figaro what amounts to artificially low wholesale prices for apps sold in or via the App Store, and for in-app products sold in or via the App Store, or in apps acquired therefrom.)

45.     Figaro seeks monetary and injunctive relief as stated and requested herein, on its own behalf, and on behalf of similarly situated iOS developers.

### b.     L'Équipe

46.     L'Équipe 24/24 SAS (L'Équipe), a French simplified joint-stock company, is a French resident with its principal place of business in Boulogne-Billancourt, France. It is the developer of the L'Équipe sports-news and streaming app and in app-product product (*i.e.*, its related content subscriptions), among others. L'Équipe is a party to Apple's DPLA. This agreement (with pertinent schedule(s) or exhibit(s) thereto) specifies the commission rates, pricing mandates,[43] and certain other mandates at issue in this suit. Also, in order to be permitted to make its apps available in the App Store, and to sell non-zero priced subscriptions through its apps, L'Équipe has paid Apple's

---

[43] Regarding pricing, *see* Ex. A, Schedule 2, ¶ 3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool, which may be updated from time to time by Apple.").

mandatory developer fee, initially and thereafter on an annual basis—per Apple, "[e]nrollment is 99 USD (or in local currency where available) per membership year,"[44] including in 2018 and beyond.

47.     Furthermore, in order to be eligible to make its apps available in the App Store, and to sell non-zero-priced in-app products through its apps, L'Équipe, like all similarly situated iOS developers, must renew the DPLA every year:

> **11.1 Term**
> The Term of this Agreement shall extend until the one (1) year anniversary of the original activation date of Your Program account. Thereafter, subject to Your payment of annual renewal fees and compliance with the terms of this Agreement, the Term will automatically renew for successive one (1) year terms, unless sooner terminated in accordance with this Agreement.[45]

This periodic renewal entails payment of the annual fee. There is no mere rollover of the agreement from one year to the next; each renewal is a discrete, new, and independent event.[46] Thus, Apple's anticompetitive and offenses, behavior, mandates, and application of supracompetitive pricing apply, take place, and occur anew and separately with the inception of each annual term at minimum.

48.     L'Équipe makes its iOS apps and in-app products available in the App Store (or, as to its in-app products, in apps acquired therefrom). By default,[47] the apps of L'Équipe and other similarly situated developers are available in all territories, countries, or regions where the App Store is available. L'Équipe's iOS digital products are available to App Store consumer end-users in France and the United States, among other places.[48] Further, as alleged herein, L'Équipe has used, and uses, Apple's iOS app-distribution and IAP services, pursuant to Apple's adhesive agreements, practices, and policies. And, of course, L'Équipe has paid Apple's supracompetitive commissions on its non-zero-priced digital in-app products.

---

[44] "Choosing a Membership," available at: https://developer.apple.com/support/compare-memberships/ (last accessed Nov. 29, 2022).

[45] Ex. A, ¶ 11.1.

[46] *See also, e.g.*, Higney Decl. Ex. D ("Agreement History" prepared by Apple from its records, showing L'Équipe's *separate and discrete* entries into Apple agreements on periodic bases, with columns entitled "Date Live" and "Accepted/Rejected On").

[47] *E.g.*, n.40, *supra*.

[48] *See, e.g.*, n.41, *supra*.

49.     L'Équipe's native apps and in-app products for iOS mobile devices were developed in the Swift or Objective-C programming language (though referenced herein, for the sake of conciseness, as iOS apps and in-app products). Both of these programming languages are different from the programming language(s) used to develop native apps and in-app products for Android OS or other mobile OS devices.

50.     L'Équipe's last sale(s) of its app in or via the App Store occurred in the calendar year 2022. L'Équipe has paid Apple's commission, including its supracompetitive default 30% commission, on at least some of its sales.

51.     The U.S. Apple Inc. entity paid L'Équipe from sums paid by end-user consumers, whichever the App Store storefront they accessed.

52.     Alternatively, Apple paid L'Équipe what amounts to an artificially low wholesale price for digital products sold in or via the App Store (or in or via apps acquired therefrom).

53.     Furthermore, L'Équipe's sales have been subject to Apple's requirement that app and in-app transactions be priced at a minimum of USD $.99 (or its equivalent,[49] with a very recent specification of €1.19, as alleged herein), as well as its end-in-USD $.99 pricing mandate (or their analogues or equivalents). L'Équipe would try price points that end in sums other than what Apple has mandated, as well as sales of digital products at price points below USD $.99 (or its analogue or equivalent), in efforts to achieve maximum sales, if Apple allowed it to do so—though it still would face the discoverability issues caused by cramming millions of apps into one app store.

54.     In order to reach consumers of iOS devices, L'Équipe required iOS distribution services (and not iOS or other OS distribution services). Because Apple excluded all competition for iOS distribution services, L'Équipe had no choice but to agree to Apple's adhesive and anticompetitive contractual terms, and to pay what Apple demanded for its iOS app-distribution and IAP services, *i.e.*, its supracompetitive 30% commission on sales of its content. (Alternatively, Apple paid L'Équipe what amounts to artificially low wholesale prices for apps sold in or via the App Store, and for in-app products sold in or via the App Store, or in apps acquired therefrom.)

---

[49] *E.g.*, its equivalent in EUR.

1    55.    L'Équipe seeks monetary and injunctive relief as stated and requested herein, on its

2    own behalf, and on behalf of similarly situated iOS developers.

3    **2.    Association—Le GESTE**

4    56.    Plaintiff le GESTE is an association of publishers of online content and service based

5    in Paris, France. Its members include and have included Individual Developers. In fact, many

6    members, including Figaro and L'Équipe, have developed iOS apps and in-app products available for

7    sale in or via the App Store since May 2018 (and prior to that date)—as Apple well knows.[50] Thus, le

8    GESTE iOS-developer members, including Individual Developers, are parties to Apple's DPLA.

9    This agreement (with pertinent schedule(s) or exhibit(s) thereto) specifies the commission rates,

10   pricing mandates,[51] and certain other mandates at issue in this suit. Also, in order to be permitted to

11   make their apps available for sale in the App Store, le GESTE iOS-developer members, like all iOS

12   developers, have paid Apple's mandatory USD $99 annual developer fee, initially and on an annual

13   basis thereafter—per Apple, "[e]nrollment is 99 USD (or in local currency where available) per

14   membership year"[52]—including in 2018 and beyond. Based on research, various le GESTE iOS-

15   developer members last sold iOS apps or in-app products in or via the App Store in the calendar year

16   2022. Because these are non-zero-priced digital iOS products, le GESTE iOS-developer members (or

17   some of them) have paid Apple's commissions, including its 30% default commission, on sales.

18   57.    Furthermore, in order to be eligible to make their apps available in the App Store, and

19   to sell non-zero-priced in-app products through their apps, le GESTE iOS-developer members, like all

20   similarly situated iOS developers, must renew the DPLA every year:

21

22   _____

23   [50] *See* Higney Decl. Ex. B (printout of publicly available le GESTE member list, referencing,
     *e.g.*, TF1, M6, France TV, Radio France, Groupe Canal+, RTL, and Deezer, among others, in
24   addition to Figaro and L'Équipe—all of these entities are iOS developers that also produce and
     publish digital content for use within their iOS apps).

25   [51] Regarding pricing, *see* Ex. A, Schedule 2, ¶ 3.1 ("All of the Licensed Applications shall be
     marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated
26   by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool,
     which may be updated from time to time by Apple.").

27   [52] "Choosing a Membership," available at: https://developer.apple.com/support/compare-
     memberships/.

28

**11.1 Term**
The Term of this Agreement shall extend until the one (1) year anniversary of the original activation date of Your Program account. Thereafter, subject to Your payment of annual renewal fees and compliance with the terms of this Agreement, the Term will automatically renew for successive one (1) year terms, unless sooner terminated in accordance with this Agreement.[53]

This periodic renewal entails payment of the annual fee. There is no mere rollover of the agreement from one year to the next; each renewal is a discrete, new, and independent event. Thus, Apple's anticompetitive behavior and offenses, mandates, and application of supracompetitive pricing for le GESTE iOS-developer members apply, take place, and occur anew and separately with the inception of each annual term at minimum.

58.     Le GESTE iOS-developer members make iOS apps and in-app products available in the App Store (or, as to its in-app products, in apps acquired therefrom). By default,[54] the apps of these developer-members are available in all territories, countries, or regions where the App Store is available. These developers' iOS digital products are available to App Store consumer end-users in France and the United States, among other places.[55] Further, as alleged herein, le GESTE iOS-developer members have used, and use, Apple's iOS app-distribution and IAP services, pursuant to Apple's adhesive agreements, practices, and policies. And, of course, these developer members have paid Apple's supracompetitive commissions on its non-zero-priced digital in-app products.

59.     Le GESTE iOS-developer members' native apps and in-app products for iOS mobile devices were written or created in the Swift or Objective-C programming language (though referenced herein, for the sake of conciseness, as iOS apps and in-app products). Both of these programming languages are different from the programming language(s) used to develop native apps and in-app products for Android OS or other mobile OS devices.

60.     Furthermore, le GESTE iOS-developer members' sales have been subject to Apple's requirement that app and in-app transactions be priced at a minimum of USD $.99 (or its

---

[53] Ex. A, ¶ 11.1.

[54] *E.g.*, n.40, *supra*.

[55] *See, e.g.*, n.41, *supra*.

equivalent,[56] with a very recent specification of €1.19, as alleged herein), as well as its end-in-USD $.99 pricing mandate (or their analogues or equivalents). Le GESTE's developer members would try price points that end in sums other than what Apple has mandated, as well as sales of digital products at price points below USD $.99 (or its analogue or equivalent), in efforts to achieve maximum sales, if Apple allowed them to do so—though they still would face the discoverability issues caused by cramming millions of apps into one app store. As a consequence of Apple's willfully anticompetitive behavior, good apps go unfound. In fact, it is common that a query in the App Store yields pages and pages of apps called by Apple's search algorithm—with no real accounting of the surfaced apps' quality, age, or features.[57] This state of affairs devalues the iOS app-distribution and IAP services that Apple sells to iOS developers, which already are priced supracompetitively.

61.    In order to reach consumers of iOS devices, le GESTE iOS-developer members required iOS distribution services (and not iOS or other OS distribution services). Because Apple excluded all competition for iOS distribution services, le GESTE iOS-developer members had no choice but to agree to Apple's adhesive and anticompetitive contractual terms, and to pay what Apple demanded for its iOS app-distribution and IAP services, *i.e.*, its supracompetitive commissions. (Alternatively, Apple paid le GESTE iOS-developer members what amounts to artificially low wholesale prices for apps sold in or via the App Store, and for in-app products sold in or via the App Store, or in apps acquired therefrom.)

62.    What is more, Le GESTE has itself suffered direct economic injury, including lost money or property. Le GESTE is pro-publisher; content produced by its members enlighten, edify, and entertain the public. It advocates generally for competitive markets for online publishers. Since

---

[56] *E.g.*, its equivalent in EUR.

[57] Apple's efforts to revamp the look of the App Store, and to feature more apps, is not, and will never be, enough, to surface when there are only 365 days in the year, only so much space on screens, and so very many apps of all sorts crowded into a single store. (*See, e.g.*, "App Store discovery is climbing after the iOS 11 redesign," *Business Insider*, May 16, 2018, available at: https://www.businessinsider.com/apple-redesign-boosting-app-store-discovery-2018-5 (discussing effect of September 2017 design change that allows more apps to be featured, which was quite limited, especially when compared to the total number of apps in the App Store, and also considering that most apps are found by search—which again will yield way too many results to prove fruitful to vast numbers of developers) (last accessed Nov. 29, 2022).)

its creation in 1987, le GESTE has analyzed changes in the economic model of publishers of online

content and services, in order to provide a better understanding of the challenges posed by digital

transformation and the emergence of economic, legislative, and competitive conditions.[58] But

Apple's behavior has proven to be particularly deleterious and demanding of attention. Thus, due to

Apple's imposition of anticompetitive App Store-related practices, policies, and contractual

mandates; its monopolization of iOS app-distribution and IAP services; and its levy of

supracompetitive commissions, among other anticompetitive behavior as described herein, le GESTE

was forced to divert, and diverted and devoted, person-power, and financial and other resources, to

research, investigate, and analyze these specific iOS app-distribution and IAP-related issues.

Further, Le GESTE undertook these measures and expenditures in response to, and to counteract, the

effects of Apple's misconduct, rather than in anticipation of litigation, or for litigation purposes.

63.     In fact, for many months now, including many months before this suit was filed, all

four of le GESTE's permanent employees have spent hours and hours investigating, analyzing, and

addressing Apple's anticompetitive practices, often on a near-daily basis, which has drained critical

resources. Due to this diversion of resources, le GESTE has postponed the following activities that

are central to its mission: several planned projects concerning media corporate social responsibility;

research to address issues around emerging technologies, including artificial intelligence; and a

project to publish guidelines on the ad tech value chain. Le GESTE's focus on Apple has also

prevented its employees from working more closely on regulation relevant to developers, such as the

European Data Governance Act, the European Data Act, and regulations concerning artificial

intelligence. This diversion of resources has significantly interfered with le GESTE's mission.

64.     Despite its own loss of money or property as alleged herein, resulting in direct

economic injury to itself, plaintiff le GESTE seeks only prospective injunctive relief on its own

---

[58] *See* Le GESTE, *Formation et Object de l'Association*, https://www.geste.fr/statuts-de-lassociation ("Article 2 - Object et but . . . L'organisation d'échanges d'expériences et la mise à disposition de ses membres d'outils de formation et d'information concernant l'évolution du secteur du point de vue économique, juridique, technique.").

behalf, and also, additionally and alternatively, as a proposed class representative for its iOS-developer members.

**B.    The Defendant**

65.    Apple, the designer, manufacturer, and vendor of iPhones, iPads, and iPod touch music players, as well as the Apple Watch; the designer and author of iOS and iOS updates, as well as of iPad OS and Watch OS; and the owner and operator of the App Store, is a California corporation. It maintains its headquarters and principal place of business in Cupertino, California.

66.    Also upon information and belief, and as alleged above, Apple took all decisions and actions complained of herein at or near its corporate headquarters in Cupertino, California, or elsewhere in the state of California. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this complaint occurred in or emanated from California.[59]

**V.    RELEVANT FACTS**

67.    As demonstrated below, Apple has injured plaintiffs and competition by way of its unlawful behavior in the global, or, alternatively, the U.S., market for iOS app-distribution (or retailing) and IAP services. Plaintiffs participated in this market domestically, as purchasers of Apple's services in the United States domestic marketplace. Thus, U.S. antitrust law applies. So does California unfair-competition and antitrust law.

68.    As the holder of a willfully obtained monopoly in this market (or, effectively, as a monopsonist in the retailing of apps and in-app products), Apple's behavior has resulted in super-high prices for its iOS app-distribution and IAP services. These overcharges have resulted from its imposition of a supracompetitive and profit-reducing default 30% commission with respect to sales made in or via its App Store (or in apps acquired therefrom).[60] Alternatively, as a retail monopsonist that obtained its power by improper means, Apple has underpaid plaintiffs for their digital products.

---

[59] *See, e.g.*, ¶¶ 34, 65, *supra*; ¶ 244, *infra*.

[60] Again, the rate for auto-renewing subscriptions now drops to 15% after one year. (*E.g.*, n.18, *supra*.)

69.     Such conduct has been wildly profitable for Apple—while its hardware sales may vary or even decline at times, analysts have predicted that its App Store revenues will increase.[61] And certainly they have. In fact, Apple has been the beneficiary of an unseemly COVID-19-related windfall, above and beyond what its supracompetitive pricing has brought it.[62]

70.     What is more, Apple's aggressive and improper monopolization of this market, or the improper acquisition and abuse of its monopsony powers in the retailing space, has stifled competition by preventing the emergence of any viable competitors whatsoever, which reinforces and strengthens its pernicious and overbearing power in a market already distinguished by high barriers to entry.

71.     Additionally, Apple's exclusion of any competitors depresses the output of iOS app and in-app-product distribution transactions by dissuading the development of new apps (or in-app products), due to high distribution and IAP service fees as compared to sums needed to develop and market new iOS digital products. Apple's behavior also has depressed output by rendering undiscoverable vast numbers of apps and related in-app products, due to the sheer number of apps available in the one iOS app store. Further, Apple's minimum and end-in-$.99 pricing mandates have depressed output by denying developers the ability to price as they would choose in order to maximize sales to end-users—less of these sales means also less output of iOS app-distribution and IAP services.

72.     And, yet further, Apple's behavior has stifled innovation and let to poor developer and end-user consumer experiences. With competition, Apple and new market entrants would have to, and would, do better.

---

[61] *See, e.g.*, "The 30 Percent App Fees Are Too Damn High," *Bloomberg Businessweek*, available at: https://www.bloomberg.com/news/articles/2019-01-07/the-30-percent-fees-app-developers-have-to-pay-are-too-damn-high ("Apple skipped its typical disclosure of full-year App Store purchases and developer payouts for 2018, but analysts estimate revenue has risen steadily. At the same time, growth of its iPhone income stream has become unreliable.") (last accessed Nov. 29, 2022).

[62] *E.g.*, "Apple's App Store had gross sales around $64 billion last year and it's growing strongly again," *CNBC*, January 8, 2021, available at: https://www.cnbc.com/2021/01/08/apples-app-store-had-gross-sales-around-64-billion-in-2020.html (last accessed Nov. 29, 2022).

1

2

**A.      As They Must, iOS Developers Distribute Their Native Apps and Digital In-App Products in or via Apple's App Store, Or in Apps Acquired Therefrom, On Apple's Terms**

3

73.      With the App Store, Apple created a closed system to which it is the only gatekeeper.

4      Developers of apps and in-app products that run on Apple-branded mobile devices have participated

5      in this system with no choice in the matter. They had to participate if they wanted to sell their digital

6      wares to the millions and millions of device end-users who wanted to buy them.

7          **1.      Inception of the App Store**

8          74.      Apple began selling the iPhone in the summer of 2007. Thereafter, recognizing a

9      demand among iPhone users for native apps—as distinct from web apps[63]—Apple introduced the

10     App Store in July 2008.[64]

11         75.      The App Store was, and is, exclusive on purpose. That is, Apple determined that it

12     would shut out competition in distribution of native apps. Apple's claims that it willfully excluded all

13     competition in the field for the sake of end-user consumer safety fails any test of reasonableness or

14     proportionality. For example, (a) to have sought to establish, or to have established, standards for, or

15     (b) to have sought to recommend or require review of, or (c) to have insisted on certain safeguards

16     for, alternative distribution channels, would be one thing. To have undertaken willfully—and

17     successfully—to exclude all competition by deliberate choices and means is another. This latter

18     course is the impermissible pouring-on of the anticompetitive sauce.

19         **2.      The scale of the App Store**

20         76.      iOS device owner- and operator-ship is enormous. For example, Americans

21     themselves presently use some 118 million iPhones.[65] Also, they own tens if not hundreds of

22

23     ───────────────

[63] *See* ¶¶ 107, 175-80, *infra*.

[64] Apple Sup. Ct. Pet. Br. at 7.

24     [65] "Number of iPhone users in the United States from 2012 to 2022," *Statista*, available at:
25     https://www.statista.com/statistics/232790/forecast-of-apple-users-in-the-us/ (last accessed Nov. 29, 2022). Others have put the number even higher in and for recent years. *Cf., e.g.*, "189 Million
26     iPhones Are Currently in Use in the U.S.," *Cult of Mac*, Feb. 7, 2019, available at:
https://www.cultofmac.com/605442/189-million-iphones-are-currently-in-use-in-the-u-s/
27     ("According to new research published by Consumer Intelligence Research Partners, Apple's total
U.S. install base (the number of active iPhones being used) currently stands at 189 million units.

28

1    millions more iPads and iPod touch devices[66] Non-U.S. persons and other entities own and use

2    hundreds of millions more iOS devices.[67]

3        77.    The market for the distribution of iOS apps and, therefore, related in-app digital

4    products has been large for years (though output could not be increased as alleged herein with

5    competition).[68] For example, as *CNBC* reported earlier this year:

6        Apple said Monday [January 10, 2022] that it paid developers $60 billion in
         2021, or $260 billion total since the App Store launched in 2008. It's a figure that
7        suggests App Store sales continue to grow at a rapid clip.

8        By comparison, Apple said in 2019 it had paid developers a total of $155
         billion since 2008. And at the end of 2020, it said it had paid $200 billion, an increase
9        of $45 billion. Monday's figures show a jump of $60 billion.

10       ***

11       If Apple's commissions were uniformly at 30%, it grossed $85.71 billion in
         App Store sales in 2021 at the highest, based on CNBC analysis. If Apple's
12       commissions were all 15%, it would come in lower, at $70.58 billion.

13

14

15

16

17   _____

With the U.S. population in the vicinity of 325.7 million people, that's more than one iPhone for
18   every two people in the country.") (last accessed Nov. 29, 2022).

19       [66] For example, the number of iPad users in the U.S. in the 2018-19 timeframe was and is
approximately 81 million. (*See* "Number of iPad users in the United States from 2013 to 2020 (in
20   millions)," available at: https://www.statista.com/statistics/208039/ipad-users-forecast-in-the-us/
(last accessed Nov. 29, 2022).)

21   Also, as of a few years ago, Apple already had sold some 350 million+ iPods. ("Apple by the
numbers: 84M iPads, 400M iOS devices, 350M iPods sold," *CNET*, Sept. 12, 2012, available at:
22   https://www.cnet.com/tech/tech-industry/apple-by-the-numbers-84m-ipads-400m-ios-devices-350m-
ipods-sold/ (last accessed Nov. 29, 2022).) While that figure is not iPod touch-only, nonetheless,
23   many, many millions of end-user consumers purchased the iPod touch over the years.

24       [67] *See, e.g.*, "Apple says there are now over 1 billion active iPhones—With 1.65 billion Apple
devices in use overall," *The Verge*, Jan. 27, 2021, available at:
25   https://www.theverge.com/2021/1/27/22253162/iphone-users-total-number-billion-apple-tim-cook-
q1-2021 ("Apple says there are now more than 1 billion active iPhones, an enormous milestone for
26   the company that speaks to the phones' continued success and longevity. There are now 1.65 billion
Apple devices in active use overall, Tim Cook said during Apple's earnings call this afternoon.")
27   (last accessed Nov. 29, 2022).

28       [68] *See, e.g.*, Apple Sup. Ct. Pet. Br. at 9-10 (emphasis deleted).

1

2

Last year, CNBC analysis suggested that Apple's App Store grossed more than $64 billion in 2020, based on a 30% commission rate. . . .[69]

3

**3.     Plaintiffs' and the classes' iOS device-specific digital products**

4

5

6

7

8

9

10

78.     The iOS operating system is unique and incompatible with other mobile operating systems. The native apps and in-app products here at issue will run iOS-powered mobile devices, and not on mobile devices powered by other operating systems. Thus, the market for iOS app-distribution and IAP services is discrete. An iOS developer needs distribution services that will allow its products to reach iOS devices and their users. It cannot use other distribution channels set up to reach owners of products powered by a different mobile operating system. They are not substitutes for iOS app-distribution and IAP services.

11

12

13

14

15

16

17

79.     By Apple's anticompetitive fiat, the iOS App Store is the sole way in which iOS apps can be sold to iOS device owners, and iOS in-app products are sold solely in or via apps acquired therefrom (or in the App Store itself). (Again, as explained above, there is a minor exception with enterprise distribution. Also, others have endeavored to offer unsanctioned stores or distribution methods, to which Apple has not reacted well—and which have gained scant traction.) The App Store is exclusive and anticompetitive by intention, and so, then, are Apple's iOS app-distribution and IAP services.

18

19

20

21

22

23

24

25

26

27

28

---

[69] "Apple implies it generated record revenue from the App Store during 2021," *CNBC*, Jan. 10, 2022, available at: https://www.cnbc.com/2022/01/10/apple-implies-it-generated-record-revenue-from-app-store-during-2021-.html (last accessed Nov. 29, 2022).

Previously, Apple reported that in 2018, iOS developers globally earned some $34 billion from sales in the App Store. (*E.g.*, "Developer's [*sic*] $34 Billion Earnings from Apple's App Store Rose 28% in 2018," *Fortune*, Jan. 29, 2019, available at: fortune.com/2019/01/28/apple-app-store-developer-earning-2018/ (last accessed Nov. 29, 2022).) Apple reduced certain fees for App Store subscription sales beginning in September 2016. (*E.g.*, "Google matches Apple by reducing Play Store fee for Android app subscriptions," *The Verge*, Oct. 19, 2017, available at: https://www.theverge.com/2017/10/19/16502152/google-play-store-android-apple-app-store-subscription-revenue-cut (last accessed Nov. 29, 2022).) Applying a hypothetical blended, *i.e.*, average, rate of 27% for Apple's iOS distribution fees would yield some $12.57 billion that developers paid to Apple in 2018 (not including Apple's $99 fee).

Alternatively, if Apple is viewed as a monopsonist retailer, it essentially paid developers a wholesale price of USD $34 billion for the digital products it retailed in the App Store in 2018. Plaintiffs contend that but for the anticompetitive conditions that Apple has willfully brought about, they would have been paid much more for the digital products sold in the App Store.

1

**4.     How iOS app and in-app product distribution works**

2      80.     For their zero-priced and non-zero-priced iOS apps, and their in-app products, to be

3    made available or sold in the iOS App Store (or in or via apps acquired therefrom), iOS application

4    developers[70] enter into the Apple DPLA[71] and applicable attachments, schedules, and exhibits.[72]

5    Plaintiffs believe, and therefore allege, that the pertinent contractual terms, including those alleged

6    herein, have been the same, or substantially the same, during at least the four years preceding the

7    filing of this complaint. Schedule 2 to the DPLA contains the terms requiring payment by developers

8    of Apple's default 30% commission on paid sales of apps and in-app products.[73] Apple's App Store

9    Review Guidelines spell out the mandatory use of Apple's IAP services where applicable.[74]

10      81.     An iOS developer must obtain Apple's approval for its apps and in-app products

11    before it can sell them in the App Store.[75] The DPLA requires that iOS apps be distributed

12    exclusively in or via the iOS App Store, *i.e.*, they may not be distributed in other stores for iOS apps

13    (if there were any).[76]

14      82.     Thus, Apple cannot credibly claim that this is a simple matter of iOS developers

15    signing up voluntarily to use Apple's intellectual property to develop iOS digital products and then

16    seeking to avoid paying. Rather, Apple established this system, which contemplates the use of

17    certain software, content, or services,[77] key aspects of which it offers for free,[78] with the intended

18    result that iOS developers will only be able to distribute their digital products in or via the App Store.

19    And this, of course, has required that these developers pay Apple supracompetitive iOS app

20    _____

21      [70] Except presumably Apple, which also offers its own products—including its paid Apple Music
      product—in the App Store.

22      [71] *See* Ex. A. Upon information and belief, Apple's DPLA may previously have been
      denominated the iPhone Developer Program License Agreement.

23      [72] *See id.* (DPLA, including same).

24      [73] *See id.*, Schedule 2 at ¶ 3.4.

25      [74] *E.g.*, Ex. B, Sec. 3.1.

      [75] *See, e.g.*, n.206, *infra*.

26      [76] Ex. A, ¶ 7.

27      [77] *See generally* Exs. A and C (current exemplar of Apple Developer Agreement).

      [78] "Choosing a Membership," available at: https://developer.apple.com/support/compare-
28    memberships/ (last accessed Nov. 29, 2022).

1    distribution and in-app-product-related commissions, with the only real option being to walk away

2    from the large, and only, end-user market for their particular digital wares.

3        83.    Furthermore, Apple benefits greatly from the work of developers of iOS apps and

4    digital in-app products, so it already recoups value for any software or tools it makes available. End-

5    user consumers expect a variety of apps and in-app products, including free-to-get apps; thus, iOS

6    developers' work contributes greatly to the sale of Apple-branded mobile devices, even before the

7    payment of commissions or Apple's $99 USD annual developer-program fee.[79]

8        84.    Developers ostensibly set prices for products sold in the App Store, but their

9    discretion is actually limited by Apple. Apple requires that paid products be sold to U.S. consumers

10   at a regular price of no lower than USD $.99 (or its equivalent, with limited exceptions for certain

11   foreign App Store digital storefronts), and that pricing be set via a tier system with prices ending in

12   USD $.99 (or its analogue/equivalent), with limited exceptions for a few foreign App Store digital

13   storefronts.[80]

14       85.    According to Apple, the App Store is like a mall.[81] As to the iOS digital wares sold in

15   or via the App Store, or in or via apps acquired therefrom, Apple charges a (hefty) distribution or

16   IAP commission.[82]

17

18

19   _____

20   [79] See, e.g., Epic Games, 559 F. Supp. 3d at 946 ("Apple's late Chief Executive Order [sic], Mr.
     Steve Jobs, recognized that the 'purpose in the App Store is to add value to the iPhone' and
     ultimately 'sell more iPhones.'").

21   [80] Pricing for sales to end-users is set via tiers published by Apple. (See id., ¶ 3.1 ("All of the
22   Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified
     in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in
23   the App Store Connect tool, which may be updated from time to time by Apple.").) Upon
     information and belief, the maximum price that Apple has allowed in the years at issue was and is
24   USD $999.99 (or its equivalent—in the last several weeks, €1,199.99). (But see ¶ 19, supra.)

25   [81] Answering Brief of Respondent Apple Inc., submitted July 11, 2014, in Pepper v. Apple Inc.,
     Ninth Cir. No. 14-15000 (Apple Ninth Cir. Resp. Br.) at 28 ("As Plaintiffs allege, Apple sells
26   software distribution services to developers, much in the way that a shopping mall leases physical
     space to various stores. The fact that Apple's charge for those distribution services is expressed as a
27   percentage of the developer's sales proceeds is immaterial.") (emphasis added).

28   [82] See id.

     FIRST AMENDED CLASS ACTION COMPLAINT - 29
     Case No.: 4:22-cv-04437-YGR
     011083-11/2086911 V1

1

2

3

86.     In other words, as Apple admits, developers are direct purchasers of iOS app-distribution (and IAP) services from Apple.[83] In a brief to the U.S. Supreme Court, Apple depicted its transactions with iOS developers this way:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19

20

21

22

Accordingly, developers pay Apple a default 30% commission (with the exceptions referenced herein) for the app-distribution or IAP services that Apple sells to them directly on each sale of a paid iOS app or in-app product in the App Store (or in apps acquired therefrom). As alleged in further detail below, the fee is supracompetitive, resulting in overcharges.

23    **B.     Apple has willfully monopolized the market for iOS app-distribution and IAP services.**

24

25

87.     Shutting out competition works. By way of the behavior alleged and described herein, Apple is a willful monopolist in the market for iOS app-distribution and IAP services.

26

27

28

---

[83] *E.g.*, *id.* at 41 ("Apps developers have standing under *Illinois Brick* to argue whatever they want *because they are direct purchasers of distribution services from Apple . . . .*") (emphasis added).

**1.     The market**

88.     Plaintiffs summarize the details of the relevant market here. They further detail the relevant market in Sec. VII below.

89.     The iOS ecosystem is founded on and specific to unique and discrete operating system, iOS. Thus, there is no substitute worldwide for the iOS app-distribution and IAP services that Apple willfully keeps to itself. Non-iOS app distribution and IAP services, such as Android OS-directed services, are useless to iOS developers because they have incompatible digital products to sell.

**a.     The geographic market**

90.     The geographic area of the product market is global, or, alternatively, U.S.-nationwide. (But the geographic reach of the product market is to be distinguished from the reach of American antitrust law.[84])

**b.     The product market**

91.     As for the product market, iOS app and in-app products—that is, apps and in-app products programmed in languages yielding code that will run on iOS devices—require *iOS* app-distribution and IAP services. Thus, for example, Google's distribution services in its Android walled garden are meaningless to iOS digital-product developers whose apps and in-app products were programmed and otherwise designed for use on for use on *iOS*-powered devices.

92.     Developers may learn to code in the Objective-C or Swift programming language, and they and their employees, if any, may well not know how to code in a different programming language applicable to devices running on a different operating system. Nor may they be familiar with the other hardware and its various requirements. And they cannot simply run a program to convert their applications to the code used for a different operating system environment in the way that one might convert a WAV audio file to a FLAC audio file; there is no button to be pushed.[85]

---

[84] *Epic Games*, 559 F. Supp. 3d at 1026-27.

[85] *Compare, e.g.*, "6 Best Free Audio Converter Software Programs," *Lifewire*, July 1, 2022 (updated), available at: https://www.lifewire.com/free-audio-converter-software-programs-2622863 (last accessed Nov. 29, 2022), *with, e.g.* "How to Convert an Android App to an iOS App (and Vice

Great effort and expense and financial risk will ensue, including when the hiring of differently skilled developers, or the engagement of other expertise, is required.

93.     Also, differences in operating system versions come into play, as do the adoption rates for those versions. Additionally, there are differences among the various devices and screen sizes available for devices in that other ecosystem. In short, there is no simple or cost-effective way to abandon the Apple iOS environment and migrate to another environment with the hope that distribution fees will be cheaper, or that if enough other developers move, Apple would be forced to lower its distribution-service prices, which are super-high as alleged herein. What is more, a move away from the iOS system would mean that a developer could no longer offer its iOS apps or in-app products to hundreds of millions of end-user consumers who would have no other way to buy these iOS native digital products for their devices. And in any event, the developer (including during the preceding several years) would face the same default 30% commission rate at the Google Play store, too, thanks to Google's similar anticompetitive behavior in its own walled garden.[86]

94.     Thus, Google offers no competitive downward pressure on iOS distribution-services pricing (or, alternatively, the prices paid by Apple for digital products sold in its retail App Store). Google's distribution services, which are tied to offerings in its Google Play store, do not cover iOS products—only Android OS products distributed via Google Play. They are not substitutes for the services that Apple offers iOS app developers. The same is true of Amazon's distribution services, which are tied to its Appstore—these, too, are solely for Android OS products and never for iOS items.[87]

_____

Versa)," *Upwork*, available at: https://web.archive.org/web/20190410123846/https://www.upwork.com/hiring/for-clients/convert-android-app-ios-app-vice-versa/ ("Porting Android to iOS is not the same as making a copy of a JPEG image or converting MP3 music file to WAV. . . . To convert an app from one platform to another you have to hire developers that will build a new app (which, actually, will have the same or almost the same functionality and interface) specifically for the chosen platform . . . .") (reprinted with permission from *Stormotion*) (last accessed Nov. 29, 2022).

[86] "Service fees," available at: https://support.google.com/googleplay/android-developer/answer/112622?hl=en (last accessed Nov. 29, 2022).

[87] *E.g.*, "Amazon developer, available at: https://developer.amazon.com/ ("Develop Android apps and games for Amazon Fire TV, Fire tablet, and mobile platforms.") (last accessed Nov. 29, 2022).

95.     Europe has recognized these realities in addressing anticompetitiveness concerns with Google Play. As the European Commission put it in terms specifically regarding Android, but with certain facts and logic equally applicable to iOS:

> As a licensable operating system, Android is different from operating systems exclusively used by vertically integrated developers (like Apple iOS or Blackberry). Those are not part of the same market because they are not available for license by third party device manufacturers.
>
> Nevertheless, the Commission investigated to what extent competition for end users (downstream), in particular between Apple and Android devices, could indirectly constrain Google's market power for the licensing of Android to device manufacturers (upstream). The Commission found that this competition does not sufficiently constrain Google upstream for a number of reasons, including:
>
> *End user purchasing decisions are influenced by a variety of factors (such as hardware features or device brand), which are independent from the mobile operating system*;
>
> Apple devices are typically priced higher than Android devices and may therefore not be accessible to a large part of the Android device user base;
>
> *Android device users face switching costs when switching to Apple devices, such as losing their apps, data and contacts, and having to learn how to use a new operating system*; and . . . .[88]

96.     Regarding app stores specifically, the European Commission has stated (again with specific regard to Google Play, but with an observation that applies to the iOS App Store as well):

> This market is also characterized by high barriers to entry. *For similar reasons to those already listed above, Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices.*[89]

97.     In sum, the market for iOS app-distribution and IAP services is discrete.

**2.     Apple's willful acquisition of monopoly market power**

98.     Notably, Apple does not contractually bind buyers of iOS devices to the App Store as the sole source of their apps or in-app products.[90]

---

[88] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm (emphasis added) (last accessed Nov. 29, 2022).

[89] *Id.* (emphasis added).

[90] *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 1024 ("consumers do not contractually agree to obtain apps only through the App Store when they purchase an iPhone . . . .").

99.     Nonetheless, to reach Apple iOS device owners, iOS developers have no choice but to sell their iOS digital products via the App Store. By technical and contractual means, Apple imposes exclusivity with iOS developers for distribution of their iOS apps.[91]

100.     Thus, by design, Apple's market share in the enormous market for iOS app-distribution and IAP services is likely close to 100%.[92]

101.     Apple admits that as a general proposition, it shuts out all competition from app-distribution and IAP services to iOS device consumers.

102.     In fact, as to in-app purchases, Apple imposes anti-steering provisions. In limited exceptions, Apple has allowed for payments to be made for purchases outside of its IAP system. One example pertains to multiplatform apps (so long as the content is offered in-app as well).[93] Apple has permitted content for these apps to be paid for outside of IAP. But even where a developer is excepted from using IAP to sell content, and certainly when it is not, Apple has not permitted the developer to tell end-users *within its app* that they can acquire and pay for content outside the app.[94] Nor has Apple permitted developers to provide a link *within their apps* to the places where end-users can procure content.[95] This behavior, which plainly is not consumer-friendly, reinforces Apple's default lock on in-app-purchase services. The *Epic Games* court required significant changes to these terms by way of a U.S.-nationwide injunction issued post-trial.[96] Also, Apple voluntarily agreed with developers in the *Cameron* settlement to alter its terms for "U.S. Developers," particularly with

---

[91] *E.g.*, *Epic Games*, 559 F. Supp. 3d at 993; *see also* Ex. A, ¶ 7.

[92] As alleged above, there is no approved way to distribute iOS apps to end-user consumers writ large except through the App Store. (*E.g.*, Ex. A, ¶ 7.) Others, such as Cydia, have tried to use unapproved ways to do so, and they have failed. A suit based on the alleged harm to Cydia is pending in this Court. *See SaurikIT, LLC v. Apple Inc*., N.D. Cal. No. 4:20-cv-08733-YGR.

[93] Ex. B, ¶ 3.1.3(b).

[94] *See* Ex. B, ¶ 3.1.3; *but also see* Ex. B, ¶ 3.1.3(a)-"Reader" Apps, for a recent change ("Reader app developers may apply for the External Link Account Entitlement to provide an informational link in their app to a web site the developer owns or maintains responsibility for in order to create or manage an account.").

[95] Ex. B, ¶¶ 3.1.1 and 3.1.3.

[96] *Epic Games*, 559 F. Supp. 3d at 1058.

respect to the use of information acquired in-app.[97] Nonetheless, as of now, anti-steering provisions remain in Apple's developer guidelines, including because of the stay of the *Epic Games* court's injunction pending resolution of the cross-appeal in that matter before the Ninth Circuit.

103.    In sum, by deliberate action, Apple has acquired and maintained an unlawful monopoly in the relevant market (or submarket) for iOS app and in-app-product distribution services. Apple has done so by shutting out competition for no justifiable reason. Alternatively, notwithstanding its commission model, Apple acts as a willful monopsonist for iOS apps and related digital products.

**C.    Alternatively, Apple has willfully attempted to acquire monopoly market power.**

104.    Alternatively, for the foregoing reasons, Apple is an attempted monopolist in the market for iOS app and in-app-product distribution services. Given that the facts alleged amply support a finding that Apple has willfully maintained monopoly status in this market, *a fortiori*, the facts alleged support a finding that Apple is attempting (and has attempted) to monopolize this iOS app-distribution and IAP services market by improper means.

105.    In fact, even if one were to consider a broader market consisting of all app and in-app product distribution services to include other discrete device markets, Apple's share would still hover currently around 56.65% as of June 2022 (or 59.87% as of January 2022)[98]—enough to sustain an attempted monopolization claim in that theoretical—albeit improperly drawn—market.

**D.    Alternatively, Apple has willfully acquired monopsony market power, or has willfully attempted to acquire it**

106.    Alternatively, by requiring that it be the sole retailer of iOS developers' digital products, Apple acts as a monopsonist, or attempted monopsonist. A monopsonist is a buy-side monopolist. The circumstances and effects are essentially the same as with monopoly or attempted

---

[97] *See* "Settlement Agreement and Release" in *Cameron v. Apple Inc.*, N.D. Cal. No. 4:19-cv-03074-YGR, ¶ 5.1.3, available at: https://angeion-public.s3.amazonaws.com/www.SmallAppDeveloperAssistance.com/docs/Settlement+Agreement.pdf (last accessed Nov. 29, 2022).

[98] "Mobile Operating System Market Share United States of America," *GlobalStats* statcounter, available at: http://gs.statcounter.com/os-market-share/mobile/united-states-of-america (last accessed Nov. 29, 2022).

monopoly: by Apple's behavior as alleged herein, Apple uses its monopsony power as the sole retailer-distributor for iOS apps and in-app products to pay iOS developers below the price they would obtain in a competitive market for their products. The effect is the same as if Apple, in an explicitly wholesale-retail model, had depressed wholesale prices by way of its anticompetitive market power and behavior.

**E.      By Apple's purposeful, exclusionary design, no entity applies market constraints.**

107.    Nor does any other entity providing app and in-app-product distribution services for iOS native apps (and iOS in-app digital products), including Google, provide any constraints to Apple's market power. One definition of "native app" is:

> a software program that is developed for use on a particular platform or device.

> Because a native app is built for use on a particular device and its OS, it has the ability to use device-specific hardware and software. Native apps can provide optimized performance and take advantage of the latest technology, such as a GPS, compared to web apps or mobile cloud apps developed to be generic across multiple systems.

> ***

> The term *native app* is used to refer to platforms such as Mac and PC, with examples such as the Photos, Mail or Contacts applications that are preinstalled and configured on every Apple computer. However, in the context of mobile web apps, the term native app is used to mean any application written to work on a specific device platform.

> The two main mobile OS platforms are Apple's iOS and Google's Android. Native apps are written in the code preliminarily used for the device and its OS. For example, developers write iOS applications in Objective-C or Swift, while they create Android-native apps in Java.

> Native apps work with the device's OS in ways that enable them to perform faster and more flexibly than alternative application types. If the app is marketed to users of various device types, developers create a separate app version for each one.[99]

108.    Thus. apps sold for devices running one operating system or the other are incompatible; accordingly and not surprisingly, developers of iOS apps and in-app products cannot

---

[99] "Definition, native app," available at: https://www.techtarget.com/searchsoftwarequality/definition/native-application-native-app (last accessed Nov. 29, 2022).

1    sell their iOS digital products via the Google Play store. Therefore, Google's Android OS

2    distribution services are of no use to developers. And certainly they cannot aid iOS developers in

3    reaching the many tens and hundreds of millions of iOS device consumers for whom they

4    programmed their apps and-in app products.

5         109.   Furthermore, the switching costs between developing for iOS and Android are high.

6    For example, app developers must learn the discrete programming languages peculiar to each

7    ecosystem. (As another example, they must learn the hardware and OS peculiarities of each

8    ecosystem.) This takes time (including diversion from other economic opportunities), money, and

9    much effort.

10        110.   Most recently, iOS native apps are usually written in the Swift programming

11   language.[100] Previously, most iOS apps were written in the Objective-C programming language.[101]

12        111.   As for native Android OS apps, on the other hand:

13             Android apps can be written using Kotlin, Java, and C++ languages. The
      Android SDK tools compile your code along with any data and resource files into an
14     APK or an Android App Bundle.

15             An *Android package*, which is an archive file with an .apk suffix, contains the
      contents of an Android app that are required at runtime and it is the file that Android-
16     powered devices use to install the app.[102]

17        112.   Given the use of these different programming languages, it is no simple task to switch

18   from iOS apps to Android apps because the ecosystems, like the markets to which they give rise, are

19   separate and discrete. So again, the fact that Google may offer distribution services for Android OS

20   phones, tablets, and music players is of no moment to iOS developers.

21

22

23   ───────────────

24        [100] *See, e.g.*, Apple Developer, "Swift," available at: https://developer.apple.com/swift/ ("Swift is
      a powerful and intuitive programming language for iOS, iPad OS, macOS, tvOS, and watchOS.")
25   (last accessed Nov. 29, 2022).

26        [101] *See, e.g.*, "A Short History of Objective-C," *Medium*, Apr. 24, 2017, available at:
      https://medium.com/chmcore/a-short-history-of-objective-c-aff9d2bde8dd (last accessed Nov. 29,
      2022).

27        [102] Android Developers, "Application Fundamentals," available at:
28   https://developer.android.com/guide/components/fundamentals (last accessed Nov. 29, 2022).

113.    Europe is in accord: Google offers no counterbalance to Apple in the iOS distribution-services market.[103]

114.    Moreover, for sales in its Google Play store, Google charges Android OS developers the same default 30% commission on paid apps and paid in-app products, and non-auto-renewing subscriptions (initially).[104] Apple's practices and mandates have given Google the cover it has needed, in its discrete ecosystem, to charge developers similarly supracompetitive rates. So even if an iOS developer were to think about spending the time, money, and effort to develop apps for Android OS devices, there would be no respite from default supracompetitive and profit-killing commissions (or, alternatively, from unnaturally low wholesale-level payments for apps and in-app digital products).

**F.    Apple's willful practices with respect to the iOS App Store are especially grievous and effective as to the market for iOS app-distribution and IAP services, where already there are high barriers to entry.**

115.    Even if Apple did not shut out competitors willfully, by design,[105] market-participant hopefuls would still need the resources to build and maintain an app store client for iOS devices to program and maintain the requisite software and algorithms going forward, to advertise the client and the steps needed to install it (assuming that Apple would never allow it to be distributed via the App Store, as is currently the case), among other barriers. This is not to say that the barriers are insurmountable—Epic Games, for example, has signaled a willingness to enter the market, and it did so on a limited basis, for payment processing services related to its Fortnite game, in August 2020—but they are high. As the court found in *Epic Games* (with respect to the market there addressed): "barriers to entry are currently relatively high but are plausibly decreasing and may be lower in the future."[106]

---

[103] *See, e.g.*, ¶¶ 91-97, *supra*.

[104] "Service fees," available at: https://support.google.com/googleplay/android-developer/answer/112622?hl=en (last accessed Nov. 29, 2022). The latest statements regarding Google Play billing reflects its latest policies as to automatically renewing subscription products and its "15% service fee tier" for the first $1 million (USD) of earnings per year. (*Id.*)

[105] *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 993.

[106] 559 F. Supp. 3d at 994.

116.    To reiterate: the European Commission also has concluded that there are high barriers to entering the market for app distribution via app stores.[107] The same factors it cited as high barriers to entry in "the worldwide market (excluding China) for licensable smart operating systems," with specific respect to Google's Android OS ecosystem, apply with respect to entry into the market for iOS app-distribution and IAP services.

**G.    Apple offers an overblown excuse for its brazenly anticompetitive behavior.**

117.    Apple claims that it blocks others from providing iOS app-distribution and IAP services in order to protect device customers from bad apps and malware. But this is largely, if not wholly, pretextual. There is no reason to believe that other reputable vendors, including Amazon, for example, could not host an iOS app store and provide a trustworthy iOS app-distribution and IAP system if Apple were to open up its system to other providers. Indeed, Apple could provide certain vetting services to help ensure it.

118.    Apple is not uniquely qualified to police an apps marketplace. For example, before apps and in-app products must be sold in or via the App Store (or in apps acquired therefrom), it must first approve them.[108] It says it vet apps "for malware and offensive content, among other things."[109] But Apple is not infallible where security or curation are concerned.[110]

---

[107] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterised by high barriers to entry. . . .") (last accessed Nov. 29, 2022).

[108] *See, e.g., Epic Games*, 559 F. Supp. 3d at 943.

[109] Apple Sup. Ct. Pet. Br. at 7.

[110] *See, e.g.*, "Apple Removes 17 Malicious iOS Apps From App Store," *Threatpost*, Oct. 24, 2019, available at: https://threatpost.com/click-fraud-malware-apple-app-store/149496/ (last accessed Nov. 29, 2022) ("Researchers have uncovered 17 apps on Apple's official App Store infected with malware. Apple has since removed the apps from the App Store – but a "significant" number of iOS users could have installed them, researchers said. . . . And last year, Apple removed two apps that were posing as fitness-tracking tools – but were actually using Apple's Touch ID feature to loot money from unassuming iOS victims."); "Apple Battles App Store Malware Outbreak," *BankInfoSecurity*, Sept. 21, 2015, available at: https://www.bankinfosecurity.com/apple-battles-app-store-malware-outbreak-a-8538 (noting that U.S. consumers were affected: "[f]or example, WeChat

119.     Nor, despite the enormous profits collected with respect to the App Store, has Apple always employed the best practices or procured the best results. In fact, an Apple engineer has claimed that App Store security was akin to "bringing a plastic butter knife to a gunfight." He also claimed that Apple's app-review process was "more like the pretty lady who greets you . . . at the airport rather than a drug-sniffing dog," and that Apple was not well-equipped to "deflect sophisticated attackers."

120.     As for curation and protection of end-users and the iOS app ecosystem, the App Store has been home to much so-called "fleeceware"—reportedly well more than in the Google Play store for Android OS apps.[111] These fleeceware apps have, per a *Forbes* report, "made $365 million in revenue."[112] Scammers deploying these apps have "skirt[ed] App Store regulations and scam[med] iPhone and iPad owners using Apple's own in-app purchasing system," per research and reporting.[113]

121.     Further, reports are that Apple actually benefits from iTunes gift card scams. Fraudsters persuade unsuspecting people to buy iTunes gift cards for some sort of supposedly urgent purpose.[114] The fraudsters then persuade the victims to give up the code numbers on the card.[115] Then they use the cards to buy apps from the App Store—scam apps that the fraudsters as supposed iOS developers themselves, or their accomplices, have placed for sale in or via the App Store.[116] The result is that Apple pays the "developers" or their accomplices 70% of the victim's money spent on

---

is widely used across the Asia-Pacific region, while business card scanning program CamCard - which is developed by a Chinese company - is the most-downloaded business card reader and scanner in many countries, including the United States.") (last accessed Nov. 29, 2022).)

[111] *See* "Apple Engineer Claims App Store Security Brings 'A Plastic Butter Knife To A Gunfight,'" *Forbes*, April 10, 2021, available at: https://www.forbes.com/sites/gordonkelly/2021/04/10/apple-iphone-app-store-fleeceware-scam-iphone-12-pro-max/?sh=4ff3e19a1911 (last accessed Nov. 29, 2022).

[112] *See id.*

[113] *See id.*

[114] "About Gift Card Scams," available at: https://support.apple.com/gift-card-scams (last accessed Nov. 29, 2022).

[115] *Id.*

[116] *See, e.g.*, "Why Do Scammers Ask for iTunes Gift Cards," *Safeguard Tips*, May 10, 2019 update, available at: https://safeguardtips.com/why-do-scammers-ask-for-itunes-gift-cards/ (last accessed Nov. 29, 2022).

the scam apps that the fraudsters somehow control—with Apple keeping the rest as its commission.[117] This sort of behavior—essentially a money-laundering scheme—harms App Store end-users and diminishes broader end-user trust in the App Store, even as it tarnishes the reputation of developers participating in the iOS app ecosystem. So again, there is no reason to believe that other reputable entities could not participate responsibly and honorably in the sale of iOS distribution services, apps, and in-app products by way of competing stores, or by way of self-distribution. Certainly Apple, despite its unfathomable resources, is not uniquely equipped to provide, nor does it provide, perfect App Store-related services. To the contrary.

**H.      In an illustration and exercise of its monopoly power, Apple unfairly taxes iOS app and in-app product distribution.**

**1.      Apple's supracompetitive default commission**

122.     Since July 2008, when it launched the App Store, and despite the accrual of efficiencies and economies of scale, Apple has charged iOS developers a default and super-high 30% commission on sales of apps and in-app products.

123.     In spite of not having to carry physical inventory (as distinct from uploaded digital content); having such a large and growing pre-install base for the App Store, which has multiplied not by building more physical stores but simply by replicating a software client pre-installed on iOS devices; and economies of scale that have grown over time, Apple has continued, where its default rate applies, to take nearly a third of every dollar (or analogue/equivalent) for iOS app-distribution or IAP services with respect to iOS app and in-app product sales. Given how large the market is, there is plainly enough revenue to support distribution functions while providing a healthy profit in the event the default 30% transaction fee[118] were lowered to a reasonable rate—one the market could

---

[117] *See id.* A proposed class action lawsuit, *Barrett v. Apple Inc.*, N.D. Cal. No. 5:20-cv-04812-EJD, currently is pending in this Court based on such allegations.

[118] Or alternatively, the 30% fee is a retail commission, and Apple is able to impose this high tax on retail sales because it is a monopsonist. Seen another way, Apple essentially pays developers a default wholesale price of ~USD $.70 (or its equivalent) for products that retail for USD ~$1.00 (or its equivalent).

generate on its own but for Apple's improperly acquired monopoly in the market for iOS app-distribution and IAP services.

124.     Because the fee or commission is supracompetitive, it cuts improperly into, and otherwise contributes to the diminishment of, what ought to be the developers' profits. Viewed another way, Apple the monopsonist retailer pays iOS developers less for their digital products than what they would be paid in a competitive market. It is an underpayment, whereas, if Apple is viewed as a monopolist with respect to iOS app-distribution and IAP services, it is an overcharge.

125.     Only in certain circumstances, such as the Small Business Program, has Apple veered from its default rate. More specifically, Apple dropped the commission rate from 30% to 15%, with no steps in between, in just three circumstances: (a) for participants in its Video Partner Program; (b) with respect to subscriptions sold in-app, via IAP, that are in place for longer than a year; and, most recently (c) for sales by developers who qualify for its Small Business Program. With respect to these variances from it standard 30% rate, Apple steadfastly maintains that the terms apply to all qualified developers, with no special deals.

126.     But Apple has not varied its commission rates in response to competition *because it has none, by design, in iOS app-distribution or IAP services*. In fact, its CEO Tim Cook's candid trial testimony at the *Epic Games v. Apple* trial well-illustrated that Apple has *not* priced its commissions in response to *any* supposed *competition*:

> **The Court**: The issue with the $1 million Small Business Program, at least from what I've seen thus far: that really wasn't the result of competition. That seemed to be a result of the pressure that you're feeling from investigations, from lawsuits, not competition.
>
> **Mr. Cook**: It was the result of feeling like we should do something from a COVID point of view, and then electing to instead of doing something very temporary, to do something permanent. And of course we had the lawsuits and all the rest of the stuff in the back of our head, but the thing that triggered it was, we were very worried about small business.
>
> **The Court**: Okay, but it wasn't competition.
>
> **Mr. Cook**: It was competition after we did ours to 15, it was competition that made Google drop theirs to 15.
>
> **The Court**: I understand perhaps that when Google changed its price, but your action wasn't the result of competition.
>
> **Mr. Cook**: It was the result of feeling like we should do something for small

1   business, which in our . . . vernacular is small developer.[119]

2   127.   Indeed, as to Apple's default 30% commission, the *Epic Games v. Apple* court put it

3   succinctly: "[T]he 30 percent number has been there since the inception . . . [a]nd if there was real

4   competition, that number would move, and it hasn't."[120]

5   128.   Notably, Apple's SBP cuts the default 30% commission rate *in half*, underscoring

6   how arbitrary—and super-high—the rate has been all along. Further, Apple implicitly acknowledged

7   in its announcement of the SBP that lowering the rate "means small developers and aspiring

8   entrepreneurs will have more resources to invest in and grow their businesses in the App Store

9   ecosystem."[121] In other words, new apps and greater output will ensue.

10   129.   As the foregoing illustrates, there is no good, pro-competitive, or otherwise justified

11   reason for Apple's default and supracompetitive 30% commission, which it has maintained since the

12   opening of its App Store thanks to the competition it has willfully excluded.[122] Nor was there such

13   justification for this commission rate, or for any commission rate above what would exist in a market

14   with actual competition, in the four years preceding the filing of this suit. Nor, seen another way, are

15   there pro-competitive or other justifiable reasons for the continually low prices Apple pays iOS

16   developers for digital wares sold in the App Store (or in apps acquired therefrom). Rather, this

17   unnatural price stability, under the circumstances alleged herein, is a sure sign of Apple's unlawful

18   acquisition of monopoly power and the abuse of that market power. Thus, the anticompetitive harm

19   of Apple's conduct as alleged herein necessarily outweighs any pro-competitive benefit.

20

21

22   [119] *Epic Games v. Apple* Trial Tr. Vol. 15 at 3992:4-3993:1.

   [120] *Epic Games v. Apple* Trial Tr. Vol. 16 at 4081:3-7.

23   [121] "Apple announces App Store Small Business Program," Apple Newsroom, Nov. 18, 2020,

24   available at: https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/ (last accessed Nov. 29, 2022).

25   [122] *See, e.g.*, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," *The*

26   *Register*, Aug. 29, 2018, available at:
   https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ ("Apple unveiled the

27   App Store in July 2008, and Android Market the following month, opening with the first Android device that October. Apple set the 30 per cent rate, Google simply followed suit.") (last accessed

28   Nov. 29, 2022).

### 2.      Commission rates charged at other stores

130.    In addition to the foregoing, facts related to other stores help to illustrate the supracompetitive, anticompetitive, and injurious nature of Apple's 30% default commission rate. These include the rates charged by other stores, set forth immediately below, as well as the example of Amazon's Coins program for its Appstore, discussed in Sec. V.L.2, *infra*.

#### a.      Epic Games Store

131.    In its August 29, 2018 article entitled, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," *The Register* raised several important points and asked as many hard questions with regard to Apple's long-standing fee structure. The impetus for the article was the developer Epic Games' decision to distribute its popular Fortnite game to Android device owners outside of Google Play.[123] (Of course, due to Apple's completely exclusionary practices, Epic Games could not simply abandon the App Store—if it did so, thanks to Apple's admitted policies and practices, it could not reach *any* consumers in the iOS device and apps market.)

132.    As reported in the article, Epic Games' CEO, Tim Sweeney, told *Forbes*[124] that "[a]voiding the 30 percent 'store tax' is a part of Epic's motivation."[125] "It's a high cost in a world where game developers' 70 per cent must cover all the cost of developing, operating, and supporting their games. And it's disproportionate to the cost of the services these stores perform, such as payment processing, download bandwidth, and customer service."[126] In a previous *Register* article,

---

[123] Article available at: https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ (last accessed Nov. 29, 2022). The article's subtitle and URL refer to a "duopoly." There is no duopoly in a legal sense, given the incompatibility between Android OS apps on the one hand and Apple iOS apps on the other.

[124] *See* "From 'Fortnite' To 'Fallout 76,' Publishers Are Sick of Google, Apple and Steam's Store Cuts," Aug.13, 2018, available at: https://www.forbes.com/sites/insertcoin/2018/08/13/from-fortnite-to-fallout-76-publishers-are-sick-of-google-apple-and-steams-store-cuts/#1c118ff2578c ("Epic announced that Fortnite would indeed be coming to Android, but it would not be sold through the Google Play store. Players would have to (somewhat clunkily) download it from Epic's website on their phones, and the game would then update itself independently of the Play store going forward.") (last accessed Nov. 29, 2022).

[125] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[126] *Id.*

Mr. Sweeney put it this way: "[F]rom the [developer's] 70 percent, the developer pays all the costs of developing the game, operating it, marketing it, acquiring users and everything else. For most developers that eats up the majority of their revenue."[127]

133.    After noting that one reader of a previous *Register* article had written: "I learned something. Google take[s] 30%. That is some serious gouging," the later article stated: "More pertinently, after a decade, is the question why Apple and Google *still* take a 30 per cent cut. In a competitive marketplace, wouldn't that rate have been whittled down over the years?"[128] As plaintiffs allege and demonstrate herein, the answer is yes.

134.    While the scale of Epic Games' own endeavor—not only the sale of Fortnite outside of Google Play, but a possible new game store for Android OS device owners—would be relatively small compared to the Apple behemoth, such that it could not benefit from Apple's economies of scale (or experience at keeping down costs), its owner provided information illustrating the supracompetitive nature of Apple's 30% iOS app-distribution and IAP services fee. For its own store, Epic Games opted to set a *12%* commission rate.

135.    This is plenty to achieve a reasonable profit, as explained by Epic Games' CEO. Per an *MCV* article entitled, "New Epic Games Store takes on Steam with just 12% revenue share – Tim Sweeney answers our questions"[129]:

> "While running Fortnite we [Epic] learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5 per cent to 3.5 per cent for payment processing for major payment methods, less than 1.5 per cent for CDN costs (assuming all games are updated as often as Fortnite), and between 1 and 2 per cent for variable operating and customer support costs." Sweeney told us.

> "Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," he reveals. "But with developers receiving 88 per cent of

---

[127] "Game over for Google: Fortnite snubs Play Store, keeps its 30%, sparks security fears, Aug. 3, 2018," Aug. 3, 2018, available at: https://www.theregister.co.uk/2018/08/03/fortnite_security_fears/ (last accessed Nov. 29, 2022). The security fears of which the article also speaks could be avoided if Google permitted the distribution of alternative game-store clients through Google Play—and likewise if Apple permitted the distribution of game-store and other-digital-product-store clients through the App Store.

[128] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[129] https://www.mcvuk.com/business/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions (dated Dec. 4, 2018) (last accessed Nov. 29, 2022).

revenue and Epic receiving 12 per cent, this store will still be a profitable business for us," he explains.[130]

136.    That a newcomer like Epic Games expected to run a store profitably with a 12% fee demonstrates how supracompetitive Apple's default 30% developer fee truly is.[131] More recently, despite "front-load[ing] its marketing and user-acquisition costs to gain market share," Epic Games indicated that it "expects the Epic Games Store to become profitable by 2023 . . . ."[132] Given Apple's experience, huge pre-installation base for the App Store (given that each iPhone, iPad, and iPod touch bears the store client out of the box), and the economies of scale that have accrued over the years, it is likely that it could earn a healthy profit by charging even less than 12% per covered transaction.

**b.    Bandcamp**

137.    Recently, Epic Games acquired Bandcamp, an online store for digital music distribution.[133]

138.    As at least one commentator has noted, Bandcamp "'charges its customers just 10-15% commission,' and sometimes nothing . . . ." "'But that retailer *has paid out around a billion dollars to artists, and crucially, it says that it has long been profitable*."[134] This, too, helps to indicate the super-high nature of Apple's default 30% commission rate.

**c.    Google Play**

139.    Following Apple's adoption of its Small Business Program, Google established a similar program, further illustrating how high Apple's default 30% commission rate has been (and is). Indeed, the Google Play small business program, unlike Apple's SBP, lowers its standard rate

---

[130] *Id.*

[131] Despite "front-load[ing] its marketing and user-acquisition costs to gain market share," Epic Games has indicated that it "expects the Epic Games Store to become profitable by 2023 . . . ." *Epic Games*, 559 F. Supp. 3d at 933-34.

[132] *Epic Games*, 559 F. Supp. 3d at 933-34.

[133] *See, e.g.*, "Is This the Real Reason Epic Games Acquired Bandcamp?" *Music Business Worldwide*, Mar. 15, 2022, available at: https://www.musicbusinessworldwide.com/podcast/is-this-the-real-reason-epic-games-acquired-bandcamp/ (last accessed Nov. 29, 2022).

[134] *Id.* (emphasis added).

from 30% to 15% for the first million dollars (USD) of revenue for all U.S. Android app developers, starting anew each year, without a requirement of revenues under USD $1 million for the preceding year.[135] 30% is and has been an arbitrary, super-high rate imposed by two giants in their respective walled gardens.

### d. Chrome Web Store

140.    Another comparator comes from Google. Google has for years operated the Chrome Web Store, whereby it sells certain (non-iOS) apps for use on computers, such as Windows laptops and desktops.[136] Google's Chrome Web Store distribution fee for certain paid apps or in-app products is only 5%,[137] not the App Store's (or Google Play's) default 30%.

141.    There is no indication that the Chrome Web Store is an eleemosynary venture, or that Google is losing money by way of transaction fees set at 5%.

### e. Microsoft Store

142.    Last year, Microsoft announced that it was lowering its distribution-service fees for various (non-iOS) apps and in-app products. In June 2021, it stated that it would move to an 85/15% split in the Microsoft Store, with an 88/12% split for games.[138]

143.    Moreover, Microsoft also announced that it, like Epic Games at that time, would permit developers to use their own payment-processing systems. Thus, developers with their own, or

---

[135] *See, e.g.*, "Google Play drops commissions to 15% from 30%, following Apple's move last year," *TechCrunch*, Mar. 16, 2021, available at: https://techcrunch.com/2021/03/16/google-play-drops-commissions-to-15-from-30-following-apples-move-last-year/ (last accessed Nov. 29, 2022) (quoting Sameer Samat, VP of Android and Google Play: "This is why we are making this reduced fee on the first $1 million of total revenue earned each year available to every Play developer that uses the Play billing system, regardless of size. We believe this is a fair approach that aligns with Google's broader mission to help all developers succeed.").

[136] *See* https://chrome.google.com/webstore/category/extensions (last accessed Nov. 29, 2022).

[137] https://developer.chrome.com/webstore/pricing#seller ("The charge for using Chrome Web Store Payments is 5%. For example, if you charge $1.99, you'll receive $1.89.") (last accessed Nov. 29, 2022). But note that the developer.chrome website indicates that "[t] Chrome Web Store payments system is now deprecated." (*Id.* (emphasis in original).)

[138] "Building a new, open Microsoft Store on Windows 11," Windows Experience Blog, June 24, 2021, available at: https://blogs.windows.com/windowsexperience/2021/06/24/building-a-new-open-microsoft-store-on-windows-11/ (last accessed Nov. 29, 2022).

1    third-party, commerce platforms soon would soon be able to sell their digital wares via the Microsoft

2    Store at a *0%* commission rate.[139]

3            144.    Previously, in 2019, Microsoft announced that it had lowered its distribution-service

4    fees for various (non-iOS) apps and in-app products.[140]

5            145.    Microsoft's App Developer Agreement, v. 8.4, with an effective date of March 5,

6    2019, covered apps built for Windows and sold through the Microsoft Store. Among other fee

7    reductions, Microsoft reduced its distribution fees (called Store Fees) per the following from 30% to:

8        iii. Fifteen percent (15%) of Net Receipts for any Apps that are not Games (and any
         In-App Products in such Apps) when: (a) a Customer acquires such App or In-App
9        Product in a version of the Microsoft Store not listed in Section 6(b)(i)(c) on a
         Windows 10 device that is not an Xbox console; and (b) the Customer acquisition was
10       driven by Microsoft (with such acquisition referral being marked with an OCID).

11       iv. Five percent (5%) of Net Receipts for any Apps that are not Games (and any In-
         App Products in such Apps) when: (a) a Customer acquires such App or In-App
12       Product in a version of the Microsoft Store not listed in Section 6(b)(i)(c) on a
         Windows 10 device that is not an Xbox console; and (b) there is either:

13
                (i) Customer acquisition of such App or In-App Product driven by you (with
14       such acquisition referral being marked with a CID);

15              (ii) Customer acquisition of such App or In-App Product driven by both you
         and Microsoft (with such acquisition referral being marked with a CID and an OCID);
16       or

17              (iii) Customer acquisition of such App or In-App Product that was not driven
         by either party (with such lack of acquisition referral being marked by the absence of
18       either an OCID or a CID).[141]

19

20

21

---

22   [139] *See id.*

23   [140] *See, e.g.,* "Microsoft is now giving consumer app developers up to 95 percent of their Store
     app sales," *ZD Net*, March 7, 2019, available at: https://www.zdnet.com/article/microsoft-is-now-
24   giving-consumer-app-developers-up-to-95-percent-of-their-store-app-sales/ (last accessed Nov. 29,
     2022).

25   [141] *Compare* Microsoft App Developer Agreement, v.8.4, Effective Date: Mar. 5, 2019, available
26   at: https://web.archive.org/web/20190409082807/https://docs.microsoft.com/en-
     us/legal/windows/agreements/app-developer-agreement (last accessed Nov. 29, 2022), *with*
27   Microsoft App Developer Agreement, v.8.3, Effective Date: May 23, 2018, available at:
     https://web.archive.org/web/20190117150043/https://docs.microsoft.com/en-
28   us/legal/windows/agreements/app-developer-agreement (last accessed Nov. 29, 2022).

146.    Again, these rates contrast(ed) with Apple's default, supracompetitive 30% rate for iOS app-distribution and IAP services. There is no indication that Microsoft will fail to earn a reasonable profit on its services.

### f.    Amazon Appstore

147.    Amazon also has announced price cuts for its Appstore services.

148.    For small developers, Amazon stated in June 2021 that its commission rate soon would be *20%*; moreover, Amazon stated that it would credit those developers with Amazon Web Services credits equivalent to 10% of their revenue, which would sweeten the deal substantially.[142] It began implementing the program in December 2021.[143]

149.    Developers of skills apps for Amazon's Alexa devices likewise are seeing their revenue share increase:

> Starting this month, developers that earn less than $1MM in aggregate annual revenue from In-Skill Purchasing (ISP), Subscriptions, and Paid Skills will now receive revenue share of 80% — an increase from the earlier revenue share model of 70/30. In addition, these developers will also receive 10% of their skills' earnings as an additional value back incentive. This incentive will be paid out in cash for 2022. In the future, we expect to offer developers this same value as traffic promotional credits that can be applied toward Promoted Skills: a self-serve skill promotion offering which we are also announcing today designed to drive traffic to skills. We'll share more about Promoted Skills later this year. With these incentives, the revenue share for skill developers will effectively go up to 90/10. The increased revenue share model goes into effect starting with the earnings for the month of July 2022.[144]

---

[142] "Coming Soon: Amazon Appstore Small Business Accelerator Program," Appstore Blogs, June 15, 2021, available at: https://developer.amazon.com/blogs/appstore/post/93e89be7-1611-4764-8f97-f4eef0a7c0e0/coming-soon-amazon-appstore-small-business-accelerator-program (last accessed Nov. 29, 2022); "Small Business Accelerator Program," Amazon Appstore—Make money from your apps, available at: https://developer.amazon.com/apps-and-games/services-and-apis/monetization#sbap ("Developers with less than 1 million USD in the previous calendar year now receive an increased 80/20 revenue share - no action required.") (last accessed Nov. 29, 2022).

[143] "Small business developers now earn more," Amazon Appstore Developer, Dec. 28, 2021, available at: https://developer.amazon.com/apps-and-games/blogs/2021/12/small-business-developers-now-earn-more (last accessed Nov. 29, 2022).

[144] "Amazon announces new Sill Developer Accelerator Program for Alexa," Alexa, July 20, 2022, available at: https://developer.amazon.com/en-US/blogs/alexa/alexa-skills-kit/2022/07/Alexa-live-skill-developer-accelerator-program-july-2022 (last accessed Nov. 29, 2022).

1

g.      **Shopify**

2          150.    Shopify likewise has lowered rates for its app store.[145]

3          151.    Per a press report, "[f]ollowing similar moves by Apple, Google, and more recently

4   Amazon, among others, e-commerce platform Shopify announced today [June 29, 2021] it's also

5   lowering its cut of developer revenue across its app marketplace, the Shopify App Store, as well as

6   the new Shopify Theme Store."[146]

7          152.    Thus, Shopify reduced the rate to 0% from 20%. Business affected would be

8   substantial; in 2020 alone, its "app developer partners earned $233 million."[147]

9          Per *TechCrunch*:

10         This benchmark will also reset annually, giving developers — and, particularly those on
           the cusp of $1 million — more earning potential. And when Shopify's revenue share

11         kicks in, it will now only be 15% of "marginal" revenue. That means developers will
           pay 15% only on revenue they make that's over the $1 million mark.

12
           The same business model will apply to Shopify's Theme Store, which opens to
13         developer submissions July 15.

14         As the two stores are separate entities, the $1 million revenue share metric applies to
           each store individually. The new business model will begin on August 1, 2021 . . . .
15
           Shopify says the more developer-friendly business model will mean a drop in company
16         revenue, but says it doesn't expect this impact "to be material" *because it will*
           *encourage greater innovation and development*.[148]
17

18         **3.      Apple's maximization of its super-high commission by pricing mandates**

19         153.    Apple maximizes its expensive commission by also insisting, with certain

20  exceptions,[149] that paid apps and in-app products be priced no less than USD $.99 (or equivalent) at

21  minimum and in sums ending in USD 99 cents (or analogous/equivalent) for higher-priced apps and

22

23         ──────────────
           [145] *See, e.g.*, "Shopify drops its App Store commissions to 0% on developers' first million in
    revenue," *TechCrunch*, June 20, 2021, available at: https://techcrunch.com/2021/06/29/shopify-
24  drops-its-app-store-commissions-to-0-on-developers-first-million-in-revenue/ (last accessed Nov. 29,
    2022).
25         [146] *Id.*

26         [147] *Id.*

27         [148] *Id.* (emphasis added).
           [149] These include alternate tiers in certain App Store storefronts, as well as variations based on
28  exchange rates and taxes.

in-app products. For example, no USD $.49 (or equivalent) or $1.49 (or equivalent) regular-priced apps or in-app digital items are allowed. This adds to Apple's profit by ensuring that when its default commission rate applies, and where its standard pricing terms apply, it collects roughly USD $.30 on every paid sale at U.S.-App Store-digital-storefront and U.S.-digital-App Store-digital-storefront-equivalent pricing.[150]

154.    Apple's minimum end-user consumer pricing for paid digital products—USD $.99 or €.99, or its recently mandated higher prices (*e.g.*, €1.19 vs. €.99), as well as its end-in-.99 pricing (or, more recently, its prescribed price points of €1.19, €2.49, and €3.49 in "territories that use the euro currency")—are unlawful exercises of its ill-gotten and ill-maintained monopoly (or, alternatively, monopsony) market power.

155.    Low-price apps sell especially well, but Apple will not allow regular paid pricing in the U.S. or France, for example, to fall below its prescribed minimum, to the detriment of developers. They see less sales than they would if they could price apps at lower price points such as USD $.49 (or its analogue or equivalent). This diminishes output in app and in-app product distribution services.

156.    Apple's requirement of prices ending in USD $.99 (or equivalent) also inhibits sales and output in app and in-app-product transactions. For example, developers cannot offer $1.49 or $1.69 (or equivalent) paid apps or in-app products (but for possible exceptions in certain foreign iOS App Store digital storefronts).

---

[150] While many apps are initially free to consumers, such that Apple does not charge their developers at the time consumers download them, many developers monetize their work by offering digital products in-app for a fee (and Apple collects its 30% commission accordingly). (*See, e.g.*, "Choosing a business model," available at: https://developer.apple.com/app-store/business-models/ (last accessed Nov. 29, 2022).)

Apple touts at least two business models that allow developers to monetize their creations by selling in-app digital products: "freemium" and "paymium." (*See, e.g.*, *id.*) Again, Apple charges developers a default 30% commission on such sales (though again, there are exceptions for its recently established Small Business Program and for subscriptions of a specified duration, among other limited exceptions—*see, e.g.*, *id.*).

157.   There is no pro-competitive or lawful justification for these pricing mandates.[151]

158.   Notably, as part of a 2021 settlement with U.S. iOS developers, Apple agreed to "expand the number of price points available to developers for subscriptions, in-app purchase, and paid apps" significantly.[152]

### 4.   Apple's added annual fee

159.   What is more, Apple mandates that its "tens of thousands of registered iOS app developers" pay an additional *USD $99* (or equivalent) per year.[153] (To reiterate, "[e]nrollment is 99 USD (or in local currency where available) per membership year"[154]) This additional charge, aggregated, surely offsets and exceeds much of, if not most or all of, the cost of Apple's curation and security efforts for most if not all such iOS developers, as well as payment processing and other functions. Moreover, paying that USD $99 fee annually can also obliterate profits for app developers that are trying to build business, including because it cuts into funds available to market their wares (a critical matter given the severe discoverability problem in a single store crammed with some two million apps).

### 5.   Apple's supracompetitive profits

160.   Apple's anticompetitive app-distribution and IAP distribution system, together with its super-high pricing, have given rise to stories of its enormous, supracompetitive App Store profits[155]—the result of its unfair taxation of the market for iOS app-distribution and IAP services.

---

[151] "Settlement Agreement and Release" in *Cameron v. Apple Inc.*, N.D. Cal. No. 4:19-cv-03074-YGR, ¶ 5.1.4.

[152] *E.g.*, "Apple, US developers agree to App Store updates that will support businesses and maintain a great experience for users," Apple Newsroom, Aug. 26, 2021, available at: https://www.apple.com/newsroom/2021/08/apple-us-developers-agree-to-app-store-updates/ (last accessed Nov. 29, 2022).

[153] Apple Sup. Ct. Pet. Br. at 7.

[154] "Choosing a Membership," available at: https://developer.apple.com/support/compare-memberships/ (last accessed Nov. 29, 2022).

[155] *See, e.g.*, "Apple's App Store Generated Over $11 Billion in Revenue for the Company Last Year," *Forbes*, Jan. 6, 2018, available at: https://www.forbes.com/sites/chuckjones/2018/01/06/apples-app-store-generated-over-11-billion-in-revenue-for-the-company-last-year/#63205d266613 ("Apple reported that its App Store <u>generated</u>

As the court found in *Epic Games*, following trial, Apple's App Store profits well exceeded *70%*, persistently.[156] Per the court, "*under any normative measure, the record support[ed] a finding that Apple's operating margins tied to the App Store are extraordinarily high. Apple did nothing to suggest operating margins over 70% would not be viewed as such.*"[157]

161.   Apple's super-high profit margins are both indicative of its monopoly market power and an exercise of it.

162.   There is, after all, no competitive check on Apple's pricing or profit-taking behavior. For example, Google LLC owns and operates the Google Play store. But Google Play is a separate walled garden for the sale of *Android OS* apps that operate on *Android OS* (or Chrome OS) devices. As Google explains: "Other operating systems: Devices running other operating systems (including Apple and Windows devices) are not supported for downloading Android apps on Google Play."[158] This is because iOS and Android devices and apps are incompatible. So again, even if the Google Play store were available on iOS devices—and it is not—it would put no pressure on Apple to lower distribution fees to iOS developers because those developers could not sell their wares in Google Play. And because Apple does not allow its device owners access to other iOS stores (and prohibits its iOS developers from selling their iOS digital wares in alternative venues anyway), there is no downward pressure on Apple's commissions (or upward pressure on the prices it pays to iOS developers).

---

over $26.5 billion in revenue for developers in 2017, which was up about 30% year-over-year. *This means that the App Store created approximately $11.5 billion in revenue for the company.*") (emphasis added) (last accessed Nov. 29, 2022). And while Apple likes to tout what iOS developers have earned by selling their products through the only iOS store available to them, the fact that the numbers may be large in isolation does not speak to their fairness vis-a-vis Apple's developer fees and other charges. Developers would have earned more but-for Apple's mandates and practices as alleged herein.

[156] *Epic Games*, 559 F. Supp. 3d at 952-53.

[157] *Id*. at 953 (emphasis added).

[158] "System requirements," available at: https://web.archive.org/web/20190423183512/https://support.google.com/googleplay/answer/2844198?hl=en (last accessed Nov. 29, 2022); *see also* "Google Play supported devices," available at: https://support.google.com/googleplay/answer/1727131?hl=en (last accessed Nov. 29, 2022) (linking to lists of "Android devices" and "Chrome OS devices" "that use Google Play.").

1    **I.      Alternatively, as a retailer, Apple has underpaid developers.**

2          163.    Alternatively, since July 2008, when it launched the iOS App Store, and despite the

3    accrual of efficiencies and economies of scale, Apple as a digital product retailer has underpaid iOS

4    developers for the digital products it sells in its iOS App Store (or for digital in-app products sold in

5    the iOS App Store or in apps acquired therefrom).

6    **J.      The lack of competition has diminished the quality of Apple's services.**

7          164.    Furthermore, with no competition to spur Apple to improve, the quality of its services

8    is diminished.

9          **1.      Slow payments**

10          165.    Naturally, iOS developers, like all who engage in commerce, wish to get paid for their

11   products as soon as possible. But Apple's monopolization of the market, including as to payment

12   processing, circumvents the ability of would-be competitors to better serve developers, and for

13   developers to be better served.

14          166.    Apple's requirement that iOS developers use its IAP services entails the use of

15   Apple's payment processing system, which is subject to Apple payout policies.[159] Unfortunately, this

16   means that developers must endure the six-plus-weeks' delays in funds distribution that are built into

17   Apple's system.[160] If iOS developers were allowed to use other systems besides Apple's IAP, or

18   allowed to use other payment processors in conjunction with the IAP system, they could engage

19   third-party payment processors that would get their money to them much sooner.[161]

20

21   _____

22          [159] *See, e.g.*, "Getting paid overview," available at: https://help.apple.com/app-store-connect/#/dev6a92b6d7b (last accessed Nov. 29, 2022); "Workflow for configuring in-app

23   purchases," available at: https://help.apple.com/app-store-connect/#/devb57be10e7 (last accessed Nov. 29, 2022).

24          [160] *See, e.g.*, "Getting paid overview," available at: https://help.apple.com/app-store-connect/#/dev6a92b6d7b ("If you meet those requirements, payments are made to the bank account and

25   currency you provided within 45 days of the last day of the fiscal month in which the transaction was completed.") (last accessed Nov. 29, 2022).

26          [161] *Compare id.*, *with*, *e.g.,* "Receiving Payout," available at:

27   https://stripe.com/docs/payouts#payout-schedule (referring to two-and-three-business-day and seven-calendar-day payout schedule for U.S. accounts, depending on assessed risk level, for the payment

28   processor Stripe) (last accessed Nov. 29, 2022).

167.     The sheer size of the market for iOS apps and in-app products—many, many billions of app downloads per year,[162] giving rise to billions of purchases of in-app products per year[163]—also means that a large, and certainly not insubstantial, amount of payment processing by other entities is foreclosed by Apple's anticompetitive behavior, which in general allows none where iOS digital products are concerned.

**2.     Inferior refunds**

168.     By its DPLA, Apple also takes over the refund function between developers and their end-user consumers.[164]

169.     As the court found in *Epic Games*:

>        Apple does a poor job of mediating disputes between a developer and its customer. Consumers do not understand that developers have effectively no control over payment issues and or even access to consumers' information. Consequently, it can be frustrating for both sides when issues arise relating to the inability to issue and manage the legitimacy of requests for refunds.[165]

170.     This leads to inefficiencies and poor customer service. It also means that developers cannot implement their preferred refund policies, nor can they tailor refunds to customer histories. Worse, due to Apple's lack of visibility into transactions, its policies actually can increase fraud. Also, only recently did Apple begin to provide developers with information that a refund had been issued; moreover, developers had no ability to remove the refunded feature to prevent its further use. Developers cannot respond effectively under these conditions when a refund is requested (and

---

[162] According to Apple, "[m]ore than 4B apps [are] distributed each day . . . ." ("The apps you love. From a place you can trust," available at: https://www.apple.com/app-store/ (last accessed Nov. 29, 2022).)

[163] *See, e.g.*, "A Global Perspective on the Apple App Store Ecosystem," Analysis Group, June 2021, available at: https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf (estimating billings and sales of "Digital Goods and Services" at $86 billion worldwide for 2020—the term "billings" was used to refer "specifically to payments generated by paid downloads and in-app purchases, including subscriptions, that use the Apple in-app payment systems . . . ." (last accessed Nov. 29, 2022).

[164] *E.g.*, Ex. A, ¶ 3.4 ("You will not issue any refunds to end-users of Your Application, and You agree that Apple may issue refunds to end-users in accordance with the terms of Schedule 2.").

[165] 559 F. Supp. 3d at 951 (footnote omitted).

1    given), particularly if the request is one based on purported customer dissatisfaction with the

2    developer's product.[166]

3          171.    Apple does not provide better service in these regards because it is the only game in

4    town.

5          **3.    Other interference in the relationship between developers and end-users**

6          172.    In 2020, the CEO of an app maker explained Apple's interference with the developer

7    - end-user relationship. According to his post, the interference went beyond refunds.

8          173.    As he explained:

9              Most people don't know what happens to your customer relationship when
               you're forced to accept In App Payments or offer subscriptions in Apple's App Store.
10             1. When someone signs up for your product in the App Store, they aren't
               technically your customer anymore - they are essentially Apple's customer. They pay
11             Apple, and Apple then pays you. So that customer you've spent years of time,
               treasure, and reputation earning, is handed over to Apple. And you have to pay Apple
12             30% for the privilege of doing so!

13             2. You can no longer help the customer who's buying your product with the
               following requests: Refunds, credit card changes, discounts, trial extensions, hardship
14             exceptions, comps, partial payments, non-profit discounts, educational discounts,
               downtime credits, tax exceptions, etc. You can't control any of this when you charge
15             your customers through Apple's platform. So now you're forced to sell a product -
               with your name and reputation on it - to your customers, yet you are helpless and
16             unable to help them if they need a hand with any of the above.[167]

17         174.    Again, with no competition, Apple is disincentivized to fix this sort of interference to

18   the satisfaction of all concerned. This sort of unfortunate interference is another detrimental outcome

19   of Apple's behavior.

20         **K.    Nor does the potential for web apps alleviate the harm to plaintiffs or competition.**

21         175.    Nor does the potential for creating web apps alleviate the harm to plaintiffs or

22   competition. Web apps are not substitutes for native iOS apps. They are not the digital product at

23   issue, nor do they take the same skill set to create as to native apps.

24

25

---

26   [166] *See, e.g., id.*

27   [167] "Our CEO's take on Apple's App Store payment policies, and their impact on our relationship
     with our customers," *Hey.com*, June 19, 2020, available at: https://www.hey.com/apple/iap/ (last
28   accessed Nov. 29, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT - 56
Case No.: 4:22-cv-04437-YGR
011083-11/2086911 V1

176.    Consider the success of the one App Store, which Apple regularly speaks to. Despite Apple's excessive pricing and take-it-or-leave-it terms relating to the distribution and sale of iOS apps and in-app products, the App Store sells a *lot* of iOS apps and in-app products every year. Consumers understand native apps. They visit an app store, in this case the iOS App Store, and acquire an app which is then uploaded to their Apple-branded mobile device by way of a familiar process. It is the way that Apple has trained them to acquire apps.

177.    Then there are unfamiliar, and inferior, web apps. As one source explains:

> A web app is an application that the user does not download and instead accesses via a web browser over a network. Example web browsers include Google Chrome, Safari and Mozilla Firefox. Web apps provide functionality from bank account access to YouTube video viewing via, for example, Safari on an iPhone.

> While native apps are written to the specific device, a majority of web applications can be written in JavaScript, CSS and the standard version of HTML for universal use across various browsers. Web apps can use a single code base because they are not designed around a specific device. Web apps are fast and simple to build, but are not as versatile and quick as native apps.[168]

178.    Among the technology that diminishes the quality of web apps and the web-app experience is Apple's own WebKit browser engine and its relationship to Apple's Safari browser, which many consider to be inferior in quality to, and lacking in key features as compared to, other browsers.[169] Further, because of Apple policies mandating the use of WebKit on all web browsers used on iOS devices, and because of Apple's restrictions on the use of certain of its Application Programming Interfaces (API), no browser can do better than Apple's own Safari browser.[170] Further, Apple limits the abilities and performance of web apps accessed via third-party browsers versus those accessed via Safari, including as to full-screen use, installation of web apps on the home screen (which can only be done via Safari), use of extensions, mandatory use of Apple Pay within

---

[168] Definition of "web app," per "Definition, native app," available at: https://www.techtarget.com/searchsoftwarequality/definition/native-application-native-app (last accessed Nov. 29, 2022).

[169] *See generally* "Response to Mobile Ecosystems Interim Report, Brower and Web-App Remedies v.1.2," Open Web Advocacy, available at: https://open-web-advocacy.org/files/OWA%20-%20Response%20to%20Mobile%20Ecosystem%20Interim%20Report%20-%20v1.1.pdf (last accessed Nov. 29, 2022), and *id.* at 5.

[170] *See generally id.*, and *id.* at 5.

Apple's Web Payments API, and in-app favoring of Safari, no matter the end-user's default browser choice.[171] Thus, among other ill effects, innovation is diminished and held hostage to WebKit and Safari.

179.    Not surprisingly, this state of affairs favors Apple. As the U.K.'s Competition & Markets Authority (CMA) recently has observed:

> There are two main ways in which Apple benefits from the ways in which the WebKit restriction harms other browsers' ability to compete.
>
> First, Apple receives significant revenue from Google by setting Google Search as the default search engine on Safari, and therefore benefits financially from high usage of Safari. Safari has a strong advantage on iOS over other browsers because it is pre-installed and set as the default browser. The WebKit restriction may help to entrench this position by limiting the scope for other browsers on iOS to differentiate themselves from Safari (for example being less able to accelerate the speed of page loading and not being able to display videos in formats not supported by WebKit). As a result, it is less likely that users will choose other browsers over Safari, which in turn secures Apple's revenues from Google.
>
> Second, and as discussed in Chapter 4, Apple generates revenue through its App Store, both by charging developers for access to the App Store and by taking a commission for payments made via Apple IAP. Apple therefore benefits from higher usage of native apps on iOS. By requiring all browsers on iOS to use the WebKit browser engine, Apple is able to exert control over the maximum functionality of all browsers on iOS and, as a consequence, hold up the development and use of web apps. This limits the competitive constraint that web apps pose on native apps, which in turn protects and benefits Apple's App Store revenues.[172]

180.    In sum, Apple knows well that web apps are inferior to iOS native apps; its technologies and self-serving policies give rise to this inferiority; and Apple benefits thereby. Web apps are not real substitutes for iOS apps and related distribution and IAP services; in fact, Apple's behavior with respect to them is part of its willful acquisition and maintenance of monopoly (or monopsony) power.

**L.    Apple's deliberate and unlawful practices harm competition, iOS developers, and end-user consumers of iOS apps and in-app products, too.**

181.    Apple's monopolistic practices—its fiat that it be the sole provider of iOS app-distribution and IAP services, and that it run the lone iOS app store in the market for iOS app-

---

[171] *See generally id.*, and *id.* at 6-7.

[172] "Mobile ecosystems, market study final report," U.K. Competition & Markets Authority, June 10, 2022, available at: https://www.gov.uk/government/publications/mobile-ecosystems-market-study-final-report (last accessed Nov. 29, 2022).

distribution and IAP services—kills competition. Apple did not beat competitors in the iOS app and in-app product space; it boxed out all potential competition deliberately, by way of technical means and adhesive contracts.[173]

182.    Also, Apple taxes iOS developers at supracompetitive rates. What is more, Apple's distribution charges are so high that undoubtedly they keep many would-be iOS developers out of the App Store; these developers will decline to take the financial risk, and to invest development time and effort, as well as marketing resources, given that Apple will take such a large percentage of their app and in-app product sales. Additionally, the fact that apps are not discoverable due to the sheer amount of product in the one iOS app store hurts iOS developers and end-user buyers of iOS apps and in-app products, and it deters the production of new and better apps and in-app products.

183.    Furthermore, Apple's practices harm iOS device consumers by robbing them of innovation and choice. They rob iOS-device end-users of more other apps that might be truly useful, fun, or innovative, due to the exorbitant distribution charges that iOS developers must pay, and also due to Apple's refusal to permit the sale of paid apps and in-app products that do not end in USD 99 cents (or its equivalent)—*e.g.*, generally speaking, there are no USD $.49 (or equivalent) apps or in-app digital products available to them.

**1.    Apple's harm to competition and iOS developers, as well as end-user consumers, including by depression of output**

184.    Evidence shows that consumers of app-store products are quite price sensitive.[174] Apple's high commission fees, therefore, inhibit sales of products sold via the App Store, as developers must take account of them in pricing and otherwise.[175] Thus, sales of iOS app-distribution and IAP services are inhibited as well. In other words, Apple's fees depress output.

---

[173] *E.g.*, *Epic Games*, 559 F. Supp. 3d at 993.

[174] *See, e.g.*, "Only 33% of US Mobile Users Will Pay for Apps This Year," Feb. 5, 2015, available at https://web.archive.org/web/20220120040214/https://www.emarketer.com/Article/Only-33-of-US-Mobile-Users-Will-Pay-Apps-This-Year/1011965 ("Put a dollar sign in front of an app, and the number of people who are willing to download and install it drops dramatically. According to a new forecast from eMarketer, 80.1 million US consumers will pay for mobile apps at least once this year, representing only 33.3% of all mobile users.") (last accessed Nov. 29, 2022).

[175] *See id.*; *see also* ¶ 22, *supra*.

185.    So do Apple's USD $.99 (or equivalent) minimum price and end-in-.99 (or analogous/equivalent) pricing mandates. Apple itself recognizes this by way of contractual terms that set and allow alternative prices in certain other countries:[176] lower prices move more apps and in-app products, which would give rise to more sales of iOS app-distribution and IAP services.

186.    What is more, cramming so many apps into the one iOS app store also depresses output. Without alternative iOS app stores, which could feature more and other apps, and certain kinds of apps, many iOS apps (and, therefore, iOS in-app products) will never reasonably be found, or they will not be built in the first place, especially without the wherewithal to risk lots of money on marketing.

187.    To reiterate: Apple currently touts the 1.8 million apps available in the App Store,[177] of every type and variety. It says (and has said) that it reviews *"100k"* more each week,[178] and previously it said that it approved 60% of them on the first try.[179] In a competitive marketplace, the availability of more and varied product for sale would lead to more distribution-transaction output.

188.    But by making itself the sole avenue of retail sales for iOS apps and in-app products, Apple depresses output in the market for iOS app and in-app-product distribution services by way of the sheer number and variety of apps that clog the App Store.[180] With discoverability so strongly impacted, apps (and, therefore, in-app products) get lost. Unsurfaced apps (and in-app products) will and do not give rise to as many sales of iOS app-distribution and IAP services; and the fact of the severe discoverability problem caused by Apple's anticompetitive behavior will and does deter developers at the outset. That is, fewer sales to end-user consumers correspond to fewer sales of iOS app-distribution and IAP services.[181] Output is depressed.

---

[176] *See* n.80, *supra* (discussing pricing schedule).

[177] *See* n.26, *supra*.

[178] *See* n.28, *supra*.

[179] *See id.*

[180] *See also* ¶ 60 and nn.26-28, *infra*.

[181] *See id.* and n.57, *supra*.

189.    If Apple did not prohibit all competition by inescapable fiat, other stores from competitors big and small would be inevitable, as others sought to service the many tens of millions of iOS-device end-user consumers and the millions and millions of iOS app developers, including those among the latter who presently make their apps and in-app products available for sale in or via the App Store (or in apps acquired therefrom). Large competitors such as Amazon might enter the field, as it has with respect to Android OS apps, but also specialty stores as well. Each such store would become another way by which iOS app developers could get their products seen. This would lead to more sales and the need for more distribution transactions, such that output in the iOS distribution-services market would increase.

### 2.    Apple's stifling of innovation

190.    Apple's anticompetitive behavior also stifles innovation in the market for iOS app-distribution and IAP services.[182]

191.    For example, Amazon devised an alternative way of distributing Android OS apps, Amazon Underground, which made apps and in-app purchases "actually free" to consumers.[183] Amazon paid (or pays) developers according to how much time consumers spend interacting with the apps.[184] Yet Apple's contracts and practices would not allow Amazon or any other competitor to distribute the client for an iOS version of this store (or something similar) via the App Store (even as Amazon distributes several other Amazon apps through the App Store).[185] Simply put, Apple bars *all* competitors from offering distribution and IAP services to iOS developers.

---

[182] *E.g.*, Stephen D. Houck, *Injury to Competition/Consumers in High Tech Cases*, St. Johns L. Rev. Vol. 5, Iss. 4, 593, 598 (2001) ("Any assessment of a restraint's anticompetitive impact, however, will be incomplete if limited to price and output effects. The restraint's impact on consumer choice and innovation must also be considered.").

[183] *See, e.g.*, "Amazon offers up 'actually free' apps and games with its new Underground app," *Android Authority,* Aug. 26, 2016, available at: https://www.androidauthority.com/amazon-underground-new-app-actually-free-637062/ (last accessed Nov. 29, 2022).

[184] *Id.*

[185] *See, e.g.*, n.207, *infra*.

192.    Surely Apple's aggressive, anticompetitive behavior is one reason why Amazon decided to shutter Amazon Underground in 2019.[186] Industry analysts perceived Amazon's extreme uphill battle from the outset. One put it this way:

The first issue is scale. For a system like this you need critical mass and scale in terms of audience and content. *Amazon's hands were tied because they weren't able to make Underground readily available on iOS (obviously)* or Google devices.[187]

That means they were always going to be limited to those people with Fire devices or who were motivated enough to use more than one app store. . . .[188]

193.    Another analyst put it this way:

**User acquisition is still the biggest challenge**

Amazon's revamped plans offer app publishers an innovative new model for monetising certain apps but it may not be enough to address its major challenge: how to persuade Android users to download an alternative store to Google Play. . . .

**Underground's economics will not fit all apps**

Amazon has published guidelines regarding which apps best suit the new Underground service, focusing on apps which had either previously been paid apps and those which monetise via non-subscription in-app purchases. Amazon can also insert advertising within each Underground app, which will help it monetise the audience rather than simply using Underground to attract a new audience.

Amazon promises to pay $0.0020 to developers for each minute spent within app, meaning a user would have to spend 8.3 hours using an app to generate a $1 pay-out to the developer.

Unlike the traditional freemium model, in which a good conversion rate would mean 2%-5% of the audience pays for any content, developers using Amazon Underground will get some form of monetisation from each app user.

Developers at the top of the app store chart, whose apps generate hundreds of millions of dollars revenue per quarter, are unlikely to adopt Amazon Underground. *But for developers with apps lower down the charts and those looking to extend the*

---

[186] *See, e.g.*, "Why is Amazon shutting down its Underground initiative?" May 9, 2017, available at: https://www.pocketgamer.biz/mobile-mavens/65694/why-is-amazon-shutting-down-its-underground-initiative/ ("It was part of a long-term strategy with bold ambitions to change the way mobile developers made games, but two years on Amazon has announced that Underground will no longer feature on the Amazon Appstore as of Summer 2017, with the program officially ending in 2019.") (last accessed Nov. 29, 2022).

[187] *Id*. (emphasis added). Of course, unless they jailbreak their devices and risk voiding their Apple hardware warranties, iOS users cannot download alternative stores at all per Apple's admitted design and practices.

[188] *Id.* (quoting Oscar Clark, "Author, Consultant and Independent Developer Rocket Lolly Games") (emphasis added).

*life of older catalogue titles, Amazon Underground is worth consideration as a way to drive incremental revenues . . . .*[189]

**Other stores are unlikely to follow suit, for now**

Amazon's Underground app program is a response challenging market position. As a challenger store with limited market share, Amazon has to innovate to attract users. It also needs to give developers a reason to provide content for its store. Amazon can offset the costs of running the Underground program by tying its users more closely into its ecosystem and driving retail transactions and other content revenues; Amazon Prime Video and its retail store are available alongside mobile apps in Underground. *Market leaders Apple and Google do not struggle to attract users or app publishers and the share they take from app transactions have become significant revenue streams, so there is no incentive for them to adopt a similar program.*[190]

194.    But even as Apple has shut out even well-resourced potential competitors such as Amazon, Amazon has innovated by way of its Amazon Coins program. This program allows consumers to buy apps at a discount in the Amazon Appstore.[191] For example, on July 24, 2022, the popular game Minecraft is priced at the same nominal sum of $6.99 in both Apple's App Store and

---

[189] This sort of competition and innovation also would boost output of transactions.

[190] *See* "Amazon Underground innovates with free apps but faces challenges," Oct. 7, 2015, available at: https://web.archive.org/web/20160530233912/https://technology.ihs.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (emphasis added) (last accessed Nov. 29, 2022).

[191] Amazon's default revenue split in its own Appstore is also 70% developer / 30% store operator, as with Apple. (*See* "Amazon Developer Services Agreement," July 20, 2022 update, available at: https://developer.amazon.com/support/legal/da (last accessed Nov. 29, 2022).) On the other hand, its Amazon Coins program allows end-user consumers to save money on the purchase price of apps and in-app products every day, and it allowed developers to continue to earn their 70% developer share. (*See* https://www.amazon.com/dp/B018HB6E80/ref=twister_B009CDKIA8?_encoding=UTF8&psc=1#w (explaining Amazon Coins programs and noting: "Buy Amazon Coins and save on apps, games, and in-app items," and showing example of $500 worth of coins priced at $400) (last accessed Nov. 29, 2022); https://web.archive.org/web/20190617084114/https://developer.amazon.com/blogs/appstore/post/cbadeae1-990d-4d52-bef5-ea61f6114b94/announcement-amazon-actually-free-program ("Customers can buy Amazon Coins at a discount, while developers continue to get their full 70 percent revenue share.") (last accessed Nov. 29, 2022).)

Amazon's Appstore.[192] But by using Amazon Coins, a purchaser could save 20%, bringing her price to approximately $5.59:

Minecraft
By <u>Mojang</u>

\* \* \*

Price: $6.99

Special offers available

*Save up to 20%* on this app and its in-app items when you purchase **Amazon Coins**.
<u>Learn More</u>

Sold by: Amazon.com Services LLC

This program drives transaction volumes by offering consumers lower prices, while at the same time allowing developers their revenue share based on the nominal price (in this case, $6.99).[193] Effectively, Amazon lowers (or lowered) the price of its distribution fee through this program. By remitting $4.89 ($6.99 x .7) to the developer on the sale of a game that is nominally priced at $6.99, but for which it collects only $5.59 ($6.99 x .8) from the consumer, this leaves only approximately $.70 for the distribution fee it collects. Thus, Amazon effectively lowers (or lowered) the commission rate to only 10% of the $6.99 nominal price or 12.5% of the $5.59 effective price. This is the sort of competition that developers are denied by way of Apple's abusive monopoly: more sales driven by consumer-side discounts, with lower distribution (and IAP-type) fees.

---

[192] *Compare* https://apps.apple.com/us/app/minecraft/id479516143 (last accessed Nov. 29, 2022) *with* https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_1?crid=1RRFSOVVD1JWR&keywords=minecraft&qid=1658 692839&s=mobile-apps&sprefix=minecraft%2Cmobile-apps%2C139&sr=1-1 (last accessed Nov. 29, 2022).

[193] https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_1?crid=1RRFSOVVD1JWR&keywords=minecraft&qid=1658 692839&s=mobile-apps&sprefix=minecraft%2Cmobile-apps%2C139&sr=1-1 (setting forth nominal price of app).

195.    Amazon also introduced merchandising programs for developers.[194] And it tried an "Actually Free" program, too.[195]

196.    Apple's abusive monopoly also stifles innovation in apps—another way it hurts competition generally. To reiterate: other vibrant app stores would mean more places for featuring apps. With so many apps available on the market, massive volumes of product can and do get lost in the App Store. Consumers, as well as developers and competition generally, would benefit from other venues that would surface good, new product and encourage the development of yet more and better apps—all of which would engender more output in the market here at issue.

### 3.    Apple's harm to iOS developers by denying them the opportunity to choose other means to get paid for their work

#### a.    Apple's refusal to allow others to innovate in the market

197.    Apple's aggressive, anticompetitive behavior diminishes the choice offered by endeavors such as Amazon Underground. As explained above, this program lowered prices (even to zero, with its Actually Free component), while also offering developers another way to earn from their work. iOS developers could not hope to benefit from Amazon Underground or any other such third-party program because Apple will not permit it.

#### b.    Apple's ATT program

198.    Another situation that Apple has devised and then exploited for yet more profits is that involving recent implementation of its App Tracking Transparency (ATT) program. Ostensibly, this program is good for end-user consumers because it gives them more choice as to third-party tracking of personal data.[196]

---

[194] *See, e.g.*, "Announcement: Amazon Underground Actually Free Program," available at: https://web.archive.org/web/20190617084114/https://developer.amazon.com/blogs/appstore/post/cbadeae1-990d-4d52-bef5-ea61f6114b94/announcement-amazon-actually-free-program (last accessed Nov. 29, 2022).

[195] *See* ¶¶ 191, 194, *supra.*

[196] "Mobile ecosystems, Market study final report," U.K. Competition and Markets Authority, at 181, available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1081885/Mobile_ecosystems_final_report_-_full_draft_-_FINAL_.pdf (last accessed Nov. 29, 2022).

199.     However, large and small iOS developers claim that it is implemented in such a way that they are unfairly robbed of their ability to monetize their work by fair use of consumer data for targeted advertising. These developers, which include plaintiffs Individual Developers, as well as associational plaintiff le GESTE, allege that Apple's ATT program will mean less free-to-get apps; developers will forgo creating them, or will begin to charge fees for heretofore free-to-get apps, because they will be unable to make a living by means of advertising.[197]

200.     Moreover, they claim that Apple is advantaging itself by the way in which it presents consumers with the option to opt-out of certain third-party tracking, versus other means that would more fairly present the choice.[198] They also claim that Apple advantages itself by offering a Personalized Ads architecture for its own apps that is not parallel to the way it presents the ATT opt-out choice; instead, as the U.K.'s CMA has written, it "employs a different choice architecture compared to the ATT prompt."[199] Thus, Apple, which already holds stores of first-party data, and whose advertising services can "use the Apple Ads Attribution API while third parties must use SKAdNetwork [which may be more limited and immature]," is and will be further advantaged vis-à-vis other entities that participate in digital marketing or product development.[200] And so will other large gatekeepers such as Google, which itself holds enormous stores of first-party data gathered by way of its many properties.[201]

201.     By monopolizing the relevant market, Apple affords iOS developers who do not wish to participate in ATT, especially as implemented, nowhere to go. Again, Apple presents ATT as a take-it-or-leave-it proposition, if iOS developers wish to sell their iOS apps and in-app products. If

---

("Apple's App Tracking Transparency policy gives Apple device users greater control over their personal data, enhancing privacy and choice. However, the way it has been implemented (*e.g.*, the design of prompts) may distort user choice, potentially tilting the playing field in Apple's favour in respect of app discovery and advertising services.").

[197] *See, e.g.*, *id.* at 243-44.

[198] *See, e.g.*, *id.* at 234-37.

[199] *See, e.g.*, *id.* and *id.* at 235.

[200] *See, e.g.*, *id.* at 236, 239-40.

[201] *See, e.g.*, *id.* at 269-70 ("In circumstances where large digital platforms – with substantial access to 'first-party' data – are given an advantage, other businesses that rely on advertising revenues such as online newspapers are likely to suffer.").

there were competition, iOS developers such as Individual Developers could choose other distribution avenues, or they could more effectively press Apple to change some of its policies and practices around ATT. As to the latter—changing policies and practices—Apple might be persuaded to change the ways in which it presents the opt-out screen to consumers. Or it might be persuaded to allow developers to tell end-users in a fair manner, when the ATT opt-out screen is presented, that if they opt-in, they will receive remuneration or free or discounted digital products,[202] for example.

202.    But instead, affected iOS developers are offered no real choices. On the other hand, in typical Apple fashion, it benefits from ATT monetarily. Apple's App Store Search Ads, which iOS developers that can afford them buy in order to help to alleviate the discoverability issue, are reportedly up in volume sold and more expensive following the introduction of ATT.[203] Because they are auction-based,[204] the more developers that bid on them, the higher the prices go. And in fact there are more bidders, as iOS developers shift more of their own app-related advertising dollars to Apple, given ATT's negative effect on the quality of certain other places where they might have advertised previously.[205] Once again, iOS developers are squeezed, as Apple's App Store-related profits increase yet again.

**M.    Apple's admission that iOS developers have antitrust standing to bring this suit**

203.    Apple has admitted that iOS developers have standing to bring the antitrust claims in this suit.

---

[202] *See id.* at 235 ("We are also concerned about the inability of developers to offer any incentive for users to opt in to sharing their data. Apple told us that the reason for this restriction was that 'gating' functionality in this way could be seen as contradicting various privacy guidance around the world. From a UK data protection law perspective, we note that the ICO's guidance on valid consent does not preclude the possibility that parties might lawfully incentivise consent, so long as this does not unfairly penalise those who refuse.") (footnotes omitted).

[203] *See id.* at 239-42 and *id.* at 240 (discussing evidence and findings as to the UK, but noting a report that indicates "significant cost per tap (CPT) rises for ASA [Apple Search Ads] internationally") (footnote omitted).

[204] *See* "Set and adjust bids," Apple Search Ads, available at: https://searchads.apple.com/help/bids-and-budget/0062-set-and-adjust-bids (last accessed Nov. 29, 2022).

[205] *See, e.g.*, "Mobile ecosystems, Market study final report," U.K. Competition and Markets Authority, at 239-42.

204.    Apple admits that iOS apps are distributed solely through its App Store.[206] Ostensibly, this is so that it can review them "for malware and similar issues," though certainly other distributors could perform this function as well.[207]

205.    According to Apple, "[d]evelopers are the ones who purchase distribution [from it], not consumers."[208]

206.    As between consumers of apps and in-app products vs. consumers of its app and in-app-product distribution services, Apple admits that distributors have antitrust standing. In briefing to the Ninth Circuit, Apple has stated: "The software developers who are directly impacted by Apple's 30% commission absolutely would have antitrust standing to bring a monopolization case, if they wanted to . . . ."[209] "App developers have standing under *Illinois Brick* to argue whatever they want because they are direct purchasers of distribution services from Apple, and if they want to argue, for example, that their consent [to Apple's fees] was coerced by Apple's market power, they can."[210] With respect to *Illinois Brick* issues, it has said that "[a]pp developers are the ones who have antitrust standing to bring any claim about Apple's 'monopolization' of Apps distribution."[211]

207.    Similarly, in briefing to the U.S. Supreme Court, Apple has stated: "The developer is also the first person to bear the alleged overcharge on the allegedly monopolized service, and by that definition also the 'direct purchaser.'"[212] According to Apple, "it is plainly the iOS developers—the

---

[206] "Indeed, Apple does require iOS developers to submit iOS apps to Apple for review for malware and similar issues. Approved native iOS apps are then distributed solely through the App Store (otherwise developers could circumvent the approval process)" (App. Sup. Ct. Pet. Br. at 2; *see also id.* at 7 ("That [iOS] ecosystem has two relevant features: (1) *iPhones will only download third party software that Apple has reviewed for malware and offensive content, among other things*," and (2) to distribute those third party apps, Apple created a new kind of software distribution system, the App Store.") (emphasis added).)

[207] For example, as noted above, Amazon runs a store for Android OS apps. It is not credible that Amazon or another potential competitor could not perform the same functions as Apple. In fact, Apple itself is by no means infallible in its curation and security functions. (*See, e.g.*, n.110, *supra*.)

[208] Apple. Sup. Ct. Pet. Br. at 36.

[209] Apple Ninth Cir. Resp. Br.at 18.

[210] *Id.* at 41.

[211] *Id.*

[212] *See* Apple Sup. Ct. Pet. Br. at 37.

direct purchasers and 'consumers' of the allegedly monopolized distribution services, and the group that meets all of the relevant 'efficient enforcer' criteria," who is the direct purchaser, "the *one* appropriate plaintiff group among the categories of possible plaintiffs . . . ."[213]

208.    Finally, as Apple told the Supreme Court, "the first party that directly pays an overcharge"—here, the developers, per its own admissions—"has a complete and undiluted cause of action for the entire overcharge."[214] According to Apple, the high court's precedent mandates that "'the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party "injured in his business or property" within the meaning of the [Clayton Act].'"[215] Apple stated: the Supreme Court's prior "decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), gives developers a claim for 100% of any overcharge."[216] Per Apple, "*Hanover Shoe* 'concentrate[s] the full recovery for the overcharge' in the direct purchaser's hands."[217]

209.    There is simply no doubt in Apple's view that developers, as opposed to app and in-app-product end-user consumers, are the proper plaintiffs in a suit regarding commissions for its iOS app-distribution and IAP services. As it has told the Supreme Court, "[t]here is no 'next best plaintiff' theory that permits indirect purchasers [such as consumers of the apps and in-app products themselves] to secure their own standing by undermining the claims of those who first bear an alleged overcharge"[218]—here, Individual Developers and putative class members.

210.    But even without these admissions, the Supreme Court of the United States recently recognized developer standing in this matter. As the court put it with respect to a monopsony case, which plaintiffs plead in the alternative here:

> And it could be that some upstream app developers will also sue Apple on a monopsony theory. In this instance, the two suits would rely on fundamentally different theories of harm and would not assert dueling claims to a "common fund,"

---

[213] *Id.* at 33.

[214] *Id.* at 17.

[215] *Id.* at 24 (citation omitted); *see also* Reply Brief of Petitioner, submitted Oct. 29, 2018,, in *Apple Inc. v. Pepper*, U.S. Sup. Ct. No. 17-204, (Apple Sup. Ct. Pet. Reply Br.), at 4 ("[D]evelopers would be the parties first and directly injured by any allegedly excessive commissions.").

[216] Apple Sup. Ct. Pet. Reply Br. at 4.

[217] *Id.* at 18 (citation omitted).

[218] *Id.* at 21.

as that term was used in *Illinois Brick*. The consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit.[219]

## VI. TRADE OR COMMERCE AMONG THE SEVERAL STATES, OR WITH FOREIGN NATIONS

211.    The activities of Apple as alleged in this complaint were within the flow of, and substantially affected, interstate commerce or trade or commerce with foreign nations. As alleged herein, Apple sells its iOS app-distribution and IAP services to developers across, and without regard to, state or international lines, albeit under the instant circumstances from or within California and the United States. Alternatively, as alleged herein, it acts as a monopsony app and in-app digital product acquirer or retailer across, and without regard to, state or international lines, albeit under the instant circumstances from or within California and the United States.

## VII. RELEVANT MARKET

212.    The antitrust injuries alleged herein, including harm to: (a) France-resident developers of iOS apps and in-app products, and also to (b) competition, have occurred in the global market (or submarket) for iOS app-distribution and the term IAP services (or for retailing services). For avoidance of doubt, IAP services include payment-processing services. Apple monopolizes this market (or acts as a monopsonist retailer) as alleged herein.

213.    Alternatively, the antitrust injuries alleged herein, including harm to: (a) France-resident developers of iOS apps and in-app products, and also to (b) competition, have occurred in the U.S. market (or submarket) for iOS app-distribution and IAP services (or for retailing services). For avoidance of doubt, the term IAP services include payment-processing services. Apple monopolizes this market (or acts as a monopsonist retailer) as alleged herein.

214.    For further avoidance of doubt: the references to a "global market," or, alternatively, to a "U.S. market," in this section of plaintiffs' complaint, including in the preceding two paragraphs,

---

[219] *Pepper*, 139 S. Ct. at 1525. Notably, the Supreme Court did *not* overturn or otherwise disrupt the thoroughly established body of law allowing plaintiffs to seek overcharge damages in a case such as this one.

1    focus on the geographic area of competition *vel non*, as distinct from the reach of United States

2    antitrust laws.[220]

3        215.    The market (or submarket) is a single-brand market. Alternatively, the market (or

4    submarket), is not completely single-brand in nature. But because of Apple's deliberate policies,

5    practices, and choices to exclude competition, including the technical and contractual means

6    referenced herein, Apple has had a near-100% share of the relevant market for at least the four years

7    preceding the filing of this complaint—and well beyond. And it has a 100% share of what it itself

8    seems to be the officially sanctioned relevant market for the services at issue.

9        216.    Under the instant facts and circumstances, plaintiffs need not plead or demonstrate the

10   existence of an antitrust aftermarket for purposes of establishing the relevant product market. Even a

11   single-brand market can exist under the pertinent facts and circumstances outside the analytical

12   framework of foremarkets and aftermarkets.

13       217.    Due to the incompatibility of Apple's iOS with Google's Android OS, as well as the

14   incompatibility of iOS and Android OS digital products as alleged herein, Google and its Google

15   Play store offer no competition to, and is not a substitute for, the App Store and Apple's iOS app-

16   distribution and IAP services. Likewise, other distribution or in-app-purchase service providers such

17   as Amazon or Microsoft, which also do not provide distribution services for iOS apps and in-app

18   products (and which Apple bars from competing in any event), offer no competition to, and are not

19   substitutes for, the App Store and Apple's iOS app-distribution and IAP services. Even with, or in

20   the face of, a small but significant—or large—price increase, whatever the duration, plaintiff

21   developers have nowhere to go to serve the iOS end-user market with their iOS native apps and in-

22   app products—they need *iOS* app-distribution and IAP services. And Apple is the sole,

23

24

---

25       [220] *See Epic Games*, 559 F. Supp. 3d at 1026-27 ("A geographic market is an area of effective
     competition where buyers can turn for alternate sources of supply." . . . The relevant geographic
26   market for goods sold nationwide is often the entire United States[.]" . . . As compared to others, in
     antitrust cases, courts regularly recognize global markets. . . . Importantly here, the question focuses
27   on the area of effective competition, not the reach of United States antitrust laws which is addressed
     elsewhere.") (citations omitted).
28

monopolistic[221] provider thereof, thanks to its deliberate exclusion of competition. Furthermore, even if a developer were to seek lower prices elsewhere (or, alternatively, better wholesale-level pricing), he or she would not find them in Google's parallel store, Google Play. Thanks to having split the world neatly between them, Google's fees were, and mostly are, as high as Apple's.

218.    Alternatively, even if one were to consider *all* distribution services for any apps or in-app products, whatever the underlying operating system, or whatever the platform or devices, Apple's distribution services for iOS apps and in-app products would form a distinct relevant submarket, which it willfully monopolizes.

219.    Apple's restraints on competition directly impact the global market, or, alternatively, the U.S. market (or submarket) for iOS app-distribution and IAP services as alleged herein.

220.    As Apple has admitted to the U.S. Supreme Court, it is a direct seller of iOS app-distribution and IAP services to iOS developers.[222] It has acknowledged that experts and scholars have deemed it a "distribution monopolist" and opined that "Apple sells software distribution services to developers."[223] Contractually, it specifies the same.[224] Plaintiffs herein (to include le GESTE's iOS-developer members) purchased these services from Apple in the global market, or, alternatively, the U.S. market or submarket identified. Plaintiffs seek relief on behalf of themselves and similarly situated developers for injuries suffered in the relevant market, including as to overpayments made to Apple related to sales in or via any App Store storefront, whether U.S., French, or otherwise, or in apps acquired therefrom.

---

[221] Throughout, where plaintiffs refer to monopolizations or variants thereof, they also mean in the alternative monopsonization and its variants, as they relate to Apple as a monopsonistic retailer.

[222] *See, e.g.*, n.212, *supra*. Apple also told the Ninth Circuit, with respect to the App Store, that it sells distribution services to developers. *See also* n.81, *supra*.

[223] Apple Ninth Cir. Resp. Br. at 28.

[224] *See, e.g.*, Ex. A at Schedule 2, ¶ 3.4 ("Apple shall be entitled to the following commissions in consideration for its services as Your agent and/or commissionaire under this Schedule 2: (a) For sales of Licensed Applications to End-Users, Apple shall be entitled to a commission equal to thirty percent (30%) of all prices payable by each End-User. . . ."); *see also id.*, ¶ 1.2 (describing certain services that may be performed by Apple).

221.    Insofar as the App Store may be or is a two-sided platform, charging lower prices to developers for distribution services (or for retail commissions) would not lead to any discernible negative indirect network effects under the instant circumstances. For example, unlike with respect to credit-card transaction platforms, lower fees or prices would not mean less money available to Apple to pay rebates or rewards to end-user consumers, such that they might depart the platform. Relatedly, Apple charges no fees to consumer end-users to use the App Store; thus, there are no fees to discount with a portion of the commissions it extracts from iOS developers, lest end-users flee. To the contrary, Apple does not share its fees with consumers.

222.    Here, Apple's restraints and other unlawful behavior do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Apple can point to no considerations that countervail the propriety of the monetary and injunctive relief that plaintiffs seek.

## VIII.   CLASS ALLEGATIONS

223.    Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

**A.     U.S. federal-law classes**

224.    Individual Developers bring this action on behalf of themselves and the following federal-law class, for monetary relief based on violations of the Sherman Act or as otherwise described herein:

> All current or former France-resident persons or entities that paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services with respect to any paid, non-zero-priced iOS app or paid, non-zero-priced in-app product or content (including subscriptions) sold in or via the iOS App Store (or, in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise.

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

225.     Additionally, Individual Developers bring this action on behalf of themselves and the following federal-law class, for injunctive and other relief based on violations of the Sherman Act or as otherwise described herein:

> All current or former France-resident persons or entities whose iOS apps or in-app products were sold or otherwise distributed in or via the App Store (or in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise, regardless of whether the person or entity paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services.

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

226.     Le GESTE brings this action on behalf of itself, and, alternatively and additionally, the following federal-law class, for injunctive relief based on violations of the Sherman Act or as otherwise described herein:

> All current or former France-resident persons or entities (or, at minimum, le GESTE iOS-developer members) whose iOS apps or in-app products were sold or otherwise distributed in or via the App Store (or in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise, regardless of whether the person or entity paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services.

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

**B.     State-law, *i.e.*, California-law, Classes**

227.     Individual Developers also bring this action on behalf of themselves and the following state-law, *i.e.*, California-law, class, for monetary (including restitutionary) relief based on violations of California law, including its Unfair Competition Law and Cartwright Act:

> All current or former France-resident persons or entities that paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services with respect to any paid,

non-zero-priced iOS app or paid, non-zero-priced in-app content (including subscriptions) sold in or via the iOS App Store (or, in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise.

Insofar as their claims for monetary (including restitutionary) relief pursuant to the Unfair Competition Law are concerned, Individual Developers seek such monetary (including restitutionary) relief in the alternative to their claims at law for relief as specified herein, where and if their remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise available, including where such remedy at law is not plain, adequate, and complete. Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

228.    Additionally, Individual Developers bring this action on behalf of themselves and the following state-law, *i.e.*, California-law, class, for injunctive and other relief based on violations of California law, including its Unfair Competition Law and Cartwright Act:

All current or former France-resident persons or entities whose iOS apps or in-app products were sold or otherwise distributed in or via the App Store (or in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise, regardless of whether the person or entity paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services.

Insofar as their claims for injunctive relief pursuant to the Unfair Competition Law are concerned, or where any claim for equitable relief under California law is concerned, Individual Developers seek such relief (including prospective injunctive relief) in the alternative to their claims at law for relief as specified herein, where and if their remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise available, including where such remedy at law is not plain, adequate, and complete. Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

229.    Le GESTE also brings this action on behalf of itself and the following state-law, *i.e.*, California-law, class, for injunctive and other relief based on violations of California law, including its Unfair Competition Law and Cartwright Act:

> All current or former France-resident persons or entities (or, at minimum, le GESTE iOS-developer members) whose iOS apps or in-app products were sold or otherwise distributed in or via the App Store (or in the case of in-app content, in or via an app acquired therefrom), whatever the iOS App Store digital storefront, whether French, U.S., or otherwise, regardless of whether the person or entity paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services.

Insofar as any claims for injunctive relief pursuant to the Unfair Competition Law are concerned, or where any other claim for equitable relief under California law is concerned, Le GESTE seeks such relief (including prospective injunctive relief) in the alternative to any claim at law, where and if a remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise available, including where any such remedy at law is not plain, adequate, and complete. Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

## C.    Elements

230.    **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but upon information and belief, supported by Apple's past statements,[225] and by comparison to publicly available data as to U.S. iOS

---

[225] According to Apple in or about 2019, it had some 20 million developers in [its] Apple Developer Program. "App Store—Overview," available at: https://web.archive.org/web/20190808232156/https://www.apple.com/ios/app-store/principles-practices/ (last accessed Nov. 29, 2022). Not all iOS developers distribute non-zero-priced apps or in-app products in or via the App Store, or in apps acquired therefrom, such that they have paid Apple commissions. Nor are all of those who do so based in France. However, the very large number of iOS developers supports the proposition that there likely are thousands of potential class members. Discovery will reveal the precise number of iOS developers making up the putative classes.

1     developers,[226] the classes likely will consist of thousands of members,[227] such that individual joinder

2     in this case is impracticable.

3         231.    **Commonality:** Numerous questions of law and fact are common to the claims of the

4     plaintiffs and members of the proposed classes. These include, but are not limited to:

5             a.      Whether there is a global, or, alternatively, a U.S. market, for iOS app-distribution

6     and IAP services, or for iOS app and in-app-product retail services;

7             b.      Alternatively, whether there is a U.S. submarket or single-brand market for iOS

8     app-distribution and IAP services, or for iOS app and in-app-product retail services;

9             c.      Whether Apple has unlawfully monopolized, or attempted to monopolize, the

10    global market, or, alternatively, the U.S. market for iOS app-distribution and IAP services, including

11    by way of the contractual terms, policies, practices, mandates, and restraints described herein;

12            d.      Whether competition in the global market, or, alternatively, the U.S. market for

13    iOS app-distribution and IAP services has been restrained and harmed by Apple's monopolization, or

14    attempted monopolization, of that market;

15            e.      Alternatively, whether Apple has behaved as a monopsonist, or attempted

16    monopsonist, retailer of iOS app-distribution and IAP services as alleged herein;

17            f.      Whether plaintiffs Individual Developers, le GESTE iOS-developer members, and

18    those similarly situated iOS developers they seek to represent participated as purchaser-consumers in

19    the U.S. marketplace, or domestic market or submarket or single-brand market, for iOS app-

20    distribution and IAP services, or otherwise participated in U.S. commerce, as alleged herein, to their

21    direct detriment due to the domestic effects of Apple's anticompetitive and unlawful behavior as

22    alleged herein;

23

24

25    _____

      [226] *See, e.g.*, Developer Pls.' Notice of Mot. and Mot. for Final Approval of Settlement, *Cameron*
26    *v. Apple Inc.*, No. 4:19-cv-03074-YGR, filed Apr. 29, 2022, ECF No. 471 at 5 (N.D. Cal.) ("In total,
      the resulting class list comprised 67,440 unique application developer accounts for potentially
27    eligible class members.").

28        [227] *See id.*

g.      Whether Individual Developers or plaintiff le GESTE (individually or as a class representative), its members, and similarly situated developers in the proposed class(es) are entitled to declaratory or injunctive relief to halt Apple's unlawful practices, and to their attorney fees, costs, and expenses;

h.      Whether Individual Developers and members of the proposed class(es) are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and

i.      Whether Individual Developers and members of the proposed class(es) are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief sought herein, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

232.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Apple's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

233.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members they seek to represent.

234.    **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

235.    **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Apple has acted on grounds that apply generally to the proposed classes. Accordingly, final

1   injunctive relief or corresponding declaratory relief as requested herein is appropriate respecting the

2   classes as a whole.

3       236.   **Predominance and superiority:** This proposed class action is appropriate for

4   certification. Class proceedings on these facts and this law are superior to all other available methods

5   for the fair and efficient adjudication of this controversy, given that joinder of all members is

6   impracticable. Even if members of the proposed classes could sustain individual litigation, that

7   course would not be preferable to a class action because individual litigation would increase the

8   delay and expense to the parties due to the complex factual and legal controversies present in this

9   matter. Here, the class action device will present far fewer management difficulties, and it will

10  provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by

11  this Court. Further, uniformity of decisions will be ensured.

12              **IX.    APPLICABILITY OF U.S. FEDERAL ANTITRUST LAW**

13      237.   U.S. federal antitrust law, including Sections 1-7 of U.S. Code Title 15, applies under

14  the instant circumstances notwithstanding, and per, the FTAIA, 15 U.S.C. § 6a.

15      238.   *First*, Apple's DPLA contains a U.S. law provision.[228] This provision contemplates

16  the application of U.S. law, including the Sherman and Clayton Acts, to plaintiffs' claims, as well as

17  those of the putative classes.

18      239.   *Second*, the FTAIA does not apply because the conduct at issue—purchases of

19  distribution and IAP services sold by an American company, pursuant to a contract (the DPLA) with

20  a U.S. company—was done in the U.S., including via the Internet. Under the facts and circumstances

21  pertaining to *this* matter, and the way that Apple conducts its App Store-related business, plaintiffs

22  bought Apple's app-distribution and IAP services literally in the United States. There is no material

23  difference between the way a U.S.-based developer conducts the subject commerce with Apple

24  versus the way a France-based developer does so. Therefore, there is no "conduct involving trade

25

26

27          [228] Ex. A, ¶ 14.10 ("This Agreement will be governed by and construed in accordance with the
    laws of the United States and the State of California, except that body of California law concerning
28  conflicts of law.").

1    or commerce (other than import trade or import commerce) with foreign nations" within the meaning

2    of the statute, even though plaintiffs and putative class members regularly reside in France.

3         240.   Accordingly, plaintiffs have standing because their antitrust injuries were suffered in

4    the U.S. domestic setting, just as if they were U.S. residents. Their participation as consumers

5    (including the participation of le GESTE iOS-developer members) in the U.S. economy directly led

6    to their injuries, due to Apple's monopolization of iOS app-distribution and IAP services, its

7    establishment and charging of supracompetitive prices, and its imposition of anticompetitive and

8    harmful contractual terms.

9         241.   *Third*, even if the FTAIA applied, plaintiffs' federal antitrust claims would be

10   excepted from any bar thereof on at least the ground that Apple's conduct at issue: (a) has had a

11   "direct, substantial and reasonably foreseeable effect" on U.S. domestic or import commerce; and (b)

12   the effect "gives rise to" plaintiffs' federal law claims. 15 U.S.C. § 6a(1)(A). That is, Apple's U.S.-

13   based conduct in willfully and unlawfully monopolizing the market for iOS app-distribution and IAP

14   services as alleged herein, such that it could impose and has imposed from its U.S. base

15   supracompetitive pricing and anticompetitive terms on iOS developers wherever they reside, directly

16   and proximately caused plaintiffs' injuries. As the court observed, in pertinent part, in its post-trial

17   decision in *Epic Games v. Apple*:

18        Apple's restrictions appear to be imposed by Apple, rather than by market forces.
19        Importantly, the Court finds more persuasive that Apple actually treats app
          distribution as a global enterprise. Its rules and guidelines apply globally to all
20        storefronts, the business development team engages with developers globally, the
          DPLA applies globally, and the complexity and justification for the complexity of the
21        IAP system is due in large part because of the global nature of the business.[229]

22        242.   More specifically, Apple unlawfully acquired a monopoly in services as alleged

23   herein. Then it set policies, practices, and supracompetitive pricing and pricing mandates in the U.S.

24   and determined to apply them to developers that reside in the U.S. and elsewhere. Then the France-

25   resident Individual Developers and iOS-developer members of le GESTE did business with Apple

26   and suffered resultant injury as a direct result of Apple's course of conduct in the U.S.

27

28   _____
     [229] 559 F. Supp. 3d at 991.

243.   What is more, these France-resident developers participated in the U.S. domestic market, and in U.S. commerce, as consumer-purchasers for purposes of determining the applicability of U.S. antitrust law, even if the geographic reach of the product market, for relevant market purposes, is global.[230]

244.   That the trade or commerce at issue has had the requisite domestic effects, and that Individual Developers and le GESTE iOS-developer members participated as consumers in the U.S. domestic market, or marketplace, for iOS app-distribution and IAP services, and in U.S. commerce, is illustrated further by at least the following:

(a)   Apple operates *the* App Store as one global enterprise,[231] with uniform contracts and policies and practices, including pricing terms, applicable to all, or all similarly situated, developers (but for limited accommodations pursuant to local law or judicial orders);[232]

(b)   Apple regularly refers to "the" App Store and "its" App Store, emphasizing that that is only one, singular U.S.-based App Store. All non-U.S. storefronts are merely digital veneers that face end-user consumers;[233]

---

[230] *See* n.69, *supra.*

[231] *See, e.g.*, "The apps you love. From a place you can trust," App Store, available at: https://www.apple.com/app-store/ (referring to, and addressing the entity, as "*the* App Store," notwithstanding the virtual presence of non-U.S. digital "storefronts") (last accessed Nov. 29, 2022).

[232] *See, e.g.*, "Agreements and Guidelines for Apple Developers," including foreign-language translations, available at: https://developer.apple.com/support/terms/ (uniform contracts) (last accessed Nov. 29, 2022); *see also* "Distributing dating apps in the Netherlands," Developer Support, available at: https://developer.apple.com/support/storekit-external-entitlement/ (last accessed Nov. 29, 2022).

[233] *E.g., id.*; "Meeting pandemic challenges, Apple developers grow total billings and sales in the App Store ecosystem by 24 percent to $643 billion in 2020," Apple *Newsroom*, June 2, 2021, available at: https://www.apple.com/newsroom/2021/06/apple-developers-grow-app-store-ecosystem-billings-and-sales-by-24-percent-in-2020/ (last accessed Nov. 29, 2022); "Together we turn apps into opportunities." *App Store*, available at: https://www.apple.com/app-store/developing-for-the-app-store/#footnote-3 (last accessed Nov. 29, 2022); *see also* "A Global Perspective on the Apple App Store Ecosystem—An exploration of small businesses within the App Store ecosystem," Analysis Group, June 2021, available at: https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf (Apple "support[ed]" study) (last accessed Nov. 29, 2022).

(c)      The DPLA, with its schedules, exhibits, and addenda, is a uniform contract imposed by the U.S. company and seller Apple Inc. on distributing iOS developers everywhere;

(d)      The DPLA is written in the domestic U.S. language of English, with a special term directed to speakers of other languages:

> Any translation is provided as a courtesy to You, and in the event of a dispute between the English and any non-English version, the English version of this Agreement shall govern, to the extent not prohibited by local law in Your jurisdiction. If You are located in the province of Quebec, Canada or are a government organization within France, then the following clause applies to You: The parties hereby confirm that they have requested that this Agreement and all related documents be drafted in English. *Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglais.*[234]

Translations are provided for "convenience" only;[235]

(e)      Apple executives responsible for App Store policies, practices, and sales, as well as pricing of Apple's iOS app-distribution and IAP services, including Phil Schiller, Eddy Cue, and Matt Fischer, are based in California, as are Apple's headquarters;[236]

(f)      France-resident iOS developers buy the referenced iOS app-distribution and IAP services not from a French or other foreign affiliate of Apple Inc., but from the company in the U.S. instead. For example, the App Store Connect

---

[234] Ex. A at 50.

[235] "Program license agreements," available at: https://developer.apple.com/support/terms/ (last accessed Nov. 29, 2022) ("Please note that the English language version of the agreements you accept in your developer account are binding and the most up to date. Any other language translations of select agreements that we may provide are for your convenience."); *see also* "Apple Developer Program License Agreement" at "View translations" link, available at: https://developer.apple.com/support/terms/ ("Please note that the English version of the Apple Developer Program License Agreement you accept in your developer account is binding and the most up to date. Translations of select agreements may also be available within a reasonable period of time after the English versions are updated. Any translations are provided for your convenience.") (last accessed Nov. 29, 2022).

[236] As to Phil Schiller, *see, e.g.*, https://www.linkedin.com/in/philip-schiller-3814701b8/ (last accessed Nov. 29, 2022); as to Eddy Cue, *see, e.g.*, https://www.linkedin.com/in/eddy-cue-7483301/ (last accessed Nov. 29, 2022); as to Matt Fischer, *see, e.g.*, https://www.linkedin.com/in/mattfischer/ (last accessed Nov. 29, 2022); *see also* as to Apple: "Corporate Address," available at: https://www.apple.com/contact/ (last accessed Nov. 29, 2022).

Help guide states to *all* iOS app developers who distribute through the App Store as follows:

> Apps uploaded to App Store Connect are uploaded to an Apple server in the United States. When you submit your app with the intention of distributing your app on the App Store or to external testers through TestFlight outside of the U.S. or Canada, it is considered a U.S. export and is subject to U.S. export laws (regardless of where your legal entity is based)[237];

(g)     Relatedly, the DPLA provides that the developer "hereby certif[ies] that all of the Licensed Applications [the Developer] deliver[s] to Apple under this Schedule 1 are authorized for export from the United States to each of the regions designated by You under Section 2.1 hereof . . .;"[238]

(h)     Apple's financials reflect one App Store—*the* App Store—reporting App Store net sales as part of its global "Services" net sales;[239]

(i)     Per examination of Individual Developer payment documents, Apple Inc., the U.S. entity based in California, is payor, including to France-resident developers, of post-commission and post-tax proceeds for their digital products; and

(j)     The DPLA contains a U.S. and California law provision,[240] along with a term providing for a California litigation venue.

245.     So, at a minimum, Apple's conduct, including conduct involving trade or commerce (other than import trade or import commerce) with foreign nations, has had, and has,

(1) . . . a direct, substantial, and reasonably foreseeable effect—

> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; . . . and

---

[237] *See* "App Store Connect Help," available at: https://help.apple.com/app-store-connect/en.lproj/static.html (last accessed Nov. 29, 2022).

[238] Ex. A, Schedule 1, ¶ 2.3.

[239] *E.g.*, Apple Inc. 2021 Form 10-K at 21, available via link at: https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=15311311 (last accessed Nov. 29, 2022).

[240] Ex. A, ¶ 14.10.

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title [15 U.S.C.] . . . .[241]

Accordingly, the conduct at issue falls within the domestic-effects exception to the bar otherwise set forth in the FTAIA, and plaintiffs may proceed with this suit pursuant to U.S. federal antitrust law.

246.    *Fourth*, Apple's own contracts, and its conduct requiring the uploading of non-U.S. residents' iOS digital products to the U.S. before they can be sold in or via its French, U.S., or other App Store digital facades,[242] can be seen to establish plaintiffs and putative class members as U.S. exporters within the meaning of the FTAIA.

247.    Thus—alternatively or additionally—Apple's conduct as alleged herein, including conduct involving trade or commerce (other than import trade or import commerce) with foreign nations, has had, and has,

(1) . . . a direct, substantial, and reasonably foreseeable effect—

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title [15 U.S.C.] . . . .[243]

248.    More specifically, and alternatively, Apple's anticompetitive conduct with respect to France-based developers affects the purchase of iOS app-distribution and IAP services as alleged herein, particularly with respect to iOS digital products "exported" from the U.S. by Individual Developers and others similarly situated to France-resident (or other non-U.S. resident) end-users. Thus, Apple's conduct, including the willful acquisition of monopoly power and its use to impose supracompetitive pricing and pricing and other mandates on Individual Developers and others similarly situated, has resulted in "injury to export business in the United States."[244]

---

[241] *See* 15 U.S.C. § 6a(1)(A).

[242] *See* Ex. A, Schedule 1, ¶¶ 2.1-2.3; *see also* ¶ 244(f) and (g), *supra*.

[243] *See* 15 U.S.C. § 6a(1)(B).

[244] *See* 15 U.S.C. § 6a(2).

249.    Accordingly, the conduct at issue falls within the export exception to the bar otherwise set forth in the FTAIA, and plaintiffs may proceed with this suit pursuant to U.S. federal antitrust law.

250.    *Fifth*, Individual Developers, along with other similarly situated France-based developers, and certain le GESTE iOS-developer members, sold or otherwise distributed OS apps and in-app products to end-user consumers in the United States, in or via the U.S. App Store digital storefront (or in apps acquired therefrom). As to iOS app-distribution and IAP services related to these apps and in-app products, the FTAIA does not bar plaintiffs' claims, including, or alternatively, because such conduct may be considered import trade or commerce, or import trade or commerce with foreign nations. As to the latter, Apple's conduct has had the requisite effect on import trade or commerce with foreign nations for the reasons alleged herein, and such effect gives rise to plaintiffs' U.S. federal antitrust claims.

251.    In sum, the FTAIA does not apply to plaintiffs' claims under the instant circumstances. But even if does, one or more built-in exceptions appl(ies), such that plaintiffs can proceed with their federal antitrust claims. Also, in any event, the FTAIA does not apply to, or bar, plaintiffs' claims insofar as they correspond to sales of their iOS digital products to U.S. end-user consumers.

252.    Furthermore, because the FTAIA does not bar plaintiffs' federal law claims, neither does it affect, bar, or limit plaintiffs' or putative class members' state-law claims.

## X.      APPLICABILITY OF CALIFORNIA LAW

253.    There is a California law provision incorporated by reference in Apple's DPLA.[245] Accordingly, plaintiffs allege that California law applies to the state-law claims they assert on their own behalf and on behalf of the proposed California-law classes.

---

[245] *See, e.g.*, *id.* ("Dispute Resolution; Governing Law") ("Any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California . . . . This agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law. . . ."). Upon information and belief, this or an effectively identical provision has been in force for at least the

254.     Furthermore, upon information and belief, the unlawful conduct alleged in this complaint, including the drafting, dissemination, and consummation of anticompetitive contracts and policies, as well as the levying and collection of Apple's supracompetitive distribution-services fee from iOS app and in-app-product developers, or the payment to developers of artificially low prices for digital products sold in the App Store, and the enforcement of minimum-price and end-in-$.99 price terms, was effected, implemented, adopted, and ratified in the state of California, where Apple maintains its U.S. and worldwide headquarters. Therefore, a substantial part of the anticompetitive conduct took place in California. Also, California has a clear, substantial, legitimate, and compelling interest in protecting competition in California and in seeing justice for the claims by all victims of its corporate citizen Apple's unlawful and anticompetitive conduct that emanated from within its borders, wherever they may reside.

255.     Under the instant circumstances, any relief, including injunctive or other equitable relief, granted on the basis of California law should cover at a minimum French iOS app and in-app product developers.

## XI.     CLAIMS FOR RELIEF

256.     Plaintiffs, on their own behalf and on behalf of those similarly situated, have pled monopsony as an alternative to monopoly. Monopsony is the mirror image of monopolization, but on the buy-side. Therefore, the following causes of action should be read to include monopsony, monopsonization, and attempted monopsony and monopsonization in the alternative to the monopoly, monopolization, and attempted monopoly and monopolization claims explicitly referenced therein.

---

preceding four years, but likely since the inception of Apple's provision of distribution services to iOS developers. (*See, e.g.*, Apple Sup. Ct. Pet. Br. at 36-37 n.15 ("The [developer's] obligations were in fact contained in the then-named iPhone Developer Program License Agreement (copies of which are widely available on the internet), and are now found in the Apple Developer Program License Agreement."); *see also* Ex. C (current exemplar of Apple Developer Agreement), ¶ 17 , available at: https://developer.apple.com/support/downloads/terms/apple-developer-agreement/Apple-Developer-Agreement-20220606-English.pdf (last accessed Nov. 29, 2022) (also containing California choice-of-law provision).)

257.     Furthermore, plaintiff le GESTE seeks injunctive relief individually, on behalf of its iOS-developer members, and on behalf of the class(es) it seeks to represent.

**FIRST CAUSE OF ACTION:**

**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION OF THE iOS APP-DISTRIBUTION AND IAP SERVICES MARKET (15 U.S.C. § 2)**

258.     Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

259.     Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed federal-law class(es) described above.

260.     Apple has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand monopoly power in that market. Thus, Apple possesses monopoly power in the global market, or, alternatively, the U.S. market for iOS app-distribution services it provides to, *inter alia*, France-resident iOS app developers. Alternatively, Apple possesses monopoly power in a market that includes, *inter alia*, the Google Play store for Android OS digital products.

261.     For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

262.     Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its potential rivals in the market for iOS app-distribution services.

263.     Apple has behaved as alleged herein to achieve, maintain, and grow its monopoly in the market for iOS app-distribution services, with the effect being that competition is foreclosed and that developer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by imposing supracompetitive developer commissions and minimum price fixing. Further, Apple's actions have depressed output as alleged herein.

264.     There is no valid business necessity or pro-competitive justification for Apple's conduct. Instead, Apple's actions are designed to destroy competition as alleged herein. Moreover, Apple's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

1

2       265.    Individual Developers, le GESTE iOS-developer members, and the proposed class(es)

3    have been injured, and will continue to be injured, in their businesses and property as a result of

     Apple's conduct, including by way of overpaying Apple for iOS app-distribution services.

4       266.    Further, iOS developers, including Individual Developers and iOS-developer

5    members of le GESTE, are inclined to sell iOS applications, in-app products, and subscriptions in or

6    via the App Store, or in or via apps acquired therefrom, in the future, in part because of their

7    investment in their development for the iOS ecosystem, which is incompatible with Google's

8    Android OS ecosystem.  Individual Developers are entitled to an injunction to prevent Apple from

9    persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing

10   to their businesses. Le GESTE, individually, and on behalf of its iOS-developer members, also seeks

11   injunctive relief, including in the alternative to any potential claims at law as referenced herein,

12   where and if any such remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise

13   available, including where such remedy at law is not plain, adequate, and complete.

14                             **SECOND CAUSE OF ACTION:**

15       **VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION**
              **OF THE iOS APP-DISTRIBUTION AND IAP SERVICES MARKET**
16                                  **(15 U.S.C. § 2)**

17       267.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

18       268.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each

19   member of the proposed federal-law class(es) described above.

20       269.    Apple has attempted to monopolize the global market, or, alternatively, the U.S.

21   market for iOS app-distribution services.

22       270.    Apple's anticompetitive conduct has created a dangerous probability that it will

23   achieve monopoly power in the relevant market.

24       271.    Apple has a specific intent to achieve monopoly power in the global market, or,

25   alternatively, the U.S. market for iOS app-distribution services.

26

27

28
     FIRST AMENDED CLASS ACTION COMPLAINT - 88
     Case No.: 4:22-cv-04437-YGR
     011083-11/2086911 V1

272.   Apple has the power to exclude competition in the market for iOS app-distribution services, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

273.   For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

274.   Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its potential rivals in the relevant market for iOS app-distribution services.

275.   Apple has behaved as alleged herein in a willful attempt to obtain a monopoly in the global market, or, alternatively, the U.S. market for iOS app-distribution services, with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by insisting on default 30% commissions, where applicable, and minimum price fixing. Further, Apple's actions have depressed output as alleged herein.

276.   There is no valid business necessity or pro-competitive justification for Apple's conduct. Moreover, Apple's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

277.   Individual Developers, le GESTE iOS-developer members, and the proposed class(es) have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying Apple for iOS app-distribution services.

278.   Further, iOS developers, including Individual Developers and iOS-developer members of le GESTE, are inclined to sell iOS applications, in-app products, and subscriptions in or via the App Store, or in or via apps acquired therefrom, in the future, in part because of their investment in their development for the iOS ecosystem, which is incompatible with Google's Android OS ecosystem.  Individual Developers are entitled to an injunction to prevent Apple from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses. Le GESTE, individually, and on behalf of its iOS-developer members, also seeks

1   injunctive relief, including in the alternative to any potential claims at law as referenced herein,

2   where and if any such remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise

3   available, including where such remedy at law is not plain, adequate, and complete.

**THIRD CAUSE OF ACTION:**

4

5   **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION ACT**
    **(CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)**
6

7        279.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

8        280.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the

9   proposed nationwide class described above.

10        281.    California's Unfair Competition Law (UCL) defines "unfair competition" to include

11   any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 *et*

12   *seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and

13   fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

14        282.    Apple has engaged in, and continues to engage in, acts of unfair competition as

15   defined in California's UCL. More specifically, Apple, by way of the conduct alleged herein, has

16   violated the unlawful and unfair prongs of the UCL, including as a California corporation, and

17   including by way of conduct within, and emanating from, California. Further, the FTAIA does not

18   affect the viability of plaintiffs' UCL claim for the reasons stated herein.

19   **A.    Apple has behaved unlawfully**

20        283.    Apple's acts of unfair competition include its violations of the Sherman and

21   Cartwright Acts as alleged herein. Therefore, Apple has violated the unlawful prong of the UCL.

22        284.    Apple's unlawful conduct has caused plaintiffs, as well as members of the proposed

23   classes, to suffer injury in fact. Because developers have overpaid for iOS app-distribution and IAP

24   services, they have lost money or property as a result of Apple's unlawful behavior. Individual

25   Developers and the classes they seek to represent are entitled to restitution, both at law and at equity.

26        285.    Further, iOS developers, including Individual Developers and iOS-developer

27   members of le GESTE, are inclined to sell iOS applications, in-app purchases, and subscriptions in

28

1    or via the App Store, or in or via apps acquired therefrom, in the future, in part because of their

2    investment in their development for the iOS ecosystem, which is incompatible with Google's

3    Android OS ecosystem.  Individual Developers are entitled to an injunction to prevent Apple from

4    persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing

5    to their businesses. Le GESTE also seeks injunctive or other equitable relief, on its own behalf, and

6    on behalf of its iOS-developer members, including in the alternative to any potential claims at law as

7    referenced herein, where and if any such remedy at law is deemed, or is, plain, adequate, and

8    complete; or as otherwise available, including where such remedy at law is not plain, adequate, and

9    complete.

10   **B.      Apple has behaved unfairly**

11          286.    Apple's acts of unfair competition include its violations of the Sherman Act and

12   Cartwright Acts and the policies underlying those statutes, as alleged herein. Additionally, Apple has

13   behaved unfairly and in violation of public policy as alleged herein. Among other unfair conduct,

14   Apple has stifled price competition by prohibiting plaintiffs and class members from communicating

15   in-app or otherwise with their customers about alternative, lower-priced payment options, causing

16   harm to plaintiffs and class members and to competition. These anti-steering restraints, at a

17   minimum, threaten an incipient violation of antitrust law by preventing informed choice among App

18   Store users, and they violate the policy and spirit of the antitrust laws. Therefore, Apple has violated

19   the unfair prong of the UCL.

20          287.    Apple's unfair conduct has caused plaintiffs (and le GESTE iOS-developer members),

21   as well as members of the proposed classes, to suffer injury in fact. Because developers have

22   overpaid for iOS app-distribution and IAP services, they have lost money or property as a result of

23   Apple's unfair behavior. Individual Developers and the classes they seek to represent are entitled to

24   restitution, both at law and at equity.

25          288.    Further, iOS developers, including Individual Developers and iOS-developer

26   members of le GESTE, are inclined to sell iOS applications, in-app purchases, and subscriptions in

27   or via the App Store, or in or via apps acquired therefrom, in the future, in part because of their

28

investment in their development for the iOS ecosystem, which is incompatible with Google's Android OS ecosystem. Individual Developers are entitled to an injunction to prevent Apple from persisting in its unfair (and unlawful) behavior to their detriment, including the harm that its behavior is causing to their businesses. Le GESTE also seeks injunctive or other equitable relief, on its own behalf, and on behalf of its iOS-developer members, including in the alternative to any potential claims at law as referenced herein, where and if any such remedy at law is deemed, or is, plain, adequate, and complete; or as otherwise available, including where such remedy at law is not plain, adequate, and complete.

### FOURTH CAUSE OF ACTION:

### VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT
### (CA. BUS & PROF. CODE §§ 16700 *ET SEQ.*)

289.    Plaintiffs repeat and re-make every allegation above as set forth herein in full.

290.    Apple's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia,*  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

291.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

292.    The global, or, alternatively, the U.S., market for iOS app-distribution and IAP services is a valid antitrust market.

293.    Apple requires iOS app developers to enter its standardized DPLA, and incorporated schedules and exhibits, as a condition of having their apps distributed through its willfully monopolized App Store. The relevant provisions of these agreements unreasonably restrain competition in the relevant market.

294.    For example, paragraph 7.2 of the DPLA, together with its Schedule 2, paragraph 3.1.1, and paragraph 3.1.1 of the App Store Review Guidelines, require that iOS app developers agree to use Apple's IAP services, including payment processing, in order to receive payment for

apps or in-app products distributed through the App Store, and for in-app digital products sold in or via apps acquired therefrom. While Apple's policies exclude certain types of transactions from this requirement, such as physical products, the general rule is that the use of IAP payment processing is required for digital products.

295.   The exclusionary and restrictive practices and contractual provisions cited herein serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the global market, or, alternatively, the U.S. market or California market for iOS app-distribution and IAP services. Moreover, Apple's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

296.   Apple's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

297.   Individual Developers, le GESTE iOS-developer members, and the proposed class(es) have been harmed by Apple's anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. Individual Developers, le GESTE iOS-developer members, and the proposed class(es) have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying Apple for iOS app-distribution services.

298.   Further, iOS developers, including Individual Developers and iOS-developer members of le GESTE, are inclined to sell iOS applications, in-app purchases, and subscriptions in or via the App Store, or in or via apps acquired therefrom, in the future, in part because of their investment in their development for the iOS ecosystem, which is incompatible with Google's Android OS ecosystem. Individual Developers and Le GESTE (and its iOS-developer members) are entitled to an injunction to prevent Apple from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

299.   What is more, Apple, by way of the conduct alleged herein, has violated the Cartwright Act, including as a California corporation, and including by way of conduct within, and emanating from, California. Additionally, the FTAIA does not affect the viability of plaintiffs' Cartwright Act claim for the reasons stated herein.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request the following relief on their own behalf and on behalf of all those similarly situated:

A.      That the Court certify this case as a class action; that it certify the proposed federal-law class(es) and the proposed California-law class(es); and that it appoint plaintiffs as class representatives as requested herein, and their counsel as class counsel;

B.      That the Court award them and the proposed classes all appropriate relief, to include, but not to be limited to, injunctive relief (whether as an alternative remedy as pled herein or otherwise) requiring that Apple cease the abusive, unlawful, and anticompetitive practices described herein, including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26, and also pursuant to state law: *see, e.g.*, Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 16750, as requested herein;

C.      That the Court award them and the proposed classes declaratory relief, adjudging Apple's complained-of practices to be unlawful;

D.      That the Court award Individual Developers and the proposed class(es) they seek to represent all appropriate monetary relief, whether by way of damages, including treble damages (*see, e.g.*, 15 U.S.C. § 15(a) and Cal. Bus. & Prof. Code § 16750), or other multiple or punitive damages, or restitution, where mandated or available by or at law (including federal antitrust law: *see, e.g.*, 15 U.S.C. § 15(a), and California law: *see, e.g.*, Cal. Bus. & Prof. Code § 16750), or equity or as otherwise available; or restitution in equity or at law (*see, e.g.*, Cal. Bus. & Prof. Code § 17203), whether as an alternative remedy as pled herein or otherwise; together with recovery of their costs of suit, to include their reasonable attorneys' fees, costs, and expenses (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 15(a) and/or 15 U.S.C. § 26, and California law; *see, e.g.*, Cal. Bus. & Prof. Code § 16750 and Cal. Code Civ. Pro. § 1021.5)); in addition to pre- and post-judgment interest to the maximum levels permitted by federal and California law or equity;

E.      That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein; and

1    F.    That the Court award them and proposed classes such other, favorable relief as may

2    be available and appropriate under federal or state law, or at equity.

3                                    **JURY TRIAL DEMANDED**

4        Plaintiffs demand a trial by jury on all issues so triable.

5    DATED:  December 2, 2022                  Respectfully submitted,

6                                              By  */s/ Steve W. Berman*

7                                                  Steve W. Berman (*pro hac vice*)
                                               Robert F. Lopez (*pro hac vice*)

8                                              Abigail D. Pershing (*pro hac vice*)
                                               HAGENS BERMAN SOBOL SHAPIRO LLP

9                                              1301 Second Avenue, Suite 2000
                                               Seattle, WA  98101

10                                             Telephone: (206) 623-7292
                                               Facsimile:  (206) 623-0594

11                                             steve@hbsslaw.com
                                               robl@hbsslaw.com

12                                             abigailp@hbsslaw.com

13

14                                             Ben M. Harrington (SBN 313877)
                                               HAGENS BERMAN SOBOL SHAPIRO LLP

15                                             715 Hearst Avenue, Suite 202
                                               Berkeley, CA 94710

16                                             Telephone: (510) 725-3000
                                               Facsimile:  (510) 725-3001

17                                             benh@hbsslaw.com

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**PLEASE READ THE FOLLOWING APPLE DEVELOPER PROGRAM LICENSE AGREEMENT
TERMS AND CONDITIONS CAREFULLY BEFORE DOWNLOADING OR USING THE APPLE
SOFTWARE OR APPLE SERVICES.  THESE TERMS AND CONDITIONS CONSTITUTE A
LEGAL AGREEMENT BETWEEN YOU AND APPLE.**

# Apple Developer Program License Agreement

## Purpose

You would like to use the Apple Software (as defined below) to develop one or more Applications
(as defined below) for Apple-branded products.  Apple is willing to grant You a limited license to
use the Apple Software and Services provided to You under this Program to develop and test
Your Applications on the terms and conditions set forth in this Agreement.

Applications developed under this Agreement for iOS Products, Apple Watch, or Apple TV can be
distributed in four ways: (1) through the App Store, if selected by Apple, (2) through the Custom
App Distribution, if selected by Apple, (3) on a limited basis for use on Registered Devices (as
defined below), and (4) for beta testing through TestFlight.  Applications developed for macOS
can be distributed: (a) through the App Store, if selected by Apple, (b) for beta testing through
TestFlight, or (c) separately distributed under this Agreement.

Applications that meet Apple's Documentation and Program Requirements may be submitted for
consideration by Apple for distribution via the App Store, Custom App Distribution, or for beta
testing through TestFlight.  If submitted by You and selected by Apple, Your Applications will be
digitally signed by Apple and distributed, as applicable.  Distribution of free (no charge)
Applications (including those that use the In-App Purchase API for the delivery of free content) via
the App Store or Custom App Distribution will be subject to the distribution terms contained in
Schedule 1 to this Agreement.  If You would like to distribute Applications for which You will
charge a fee or would like to use the In-App Purchase API for the delivery of fee-based content,
You must enter into a separate agreement with Apple ("Schedule 2").  If You would like to
distribute paid Applications via Custom App Distribution, You must enter into a separate
agreement with Apple ("Schedule 3").  You may also create Passes (as defined below) for use on
Apple-branded products running iOS or watchOS under this Agreement and distribute such
Passes for use by Wallet.

## 1.      Accepting this Agreement; Definitions

### 1.1      Acceptance
In order to use the Apple Software and Services, You must first accept this Agreement.  If You do
not or cannot accept this Agreement, You are not permitted to use the Apple Software or
Services.  Do not download or use the Apple Software or Services in that case.  You accept and
agree to the terms of this Agreement on Your own behalf and/or on behalf of Your company,
organization, educational institution, or agency, instrumentality, or department of the federal
government as its authorized legal representative, by doing either of the following:
(a) checking the box displayed at the end of this Agreement if You are reading this on an Apple
website; or
(b) clicking an "Agree" or similar button, where this option is provided by Apple.

### 1.2      Definitions
Whenever capitalized in this Agreement:

"**Ad Network APIs**" means the Documented APIs that provide a way to validate the successful
conversion of advertising campaigns on supported Apple-branded products using a combination
of cryptographic signatures and a registration process with Apple.

"**Ad Support APIs**" means the Documented APIs that provide the Advertising Identifier and Tracking Preference.

"**Advertising Identifier**" means a unique, non-personal, non-permanent identifier provided through the Ad Support APIs that are associated with a particular Apple-branded device and are to be used solely for advertising purposes, unless otherwise expressly approved by Apple in writing.

"**Agreement**" means this Apple Developer Program License Agreement, including any attachments, Schedule 1 and any exhibits thereto which are hereby incorporated by this reference.  For clarity, this Agreement supersedes the iOS Developer Program License Agreement (including any attachments, Schedule 1 and any exhibits thereto), the Safari Extensions Digital Signing Agreement, the Safari Extensions Gallery Submission Agreement, and the Mac Developer Program License Agreement.

"**App Store**" means an electronic store and its storefronts branded, owned, and/or controlled by Apple, or an Apple Subsidiary or other affiliate of Apple, through which Licensed Applications may be acquired.

"**App Store Connect**" means Apple's proprietary online content management tool for Applications.

"**Apple**" means Apple Inc., a California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014, U.S.A.

"**Apple Certificates**" means the Apple-issued digital certificates provided to You by Apple under the Program.

"**Apple Maps Server API**" means the Documented APIs that enable You to add server-to-server mapping features or functionality to Your Applications, websites, or web applications.

"**Apple Maps Service**" means the mapping platform and Map Data provided by Apple via the MapKit API and/or Apple Maps Server API for use by You only in connection with Your Applications, or the mapping platform and Map Data provided by Apple via MapKit JS and related tools for capturing map content (e.g., MapSnapshotter) for use by You only in connection with Your Applications, websites, or web applications.

"**Apple Pay APIs**" means the Documented APIs that enable end-users to send payment information they have stored on a supported Apple-branded product to an Application to be used in payment transactions made by or through the Application, and includes other payment-related functionality as described in the Documentation.

"**Apple Pay Payload**" means a customer data package passed through the Apple Software and Apple Pay APIs as part of a payment transaction (e.g., name, email, billing address, shipping address, and device account number).

"**Apple Push Notification Service**" or "**APN**" means the Apple Push Notification service that Apple may provide to You to enable You to transmit Push Notifications to Your Application or for use as otherwise permitted herein.

"**APN API**" means the Documented API that enables You to use the APN to deliver a Push Notification to Your Application or for use as otherwise permitted herein.

"**Apple Services**" or "**Services**" means the developer services that Apple may provide or make available through the Apple Software or as part of the Program for use with Your Covered

Products or development, including any Updates thereto (if any) that may be provided to You by Apple under the Program.

"**Apple Software**" means Apple SDKs, iOS, watchOS, tvOS, iPadOS, and/or macOS, the Provisioning Profiles, FPS SDK, FPS Deployment Package, and any other software that Apple provides to You under the Program, including any Updates thereto (if any) that may be provided to You by Apple under the Program.

"**Apple SDKs**" means the Apple-proprietary Software Development Kits (SDKs) provided hereunder, including but not limited to header files, APIs, libraries, simulators, and software (source code and object code) labeled as part of iOS, watchOS, tvOS, iPadOS, or Mac SDK and included in the Xcode Developer Tools package and Swift Playgrounds for purposes of targeting Apple-branded products running iOS, watchOS, tvOS, iPadOS, and/or macOS, respectively.

"**Apple Subsidiary**" means a corporation at least fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are owned or controlled, directly or indirectly, by Apple, and that is involved in the operation of or otherwise affiliated with the App Store, Custom App Distribution, TestFlight, and as otherwise referenced herein (e.g., Attachment 4).

"**Apple TV**" means an Apple-branded product that runs the tvOS.

"**Apple Watch**" means an Apple-branded product that runs the watchOS.

"**Apple Weather Data**" means any content, data or information provided through the WeatherKit APIs, including, but not limited to, Weather Alerts, general forecasts and other weather data.

"**Application**" means one or more software programs (including extensions, media, and Libraries that are enclosed in a single software bundle) developed by You in compliance with the Documentation and the Program Requirements, for distribution under Your own trademark or brand, and for specific use with an Apple-branded product running iOS, iPadOS, watchOS, tvOS, or macOS, as applicable, including bug fixes, updates, upgrades, modifications, enhancements, supplements to, revisions, new releases and new versions of such software programs.

"**Authorized Developers**" means Your employees and contractors, members of Your organization or, if You are an educational institution, Your faculty and staff who (a) each have an active and valid Apple Developer account with Apple, (b) have a demonstrable need to know or use the Apple Software in order to develop and test Covered Products, and (c) to the extent such individuals will have access to Apple Confidential Information, each have written and binding agreements with You to protect the unauthorized use and disclosure of such Apple Confidential Information.

"**Authorized Test Units**" means Apple-branded hardware units owned or controlled by You that have been designated by You for Your own testing and development purposes under this Program, and if You permit, Apple-branded hardware units owned or controlled by Your Authorized Developers so long as such units are used for testing and development purposes on Your behalf and only as permitted hereunder.

"**BackgroundAssets Framework**" means the Documented APIs that provide Applications with the ability to perform download operations in the background before first launch of the Application by the user and at other times after the first launch.

"**Beta Testers**" means end-users whom You have invited to sign up for TestFlight in order to test pre-release versions of Your Application and who have accepted the terms and conditions of the TestFlight Application.

"**ClassKit APIs**" means the Documented APIs that enable You to send student progress data for use in a school-managed environment.

"**CloudKit APIs**" means the Documented APIs that enable Your Applications, Web Software, and/or Your end-users (if You permit them) to read, write, query and/or retrieve structured data from public and/or private containers in iCloud.

"**Configuration Profile(s)**" means an XML file that allows You to distribute configuration information (e.g., VPN or Wi-Fi settings) and restrictions on device features (e.g., disabling the camera) to compatible Apple-branded products through Apple Configurator or other similar Apple-branded software tools, email, a webpage, or over-the-air deployment, or via Mobile Device Management (MDM).  For the sake of clarity, unless otherwise expressly permitted by Apple in writing, MDM is available only for enterprise use and is separately licensed for under the Apple Developer Enterprise Program License Agreement.

"**Corresponding Products**" means web-based or other versions of Your software applications that have the same title and substantially equivalent features and functionality as Your Licensed Application (e.g., feature parity).

"**Covered Products**" means Your Applications, Libraries, Passes, Safari Extensions, Safari Push Notifications, and/or FPS implementations developed under this Agreement.

"**Custom App Distribution**" means the store or storefront functionality that enables users to obtain Licensed Applications through the use of Apple Business Manager, Apple School Manager, or as otherwise permitted by Apple.

"**DeviceCheck APIs**" means the set of APIs, including server-side APIs, that enable You to set and query two bits of data associated with a device and the date on which such bits were last updated.

"**DeviceCheck Data**" means the data stored and returned through the DeviceCheck APIs.

"**Documentation**" means any technical or other specifications or documentation that Apple may provide to You for use in connection with the Apple Software, Apple Services, Apple Certificates, or otherwise as part of the Program.

"**Documented API(s)**" means the Application Programming Interface(s) documented by Apple in published Apple Documentation and which are contained in the Apple Software.

"**Face Data**" means information related to human faces (e.g., face mesh data, facial map data, face modeling data, facial coordinates or facial landmark data, including data from an uploaded photo) that is obtained from a user's device and/or through the use of the Apple Software (e.g., through ARKit, the Camera APIs, or the Photo APIs), or that is provided by a user in or through an Application (e.g., uploads for a facial analysis service).

"**FPS**" or "**FairPlay Streaming**" means Apple's FairPlay Streaming Server key delivery mechanism as described in the FPS SDK.

"**FPS Deployment Package**" means the D Function specification for commercial deployment of FPS, the D Function reference implementation, FPS sample code, and set of unique production keys specifically for use by You with an FPS implementation, if provided by Apple to You.

"**FPS SDK**" means the FPS specification, FPS server reference implementation, FPS sample code, and FPS development keys, as provided by Apple to You.

"**FOSS**" (Free and Open Source Software) means any software that is subject to terms that, as a condition of use, copying, modification or redistribution, require such software and/or derivative works thereof to be disclosed or distributed in source code form, to be licensed for the purpose of making derivative works, or to be redistributed free of charge, including without limitation software distributed under the GNU General Public License or GNU Lesser/Library GPL.

"**Game Center**" means the gaming community service and related APIs provided by Apple for use by You in connection with Your Applications that are associated with Your developer account.

"**HealthKit APIs**" means the Documented APIs that enable reading, writing, queries and/or retrieval of an end-user's health and/or fitness information in Apple's Health application.

"**HomeKit Accessory Protocol**" means the proprietary protocol licensed by Apple under the MFi Program that enables home accessories designed to work with the HomeKit APIs (e.g., lights, locks) to communicate with compatible iOS Products, Apple Watch and other supported Apple-branded products.

"**HomeKit APIs**" means the Documented APIs that enable reading, writing, queries and/or retrieval of an end-user's home configuration or home automation information from that end-user's designated area of Apple's HomeKit Database.

"**HomeKit Database**" means Apple's repository for storing and managing information about an end-user's Licensed HomeKit Accessories and associated information.

"**iCloud**" or "**iCloud service**" means the iCloud online service provided by Apple that includes remote online storage.

"**iCloud Storage APIs**" means the Documented APIs that allow storage and/or retrieval of user-generated documents and other files, and allow storage and/or retrieval of key value data (e.g., a list of stocks in a finance App, settings for an App) for Applications and Web Software through the use of iCloud.

"**In-App Purchase API**" means the Documented API that enables additional content, functionality or services to be delivered or made available for use within an Application with or without an additional fee.

"**Intermediary Party**" means a party that: (a) passes an Apple Pay end-user's Apple Pay Payload to a Merchant for processing such end-user's payment transaction outside of an Application, or (b) develops and makes available an Application to enable Merchants to conduct Tap to Pay transactions.

"**iOS**" means the iOS operating system software provided by Apple for use by You only in connection with Your Application development and testing, including any successor versions thereof.

"**iOS Product**" means an Apple-branded product that runs iOS or iPadOS.

"**iPadOS**" means the iPadOS operating system software provided by Apple for use by You only in connection with Your Application development and testing, including any successor versions thereof.

"**iPod Accessory Protocol**" or "**iAP**" means Apple's proprietary protocol for communicating with supported Apple-branded products and which is licensed under the MFi Program.

"**Library**" means a code module that cannot be installed or executed separately from an Application and that is developed by You in compliance with the Documentation and Program Requirements only for use with iOS Products, Apple Watch, or Apple TV.

"**Licensed Application**" means an Application that (a) meets and complies with all of the Documentation and Program Requirements, and (b) has been selected and digitally signed by Apple for distribution, and includes any additional permitted functionality, content or services provided by You from within an Application using the In-App Purchase API.

"**Licensed Application Information**" means screenshots, images, artwork, previews, icons and/or any other text, descriptions, representations or information relating to a Licensed Application that You provide to Apple for use in accordance with Schedule 1, or, if applicable, Schedule 2 or Schedule 3.

"**Licensed HomeKit Accessories**" means hardware accessories licensed under the MFi Program that support the HomeKit Accessory Protocol.

"**Local Notification**" means a message, including any content or data therein, that Your Application delivers to end-users at a pre-determined time or when Your Application is running in the background and another application is running in the foreground.

"**macOS**" means the macOS operating system software provided by Apple for use by You, including any successor versions thereof.

"**Managed Apple ID**" means the Apple ID created by an organization for an employee or student to use and managed by the organization's IT administrator.

"**Map Data**" means any content, data or information provided through the Apple Maps Service including, but not limited to, imagery, terrain data, latitude and longitude coordinates, transit data, points of interest and traffic data.

"**MapKit API**" means the Documented client-side API that enables You to add mapping features or functionality to Applications.

"**MapKit JS**" means the JavaScript library that enables You to add mapping features or functionality to Your Applications, websites, or web applications.

"**Merchant**" means a party who: (a) processes Apple Pay payment transactions, or (b) uses the TTP APIs to accept payments, conduct transactions and access related services via Your Application, under their own name, trademark, or brand (e.g., their name shows up on the end-user's credit card statement).

"**MFi Accessory**" means a non-Apple branded hardware device that interfaces, communicates, or otherwise interoperates with or controls an Apple-branded product using technology licensed under the MFi Program (e.g., the ability to control a supported Apple-branded product through the iPod Accessory Protocol).

"**MFi Licensee**" means a party who has been granted a license by Apple under the MFi Program.

"**MFi Program**" means a separate Apple program that offers developers, among other things, a license to incorporate or use certain Apple technology in or with hardware accessories or devices for purposes of interfacing, communicating or otherwise interoperating with or controlling select Apple-branded products.

"**Motion & Fitness APIs**" means the Documented APIs that are controlled by the Motion & Fitness privacy setting in a compatible Apple-branded product and that enable access to motion

and fitness sensor data (e.g., body motion, step count, stairs climbed), unless the end-user has disabled access to such data.

"**Multitasking**" means the ability of Applications to run in the background while other Applications are also running.

"**MusicKit APIs**" means the set of APIs that enable Apple Music users to access their subscription through Your Application or as otherwise permitted by Apple in the Documentation.

"**MusicKit Content**" means music, video, and/or graphical content rendered through the MusicKit APIs.

"**MusicKit JS**" means the JavaScript library that enables Apple Music users to access their subscription through Your Applications, websites, or web applications.

"**Network Extension Framework**" means the Documented APIs that provide Applications with the ability to customize certain networking features of compatible Apple-branded products (e.g., customizing the authentication process for WiFi Hotspots, VPN features, and content filtering mechanisms).

"**Pass(es)**" means one or more digital passes (e.g., movie tickets, coupons, loyalty reward vouchers, boarding passes, membership cards, etc.) developed by You under this Agreement, under Your own trademark or brand, and which are signed with Your Pass Type ID.

"**Pass Information**" means the text, descriptions, representations or information relating to a Pass that You provide to or receive from Your end-users on or in connection with a Pass.

"**Pass Type ID**" means the combination of an Apple Certificate and Push Application ID that is used by You to sign Your Passes and/or communicate with the APN.

"**Program**" means the overall Apple development, testing, digital signing, and distribution program contemplated in this Agreement.

"**Payment Service Provider**" means a provider that: (a) provides payment processing services involving the processing of TTP Data for Merchants, whether directly or indirectly, and (b) is set forth in the Documentation.

"**Program Requirements**" mean the technical, human interface, design, product category, security, performance, and other criteria and requirements specified by Apple, including but not limited to the current set of requirements set forth in **Section 3.3**, as they may be modified from time to time by Apple in accordance with this Agreement.

"**Provisioning Profiles**" means the files (including applicable entitlements or other identifiers) that are provided by Apple for use by You in connection with Your Application development and testing, and limited distribution of Your Applications for use on Registered Devices and/or on Authorized Test Units.

"**Push Application ID**" means the unique identification number or other identifier that Apple assigns to an Application, Pass or Site in order to permit it to access and use the APN.

"**Push Notification**" or "**Safari Push Notification**" means a notification, including any content or data therein, that You transmit to end-users for delivery in Your Application, Your Pass, and/or in the case of macOS, to the macOS desktop of users of Your Site who have opted in to receive such messages through Safari on macOS.

"**Registered Devices**" means Apple-branded hardware units owned or controlled by You, or owned by individuals who are affiliated with You, where such Products have been specifically registered with Apple under this Program.

"**Roster API**" means the Documented API that enables the sharing of student, teacher, and staff Roster Data from a school, if the school's IT administrator enables Your Application or Corresponding Products to receive that data.

"**Roster Data**" means any user data or tokens obtained, collected through, relating to, or from the use of the Roster API, including any data that relates to an identified or identifiable individual or that is linked or linkable to them.

"**Safari Extensions**" means one or more software extensions developed by You under this Agreement only for use with Safari in compliance with this Agreement.

"**Security Solution**" means the proprietary Apple content protection system marketed as Fairplay, to be applied to Licensed Applications distributed on the App Store to administer Apple's standard usage rules for Licensed Applications, as such system and rules may be modified by Apple from time to time.

"**ShazamKit APIs**" means the Documented APIs that enable You to add audio-based recognition features or functionality to Your Application and Corresponding Products.

"**ShazamKit Content**" means metadata, music, and/or graphical content provided by Apple and rendered through the ShazamKit APIs, including but not limited to MusicKit Content.

"**Sign In with Apple**" means the Documented APIs and JavaScript libraries that allow You to log users into Your Application (and Corresponding Products) with their Apple ID or anonymized credentials.

"**Sign in with Apple at Work & School**" means the Documented APIs and JavaScript libraries that allow You to log users into Your Application (and Corresponding Products) with their Managed Apple ID subject to the management of access by the user organization's IT administrator.

"**SiriKit**" means the set of APIs that allow Your Application to access or provide SiriKit domains, intents, shortcuts, donations, and other related functionality, as set forth in the Documentation.

"**Site**" means a website provided by You under Your own name, trademark or brand.

"**Single Sign-on Specification**" means the Documentation provided by Apple hereunder for the Single Sign-On API, as updated from time to time.

"**Tap to Pay Data**" or "**TTP Data**" means a Merchant's customer's data package passed through the Apple Software and Tap to Pay APIs as part of a transaction (e.g., primary account number, transaction amount, etc.).

"**Tap to Pay APIs**" or "**TTP APIs**" means the Documented APIs that enable Merchants to conduct transactions through the use of Your Application.

"**Term**" means the period described in **Section 11**.

"**TestFlight**" means Apple's beta testing service for pre-release Applications made available through Apple's TestFlight Application.

"**TestFlight Application**" means Apple's application that enables the distribution of pre-release versions of Your Applications to a limited number of Your Authorized Developers and to a limited number of Beta Testers (as specified on the TestFlight developer website) through TestFlight.

"**Tracking Preference**" means the Apple setting that enables an end-user to set an ad tracking preference.

"**TV App API**" means the API documented in the TV App Specification that enables You to provide Apple with TV App Data.

"**TV App Data**" means the data described in the TV App Specification to be provided to Apple through the TV App API.

"**TV App Features**" means functionality accessible via the TV App and/or tvOS, iOS, iPadOS, and/or macOS devices, which functionality provides the user the ability to view customized information and recommendations regarding content and to access such content through the user's apps, and/or provides the user the ability to continue play of previously viewed content.

"**TV App Specification**" means the Documentation provided by Apple hereunder for the TV App API, as updated from time to time.

"**tvOS**" means the tvOS operating system software, including any successor versions thereof.

"**Updates**" means bug fixes, updates, upgrades, modifications, enhancements, supplements, and new releases or versions of the Apple Software or Services, or to any part of the Apple Software or Services.

"**Wallet**" means Apple's application that has the ability to store and display Passes for use on iOS Products, Apple Watch, or Safari on macOS.

"**WatchKit Extension**" means an extension bundled as part of Your Application that accesses the WatchKit framework on iOS to run and display a WatchKit app on the watchOS.

"**watchOS**" means the watchOS operating system software, including any successor versions thereof.

"**Weather Alerts**" means any weather warnings, or other alerts provided via the WeatherKit APIs from time to time by meteorological agencies describing specific weather conditions in a geographic location.

"**WeatherKit APIs**" means the Documented APIs that enable You to add weather features or functionality to Your Applications or Corresponding Products.

"**Web Software**" means web-based versions of Your software applications that have the same title and substantially equivalent features and functionality as Your Licensed Application (e.g., feature parity).

"**Website Push ID**" means the combination of an Apple Certificate and Push Application ID that is used by You to sign Your Site's registration bundle and/or communicate with the APN.

"**Xcode Cloud**" or "**Xcode Cloud Service**" means Apple's cloud hosted continuous integration and delivery service and related technologies.

"**Xcode Cloud Content**" means the software, tests, scripts, data, information, text, graphics, videos, or other content that You post or make available when accessing or using the Xcode

Cloud Service (including any software residing in source code repositories to which You provide log-in credentials), excluding any Apple materials licensed to You.

"**You**" and "**Your**" means and refers to the person(s) or legal entity (whether the company, organization, educational institution, or governmental agency, instrumentality, or department) that has accepted this Agreement under its own developer account and that is using the Apple Software or otherwise exercising rights under this Agreement.

**Note:** For the sake of clarity, You may authorize contractors to develop Applications on Your behalf, but any such Applications must be owned by You, submitted under Your own developer account, and distributed as Applications only as expressly permitted herein. You are responsible to Apple for Your contractors' activities under Your account (e.g., adding them to Your team to perform development work for You) and their compliance with this Agreement. Any actions undertaken by Your contractors arising out of this Agreement shall be deemed to have been taken by You, and You (in addition to Your contractors) shall be responsible to Apple for all such actions.

## 2.     Internal Use License and Restrictions

### 2.1     Permitted Uses and Restrictions; Program services
Subject to the terms and conditions of this Agreement, Apple hereby grants You during the Term, a limited, non-exclusive, personal, revocable, non-sublicensable and non-transferable license to:

(a) Install a reasonable number of copies of the Apple Software provided to You under the Program on Apple-branded products owned or controlled by You, to be used internally by You or Your Authorized Developers for the sole purpose of developing or testing Covered Products designed to operate on the applicable Apple-branded products, except as otherwise expressly permitted in this Agreement;
(b) Make and distribute a reasonable number of copies of the Documentation to Authorized Developers for their internal use only and for the sole purpose of developing or testing Covered Products, except as otherwise expressly permitted in this Agreement;
(c) Install a Provisioning Profile on each of Your Authorized Test Units, up to the number of Authorized Test Units that You have registered and acquired licenses for, to be used internally by You or Your Authorized Developers for the sole purpose of developing and testing Your Applications, except as otherwise expressly permitted in this Agreement;
(d) Install a Provisioning Profile on each of Your Registered Devices, up to the limited number of Registered Devices that You have registered and acquired licenses for, for the sole purpose of enabling the distribution and use of Your Applications on such Registered Devices; and
(e) Incorporate the Apple Certificates issued to You pursuant to this Agreement for purposes of digitally signing Your Applications, Passes, Safari Extensions, Safari Push Notifications, and as otherwise expressly permitted by this Agreement.

Apple reserves the right to set the limited number of Apple-branded products that each Licensee may register with Apple and obtain licenses for under this Program (a "**Block of Registered Device Licenses**"). For the purposes of limited distribution on Registered Devices under **Section 7.3 (Ad Hoc distribution)**, each company, organization, educational institution or affiliated group may only acquire one (1) Block of Registered Device Licenses per company, organization, educational institution or group, unless otherwise agreed in writing by Apple. You agree not to knowingly acquire, or to cause others to acquire, more than one Block of Registered Device Licenses for the same company, organization, educational institution or group.

Apple may provide access to services by or through the Program for You to use with Your developer account (e.g., device or app provisioning, managing teams or other account resources). You agree to access such services only through the Program web portal (which is accessed through Apple's developer website) or through Apple-branded products that are designed to work in conjunction with the Program (e.g., Xcode, App Store Connect, Swift

Program Agreement

Playgrounds) and only as authorized by Apple.  If You (or Your Authorized Developers) access Your developer account through these other Apple-branded products, You acknowledge and agree that this Agreement shall continue to apply to any use of Your developer account and to any features or functionality of the Program that are made available to You (or Your Authorized Developers) in this manner (e.g., Apple Certificates and Provisioning Profiles can be used only in the limited manner permitted herein, etc.).  You agree not to create or attempt to create a substitute or similar service through use of or access to the services provided by or through the Program.  If Apple provides power and performance metrics for Your Application, You agree that such metrics may be used solely for Your own internal use and may not be provided to any third party (except as set forth in **Section 2.9**).  Further, You may only access such services using the Apple ID associated with Your developer account or authentication credentials (e.g., keys, tokens, password) associated with Your developer account, and You are fully responsible for safeguarding Your Apple ID and authentication credentials from compromise and for using them only as authorized by Apple and in accordance with the terms of this Agreement, including but not limited to **Section 2.8** and **5**.  Except as otherwise expressly permitted herein, You agree not to share, sell, resell, rent, lease, lend, or otherwise provide access to Your developer account or any services provided therewith, in whole or in part, to anyone who is not an Authorized Developer on Your team, and You agree not to solicit or request Apple Developer Program members to provide You with their Apple IDs, authentication credentials, and/or related account information and materials (e.g., Apple Certificates used for distribution or submission to the App Store or TestFlight).  You understand that each team member must have their own Apple ID or authentication credentials to access Your account, and You shall be fully responsible for all activity performed through or in connection with Your account.  To the extent that You own or control an Apple-branded computer running Apple's macOS Server or Xcode Server ("**Server**") and would like to use it for Your own development purposes in connection with the Program, You agree to use Your own Apple ID or other authentication credentials for such Server, and You shall be responsible for all actions performed by such Server.

**2.2     Authorized Test Units and Pre-Release Apple Software**
As long as an Authorized Test Unit contains any pre-release versions of the Apple Software or uses pre-release versions of Services, You agree to restrict access to such Authorized Test Unit to Your Authorized Developers and to not disclose, show, rent, lease, lend, sell or otherwise transfer such Authorized Test Unit to any third party.  You further agree to take reasonable precautions to safeguard, and to instruct Your Authorized Developers to safeguard, all Authorized Test Units from loss or theft.  Further, subject to the terms of this Agreement, You may deploy Your Applications to Your Authorized Developers for use on a limited number of Authorized Test Units for Your own internal testing and development purposes.

**You acknowledge that by installing any pre-release Apple Software or using any pre-release Services on Your Authorized Test Units, these Units may be "locked" into testing mode and may not be capable of being restored to their original condition.**  Any use of any pre-release Apple Software or pre-release Services are for evaluation and development purposes only, and You should not use any pre-release Apple Software or pre-release Services in a commercial operating environment or with important data.  You should back up any data prior to using the pre-release Apple Software or pre-release Services.  Apple shall not be responsible for any costs, expenses or other liabilities You may incur as a result of provisioning Your Authorized Test Units and Registered Devices, Your Covered Product development or the installation or use of this Apple Software or any pre-release Apple Services, including but not limited to any damage to any equipment, or any damage, loss, or corruption of any software, information or data.

**2.3     Confidential Nature of Pre-Release Apple Software and Services**
From time to time during the Term, Apple may provide You with pre-release versions of the Apple Software or Services that constitute Apple Confidential Information and are subject to the confidentiality obligations of this Agreement, except as otherwise set forth herein.  Such pre-release Apple Software and Services should not be relied upon to perform in the same manner as a final-release, commercial-grade product, nor used with data that is not sufficiently and regularly

backed up, and may include features, functionality or APIs for software or services that are not yet available.  You acknowledge that Apple may not have publicly announced the availability of such pre-release Apple Software or Services, that Apple has not promised or guaranteed to You that such pre-release software or services will be announced or made available to anyone in the future, and that Apple has no express or implied obligation to You to announce or commercially introduce such software or services or any similar or compatible technology.  You expressly acknowledge and agree that any research or development that You perform with respect to pre-release versions of the Apple Software or Services is done entirely at Your own risk.

**2.4     Copies**
You agree to retain and reproduce in full the Apple copyright, disclaimers and other proprietary notices (as they appear in the Apple Software and Documentation provided) in all copies of the Apple Software and Documentation that You are permitted to make under this Agreement.

**2.5     Ownership**
Apple retains all rights, title, and interest in and to the Apple Software, Services, and any Updates it may make available to You under this Agreement.  You agree to cooperate with Apple to maintain Apple's ownership of the Apple Software and Services, and, to the extent that You become aware of any claims relating to the Apple Software or Services, You agree to use reasonable efforts to promptly provide notice of any such claims to Apple.  The parties acknowledge that this Agreement does not give Apple any ownership interest in Your Covered Products.

**2.6     No Other Permitted Uses**
Except as otherwise set forth in this Agreement, You agree not to rent, lease, lend, upload to or host on any website or server, sell, redistribute, or sublicense the Apple Software, Apple Certificates, or any Services, in whole or in part, or to enable others to do so.  You may not use the Apple Software, Apple Certificates, or any Services provided hereunder for any purpose not expressly permitted by this Agreement, including any applicable Attachments and Schedules. You agree not to install, use or run the Apple SDKs on any non-Apple-branded computer, and not to install, use or run iOS, watchOS, tvOS, iPadOS, macOS and Provisioning Profiles on or in connection with devices other than Apple-branded products, or to enable others to do so.  You may not and You agree not to, or to enable others to, copy (except as expressly permitted under this Agreement), decompile, reverse engineer, disassemble, attempt to derive the source code of, modify, decrypt, or create derivative works of the Apple Software, Apple Certificates or any Services provided by the Apple Software or otherwise provided hereunder, or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by licensing terms governing use of open-sourced components or sample code included with the Apple Software).  You agree not to exploit any Apple Software, Apple Certificates, or Services provided hereunder in any unauthorized way whatsoever, including but not limited to, by trespass or burdening network capacity, or by harvesting or misusing data provided by such Apple Software, Apple Certificates, or Services.  Any attempt to do so is a violation of the rights of Apple and its licensors of the Apple Software or Services.  If You breach any of the foregoing restrictions, You may be subject to prosecution and damages. All licenses not expressly granted in this Agreement are reserved and no other licenses, immunity or rights, express or implied are granted by Apple, by implication, estoppel, or otherwise.  This Agreement does not grant You any rights to use any trademarks, logos or service marks belonging to Apple, including but not limited to the iPhone or iPod word marks.  If You make reference to any Apple products or technology or use Apple's trademarks, You agree to comply with the published guidelines at https://www.apple.com/legal/intellectual-property/guidelinesfor3rdparties.html, as they may be modified by Apple from time to time.

**2.7     FPS SDK and FPS Deployment Package**
You may use the FPS SDK to develop and test a server-side implementation of FPS, solely for use with video streamed by You (or on Your behalf) through Your Applications, or video downloaded for viewing through Your Applications, on iOS Products and/or Apple TV, through

Safari on macOS, or as otherwise approved by Apple in writing (collectively, "**Authorized FPS Applications**").  You understand that You will need to request the FPS Deployment Package on the Program web portal prior to any production or commercial use of FPS.  As part of such request, You will need to submit information about Your requested use of FPS.  Apple will review Your request and reserves the right to not provide You with the FPS Deployment Package at its sole discretion, in which case You will not be able to deploy FPS.  Any development and testing You perform with the FPS SDK is at Your own risk and expense, and Apple will not be liable to You for such use or for declining Your request to use FPS in a production or commercial environment.

If Apple provides You with the FPS Deployment Package, You agree to use it solely as approved by Apple and only in connection with video content streamed by You (or on Your behalf) to Authorized FPS Applications or downloaded for viewing through Your Authorized FPS Applications.  Except as permitted in **Section 2.9 (Third-Party Service Providers)**, You will not provide the FPS Deployment Package to any third party or sublicense, sell, resell, lease, disclose, or re-distribute the FPS Deployment Package or FPS SDK to any third party (or any implementation thereof) without Apple's prior written consent.

You acknowledge and agree that the FPS Deployment Package (including the set of FPS production keys) is Apple Confidential Information as set forth in **Section 9 (Confidentiality)**.  Further, such FPS keys are unique to Your company or organization, and You are solely responsible for storing and protecting them.  You may use such FPS keys solely for the purpose of delivering and protecting Your content key that is used to decrypt video content streamed by You to Authorized FPS Applications or downloaded for viewing through Your Authorized FPS Applications.  Apple will have no liability or responsibility for unauthorized access to or use of any FPS key or any content streamed or otherwise delivered under this Agreement in connection with FPS.  In the event that Your FPS key is disclosed, discovered, misappropriated or lost, You may request that Apple revoke it by emailing product-security@apple.com, and You understand that Apple will have no obligation to provide a replacement key.  Apple reserves the right to revoke Your FPS key at any time if requested by You, in the event of a breach of this Agreement by You, if otherwise deemed prudent or reasonable by Apple, or upon expiration or termination of this Agreement for any reason.

You acknowledge and agree that Apple reserves the right to revoke or otherwise remove Your access to and use of FPS (or any part thereof) at any time in its sole discretion.  Further, Apple will have no obligation to provide any modified, updated or successor version of the FPS Deployment Package or the FPS SDK to You and will have no obligation to maintain compatibility with any prior version.  If Apple makes new versions of the FPS Deployment Package or FPS SDK available to You, then You agree to update to them within a reasonable time period if requested to do so by Apple.

### 2.8     Use of Apple Services

Apple may provide access to Apple Services that Your Covered Products may call through APIs in the Apple Software and/or that Apple makes available to You through other mechanisms, e.g., through the use of keys that Apple may make accessible to You under the Program.  You agree to access such Apple Services only through the mechanisms provided by Apple for such access and only for use on Apple-branded products.  Except as permitted in **Section 2.9 (Third-Party Service Providers)** or as otherwise set forth herein, You agree not to share access to mechanisms provided to You by Apple for the use of the Services with any third party.  Further, You agree not to create or attempt to create a substitute or similar service through use of or access to the Apple Services.

You agree to access and use such Services only as necessary for providing services and functionality for Your Covered Products that are eligible to use such Services and only as permitted by Apple in writing, including in the Documentation.  You may not use the Apple Services in any manner that is inconsistent with the terms of this Agreement or that infringes any

intellectual property rights of a third party or Apple, or that violates any applicable laws or regulations.  You agree that the Apple Services contain proprietary content, information and material owned by Apple and its licensors, and protected by applicable intellectual property and other laws.  You may not use such proprietary content, information or materials in any way whatsoever, except for the permitted uses of the Apple Services under this Agreement, or as otherwise agreed by Apple in writing.

You understand there may be storage capacity, transmission, and/or transactional limits for the Apple Services both for You as a developer and for Your end-users.  If You reach or Your end-user reaches such limits, then You or Your end-user may be unable to use the Apple Services or may be unable to access or retrieve data from such Services through Your Covered Products or through the applicable end-user accounts.  You agree not to charge any fees to end-users solely for access to or use of the Apple Services through Your Covered Products or for any content, data or information provided therein, and You agree not to sell access to the Apple Services in any way.  You agree not to fraudulently create any end-user accounts or induce any end-user to violate the terms of their applicable end-user terms or service agreement with Apple or to violate any Apple usage policies for such end-user services.  Except as expressly set forth herein, You agree not to interfere with an end-user's ability to access or use any such services.

Apple reserves the right to change, suspend, deprecate, deny, limit, or disable access to the Apple Services, or any part thereof, at any time without notice (including but not limited to revoking entitlements or changing any APIs in the Apple Software that enable access to the Services or not providing You with an entitlement).  In no event will Apple be liable for the removal of or disabling of access to any of the foregoing.  Apple may also impose limits and restrictions on the use of or access to the Apple Services, may remove the Apple Services for indefinite time periods, may revoke Your access to the Apple Services, or may cancel the Apple Services (or any part thereof) at any time without notice or liability to You and in its sole discretion.

Apple does not guarantee the availability, accuracy, completeness, reliability, or timeliness of any data or information displayed by any Apple Services.  To the extent You choose to use the Apple Services with Your Covered Products, You are responsible for Your reliance on any such data or information.  You are responsible for Your use of the Apple Software and Apple Services, and if You use such Services, then it is Your responsibility to maintain appropriate alternate backup of all Your content, information and data, including but not limited to any content that You may provide to Apple for hosting as part of Your use of the Services.  You understand and agree that You may not be able to access certain Apple Services upon expiration or termination of this Agreement and that Apple reserves the right to suspend access to or delete content, data or information that You or Your Covered Product have stored through Your use of such Services provided hereunder.  You should review the Documentation and policy notices posted by Apple prior to using any Apple Services.

Apple Services may not be available in all languages or in all countries or regions, and Apple makes no representation that any such Services would be appropriate, accurate or available for use in any particular location or product.  To the extent You choose to use the Apple Services with Your Applications, You do so at Your own initiative and are responsible for compliance with any applicable laws.  Apple reserves the right to charge fees for Your use of the Apple Services. Apple will inform You of any Apple Service fees or fee changes by email and information about such fees will be posted in the Program web portal, App Store Connect, or the CloudKit console. Apple Service availability and pricing are subject to change.  Further, Apple Services may not be made available for all Covered Products and may not be made available to all developers.  Apple reserves the right to not provide (or to cease providing) the Apple Services to any or all developers at any time in its sole discretion.

**2.9      Third-Party Service Providers**

Unless otherwise prohibited by Apple in the Documentation or this Agreement, You are permitted to employ or retain a third party ("**Service Provider**") to assist You in using the Apple Software and Services provided pursuant to this Agreement, including, but not limited to, engaging any such Service Provider to maintain and administer Your Applications' servers on Your behalf, provided that any such Service Provider's use of the Apple Software and Services or any materials associated therewith is done solely on Your behalf and only in accordance with these terms.  Notwithstanding the foregoing, You may not use a Service Provider to submit an Application to the App Store or use TestFlight on Your behalf.  You agree to have a binding written agreement with Your Service Provider with terms at least as restrictive and protective of Apple as those set forth herein.  Any actions undertaken by any such Service Provider in relation to Your Applications or use of the Apple Software or Apple Services and/or arising out of this Agreement shall be deemed to have been taken by You, and You (in addition to the Service Provider) shall be responsible to Apple for all such actions (or any inactions).  In the event of any actions or inactions by the Service Provider that would constitute a violation of this Agreement or otherwise cause any harm, Apple reserves the right to require You to cease using such Service Provider.

**2.10    Updates; No Support or Maintenance**
Apple may extend, enhance, or otherwise modify the Apple Software or Services (or any part thereof) provided hereunder at any time without notice, but Apple shall not be obligated to provide You with any Updates to the Apple Software or Services.  If Updates are made available by Apple, the terms of this Agreement will govern such Updates, unless the Update is accompanied by a separate license in which case the terms of that license will govern.  You understand that such modifications may require You to change or update Your Covered Products.  Further, You acknowledge and agree that such modifications may affect Your ability to use, access, or interact with the Apple Software and Services.  Apple is not obligated to provide any maintenance, technical or other support for the Apple Software or Services.  You acknowledge that Apple has no express or implied obligation to announce or make available any Updates to the Apple Software or to any Services to anyone in the future.  Should an Update be made available, it may have APIs, features, services or functionality that are different from those found in the Apple Software licensed hereunder or the Services provided hereunder.

# 3.    Your Obligations

## 3.1    General
You certify to Apple and agree that:
(a) You are of the legal age of majority in the jurisdiction in which You reside (at least 18 years of age in many countries or regions) and have the right and authority to enter into this Agreement on Your own behalf, or if You are entering into this Agreement on behalf of Your company, organization, educational institution, or agency, instrumentality, or department of the federal government, that You have the right and authority to legally bind such entity or organization to the terms and obligations of this Agreement;
(b) All information provided by You to Apple or Your end-users in connection with this Agreement or Your Covered Products, including without limitation Licensed Application Information or Pass Information, will be current, true, accurate, supportable and complete and, with regard to information You provide to Apple, You will promptly notify Apple of any changes to such information.  Further, You agree that Apple may share such information (including email address and mailing address) with third parties who have a need to know for purposes related thereto (e.g., intellectual property questions, customer service inquiries, etc.);
(c) You will comply with the terms of and fulfill Your obligations under this Agreement, including obtaining any required consents for Your Authorized Developers' use of the Apple Software and Services, and You agree to monitor and be fully responsible for all such use by Your Authorized Developers and their compliance with the terms of this Agreement;
(d) You will be solely responsible for all costs, expenses, losses and liabilities incurred, and activities undertaken by You and Your Authorized Developers in connection with the Apple Software and Apple Services, the Authorized Test Units, Registered Devices, Your Covered

Products and Your related development and distribution efforts, including, but not limited to, any related development efforts, network and server equipment, Internet service(s), or any other hardware, software or services used by You in connection with Your use of any services;
(e) For the purposes of Schedule 1 (if applicable), You represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent for the delivery of Your Licensed Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party; and
(f) You will not act in any manner which conflicts or interferes with any existing commitment or obligation You may have and no agreement previously entered into by You will interfere with Your performance of Your obligations under this Agreement.

### 3.2    Use of the Apple Software and Apple Services

As a condition to using the Apple Software and any Apple Services, You agree that:
(a) You will use the Apple Software and any services only for the purposes and in the manner expressly permitted by this Agreement and in accordance with all applicable laws and regulations;
(b) You will not use the Apple Software or any Apple Services: (1) for any unlawful or illegal activity, nor to develop any Covered Product, which would commit or facilitate the commission of a crime, or other tortious, unlawful or illegal act; (2) to threaten, incite, or promote violence, terrorism, or other serious harm; or (3) to create or distribute any content or activity that promotes child sexual exploitation or abuse;
(c) Your Application, Library and/or Pass will be developed in compliance with the Documentation and the Program Requirements, the current set of which is set forth in **Section 3.3** below;
(d) To the best of Your knowledge and belief, Your Covered Products, Licensed Application Information, Xcode Cloud Content, and Pass Information do not and will not violate, misappropriate, or infringe any Apple or third party copyrights, trademarks, rights of privacy and publicity, trade secrets, patents, or other proprietary or legal rights (e.g., musical composition or performance rights, video rights, photography or image rights, logo rights, third party data rights, etc. for content and materials that may be included in Your Application);
(e) You will not, through use of the Apple Software, Apple Certificates, Apple Services or otherwise, create any Covered Product or other code or program that would: (1) disable, hack or otherwise interfere with the Security Solution, or any security, digital signing, digital rights management, verification or authentication mechanisms implemented in or by iOS, watchOS, iPadOS, tvOS, the Apple Software, or any Services, or other Apple software or technology, or enable others to do so (except to the extent expressly permitted by Apple in writing); or (2) violate the security, integrity, or availability of any user, network, computer or communications system;
(f) You will not, directly or indirectly, commit any act intended to interfere with any of the Apple Software or Services, the intent of this Agreement, or Apple's business practices including, but not limited to, taking actions that may hinder the performance or intended use of the App Store, Custom App Distribution, TestFlight, Xcode Cloud, Ad Hoc distribution, or the Program (e.g., submitting fraudulent reviews of Your own Application or any third party application, choosing a name for Your Application that is substantially similar to the name of a third party application in order to create consumer confusion, or squatting on application names to prevent legitimate third party use).  Further, You will not engage, or encourage others to engage, in any unlawful, unfair, misleading, fraudulent, improper, or dishonest acts or business practices relating to Your Covered Products (e.g., engaging in bait-and-switch pricing, consumer misrepresentation, deceptive business practices, or unfair competition against other developers); and
(g) Applications for iOS Products, Apple Watch, or Apple TV developed using the Apple Software may be distributed only if selected by Apple (in its sole discretion) for distribution via the App Store, Custom App Distribution, for beta distribution through TestFlight, or through Ad Hoc distribution as contemplated in this Agreement.  Passes developed using the Apple Software may be distributed to Your end-users via email, a website or an Application in accordance with the terms of this Agreement, including Attachment 5. Safari Extensions signed with an Apple Certificate may be distributed to Your end-users in accordance with the terms of this Agreement, including Attachment 7. Applications for macOS may be distributed outside of the App Store using Apple Certificates and/or tickets as set forth in **Section 5.3** and **5.4**.

### 3.3     Program Requirements

Any Application that will be submitted to the App Store, Custom App Distribution, or TestFlight, or that will be distributed through Ad Hoc distribution, must be developed in compliance with the Documentation and the Program Requirements, the current set of which is set forth below in this **Section 3.3**.  Corresponding Products, Libraries, and Passes are subject to the same criteria:

**APIs and Functionality:**

**3.3.1**    Applications may only use Documented APIs in the manner prescribed by Apple and must not use or call any private APIs.  Further, macOS Applications submitted to Apple for distribution on the App Store may use only Documented APIs included in the default installation of macOS, as bundled with Xcode and the Mac SDK, or as bundled with Swift Playgrounds; deprecated technologies (such as Java) may not be used.

**3.3.2**    Except as set forth in the next paragraph, an Application may not download or install executable code.  Interpreted code may be downloaded to an Application but only so long as such code: (a) does not change the primary purpose of the Application by providing features or functionality that are inconsistent with the intended and advertised purpose of the Application as submitted to the App Store, (b) does not create a store or storefront for other code or applications, and (c) does not bypass signing, sandbox, or other security features of the OS.

An Application that is a programming environment intended for use in learning how to program may download and run executable code so long as the following requirements are met: (i) no more than 80 percent of the Application's viewing area or screen may be taken over with executable code, except as otherwise permitted in the Documentation, (ii) the Application must present a reasonably conspicuous indicator to the user within the Application to indicate that the user is in a programming environment, (iii) the Application must not create a store or storefront for other code or applications, and (iv) the source code provided by the Application must be completely viewable and editable by the user (e.g., no pre-compiled libraries or frameworks may be included with the code downloaded).

**3.3.3**    Without Apple's prior written approval or as permitted under **Section 3.3.25** (**In-App Purchase API**), an Application may not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store, Custom App Distribution or TestFlight.

**3.3.4**    An Application for iOS, watchOS, iPadOS, or tvOS may only read data from or write data to an Application's designated container area on the device, except as otherwise specified by Apple. For macOS Applications submitted to Apple for distribution on the App Store: (a) all files necessary for the Application to execute on macOS must be in the Application bundle submitted to Apple and must be installed by the App Store; (b) all localizations must be in the same Application bundle and may not include a suite or collection of independent applications within a single Application bundle; (c) native user interface elements or behaviors of macOS (e.g., the system menu, window sizes, colors, etc.) may not be altered, modified or otherwise changed; (d) You may not use any digital rights management or other copy or access control mechanisms in such Applications without Apple's written permission or as specified in the Documentation; and (e) except as otherwise permitted by **Section 3.3.25** (**In-App Purchase API**), such Applications may not function as a distribution mechanism for software and may not include features or functionality that create or enable a software store, distribution channel or other mechanism for software delivery within such Applications (e.g., an audio application may not include an audio filter plug-in store within the Application).

**3.3.5**    An Application for an iOS Product must have at least the same features and functionality when run by a user in compatibility mode on an iPad (e.g., an iPhone app running in an equivalent iPhone-size window on an iPad must perform in substantially the same manner as

when run on the iPhone; provided that this obligation will not apply to any feature or functionality that is not supported by a particular hardware device, such as a video recording feature on a device that does not have a camera).  Further, You agree not to interfere or attempt to interfere with the operation of Your Application in compatibility mode.

**3.3.6**     You may use the Multitasking services only for their intended purposes as described in the Documentation.

**User Interface, Data Collection, Local Laws and Privacy:**

**3.3.7**     Applications must comply with the Human Interface Guidelines (HIG) and other Documentation provided by Apple.  You agree to follow the HIG to develop an appropriate user interface and functionality for Your Application that is compatible with the design of Apple-branded products (e.g., a watch App should have a user interface designed for quick interactions in accordance with the HIG's watchOS design themes).

**3.3.8**     If Your Application captures or makes any video, microphone, screen recordings, or camera recordings, whether saved on the device or sent to a server (e.g., an image, photo, voice or speech capture, or other recording) (collectively "**Recordings**"), a reasonably conspicuous audio, visual or other indicator must be displayed to the user as part of the Application to indicate that a Recording is taking place.

- In addition, any form of data, content or information collection, processing, maintenance, uploading, syncing, storage, transmission, sharing, disclosure or use performed by, through or in connection with Your Application must comply with all applicable privacy laws and regulations as well as any related Program Requirements, including but not limited to any notice or consent requirements.

**3.3.9**     You and Your Applications (and any third party with whom You have contracted to serve advertising) may not collect user or device data without prior user consent, whether such data is obtained directly from the user or through the use of the Apple Software, Apple Services, or Apple SDKs, and then only to provide a service or function that is directly relevant to the use of the Application, or to serve advertising in accordance with **Sections 3.3.12**.  You may not broaden or otherwise change the scope of usage for previously collected user or device data without obtaining prior user consent for such expanded or otherwise changed data collection.  Further, neither You nor Your Application will use any permanent, device-based identifier, or any data derived therefrom, for purposes of uniquely identifying a device.

**3.3.10**   You must provide clear and complete information to users regarding Your collection, use and disclosure of user or device data, e.g., a description of Your use of user and device data in the App Description on the App Store.  Furthermore, You must take appropriate steps to protect such data from unauthorized use, disclosure or access by third parties.  If a user ceases to consent or affirmatively revokes consent for Your collection, use or disclosure of such user's device or user data, You (and any third party with whom You have contracted to serve advertising) must promptly cease all such use. You must provide a privacy policy in Your Application, on the App Store, and/or on Your website explaining Your collection, use, disclosure, sharing, retention, and deletion of user or device data.  You agree to notify Your users, in accordance with applicable law, in the event of a data breach in which user data collected from Your Application is compromised (e.g., You will send an email notifying Your users if there has been an unintentional disclosure or misuse of their user data).

**3.3.11**   Applications must comply with all applicable criminal, civil and statutory laws and regulations, including those in any jurisdictions in which Your Applications may be offered or made available.  In addition:

-  You and the Application must comply with all applicable privacy and data collection laws and regulations with respect to any collection, use or disclosure of user or device data (e.g., a user's IP address, the name of the user's device, and any installed apps associated with a user);

-  Applications may not be designed or marketed for the purpose of harassing, abusing, spamming, stalking, threatening or otherwise violating the legal rights (such as the rights of privacy and publicity) of others;

-  Neither You nor Your Application may perform any functions or link to any content, services, information or data or use any robot, spider, site search or other retrieval application or device to scrape, mine, retrieve, cache, analyze or index software, data or services provided by Apple or its licensors, or obtain (or try to obtain) any such data, except the data that Apple expressly provides or makes available to You in connection with such services.  You agree that You will not collect, disseminate or use any such data for any unauthorized purpose; and

-  If Your Application is intended for human subject research or uses the HealthKit APIs for clinical health-related uses which may involve personal data (e.g., storage of health records), then You agree to inform participants of the intended uses and disclosures of their personally identifiable data as part of such research or clinical health uses and to obtain consent from such participants (or their guardians) who will be using Your Application for such research or clinical health purposes.  Further, You shall prohibit third parties to whom You provide any de-identified or coded data from re-identifying (or attempting to re-identify) any participants using such data without participant consent, and You agree to require that such third parties pass the foregoing restriction on to any other parties who receive such de-identified or coded data.

**Advertising Identifier and Tracking Preference; Ad Network APIs:**

**3.3.12**   You and Your Applications (and any third party with whom You have contracted to serve advertising) may use the Advertising Identifier, and any information obtained through the use of the Advertising Identifier, only for the purpose of serving advertising.  If a user resets the Advertising Identifier, then You agree not to combine, correlate, link or otherwise associate, either directly or indirectly, the prior Advertising Identifier and any derived information with the reset Advertising Identifier.  For Applications compiled for any Apple-branded product providing access to the Ad Support APIs, You agree to check a user's Tracking Preference prior to serving any advertising using the Advertising Identifier, and You agree to abide by a user's setting in the Tracking Preference in Your use of the Advertising Identifier and in Your use of any other user or device data for tracking.

In addition, You may request to use the Ad Network APIs to track application advertising conversion events.  If You are granted permission to use the Ad Network APIs, You agree not to use such APIs, or any information obtained through the use of the Ad Network APIs, for any purpose other than verifying ad validation information as part of an advertising conversion event.  You agree not to combine, correlate, link, or otherwise associate, either directly or indirectly, information that is provided as part of the ad validation through the use of the Ad Network APIs with other information You may have about a user.  Apple reserves the right to reject any requests to use the Ad Network APIs, in its sole discretion.

**Location and Maps; User Consents:**

**3.3.13**   Applications that use location-based APIs (e.g., Core Location, MapKit API, Apple Maps Server API) or otherwise provide location-based services may not be designed or marketed for automatic or autonomous control of vehicle behavior, or for emergency or life-saving purposes.

**3.3.14**   Applications that offer location-based services or functionality, or that otherwise obtain a user's location through the use of the Apple Software or Apple Services, must notify and obtain consent from a user before a user's location data is collected, transmitted or otherwise used by

Program Agreement

the Application and then such data must be used only as consented to by the user and as permitted herein.  For example, if You use the "Always" location option in Your Application for the purpose of continuous collection and use of a user's location data, You should provide a clearly defined justification and user benefit that is presented to the user at the time of the permission.

**3.3.15**   If You choose to provide Your own location-based service, data and/or information in conjunction with the Apple maps provided through the Apple Maps Service (e.g., overlaying a map or route You have created on top of an Apple map), You are solely responsible for ensuring that Your service, data and/or information correctly aligns with any Apple maps used.  For Applications that use location-based APIs for real-time navigation (including, but not limited to, turn-by-turn route guidance and other routing that is enabled through the use of a sensor), You must have an end-user license agreement that includes the following notice:  YOUR USE OF THIS REAL TIME ROUTE GUIDANCE APPLICATION IS AT YOUR SOLE RISK.  LOCATION DATA MAY NOT BE ACCURATE.

**3.3.16**   Applications must not disable, override or otherwise interfere with any Apple-implemented system alerts, warnings, display panels, consent panels and the like, including, but not limited to, those that are intended to notify the user that the user's location data, address book data, calendar, photos, audio data, and/or reminders are being collected, transmitted, maintained, processed or used, or intended to obtain consent for such use.  Further, if You have the ability to add a description in such alerts, warnings, and display panels (e.g., information in the purpose strings for the Camera APIs), any such description must be accurate and not misrepresent the scope of use.  If consent is denied or withdrawn, Applications may not collect, transmit, maintain, process or utilize such data or perform any other actions for which the user's consent has been denied or withdrawn.

**3.3.17**   If Your Application (or Your website or web application, as applicable) uses or accesses the MapKit API, Apple Maps Server API or MapKit JS from a device running iOS version 6 or later, Your Application (or Your website or web application, as applicable) will access and use the Apple Maps Service.  All use of the MapKit API, Apple Maps Server API, MapKit JS, and Apple Maps Service must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 6 (Additional Terms for the use of the Apple Maps Service).

**Content and Materials:**

**3.3.18**   Any master recordings and musical compositions embodied in Your Application must be wholly-owned by You or licensed to You on a fully paid-up basis and in a manner that will not require the payment of any fees, royalties and/or sums by Apple to You or any third party.  In addition, if Your Application will be distributed outside of the United States, any master recordings and musical compositions embodied in Your Application (a) must not fall within the repertoire of any mechanical or performing/communication rights collecting or licensing organization now or in the future and (b) if licensed, must be exclusively licensed to You for Your Application by each applicable copyright owner.

**3.3.19**   If Your Application includes or will include any other content, You must either own all such content or have permission from the content owner to use it in Your Application.

**3.3.20**   Applications may be rejected if they contain content or materials of any kind (text, graphics, images, photographs, sounds, etc.) that in Apple's reasonable judgment may be found objectionable or inappropriate, for example, materials that may be considered obscene, pornographic, or defamatory.

**3.3.21**   Applications must not contain any malware, malicious or harmful code, program, or other internal component (e.g., computer viruses, trojan horses, "backdoors") which could damage, destroy, or adversely affect the Apple Software, services, Apple-branded products, or other software, firmware, hardware, data, systems, services, or networks.

**3.3.22**   If Your Application includes any FOSS, You agree to comply with all applicable FOSS licensing terms.  You also agree not to use any FOSS in the development of Your Application in such a way that would cause the non-FOSS portions of the Apple Software to be subject to any FOSS licensing terms or obligations.

**3.3.23**   Your Application may include promotional sweepstake or contest functionality provided that You are the sole sponsor of the promotion and that You and Your Application comply with any applicable laws and fulfill any applicable registration requirements in the country, territory, or region where You make Your Application available and the promotion is open.  You agree that You are solely responsible for any promotion and any prize, and also agree to clearly state in binding official rules for each promotion that Apple is not a sponsor of, or responsible for conducting, the promotion.

**3.3.24**   Your Application may include a direct link to a page on Your web site where You include the ability for an end-user to make a charitable contribution, provided that You comply with any applicable laws (which may include providing a receipt), and fulfill any applicable regulation or registration requirements, in the country, territory, or region where You enable the charitable contribution to be made.  You also agree to clearly state that Apple is not the fundraiser.

**In-App Purchase API:**

**3.3.25**   All use of the In-App Purchase API and related services must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 2 (Additional Terms for Use of the In-App Purchase API).

**Network Extension Framework:**

**3.3.26**   Your Application must not access the Network Extension Framework unless Your Application is primarily designed for providing networking capabilities, and You have received an entitlement from Apple for such access.  You agree to the following if You receive such entitlement:

- You agree to clearly disclose to end-users how You and Your Application will be using their network information and, if applicable, filtering their network data, and You agree to use such data and information only as expressly consented to by the end-user and as expressly permitted herein;

- You agree to store and transmit network information or data from an end-user in a secure and appropriate manner;

- You agree not to divert an end-user's network data or information through any undisclosed, improper, or misleading processes, e.g., to filter it through a website to obtain advertising revenue or spoof a website;

- You agree not to use any network data or information from end-users to bypass or override any end-user settings, e.g., You may not track an end-user's WiFi network usage to determine their location if they have disabled location services for Your Application; and

- Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use the Network Extension Framework, or any data or information obtained through the Network Extension Framework, for any purpose other than providing networking capabilities in connection with Your Application (e.g., not for using an end-user's Internet traffic to serve advertising or to otherwise build user profiles for advertising).

Apple reserves the right to not provide You with an entitlement to use the Network Extension

Program Agreement

Framework in its sole discretion and to revoke such entitlement at any time.  In addition, if You would like to use the Access WiFi Information APIs (which provide the WiFi network to which a device is connected), then You must request an entitlement from Apple for such use, and, notwithstanding anything to the contrary in **Section 3.3.9**, You may use such APIs only for providing a service or function that is directly relevant to the Application (e.g., not for serving advertising).

**MFi Accessories:**

**3.3.27**   Your Application may interface, communicate, or otherwise interoperate with or control an MFi Accessory (as defined above) through wireless transports or through Apple's lightning or 30-pin connectors only if (i) such MFi Accessory is licensed under the MFi Program at the time that You initially submit Your Application, (ii) the MFi Licensee has added Your Application to a list of those approved for interoperability with their MFi Accessory, and (iii) the MFi Licensee has received approval from the MFi Program for such addition.

**Regulatory Compliance:**

**3.3.28**   You will fulfill any applicable regulatory requirements, including full compliance with all applicable laws, regulations, and policies related to the manufacturing, marketing, sale and distribution of Your Application in the United States, and in particular the requirements of the U.S. Food and Drug Administration (FDA) as well as other U.S. regulatory bodies such as the FAA, HHS, FTC, and FCC, and the laws, regulations and policies of any other applicable regulatory bodies in any countries, territories, or regions where You use or make Your Application available, e.g., MHRA, CFDA. However, You agree that You will not seek any regulatory marketing permissions or make any determinations that may result in any Apple products being deemed regulated or that may impose any obligations or limitations on Apple.  By submitting Your Application to Apple for selection for distribution, You represent and warrant that You are in full compliance with any applicable laws, regulations, and policies, including but not limited to all FDA laws, regulations and policies, related to the manufacturing, marketing, sale and distribution of Your Application in the United States, as well as in other countries, territories, or regions where You plan to make Your Application available.  You also represent and warrant that You will market Your Application only for its cleared or approved intended use/indication for use, and only in strict compliance with applicable regulatory requirements.  Upon Apple's request, You agree to promptly provide any such clearance documentation to support the marketing of Your Application. If requested by the FDA or by another government body that has a need to review or test Your Application as part of its regulatory review process, You may provide Your Application to such entity for review purposes.  You agree to promptly notify Apple in accordance with the procedures set forth in **Section 14.5** of any complaints or threats of complaints regarding Your Application in relation to any such regulatory requirements, in which case Apple may remove Your Application from distribution.

**Cellular Network:**

**3.3.29**   If an Application requires or will have access to the cellular network, then additionally such Application:

-  Must comply with Apple's best practices and other guidelines on how Applications should access and use the cellular network; and

-  Must not in Apple's reasonable judgment excessively use or unduly burden network capacity or bandwidth.

**3.3.30**   Because some mobile network operators may prohibit or restrict the use of Voice over Internet Protocol (VoIP) functionality over their network, such as the use of VoIP telephony over a cellular network, and may also impose additional fees, or other charges in connection with VoIP.

You agree to inform end-users, prior to purchase, to check the terms of agreement with their operator, for example, by providing such notice in the marketing text that You provide accompanying Your Application on the App Store.  In addition, if Your Application allows end-users to send SMS messages or make cellular voice calls, then You must inform the end-user, prior to use of such functionality, that standard text messaging rates or other carrier charges may apply to such use.

**Apple Push Notification Service and Local Notifications:**

**3.3.31**   All use of Push Notifications via the Apple Push Notification Service or Local Notifications must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 1 (Additional Terms for Apple Push Notification Service and Local Notifications).

**Game Center:**

**3.3.32**   All use of the Game Center must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 3 (Additional Terms for the Game Center).

**iCloud:**

**3.3.33**   All use of the iCloud Storage APIs and CloudKit APIs, as well as Your use of the iCloud service under this Agreement, must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 4 (Additional Terms for the use of iCloud).

**Wallet:**

**3.3.34**   Your development of Passes, and use of the Pass Type ID and Wallet under this Agreement, must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 5 (Additional Terms for Passes).

**Additional Services or End-User Pre-Release Software:**

**3.3.35**   From time to time, Apple may provide access to additional Services or pre-release Apple Software for You to use in connection with Your Applications, or as an end-user for evaluation purposes.  Some of these may be subject to separate terms and conditions in addition to this Agreement, in which case Your usage will also be subject to those terms and conditions.  Such services or software may not be available in all languages or in all countries or regions, and Apple makes no representation that they will be appropriate or available for use in any particular location.  To the extent You choose to access such services or software, You do so at Your own initiative and are responsible for compliance with any applicable laws, including but not limited to applicable local laws.  To the extent any such software includes Apple's FaceTime or Messages feature, You acknowledge and agree that when You use such features, the telephone numbers and device identifiers associated with Your Authorized Test Units, as well as email addresses and/or Apple ID information You provide, may be used and maintained by Apple to provide and improve such software and features.  Certain services made accessible to You through the Apple Software may be provided by third parties.  You acknowledge that Apple will not have any liability or responsibility to You or any other person (including to any end-user) for any third-party services or for any Apple services.  Apple and its licensors reserve the right to change, suspend, remove, or disable access to any services at any time.  In no event will Apple be liable for the removal or disabling of access to any such services.  Further, upon any commercial release of such software or services, or earlier if requested by Apple, You agree to cease all use of the pre-release Apple Software or Services provided to You as an end-user for evaluation purposes under this Agreement.

**3.3.36**   If Your Application accesses the Google Safe Browsing service through the Apple Software such access is subject to Google's terms of service set forth at:

https://developers.google.com/safe-browsing/terms. If You do not accept such terms of service, then You may not use the Google Safe Browsing Service in Your Application, and You acknowledge and agree that such use will constitute Your acceptance of such terms of service.

**3.3.37**  If Your Application accesses data from an end-user's Address Book through the Address Book API, You must notify and obtain consent from the user before a user's Address Book data is accessed or used by Your Application. Further, Your Application may not provide an automated mechanism that transfers only the Facebook Data portions of the end-user's Address Book altogether to a location off of the end-user's device.  For the sake of clarity, this does not prohibit an automated transfer of the user's entire Address Book as a whole, so long as user notification and consent requirements have been fulfilled; and does not prohibit enabling users to transfer any portion of their Address Book data manually (e.g., by cutting and pasting) or enabling them to individually select particular data items to be transferred.

**Extensions:**

**3.3.38**  Applications that include extensions in the Application bundle must provide some functionality beyond just the extensions (e.g., help screens, additional settings), unless an Application includes a WatchKit Extension.  In addition:

- Extensions (excluding WatchKit Extensions) may not include advertising, product promotion, direct marketing, or In-App Purchase offers in their extension view;

- Extensions may not block the full screen of an iOS Product or Apple TV, or redirect, obstruct or interfere in an undisclosed or unexpected way with a user's use of another developer's application or any Apple-provided functionality or service;

- Extensions may operate only in Apple-designated areas of iOS, watchOS, iPadOS, or tvOS as set forth in the Documentation;

- Extensions that provide keyboard functionality must be capable of operating independent of any network access and must include Unicode characters (vs. pictorial images only);

- Any keystroke logging done by any such extension must be clearly disclosed to the end-user prior to any such data being sent from an iOS Product, and notwithstanding anything else in **Section 3.3.9**, such data may be used only for purposes of providing or improving the keyboard functionality of Your Application (e.g., not for serving advertising);

- Any message filtering done by an extension must be clearly disclosed to the end-user, and notwithstanding anything else in **Section 3.3.9**, any SMS or MMS data (whether accessed through a message filtering extension or sent by iOS to a messaging extension's corresponding server) may be used only for purposes of providing or improving the message experience of the user by reducing spam or messages from unknown sources, and must not be used for serving advertising or for any other purpose.  Further, SMS or MMS data from a user that is accessed within the extension may not be exported from the extension's designated container area in any way; and

- Your Application must not automate installation of extensions or otherwise cause extensions to be installed without the user's knowledge, and You must accurately specify to the user the purpose and functionality of the extension.

**HealthKit APIs and Motion & Fitness APIs:**

**3.3.39**  Your Application must not access the HealthKit APIs or Motion & Fitness APIs unless the use of such APIs is for health, motion, and/or fitness purposes, and this usage is clearly evident in Your marketing text and user interface.  In addition:

- Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use the HealthKit APIs or the Motion & Fitness APIs, or any information obtained through the HealthKit APIs or the Motion & Fitness APIs, for any purpose other than providing health, motion, and/or fitness services in connection with Your Application (e.g., not for serving advertising);

- You must not use the HealthKit APIs or the Motion & Fitness APIs, or any information obtained through the HealthKit APIs or the Motion & Fitness APIs, to disclose or provide an end-user's health, motion, and/or fitness information to a third party without prior express end-user consent, and then only for purposes of enabling the third party to provide health, motion, and/or fitness services as permitted herein.  For example, You must not share or sell an end-user's health information collected through the HealthKit APIs or Motion & Fitness APIs to advertising platforms, data brokers, or information resellers.  For clarity, You may allow end-users to consent to share their data with third parties for medical research purposes; and

- You agree to clearly disclose to end-users how You and Your Application will be using their health, motion, and/or fitness information and to use it only as expressly consented to by the end-user and as expressly permitted herein.

**Configuration Profiles:**

**3.3.40**   Configuration Profiles cannot be delivered to consumers other than for the purposes of configuration of WiFi, APN, or VPN settings, or as otherwise expressly permitted by Apple in the then-current Configuration Profile Reference Documentation. You must make a clear declaration of what user data will be collected and how it will be used on an app screen or other notification mechanism prior to any user action to use a Configuration Profile. You may not share or sell user data obtained through a Configuration Profile to advertising platforms, data brokers, or information resellers.  In addition, You may not override the consent panel for a Configuration Profile or any other mechanisms of a Configuration Profile.

**HomeKit APIs:**

**3.3.41**   Your Application must not access the HomeKit APIs unless it is primarily designed to provide home configuration or home automation services (e.g., turning on a light, lifting a garage door) for Licensed HomeKit Accessories and this usage is clearly evident in Your marketing text and user interface.  You agree not to use the HomeKit APIs for any purpose other than interfacing, communicating, interoperating with or otherwise controlling a Licensed HomeKit Accessory or for using the HomeKit Database, and then only for home configuration or home automation purposes in connection with Your Application.  In addition:

- Your Application may use information obtained from the HomeKit APIs and/or the HomeKit Database only on a compatible Apple-branded product and may not export, remotely access or transfer such information off of the applicable product (e.g., a lock password cannot be sent off an end-user's device to be stored in an external non-Apple database), unless otherwise expressly permitted by Apple in the Documentation; and

- Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use the HomeKit APIs, or any information obtained through the HomeKit APIs or through the HomeKit Database, for any purpose other than providing or improving home configuration or home automation services in connection with Your Application (e.g., not for serving advertising).

**Apple Pay APIs:**

**3.3.42**   Your Application may use the Apple Pay APIs solely for the purpose of facilitating payment transactions that are made by or through Your Application, and only for the purchase of goods and services that are to be used outside of any iOS Product or Apple Watch, unless

otherwise permitted by Apple in writing.  For clarity, nothing in this **Section 3.3.42** supplants any of the rules or requirements for the use of the In-App Purchase API, including but not limited to **Section 3.3.3** and the guidelines.  In addition:

-  You acknowledge and agree that Apple is not a party to any payment transactions facilitated through the use of the Apple Pay APIs and is not responsible for any such transactions, including but not limited to the unavailability of any end-user payment cards or payment fraud.  Such payment transactions are between You and Your bank, acquirer, card networks, or other parties You utilize for transaction processing, and You are responsible for complying with any agreements You have with such third parties.  In some cases, such agreements may contain terms specifying specific rights, obligations or limitations that You accept and assume in connection with Your decision to utilize the functionality of the Apple Pay APIs;

-  You agree to store any private keys provided to You as part of Your use of the Apple Pay APIs in a secure manner (e.g., encrypted on a server) and in accordance with the Documentation.  You agree not to store any end-user payment information in an unencrypted manner on an iOS Product.  For clarity, You may not decrypt any such end-user payment information on an iOS Product;

-  You agree not to call the Apple Pay APIs or otherwise attempt to gain information through the Apple Pay APIs for purposes unrelated to facilitating end-user payment transactions; and

-  If You use Apple Pay APIs in Your Application, then You agree to use commercially reasonable efforts to include Apple Cash as a payment option with Your use of the Apple Pay APIs in accordance with the Documentation and provided that Apple Cash is available in the jurisdiction in which the Application is distributed.

**3.3.43**   As part of facilitating an end-user payment transaction through the Apple Pay APIs, Apple may provide You (whether You are acting as the Merchant, an Intermediary Party, or displaying the Merchant web page that facilitates an Apple Pay end-user payment transaction) with an Apple Pay Payload.  If You receive an Apple Pay Payload, then You agree to the following:

-  If You are acting as the Merchant, then You may use the Apple Pay Payload to process the end-user payment transaction and for other uses that You disclose to the end-user, and only in accordance with applicable law;

-  If You are acting as an Intermediary Party, then:

(a)  You may use the Apple Pay Payload only for purposes of facilitating the payment transaction between the Merchant and the end-user and for Your own order management purposes (e.g., customer service) as part of such transaction;
(b)  You agree that You will not hold the Apple Pay Payload data for any longer than necessary to fulfill the payment transaction and order management purposes for which it was collected;
(c)  You agree not to combine data obtained through the Apple Pay APIs, including but not limited to, the Apple Pay Payload with any other data that You may have about such end-user (except to the limited extent necessary for order management purposes).  For clarity, an Intermediary Party may not use data obtained through the Apple Pay APIs for advertising or marketing purposes, for developing or enhancing a user profile, or to otherwise target end-users;
(d)  You agree to disclose to end-users that You are an Intermediary Party to the transaction and to provide the identity of the Merchant for a particular transaction on the Apple Pay Payment Sheet (in addition to including Your name as an Intermediary Party); and
(e)  If You use a Merchant, then You will be responsible for ensuring that the Merchant You select uses the Apple Pay Payload provided by You only for purposes of processing the end-user payment transaction and for other uses they have disclosed to the end-user, and only in accordance with applicable law.  You agree to have a binding written agreement with such

Program Agreement

Merchant with terms at least as restrictive and protective of Apple as those set forth herein. Any actions undertaken by any such Merchant in relation to such Apple Pay Payload or the payment transaction shall be deemed to have been taken by You, and You (in addition to such Merchant) shall be responsible to Apple for all such actions (or any inactions). In the event of any actions or inactions by such Merchant that would constitute a violation of this Agreement or otherwise cause any harm, Apple reserves the right to require You to cease using such Merchant, and

 - If You are displaying the Merchant web page that facilitates an Apple Pay end-user payment transaction but are acting neither as an Intermediary Party nor a Merchant (i.e., You host a Merchant checkout through WKWebView), then:

(a) You agree not to access the Apple Pay Payload for any reason whatsoever; and
(b) You agree not to use information that is derived from or relates to the Apple Pay payment transaction for purposes other than displaying the Merchant web page.

**SiriKit:**

**3.3.44**   Your Application may register as a destination to use the Apple-defined SiriKit domains, but only if Your Application is designed to provide relevant responses to a user, or otherwise carry out the user's request or intent, in connection with the applicable SiriKit domain (e.g., ride sharing) that is supported by Your Application and this usage is clearly evident in Your marketing text and user interface. In addition, Your Application may contribute actions to SiriKit, but only if such actions are tied to user behavior or activity within Your Application and for which You can provide a relevant response to the user. You agree not to submit false information through SiriKit about any such user activity or behavior or otherwise interfere with the predictions provided by SiriKit (e.g., SiriKit donations should be based on actual user behavior).

**3.3.45**   Your Application may use information obtained through SiriKit only on supported Apple products and may not export, remotely access or transfer such information off a device except to the extent necessary to provide or improve relevant responses to a user or carry out a user's request or in connection with Your Application. Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use SiriKit, or any information obtained through SiriKit, for any purpose other than providing relevant responses to a user or otherwise carrying out a user's request or intent in connection with an SiriKit domain, intent, or action supported by Your Application and/or for improving Your Application's responsiveness to user requests (e.g., not for serving advertising).

**3.3.46**   If Your Application uses SiriKit to enable audio data to be processed by Apple, You agree to clearly disclose to end-users that You and Your Application will be sending their recorded audio data to Apple for speech recognition, processing and/or transcription purposes, and that such audio data may be used to improve and provide Apple products and services. You further agree to use such audio data, and recognized text that may be returned from SiriKit, only as expressly consented to by the end-user and as expressly permitted herein.

**Single Sign-On API:**

**3.3.47**   You must not access or use the Single Sign-On API unless You are a Multi-channel Video Programming Distributor (MVPD) or unless Your Application is primarily designed to provide authenticated video programming via a subscription-based MVPD service, and You have received an entitlement from Apple to use the Single Sign-On API. If You have received such an entitlement, You are permitted to use the Single Sign-On API solely for the purpose of authenticating a user's entitlement to access Your MVPD content for viewing on an Apple Product, in accordance with the Single Sign-on Specification. Any such use must be in compliance with the Documentation for the Single Sign-On Specification. You acknowledge that Apple reserves the right to not provide You such an entitlement, and to revoke such entitlement, at any time, in its sole discretion.

Program Agreement

If You use the Single Sign-On API, You will be responsible for providing the sign-in page accessed by users via the Single Sign-On API where users sign in to authenticate their right to access Your MVPD content.  You agree that such sign-in page will not display advertising, and that the content and appearance of such page will be subject to Apple's prior review and approval.  If You use the Single Sign-On API and Apple provides an updated version of such API and/or the Single Sign-on Specification, You agree to update Your implementation to conform with the newer version and specification within 3 months after receiving the update from Apple.

You authorize Apple to use, reproduce, and display the trademarks provided by You for use in connection with the Single-Sign-On feature, including use in the user interface screens in Apple products where the user selects the provider and authenticates through Single Sign-on, and/or to provide the user with a list of apps that are accessible to such user through Single Sign-On.  You also grant Apple the right to use screenshots and images of such user interface, including but not limited to use in instructional materials, training materials, marketing materials, and advertising in any medium.  Data provided via the Single Sign-On API will be considered Licensed Application Information hereunder, but will be subject to the use limitations set forth in this Section.

You must not collect, store or use data provided via the Single Sign-On API for any purpose other than to authenticate a user's entitlement to access Your MVPD content on an Apple product, to provide the user access to Your MVPD content, and/or to address performance and technical problems with Your MVPD service.  You will not provide or disclose data, content or information obtained from use of the Single Sign-On API to any other party except for authentication information provided to a video programming provider whose programming is offered as part of an MVPD subscription offered by You, and solely for the purpose of authenticating the user's entitlement to access such video programming on an Apple product under the user's MVPD subscription.

**TV App API:**

**3.3.48**   You may not use the TV App API unless (a) Your Application is primarily designed to provide video programming, (b) You have received an entitlement from Apple, and (c) Your use is in accordance with the TV App Specification.  To the extent that You provide TV App Data to Apple, Apple may store, use, reproduce and display such data solely for the purposes of: (a) providing information and recommendations to users of TV App Features, (b) enabling users to link from such recommendations and/or information to content for viewing via Your Licensed Application, and/or (c) servicing, maintenance, and optimization of TV App Features.  With respect to any TV App Data that has been submitted by You prior to termination of this Agreement, Apple may continue to use such data in accordance with this **Section 3.3.48** after termination of this Agreement.  TV App Data will be considered Licensed Application Information under this Agreement, but will be subject to the use limitations set forth in this Section.  You acknowledge that Apple reserves the right to not include Your Licensed Application in the TV App Features, in its sole discretion.

Apple will obtain user consent based on the user's Apple ID before including Your Licensed Application in the TV App Features displayed under that Apple ID.  Apple will also provide users with the ability to withdraw such consent at any time thereafter and to delete their TV App Data from Apple's systems.  In addition, You may solicit user consent based upon Your own subscriber ID system. You are responsible for Your compliance with all applicable laws, including any applicable local laws for obtaining user consent with respect to Your provision of TV App Data to Apple.

**Spotlight-Image-Search Service:**

**3.3.49**   To the extent that You provide Apple's spotlight-image-search service with access to any of Your domains that are associated with Your Licensed Applications (the "Associated

Domain(s)"), You hereby grant Apple permission to crawl, scrape, copy, transmit and/or cache the content found in the Associated Domain(s) (the "Licensed Content") for the purposes set forth in this section.  The Licensed Content shall be considered Licensed Application Information under this Agreement.  You hereby further grant Apple a license to use, make, have made, reproduce, crop and/or modify the file format, resolution and appearance of the Licensed Content (for the purposes of reducing file size, converting to a supported file type and/or displaying thumbnails), and to publicly display, publicly perform, integrate, incorporate and distribute the Licensed Content to enhance search, discovery, and end-user distribution of the Licensed Content in Apple's Messages feature.  Upon the termination of this Agreement for any reason, end users of Apple-branded products will be permitted to continue using and distributing all Licensed Content that they obtained through the use of Apple-branded products prior to such termination.

**MusicKit:**

**3.3.50**   You agree not to call the MusicKit APIs or use MusicKit JS (or otherwise attempt to gain information through the MusicKit APIs or MusicKit JS) for purposes unrelated to facilitating access to Your end users' Apple Music subscriptions.  If You access the MusicKit APIs or MusicKit JS, then You must follow the Apple Music Identity Guidelines.  You agree not to require payment for or indirectly monetize access to the Apple Music service (e.g. in-app purchase, advertising, requesting user info) through Your use of the MusicKit APIs, MusicKit JS, or otherwise in any way.  In addition:

-  If You choose to offer music playback through the MusicKit APIs or MusicKit JS, full songs must be enabled for playback, and users must initiate playback and be able to navigate playback using standard media controls such as "play," "pause," and "skip", and You agree to not misrepresent the functionality of these controls;

-  You may not, and You may not permit Your end users to, download, upload, or modify any MusicKit Content and MusicKit Content cannot be synchronized with any other content, unless otherwise permitted by Apple in the Documentation;

-  You may play MusicKit Content only as rendered by the MusicKit APIs or MusicKit JS and only as permitted in the Documentation (e.g., album art and music-related text from the MusicKit API may not be used separately from music playback or managing playlists);

-  Metadata from users (such as playlists and favorites) may be used only to provide a service or function that is clearly disclosed to end users and that is directly relevant to the use of Your Application, website, or web application, as determined in Apple's sole discretion; and

-  You may use MusicKit JS only as a stand-alone library in Your Application, website, or web application and only as permitted in the Documentation (e.g., You agree not to recombine MusicKit JS with any other JavaScript code or separately download and re-host it).

**DeviceCheck APIs:**

**3.3.51**   If You use DeviceCheck APIs to store DeviceCheck Data, then You must provide a mechanism for customers to contact You to reset those values, if applicable (e.g. resetting a trial subscription or re-authorizing certain usage when a new user acquires the device).  You may not rely on the DeviceCheck Data as a single identifier of fraudulent conduct and must use the DeviceCheck Data only in connection with other data or information, e.g., the DeviceCheck Data cannot be the sole data point since a device may have been transferred or resold.  Apple reserves the right to delete any DeviceCheck Data at any time in its sole discretion, and You agree not to rely on any such Data.  Further, You agree not to share the DeviceCheck tokens You receive from Apple with any third party, except a Service Provider acting on Your behalf.

**Face Data:**

**3.3.52**   If Your Application accesses Face Data, then You must do so only to provide a service or function that is directly relevant to the use of the Application, and You agree to inform users of Your intended uses and disclosures of Face Data by Your Application and to obtain clear and conspicuous consent from such users before any collection or use of Face Data.  Notwithstanding anything to the contrary in **Section 3.3.9**, neither You nor Your Application (nor any third party with whom You have contracted to serve advertising) may use Face Data for serving advertising or for any other unrelated purposes.   In addition:

-  You may not use Face Data in a manner that will violate the legal rights of Your users (or any third parties) or to provide an unlawful, unfair, misleading, fraudulent, improper, exploitative, or objectionable user experience and then only in accordance with the Documentation;

- You may not use Face Data for authentication, advertising, or marketing purposes, or to otherwise target an end-user in a similar manner;

- You may not use Face Data to build a user profile, or otherwise attempt, facilitate, or encourage third parties to identify anonymous users or reconstruct user profiles based on Face Data;

- You agree not to transfer, share, sell, or otherwise provide Face Data to advertising platforms, analytics providers, data brokers, information resellers or other such parties; and

- Face Data may not be shared or transferred off the user's device unless You have obtained clear and conspicuous consent for the transfer and the Face Data is used only in fulfilling a specific service or function for Your Application (e.g., a face mesh is used to display an image of the user within the Application) and only in accordance with these terms and the Documentation. You agree to require that Your service providers use Face Data only to the limited extent consented to by the user and only in accordance with these terms.

**ClassKit APIs, Roster API:**

**3.3.53**   Your Application must not include the ClassKit APIs unless it is primarily designed to provide educational services, and this usage is clearly evident in Your marketing text and user interface. You agree not to submit false or inaccurate data through the ClassKit APIs or to attempt to redefine the assigned data categories for data submitted through the ClassKit APIs (e.g., student location data is not a supported data type and should not be submitted).

You may not share, sell, transfer or disclose Roster Data to any third parties (e.g., affiliates, advertising platforms, data brokers, information resellers). You must process Roster Data for educational purposes solely in accordance with the instructions of the school's IT administrator. You must comply with the school IT administrator's choice to not renew or to revoke the school's consent to use the Roster Data. If the school IT administrator does not renew or revokes Your access to a school's Roster Data, You must destroy all of the school's Roster Data in Your possession within thirty (30) days. You are responsible for complying with all applicable legal requirements associated with Your use of the Roster API.

**Sign In with Apple, Sign In with Apple at Work & School:**

**3.3.54**   You may use Sign In with Apple or Sign In with Apple at Work & School in Your Corresponding Products only so long as Your use is comparable to including Sign In with Apple or Sign in with Apple at Work & School, respectively, in Your Application. You may not share or sell user data obtained through Sign In with Apple or Sign In with Apple at Work & School to advertising platforms, data brokers, or information resellers.

If a Sign in with Apple user has chosen to anonymize their user data as part of Sign In with Apple, You agree not to attempt to link such anonymized data with information that directly identifies the

individual and that is obtained outside of Sign In with Apple without first obtaining user consent.

You must process the data You receive from Sign In with Apple at Work & School solely in accordance with the instructions of the organization's IT administrator.

**ShazamKit:**

**3.3.55**   All use of the ShazamKit APIs must be in accordance with the terms of this Agreement (including the Apple Music Identity Guidelines and Program Requirements) and the Documentation. If You choose to display ShazamKit Content corresponding to songs available on Apple Music, then You must provide a link to the respective content within Apple Music in accordance with the Apple Music Identity Guidelines.  Except to the extent expressly permitted herein, You agree not to copy, modify, translate, create a derivative work of, publish or publicly display ShazamKit Content in any way. Further, You may not use or compare the data provided by the ShazamKit APIs for the purpose of improving or creating another audio recognition service. Applications that use the ShazamKit APIs may not be designed or marketed for compliance purposes (e.g., music licensing and royalty auditing).

**Xcode Cloud:**

**3.3.56**   To the extent that You use the Xcode Cloud Service to manage Your Xcode Cloud Content and build Your Applications, You hereby grant to Apple, its affiliates and agents, a non-exclusive, worldwide, fully paid-up, royalty-free license to reproduce, host, process, display, transmit, modify, create derivative works of, and otherwise use Your Xcode Cloud Content solely in order for Apple to provide the Xcode Cloud Service.  Apple will use Your Xcode Cloud Content that is source code solely in order to provide the Xcode Cloud Service to You. You acknowledge and agree that: (a) You are solely responsible for such Xcode Cloud Content, in which Apple has no ownership rights, (b) if You choose to use a third party service (e.g., source code hosting, artifact storage, messaging, or testing services) with the Xcode Cloud Service, You are responsible for Your compliance with the terms and conditions governing such third party service, (c) the provision of user generated content (e.g., builds) by the Xcode Cloud Service shall not be considered a distribution for contractual or licensing obligations, (d) any execution of Your Xcode Cloud Content within Xcode Cloud shall be limited to testing of Your Xcode Cloud Content, (e) You shall not mine cryptocurrencies using Xcode Cloud, and (f) Your Xcode Cloud Content complies with the requirements set forth for Applications in 3.3.21 and 3.3.22.

**3.3.57**   While in no way limiting Apple's other rights under this Agreement, Apple reserves the right to take action if in its sole discretion, Apple determines or has reason to believe You have violated a term of this Agreement.  These actions may include limiting, suspending, or revoking your access to the Xcode Cloud Service, or terminating your build.

**Tap to Pay APIs:**

**3.3.58**   Your Application may use the Tap to Pay APIs solely for the purpose of enabling Merchants to conduct transactions through Your Application, and Your Application must not access the Tap to Pay APIs unless You have received an entitlement from Apple for such access. In addition:

-  You acknowledge and agree that Apple is not a party to any transactions facilitated through the use of the Tap to Pay APIs and is not responsible for any such transactions, including but not limited to the unavailability of any payment cards or payment fraud.  Such transactions are between You, the Merchant, and Your Payment Service Provider, acquirer, card networks, or other parties You utilize for transaction processing, and You are responsible for complying with any agreements You have with such third parties.  In some cases, such agreements may contain terms specifying specific rights, obligations or limitations that You accept and assume in connection with Your decision to utilize the functionality of the Tap to Pay APIs;

Program Agreement

- You agree to store any private keys and TTP Data provided to You as part of Your use of the Tap to Pay APIs in a secure manner (e.g., encrypted on a server) and in accordance with the Documentation.  For clarity, You may not decrypt any encrypted TTP Data unless You are processing the TTP Data as a Payment Service Provider;

- You agree to not call the TTP APIs or otherwise attempt to gain information through the TTP APIs for purposes unrelated to enabling Merchants to conduct transactions through the use of Your Application;

- You agree that Apple has no responsibility to check that the transactions facilitated by the Tap to Pay APIs have been duly authorized. Apple shall not be liable in any event for any unauthorized or fraudulent transactions;

- You agree to use commercially reasonable efforts to include Apple Pay as a payment option with Your use of the Tap to Pay APIs in accordance with the Documentation and provided that Apple Pay is available in the jurisdiction in which Your Application is distributed.

**3.3.59**   Apple may provide You (whether You are acting as the Merchant or as an Intermediary Party) with TTP Data. If you receive TTP Data, You agree to the following:

- If You are acting as the Merchant, then You may use the TTP Data solely to process the transaction and for order management purposes, in each case, in accordance with applicable law;

- If You are acting as an Intermediary Party, then: (a) You may use the TTP Data solely for the purpose of facilitating the transaction between the Merchant and the Merchant customer and for order management purposes; (b) You must restrict the transfer or disclosure of the TTP Data to only those parties required to facilitate the transaction; (c) You may not hold the TTP Data for any longer than necessary to fulfill the transaction or for order management purposes; and (d) You may not combine data obtained through the Tap to Pay APIs, including but not limited to, the TTP Data with any other data that You may have about the Merchant or Merchant customer involved in the transaction (except to the limited extent necessary to facilitate the transaction and for order management purposes).  For clarity, an Intermediary Party may not use data obtained through the Tap to Pay APIs for advertising or marketing purposes, for developing or enhancing a Merchant customer profile, or to otherwise target Merchant customers;

- If You are not acting as a Payment Service Provider, then You must: (i) have an agreement with a Payment Service Provider and (ii) ensure that such Payment Service Provider uses the TTP Data obtained by You only for purposes of processing the transaction, which may include the application of fraud detection services, and for order management purposes, in each case, in accordance with applicable law.  For clarity, such Payment Service Provider is Your Third-Party Service Provider. Whether You are a Merchant or an Intermediary Party, any actions undertaken by Your Payment Service Provider in relation to the TTP Data transferred by You to Your Payment Service Provider shall be deemed to have been taken by You, and You (in addition to Your Payment Service Provider) shall be responsible to Apple and to the Merchant's customer for all such actions (or any inactions);

- If You are an Intermediary Party, then Your Application must confirm that each Merchant using Your Application has accepted and agreed to the Tap to Pay Platform Terms and Conditions prior to enabling such Merchant to conduct any transactions using Your Application in accordance with the Documentation. If You are a Merchant, You must accept and agree to the Tap to Pay Platform Terms and Conditions prior to conducting any transactions in Your Application.

Apple reserves the right to not provide You with an entitlement to use the Tap to Pay APIs in its sole discretion and to revoke such entitlement at any time.

**BackgroundAssets Framework:**

**3.3.60**   You may use the BackgroundAssets Framework only to download additional assets for Your Application distributed through the App Store or for beta testing through TestFlight; no other use is permitted. You may not use the BackgroundAssets Framework to collect or transmit data in order to identify a user or device, or to perform advertising or advertising measurement.  Your use of the BackgroundAssets Framework and the assets downloaded must comply with the terms of this Agreement, including without limitation the App Store Review Guidelines.

**WeatherKit APIs:**

**3.3.61**   All use of the WeatherKit APIs must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 8 (Additional Terms for use of the WeatherKit APIs).

## 4.      Changes to Program Requirements or Terms

Apple may change the Program Requirements or the terms of this Agreement at any time.  New or modified Program Requirements will not retroactively apply to Applications already in distribution via the App Store or Custom App Distribution; provided however that You agree that Apple reserves the right to remove Applications from the App Store or Custom App Distribution that are not in compliance with the new or modified Program Requirements at any time.  In order to continue using the Apple Software, Apple Certificates or any Services, You must accept and agree to the new Program Requirements and/or new terms of this Agreement.  If You do not agree to new Program Requirements or new terms, Your use of the Apple Software, Apple Certificates and any Services will be suspended or terminated by Apple.  You agree that Your acceptance of such new Agreement terms or Program Requirements may be signified electronically, including without limitation, by Your checking a box or clicking on an "agree" or similar button.  Nothing in this Section shall affect Apple's rights under **Section 5 (Apple Certificates; Revocation)**.

## 5.      Apple Certificates; Revocation
### 5.1      Certificate Requirements

All Applications must be signed with an Apple Certificate in order to be installed on Authorized Test Units, Registered Devices, or submitted to Apple for distribution via the App Store, Custom App Distribution, or TestFlight.  Similarly, all Passes must be signed with an Apple Certificate to be recognized and accepted by Wallet.  Safari Extensions must be signed with an Apple Certificate to run in Safari on macOS.  You must use a Website ID to send Safari Push Notifications to the macOS desktop of users who have opted in to receive such Notifications for Your Site through Safari on macOS.  You may also obtain other Apple Certificates and keys for other purposes as set forth herein and in the Documentation.

In relation to this, You represent and warrant to Apple that:
(a) You will not take any action to interfere with the normal operation of any Apple Certificates, keys, or Provisioning Profiles;
(b) You are solely responsible for preventing any unauthorized person or organization from having access to Your Apple Certificates and keys, and You will use Your best efforts to safeguard Your Apple Certificates and keys from compromise (e.g., You will not upload Your Apple Certificate for App Store distribution to a cloud repository for use by a third-party);
(c) You agree to immediately notify Apple in writing if You have any reason to believe there has been a compromise of any of Your Apple Certificates or keys;
(d) You will not provide or transfer Apple Certificates or keys provided under this Program to any third party (except for a Service Provider who is using them on Your behalf in compliance with this Agreement and only to the limited extent expressly permitted by Apple in the Documentation or this Agreement (e.g., You are prohibited from providing or transferring Your Apple Certificates

that are used for distribution or submission to the App Store to a Service Provider), and You will not use Your Apple Certificates to sign any third party's application, pass, extension, notification, implementation, or site;

(e) You will use any Apple Certificates or keys provided under this Agreement solely as permitted by Apple and in accordance with the Documentation; and

(f) You will use Apple Certificates provided under this Program exclusively for the purpose of signing Your Passes, signing Your Safari Extensions, signing Your Site's registration bundle, accessing the APN service, and/or signing Your Applications for testing, submission to Apple and/or for limited distribution for use on Registered Devices or Authorized Test Units as contemplated under this Program, or as otherwise permitted by Apple, and only in accordance with this Agreement.  As a limited exception to the foregoing, You may provide versions of Your Applications to Your Service Providers to sign with their Apple-issued development certificates, but solely for purposes of having them perform testing on Your behalf of Your Applications on Apple-branded products running iOS, watchOS, iPadOS, and/or tvOS and provided that all such testing is conducted internally by Your Service Providers (e.g., no outside distribution of Your Applications) and that Your Applications are deleted within a reasonable period of time after such testing is performed.  Further, You agree that Your Service Provider may use the data obtained from performing such testing services only for purposes of providing You with information about the performance of Your Applications (e.g., Your Service Provider is prohibited from aggregating Your Applications' test results with other developers' test results).

You further represent and warrant to Apple that the licensing terms governing Your Application, Your Safari Extension, Your Site's registration bundle, and/or Your Pass, or governing any third party code or FOSS included in Your Covered Products, will be consistent with and not conflict with the digital signing or content protection aspects of the Program or any of the terms, conditions or requirements of the Program or this Agreement.  In particular, such licensing terms will not purport to require Apple (or its agents) to disclose or make available any of the keys, authorization codes, methods, procedures, data or other information related to the Security Solution, digital signing or digital rights management mechanisms or security utilized as part of any Apple software, including the App Store.  If You discover any such inconsistency or conflict, You agree to immediately notify Apple of it and will cooperate with Apple to resolve such matter.  You acknowledge and agree that Apple may immediately cease distribution of any affected Licensed Applications or Passes, and may refuse to accept any subsequent Application or Pass submissions from You until such matter is resolved to Apple's reasonable satisfaction.

## 5.2     Relying Party Certificates

The Apple Software and Services may also contain functionality that permits digital certificates, either Apple Certificates or other third-party certificates, to be accepted by the Apple Software or Services (e.g., Apple Pay) and/or to be used to provide information to You (e.g., transaction receipts, App Attest receipts).  It is Your responsibility to verify the validity of any certifications or receipts You may receive from Apple prior to relying on them (e.g., You should verify that the receipt came from Apple prior to any delivery of content to an end-user through the use of the In-App Purchase API).  You are solely responsible for Your decision to rely on any such certificates and receipts, and Apple will not be liable for Your failure to verify that any such certificates or receipts came from Apple (or third parties) or for Your reliance on Apple Certificates or other digital certificates.

## 5.3     Notarized Applications for macOS

To have Your macOS Application notarized, You may request a digital file for authentication of Your Application from Apple's digital notary service (a "**Ticket**").  You can use this Ticket with Your Apple Certificate to receive an improved developer signing and user experience for Your Application on macOS.  To request this Ticket from Apple's digital notary service, You must upload Your Application to Apple through Apple's developer tools (or other requested mechanisms) for purposes of continuous security checking.  This continuous security checking will involve automated scanning, testing, and analysis of Your Application by Apple for malware or other harmful or suspicious code or components or security flaws, and, in limited cases, a

manual, technical investigation of Your Application by Apple for such purposes.  By uploading Your Application to Apple for this digital notary service, You agree that Apple may perform such security checks on Your Application for purposes of detecting malware or other harmful or suspicious code or components, and You agree that Apple may retain and use Your Application for subsequent security checks for the same purposes.

If Apple authenticates Your developer signature and Your Application passes the initial security checks, Apple may provide You with a Ticket to use with Your Apple Certificate.  Apple reserves the right to issue Tickets in its sole discretion, and Apple may revoke Tickets at any time in its sole discretion in the event that Apple has reason to believe, or has reasonable suspicions, that Your Application contains malware or malicious, suspicious or harmful code or components or that Your developer identity signature has been compromised.  You may request that Apple revoke Your Ticket at any time by emailing: product-security@apple.com.  If Apple revokes Your Ticket or Your Apple Certificate, then Your Application may no longer run on macOS.

You agree to cooperate with Apple regarding Your Ticket requests and to not hide, attempt to bypass, or misrepresent any part of Your Application from Apple's security checks or otherwise hinder Apple from being able to perform such security checks.  You agree not to represent that Apple has performed a security check or malware detection for Your Application or that Apple has reviewed or approved Your Application for purposes of issuing a Ticket to You from Apple's digital notary service.  You acknowledge and agree that Apple is performing security checks solely in connection with Apple's digital notary service and that such security checks should not be relied upon for malware detection or security verification of any kind.  You are fully responsible for Your own Application and for ensuring that Your Application is safe, secure, and operational for Your end-users (e.g., informing Your end-users that Your Application may cease to run if there is an issue with malware).  You agree to comply with export requirements in Your jurisdiction when uploading Your Application to Apple, and You agree not to upload any Application that is: (a) subject to the United States Export Administration Regulations, 15 C.F.R. Parts 730-774 or to the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130; or (b) that cannot be exported without prior written government authorization, including, but not limited to, certain types of encryption software and source code, without first obtaining that authorization.  Apple will not be liable to You or any third-party for any inability or failure to detect any malware or other suspicious, harmful code or components in Your Application or other security issues, or for any ticket issuance or revocation.  Apple shall not be responsible for any costs, expenses, damages, losses or other liabilities You may incur as a result of Your Application development, use of the Apple Software, Apple Services (including this digital notary service), or Apple Certificates, tickets, or participation in the Program, including without limitation the fact that Apple performs security checks on Your Application.

**5.4      Certificate Revocation**

Except as otherwise set forth herein, You may revoke Apple Certificates issued to You at any time.  If You want to revoke the Apple Certificates used to sign Your Passes and/or issued to You for use with Your macOS Applications distributed outside of the App Store, You may request that Apple revoke these Apple Certificates at any time by emailing: product-security@apple.com.  Apple also reserves the right to revoke any Apple Certificates at any time, in its sole discretion.  By way of example only, Apple may choose to do this if: (a) any of Your Apple Certificates or corresponding private keys have been compromised or Apple has reason to believe that either have been compromised; (b) Apple has reason to believe or has reasonable suspicions that Your Covered Products contain malware or malicious, suspicious or harmful code or components (e.g., a software virus); (c) Apple has reason to believe that Your Covered Products adversely affect the security of Apple-branded products, or any other software, firmware, hardware, data, systems, or networks accessed or used by such products; (d) Apple's certificate issuance process is compromised or Apple has reason to believe that such process has been compromised; (e) You breach any term or condition of this Agreement; (f) Apple ceases to issue the Apple Certificates for the Covered Product under the Program; (g) Your Covered Product misuses or overburdens any Services provided hereunder; or (h) Apple has reason to believe that

such action is prudent or necessary.  Further, You understand and agree that Apple may notify end-users of Covered Products that are signed with Apple Certificates when Apple believes such action is necessary to protect the privacy, safety or security of end-users, or is otherwise prudent or necessary as determined in Apple's reasonable judgment. Apple's Certificate Policy and Certificate Practice Statements may be found at: http://www.apple.com/certificateauthority.

## 6.    Application Submission and Selection

### 6.1    Submission to Apple for App Store or Custom App Distribution

You may submit Your Application for consideration by Apple for distribution via the App Store or Custom App Distribution once You decide that Your Application has been adequately tested and is complete.  By submitting Your Application, You represent and warrant that Your Application complies with the Documentation and Program Requirements then in effect as well as with any additional guidelines that Apple may post on the Program web portal or in App Store Connect. You further agree that You will not attempt to hide, misrepresent or obscure any features, content, services or functionality in Your submitted Applications from Apple's review or otherwise hinder Apple from being able to fully review such Applications.  In addition, You agree to inform Apple in writing through App Store Connect if Your Application connects to a physical device, including but not limited to an MFi Accessory, and, if so, to disclose the means of such connection (whether iAP, Bluetooth Low Energy (BLE), the headphone jack, or any other communication protocol or standard) and identify at least one physical device with which Your Application is designed to communicate.  If requested by Apple, You agree to provide access to or samples of any such devices at Your expense (samples will not be returned).  You agree to cooperate with Apple in this submission process and to answer questions and provide information and materials reasonably requested by Apple regarding Your submitted Application, including insurance information You may have relating to Your Application, the operation of Your business, or Your obligations under this Agreement.  Apple may require You to carry certain levels of insurance for certain types of Applications and name Apple as an additional insured.  If You make any changes to an Application (including to any functionality made available through use of the In-App Purchase API) after submission to Apple, You must resubmit the Application to Apple. Similarly all bug fixes, updates, upgrades, modifications, enhancements, supplements to, revisions, new releases and new versions of Your Application must be submitted to Apple for review in order for them to be considered for distribution via the App Store or Custom App Distribution, except as otherwise permitted by Apple.

### 6.2    App Thinning and Bundled Resources

As part of Your Application submission to the App Store or Custom App Distribution, Apple may optimize Your Application to target specific devices by repackaging certain functionality and delivered resources (as described in the Documentation) in Your Application so that it will run more efficiently and use less space on target devices ("**App Thinning**").  For example, Apple may deliver only the 32-bit or 64-bit version of Your Application to a target device, and Apple may not deliver icons or launch screens that would not render on the display of a target device.  You agree that Apple may use App Thinning to repackage Your Application in order to deliver a more optimized version of Your Application to target devices.

As part of App Thinning, You can also request that Apple deliver specific resources for Your Application (e.g., GPU resources) to target devices by identifying such bundled resources as part of Your code submission ("**Bundled Resources**").  You can define such Bundled Resources to vary the timing or delivery of assets to a target device (e.g., when a user reaches a certain level of a game, then the content is delivered on-demand to the target device).  App Thinning and Bundled Resources are not available for all Apple operating systems, and Apple may continue to deliver full Application binaries to some target devices.

### 6.3    iOS and iPadOS apps on Mac

If You compile Your Application for iOS or iPadOS (collectively "iOS" for purposes of this Section 6.3) and submit such Application for distribution on the App Store, You agree that Apple will make

Your Application available on both iOS and macOS via the App Store, unless You choose to opt out of making Your Application available on macOS by following the opt out process in App Store Connect.  You agree that the foregoing applies to an Application for iOS submitted by You and currently available on the App Store and to any future Application compiled for iOS and submitted by You to the App Store.  Notwithstanding the foregoing, such availability on the App Store will apply only if such Application has been selected by Apple for distribution on the App Store pursuant to Section 7 and only if such Application can function appropriately on, and be compatible with, macOS, as determined in Apple's sole discretion.  You are responsible for obtaining and determining if You have appropriate rights for Your Application to operate on macOS.  If You do not have such rights, You agree to opt out of making such Application available on macOS.  You are responsible for testing such Application on macOS.

**6.4     Bitcode Submissions**
For Application submissions to the App Store or Custom App Distribution for some Apple operating systems (e.g., for watchOS), Apple may require You to submit an intermediate representation of Your Application in binary file format for the LLVM compiler ("**Bitcode**"). You may also submit Bitcode for other supported Apple operating systems.  Such Bitcode submission will allow Apple to compile Your Bitcode to target specific Apple-branded devices and to recompile Your Bitcode for subsequent releases of Your Application for new Apple hardware, software, and/or compiler changes.  When submitting Bitcode, You may choose whether or not to include symbols for Your Application in the Bitcode; however, if You do not include symbols, then Apple will not be able to provide You with symbolicated crash logs or other diagnostic information as set forth in **Section 6.6 (Improving Your Application)** below. Further, You may be required to submit a compiled binary of Your Application with Your Bitcode.

By submitting Bitcode to Apple, You authorize Apple to compile Your Bitcode into a resulting binary that will be targeted for specific Apple-branded devices and to recompile Your Bitcode for subsequent rebuilding and recompiling of Your Application for updated hardware, software, and/or compiler changes (e.g., if Apple releases a new device, then Apple may use Your Bitcode to update Your Application without requiring resubmission).  You agree that Apple may compile such Bitcode for its own internal use in testing and improving Apple's developer tools, and for purposes of analyzing and improving how applications can be optimized to run on Apple's operating systems (e.g., which frameworks are used most frequently, how a certain framework consumes memory, etc.).  You may use Apple's developer tools to view and test how Apple may process Your Bitcode into machine code binary form. Bitcode is not available for all Apple operating systems.

**6.5     TestFlight Submission**
If You would like to distribute Your Application to Beta Testers outside of Your company or organization through TestFlight, You must first submit Your Application to Apple for review.  By submitting such Application, You represent and warrant that Your Application complies with the Documentation and Program Requirements then in effect as well as with any additional guidelines that Apple may post on the Program web portal or in App Store Connect.  Thereafter, Apple may permit You to distribute updates to such Application directly to Your Beta Testers without Apple's review, unless such an update includes significant changes, in which case You agree to inform Apple in App Store Connect and have such Application re-reviewed.  Apple reserves the right to require You to cease distribution of Your Application through TestFlight, and/or to any particular Beta Tester, at any time in its sole discretion.

**6.6     Improving Your Application**
Further, if Your Application is submitted for distribution via the App Store, Custom App Distribution or TestFlight, You agree that Apple may use Your Application for the limited purpose of compatibility testing of Your Application with Apple products and services, for finding and fixing bugs and issues in Apple products and services and/or Your Applications, for internal use in evaluating iOS, watchOS, tvOS, iPadOS, and/or macOS performance issues in or with Your Application, for security testing, and for purposes of providing other information to You (e.g.,

Program Agreement

crash logs).  Except as otherwise set forth herein, You may opt in to send app symbol information for Your Application to Apple, and if You do so, then You agree that Apple may use such symbols to symbolicate Your Application for purposes of providing You with symbolicated crash logs and other diagnostic information, compatibility testing of Your Application with Apple products and services, and for finding and fixing bugs and issues in Apple products and services and/or Your Application.  In the event that Apple provides You with crash logs or other diagnostic information for Your Application, You agree to use such crash logs and information only for purposes of fixing bugs and improving the performance of Your Application and related products.  You may also collect numeric strings and variables from Your Application when it crashes, so long as You collect such information only in an anonymous, non-personal manner and do not recombine, correlate, or use such information to attempt to identify or derive information about any particular end-user or device.

**6.7     App Analytics**

To the extent that Apple provides an Analytics service through App Store Connect for Applications distributed through the App Store, You agree to use any data provided through such App Analytics service solely for purposes of improving Your Applications and related products. Further, You agree not to provide such information to any third parties, except for a Service Provider who is assisting You in processing and analyzing such data on Your behalf and who is not permitted to use it for any other purpose or disclose it to any other party.  For clarity, You must not aggregate (or permit any third-party to aggregate) analytics information provided to You by Apple for Your Applications as part of this App Analytics service with other developers' analytics information, or contribute such information to a repository for cross-developer analytics. You must not use the App Analytics service or any analytics data to attempt to identify or derive information about any particular end-user or device.

**6.8     Compatibility Requirement with Current Shipping OS Version**

Applications that are selected for distribution via the App Store must be compatible with the currently shipping version of Apple's applicable operating system (OS) software at the time of submission to Apple, and such Applications must stay current and maintain compatibility with each new release of the applicable OS version so long as such Applications are distributed through the App Store.  You understand and agree that Apple may remove Applications from the App Store when they are not compatible with the then-current shipping release of the OS at any time in its sole discretion.

**6.9     Selection by Apple for Distribution**

You understand and agree that if You submit Your Application to Apple for distribution via the App Store, Custom App Distribution, or TestFlight, Apple may, in its sole discretion:

(a) determine that Your Application does not meet all or any part of the Documentation or Program Requirements then in effect;
(b) reject Your Application for distribution for any reason, even if Your Application meets the Documentation and Program Requirements; or
(c) select and digitally sign Your Application for distribution via the App Store, Custom App Distribution, or TestFlight.

Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of Your Application development, use of the Apple Software, Apple Services, or Apple Certificates or participation in the Program, including without limitation the fact that Your Application may not be selected for distribution via the App Store or Custom App Distribution.  You will be solely responsible for developing Applications that are safe, free of defects in design and operation, and comply with applicable laws and regulations.  You will also be solely responsible for any documentation and end-user customer support and warranty for such Applications.  The fact that Apple may have reviewed, tested, approved or selected an Application will not relieve You of any of these responsibilities.

## 7.    Distribution of Applications and Libraries

**Applications:**

Applications developed under this Agreement for iOS, watchOS, iPadOS, or tvOS may be distributed in four ways: (1) through the App Store, if selected by Apple, (2) through the Custom App Distribution, if selected by Apple, (3) through Ad Hoc distribution in accordance with **Section 7.3**, and (4) for beta testing through TestFlight in accordance with **Section 7.4**.  Applications for macOS may be distributed: (a) through the App Store, if selected by Apple, (b) separately distributed under this Agreement, and (c) for beta testing through TestFlight in accordance with **Section 7.4**.

### 7.1    Delivery of Free Licensed Applications via the App Store or Custom App Distribution
If Your Application qualifies as a Licensed Application, it is eligible for delivery to end-users via the App Store or Custom App Distribution by Apple and/or an Apple Subsidiary.  If You would like Apple and/or an Apple Subsidiary to deliver Your Licensed Application or authorize additional content, functionality or services You make available in Your Licensed Application through the use of the In-App Purchase API to end-users for free (no charge) via the App Store or Custom App Distribution, then You appoint Apple and Apple Subsidiaries as Your legal agent and/or commissionaire pursuant to the terms of Schedule 1 for Licensed Applications designated by You as free-of-charge applications.

### 7.2    Schedule 2 and Schedule 3 for Fee-Based Licensed Applications; Receipts
If Your Application qualifies as a Licensed Application and You intend to charge end-users a fee of any kind for Your Licensed Application or within Your Licensed Application through the use of the In-App Purchase API, You must enter into a separate agreement (Schedule 2) with Apple and/or an Apple Subsidiary before any such commercial distribution of Your Licensed Application may take place via the App Store or before any such commercial delivery of additional content, functionality or services for which You charge end-users a fee may be authorized through the use of the In-App Purchase API in Your Licensed Application.  If You would like Apple to sign and distribute Your Application for a fee through Custom App Distribution, then You must enter into a separate agreement (Schedule 3) with Apple and/or an Apple Subsidiary before any such distribution may take place.  To the extent that You enter (or have previously entered) into Schedule 2 or Schedule 3 with Apple and/or an Apple Subsidiary, the terms of Schedule 2 or 3 will be deemed incorporated into this Agreement by this reference.

When an end-user installs Your Licensed Application, Apple will provide You with a transaction receipt signed with an Apple Certificate.  It is Your responsibility to verify that such certificate and receipt were issued by Apple, as set forth in the Documentation.  You are solely responsible for Your decision to rely on any such certificates and receipts.  YOUR USE OF OR RELIANCE ON SUCH CERTIFICATES AND RECEIPTS IN CONNECTION WITH A PURCHASE OF A LICENSED APPLICATION IS AT YOUR SOLE RISK.  APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, RELIABILITY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO SUCH APPLE CERTIFICATES AND RECEIPTS.  You agree that You will only use such receipts and certificates in accordance with the Documentation, and that You will not interfere or tamper with the normal operation of such digital certificates or receipts, including but not limited to any falsification or other misuse.

### 7.3    Distribution on Registered Devices (Ad Hoc Distribution)
Subject to the terms and conditions of this Agreement, You may also distribute Your Applications for iOS, watchOS, iPadOS, and tvOS to individuals within Your company, organization, educational institution, group, or who are otherwise affiliated with You for use on a limited number

of Registered Devices (as specified in the Program web portal), if Your Application has been digitally signed using Your Apple Certificate as described in this Agreement.  By distributing Your Application in this manner on Registered Devices, You represent and warrant to Apple that Your Application complies with the Documentation and Program Requirements then in effect and You agree to cooperate with Apple and to answer questions and provide information about Your Application, as reasonably requested by Apple.  You also agree to be solely responsible for determining which individuals within Your company, organization, educational institution or affiliated group should have access to and use of Your Applications and Registered Devices, and for managing such Registered Devices.  Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of distributing Your Applications in this manner, or for Your failure to adequately manage, limit or otherwise control the access to and use of Your Applications and Registered Devices.  You will be responsible for attaching or otherwise including, at Your discretion, any relevant usage terms with Your Applications.  Apple will not be responsible for any violations of Your usage terms.  You will be solely responsible for all user assistance, warranty and support of Your Applications.

**7.4     TestFlight Distribution**
**A.      Internal Distribution to Authorized Developers and App Store Connect users**
You may use TestFlight for internal distribution of pre-release versions of Your Applications to a limited number (as specified on the TestFlight developer website) of Your Authorized Developers or Your App Store Connect users who are members of Your company or organization, but solely for their internal use in testing, evaluating and/or developing Your Applications.  Apple reserves the right to require You to cease distribution of such Applications to Your Authorized Developers or Your App Store Connect users through TestFlight, or to any particular Authorized Developer or App Store Connect user, at any time in its sole discretion.

**B.      External Distribution to Beta Testers**
You may also use TestFlight for external distribution of pre-release versions of Your Applications to a limited number of Beta Testers (as specified on the TestFlight developer website), but solely for their testing and evaluation of such pre-release versions of Your Applications and only if Your Application has been approved for such distribution by Apple as set forth in **Section 6.5 (TestFlight Submission)**.  You may not charge Your Beta Testers fees of any kind to participate in Apple's TestFlight or for the use of any such pre-release versions.  You may not use TestFlight for purposes that are not related to improving the quality, performance, or usability of pre-release versions of Your Application (e.g., continuous distribution of demo versions of Your Application in an attempt to circumvent the App Store or providing trial versions of Your Applications for purposes of soliciting favorable App Store ratings are prohibited uses).  Further, if Your Application is primarily intended for children, You must verify that Your Beta Testers are of the age of majority in their jurisdiction.  If You choose to add Beta Testers to TestFlight, then You are assuming responsibility for any invitations sent to such end-users and for obtaining their consent to contact them.  Apple will use the email addresses that You provide through TestFlight only for purposes of sending invitations to such end-users via TestFlight.  By uploading email addresses for the purposes of sending invites to Beta Testers, You warrant that You have an appropriate legal basis for using such emails addresses for the purposes of sending invites.  If a Beta Tester requests that You stop contacting them (either through TestFlight or otherwise), then You agree to promptly do so.

**C.      Use of TestFlight Information**
To the extent that TestFlight provides You with beta analytics information about Your end-user's use of pre-release versions of Your Application (e.g., installation time, frequency of an individual's use of an App, etc.) and/or other related information (e.g. tester suggestions, feedback, screenshots), You agree to use such data solely for purposes of improving Your Applications and related products.  You agree not to provide such information to any third parties, except for a Service Provider who is assisting You in processing and analyzing such data on Your behalf and who is not permitted to use it for any other purpose or disclose it to any other party (and then only

to the limited extent not prohibited by Apple).  For clarity, You must not aggregate (or permit any third-party to aggregate) beta analytics information provided to You by Apple for Your Applications as part of TestFlight with other developers' beta analytics information, or contribute such information to a repository for cross-developer beta analytics information.  Further, You must not use any beta analytics information provided through TestFlight for purposes of de-anonymizing information obtained from or regarding a particular device or end-user outside of TestFlight (e.g., You may not attempt to connect data gathered through TestFlight for a particular end-user with information that is provided in an anonymized form through Apple's analytics service).

**Libraries:**

**7.5     Distribution of Libraries**
You can develop Libraries using the Apple Software.  Notwithstanding anything to the contrary in the Xcode and Apple SDKs Agreement or the Swift Playgrounds Agreement, under this Agreement You may develop Libraries for iOS, watchOS, iPadOS, and/or tvOS using the applicable Apple SDKs that are provided as part of the Xcode and Apple SDKs license or Swift Playgrounds license, provided that any such Libraries are developed and distributed solely for use with an iOS Product, Apple Watch, or Apple TV and that You limit use of such Libraries only to use with such products.  If Apple determines that Your Library is not designed for use with an iOS Product, Apple Watch, or Apple TV, then Apple may require You to cease distribution of Your Library at any time, and You agree to promptly cease all distribution of such Library upon notice from Apple and cooperate with Apple to remove any remaining copies of such Library.  For clarity, the foregoing limitation is not intended to prohibit the development of libraries for macOS.

**7.6     No Other Distribution Authorized Under this Agreement**
Except for the distribution of freely available Licensed Applications through the App Store or Custom App Distribution in accordance with **Sections 7.1** and **7.2**, the distribution of Applications for use on Registered Devices as set forth in **Section 7.2** (Ad Hoc Distribution), the distribution of Applications for beta testing through TestFlight as set forth in **Section 7.4**, the distribution of Libraries in accordance with **Section 7.5**, the distribution of Passes in accordance with Attachment 5, the delivery of Safari Push Notifications on macOS, the distribution of Safari Extensions on macOS, the distribution of Applications and libraries developed for macOS, and/or as otherwise permitted herein, no other distribution of programs or applications developed using the Apple Software is authorized or permitted hereunder.  In the absence of a separate agreement with Apple, You agree not to distribute Your Application for iOS Products, Apple Watch, or Apple TV to third parties via other distribution methods or to enable or permit others to do so.  You agree to distribute Your Covered Products only in accordance with the terms of this Agreement.

# 8.     Program Fees

As consideration for the rights and licenses granted to You under this Agreement and Your participation in the Program, You agree to pay Apple the annual Program fee set forth on the Program website, unless You have received a valid fee waiver from Apple.  Such fee is non-refundable, and any taxes that may be levied on the Apple Software, Apple Services or Your use of the Program shall be Your responsibility.  Your Program fees must be paid up and not in arrears at the time You submit (or resubmit) Applications to Apple under this Agreement, and Your continued use of the Program web portal and Services is subject to Your payment of such fees, where applicable.  If You opt-in to have Your annual Program fees paid on an auto-renewing basis, then You agree that Apple may charge the credit card that You have on file with Apple for such fees, subject to the terms You agree to on the Program web portal when You choose to enroll in an auto-renewing membership.

If You pay for Your Program fees through the Apple Developer app, the terms of Attachment 9 (Additional Terms for Subscriptions Purchased Through the Apple Developer App) also apply.

## 9.     Confidentiality

### 9.1      Information Deemed Apple Confidential

You agree that all pre-release versions of the Apple Software and Apple Services (including pre-release Documentation), pre-release versions of Apple hardware, the FPS Deployment Package, and any terms and conditions contained herein that disclose pre-release features will be deemed "Apple Confidential Information"; provided however that upon the commercial release of the Apple Software the terms and conditions that disclose pre-release features of the Apple Software or services will no longer be confidential.  Notwithstanding the foregoing, Apple Confidential Information will not include: (i) information that is generally and legitimately available to the public through no fault or breach of Yours, (ii) information that is generally made available to the public by Apple, (iii) information that is independently developed by You without the use of any Apple Confidential Information, (iv) information that was rightfully obtained from a third party who had the right to transfer or disclose it to You without limitation, or (v) any FOSS included in the Apple Software and accompanied by licensing terms that do not impose confidentiality obligations on the use or disclosure of such FOSS.  Further, Apple agrees that You will not be bound by the foregoing confidentiality terms with regard to technical information about pre-release Apple Software and services disclosed by Apple at WWDC (Apple's Worldwide Developers Conference), except that You may not post screenshots of, write public reviews of, or redistribute any pre-release Apple Software, Apple Services or hardware.

### 9.2      Obligations Regarding Apple Confidential Information

You agree to protect Apple Confidential Information using at least the same degree of care that You use to protect Your own confidential information of similar importance, but no less than a reasonable degree of care.  You agree to use Apple Confidential Information solely for the purpose of exercising Your rights and performing Your obligations under this Agreement and agree not to use Apple Confidential Information for any other purpose, for Your own or any third party's benefit, without Apple's prior written consent.  You further agree not to disclose or disseminate Apple Confidential Information to anyone other than: (i) those of Your employees and contractors, or those of Your faculty and staff if You are an educational institution, who have a need to know and who are bound by a written agreement that prohibits unauthorized use or disclosure of the Apple Confidential Information; or (ii) except as otherwise agreed or permitted in writing by Apple.  You may disclose Apple Confidential Information to the extent required by law, provided that You take reasonable steps to notify Apple of such requirement before disclosing the Apple Confidential Information and to obtain protective treatment of the Apple Confidential Information.  You acknowledge that damages for improper disclosure of Apple Confidential Information may be irreparable; therefore, Apple is entitled to seek equitable relief, including injunction and preliminary injunction, in addition to all other remedies.

### 9.3      Information Submitted to Apple Not Deemed Confidential

Apple works with many application and software developers and some of their products may be similar to or compete with Your Applications.  Apple may also be developing its own similar or competing applications and products or may decide to do so in the future.  To avoid potential misunderstandings and except as otherwise expressly set forth herein, Apple cannot agree, and expressly disclaims, any confidentiality obligations or use restrictions, express or implied, with respect to any information that You may provide in connection with this Agreement or the Program, including but not limited to information about Your Application, Licensed Application Information, and metadata (such disclosures will be referred to as "**Licensee Disclosures**").  You agree that any such Licensee Disclosures will be **non-confidential**.  Except as otherwise expressly set forth herein, Apple will be free to use and disclose any Licensee Disclosures on an unrestricted basis without notifying or compensating You.  You release Apple from all liability and obligations that may arise from the receipt, review, use, or disclosure of any portion of any Licensee Disclosures.  Any physical materials You submit to Apple will become Apple property and Apple will have no obligation to return those materials to You or to certify their destruction.

**9.4     Press Releases and Other Publicity**

You may not issue any press releases or make any other public statements regarding this Agreement, its terms and conditions, or the relationship of the parties without Apple's express prior written approval, which may be withheld at Apple's discretion.

# 10.     Indemnification

To the extent permitted by applicable law, You agree to indemnify and hold harmless, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to any of the following (but excluding for purposes of this Section, any Application for macOS that is distributed outside of the App Store and does not use any Apple Services or Certificates): (i) Your breach of any certification, covenant, obligation, representation or warranty in this Agreement, including Schedule 2 and Schedule 3 (if applicable); (ii) any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights; (iii) Your breach of any of Your obligations under the EULA (as defined in Schedule 1 or Schedule 2 or Schedule 3 (if applicable)) for Your Licensed Application; (iv) Apple's permitted use, promotion or delivery of Your Licensed Application, Licensed Application Information, Safari Push Notification, Safari Extension (if applicable), Pass, Pass Information, metadata, related trademarks and logos, or images and other materials that You provide to Apple under this Agreement, including Schedule 2 or Schedule 3 (if applicable); (v) any claims, including but not limited to any end-user claims, regarding Your Covered Products, Licensed Application Information, Pass Information, or related logos, trademarks, content or images; or (vi) Your use (including Your Authorized Developers' use) of the Apple Software or services, Your Licensed Application Information, Pass Information, metadata, Your Authorized Test Units, Your Registered Devices, Your Covered Products, or Your development and distribution of any of the foregoing.

You acknowledge that neither the Apple Software nor any Services are intended for use in the development of Covered Products in which errors or inaccuracies in the content, functionality, services, data or information provided by any of the foregoing or the failure of any of the foregoing, could lead to death, personal injury, or severe physical or environmental damage, and, to the extent permitted by law, You hereby agree to indemnify, defend and hold harmless each Apple Indemnified Party from any Losses incurred by such Apple Indemnified Party by reason of any such use.

In no event may You enter into any settlement or like agreement with a third party that affects Apple's rights or binds Apple in any way, without the prior written consent of Apple.

# 11.     Term and Termination

**11.1     Term**

The Term of this Agreement shall extend until the one (1) year anniversary of the original activation date of Your Program account.  Thereafter, subject to Your payment of annual renewal fees and compliance with the terms of this Agreement, the Term will automatically renew for successive one (1) year terms, unless sooner terminated in accordance with this Agreement.

**11.2     Termination**

This Agreement and all rights and licenses granted by Apple hereunder and any services provided hereunder will terminate, effective immediately upon notice from Apple:
(a) if You or any of Your Authorized Developers fail to comply with any term of this Agreement other than those set forth below in this **Section 11.2** and fail to cure such breach within 30 days after becoming aware of or receiving notice of such breach;

(b) if You or any of Your Authorized Developers fail to comply with the terms of **Section 9 (Confidentiality)**;

(c) in the event of the circumstances described in the subsection entitled "Severability" below;

(d) if You, at any time during the Term, commence an action for patent infringement against Apple;

(e) if You become insolvent, fail to pay Your debts when due, dissolve or cease to do business, file for bankruptcy, or have filed against You a petition in bankruptcy;

(f) if You or any entity or person that directly or indirectly controls You, or is under common control with You (where "control" has the meaning defined in Section 14.8), are or become subject to sanctions or other restrictions in the countries or regions available in App Store Connect; or

(g) if You engage, or encourage others to engage, in any misleading, fraudulent, improper, unlawful or dishonest act relating to this Agreement, including, but not limited to, misrepresenting the nature of Your Application (e.g., hiding or trying to hide functionality from Apple's review, falsifying consumer reviews for Your Application, engaging in payment fraud, etc.).

Apple may also terminate this Agreement, or suspend Your rights to use the Apple Software or services, if You fail to accept any new Program Requirements or Agreement terms as described in **Section 4**. Either party may terminate this Agreement for its convenience, for any reason or no reason, effective 30 days after providing the other party with written notice of its intent to terminate.

### 11.3    Effect of Termination

Upon the termination of this Agreement for any reason, You agree to immediately cease all use of the Apple Software and services and erase and destroy all copies, full or partial, of the Apple Software and any information pertaining to the services (including Your Push Application ID) and all copies of Apple Confidential Information in Your and Your Authorized Developers' possession or control.  At Apple's request, You agree to provide written certification of such destruction to Apple.  Upon the expiration of the Delivery Period defined and set forth in Schedule 1, all Licensed Applications and Licensed Application Information in Apple's possession or control shall be deleted or destroyed within a reasonable time thereafter, excluding any archival copies maintained in accordance with Apple's standard business practices or required to be maintained by applicable law, rule or regulation.  The following provisions shall survive any termination of this Agreement: Sections 1, 2.3, 2.5, 2.6, 3.1(d), 3.1(e), 3.1(f), 3.2, and 3.3, the second paragraph of Section 5.1 (excluding the last two sentences other than the restrictions, which shall survive), the third paragraph of Section 5.1, the last sentence of the first paragraph of Section 5.3 and the limitations and restrictions of Section 5.3, Section 5.4, the first sentence of and the restrictions of Section 6.6, the restrictions of Section 6.7, the second paragraph of Section 6.9, Section 7.1 (Schedule 1 for the Delivery Period), the restrictions of Section 7.3, 7.4, and 7.5, Section 7.6, Section 9 through 14 inclusive; within Attachment 1, the last sentence of Section 1.1, Section 2, Section 3.2 (but only for existing promotions), the second and third sentences of Section 4, Section 5, and Section 6; within Attachment 2, Sections 1.3, 2, 3, 4, 5, 6, and 7; within Attachment 3, Sections 1, 2 (except the second sentence of Section 2.1), 3 and 4; within Attachment 4, Sections 1.2, 1.5, 1.6, 2, 3, and 4; within Attachment 5, Sections 2.2, 2.3, 2.4 (but only for existing promotions), 3.3, and 5; within Attachment 6, Sections 1.2, 1.3, 2, 3, and 4; within Attachment 7, Section 1.1 and Section 1.2; and Attachment 8.  Apple will not be liable for compensation, indemnity, or damages of any sort as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy Apple may have, now or in the future.

## 12.    NO WARRANTY

The Apple Software or Services may contain inaccuracies or errors that could cause failures or loss of data and it may be incomplete.  Apple and its licensors reserve the right to change, suspend, remove, or disable access to any Services (or any part thereof) at any time without notice.  In no event will Apple or its licensors be liable for the removal of or disabling of access to

any such Services.  Apple or its licensors may also impose limits on the use of or access to certain Services, or may remove the Services for indefinite time periods, or cancel the Services at any time, and in any case and without notice or liability.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT USE OF THE APPLE SOFTWARE, SECURITY SOLUTION, AND ANY SERVICES IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU.  THE APPLE SOFTWARE, SECURITY SOLUTION, AND ANY SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE, APPLE'S AGENTS AND APPLE'S LICENSORS (**COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 12 AND 13**) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE APPLE SOFTWARE, SECURITY SOLUTION, AND SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, TIMELINESS, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.  APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES, THAT THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE APPLE SOFTWARE, SECURITY SOLUTION, OR THE PROVISION OF SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, THAT DEFECTS OR ERRORS IN THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL BE CORRECTED, OR THAT THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL BE COMPATIBLE WITH FUTURE APPLE PRODUCTS, SERVICES OR SOFTWARE OR ANY THIRD PARTY SOFTWARE, APPLICATIONS, OR SERVICES, OR THAT ANY INFORMATION STORED OR TRANSMITTED THROUGH ANY APPLE SOFTWARE OR SERVICES WILL NOT BE LOST, CORRUPTED OR DAMAGED.  YOU ACKNOWLEDGE THAT THE APPLE SOFTWARE AND SERVICES ARE NOT INTENDED OR SUITABLE FOR USE IN SITUATIONS OR ENVIRONMENTS WHERE ERRORS, DELAYS, FAILURES OR INACCURACIES IN THE TRANSMISSION OR STORAGE OF DATA OR INFORMATION BY OR THROUGH THE APPLE SOFTWARE OR SERVICES COULD LEAD TO DEATH, PERSONAL INJURY, OR FINANCIAL, PHYSICAL, PROPERTY OR ENVIRONMENTAL DAMAGE, INCLUDING WITHOUT LIMITATION THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL, LIFE SUPPORT OR WEAPONS SYSTEMS.  NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE WILL CREATE A WARRANTY NOT EXPRESSLY STATED IN THIS AGREEMENT.  SHOULD THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.  Location data as well as any maps data provided by any Services or software is for basic navigational purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate or incomplete location data may lead to death, personal injury, property or environmental damage.  Neither Apple nor any of its licensors guarantees the availability, accuracy, completeness, reliability, or timeliness of location data or any other data or information displayed by any Services or software.

## 13.    LIMITATION OF LIABILITY

TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL APPLE BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO THIS AGREEMENT, YOUR USE OR INABILITY TO USE THE APPLE SOFTWARE, SECURITY SOLUTION, SERVICES, APPLE CERTIFICATES, OR YOUR DEVELOPMENT EFFORTS OR PARTICIPATION IN THE PROGRAM, HOWEVER CAUSED,

WHETHER UNDER A THEORY OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCTS LIABILITY, OR OTHERWISE, EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.  In no event shall Apple's total liability to You under this Agreement for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of fifty dollars ($50.00).

## 14.    General Legal Terms

### 14.1    Third Party Notices
Portions of the Apple Software or Services may utilize or include third party software and other copyrighted material.  Acknowledgements, licensing terms and disclaimers for such material are contained in the electronic documentation for the Apple Software and Services, and Your use of such material is governed by their respective terms.

### 14.2    Consent to Collection and Use of Data
**A.     Pre-Release Versions of iOS, watchOS, tvOS, iPadOS, and macOS**
In order to provide, test and help Apple, its partners, and third party developers improve their products and services, and unless You or Your Authorized Developers opt out in the pre-release versions of iOS, watchOS, tvOS, iPadOS, or macOS, as applicable, You acknowledge that Apple and its subsidiaries and agents will be collecting, using, storing, transmitting, processing and analyzing (collectively, "**Collecting**") diagnostic, technical, and usage logs and information from Your Authorized Test Units (that are running pre-release versions of the Apple Software and services)  as part of the developer seeding process.  This information will be Collected in a form that does not personally identify You or Your Authorized Developers and may be Collected from Your Authorized Test Units at any time.  The information that would be Collected includes, but is not limited to, general diagnostic and usage data, various unique device identifiers, various unique system or hardware identifiers, details about hardware and operating system specifications, performance statistics, and data about how You use Your Authorized Test Unit, system and application software, and peripherals, and, if Location Services is enabled, certain location information.  You agree that Apple may share such diagnostic, technical, and usage logs and information with partners and third-party developers for purposes of allowing them to improve their products and services that operate on or in connection with Apple-branded products.  **By installing or using pre-release versions of iOS, watchOS, tvOS, iPadOS, or macOS on Your Authorized Test Units, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect all such information and use it as set forth above in this Section.**

**B.     Other Pre-Release Apple Software and Services**
In order to test, provide and improve Apple's products and services, and only if You choose to install or use other pre-release Apple Software or Services provided as part of the developer seeding process or Program, You acknowledge that Apple and its subsidiaries and agents may be Collecting diagnostic, technical, usage and related information from other pre-release Apple Software and Services.  Apple will notify You about the Collection of such information on the Program web portal, and You should carefully review the release notes and other information disclosed by Apple in such location prior to choosing whether or not to install or use any such pre-release Apple Software or Services.  **By installing or using such pre-release Apple Software and Services, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect any and all such information and use it as set forth above.**

**C.     Device Deployment Services**
In order to set up and use the device provisioning, account authentication, and deployment features of the Apple Software and Services, certain unique identifiers for Your computer, iOS Products, watchOS devices, tvOS devices, and account information may be needed.  These unique identifiers may include Your email address, Your Apple ID, a hardware identifier for Your computer, and device identifiers entered by You into the Apple Software or Services for such

Apple-branded products.  Such identifiers may be logged in association with Your interaction with the Service and Your use of these features and the Apple Software and Services.  **By using these features, You agree that Apple and its subsidiaries and agents may Collect this information for the purpose of providing the Apple Software and Services, including using such identifiers for account verification and anti-fraud measures.**  If You do not want to provide this information, do not use the provisioning, deployment or authentication features of the Apple Software or Services.

**D.     Apple Services**

In order to test, provide and improve Apple's products and services, and only if You choose to use the Services provided hereunder (and except as otherwise provided herein), You acknowledge that Apple and its subsidiaries and agents may be Collecting diagnostic, technical, usage and related information from the Apple Services.  Some of this information will be Collected in a form that does not personally identify You.  However, in some cases, Apple may need to Collect information that would personally identify You, but only if Apple has a good faith belief that such Collection is reasonably necessary to: (a) provide the Apple Services; (b) comply with legal process or request; (c) verify compliance with the terms of this Agreement; (d) prevent fraud, including investigating any potential technical issues or violations; or (e) protect the rights, property, security or safety of Apple, its developers, customers or the public as required or permitted by law.  **By installing or using such Apple Services, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect any and all such information and use it as set forth in this Section.**  Further, You agree that Apple may share the diagnostic, technical, and usage logs and information (excluding personally identifiable information) with partners and third-party developers for purposes of allowing them to improve their products and services that operate on or in connection with Apple-branded products.

**E.     Privacy Policy**

Data collected pursuant to this **Section 14.2** will be treated in accordance with Apple's Privacy Policy which can be viewed at http://www.apple.com/legal/privacy.

**14.3     Assignment; Relationship of the Parties**

This Agreement may not be assigned, nor may any of Your obligations under this Agreement be delegated, in whole or in part, by You by operation of law, merger, or any other means without Apple's express prior written consent and any attempted assignment without such consent will be null and void.  To submit a request for Apple's consent to assignment, please log into your account at developer.apple.com and follow the steps under Membership.  Except for the agency appointment as specifically set forth in Schedule 1 (if applicable), this Agreement will not be construed as creating any other agency relationship, or a partnership, joint venture, fiduciary duty, or any other form of legal association between You and Apple, and You will not represent to the contrary, whether expressly, by implication, appearance or otherwise.  This Agreement is not for the benefit of any third parties.

**14.4     Independent Development**

Nothing in this Agreement will impair Apple's right to develop, acquire, license, market, promote, or distribute products or technologies that perform the same or similar functions as, or otherwise compete with, Licensed Applications, Covered Products, or any other products or technologies that You may develop, produce, market, or distribute.

**14.5     Notices**

Any notices relating to this Agreement shall be in writing, except as otherwise set forth in **Section 14.3**.  Notices will be deemed given by Apple when sent to You at the email address or mailing address You provided during the sign-up process.  Except as set forth in **Section 14.3**, all notices to Apple relating to this Agreement will be deemed given (a) when delivered personally, (b) three business days after having been sent by commercial overnight carrier with written proof of delivery, and (c) five business days after having been sent by first class or certified mail, postage prepaid, to this Apple address: Developer Relations Legal, Apple Inc., One Apple Park Way, 37-

2ISM, Cupertino, California, 95014 U.S.A. You consent to receive notices by email and agree that any such notices that Apple sends You electronically will satisfy any legal communication requirements.  A party may change its email or mailing address by giving the other written notice as described above.

**14.6     Severability**

If a court of competent jurisdiction finds any clause of this Agreement to be unenforceable for any reason, that clause of this Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement shall continue in full force and effect.  However, if applicable law prohibits or restricts You from fully and specifically complying with, or appointing Apple and Apple Subsidiaries as Your agent under Schedule 1 or the Sections of this Agreement entitled "Internal Use License and Restrictions", "Your Obligations" or "Apple Certificates; Revocation", or prevents the enforceability of any of those Sections or Schedule 1, this Agreement will immediately terminate and You must immediately discontinue any use of the Apple Software as described in the Section entitled "Term and Termination."

**14.7     Waiver and Construction**

Failure by Apple to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.  Any laws or regulations that provide that the language of a contract will be construed against the drafter will not apply to this Agreement. Section headings are for convenience only and are not to be considered in construing or interpreting this Agreement.

**14.8     Export Control**

A. You may not use, export, re-export, import, sell, release, or transfer the Apple Software, Services, or Documentation except as authorized by United States law, the laws of the jurisdiction in which You obtained the Apple Software, and any other applicable laws and regulations.  In particular, but without limitation, the Apple Software, Services, source code, technology, and Documentation (collectively referred to as "Apple Technology" for purposes of this Section 14.8) may not be exported,  or re-exported, transferred, or released (a) into any U.S. embargoed countries or regions or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Persons List or on any other restricted party lists.  By using the Apple Technology, You represent and warrant that You are not located in any such country or region or on any such list.  You also agree that You will not use the Apple Technology, including any pre-release versions thereof, for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of nuclear, missile, chemical or biological weapons or any other military end uses as defined in 15 C.F.R. § 744.  You certify that pre-release versions of the Apple Technology will only be used for development and testing purposes, and will not be rented, sold, leased, sublicensed, assigned, or otherwise transferred.  Further, You certify that You will not sell, transfer or export any product, process or service that is a direct product of such pre-release Apple Technology.

B. You represent and warrant that You and any entity or person that directly or indirectly controls You, or is under common control with You, are not: (a) on any sanctions lists in the countries or regions available in App Store Connect, (b) doing business in any of the US embargoed countries or regions, and (c) a military end user as defined and scoped in 15 C.F.R § 744.  As used in this Section 14.8, "control" means that an entity or person possesses, directly or indirectly, the power to direct or cause the direction of the management policies of the other entity, whether through ownership of voting securities, an interest in registered capital, by contract, or otherwise.

**14.9     Government End-users**

The Apple Software and Documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202,

as applicable.  Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end-users (a) only as Commercial Items and (b) with only those rights as are granted to all other end-users pursuant to the terms and conditions herein.  Unpublished-rights reserved under the copyright laws of the United States.

**14.10   Dispute Resolution; Governing Law**
Any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California, and You and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect any such litigation or dispute resolution.  This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law.  Notwithstanding the foregoing:

(a) If You are an agency, instrumentality or department of the federal government of the United States, then this Agreement shall be governed in accordance with the laws of the United States of America, and in the absence of applicable federal law, the laws of the State of California will apply.  Further, and notwithstanding anything to the contrary in this Agreement (including but not limited to **Section 10 (Indemnification)**), all claims, demands, complaints and disputes will be subject to the Contract Disputes Act (41 U.S.C. §§601-613), the Tucker Act (28 U.S.C. § 1346(a) and § 1491), or the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2401-2402, 2671-2672, 2674-2680), as applicable, or other applicable governing authority.  For the avoidance of doubt, if You are an agency, instrumentality, or department of the federal, state or local government of the U.S. or a U.S. public and accredited educational institution, then Your indemnification obligations are only applicable to the extent they would not cause You to violate any applicable law (e.g., the Anti-Deficiency Act), and You have any legally required authorization or authorizing statute;
(b) If You (as an entity entering into this Agreement) are a U.S. public and accredited educational institution or an agency, instrumentality, or department of a state or local government within the United States, then (a) this Agreement will be governed and construed in accordance with the laws of the state (within the U.S.) in which Your entity is domiciled, except that body of state law concerning conflicts of law; and (b) any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in federal court within the Northern District of California, and You and Apple hereby consent to the personal jurisdiction of and exclusive venue of such District unless such consent is expressly prohibited by the laws of the state in which Your entity is domiciled; and
(c) If You are an international, intergovernmental organization that has been conferred immunity from the jurisdiction of national courts through Your intergovernmental charter or agreement, then any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be determined by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") in effect at the time of applying for arbitration by three arbitrators appointed in accordance with such rules, and will be conducted according to the International Bar Association (IBA) Rules on the Taking of Evidence in International Arbitration. The place of arbitration shall be London, England. The arbitration shall be conducted in English. Upon Apple's request, You agree to provide evidence of Your status as an intergovernmental organization with such privileges and immunities.

This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded.

**14.11   Entire Agreement; Governing Language**
This Agreement constitutes the entire agreement between the parties with respect to the use of the Apple Software, Apple Services and Apple Certificates licensed hereunder and, except as otherwise set forth herein, supersedes all prior understandings and agreements regarding its subject matter.  Notwithstanding the foregoing, to the extent that You are provided with pre-release materials under the Program and such pre-release materials are subject to a separate

license agreement, You agree that the license agreement accompanying such materials in addition to **Section 9 (Confidentiality)** of this Agreement shall also govern Your use of such materials.  If You have entered or later enter into the Xcode and Apple SDKs Agreement, this Apple Developer Program License Agreement will govern in the event of any inconsistencies between the two with respect to the same subject matter; provided, however, that this Apple Developer Program License Agreement is not intended to prevent You from exercising any rights granted to You in the Xcode and Apple SDKs Agreement in accordance with the terms and conditions set forth therein.  If You have entered or later enter into the Swift Playgrounds Agreement, this Apple Developer Program License Agreement will govern in the event of any inconsistencies between the two with respect to the same subject matter; provided, however, that this Apple Developer Program License Agreement is not intended to prevent You from exercising any rights granted to You in the Swift Playgrounds Agreement in accordance with the terms and conditions set forth therein. This Agreement may be modified only: (a) by a written amendment signed by both parties, or (b) to the extent expressly permitted by this Agreement (for example, by Apple by written or email notice to You).  Any translation is provided as a courtesy to You, and in the event of a dispute between the English and any non-English version, the English version of this Agreement shall govern, to the extent not prohibited by local law in Your jurisdiction.  If You are located in the province of Quebec, Canada or are a government organization within France, then the following clause applies to You:  The parties hereby confirm that they have requested that this Agreement and all related documents be drafted in English.  *Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglais.*

**Attachment 1**
(to the Agreement)
**Additional Terms for Apple Push Notification Service and Local Notifications**

The following terms are in addition to the terms of the Agreement and apply to any use of the APN (Apple Push Notification Service):

**1.      Use of the APN and Local Notifications**

**1.1**      You may use the APN only in Your Applications, Your Passes, and/or in sending Safari Push Notifications to the macOS desktop of users of Your Site who have opted in to receive Notifications through Safari on macOS.  You, Your Application and/or Your Pass may access the APN only via the APN API and only if You have been assigned a Push Application ID by Apple.  Except for a Service Provider who is assisting You with using the APN, You agree not to share Your Push Application ID with any third party.  You understand that You will not be permitted to access or use the APN after expiration or termination of Your Agreement.

**1.2**      You are permitted to use the APN and the APN APIs only for the purpose of sending Push Notifications to Your Application, Your Pass, and/or to the macOS desktop of users of Your Site who have opted in to receive Notifications through Safari on macOS as expressly permitted by the Agreement, the APN Documentation and all applicable laws and regulations (including all intellectual property laws).  You further agree that You must disclose to Apple any use of the APN as part of the submission process for Your Application.

**1.3**      You understand that before You send an end-user any Push Notifications through the APN, the end-user must consent to receive such Notifications.  You agree not to disable, override or otherwise interfere with any Apple-implemented consent panels or any Apple system preferences for enabling or disabling Notification functionality.  If the end-user's consent to receive Push Notifications is denied or later withdrawn, You may not send the end-user Push Notifications.

**2.      Additional Requirements**

**2.1**      You may not use the APN or Local Notifications for the purpose of sending unsolicited messages to end-users or for the purpose of phishing or spamming, including, but not limited to, engaging in any types of activities that violate anti-spamming laws and regulations, or that are otherwise improper, inappropriate or illegal. The APN and Local Notifications should be used for sending relevant messages to a user that provide a benefit (e.g., a response to an end-user request for information, provision of pertinent information relevant to the Application).

**2.2**      You may not use the APN or Local Notifications for the purposes of advertising, product promotion, or direct marketing of any kind (e.g., up-selling, cross-selling, etc.), including, but not limited to, sending any messages to promote the use of Your Application or advertise the availability of new features or versions.  Notwithstanding the foregoing, You may use the APN or Local Notifications for promotional purposes in connection with Your Pass so long as such use is directly related to the Pass, e.g., a store coupon may be sent to Your Pass in Wallet.

**2.3**      You may not excessively use the overall network capacity or bandwidth of the APN, or unduly burden an iOS Product, Apple Watch, macOS or an end-user with excessive Push Notifications or Local Notifications, as may be determined by Apple in its reasonable discretion. In addition, You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the APN, or otherwise disrupt other developers' use of the APN.

**2.4**      You may not use the APN or Local Notifications to send material that contains any obscene, pornographic, offensive or defamatory content or materials of any kind (text, graphics,

Program Agreement

images, photographs, sounds, etc.), or other content or materials that in Apple's reasonable judgment may be found objectionable by the end-user of Your Application, Pass or Site.

**2.5**    You may not transmit, store or otherwise make available any material that contains viruses or any other computer code, files or programs that may harm, disrupt or limit the normal operation of the APN or an iOS Product, Apple Watch, or macOS, and You agree not to disable, spoof, hack or otherwise interfere with any security, digital signing, verification or authentication mechanisms that are incorporated in or used by the APN, or enable others to do so.

**3.    Additional Terms for Website Push IDs**

**3.1**    Subject to the terms of this Agreement, You understand and agree that Safari Push Notifications that You send using Your Website Push ID must be sent under Your own name, trademark or brand (e.g., a user should know that the communication is coming from Your Site) and must include an icon, trademark, logo or other identifying mark for Your Site.  You agree not to misrepresent or impersonate another Site or entity or otherwise mislead users about the originator of the Safari Push Notification.  To the extent that You reference a third party's trademark or brand within Your Safari Push Notification, You represent and warrant that You have any necessary rights.

**3.2**    By enabling the APN and sending Safari Push Notifications for Your Site as permitted in this Agreement, You hereby permit Apple to use (i) screenshots of Your Safari Push Notifications on macOS; and (ii) trademarks and logos associated with such Notifications, for promotional purposes in Apple's marketing materials, excluding those portions which You do not have the right to use for promotional purposes and which You identify in writing to Apple.  You also permit Apple to use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials.

**4.    Delivery by the APN or via Local Notifications.**  You understand and agree that in order to provide the APN and make Your Push Notifications available on iOS Products, Apple Watch, or macOS, Apple may transmit Your Push Notifications across various public networks, in various media, and modify or change Your Push Notifications to comply with the technical and other requirements for connecting to networks or devices.  You acknowledge and agree that the APN is not, and is not intended to be, a guaranteed or secure delivery service, and You shall not use or rely upon it as such.  Further, as a condition to using the APN or delivering Local Notifications, You agree not to transmit sensitive personal or confidential information belonging to an individual (e.g., a social security number, financial account or transactional information, or any information where the individual may have a reasonable expectation of secure transmission) as part of any such Notification, and You agree to comply with any applicable notice or consent requirements with respect to any collection, transmission, maintenance, processing or use of an end-user's personal information.

**5.    Your Acknowledgements.**  You acknowledge and agree that:

**5.1**    Apple may at any time, and from time to time, with or without prior notice to You (a) modify the APN, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the APN APIs.  You understand that any such modifications may require You to change or update Your Applications, Passes or Sites at Your own cost.  Apple has no express or implied obligation to provide, or continue to provide, the APN and may suspend or discontinue all or any portion of the APN at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the APN or APN APIs.

**5.2**    The APN is not available in all languages or in all countries or regions and Apple makes no representation that the APN is appropriate or available for use in any particular location.  To

the extent You choose to access and use the APN, You do so at Your own initiative and are responsible for compliance with any applicable laws, including but not limited to any local laws.

**5.3**      Apple provides the APN to You for Your use with Your Application, Pass, or Site, and does not provide the APN directly to any end-user.  You acknowledge and agree that any Push Notifications are sent by You, not Apple, to the end-user of Your Application, Pass or Site, and You are solely liable and responsible for any data or content transmitted therein and for any such use of the APN.  Further, You acknowledge and agree that any Local Notifications are sent by You, not Apple, to the end-user of Your Application, and You are solely liable and responsible for any data or content transmitted therein.

**5.4**      Apple makes no guarantees to You in relation to the availability or uptime of the APN and is not obligated to provide any maintenance, technical or other support for the APN.

**5.5**      Apple reserves the right to remove Your access to the APN, limit Your use of the APN, or revoke Your Push Application ID at any time in its sole discretion.

**5.6**      Apple may monitor and collect information (including but not limited to technical and diagnostic information) about Your usage of the APN to aid Apple in improving the APN and other Apple products or services and to verify Your compliance with this Agreement; provided however that Apple will not access or disclose the content of any Push Notification unless Apple has a good faith belief that such access or disclosure is reasonably necessary to: (a) comply with legal process or request; (b) enforce the terms of this Agreement, including investigation of any potential violation hereof; (c) detect, prevent or otherwise address security, fraud or technical issues; or (d) protect the rights, property or safety of Apple, its developers, customers or the public as required or permitted by law.  Notwithstanding the foregoing, You acknowledge and agree that iOS, iPadOS, macOS, and watchOS may access Push Notifications locally on a user's device solely for the purposes of responding to user requests and personalizing user experience and suggestions on device.

**6.**      **Additional Liability Disclaimer.**  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE OF THE APN, INCLUDING ANY INTERRUPTIONS TO THE APN OR ANY USE OF NOTIFICATIONS, INCLUDING, BUT NOT LIMITED TO, ANY POWER OUTAGES, SYSTEM FAILURES, NETWORK ATTACKS, SCHEDULED OR UNSCHEDULED MAINTENANCE, OR OTHER INTERRUPTIONS.

**Attachment 2**
(to the Agreement)
**Additional Terms for Use of the In-App Purchase API**

The following terms are in addition to the terms of the Agreement and apply to any use of the In-App Purchase API in Your Application:

**1.      Use of the In-App Purchase API**

**1.1**      You may use the In-App Purchase API only to enable end-users to access or receive content, functionality, or services that You make available for use within Your Application (e.g., digital books, additional game levels, access to a turn-by-turn map service).  You may not use the In-App Purchase API to offer goods or services to be used outside of Your Application.

**1.2**      You must submit to Apple for review and approval all content, functionality, or services that You plan to provide through the use of the In-App Purchase API in accordance with these terms and the processes set forth in **Section 6 (Application Submission and Selection)** of the Agreement.  For all submissions, You must provide the name, text description, price, unique identifier number, and other information that Apple reasonably requests (collectively, the "**Submission Description**").  Apple reserves the right to review the actual content, functionality or service that has been described in the Submission Descriptions at any time, including, but not limited to, in the submission process and after approval of the Submission Description by Apple.  If You would like to provide additional content, functionality or services through the In-App Purchase API that are not described in Your Submission Description, then You must first submit a new or updated Submission Description for review and approval by Apple prior to making such items available through the use of the In-App Purchase API.  Apple reserves the right to withdraw its approval of content, functionality, or services previously approved, and You agree to stop making any such content, functionality, or services available for use within Your Application.

**1.3**      All content, functionality, and services offered through the In-App Purchase API are subject to the Program Requirements for Applications, and after such content, services or functionality are added to a Licensed Application, they will be deemed part of the Licensed Application and will be subject to all the same obligations and requirements.  For clarity, Applications that provide keyboard extension functionality may not use the In-App Purchase API within the keyboard extension itself; however, they may continue to use the In-App Purchase API in separate areas of the Application.

**2.      Additional Restrictions**

**2.1**      You may not use the In-App Purchase API to enable an end-user to set up a pre-paid account to be used for subsequent purchases of content, functionality, or services, or otherwise create balances or credits that end-users can redeem or use to make purchases at a later time.

**2.2**      You may not enable end-users to purchase Currency of any kind through the In-App Purchase API, including but not limited to any Currency for exchange, gifting, redemption, transfer, trading or use in purchasing or obtaining anything within or outside of Your Application. "Currency" means any form of currency, points, credits, resources, content or other items or units recognized by a group of individuals or entities as representing a particular value and that can be transferred or circulated as a medium of exchange.

**2.3**      Content and services may be offered through the In-App Purchase API on a subscription basis (e.g., subscriptions to newspapers and magazines).  Other than specific approved rental content such as films, television programs, music, books, rentals of content, services or functionality through the In-App Purchase API are not allowed (e.g., use of particular content may not be restricted to a pre-determined, limited period of time).

**2.4**     You may not use the In-App Purchase API to send any software updates to Your Application or otherwise add any additional executable code to Your Application.  An In-App Purchase item must either already exist in Your Application waiting to be unlocked, be streamed to Your Application after the In-App Purchase API transaction has been completed, or be downloaded to Your Application solely as data after such transaction has been completed.

**2.5**     You may not use the In-App Purchase API to deliver any items that contain content or materials of any kind (text, graphics, images, photographs, sounds, etc.) that in Apple's reasonable judgment may be found objectionable or inappropriate, for example, materials that may be considered obscene, pornographic, or defamatory.

**2.6**     With the exception of items of content that an end-user consumes or uses up within Your Application (e.g., virtual supplies such as construction materials) (a "Consumable"), any other content, functionality, services or subscriptions delivered through the use of the In-App Purchase API (e.g., a sword for a game) (a "Non-Consumable") must be made available to end-users in accordance with the same usage rules as Licensed Applications (e.g., any such content, services or functionality must be available to all of the devices associated with an end-user's account). You will be responsible for identifying Consumable items to Apple and for disclosing to end-users that Consumables will not be available for use on other devices.

**3.         Your Responsibilities**

**3.1**     For each successfully completed transaction made using the In-App Purchase API, Apple will provide You with a transaction receipt.  It is Your responsibility to verify the validity of such receipt prior to the delivery of any content, functionality, or services to an end-user and Apple will not be liable for Your failure to verify that any such transaction receipt came from Apple.

**3.2**     Unless Apple provides You with user interface elements, You are responsible for developing the user interface Your Application will display to end-users for orders made through the In-App Purchase API.  You agree not to misrepresent, falsely claim, mislead or engage in any unfair or deceptive acts or practices regarding the promotion and sale of items through Your use of the In-App Purchase API, including, but not limited to, in the Licensed Application Information and any metadata that You submit through App Store Connect.  You agree to comply with all applicable laws and regulations, including those in any jurisdictions in which You make content, functionality, services or subscriptions available through the use of the In-App Purchase API, including but not limited to consumer laws and export regulations.

**3.3**     Apple may provide hosting services for Non-Consumables that You would like to provide to Your end-users through the use of the In-App Purchase API.  Even if Apple hosts such Non-Consumables on Your behalf, You are responsible for providing items ordered through the In-App Purchase API in a timely manner (i.e., promptly after Apple issues the transaction receipt, except in cases where You have disclosed to Your end-user that the item will be made available at a later time) and for complying with all applicable laws in connection therewith, including but not limited to, laws, rules and regulations related to cancellation or delivery of ordered items.  You are responsible for maintaining Your own records for all such transactions.

**3.4**     You will not issue any refunds to end-users of Your Application, and You agree that Apple may issue refunds to end-users in accordance with the terms of Schedule 2.

**3.5**     You may provide Apple, its subsidiaries, and agents with end-user consumption information from Your Application in order to inform and improve the refund process and purchase dispute process. You shall provide notice to the user and/or obtain consent from the user in compliance with the Documentation and applicable laws.

4.      **Apple Services**

**4.1**      From time to time, Apple may choose to offer additional services and functionality relating to In-App Purchase API transactions.  Apple makes no guarantees that the In-App Purchase API or any Services will continue to be made available to You or that they will meet Your requirements, be uninterrupted, timely, secure or free from error, that any information that You obtain from the In-App Purchase API or any Services will be accurate or reliable or that any defects will be corrected.

**4.2**      You understand that You will not be permitted to access or use the In-App Purchase API after expiration or termination of Your Agreement.

**5.      Your Acknowledgements.**  You acknowledge and agree that:
Apple may at any time, and from time to time, with or without prior notice to You (a) modify the In-App Purchase API, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the In-App Purchase API.  You understand that any such modifications may require You to change or update Your Applications at Your own cost in order to continue to use the In-App Purchase API.  Apple has no express or implied obligation to provide, or continue to provide, the In-App Purchase API or any services related thereto and may suspend or discontinue all or any portion of thereof at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any suspension, discontinuation or modification of the In-App Purchase API or any services related thereto. Apple makes no guarantees to You in relation to the availability or uptime of the In-App Purchase API or any other services that Apple may provide to You in connection therewith, and Apple is not obligated to provide any maintenance, technical or other support related thereto. Apple provides the In-App Purchase API to You for Your use with Your Application, and may provide services to You in connection therewith (e.g., hosting services for Non-Consumable items).  Apple is not responsible for providing or unlocking any content, functionality, services or subscriptions that an end-user orders through Your use of the In-App Purchase API.  You acknowledge and agree that any such items are made available by You, not Apple, to the end-user of Your Application, and You are solely liable and responsible for such items ordered through the use of the In-App Purchase API and for any such use of the In-App Purchase API in Your Application or for any use of services in connection therewith.

**6.      Use of Digital Certificates for In-App Purchase**.  When an end-user completes a transaction using the In-App Purchase API in Your Application, Apple will provide You with a transaction receipt signed with an Apple Certificate.  It is Your responsibility to verify that such certificate and receipt were issued by Apple, as set forth in the Documentation.  You are solely responsible for Your decision to rely on any such certificates and receipts.  YOUR USE OF OR RELIANCE ON SUCH CERTIFICATES AND RECEIPTS IN CONNECTION WITH THE IN-APP PURCHASE API IS AT YOUR SOLE RISK.  APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, RELIABILITY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO SUCH APPLE CERTIFICATES AND RECEIPTS.  You agree that You will only use such receipts and certificates in accordance with the Documentation, and that You will not interfere or tamper with the normal operation of such digital certificates or receipts, including but not limited to any falsification or other misuse.

**7.      Additional Liability Disclaimer**.  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM THE USE OF THE IN-APP PURCHASE API AND ANY SERVICES, INCLUDING, BUT NOT LIMITED TO, (I) ANY LOSS OF PROFIT (WHETHER INCURRED DIRECTLY OR INDIRECTLY), ANY LOSS OF GOODWILL OR BUSINESS REPUTATION, ANY LOSS OF DATA SUFFERED, OR OTHER INTANGIBLE LOSS, (II) ANY CHANGES WHICH APPLE MAY MAKE TO THE IN-APP PURCHASE API OR ANY SERVICES, OR FOR ANY PERMANENT OR TEMPORARY CESSATION IN THE PROVISION OF THE IN-

Program Agreement

APP PURCHASE API OR ANY SERVICES (OR ANY FEATURES WITHIN THE SERVICES) PROVIDED THEREWITH, OR (III) THE DELETION OF, CORRUPTION OF, OR FAILURE TO PROVIDE ANY DATA TRANSMITTED BY OR THROUGH YOUR USE OF THE IN-APP PURCHASE API OR SERVICES.  It is Your responsibility to maintain appropriate alternate backup of all Your information and data, including but not limited to any Non-Consumables that You may provide to Apple for hosting services.

**Attachment 3**
(to the Agreement)
**Additional Terms for the Game Center**

The following terms are in addition to the terms of the Agreement and apply to any use of the Game Center service by You or Your Application.

**1.      Use of the Game Center service**

**1.1**     You and Your Application may not connect to or use the Game Center service in any way not expressly authorized by Apple.  You agree to only use the Game Center service in accordance with this Agreement (including this Attachment 3), the Game Center Documentation and in accordance with all applicable laws.  You understand that neither You nor Your Application will be permitted to access or use the Game Center service after expiration or termination of Your Agreement.

**1.2**     Apple may provide You with a unique identifier which is associated with an end-user's alias as part of the Game Center service (the "Player ID").  You agree to not display the Player ID to the end-user or to any third party, and You agree to only use the Player ID for differentiation of end-users in connection with Your use of the Game Center.  You agree not to reverse look-up, trace, relate, associate, mine, harvest, or otherwise exploit the Player ID, aliases or other data or information provided by the Game Center service, except to the extent expressly permitted herein.  For example, You will not attempt to determine the real identity of an end-user.

**1.3**     You will only use information provided by the Game Center service as necessary for providing services and functionality for Your Applications.  For example, You will not host or export any such information to a third party service.  Further, You agree not to transfer or copy any user information or data (whether individually or in the aggregate) obtained through the Game Center service to a third party except as necessary for providing services and functionality for Your Applications, and then only with express user consent and only if not otherwise prohibited in this Agreement.

**1.4**     You will not attempt to gain (or enable others to gain) unauthorized use or access to the Game Center service (or any part thereof) in any way, including but not limited to obtaining information from the Game Center service using any method not expressly permitted by Apple. For example, You may not use packet sniffers to intercept any communications protocols from systems or networks connected to the Game Center, scrape any data or user information from the Game Center, or use any third party software to collect information through the Game Center about players, game data, accounts, or service usage patterns.

**2.      Additional Restrictions**

**2.1**     You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the Game Center service, or otherwise disrupt other developers' or end-users' use of the Game Center.  You agree that, except for testing and development purposes, You will not create false accounts through the use of the Game Center service or otherwise use the Game Center service to misrepresent information about You or Your Application in a way that would interfere with an end-users' use of the Game Center service, e.g., creating inflated high scores through the use of cheat codes or falsifying the number of user accounts for Your Application.

**2.2**     You will not institute, assist, or enable any disruptions of the Game Center, such as through a denial of service attack, through the use of an automated process or service such as a spider, script, or bot, or through exploiting any bug in the Game Center service or Apple Software. You agree not to probe, test or scan for vulnerabilities in the Game Center service.  You further

agree not to disable, spoof, hack, undermine or otherwise interfere with any data protection, security, verification or authentication mechanisms that are incorporated in or used by the Game Center service, or enable others to do so.

**2.3**      You will not transmit, store or otherwise make available any material that contains viruses or any other computer code, files or programs that may harm, disrupt or limit the normal operation of the Game Center or an iOS Product.

**2.4**      You agree not to use any portion of the Game Center service for sending any unsolicited, improper or inappropriate messages to end-users or for the purpose of poaching, phishing or spamming of Game Center users.  You will not reroute (or attempt to reroute) users of the Game Center to another service using any information You obtain through the use of the Game Center service.

**2.5**      You shall not charge any fees to end-users for access to the Game Center service or for any data or information provided therein.

**2.6**      To the extent that Apple permits You to manage certain Game Center features and functionality for Your Application through App Store Connect (e.g., the ability to block fraudulent users or eliminate suspicious leaderboard scores from Your Application's leaderboard), You agree to use such methods only when You have a reasonable belief that such users or scores are the result of misleading, fraudulent, improper, unlawful or dishonest acts.

**3.**      **Your Acknowledgements.**  You acknowledge and agree that:

**3.1**      Apple may at any time, and from time to time, with or without prior notice to You (a) modify the Game Center service, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the Game Center APIs or related APIs.  You understand that any such modifications may require You to change or update Your Applications at Your own cost.  Apple has no express or implied obligation to provide, or continue to provide, the Game Center service and may suspend or discontinue all or any portion of the Game Center service at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the Game Center service or Game Center APIs.

**3.2**      Apple makes no guarantees to You in relation to the availability or uptime of the Game Center service and is not obligated to provide any maintenance, technical or other support for such service.  Apple reserves the right to remove Your access to the Game Center service at any time in its sole discretion.  Apple may monitor and collect information (including but not limited to technical and diagnostic information) about Your usage of the Game Center service to aid Apple in improving the Game Center and other Apple products or services and to verify Your compliance with this Agreement.

**4.**      **Additional Liability Disclaimer.**  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY INTERRUPTIONS TO THE GAME CENTER OR ANY SYSTEM FAILURES, NETWORK ATTACKS, SCHEDULED OR UNSCHEDULED MAINTENANCE, OR OTHER INTERRUPTIONS.

**Attachment 4**
(to the Agreement)
**Additional Terms for the use of iCloud**

The following terms are in addition to the terms of the Agreement and apply to Your use of the iCloud service for software development and testing in connection with Your Application, or Web Software.

**1.       Use of iCloud**

**1.1**      Your Applications and/or Web Software may access the iCloud service only if You have been assigned an entitlement by Apple.  You agree not to access the iCloud service, or any content, data or information contained therein, other than through the iCloud Storage APIs, CloudKit APIs or via the CloudKit console provided as part of the Program.  You agree not to share Your entitlement with any third party or use it for any purposes not expressly permitted by Apple.  You agree to use the iCloud service, the iCloud Storage APIs, and the CloudKit APIs only as expressly permitted by this Agreement and the iCloud Documentation, and in accordance with all applicable laws and regulations.  Further, Your Web Software is permitted to access and use the iCloud service (e.g., to store the same type of data that is retrieved or updated in a Licensed Application) only so long as Your use of the iCloud service in such Web Software is comparable to Your use in the corresponding Licensed Application, as determined in Apple's sole discretion.  In the event Apple Services permit You to use more than Your allotment of storage containers in iCloud in order to transfer data to another container for any reason, You agree to only use such additional container(s) for a reasonable limited time to perform such functions and not to increase storage and transactional allotments.

**1.2**      You understand that You will not be permitted to access or use the iCloud service for software development or testing after expiration or termination of Your Agreement; however end-users who have Your Applications or Web Software installed and who have a valid end-user account with Apple to use iCloud may continue to access their user-generated documents, private containers and files that You have chosen to store in such end-user's account via the iCloud Storage APIs or the CloudKit APIs in accordance with the applicable iCloud terms and conditions and these terms.  You agree not to interfere with an end-user's ability to access iCloud (or the end-user's own user-generated documents, private containers and files) or to otherwise disrupt their use of iCloud in any way and at any time.  With respect to data You store in public containers through the CloudKit APIs (whether generated by You or the end-user), Apple reserves the right to suspend access to or delete such data, in whole or in part, upon expiration or termination of Your Agreement, or as otherwise specified by Apple in the CloudKit console.

**1.3**      Your Application is permitted to use the iCloud Storage APIs only for the purpose of storage and retrieval of key value data (e.g., a list of stocks in a finance App, settings for an App) for Your Applications and Web Software and for purposes of enabling Your end-users to access user-generated documents and files through the iCloud service.  Your Application or Web Software application is permitted to use the CloudKit APIs for storing, retrieving, and querying of structured data that You choose to store in public or private containers in accordance with the iCloud Documentation.  You agree not to knowingly store any content or materials via the iCloud Storage APIs or CloudKit APIs that would cause Your Application to violate any of the iCloud terms and conditions or the Program Requirements for Your Applications (e.g., Your Application may not store illegal or infringing materials).

**1.4**      You may allow a user to access their user-generated documents and files from iCloud through the use of Your Applications as well as from Web Software.  However, You may not share key value data from Your Application with other Applications or Web Software, unless You are sharing such data among different versions of the same title, or You have user consent.

Program Agreement

**1.5**      You are responsible for any content and materials that You store in iCloud through the use of the CloudKit APIs and iCloud Storage APIs and must take reasonable and appropriate steps to protect information You store through the iCloud service.  With respect to third party claims related to content and materials stored by Your end-users in Your Applications through the use of the iCloud Storage APIs or CloudKit APIs (e.g., user-generated documents, end-user posts in public containers), You agree to be responsible for properly handling and promptly processing any such claims, including but not limited to Your compliance with notices sent pursuant to the Digital Millennium Copyright Act (DMCA).

**1.6**      Unless otherwise expressly permitted by Apple in writing, You will not use iCloud, the iCloud Storage APIs, CloudKit APIs, or any component or function thereof, to create, receive, maintain or transmit any sensitive, individually-identifiable health information, including "protected health information" (as such term is defined at 45 C.F.R § 160.103), or use iCloud in any manner that would make Apple (or any Apple Subsidiary) Your or any third party's "business associate" as such term is defined at 45 C.F.R. § 160.103.  You agree to be solely responsible for complying with any reporting requirements under law or contract arising from Your breach of this Section.

**2.      Additional Requirements**

**2.1**      You understand there are storage capacity, transmission, and transactional limits for the iCloud service, both for You as a developer and for Your end-users.  If You reach or Your end-user reaches such limits, then You or Your end-user may be unable to use the iCloud service until You or Your end-user have removed enough data from the service to meet the capacity limits, increased storage capacity or otherwise modified Your usage of iCloud, and You or Your end-user may be unable to access or retrieve data from iCloud during this time.

**2.2**      You may not charge any fees to users for access to or use of the iCloud service through Your Applications or Web Software, and You agree not to sell access to the iCloud service in any other way, including but not limited to reselling any part of the service.  You will only use the iCloud service in Your Application or Web Software to provide storage for an end-user who has a valid end-user iCloud account with Apple and only for use in accordance with the terms of such user account, except that You may use the CloudKit APIs to store of data in public containers for access by end-users regardless of whether such users have iCloud accounts.  You will not induce any end-user to violate the terms of their applicable iCloud service agreement with Apple or to violate any Apple usage policies for data or information stored in the iCloud service.

**2.3**      You may not excessively use the overall network capacity or bandwidth of the iCloud service or otherwise burden such service with unreasonable data loads or queries.  You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the iCloud, or otherwise disrupt other developers' or users' use of the iCloud service.

**2.4**      You will not disable or interfere with any warnings, system settings, notices, or notifications that are presented to an end-user of the iCloud service by Apple.

**3.      Your Acknowledgements**

You acknowledge and agree that:

**3.1**      Apple may at any time, with or without prior notice to You (a) modify the iCloud Storage APIs or the CloudKit APIs, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish such APIs.  You understand that any such modifications may require You to change or update Your Applications or Web Software at Your own cost. Apple has no express or implied obligation to provide, or continue to provide, the iCloud service and may suspend or discontinue all or any portion of the iCloud service at any time.  Apple shall

not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the iCloud service, iCloud Storage APIs or the CloudKit APIs.

**3.2**     The iCloud service is not available in all languages or in all countries or regions and Apple makes no representation that the iCloud service is appropriate or available for use in any particular location.  To the extent You choose to provide access to the iCloud service in Your Applications or Web Software through the iCloud Storage APIs or CloudKit APIs (e.g., to store data in a public or private container), You do so at Your own initiative and are responsible for compliance with any applicable laws or regulations.

**3.3**     Apple makes no guarantees to You in relation to the availability or uptime of the iCloud service and is not obligated to provide any maintenance, technical or other support for the iCloud service.  Apple is not responsible for any expenditures, investments, or commitments made by You in connection with the iCloud service, or for any use of or access to the iCloud service.

**3.4**     Apple reserves the right to suspend or revoke Your access to the iCloud service or impose limits on Your use of the iCloud service at any time in Apple's sole discretion.  In addition, Apple may impose or adjust the limit of transactions Your Applications or Web Software may send or receive through the iCloud service or the resources or capacity that they may use at any time in Apple's sole discretion.

**3.5**     Apple may monitor and collect information (including but not limited to technical and diagnostic information) about usage of the iCloud service through the iCloud Storage APIs, CloudKit APIs, or CloudKit console, in order to aid Apple in improving the iCloud service and other Apple products or services; provided however that Apple will not access or disclose any end-user data stored in a private container through CloudKit, any Application data stored in a public container through CloudKit, or any user-generated documents, files or key value data stored using the iCloud Storage APIs and iCloud service, unless Apple has a good faith belief that such access, use, preservation or disclosure is reasonably necessary to comply with a legal or regulatory process or request, or unless otherwise requested by an end-user with respect to data stored via the iCloud Storage APIs in that end-user's iCloud account or in that end-user's private container via the CloudKit APIs.

**3.6**     Further, to the extent that You store any personal information relating to an individual or any information from which an individual can be identified (collectively, "Personal Data") in the iCloud service through the use of the iCloud Storage APIs or CloudKit APIs, You agree that Apple (and any applicable Apple Subsidiary for purposes of this Section 3.6) will act as Your agent for the processing, storage and handling of any such Personal Data. Apple agrees to ensure that any persons authorized to process such Personal Data have agreed to maintain confidentiality (whether through terms or under an appropriate statutory obligation). Apple shall have no right, title or interest in such Personal Data solely as a result of Your use of the iCloud service. You agree that You are solely liable and responsible for ensuring Your compliance with all applicable laws, including privacy and data protection laws, regarding the use or collection of data and information through the iCloud service. You are also responsible for all activity related to such Personal Data, including but not limited to, monitoring such data and activity, preventing and addressing inappropriate data and activity, and removing and terminating access to data. Further, You are responsible for safeguarding and limiting access to such Personal Data by Your personnel and for the actions of Your personnel who are permitted access to use the iCloud service on Your behalf. Personal Data provided by You and Your users to Apple through the iCloud service may be used by Apple only as necessary to provide and improve the iCloud service and to perform the following actions on Your behalf.  Apple shall:

(a) use and handle such Personal Data only in accordance with the instructions and permissions from You set forth herein, as well as applicable laws, regulations, accords, or treaties. In the EEA

and Switzerland, Personal Data will be handled by Apple only in accordance with the instructions and permissions from You set forth herein unless otherwise required by European Union or Member State Law, in which case Apple will notify You of such other legal requirement (except in limited cases where Apple is prohibited by law from doing so);

(b) provide You with reasonable means to manage any user access, deletion, or restriction requests as defined in applicable law. In the event of an investigation of You arising from Your good faith use of the iCloud service by a data protection regulator or similar authority regarding such Personal Data, Apple shall provide You with reasonable assistance and support;

(c) notify You by any reasonable means Apple selects, without undue delay and taking account of applicable legal requirements applying to You which mandate notification within a specific timeframe, if Apple becomes aware that Your Personal Data has been altered, deleted or lost as a result of any unauthorized access to the Service. You are responsible for providing Apple with Your updated contact information for such notification purposes in accordance with the terms of this Agreement;

(d) make available to You the information necessary to demonstrate compliance obligations set forth in Article 28 of Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 (GDPR) and to allow for and contribute to audits required under these provisions; provided however that You agree that Apple's ISO 27001 and 27018 certifications shall be considered sufficient for such required audit purposes;

(e) assist You, by any reasonable means Apple selects, in ensuring compliance with its obligations pursuant to Articles 33 to 36 of the GDPR. If Apple receives a third party request for information You have stored in the iCloud service, then unless otherwise required by law or the terms of such request, Apple will notify You of its receipt of the request and notify the requester of the requirement to address such request to You. Unless otherwise required by law or the request, You will be responsible for responding to the request;

(f) use industry-standard measures to safeguard Personal Data during the transfer, processing and storage of Personal Data. Encrypted Personal Data may be stored at Apple's geographic discretion; and

(g) ensure that where Personal Data, arising in the context of this Agreement, is transferred from the EEA or Switzerland it is only to a third country that ensures an adequate level of protection or using the Model Contract Clauses/Swiss Transborder Data Flow Agreement which will be provided to You upon request if you believe that Personal Data is being transferred.

**4.      Additional Liability Disclaimer.**  NEITHER APPLE NOR ITS SERVICE PROVIDERS SHALL BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION OR TERMINATION OF iCLOUD, iCLOUD STORAGE APIS, OR CLOUDKIT APIS, OR FOR ANY UNAUTHORIZED ACCESS TO, ALTERATION OF, OR DELETION, DESTRUCTION, DAMAGE, LOSS OR FAILURE TO STORE ANY OF YOUR DATA OR ANY END-USER DATA OR ANY CLAIMS ARISING FROM ANY USE OF THE FOREGOING BY YOUR END-USERS, INCLUDING ANY CLAIMS REGARDING DATA PROCESSING OR INAPPROPRIATE OR UNAUTHORIZED DATA STORAGE OR HANDLING BY YOU IN VIOLATION OF THIS AGREEMENT.

**Attachment 5**
(to the Agreement)
**Additional Terms for Passes**

The following terms are in addition to the terms of the Agreement and apply to Your development and distribution of Passes:

**1.       Pass Type ID Usage and Restrictions**

You may use the Pass Type ID only for purposes of digitally signing Your Pass for use with Wallet and/or for purposes of using the APN service with Your Pass.  You may distribute Your Pass Type ID as incorporated into Your Pass in accordance with **Section 2** below only so long as such distribution is under Your own trademark or brand.  To the extent that You reference a third party's trademark or brand within Your Pass (e.g., a store coupon for a particular good), You represent and warrant that You have any necessary rights.  You agree not to share, provide or transfer Your Pass Type ID to any third party (except for a Service Provider and only to the limited extent permitted herein), nor use Your Pass Type ID to sign a third party's pass.

**2.       Pass Distribution; Marketing Permissions**

**2.1**      Subject to the terms of this Agreement, You may distribute Your Passes to end-users by the web, email, or an Application.  You understand that Passes must be accepted by such users before they will be loaded into Wallet and that Passes can be removed or transferred by such users at any time.

**2.2**      By distributing Your Passes in this manner, You represent and warrant to Apple that Your Passes comply with the Documentation and Program Requirements then in effect and the terms of this Attachment 5.  Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of distributing Your Passes in this manner.

**2.3**      You agree to state on the Pass Your name and address, and the contact information (telephone number; email address) to which any end-user questions, complaints, or claims with respect to Your Pass should be directed.  You will be responsible for attaching or otherwise including, at Your discretion, any relevant end-user usage terms with Your Pass.  Apple will not be responsible for any violations of Your end-user usage terms.  You will be solely responsible for all user assistance, warranty and support of Your Pass.  You may not charge any fees to end-users in order to use Wallet to access Your Pass.

**2.4**      By distributing Your Passes as permitted in this Agreement, You hereby permit Apple to use (i) screenshots of Your Pass; (ii) trademarks and logos associated with Your Pass; and (iii) Pass Information, for promotional purposes in marketing materials and gift cards, excluding those portions which You do not have the right to use for promotional purposes and which You identify in writing to Apple.  You also permit Apple to use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and gift cards.

**3.       Additional Pass Requirements**

**3.1**      Apple may provide You with templates to use in creating Your Passes, and You agree to choose the relevant template for Your applicable use (e.g., You will not use the boarding pass template for a movie ticket).

**3.2**      Passes may only operate and be displayed in Wallet, which is Apple's designated container area for the Pass, through Wallet on the lock screen of a compatible Apple-branded product in accordance with the Documentation.

**3.3.**      Notwithstanding anything else in **Section 3.3.9** of the Agreement, with prior user consent, You and Your Pass may share user and/or device data with Your Application so long as such sharing is for the purpose of providing a service or function that is directly relevant to the use of the Pass and/or Application, or to serve advertising in accordance with **Sections 3.3.12** of the Agreement.

**3.4**      If You would like to use embedded Near Field Communication (NFC) technology with Your Pass, then You may request an Apple Certificate for the use of NFC with a Pass from the Developer web portal.  Apple will review Your request and may provide You with a separate agreement for the use of such Apple Certificate.  Apple reserves the right to not provide You with such Apple Certificate.

**4.**      **Apple's Right to Review Your Pass; Revocation.**  You understand and agree that Apple reserves the right to review and approve or reject any Pass that You would like to distribute for use by Your end-users, or that is already in use by Your end-users, at any time during the Term of this Agreement.  If requested by Apple, You agree to promptly provide such Pass to Apple.  You agree not to attempt to hide, misrepresent, mislead, or obscure any features, content, services or functionality in Your Pass from Apple's review or otherwise hinder Apple from being able to fully review such Pass, and, You agree to cooperate with Apple and answer questions and provide information and materials reasonably requested by Apple regarding such Pass.  If You make any changes to Your Pass after submission to Apple, You agree to notify Apple and, if requested by Apple, resubmit Your Pass prior to any distribution of the modified Pass to Your end-users.  Apple reserves the right to revoke Your Pass Type ID and reject Your Pass for distribution to Your end-users for any reason and at any time in its sole discretion, even if Your Pass meets the Documentation and Program Requirements and terms of this Attachment 5; and, in that event, You agree that You may not distribute such Pass to Your end-users.

**5.**      **Additional Liability Disclaimer.**  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, DISTRIBUTION, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION, OR TERMINATION OF WALLET, YOUR PASS TYPE ID, YOUR PASSES, OR ANY SERVICES PROVIDED IN CONNECTION THEREWITH, INCLUDING BUT NOT LIMITED TO ANY LOSS OR FAILURE TO DISPLAY YOUR PASS IN WALLET OR ANY END-USER CLAIMS ARISING FROM ANY USE OF THE FOREGOING BY YOUR END-USERS.

**Attachment 6**
(to the Agreement)
**Additional Terms for the use of the Apple Maps Service**

The following terms are in addition to the terms of the Agreement and apply to any use of the Apple Maps Service in Your Application, website, or web application.

**1.        Use of the Maps Service**

**1.1**        Your Application may access the Apple Maps Service only via the MapKit API, Apple Maps Server API or through MapKit JS, and Your website or web application may access the Apple Maps Service only via MapKit JS or Apple Maps Server API. You agree not to access the Apple Maps Service or the Map Data other than through the MapKit API, Apple Maps Server API or MapKit JS, as applicable, and You agree that Your use of the Apple Maps Service in Your Applications, websites, or web applications must comply with the Program Requirements.

**1.2**        You will use the Apple Maps Service and Map Data only as necessary for providing services and functionality for Your Application, website, or web application.  You agree to use the Apple Maps Service, MapKit API, Apple Maps Server API, and MapKit JS only as expressly permitted by this Agreement (including but not limited to this Attachment 6) and the MapKit, Apple Maps Server API, and MapKit JS Documentation, and in accordance with all applicable laws and regulations.  MapKit JS may not be used in Your website and/or application running on non-Apple hardware for the following commercial purposes: fleet management (including dispatch), asset tracking, enterprise route optimization, or where the primary purpose of such website and/or application is to assess vehicle insurance risk.

**1.3**        You acknowledge and agree that results You receive from the Apple Maps Service may vary from actual conditions due to variable factors that can affect the accuracy of the Map Data, such as weather, road and traffic conditions, and geopolitical events.

**2.        Additional Restrictions**

**2.1**        Neither You nor Your Application, website or web application may remove, obscure or alter Apple's or its licensors' copyright notices, trademarks, logos, or any other proprietary rights or legal notices, documents or hyperlinks that may appear in or be provided through the Apple Maps Service.

**2.2**        You will not use the Apple Maps Service in any manner that enables or permits bulk downloads or feeds of the Map Data, or any portion thereof, or that in any way attempts to extract, scrape or reutilize any portions of the Map Data.  For example, neither You nor Your Application may use or make available the Map Data, or any portion thereof, as part of any secondary or derived database.

**2.3**        Except to the extent expressly permitted herein, You agree not to copy, modify, translate, create a derivative work of, publish or publicly display the Map Data in any way.  Further, You may not use or compare the data provided by the Apple Maps Service for the purpose of improving or creating another mapping service.  You agree not to create or attempt to create a substitute or similar service through use of or access to the Apple Maps Service.

**2.4**        Your Application, website, or web application may display the Map Data only as permitted herein, and when displaying it on a map, You agree that it will be displayed only on an Apple map provided through the Apple Maps Service.  Further, You may not surface Map Data within Your Application, website, or web application without displaying the corresponding Apple map (e.g., if You surface an address result through the Apple Maps Service, You must display the corresponding map with the address result).

**2.5**     Unless otherwise expressly permitted in writing by Apple, Map Data may not be cached, pre-fetched, or stored by You or Your Application, website, or web application other than on a temporary and limited basis solely as necessary (a) for Your use of the Apple Maps Service as permitted herein or in the MapKit or MapKit JS Documentation, and/or (b) to improve the performance of the Apple Maps Service with Your Application, website, or web application, after which, in all cases, You must delete any such Map Data.

**2.6**     You may not charge any fees to end-users solely for access to or use of the Apple Maps Service through Your Application, website, or web application, and You agree not to sell access to the Apple Maps Service in any other way.

**2.7**     You acknowledge and agree that Apple may impose restrictions on Your usage of the Apple Maps Service (e.g., limiting the number of transactions Your Application can make through the MapKit API or Apple Maps Server API) or may revoke or remove Your access to the Apple Maps Service (or any part thereof) at any time in its sole discretion.  Further, You acknowledge and agree that results You may receive from the Apple Maps Service may vary from actual conditions due to variable factors that can affect the accuracy of Map Data, such as road or weather conditions.

**3.**      **Your Acknowledgements.**  You acknowledge and agree that:

**3.1**     Apple may at any time, with or without prior notice to You (a) modify the Apple Maps Service and/or the MapKit API, Apple Maps Server API or MapKit JS, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the MapKit API, Apple Maps Server API or MapKit JS.  You understand that any such modifications may require You to change or update Your Applications, website, or web applications at Your own cost.  Apple has no express or implied obligation to provide, or continue to provide, the Apple Maps Service and may suspend or discontinue all or any portion of the Apple Maps Service at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the Apple Maps Service, MapKit API, Apple Maps Server API or MapKit JS.

**3.2**     The Apple Maps Service may not be available in all countries, regions, or languages, and Apple makes no representation that the Apple Maps Service is appropriate or available for use in any particular location.  To the extent You choose to provide access to the Apple Maps Service in Your Applications, website, or web applications or through the MapKit API, Apple Maps Server API or MapKit JS, You do so at Your own initiative and are responsible for compliance with any applicable laws.

**4.**      **Apple's Right to Review Your MapKit and/or MapKit JS Implementation.**  You understand and agree that Apple reserves the right to review and approve or reject Your implementation of MapKit or MapKit JS in Your Application, website, or web applications, at any time during the Term of this Agreement.  If requested by Apple, You agree to promptly provide information regarding Your implementation of MapKit and/or MapKit JS to Apple.  You agree to cooperate with Apple and answer questions and provide information and materials reasonably requested by Apple regarding such implementation. Apple reserves the right to revoke Your access to MapKit and/or MapKit JS keys and similar credentials at any time in its sole discretion, even if Your use of MapKit and/or MapKit JS meets the Documentation and Program Requirements and terms of this Attachment.  By way of example only, Apple may do so if Your MapKit and/or MapKit JS implementation places an excessive and undue burden on the Apple Maps Service, obscures or removes the Apple Maps logo or embedded links when displaying a map, or uses the Apple Maps Service with corresponding offensive or illegal map content.

**5.**      **Additional Liability Disclaimer.**  NEITHER APPLE NOR ITS LICENSORS OR
SERVICE PROVIDERS SHALL BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM
ANY USE, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION OR
TERMINATION OF THE APPLE MAPS SERVICE, INCLUDING ANY INTERRUPTIONS DUE TO
SYSTEM FAILURES, NETWORK ATTACKS, OR SCHEDULED OR UNSCHEDULED
MAINTENANCE.

**Attachment 7**
(to the Agreement)
**Additional Terms for Safari Extensions**

The following terms are in addition to the terms of the Agreement and apply to Safari Extensions signed with an Apple Certificate:

**1.1     Safari Extension Requirements**
If You would like to distribute Your Safari Extension signed with an Apple Certificate, then You agree to abide by the following requirements for such Safari Extensions, as they may be modified by Apple from time to time:

-  Your Safari Extension must not contain any malware, malicious or harmful code, or other internal component (e.g. computer viruses, trojan horses, "backdoors"), which could damage, destroy, or adversely affect Apple hardware, software or services, or other third party software, firmware, hardware, data, systems, services, or networks;

-  Your Safari Extensions must not be designed or marketed for the purpose of harassing, abusing, stalking, spamming, misleading, defrauding, threatening or otherwise violating the legal rights (such as the rights of privacy and publicity) of others.  Further, You may not create a Safari Extension that tracks the behavior of a user (e.g., their browsing sites) without their express consent;

-  Your Safari Extension must only operate in the designated container area for the Safari Extension, and must not disable, override or otherwise interfere with any Apple-implemented system alerts, warnings, display panels, consent panels and the like;

-  Your Safari Extension must have a single purpose and updates must not change the single purpose of Your Safari Extension.  You agree to accurately represent the features and functionality of Your Safari Extension to the user and to act in accordance with such representations.  For example, You must not redirect user searches to a different search provider than the one previously selected by the user in Safari without their express consent.  In addition, Your Safari Extension may not redirect a link (or any affiliate link) on a website unless that behavior is disclosed to the user.  You agree not to conceal the features or functionality of Your Safari Extension (e.g., containing obfuscated code);

-  Your Safari Extension must not be bundled with an app that has a different purpose than the Safari Extension.  Your Safari Extension must not inject ads into a website and may not display pop up ads.  You must not script or automate turning on Your Safari Extension or enable others to do so; and

-  Safari Extensions must not interfere with security, user interface, user experience, features or functionality of Safari, macOS, iOS, or other Apple-branded products.

**1.2     Compliance; Certificates.**  Your Safari Extensions must comply with the Documentation and all applicable laws and regulations, including those in any jurisdictions in which such Safari Extensions may be offered or made available.  You understand that Apple may revoke the Apple Certificates used to sign Your Safari Extensions at any time, in its sole discretion.  Further, You acknowledge and agree that Apple may block Your Safari Extension (such that it may be unavailable or inaccessible to Safari users) if it does not comply with the requirements set forth above in this **Section 1.1** or otherwise adversely affects users of Safari or Apple-branded products.

**Attachment 8**
**(to the Agreement)**
**Additional Terms for use of the WeatherKit APIs**

The following terms are in addition to the terms of the Agreement and apply to any use of Apple Weather Data and the WeatherKit APIs in Your Application or Corresponding Product. For purposes of this Attachment, the definition of "Corresponding Products" does not require a Licensed Application.

**1.      Use of Apple Weather Data and WeatherKit APIs**

**1.1**      You agree that Your use of Apple Weather Data and WeatherKit APIs must comply with the Program Requirements.

**1.2**      You may not charge any fees to end-users for access to or use of the Apple Weather Data presented in its original form through Your Application or Corresponding Product; provided, however, You may charge fees to end-users for Value-Added Services or Products – i.e., data, products, and/or services, including but not limited to, Your Applications or Corresponding Products, that You develop that are derived from Apple Weather Data, and are transformed so that it is not possible for any end user or other third party to discover, access, reverse engineer, or otherwise ascertain or use Apple Weather Data in the form originally supplied by Apple (whether in whole or in part). You may not grant sublicensing rights to the WeatherKit APIs or Apple Weather Data in their original form. You may use Apple Weather Data for internal purposes or to create, make or display Value-Added Services or Products to Your end-users. Your end user license terms must not permit end-users or any other third parties to reverse engineer the WeatherKit APIs or Apple Weather Data for any purpose.

**1.3**      Applications or Corresponding Products that use the WeatherKit APIs may not be designed or marketed for emergency or life-saving purposes.

**1.4**      Your Application or Corresponding Product may access the Apple Weather Data only through the WeatherKit APIs.  You agree that Your display of the Apple Weather Data must comply with all applicable attribution requirements and any other specifications provided in the Program Requirements. You may not modify, change, alter, or obscure Weather Alerts in any way.

**1.5**      You may not use the WeatherKit APIs in any manner that enables or permits bulk downloads or feeds of the Apple Weather Data, or any portion thereof, or that in any way attempts to extract or scrape any portions of the Apple Weather Data.  For example, neither You, Your Applications, nor Your Corresponding Products may use or make available the Apple Weather Data, or any portion thereof, as part of any secondary or derived database.

**1.6**      Unless otherwise expressly permitted in the Documentation, Apple Weather Data may not be cached, pre-fetched, or stored by You, Your Application, or Your Corresponding Product other than on a temporary and limited basis solely to improve the performance of the WeatherKit APIs with Your Application or Corresponding Product.

**2.      Your Acknowledgements**

You acknowledge and agree that:

**2.1**      The WeatherKit APIs may not be available in all countries or languages, and Apple makes no representation that the WeatherKit APIs are appropriate or available for use in any particular location. To the extent You choose to provide access to the Apple Weather Data in Your Application or Corresponding Product through the WeatherKit APIs, You do so at Your own

initiative and are responsible for compliance with any applicable laws. Your use of the WeatherKit APIs is at Your sole risk and You assume all liability arising from Your use of the WeatherKit APIs in any part of the world, including the display of Apple Weather Data in disputed territories.

**2.2**      For Applications or Corresponding Products that use the WeatherKit APIs for real-time weather guidance, You must have an end-user license agreement that includes the following notice: YOUR USE OF THIS REAL TIME WEATHER GUIDANCE APPLICATION OR WEBSITE IS AT YOUR SOLE RISK. WEATHER DATA MAY NOT BE ACCURATE. Apple Weather Data may vary from actual conditions due to variable factors, such as signal issues and geopolitical events, that can affect the accuracy of Apple Weather Data.

**3.**      **Compliance**

**3.1**      If requested by Apple, You agree to promptly provide information regarding Your implementation of the WeatherKit APIs to Apple, as needed to determine Your compliance with these requirements.

**3.2**      While in no way limiting Apple's other rights under this Agreement, Apple reserves the right to take action if in its sole discretion, Apple determines or has reason to believe You have violated a term of this Agreement. These actions may include limiting, suspending, or revoking Your access to Apple Weather Data and WeatherKit APIs.

**4.**      **Additional Liability Disclaimer.**  NEITHER APPLE NOR ITS LICENSORS OR SERVICE PROVIDERS SHALL BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION OR TERMINATION OF THE WEATHERKIT APIS, INCLUDING ANY INTERRUPTIONS DUE TO SYSTEM FAILURES, NETWORK ATTACKS, OR SCHEDULED OR UNSCHEDULED MAINTENANCE.

**5.**      **Indemnification.**  Without limiting Apple's other rights under this Agreement, You agree to indemnify and hold harmless an Apple Indemnified Party from any and all Losses incurred by an Apple Indemnified Party arising from or related to any claim that Your use of the WeatherKit APIs does not comply with local mapping laws or other applicable laws.

**Attachment 9**
(to the Agreement)
**Additional Terms for Subscriptions Purchased Through the Apple Developer App**

Through the Apple Developer app, You may be able to pay for Program fees, and, as a Program member, purchase and use other subscriptions.  For this Attachment 9 only, "Apple" means:

-   Apple Inc., located at One Apple Park Way, Cupertino, California, if You are located in the United States, including Puerto Rico;
-   Apple Canada Inc., located at 120 Bremner Blvd., Suite 1600, Toronto ON M5J 0A8, Canada if You are located in Canada;
-   Apple Services LATAM LLC, located at 1 Alhambra Plaza, Ste 700 Coral Gables, Florida, if You are located in Mexico, Central or South America, or any Caribbean country or territory (excluding Puerto Rico);
-   iTunes K.K., located at Roppongi Hills, 6-10-1 Roppongi, Minato-ku, Tokyo 106-6140, Tokyo if You are located in Japan;
-   Apple Pty Limited, located at Level 3, 20 Martin Place, Sydney NSW 2000, Australia, if You are located in Australia or New Zealand, including in any of their territories or affiliated jurisdictions; and
-   Apple Distribution International Ltd., located at Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, if You are located anywhere else.

Subscriptions automatically renew until cancelled in Your account holder's account settings.  Charges occur no more than twenty-four (24) hours prior to the renewal date.  To learn more about cancelling subscriptions, visit https://support.apple.com/HT202039.

Apple will charge Your account holder's selected payment method for any subscription, including any taxes. If Your account holder has also added it to their Apple Wallet, Apple may charge their selected payment method in Apple Wallet using Apple Pay. Your account holder can associate multiple payment methods with their Apple ID, and You agree Apple may store and charge them. The primary payment method appears at the top of the account settings payments page.

If the primary payment method cannot be charged for any reason, You authorize Apple to attempt to charge Your account holder's other eligible payment methods from top to bottom as they appear on the account settings payments page.  If Apple cannot charge Your account holder, You remain responsible for any uncollected amounts, and Apple may attempt to charge again or request another payment method.  This may change the date on which billing occurs. As permitted by law, Apple may automatically update payment information if it is provided by the payment networks or financial institutions.

Program membership includes up to 500,000 WeatherKit API calls per month.  If You purchase a subscription for WeatherKit API calls, for the duration of the subscription it will replace the WeatherKit API calls included with Program membership.

Through December 31, 2023, Program members are also eligible to use up to twenty-five (25) Xcode Cloud compute hours per month.  If You purchase a subscription for Xcode Cloud compute hours, for the duration of the subscription it will replace the Xcode Cloud compute hours per month that You are eligible to use though December 31, 2023.  Apple reserves the right to onboard You to Xcode Cloud, or to provide You the opportunity to purchase a subscription to Xcode Cloud compute hours, as capacity permits.  If You cancel and opt out of using Xcode Cloud immediately, Your account holder can contact Apple Support to request a refund.

Subscription upgrades take effect immediately and a refund will be provided based on the time remaining in the month for the original subscription.  Downgrades or cancellations of a subscription take effect at the next billing date.  Apple reserves the right to calculate or deny requests for refunds based on usage of WeatherKit API calls or Xcode Cloud compute hours.

# Schedule 1

**1.      Appointment of Agent**

**1.1**      You hereby appoint Apple and Apple Subsidiaries (collectively "Apple") as: (i) Your agent for the marketing and delivery of the Licensed Applications to end-users located in those regions listed on Exhibit A, Section 1 to this Schedule 1, subject to change; and (ii) Your commissionaire for the marketing and delivery of the Licensed Applications to end-users located in those regions listed on Exhibit A, Section 2 to this Schedule 1, subject to change, during the Delivery Period. The most current list of App Store regions among which You may select shall be set forth in the App Store Connect tool and the Custom App Distribution Site and may be updated by Apple from time to time.  You hereby acknowledge that Apple will market and make the Licensed Applications available for download by end-users, through one or more App Stores or the Custom App Distribution Site, for You and on Your behalf. For purposes of this Schedule 1, the following terms apply:

"Custom App" or "Custom Application" means a Licensed Application custom developed by You for use by specific organizations or third-party business customers, including proprietary Licensed Applications developed for Your organization's internal use.

(a) "You" shall include App Store Connect users authorized by You to submit Licensed Applications and associated metadata on Your behalf; and

(b) "end-user" includes individual purchasers as well as eligible users associated with their account via Family Sharing or Legacy Contacts.  For institutional customers, "end-user" shall mean the individual authorized to use the Licensed Application, the institutional administrator responsible for management of installations on shared devices, as well as authorized institutional purchasers themselves, including educational institutions approved by Apple, which may acquire the Licensed Applications for use by their employees, agents, and affiliates.

(c) For the purposes of this Schedule 1, the term "Licensed Application" shall include any content, functionality, extensions, stickers, or services offered in the software application.

"Volume Content Service" means an Apple service that offers the ability to obtain Custom Applications and make purchases of Licensed Applications in bulk subject to the Volume Content Terms, conditions, and requirements.

**1.2**      In furtherance of Apple's appointment under Section 1.1 of this Schedule 1, You hereby authorize and instruct Apple to:

(a) market, solicit and obtain orders on Your behalf for Licensed Applications from end-users located in the regions identified by You in the App Store Connect tool;

(b) provide hosting services to You subject to the terms of the Agreement, in order to allow for the storage of, and end-user access to, the Licensed Applications and to enable third party hosting of such Licensed Applications solely as otherwise licensed or authorized by Apple;

(c) make copies of, format, and otherwise prepare Licensed Applications for acquisition and download by end-users, including adding the Security Solution and other optimizations identified in the Agreement;

(d) allow or, in the case of cross-border assignments of certain purchases, arrange for end-users to access and re-access copies of the Licensed Applications, so that end-users may acquire from You and electronically download those Licensed Applications, Licensed Application Information, and associated metadata through one or more App Stores or the Custom App Distribution Site. In

addition, You hereby authorize distribution of Your Licensed Applications under this Schedule 1 for use by: (i) end-users with accounts associated with another end-user's account via Family Sharing; (ii) eligible Legacy Contacts of an end-user to access Your Licensed Application along with associated information and metadata stored in iCloud as described in https://support.apple.com/kb/HT212360; (iii) multiple end users under a single Apple ID when the Licensed Application is provided to such end-users through Apple Configurator in accordance with the Apple Configurator software license agreement; and (iv) a single institutional customer via Custom App Distribution for use by its end-users and/or for installation on devices with no associated Apple IDs that are owned or controlled by that institutional customer in accordance with the Volume Content Terms, conditions, and program requirements;

(e) use (i) screenshots, previews, and/or up to 30 second excerpts of the Licensed Applications; (ii) trademarks and logos associated with the Licensed Applications; and (iii) Licensed Application Information, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays, excluding those portions of the Licensed Applications, trademarks or logos, or Licensed Application Information which You do not have the right to use for promotional purposes, and which You identify in writing at the time that the Licensed Applications are delivered by You to Apple under Section 2.1 of this Schedule 1, and use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays. In addition, and subject to the limitation set forth above, You agree that Apple may use screenshots, icons, and up to 30 second excerpts of Your Licensed Applications for use at Apple Developer events (e.g., WWDC, Tech Talks) and in developer documentation;

(f) otherwise use Licensed Applications, Licensed Application Information and associated metadata as may be reasonably necessary in the marketing and delivery of the Licensed Applications in accordance with this Schedule 1. You agree that no royalty or other compensation is payable for the rights described above in Section 1.2 of this Schedule 1; and

(g) facilitate distribution of pre-release versions of Your Licensed Applications ("Beta Testing") to end-users designated by You in accordance with the Agreement, availability, and other program requirements as updated from time to time in the App Store Connect tool.  For the purposes of such Beta Testing, You hereby waive any right to collect any purchase price, proceeds or other remuneration for the distribution and download of such pre-release versions of Your Licensed Application.  You further agree that You shall remain responsible for the payment of any royalties or other payments to third parties relating to the distribution and user of Your pre-release Licensed Applications, as well as compliance with any and all laws for territories in which such Beta Testing takes place.  For the sake of clarity, no commission shall be owed to Apple with respect to such distribution.

1.3      The parties acknowledge and agree that their relationship under this Schedule 1 is, and shall be, that of principal and agent, or principal and commissionaire, as the case may be, as described in Exhibit A, Section 1 and Exhibit A, Section 2 respectively, and that You, as principal, are, and shall be, solely responsible for any and all claims and liabilities involving or relating to, the Licensed Applications, as provided in this Schedule 1.  The parties acknowledge and agree that Your appointment of Apple as Your agent or commissionaire, as the case may be, under this Schedule 1 is non-exclusive.  You hereby represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent and/or commissionaire for the delivery of Your Licensed Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party.

1.4      For purposes of this Schedule 1, the "Delivery Period" shall mean the period beginning on the Effective Date of the Agreement, and expiring on the last day of the Agreement or any renewal thereof; provided, however, that Apple's appointment as Your agent shall survive expiration of the Agreement for a reasonable phase-out period not to exceed thirty (30) days and

further provided that, solely with respect to Your end-users, subsections 1.2(b), (c), and (d) of this Schedule 1 shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 4.1 and 6.2 of this Schedule 1.

**1.5**     All of the Licensed Applications delivered by You to Apple under Section 2.1 of this Schedule 1 shall be made available by Apple for download by end-users at no charge.  Apple shall have no duty to collect any fees for the Licensed Applications for any end-user and shall have no payment obligation to You with respect to any of those Licensed Applications under this Schedule 1.  In the event that You intend to charge end-users a fee for any Licensed Application or In-App Purchase, You must enter (or have previously entered) into a separate extension of this agreement (Schedule 2) with Apple with respect to that Licensed Application.  In the event that You intend to charge end-users a fee for any Custom Apps, You must enter (or have previously entered) into a separate extension of this agreement (Schedule 3) with Apple with respect to that Custom App.

**2.**     **Delivery of the Licensed Applications to Apple**

**2.1**     You will deliver to Apple, at Your sole expense, using the App Store Connect tool or other mechanism provided by Apple, the Licensed Applications, Licensed Application Information and associated metadata, in a format and manner prescribed by Apple, as required for the delivery of the Licensed Applications to end-users in accordance with this Schedule 1.  Metadata You deliver to Apple under this Schedule 1 will include:  (i) the title and version number of each of the Licensed Applications; (ii) the regions You designate, in which You wish Apple to allow end-users to download those Licensed Applications; (iii) the end-users You designate as authorized downloaders of the Custom App; (iv) any copyright or other intellectual property rights notices; (v) Your privacy policy; (vi) Your end-user license agreement ("EULA"), if any, in accordance with Section 3.2 of this Schedule 1; and (vii) any additional metadata set forth in the Documentation and/or the App Store Connect Tool as may be updated from time to time, including metadata designed to enhance search and discovery for content on Apple-branded hardware.

**2.2**     All Licensed Applications will be delivered by You to Apple using software tools, a secure FTP site address and/or such other delivery methods as prescribed by Apple.

**2.3**     You hereby certify that all of the Licensed Applications You deliver to Apple under this Schedule 1 are authorized for export from the United States to each of the regions designated by You under Section 2.1 hereof, in accordance with the requirements of all applicable laws, including but not limited to the United States Export Administration Regulations, 15 C.F.R. Parts 730-774. You further represent and warrant that all versions of the Licensed Applications You deliver to Apple are not subject to the International Traffic in Arms Regulations 22 C.F.R. Parts 120-130 and are not designed, made, modified or configured for any military end users or end uses as defined and scoped in 15 C.F.R § 744.  Without limiting the generality of this Section 2.3, You certify that (i) none of the Licensed Applications contains, uses or supports any data encryption or cryptographic functions; or (ii) in the event that any Licensed Application contains, uses or supports any such data encryption or cryptographic functionality, You certify that You have complied with the United States Export Administration Regulations, and are in possession of, and will, upon request, provide Apple with PDF copies of export classification ruling (CCATS) issued by the United States Commerce Department, Bureau of Industry and Security ("BIS") or any self-classification reports submitted to the BIS, and appropriate authorizations from other regions that mandate import authorizations for that Licensed Application, as required. You acknowledge that Apple is relying upon Your certification in this Section 2.3 in allowing end-users to access and download the Licensed Applications under this Schedule 1.  Except as provided in this Section 2.3, Apple will be responsible for compliance with the requirements of the Export Administration Regulations in allowing end-users to access and download the Licensed Applications under this Schedule 1.

**2.4**     You shall be responsible for determining and implementing any age ratings or parental

advisory warnings required by the applicable government regulations, ratings board(s), service(s), or other organizations (each a "Ratings Board") for any video, television, gaming or other content offered in Your Licensed Application for each locality in the Territory.  Where applicable, you shall also be responsible for providing any content restriction tools or age verification functionality before enabling end-users to access mature or otherwise regulated content within Your Licensed Application.

**3.      Ownership and End-User Licensing and Delivery of the Licensed Applications to End Users**

**3.1**      You acknowledge and agree that Apple, in the course of acting as agent and/or commissionaire for You, is hosting, or pursuant to Section 1.2(b) of this Schedule 1 may enable authorized third parties to host, the Licensed Application(s), and is allowing the download of those Licensed Application(s) by end-users, on Your behalf. However, You are responsible for hosting and delivering content or services sold or delivered by You using the In-App Purchase API, except for content that is included within the Licensed Application itself (i.e., the In-App Purchase simply unlocks the content) or content hosted by Apple pursuant to Section 3.3 of Attachment 2 of the Agreement. The parties acknowledge and agree that Apple shall not acquire any ownership interest in or to any of the Licensed Applications or Licensed Applications Information, and title, risk of loss, responsibility for, and control over the Licensed Applications shall, at all times, remain with You.  Apple may not use any of the Licensed Applications or Licensed Application Information for any purpose, or in any manner, except as specifically authorized in the Agreement or this Schedule 1.

**3.2**      You may deliver to Apple Your own EULA for any Licensed Application at the time that You deliver that Licensed Application to Apple, in accordance with Section 2.1 of this Schedule 1; provided, however, that Your EULA must include and may not be inconsistent with the minimum terms and conditions specified on Exhibit B to this Schedule 1 and must comply with all applicable laws in all regions where You wish Apple to allow end-users to download that Licensed Application.  Apple shall enable each end-user to review Your EULA (if any) at the time that Apple delivers that Licensed Application to that end-user, and Apple shall notify each end-user that the end-user's use of that Licensed Application is subject to the terms and conditions of Your EULA (if any).  In the event that You do not furnish Your own EULA for any Licensed Application to Apple, You acknowledge and agree that each end-user's use of that Licensed Application shall be subject to Apple's standard EULA (which is part of the App Store Terms of Service).

**3.3**      You hereby acknowledge that the EULA for each of the Licensed Applications is solely between You and the end-user and conforms to applicable law, and Apple shall not be responsible for, and shall not have any liability whatsoever under, any EULA or any breach by You or any end-user of any of the terms and conditions of any EULA.

**3.4**      A Licensed Application may read or play content (magazines, newspapers, books, audio, music, video) that is offered outside of the Licensed Application (such as, by way of example, through Your website) provided that You do not link to or market external offers for such content within the Licensed Application.  You are responsible for authentication access to content acquired outside of the Licensed Application.

**3.5**      To the extent You promote and offer in-app subscriptions, You must do so in compliance with all legal and regulatory requirements.

**3.6**      If Your Licensed Application is periodical content-based (e.g., magazines and newspapers), Apple may provide You with the name, email address, and zip code associated with an end-user's account when they request an auto-renewing subscription via the In-App Purchase API, provided that such user consents to the provision of data to You, and further provided that You may only use such data to promote Your own products and do so in strict compliance with Your publicly posted Privacy Policy, a copy of which must be readily viewed and

Program Agreement

is consented to in Your Licensed Application.

**4.      Content Restrictions and Software Rating**

**4.1**      You represent and warrant that: (a) You have the right to enter into this Agreement, to reproduce and distribute each of the Licensed Applications, and to authorize Apple to permit end-users to download and use each of the Licensed Applications through one or more App Stores or the Custom App Distribution Site; (b) none of the Licensed Applications, or Apple's or end-users' permitted uses of those Licensed Applications, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Licensed Applications to Apple on behalf of one or more third parties; (c) none of the Custom Apps, or Apple's or end-users' permitted uses of those Custom Apps, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Custom Apps to Apple on behalf of one or more third parties other than under license grant from one or more third parties subject to Apple's Volume Content Terms and/or Custom App Distribution; (d) each of the Licensed Applications is authorized for distribution, sale and use in, export to, and import into each of the regions designated by You under Section 2.1 of this Schedule 1, in accordance with the laws and regulations of those regions and all applicable export/import regulations; (e) none of the Licensed Applications contains any obscene, offensive or other materials that are prohibited or restricted under the laws or regulations of any of the regions You designate under Section 2.1 of this Schedule 1; (f) all information You provide using the App Store Connect tool, including any information relating to the Licensed Applications, is accurate and that, if any such information ceases to be accurate, You will promptly update it to be accurate using the App Store Connect tool; and (g) in the event a dispute arises over the content of Your Licensed Applications or use of Your intellectual property on the App Store or the Custom App Distribution Site, You agree to permit Apple to share Your contact information with the party filing such dispute and to follow Apple's app dispute process on a non-exclusive basis and without any party waiving its legal rights.

**4.2**      You shall use the software rating tool set forth on App Store Connect to supply information regarding each of the Licensed Applications delivered by You for marketing and fulfillment by Apple through the App Store or the Custom App Distribution Site under this Schedule 1 in order to assign a rating to each such Licensed Application.  For purposes of assigning a rating to each of the Licensed Applications, You shall use Your best efforts to provide correct and complete information about the content of that Licensed Application with the software rating tool.  You acknowledge and agree that Apple is relying on: (i) Your good faith and diligence in accurately and completely providing the requested information for each Licensed Application; and (ii) Your representations and warranties in Section 4.1 hereof, in making that Licensed Application available for download by end-users in each of the regions You designate hereunder. Furthermore, You authorize Apple to correct the rating of any Licensed Application of Yours that has been assigned an incorrect rating; and You agree to any such corrected rating.

**4.3**      In the event that any region You designate hereunder requires the approval of, or rating of, any Licensed Application by any government or industry regulatory agency as a condition for the distribution and/or use of that Licensed Application, You acknowledge and agree that Apple may elect not to make that Licensed Application available for download by end-users in that region from any App Stores or the Custom App Distribution Site.

**5.      Responsibility and Liability**

**5.1**      Apple shall have no responsibility for the installation and/or use of any of the Licensed Applications by any end-user.  You shall be solely responsible for any and all product warranties, end-user assistance and product support with respect to each of the Licensed Applications.

**5.2**    You shall be solely responsible for, and Apple shall have no responsibility or liability whatsoever with respect to, any and all claims, suits, liabilities, losses, damages, costs and expenses arising from, or attributable to, the Licensed Applications and/or the use of those Licensed Applications by any end-user, including, but not limited to:  (i) claims of breach of warranty, whether specified in the EULA or established under applicable law; (ii) product liability claims; and (iii) claims that any of the Licensed Applications and/or the end-user's possession or use of those Licensed Applications infringes the copyright or other intellectual property rights of any third party.

## 6.    Termination

**6.1**    This Schedule 1, and all of Apple's obligations hereunder, shall terminate upon the expiration or termination of the Agreement.

**6.2**    In the event that You no longer have the legal right to distribute the Licensed Applications, or to authorize Apple to allow access to those Licensed Applications by end-users, in accordance with this Schedule 1, You shall promptly notify Apple and withdraw those Licensed Applications from the App Store or the Custom App Distribution Site using the tools provided on the App Store Connect site; provided, however, that such withdrawal by You under this Section 6.2 shall not relieve You of any of Your obligations to Apple under this Schedule 1, or any liability to Apple and/or any end-user with respect to those Licensed Applications.

**6.3**    Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You.  Without limiting the generality of this Section 6.3, You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes that:  (i) those Licensed Applications are not authorized for export to one or more of the regions designated by You under Section 2.1 hereof, in accordance with the Export Administration Regulations or other restrictions; (ii) those Licensed Applications and/or any end-user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party; (iii) the distribution and/or use of those Licensed Applications violates any applicable law in any region You designate under Section 2.1 of this Schedule 1; (iv) You have violated the terms of the Agreement, this Schedule 1, or other documentation including without limitation the App Store Review Guidelines; or (v) You or anyone representing You or Your company are subject to sanctions of any region in which Apple operates.  An election by Apple to cease allowing download of any Licensed Applications, pursuant to this Section 6.3, shall not relieve You of Your obligations under this Schedule 1.

**6.4**    You may withdraw any or all of the Licensed Applications from the App Store or the Custom App Distribution Site, at any time, and for any reason, by using the tools provided on the App Store Connect site, except that, with respect to Your end-users, You hereby authorize and instruct Apple to fulfill sections 1.2(b), (c), and (d) of this Schedule 1, which shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 4.1 and 6.2 of this Schedule 1.

## 7.    Legal Consequences

The relationship between You and Apple established by this Schedule 1 may have important legal consequences for You.  You acknowledge and agree that it is Your responsibility to consult with Your legal advisors with respect to Your legal obligations hereunder.

## EXHIBIT A
### (to Schedule 1)

## 1.      Apple as Agent

You appoint Apple Canada, Inc. ("Apple Canada") as Your agent for the marketing and end-user download of the Licensed Applications by end-users located in the following region:

Canada

You appoint Apple Pty Limited ("APL") as Your agent for the marketing and end-user download of the Licensed Applications by end-users located in the following regions:

Australia
New Zealand

You appoint Apple Inc. as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and end-user download of the Licensed Applications by end-users located in the following regions:

United States

You appoint Apple Services LATAM LLC as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and end-user download of the Licensed by end-users located in the following regions:

| Argentina* | Cayman Islands | Guatemala* | St. Kitts & Nevis |
|---|---|---|---|
| Anguilla | Chile* | Honduras* | St. Lucia |
| Antigua & Barbuda | Colombia* | Jamaica | St. Vincent & The Grenadines |
| Bahamas | Costa Rica* | Mexico* | Suriname |
| Barbados | Dominica | Montserrat | Trinidad & Tobago |
| Belize | Dominican Republic* | Nicaragua* | Turks & Caicos |
| Bermuda | Ecuador* | Panama* | Uruguay |
| Bolivia* | El Salvador* | Paraguay* | Venezuela* |
| Brazil* | Grenada | Peru* | |
| British Virgin Islands | Guyana | | |

* Custom Applications are only available in these regions.

You appoint iTunes KK as Your agent pursuant to Article 643 of the Japanese Civil Code for the marketing and end-user download of the Licensed Applications by end-users located in the following region:

Japan

## 2.      Apple as Commissionaire

You appoint Apple Distribution International Ltd. as Your commissionaire for the marketing and end-user download of the Licensed Applications by end-users located in the following regions, as updated from time to time via the App Store Connect site. For the purposes of this Agreement, "commissionaire" means an agent who purports to act on their own behalf and concludes

agreements in his own name but acts on behalf of other persons, as generally recognized in many Civil Law legal systems

| | | | |
|---|---|---|---|
| Afghanistan | Gabon | Malawi | Saudi Arabia* |
| Albania | Gambia | Malaysia* | Senegal |
| Algeria | Georgia | Maldives | Serbia |
| Angola | Germany* | Mali | Seychelles |
| Armenia | Ghana | Malta, Republic of* | Sierra Leone |
| Austria | Greece* | Mauritania | Singapore* |
| Azerbaijan | Guinea-Bissau | Mauritius | Slovakia* |
| Bahrain* | Hong Kong* | Micronesia, Fed States of | Slovenia* |
| Belarus | Hungary | Moldova | Solomon Islands |
| Belgium* | Iceland* | Mongolia | South Africa |
| Benin | India | Montenegro | Spain* |
| Bhutan | Indonesia | Morocco | Sri Lanka |
| Bosnia and Herzegovina | Iraq | Mozambique | Swaziland |
| Botswana | Ireland* | Myanmar | Sweden* |
| Brunei | Israel* | Namibia | Switzerland* |
| Bulgaria* | Italy* | Nauru | Taiwan* |
| Burkina-Faso | Jordan | Nepal | Tajikistan |
| Cambodia | Kazakhstan | Netherlands* | Tanzania |
| Cameroon | Kenya | Niger | Thailand* |
| Cape Verde | Korea* | Nigeria | Tonga |
| Chad | Kosovo | Norway* | Tunisia |
| China* | Kuwait | Oman | Turkey* |
| Congo (Democratic Republic of) | Kyrgyzstan | Pakistan | Turkmenistan |
| Congo (Republic of) | Laos | Palau | UAE* |
| Cote d'Ivoire | Latvia* | Papua New Guinea | Uganda |
| Croatia | Lebanon | Philippines* | Ukraine* |
| Cyprus* | Liberia | Poland | United Kingdom* |
| Czech Republic | Libya | Portugal | Uzbekistan |
| Denmark* | Lithuania* | Qatar* | Vanuatu |
| Egypt* | Luxembourg* | Romania* | Vietnam* |
| Estonia* | Macau | Russia* | Yemen |
| Fiji | Macedonia | Rwanda | Zambia |
| Finland* | Madagascar | Sao Tome e Principe | Zimbabwe |
| France* | | | |

*Custom Applications are only available in these regions.

## EXHIBIT B
**(to Schedule 1)**
## Instructions for Minimum Terms of Developer's
## End-User License Agreement

**1.      Acknowledgement**:  You and the end-user must acknowledge that the EULA is concluded between You and the end-user only, and not with Apple, and You, not Apple, are solely responsible for the Licensed Application and the content thereof.  The EULA may not provide for usage rules for Licensed Applications that are in conflict with, the Apple Media Services Terms and Conditions or the Volume Content Terms as of the Effective Date (which You acknowledge You have had the opportunity to review).

**2.      Scope of License**:  The license granted to the end-user for the Licensed Application must be limited to a non-transferable license to use the Licensed Application on any Apple-branded Products that the end-user owns or controls and as permitted by the Usage Rules set forth in the Apple Media Services Terms and Conditions, except that such Licensed Application may be accessed, acquired, and used by other accounts associated with the purchaser via Family Sharing, volume purchasing, or Legacy Contacts.

**3.      Maintenance and Support**:  You must be solely responsible for providing any maintenance and support services with respect to the Licensed Application, as specified in the EULA, or as required under applicable law.  You and the end-user must acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the Licensed Application.

**4.      Warranty**:  You must be solely responsible for any product warranties, whether express or implied by law, to the extent not effectively disclaimed.  The EULA must provide that, in the event of any failure of the Licensed Application to conform to any applicable warranty, the end-user may notify Apple, and Apple will refund the purchase price for the Licensed Application to that end-user; and that, to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the Licensed Application, and any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be Your sole responsibility.

**5.      Product Claims**:  You and the end-user must acknowledge that You, not Apple, are responsible for addressing any claims of the end-user or any third party relating to the Licensed Application or the end-user's possession and/or use of that Licensed Application, including, but not limited to: (i) product liability claims; (ii) any claim that the Licensed Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation, including in connection with Your Licensed or Custom Application's use of the HealthKit and HomeKit frameworks. The EULA may not limit Your liability to the end-user beyond what is permitted by applicable law.

**6.      Intellectual Property Rights**:  You and the end-user must acknowledge that, in the event of any third party claim that the Licensed Application or the end-user's possession and use of that Licensed Application infringes that third party's intellectual property rights, You, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim.

**7.      Legal Compliance**:  The end-user must represent and warrant that (i) the end-user is not located in a region that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" region; and (ii) the end-user is not listed on any U.S. Government list of prohibited or restricted parties.

**8.      Developer Name and Address**:  You must state in the EULA Your name and address,

and the contact information (telephone number; E-mail address) to which any end-user questions, complaints or claims with respect to the Licensed Application should be directed.

**9.    Third Party Terms of Agreement:**  You must state in the EULA that the end-user must comply with applicable third party terms of agreement when using Your Application, e.g., if You have a VoIP application, then the end-user must not be in violation of their wireless data service agreement when using Your Application.

**10.    Third Party Beneficiary**:  You and the end-user must acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the EULA, and that, upon the end-user's acceptance of the terms and conditions of the EULA, Apple will have the right (and will be deemed to have accepted the right) to enforce the EULA against the end-user as a third party beneficiary thereof.

**EXHIBIT C**
**(to Schedule 1)**
**App Store Promo Codes Terms**

Notwithstanding any other provisions of the Agreement or this Schedule 1, You hereby agree that the following terms shall apply to all App Store Promo Codes ("Promo Codes") requested by You via the App Store Connect tool.  For the purposes of this Exhibit C, "You" shall include additional members of Your App Store Connect team (e.g., individuals in the marketing and technical roles).

Except as otherwise expressed in writing herein, nothing in this Exhibit C shall be construed to modify the Agreement or this Schedule 1 in any way, and all capitalized terms not defined below shall have the meanings set forth in the Program Agreement.

**1.      DEFINITIONS:**

"Holder" means an individual located in a Territory to whom You provide one or more Promo Codes;

"Promo Code" means a unique alphanumeric code generated and provided to You by Apple pursuant to this Exhibit C which allows a Holder who is an App Store customer to download or access for free from the App Store the Licensed Application for which You have requested such code via the App Store Connect tool, whether offered for free or for a fee on the App Store (the "Promo Content"); and

"Effective Period" means the period between the Promo Code Activation Date and the Promo Code Expiration Date.

**2.      AUTHORIZATION AND OBLIGATIONS:**  You hereby authorize and instruct Apple to provide You with Promo Codes upon request, pursuant to the terms of this Exhibit C, and You take full responsibility for ensuring that any team member that requests such codes shall abide by the terms of this Exhibit C.  You shall be responsible for securing all necessary licenses and permissions relating to use of the Promo Codes and the Licensed Application, including any uses by You of the name(s) or other indicia of the Licensed Application, or name(s) or likenesses of the person(s) performing or otherwise featured in the Licensed Application, in any advertising, marketing, or other promotional materials, in any and all media.  Apple reserves the right to request and receive copies of such licenses and permissions from You, at any time, during the Effective Period.

**3.      NO PAYMENT:**  Except for Your obligations set forth in Section 10 of this Exhibit C, You are not obligated to pay Apple any commission for the Promo Codes.

**4.      DELIVERY:** Upon request by You via the App Store Connect tool, Apple shall provide the Promo Codes electronically to You via App Store Connect, email, or other method as may be indicated by Apple.

**5.      PROMO CODE ACTIVATION DATE:** Promo Codes will become active for use by Holders upon delivery to You.

**6.      PROMO CODE EXPIRATION DATE:** All unused Promo Codes, whether or not applied to an Apple ID, expire at midnight 11:59 PT on the earlier of: (a) the date that is twenty-eight (28) days after the delivery of the Promo Codes; or (b) the termination of the Agreement.

**7.      PERMITTED USE:** You may distribute the Promo Codes until that date which is ten (10) calendar days prior to the Promo Code Expiration Date solely for the purpose of offering instances of the app for media review or promotional purposes.  You may not distribute the

Promo Codes to Holders in any Territory in which You are not permitted to sell or distribute Your Licensed Application.

**8.    ADDITIONAL MATERIALS:** Apple shall not be responsible for developing and producing any materials in relation to the Promo Codes other than the Promo Codes themselves.

**9.    REPRESENTATIONS, WARRANTIES, AND INDEMNIFICATION:** You represent and warrant that: (i) You own or control all rights necessary to make the grant of rights, licenses, and permissions listed in Section 2, and that the exercise of such rights, licenses, and permissions shall not violate or infringe the rights of any third party, and (ii) any use of the Promo Codes shall be in accordance with the terms of this Exhibit C and shall not infringe any third party rights or violate any applicable laws, directives, rules, and regulations of any governmental authority in the Territory or anywhere else in the world.  You agree to indemnify and hold Apple, its subsidiaries and affiliates (and their respective directors, officers, and employees) harmless from all losses, liabilities, damages, or expenses (including reasonable attorneys' fees and costs) resulting from any claims, demands, actions, or other proceedings arising from a breach of the representations and warranties set for h in this Section, or a breach of any other term of the Agreement and this Schedule 1.

**10.    PAYMENT WAIVER:** You hereby waive any right to collect any royalties, proceeds, or remuneration for the distribution and download of the Licensed Application via the Promo Codes, regardless of whether any remuneration would otherwise be payable under the Agreement, including Schedule 1 thereto, if applicable.  The parties acknowledge that, as between Apple and You, the parties' respective responsibilities for the payment of any royalties or other similar payments to third parties with respect to distribution and download of the Licensed Application via the Promo Codes shall be as set forth in the Agreement.

**11.    TERMS AND CONDITIONS:** You further agree to the following terms:

(a) You shall not sell the Promo Codes or accept any form of payment, trade-in-kind, or other compensation in connection with the distribution of the Promo Codes and You shall prohibit third parties from doing so.

(b) Nothing in this Exhibit C shall cause the parties to become partners, joint venturers or co-owners, nor shall either party constitute an agent, employee, or representative of the other, or empower the other party to act for, bind, or otherwise create or assume any obligation on its behalf, in connection with any transaction under this Exhibit C; provided, however, that nothing in this Section 11(b) shall affect, impair, or modify either of the Parties' respective rights and obligations, including the agency or commissionaire relationship between them under Schedules 1, 2, and 3 of the Agreement.

(c) You shall prominently disclose any content age restrictions or warnings legally required in the Territories and ensure that Promo Codes are distributed only to persons of an age appropriate and consistent with the App Store rating for the associated Licensed Application.

(d) You shall conduct Yourself in an honest and ethical manner and shall not make any statement, orally or in writing, or do any act or engage in any activity that is obscene, unlawful, or encourages unlawful or dangerous conduct, or that may disparage, denigrate, or be detrimental to Apple or its business.

(e) Apple shall not be responsible for providing any technical or customer support to You or Holders above what Apple provides to standard or ordinary App Store users.

(f) You agree to the additional Promo Code Terms and Conditions attached hereto as Attachment 1.

(g) YOU SHALL INCLUDE THE REGION SPECIFIC HOLDER TERMS & CONDITIONS AS WELL AS THE EXPIRATION DATE OF THE PROMO CODE ON ANY INSTRUMENT USED TO DISTRIBUTE THE PROMO CODE TO HOLDERS (E.G., CERTIFICATE, CARD, EMAIL, ETC). YOU MAY ACCESS THIS INFORMATION LOCALIZED FOR EACH TERRITORY UPON REQUESTING THE PROMO CODES IN THE APP STORE CONNECT TOOL.

(h) You shall be solely responsible for Your use of the Promo Codes, including any use by other members of Your App Store Connect team, and for any loss or liability to You or Apple therefrom.

(i) In the event Your Licensed Application is removed from the App Store for any reason, You agree to cease distribution of the Promo Codes and that Apple may deactivate such Promo Codes.

(j) You agree that Apple shall have the right to deactivate the Promo Codes, even if already delivered to Holders, in the event You violate any of the terms of this Exhibit C, the Agreement, or Schedules 1, 2, or 3 thereto.

(k) You may distribute the Promo Codes within the Territories, but agree that You shall not export any Promo Code for use outside the Territories nor represent that You have the right or ability to do so.  Risk of loss and transfer of title for the Promo Codes pass to You upon delivery to You within App Store Connect, via email, or other method provided by Apple.

**12.     APPLE TRADEMARKS:**  Your use of Apple trademarks in connection with the Promo Codes is limited only to "iTunes" and "App Store" (the "Marks") subject to the following and any additional guidelines Apple may issue from time to time:

(a) You may use the Marks only during the Effective Period

(b) You shall submit any advertising, marketing, promotional or other materials, in any and all media now known or hereinafter invented, incorporating the Marks to Apple prior to use for written approval.  Any such materials not expressly approved in writing by Apple shall be deemed disapproved by Apple.

(c) You may only use the Marks in a referential manner and may not use the Marks as the most prominent visual element in any materials.  Your company name, trademark(s), or service mark(s) should be significantly larger than any reverence to the Marks.

(d) You may not directly or indirectly suggest Apple's sponsorship, affiliation, or endorsement of You, Your Licensed Applications, or any promotional activities for which You are requesting the Promo Codes.

(e) You acknowledge that the Marks are the exclusive property of Apple and agree not to claim any right, title, or interest in or to the Marks or at any time challenge or attack Apple's rights in the Marks.  Any goodwill resulting from Your use of the Marks shall inure solely to the benefit of Apple and shall not create any right, title, or interest for You in the Marks.

**13.     GOVERNING LAW:**  Any litigation or other dispute resolution between You and Apple arising out of or relating to this Exhibit C or facts relating thereto shall be governed by Section 14.10 of the Agreement.

**Attachment 1**
**(to Exhibit C of Schedule 1)**
**App Store Promo Codes Terms and Conditions**

1.      All Promo Codes delivered pursuant to this Exhibit C, whether or not applied to an App Store account, expire as indicated in this Exhibit C.

2.      Promo Codes, and unused balances, are not redeemable for cash and cannot be returned for a cash refund, exchanged, or used to purchase any other merchandise, or provide allowances or iTunes or App Store Gifts by either You or Holder. This includes Promo Codes that have expired unused.

3.      Promo Codes may only be redeemed through the App Store in the Territory, open only to persons in the Territory with a valid Apple ID. Not all App Store products may be available in all Territories. Internet access (fees may apply), the latest version of Apple software, and other compatible software and hardware are required.

4.      Access to, redemption of Promo Codes on, or purchases from, and use of products purchased on, the App Store, are subject to acceptance of its Terms of Service presented at the time of redemption or purchase, and found at http://www.apple.com/legal/itunes/ww/.

5.      Promo Codes will be placed in the Holder's applicable Apple ID and are not transferable.

6.      If a Holder's order exceeds the amount available on the Promo Codes, Holder must establish an Apple ID and pay for the balance with a credit card.

7.      Except as stated otherwise, data collection and use are subject to Apple's Privacy Policy, which can be found at http://www.apple.com/legal/privacy.

8.      Apple is not responsible for lost or stolen Promo Codes. If Holders have any questions, they may visit Apple Support at https://support.apple.com/apps.

9.      Apple reserves the right to close Holder accounts and request alternative forms of payment if Promo Codes are fraudulently obtained or used on the App Store.

10.      APPLE AND ITS LICENSEES, AFFILIATES, AND LICENSORS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO PROMO CODES OR THE APP STORE, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  IN THE EVENT A PROMO CODE IS NON-FUNCTIONAL, HOLDER'S OR COMPANY'S SOLE REMEDY, AND APPLE'S SOLE LIABILITY, SHALL BE THE REPLACEMENT OF SUCH PROMO CODE. THESE LIMITATIONS MAY NOT APPLY. CERTAIN LOCAL AND TERRITORY LAWS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES OR THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MAY NOT APPLY, AND YOU OR HOLDER MAY ALSO HAVE ADDITIONAL RIGHTS.

11.      Apple reserves the right to change any of the terms and conditions set forth in this Attachment 1 from time to time without notice.

12.      Any part of these terms and conditions may be void where prohibited or restricted by law.

**EXHIBIT D**
**(to Schedule 1)**
**Additional App Store Terms**

**1.      Discoverability on the App Store**:  The discoverability of Your Licensed Application in the App Store depends on several factors, and Apple is under no obligation to display, feature, or rank Your Licensed Application in any particular manner or order in the App Store.

(a)  The main parameters used for app ranking and discoverability are text relevance, such as using an accurate title, adding relevant keywords/metadata, and selecting descriptive categories in the Licensed Application; customer behavior relating to the number and quality of ratings and reviews and application downloads; date of launch in the App Store may also be considered for relevant searches; and whether You have violated any rules promulgated by Apple.  These main parameters deliver the most relevant results to customer search queries.

(b) When considering apps to feature in the App Store, our editors look for high-quality apps across all categories, with a particular focus on new apps and apps with significant updates. The main parameters that our editors consider are UI design, user experience, innovation and uniqueness, localizations, accessibility, App Store product page screenshots, app previews, and descriptions; and additionally, for games, gameplay, graphics and performance, audio, narrative and story depth, ability to replay, and gameplay controls.  These main parameters showcase high-quality, well-designed, and innovative apps.

(c)  If You use an Apple service for paid promotion of Your app on the App Store, Your app may be presented in a promotional placement and designated as advertising content.

To learn more about app discoverability, visit https://developer.apple.com/app-store/discoverability/.

**2.      Access to App Store Data**

You can access data concerning your Licensed Application's financial performance and user engagement in App Store Connect by using App Analytics, Sales and Trends, and Payments and Financial Reports. Specifically, You can obtain all of Your Licensed Application's financial results for individual app sales and in-app purchases (including subscriptions) in Sales and Trends, or download the data from Financial Reports; and You can view App Analytics for non-personally identifiable data that allows You to understand how consumers engage with your Licensed Applications. More information can be found at https://developer.apple.com/app-store/measuring-app-performance/. App Analytics data is provided only with the consent of our customers. For more information, see https://developer.apple.com/app-store-connect/analytics/. Apple does not provide You with access to personal or other data provided by or generated through use of the App Store by other developers; nor does Apple provide other developers with access to personal or other data provided by or generated through Your use of the App Store. Such data sharing would conflict with Apple's Privacy Policy, and with our customers' expectations about how Apple treats their data. You can seek to collect information from customers directly, so long as such information is collected in a lawful manner, and You follow the App Store Review Guidelines.

Apple handles personal and non-personal information as outlined in Apple's Privacy Policy. Information about Apple's access to and practices concerning developer and customer data can be found in "App Store & Privacy," accessible at https://support.apple.com/en-us/HT210584. Apple may provide some non-personal information to strategic partners that work with Apple to provide our products and services, help Apple market to customers, and sell ads on Apple's behalf to display in the App Store and Apple News and Stocks. Such partners are obligated to protect that information and may be located wherever Apple operates.

**3.        P2B Regulation Complaints and Mediation**

Developers established in, and which offer goods or services to customer located in, a region subject to a platform-to-business regulation ("P2B Regulation"), such as the Regulation of the European Parliament and of the Council on promoting fairness and transparency for business users of online intermediation services may submit complaints pursuant to such P2B Regulation related to the following issues at https://developer.apple.com/contact/p2b/: (a) Apple's alleged non-compliance with any obligations set forth in the P2B Regulation which affect You in the region in which you are established; (b) technological that affect You and relate directly to distribution of Your Licensed Application on the App Store in the region in which you are established; or (c) measures taken by or behavior of Apple that affect You and relate directly to distribution of Your Licensed Application on the App Store in the region in which you are established.  Apple will consider and process such complaints and communicate the outcome to You.

For Developers established in, and which offer goods or services to customer located in, the European Union, Apple identifies the following panel of mediators with which Apple is willing to engage to attempt to reach an agreement with developers established in, and which offer goods or services to customer located in, the European Union on the settlement, out of court, of any disputes between Apple and You arising in relation to the provision of the App Store services concerned, including complaints that could not be resolved by means of our complaint-handling system:

Centre for Effective Dispute Resolution
P2B Panel of Mediators
70 Fleet Street
London
EC4Y 1EU
United Kingdom
https://www.cedr.com/p2bmediation/

By clicking to agree to this Schedule 2, which is hereby offered to You by Apple, You agree with Apple to amend that certain Apple Developer Program License Agreement currently in effect between You and Apple (the "Agreement") to add this Schedule 2 thereto (supplanting any existing Schedule 2). Except as otherwise provided herein, all capitalized terms shall have the meanings set forth in the Agreement.

**Schedule 2**

**1.      Appointment of Agent and Commissionaire**

1.1      You hereby appoint Apple and Apple Subsidiaries (collectively "Apple") as: (i) Your agent for the marketing and delivery of the Licensed Applications to End-Users located in those regions listed on Exhibit A, Section 1 to this Schedule 2, subject to change; and (ii) Your commissionaire for the marketing and delivery of the Licensed Applications to End-Users located in those regions listed on Exhibit A, Section 2 to this Schedule 2, subject to change, during the Delivery Period. The most current list of App Store regions among which You may select shall be set forth in the App Store Connect tool and may be updated by Apple from time to time. You hereby acknowledge that Apple will market and make the Licensed Applications available for download by End-Users through one or more App Stores, for You and on Your behalf. For purposes of this Schedule 2, the following definitions apply:

(a)      "You" shall include App Store Connect users authorized by You to submit Licensed Applications and associated metadata on Your behalf; and

(b)      "End-User" includes individual purchasers as well as eligible users associated with their account via Family Sharing or Legacy Contacts.  For institutional customers, "End-User" shall mean the individual authorized to use the Licensed Application by the institutional purchaser, the institutional administrator responsible for management of installations on shared devices, as well as authorized institutional purchasers themselves, including educational institutions approved by Apple, which may acquire the Licensed Applications for use by their employees, agents, and affiliates.

(c)      For the purposes of this Schedule 2, the term "Licensed Application" shall include any content, functionality, extensions, stickers, or services offered in the software application.

1.2      In furtherance of Apple's appointment under Section 1.1 of this Schedule 2, You hereby authorize and instruct Apple to:

(a)      market, solicit, and obtain orders on Your behalf for Licensed Applications from End-Users located in the regions identified by You in the App Store Connect tool;

(b)      provide hosting services to You subject to the terms of the Agreement, in order to allow for the storage of, and End-User access to, the Licensed Applications and to enable third party hosting of such Licensed Applications solely as otherwise licensed or authorized by Apple;

(c)      make copies of, format, and otherwise prepare Licensed Applications for acquisition and download by End-Users, including adding the Security Solution and other optimizations identified in the Agreement;

(d)      allow or, in the case of cross-border assignments of Volume Content purchases, arrange for End-Users to access and re-access copies of the Licensed Applications, so that End-Users may acquire and electronically download those Licensed Applications developed by You, Licensed Application Information, and associated metadata through one or more App Stores. In addition, You hereby authorize distribution of Your Licensed Applications under this Schedule 2 for use by: (i) multiple End-Users when the Licensed Application is purchased by an individual account associated with other family members via Family Sharing, including at Your election as indicated in the App Store Connect tool, purchases made prior to the execution of this Schedule 2; (ii) eligible Legacy Contacts of an End-User to access Your Licensed Application along with associated information and metadata stored in iCloud as described in https://support.apple.com/kb/HT212360; and (iii) a single institutional customer via the Volume Content Service for use by its End-Users and/or for installation on devices with no associated Apple IDs that are owned or controlled by that institutional customer in accordance with the Volume Content Terms, conditions, and program requirements;

(e)       issue invoices for the purchase price payable by End-Users for the Licensed Applications;

(f)       use (i) screen shots, previews, and/or up to 30 second excerpts of the Licensed Applications; (ii) trademarks and logos associated with the Licensed Applications; and (iii) Licensed Application Information, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays, excluding those portions of the Licensed Applications, trademarks or logos, or Licensed Application Information which You do not have the right to use for promotional purposes, and which You identify in writing at the time that the Licensed Applications are delivered by You to Apple under Section 2.1 of this Schedule 2, and use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays;

(g)       otherwise use Licensed Applications, Licensed Application Information and associated metadata as may be reasonably necessary in the marketing and delivery of the Licensed Applications in accordance with this Schedule 2. You agree that no royalty or other compensation is payable for the rights described above in Section 1.2 of this Schedule 2; and

(h)       facilitate distribution of pre-release versions of Your Licensed Applications ("Beta Testing") to End-Users designated by You in accordance with the Agreement, availability, and other program requirements as updated from time to time in the App Store Connect tool.  For the purposes of such Beta Testing, You hereby waive any right to collect any purchase price, proceeds or other remuneration for the distribution and download of such pre-release versions of Your Application.  You further agree that You shall remain responsible for the payment of any royalties or other payments to third parties relating to the distribution and use of Your pre-release Licensed Applications, as well as compliance with any and all laws for territories in which such Beta Testing takes place.  For the sake of clarity, no commission shall be owed to Apple with respect to such distribution.

1.3       The parties acknowledge and agree that their relationship under this Schedule 2 is, and shall be, that of principal and agent, or principal and commissionaire, as the case may be, as described in Exhibit A, Section 1 and Exhibit A, Section 2, respectively, and that You, as principal, are, and shall be, solely responsible for any and all claims and liabilities involving or relating to, the Licensed Applications, as provided in this Schedule 2. The parties acknowledge and agree that Your appointment of Apple as Your agent or commissionaire, as the case may be, under this Schedule 2 is non-exclusive.  You hereby represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent and/or commissionaire for the delivery of Your Licensed Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party.

1.4       For purposes of this Schedule 2, the "Delivery Period" shall mean the period beginning on the Effective Date of the Agreement, and expiring on the last day of the Agreement or any renewal thereof; provided, however, that Apple's appointment as Your agent and commissionaire shall survive expiration of the Agreement for a reasonable phase-out period not to exceed thirty (30) days and further provided that, solely with respect to Your End-Users, subsections 1.2(b), (c), and (d) of this Schedule 2 shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 5.1 and 7.2 of this Schedule 2.

**2.       Delivery of the Licensed Applications to Apple**

2.1       You will deliver to Apple, at Your sole expense, using the App Store Connect tool or other mechanism provided by Apple, the Licensed Applications, Licensed Application Information and associated metadata, in a format and manner prescribed by Apple, as required for the delivery of the Licensed Applications to End-Users in accordance with this Schedule 2. Metadata You deliver to Apple under this Schedule 2 will include: (i) the title and version number of each of the Licensed Applications; (ii) the regions You designate, in which You wish Apple to allow End-Users to download those Licensed Applications; (iii) any copyright or other intellectual property rights notices; (iv) Your privacy policy; (v) Your End-User license agreement ("EULA"), if any, in accordance with Section 4.2 of this Schedule 2; and (vi) any additional metadata set forth in the Documentation and/or the App Store Connect tool as may be updated from time to time, including metadata designed to enhance search and discovery of content on Apple-branded hardware.

2.2       All Licensed Applications will be delivered by You to Apple using software tools, a secure FTP site address and/or such other delivery methods as prescribed by Apple.

2.3     You hereby certify that all of the Licensed Applications You deliver to Apple under this Schedule 2 are authorized for export from the United States to each of the regions listed on Exhibit A, in accordance with the requirements of all applicable laws, including but not limited to the United States Export Administration Regulations, 15 C.F.R. Parts 730-774. You further represent and warrant that all versions of the Licensed Applications You deliver to Apple are not subject to the International Traffic In Arms Regulations 22 C.F.R. Parts 120-130 and are not designed, made, modified or configured for any military end users or end uses. Without limiting the generality of this Section 2.3, You certify that (i) none of the Licensed Applications contains, uses or supports any data encryption or cryptographic functions; or (ii) in the event that any Licensed Application contains, uses or supports any such data encryption or cryptographic functionality, You certify that You have complied with the United States Export Administration Regulations, and are in possession of, and will upon request provide Apple with, PDF copies of export classification ruling (CCATS) issued by the United States Commerce Department, Bureau of Industry and Security ("BIS") or any self-classification reports submitted to the BIS, and appropriate authorizations from other regions that mandate import authorizations for that Licensed Application, as required.  You acknowledge that Apple is relying upon Your certification in this Section 2.3 in allowing End-Users to access and download the Licensed Applications under this Schedule 2. Except as provided in this Section 2.3, Apple will be responsible for compliance with the requirements of the Export Administration Regulations in allowing End-Users to access and download the Licensed Applications under this Schedule 2.

2.4     You shall be responsible for determining and implementing any age ratings or parental advisory warnings required by the applicable government regulations, ratings board(s), service(s), or other organizations (each a "Ratings Board") for any video, television, gaming or other content offered in Your Licensed Application for each locality in the Territory.  Where applicable, You shall also be responsible for providing any content restriction tools or age verification functionality before enabling end-users to access mature or otherwise regulated content within Your Licensed Application.

## 3.      Delivery of the Licensed Applications to End-Users

3.1     You acknowledge and agree that Apple, in the course of acting as agent and/or commissionaire for You, is hosting, or pursuant to Section 1.2(b) of this Schedule 2 may enable authorized third parties to host, the Licensed Applications, and is allowing the download of those Licensed Applications by End-Users, on Your behalf. However, You are responsible for hosting and delivering content or services sold by You using the In-App Purchase API, except for content that is included within the Licensed Application itself (i.e., the In-App Purchase simply unlocks the content) or content hosted by Apple pursuant to section 3.3 of Attachment 2 to the Agreement. All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool, which may be updated from time to time by Apple. In addition, You may, at Your election via App Store Connect, instruct Apple to market the Licensed Applications at a discount of 50% of Your established price tier for authorized institutional customers. You may change the price tier for any Licensed Application at any time, at Your discretion, in accordance with the pricing schedule set forth in the App Store Connect tool as may be updated from time to time. As Your agent and/or commissionaire, Apple shall be solely responsible for the collection of all prices payable by End-Users for Licensed Applications acquired by those End-Users under this Schedule 2.

3.2     In the event that the sale or delivery of any of the Licensed Applications to any End-User is subject to any sales, use, goods and services, value added, telecommunications or other similar tax or levy, under applicable law, responsibility for the collection and remittance of that tax for sales of the Licensed Applications to End-Users will be determined in accordance with Exhibit B to this Schedule 2 as updated from time to time via the App Store Connect site. You are solely responsible for selecting and maintaining accurate inputs for tax categorization for Your Licensed Applications via the App Store Connect site, which may be updated from time to time. Such tax categorization will be applied to the sale and delivery of Your Licensed Applications.  Any adjustments that You make to the tax categorization for Your Licensed Applications will take effect for future sales of Licensed Applications after Apple has processed the adjustment within a reasonable period of time. Adjustments that You make to the tax categorization for Your Licensed Applications will not apply to any sales of Licensed Applications occurring before Apple has processed Your tax categorization adjustment.

If the tax categorization of Your Licensed Applications is deemed to be inaccurate by any tax authority, You are solely responsible for the tax consequences. If Apple deems in its reasonable discretion that the tax categorization of Your Licensed Applications is inaccurate, Apple reserves the right to hold in trust amounts owed to You, until such time as You correct the tax categorization. Upon correction of the tax categorization, Apple will deduct any penalties and interest resulting from the inaccuracy, and remit to You any remaining amounts held in trust by Apple for You, without interest, in accordance with the provisions of this Schedule 2. You shall indemnify and hold Apple harmless against any and all claims by any tax authority for any underpayment or overpayment of any sales, use, goods and services, value added, telecommunications or other tax or levy, and any penalties and/or interest thereon.

3.3     In furtherance of the parties' respective tax compliance obligations, Apple requires that You comply with the requirements listed on Exhibit C to this Schedule 2 or on App Store Connect depending upon, among other things, (i) Your region of residence and (ii) the regions designated by You in which You wish Apple to allow access to the Licensed Applications. In the event that Apple collects any amounts corresponding to the purchase price for any of Your Licensed Applications before You have provided Apple with any tax documentation required under Exhibit C to this Schedule 2, Apple may decide to not remit those amounts to You, and to hold those amounts in trust for You, until such time as You have provided Apple with the required tax documentation. Upon receipt of all required tax documents from You, Apple will remit to You any amounts held in trust by Apple for You, without interest, under this Section 3.3, in accordance with the provisions of this Schedule 2.

3.4     Apple shall be entitled to the following commissions in consideration for its services as Your agent and/or commissionaire under this Schedule 2:

(a)     For sales of Licensed Applications to End-Users, Apple shall be entitled to a commission equal to thirty percent (30%) of all prices payable by each End-User. Solely for auto-renewing subscription purchases made by customers who have accrued greater than one year of paid subscription service within a Subscription Group (as defined below) and notwithstanding any Retention Grace Periods or Renewal Extension Periods, Apple shall be entitled to a commission equal to fifteen percent (15%) of all prices payable by each End-User for each subsequent renewal.  Retention Grace Period refers to the time period between the end of a customer's subscription (e.g., due to cancelation or non-payment) and the beginning of a new subscription within the same Subscription Group, provided that such time period is no greater than 60 days, subject to change. Renewal Extension Period refers to the time by which You extend the renewal date of the customer's subscription, without additional charges. For purposes of determining the commissions to which Apple is entitled under this Section 3.4(a), the prices payable by End-Users shall be net of any and all taxes collected, as provided in Section 3.2 of this Schedule 2.

(b)     App Store Small Business Program.  For Developers who have qualified and been approved by Apple for the App Store Small Business Program, Apple shall be entitled to a reduced commission of 15% of all prices payable by each End-User for sales of Licensed Applications to End-Users located in those regions listed in Exhibit B of this Schedule 2 as updated from time to time via the App Store Connect site. You may qualify for approval in the App Store Small Business Program subject to the terms of the Agreement, this Schedule 2, and the following:

You and Your Associated Developer Accounts must have earned no more than $1,000,000 in total proceeds (sales net of Apple's commission and certain taxes and adjustments) during the twelve (12) fiscal months occurring in the prior calendar year ("calendar year"), as calculated by Apple under standard business practices.

To enroll in the App Store Small Business Program, You must provide Apple with any requested information related to You and Your Associated Developer Accounts. If there is a change in Your relationship to an Associated Developer Account, You must update such information.  An "Associated Developer Account" is any Apple Developer Program account (i) You own or control or (ii) which owns or controls Your account.  For example, as the individual or legal entity who accepted the terms of the Agreement and this Schedule 2, You have an Associated Developer Account if any of the following apply:

•     You have majority (over 50%) corporate, individual, or partnership interest in the ownership or shares of another Apple Developer Program member account.

- Another Apple Developer Program member has majority (over 50%) corporate, individual, or partnership interest in the ownership or shares of Your account.
- You have ultimate decision-making authority over another Apple Developer Program member account.
- Another Apple Developer Program member has ultimate decision-making authority over Your account.

You and Your Associated Developer Accounts must be in good standing as members of the Apple Developer Program.

Once the total proceeds of You and Your Associated Developer Accounts exceeds $1,000,000 in the current calendar year, You will be charged the standard commission rate set forth in Section 3.4(a) in this Schedule 2 for the remainder of the calendar year.

Apple will determine eligibility and approve qualified Developers for participation in the App Store Small Business Program within fifteen (15) days of the end of each fiscal calendar month.

If the total proceeds of You and Your Associated Developer Accounts amount to no more than $1,000,000 in a future calendar year, You may re-qualify for approval in the App Store Small Business Program in the following calendar year.

If You participate, either as a Transferor or a Recipient (hereafter referred to as an "App Transfer Party"), in the transfer of a Licensed Application, the proceeds associated with that Licensed Application will be included in the calculation of total proceeds of any App Transfer Party to determine eligibility for participation in the App Store Small Business Program.  For example, if You transfer a Licensed Application from Your developer account to another developer account using the App Store Connect tool, the proceeds associated with that transferred Licensed Application will be included in the calculation of Your total proceeds and in the calculation of the total proceeds of the developer account to which you transferred the Licensed Application.  If a Licensed Application is transferred multiple times in a given calendar year, the proceeds associated with that Licensed Application will be included in the calculation of total proceeds of each and every App Transfer Party.

You and Your Associated Developer Accounts will be disqualified from the App Store Small Business Program and terminated at Apple's discretion, if You or Your Associated Developer Accounts engage in any suspicious, misleading, fraudulent, improper, unlawful or dishonest act or omission relating to qualification in the App Store Small Business Program (e.g., providing false or inaccurate information to Apple, creating or using multiple Apple Developer Program accounts to improperly benefit from the App Store Small Business Program).

Apple may withhold payments due to You and Your Associated Developer Accounts for violations of this provision.

Except as otherwise provided in Section 3.2 of this Schedule 2, Apple shall be entitled to the commissions specified in Section 3.4 hereof without reduction for any taxes or other government levies, including any and all taxes or other, similar obligations of You, Apple or any End-User relating to the delivery or use of the Licensed Applications.  For sales of Licensed Applications developed by Apple, Apple is not entitled to a commission.

3.5      Upon collection of any amounts from any End-User as the price for any Licensed Application delivered to that End-User hereunder, Apple shall deduct the full amount of its commission with respect to that Licensed Application, and any taxes collected by Apple under Section 3.2 and 3.4 hereof, and shall remit to You, or issue a credit in Your favor, as the case may be, the remainder of those prices in accordance with Apple standard business practices, including the following: remittance payments (i) are made by means of wire transfer only; (ii) are subject to minimum monthly remittance amount thresholds; (iii) require You to provide certain remittance-related information on the App Store Connect site; and (iv) subject to the foregoing requirements, will be made no later than forty-five (45) days following the close of the monthly period in which the corresponding amount was received by Apple from the End-User. No later than forty-five (45) days following the end of each monthly period, Apple will make available to You on the App Store Connect site a sales report in sufficient detail to permit You to identify the Licensed Applications sold in that monthly period and the total amount to be remitted to You by Apple. You hereby acknowledge and agree that Apple shall be entitled to a commission, in accordance with this Section 3.5 on the delivery of any Licensed Application to any End-User,

even if Apple is unable to collect the price for that Licensed Application from that End-User. In the event that the purchase price received by Apple from any End-User for any Licensed Application is in a currency other than the remittance currency agreed between Apple and You, the purchase price for that Licensed Application shall be converted to the remittance currency, and the amount to be remitted by Apple to You shall be determined, in accordance with an exchange rate fixed for the Delivery Period, as reflected in the App Store Connect tool as may be updated from time to time, pursuant to section 3.1 of this Schedule 2. Apple may provide a means on App Store Connect to enable You to designate a primary currency for the bank account designated by You for receiving remittances ("Designated Currency"). Apple may cause Apple's bank to convert all remittances in any remittance currency other than the Designated Currency into the Designated Currency prior to remittance to You. You agree that any resulting currency exchange differentials or fees charged by Apple's bank may be deducted from such remittances. You remain responsible for any fees (e.g., wire transfer fees) charged by Your bank or any intermediary banks between Your bank and Apple's bank.

3.6     In the event that Apple's commission or any price payable by any End-User for any of the Licensed Applications is subject to (i) any withholding or similar tax; or (ii) any sales, use, goods and services, value added, telecommunications or other tax or levy not collected by Apple under Section 3.2 hereof; or (iii) any other tax or other government levy of whatever nature, the full amount of that tax or levy shall be solely for Your account, and shall not reduce the commission to which Apple is entitled under this Schedule 2.

3.7     In the event that any remittance made by Apple to You is subject to any withholding or similar tax, the full amount of that withholding or similar tax shall be solely for Your account, and will not reduce the commission to which Apple is entitled on that transaction. If Apple reasonably believes that such tax is due, Apple will deduct the full amount of such withholding or similar tax from the gross amount owed to You, and will pay the full amount withheld over to the competent tax authorities. Apple will apply a reduced rate of withholding tax, if any, provided for in any applicable income tax treaty only if You furnish Apple with such documentation required under that income tax treaty or otherwise satisfactory to Apple, sufficient to establish Your entitlement to the benefit of that reduced rate of withholding tax. Upon Your timely request to Apple in writing, using means reasonably designated by Apple, Apple will use commercially practical efforts to report to You the amount of Apple's payment of withholding or similar taxes to the competent tax authorities on Your behalf. You will indemnify and hold Apple harmless against any and all claims by any competent tax authority for any underpayment of any such withholding or similar taxes, and any penalties and/or interest thereon, including, but not limited to, underpayments attributable to any erroneous claim or representation by You as to Your entitlement to, or Your disqualification for, the benefit of a reduced rate of withholding tax.

3.8     You may offer auto-renewing subscriptions in select Territories using the In-App Purchase API subject to the terms of this Schedule 2, provided that:

(a)     Auto-renew functionality must be on a weekly, monthly, bi-monthly, tri-monthly, semi-annual or annual basis at prices You select in the App Store Connect tool.  You may offer multiple durations and service levels for Your subscription and will have the ability to associate and rank these subscription items within Subscription Groups, to enable customers to easily upgrade, downgrade, and cross-grade amongst the Subscription Group options.  You understand and agree that when a subscriber upgrades or cross-grades (except for cross-grades of different durations), such service level will begin immediately and Your proceeds will be adjusted accordingly, and when a subscriber downgrades, the new service will begin at the end of the current subscription period.

(b)     You clearly and conspicuously disclose to users the following information regarding Your auto-renewing subscription:

  •  Title of auto-renewing subscription, which may be the same as the in-app product name
  •  Length of subscription
  •  Price of subscription, and price per unit if appropriate

  Links to Your Privacy Policy and Terms of Use must be accessible within Your Licensed Application.

(c)     You must fulfill the offer during the entire subscription period, as marketed, including any Billing Grace Period You authorize, and, in the event You breach this section 3.8(c) of Schedule 2, You hereby authorize and instruct Apple to refund to the End-User the full amount, or any portion thereof in Apple's sole discretion, of

the price paid by the End-User for that subscription.  Billing Grace Period refers to the period during which Developers agree to provide paid service for free to users who do not recover from a billing error.  In the event that Apple refunds any such price to an End-User, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that subscription. You acknowledge that Apple may exercise its rights under section 7.3 of this Schedule 2 for repeated violations of this provision.

3.9      When You make price changes to an existing subscription item, You may elect to retain current pricing for Your existing customers by indicating Your intent in the App Store Connect tool.  When You increase pricing for existing subscribers in regions that require end-user consent, they will be prompted to review and agree to the new price, otherwise the auto-renewal feature will be disabled.

3.10      To the extent You promote and offer for sale auto-renewing subscriptions, within or outside of Your Licensed Application, You must do so in compliance with all legal and regulatory requirements.

3.11      Subscription services purchased within Licensed Applications must use In-App Purchase.

In addition to using the In-App Purchase API, a Licensed Application may read or play content (magazines, newspapers, books, audio, music, video) that is offered outside of the Licensed Application (such as, by way of example, through Your website) provided that You do not link to or market external offers for such content within the Licensed Application.  You are responsible for authentication access to content acquired outside of the Licensed Application.

3.12      If Your Licensed Application is periodical content-based (e.g. magazines and newspapers), Apple may provide You with the name, email address, and zip code associated with an End-User's account when they purchase an auto-renewing subscription via the In-App Purchase API, provided that such user consents to the provision of data to You, and further provided that You may only use such data to promote Your own products and do so in strict compliance with Your publicly posted Privacy Policy, a copy of which must be readily viewed and is consented to in Your Licensed Application.  You may offer a free incentive to extend the subscription if the user agrees to send this information.

3.13      You may use Subscription Offer Codes to promote your auto-renewing subscriptions in select Territories subject to the terms of the Agreement, this Schedule 2, and the following:

(a)      Subscription Offer Code means a code provided by Apple to You, pursuant to these terms, which allows an End-User to whom You provide one or more Subscription Offer Codes to download or access Your Licensed Application.

(b)      Upon request by You via the App Store Connect tool, Apple shall deliver the Subscription Offer Codes electronically to You. Subscription Offer Codes will become active for use by End-Users upon delivery to You.

You may not distribute Subscription Offer Codes that are no longer active to End-Users in any Territory in which You are not permitted to sell or distribute Your Licensed Application.

You shall not export any Subscription Offer Code for use outside the Territories nor represent that You have the right or ability to do so.

Risk of loss and transfer of title for the Subscription Offer Codes pass to You upon delivery to You.

You shall comply with all applicable laws in the Territories in which You distribute Subscription Offer Codes.

(c)      Apple shall not be responsible for developing or producing any materials in relation to the Subscription Offer Codes other than the Subscription Offer Codes themselves.

You shall not sell the Subscription Offer Codes or accept any form of payment, trade-in-kind, or other compensation in connection with the distribution of the Subscription Offer Codes and You shall prohibit third parties from doing so.

During the period when a Subscription Offer Code allows an End-User to access a subscription in Your Licensed Application for free, You hereby waive any right to collect any royalties, proceeds, or remuneration for such access, regardless of whether any remuneration would otherwise be payable under the Agreement, this Schedule 2, and Schedule 1 thereto, if applicable. The parties acknowledge that, as between Apple and You, the parties' respective responsibilities for the payment of any royalties or other similar payments to third parties with respect to End-Users accessing subscriptions in your Licensed Application via the Subscription Offer Codes shall be as set forth in the Agreement and this Schedule 2.

You shall be solely responsible for Your use of the Subscription Offer Codes, including any use by other members of Your App Store Connect team, and for any loss or liability to You or Apple therefrom.

In the event Your Licensed Application is removed from the App Store for any reason, You agree to cease distribution of all Subscription Offer Codes and that Apple may deactivate such Subscription Offer Codes.

You agree that Apple shall have the right to deactivate the Subscription Offer Codes, even if already delivered to End-Users, in the event You violate any of the terms in the Agreement or this Schedule 2.

(d)      You must include the following Subscription Offer Code End-User terms in any instrument used to distribute the Subscription Offer Codes to End-Users (e.g., certificate, card, e-mail, coupons, online posts):  (i) The code expiration date or while supplies last; (ii) The Territory in which the codes can be redeemed; (iii) Apple ID is required, subject to prior acceptance of license and usage terms; (iv) Codes are not for resale, and have no cash value; (v) Full terms apply; see https://www.apple.com/legal/internet-services/itunes/; and (vi) Offer and content are provided by You.

3.14      Where available, You may offer multiple Licensed Applications offered by You in a single collection ("Bundle") to End-Users at a price tier designated by You as set forth in the App Store Connect tool as may be updated from time to time. Furthermore, You hereby authorize and instruct Apple to enable users who have purchased some but not all Licensed Applications in a Bundle to access and download the remaining items in the Bundle ("Complete My Bundle" or "CMB") for the CMB Price.  You will receive proceeds for the CMB Price, which shall equal the Bundle Price set by You less the sum of the retail prices paid by the user for previously purchased Licensed Applications.  In the event the CMB Price is less than Tier 1 and greater than zero under the price tiers set forth in the App Store Connect tool, You hereby authorize and instruct Apple to set the CMB Price for that user at Tier 1. In the event the CMB Price is less than zero, You hereby authorize and instruct Apple to provide the remaining Licensed Applications in the Bundle to the End-User without charge. Each CMB transaction will be reflected in Your statement as follows: (i) a new sale of the full Bundle at the price paid for the Bundle, identified as a CMB sale; and (ii) a return (i.e., a negative transaction) for each eligible purchased Licensed Application contained in the Bundle in the amount previously paid for the Licensed Application, each identified as a CMB return.  Bundles offered at Tier 0 must offer an auto-renewing subscription service pursuant to Section 3.8 of this Schedule 2 in each Licensed Application included in the Bundle, and users who purchase such subscription service from within one app in the Bundle must be able to access that subscription service in each of the other Licensed Applications in the Bundle at no additional cost.

**4.      Ownership and End-User Licensing**

4.1      The parties acknowledge and agree that Apple shall not acquire any ownership interest in or to any of the Licensed Applications or Licensed Application Information, and title, risk of loss, responsibility for, and control over the Licensed Applications shall, at all times, remain with You. Apple may not use any of the Licensed Applications or Licensed Application Information for any purpose, or in any manner, except as specifically authorized in the Agreement or this Schedule 2.

4.2      You may deliver to Apple Your own EULA for any Licensed Application at the time that You deliver that Licensed Application to Apple, in accordance with Section 2.1 of this Schedule 2; provided, however, that Your EULA must include and may not be inconsistent with the minimum terms and conditions specified on Exhibit D to this Schedule 2, and must comply with all applicable laws in all regions where You wish Apple to allow End-Users to download that Licensed Application. Apple shall enable each End-User to review Your EULA (if any) at the time that Apple delivers that Licensed Application to that End-User, and Apple shall notify each End-User that the End-User's use of that Licensed Application is subject to the terms and conditions of Your EULA (if any). In the event that You do not furnish Your own EULA for any Licensed Application to Apple, You

acknowledge and agree that each End-User's use of that Licensed Application shall be subject to Apple's standard EULA (which is part of the App Store Terms of Service).

4.3     You hereby acknowledge that the EULA for each of the Licensed Applications is solely between You and the End-User and conforms to applicable law, and Apple shall not be responsible for, and shall not have any liability whatsoever under, any EULA or any breach by You or any End-User of any of the terms and conditions of any EULA.

**5.      Content Restrictions and Software Rating**

5.1     You represent and warrant that: (a) You have the right to enter into this Agreement, to reproduce and distribute each of the Licensed Applications, and to authorize Apple to permit End-Users to download and use each of the Licensed Applications through one or more App Stores; (b) none of the Licensed Applications, or Apple's or End-Users' permitted uses of those Licensed Applications, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Licensed Applications to Apple on behalf of one or more third parties; (c) each of the Licensed Applications is authorized for distribution, sale and use in, export to, and import into each of the regions designated by You under Section 2.1 of this Schedule 2, in accordance with the laws and regulations of those regions and all applicable export/import regulations; (d) none of the Licensed Applications contains any obscene, offensive or other materials that are prohibited or restricted under the laws or regulations of any of the regions You designated under Section 2.1 of this Schedule 2; (e) all information You provided using the App Store Connect tool, including any information relating to the Licensed Applications, is accurate and that, if any such information ceases to be accurate, You will promptly update it to be accurate using the App Store Connect tool; and (f) in the event a dispute arises over the content of Your Licensed Applications or use of Your intellectual property on the App Store, You agree to permit Apple to share Your contact information with the party filing such dispute and to follow Apple's app dispute process on a nonexclusive basis and without any party waiving its legal rights.

5.2     You shall use the software rating tool set forth on App Store Connect to supply information regarding each of the Licensed Applications delivered by You for marketing and fulfillment by Apple through the App Store under this Schedule 2 in order to assign a rating to each such Licensed Application. For purposes of assigning a rating to each of the Licensed Applications, You shall use Your best efforts to provide correct and complete information about the content of that Licensed Application with the software rating tool. You acknowledge and agree that Apple is relying on: (i) Your good faith and diligence in accurately and completely providing requested information for each Licensed Application; and (ii) Your representations and warranties in Section 5.1 hereof, in making that Licensed Application available for download by End-Users in each of the regions You designated hereunder. Furthermore, You authorize Apple to correct the rating of any Licensed Application of Yours that has been assigned an incorrect rating; and You agree to any such corrected rating.

5.3     In the event that any region You designated hereunder requires the approval of, or rating of, any Licensed Application by any government or industry regulatory agency as a condition for the distribution, sale and/or use of that Licensed Application, You acknowledge and agree that Apple may elect not to make that Licensed Application available for download by End-Users in that region from any App Store.

5.4     Licensed Applications that are targeted at children or otherwise likely to appeal to children, and which pressure children to make purchases (including, but not limited to, phrases such as "buy now" or "upgrade now") or persuade others to make purchases for them, should not be made available in any Territory that has deemed such marketing practices illegal.  You expressly accept and agree to take full responsibility for Your Licensed Applications' compliance with applicable laws pursuant to Section 5.1(c) of this Schedule 2, including without limitation consumer protection, marketing, and gaming laws.  For more information on legal requirements of regions in the European Union, see http://ec.europa.eu/justice/consumer-marketing/unfairtrade/index_en.htm.

**6.      Responsibility and Liability**

6.1     Apple shall have no responsibility for the installation and/or use of any of the Licensed Applications by any End-User. You shall be solely responsible for any and all product warranties, End-User assistance and product support with respect to each of the Licensed Applications.

6.2     You shall be solely responsible for, and Apple shall have no responsibility or liability whatsoever with respect to, any and all claims, suits, liabilities, losses, damages, costs and expenses arising from, or attributable to, the Licensed Applications and/or the use of those Licensed Applications by any End-User, including, but not limited to: (i) claims of breach of warranty, whether specified in the EULA or established under applicable law; (ii) product liability claims; and (iii) claims that any of the Licensed Applications and/or the End-User's possession or use of those Licensed Applications infringes the copyright or other intellectual property rights of any third party.

6.3     In the event that Apple receives any notice or claim from any End-User that: (i) the End-User wishes to cancel its license to any of the Licensed Applications within ninety (90) days of the date of download of that Licensed Application by that End-User or the end of the auto-renewing subscription period offered pursuant to section 3.8, if such period is less than ninety (90) days; or (ii) a Licensed Application fails to conform to Your specifications or Your product warranty or the requirements of any applicable law, Apple may refund to the End-User the full amount of the price paid by the End-User for that Licensed Application. In the event that Apple refunds any such price to an End-User, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that Licensed Application.  In the event that Apple receives any notice or claim from a payment provider that an End-User has obtained a refund for a Licensed Application, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that Licensed Application.

## 7.     Termination

7.1     This Schedule 2, and all of Apple's obligations hereunder, shall terminate upon the expiration or termination of the Agreement. Notwithstanding any such termination, Apple shall be entitled to: (i) all commissions on all copies of the Licensed Applications downloaded by End-Users prior to the date of termination (including the phase-out period set forth in Section 1.4 hereof); and (ii) reimbursement from You of refunds paid by Apple to End-Users, whether before or after the date of termination, in accordance with Section 6.3 of this Schedule 2.  When the Agreement terminates, Apple may withhold all payments due to You for a period that Apple determines is reasonable in order to calculate and offset any End-User refunds.  If at any time Apple determines or suspects that You or any developers with which You are affiliated have engaged in, or encouraged or participated with other developers to engage in, any suspicious, misleading, fraudulent, improper, unlawful or dishonest act or omission, Apple may withhold payments due to You or such other developers.

7.2     In the event that You no longer have the legal right to distribute the Licensed Applications, or to authorize Apple to allow access to those Licensed Applications by End-Users, in accordance with this Schedule 2, You shall promptly notify Apple and withdraw those Licensed Applications from the App Store using the tools provided on the App Store Connect site; provided, however, that such withdrawal by You under this Section 7.2 shall not relieve You of any of Your obligations to Apple under this Schedule 2, or any liability to Apple and/or any End-User with respect to those Licensed Applications.

7.3     Apple reserves the right to cease marketing, offering, and allowing download by End-Users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes that: (i) those Licensed Applications are not authorized for export to one or more of the regions listed on Exhibit A, in accordance with the Export Administration Regulations or other restrictions; (ii) those Licensed Applications and/or any End-User's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party; (iii) the distribution, sale and/or use of those Licensed Applications violates any applicable law in any region You designated under Section 2.1 of this Schedule 2; (iv) You have violated the terms of the Agreement, this Schedule 2, or other documentation including without limitation the App Store Review Guidelines; (v) Your Licensed Applications violate Section 5.4 of this Schedule 2, including without limitation upon notice by a regulator of an alleged violation; or (vi) You or anyone representing You or Your company are subject to sanctions of any region in which Apple operates. An election by Apple to cease the marketing and allowing download of any Licensed Applications, pursuant to this Section 7.3, shall not relieve You of Your obligations under this Schedule 2.

7.4      You may withdraw any or all of the Licensed Applications from the App Store, at any time, and for any reason, by using the tools provided on the App Store Connect site, except that, with respect to Your End-Users, You hereby authorize and instruct Apple to fulfill sections 1.2(b), (c), and (d) of this Schedule 2, which shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 5.1 and 7.2 of this Schedule 2.

**8.      Legal Consequences**

The relationship between You and Apple established by this Schedule 2 may have important legal and/or tax consequences for You. You acknowledge and agree that it is Your responsibility to consult with Your own legal and tax advisors with respect to Your legal and tax obligations hereunder.

By clicking to agree to this Schedule 3, which is hereby offered to You by Apple, You agree with Apple to amend that certain Apple Developer Program License Agreement currently in effect between You and Apple (the "Agreement") to add this Schedule 3 thereto (supplanting any existing Schedule 3). Except as otherwise provided herein, all capitalized terms shall have the meanings set forth in the Agreement.

**Schedule 3**

**1.      Appointment of Agent and Commissionaire**

1.1      You hereby appoint Apple and Apple Subsidiaries (collectively "Apple") as: (i) Your agent for the marketing, sale and delivery of Custom Applications via Custom App Distribution to Custom App Distribution Customers and applicable End-Users located in those regions listed on Exhibit A, Section 1 to this Schedule 3, subject to change; and (ii) Your commissionaire for the marketing, sale, and delivery of Custom Applications to Custom App Distribution Customers and applicable End-Users located in those regions listed on Exhibit A, Section 2 to this Schedule 3, subject to change, during the Delivery Period. The most current list of App Store regions among which You may select with respect to Your Custom Applications shall be set forth in the App Store Connect tool and may be updated by Apple from time to time.  You hereby acknowledge that Apple will market and make the Custom Applications available for purchase by Custom App Distribution Customers through the Custom App Distribution Site, and downloadable by End-Users or, solely in connection with certain Apple licensed software, by Custom App Distribution Customers using a single Apple ID for distribution to multiple End-Users, for You and on Your behalf.

For purposes of this Schedule 3:

"Content Code(s)" means alphanumeric content codes generated by Apple and distributed to Custom App Distribution Customers that may be redeemed by an End-User for the download of a licensed copy of the Custom Application.

"Custom Application" also includes any additional permitted functionality, content, or services sold by You from within a Custom Application using the In-App Purchase API.

"End-User" includes the individual or Legacy Contacts authorized to use the Custom Application by the institutional purchaser, the institutional administrator responsible for management of installations on shared devices, as well as authorized institutional purchasers themselves, including educational institutions approved by Apple, which may acquire the Custom Applications for use by their employees, agents, and affiliates.

"Licensed Application" shall include any content, functionality, extensions, stickers, or services offered in the software application.

"Licensed Application Information" includes Licensed Application Information associated with a Custom Application.

"Volume Content Service" means an Apple program that offers the ability to obtain Custom Applications and make purchases of Licensed Applications in bulk subject to the Volume Content Terms, conditions, and program requirements.

"Custom App Distribution Customer" means a third party that is enrolled in Apple's Volume Content Service and/or Custom App Distribution.

"You" shall include App Store Connect users authorized by You to submit Licensed Applications and associated metadata on Your behalf.

1.2      In furtherance of Apple's appointment under Section 1.1 of this Schedule 3, You hereby authorize and instruct Apple to:

(a)      market, solicit, and obtain orders on Your behalf for Custom Applications from Custom App Distribution Customers identified by You and their related End-Users in the regions identified in the App Store Connect tool;

(b)      provide hosting services to You, in order to allow for the storage of, and End-User access to, the Custom Applications and, solely in connection with certain Apple licensed software, permit third party hosting of such Custom Applications;

(c)      make copies of, format, and otherwise prepare Custom Applications for acquisition and download by End-Users, including adding the Security Solution and other optimizations identified in the Agreement;

(d)      allow or, in the case of cross-border assignments of Volume Content purchases, arrange for End-Users to access and re-access copies of the Custom Applications, so that End-Users may acquire and electronically download those Custom Applications developed by You, Licensed Application Information, and associated metadata to End-Users through the Custom App Distribution Site. In addition, You hereby authorize distribution of Your Custom Applications under this Schedule 3 for use by: (i) multiple End-Users when the Custom Application is purchased by a single institutional customer via the Volume Content Service for use by its End-Users and/or for installation on devices with no associated Apple IDs that are owned or controlled by that institutional customer in accordance with the Volume Content Terms, conditions, and program requirements; and (ii) eligible Legacy Contacts of an End-User to access Your Custom Application along with associated information and metadata stored in iCloud as described in https://support.apple.com/kb/HT212360;

(e)      issue invoices for the purchase price payable by Custom App Distribution Customers for the Custom Applications;

(f)      use (i) screen shots and/or up to 30 second excerpts of the Custom Applications; (ii) trademarks and logos associated with the Custom Applications; and (iii) Licensed Application Information, for promotional purposes in marketing materials and in connection with vehicle displays, excluding those portions of the Custom Applications, trademarks or logos, or Custom Application Information which You do not have the right to use for promotional purposes, and which You identify in writing at the time that the Custom Applications are delivered by You to Apple under Section 2.1 of this Schedule 3, and use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and in connection with vehicle displays; and

(g)      otherwise use Custom Applications, Licensed Application Information and associated metadata as may be reasonably necessary in the marketing and delivery of the Custom Applications in accordance with this Schedule 3. You agree that no royalty or other compensation is payable for the rights described above in Section 1.2 of this Schedule 3.

1.3      The parties acknowledge and agree that their relationship under this Schedule 3 is, and shall be, that of principal and agent, or principal and commissionaire, as the case may be, as described in Exhibit A, Section 1 and Exhibit A, Section 2, respectively, and that You, as principal, are, and shall be, solely responsible for any and all claims and liabilities involving or relating to, the Custom Applications, as provided in this Schedule 3. The parties acknowledge and agree that Your appointment of Apple as Your agent or commissionaire, as the case may be, under this Schedule 3 is non-exclusive.  You hereby represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent and/or commissionaire for the delivery of Your Custom Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party.

1.4      For purposes of this Schedule 3, the "Delivery Period" shall mean the period beginning on the Effective Date of the Agreement, and expiring on the last day of the Agreement or any renewal thereof; provided, however, that Apple's appointment as Your agent or commissionaire shall survive expiration of the Agreement for a reasonable phase-out period not to exceed thirty (30) days after the final outstanding Content Code for Your Custom Applications has been redeemed and further provided that, solely with respect to Your End-Users, subsections 1.2(b), (c), and (d) of this Schedule 3 shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 5.1 and 7.2 of this Schedule 3.

**2.      Delivery of the Custom Applications to Apple**

2.1      You will deliver to Apple, at Your sole expense, using the App Store Connect tool, the Custom Applications, Licensed Application Information and associated metadata, in a format and manner prescribed by Apple, as required for the delivery of the Custom Applications to End-Users in accordance with this Schedule 3

and will identify this material as a Custom Application via the App Store Connect site. Metadata You deliver to Apple under this Schedule 3 will include: (i) the title and version number of each of the Custom Applications; (ii) the Custom App Distribution Customers You designate as authorized purchasers of the Custom Application and whose End-Users may use the Content Codes; (iii) any copyright or other intellectual property rights notices; (iv) Your privacy policy; (v) Your End-User license agreement ("EULA"), if any, in accordance with Section 4.2 of this Schedule 3; and (vi) any additional metadata set forth in the Documentation and/or the App Store Connect tool as may be updated from time to time, including metadata designed to enhance search and discovery for content on Apple-branded hardware.

2.2     All Custom Applications will be delivered by You to Apple using software tools, a secure FTP site address and/or such other delivery methods as prescribed by Apple.

2.3     You hereby certify that all of the Custom Applications You deliver to Apple under this Schedule 3 are authorized for export from the United States to each of the regions listed on Exhibit A, in accordance with the requirements of all applicable laws, including but not limited to the United States Export Administration Regulations, 15 C.F.R. Parts 730-774. You further represent and warrant that all versions of the Custom Applications You deliver to Apple are not subject to the International Traffic In Arms Regulations 22 C.F.R. Parts 120-130 and are not designed, made, modified or configured for any military end users or end uses. Without limiting the generality of this Section 2.3, You certify that (i) none of the Custom Applications contains, uses or supports any data encryption or cryptographic functions; or (ii) in the event that any Custom Application contains, uses or supports any such data encryption or cryptographic functionality, You will upon request provide Apple with PDF copies of export classification ruling (CCATS) issued by the United States Commerce Department, Bureau of Industry and Security ("BIS") or any self-classification reports submitted to the BIS, and appropriate authorizations from other regions that mandate import authorizations for that Custom Application, as required. You acknowledge that Apple is relying upon Your certification in this Section 2.3 in allowing End-Users to access and download the Custom Applications under this Schedule 3. Except as provided in this Section 2.3, Apple will be responsible for compliance with the requirements of the Export Administration Regulations in allowing End-Users to access and download the Custom Applications under this Schedule 3.

2.4     You shall be responsible for determining and implementing any age ratings or parental advisory warnings required by the applicable government regulations, ratings board(s), service(s), or other organizations (each a "Ratings Board") for any video, television, gaming or other content offered in Your Custom Application for each locality in the Territory.  Where applicable, You shall also be responsible for providing any content restriction tools or age verification functionality before enabling end-users to access mature or otherwise regulated content within Your Custom Application.

**3.     Delivery of the Custom Applications to End-Users**

3.1     You acknowledge and agree that Apple, in the course of acting as agent and/or commissionaire for You, is hosting the Custom Applications, providing Content Codes to Custom App Distribution Customers, and is allowing the download of the Custom Applications by End-Users, on Your behalf. However, You are responsible for hosting and delivering content or services sold by You using the In-App Purchase API, except for content that is included within the Custom Application itself (i.e., the In-App Purchase simply unlocks the content) or content hosted by Apple pursuant to Section 3.3 of the Program Agreement. All of the Custom Applications shall be marketed by Apple, on Your behalf, to End-User Custom App Distribution Customers at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool, which may be updated from time to time by Apple. You may change the price tier for any Custom Application at any time, at Your discretion, in accordance with the pricing schedule set forth in the App Store Connect tool. As Your agent and/or commissionaire, Apple shall be solely responsible for the collection of all prices payable by Custom App Distribution Customers for Custom Applications acquired by End-Users under this Schedule 3.

3.2     In the event that the sale or delivery of any of the Custom Applications to any End-User is subject to any sales, use, goods and services, value added, telecommunications or other similar tax or levy, under applicable law, responsibility for the collection and remittance of that tax for sales of the Custom Applications to End-Users will be determined in accordance with Exhibit B to this Schedule 3 as updated from time to time via the App Store Connect site. You are solely responsible for selecting and maintaining accurate inputs for tax categorization for Your Custom Applications via the App Store Connect site, which may be updated from time

to time. Such tax categorization will be applied to the sale and delivery of Your Custom Applications. Any adjustments that You make to the tax categorization for Your Custom Applications will take effect for future sales of Custom Applications after Apple has processed the adjustment within a reasonable period of time. Adjustments that You make to the tax categorization for Your Custom Applications will not apply to any sales of Custom Applications occurring before Apple has processed Your tax categorization adjustment.

If the tax categorization of Your Custom Applications is deemed to be inaccurate by any tax authority, You are solely responsible for the tax consequences. If Apple deems in its reasonable discretion that the tax categorization of Your Custom Applications is inaccurate, Apple reserves the right to hold in trust amounts owed to You, until such time as You correct the tax categorization. Upon correction of the tax categorization, Apple will deduct any penalties and interest resulting from the inaccuracy, and remit to You any remaining amounts held in trust by Apple for You, without interest, in accordance with the provisions of this Schedule 3. You shall indemnify and hold Apple harmless against any and all claims by any tax authority for any underpayment or overpayment of any sales, use, goods and services, value added, telecommunications or other tax or levy, and any penalties and/or interest thereon.

3.3     In furtherance of the parties' respective tax compliance obligations, Apple requires that You comply with the requirements listed on Exhibit C to this Schedule 3 or on App Store Connect depending upon, among other things, (i) Your region of residence, and (ii) the regions designated by You in which You wish Apple to allow sale of and access to the Custom Applications. In the event that Apple collects any amounts corresponding to the purchase price for any of Your Custom Applications before You have provided Apple with any tax documentation required under Exhibit C to this Schedule 3, Apple may decide to not remit those amounts to You, and to hold those amounts in trust for You, until such time as You have provided Apple with the required tax documentation. Upon receipt of all required tax documents from You, Apple will remit to You any amounts held in trust by Apple for You, without interest, under this Section 3.3, in accordance with the provisions of this Schedule 3.

3.4     Apple shall be entitled to the following commissions in consideration for its services as Your agent and/or commissionaire under this Schedule 3:

For sales of Custom Applications to Custom App Distribution Customers, Apple shall be entitled to a commission equal to thirty percent (30%) of all prices payable by each Custom App Distribution Customer. Solely for auto-renewing subscription purchases made by customers who have accrued greater than one year of paid subscription service within a Subscription Group (as defined below) and notwithstanding any Retention Grace Periods or Renewal Extension Periods, Apple shall be entitled to a commission equal to fifteen percent (15%) of all prices payable by each End-User for each subsequent renewal.  Retention Grace Period refers to the time period between the end of a customer's subscription (e.g. due to cancelation or non-payment) and the beginning of a new subscription within the same Subscription Group, provided that such time period is no greater than 60 days, subject to change. Renewal Extension Period refers to the time by which You extend the renewal date of the customer's subscription, without additional charges. For purposes of determining the commissions to which Apple is entitled under this Section 3.4, the prices payable by Custom App Distribution Customers shall be net of any and all taxes collected, as provided in Section 3.2 of this Schedule 3.

Except as otherwise provided in Section 3.2 of this Schedule 3, Apple shall be entitled to the commissions specified in Section 3.4 hereof without reduction for any taxes or other government levies, including any and all taxes or other, similar obligations of You, Apple or any Custom App Distribution Customer relating to the delivery or use of the Custom Applications.  For sales of Licensed Applications and/or Custom Applications developed by Apple, Apple is not entitled to a commission.

3.5     Upon collection of any amounts from any Custom App Distribution Customer as the price for any Custom Application delivered to that Custom App Distribution Customer's designated End-Users hereunder, Apple shall deduct the full amount of its commission with respect to that Custom Application, and any taxes collected by Apple under Section 3.2 and 3.4 hereof, and shall remit to You, or issue a credit in Your favor, as the case may be, the remainder of those prices in accordance with Apple standard business practices, including the following: remittance payments (i) are made by means of wire transfer only; (ii) are subject to minimum monthly remittance amount thresholds; (iii) require You to provide certain remittance-related information on the App Store Connect site; and (iv) subject to the foregoing requirements, will be made no later than forty-five (45) days following the close of the monthly period in which the corresponding amount was

received by Apple from the End-User. No later than forty-five (45) days following the end of each monthly period, Apple will make available to You on the App Store Connect site a sales report in sufficient detail to permit You to identify the Custom Applications sold in that monthly period and the total amount to be remitted to You by Apple. You hereby acknowledge and agree that Apple shall be entitled to a commission, in accordance with this Section 3.5 on the delivery of any Content Codes to any Custom App Distribution Customer, even if Apple is unable to collect the price for that Custom Application from the Custom App Distribution Customer. In the event that the purchase price received by Apple from any Custom App Distribution Customer for any Custom Application is in a currency other than the remittance currency agreed between Apple and You, the purchase price for that Custom Application shall be converted to the remittance currency, and the amount to be remitted by Apple to You shall be determined, in accordance with an exchange rate fixed for the Delivery Period, as reflected in the App Store Connect tool, as may be updated from time to time, pursuant to section 3.1 of this Schedule 3.  Apple may provide a means on App Store Connect to enable You to designate a primary currency for the bank account designated by You for receiving remittances ("Designated Currency"). Apple may cause Apple's bank to convert all remittances in any remittance currency other than the Designated Currency into the Designated Currency prior to remittance to You. You agree that any resulting currency exchange differentials or fees charged by Apple's bank may be deducted from such remittances. You remain responsible for any fees (e.g., wire transfer fees) charged by Your bank or any intermediary banks between Your bank and Apple's bank.

3.6      In the event that Apple's commission or any price payable by any Custom App Distribution Customer for any of the Custom Applications is subject to (i) any withholding or similar tax; or (ii) any sales, use, goods and services, value added, telecommunications or other tax or levy not collected by Apple under Section 3.2 hereof; or (iii) any other tax or other government levy of whatever nature, the full amount of that tax or levy shall be solely for Your account, and shall not reduce the commission to which Apple is entitled under this Schedule 3.

3.7      In the event that any remittance made by Apple to You is subject to any withholding or similar tax, the full amount of that withholding or similar tax shall be solely for Your account, and will not reduce the commission to which Apple is entitled on that transaction. If Apple reasonably believes that such tax is due, Apple will deduct the full amount of such withholding or similar tax from the gross amount owed to You, and will pay the full amount withheld over to the competent tax authorities. Apple will apply a reduced rate of withholding tax, if any, provided for in any applicable income tax treaty only if You furnish Apple with such documentation required under that income tax treaty or otherwise satisfactory to Apple, sufficient to establish Your entitlement to the benefit of that reduced rate of withholding tax. Upon Your timely request to Apple in writing, using means reasonably designated by Apple, Apple will use commercially practical efforts to report to You the amount of Apple's payment of withholding or similar taxes to the competent tax authorities on Your behalf. You will indemnify and hold Apple harmless against any and all claims by any competent tax authority for any underpayment of any such withholding or similar taxes, and any penalties and/or interest thereon, including, but not limited to, underpayments attributable to any erroneous claim or representation by You as to Your entitlement to, or Your disqualification for, the benefit of a reduced rate of withholding tax.

3.8      You may offer auto-renewing subscriptions in select Territories using the In-App Purchase API subject to the terms of this Schedule 3, provided that:

(a)      Auto-renew functionality must be on a weekly, monthly, bi-monthly, tri-monthly, semi-annual, or annual basis at prices You select in the App Store Connect tool.  You may, however, offer more than one option.

(b)      You clearly and conspicuously disclose to users the following information regarding Your auto-renewing subscription:

•    Title of auto-renewing subscription, which may be the same as the in-app product name
•    Length of subscription
•    Price of subscription, and price per unit if appropriate

Links to Your Privacy Policy and Terms of Use must be accessible within Your Licensed Application or Custom Application.

(c)     You must fulfill the offer during the entire subscription period, as marketed, including any Billing Grace period You authorize, and, in the event You breach this section 3.8(c) of Schedule 3, You hereby authorize and instruct Apple to refund to the End-User the full amount, or any portion thereof in Apple's sole discretion, of the price paid by the End-User for that subscription. Billing Grace Period refers to the period during which Developers agree to provide paid service for free to users who do not recover from a billing error.  In the event that Apple refunds any such price to an End-User, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that subscription. You acknowledge that Apple may exercise its rights under section 7.3 of this Schedule 3 for repeated violations of this provision.

3.9     When You make price changes to an existing subscription item, You may elect to retain current pricing for Your existing customers by indicating Your intent in the App Store Connect tool. When You increase pricing for existing subscribers in regions that require end-user consent, they will be prompted to review and agree to the new price, otherwise the auto-renewal feature will be disabled.

3.10    To the extent You promote and offer for sale auto-renewing subscriptions within or outside of Your Custom Application, You must do so in compliance with all legal and regulatory requirements.

3.11    Subscription services purchased within Custom Applications must use In-App Purchase, which will be charged to the End-User iTunes account, not the Custom App Distribution Customer account.

In addition to using the In-App Purchase API, a Custom Application may read or play content (magazines, newspapers, books, audio, music, video) that is offered outside of the Custom Application (such as, by way of example, through Your website) provided that You do not link to or market external offers for such content within the Custom Application.  You are responsible for authentication access to content acquired outside of the Custom Application.

3.12    If Your Custom Application is periodical content-based (e.g. magazines and newspapers), Apple may provide You with the name, email address, and zip code associated with an End-User's account when they purchase an auto-renewing subscription via the In-App Purchase API, provided that such user consents to the provision of data to You, and further provided that You may only use such data to promote Your own products and otherwise in strict compliance with Your publicly posted Privacy Policy, a copy of which must be readily viewed through and is consented to in Your Custom Application.  You may offer a free incentive to extend the subscription if the user agrees to send this information.

**4.     Ownership and End-User Licensing**

4.1     The parties acknowledge and agree that Apple shall not acquire any ownership interest in or to any of the Custom Applications or Licensed Application Information, and title, risk of loss, responsibility for, and control over the Custom Applications shall, at all times, remain with You. Apple may not use any of the Custom Applications or Licensed Application Information for any purpose, or in any manner, except as specifically authorized in this Schedule 3.

4.2     You may deliver to Apple Your own EULA for any Custom Application at the time that You deliver that Custom Application to Apple, in accordance with Section 2.1 of this Schedule 3; provided, however, that Your EULA must include and may not be inconsistent with the minimum terms and conditions specified on Exhibit D to this Schedule 3, and must comply with all applicable laws in the United States. Apple shall allow each End-User to which Apple allows access to any such Custom Application to review Your EULA (if any) at the time that Apple delivers that Custom Application to that End-User, and Apple shall notify each End-User that the End-User's use of that Custom Application is subject to the terms and conditions of Your EULA (if any). In the event that You do not furnish Your own EULA for any Custom Application to Apple, You acknowledge and agree that each End-User's use of that Custom Application shall be subject to Apple's standard EULA (which is part of the App Store Terms of Service).

4.3     You hereby acknowledge that the EULA for each of the Custom Applications is solely between You and the End-User and conforms to applicable law, and Apple shall not be responsible for, and shall not have any liability whatsoever under, any EULA or any breach by You or any End-User of any of the terms and conditions of any EULA.

**5.**     **Content Restrictions and Software Rating**

5.1      You represent and warrant that: (a) You have the right to enter into this Agreement, to reproduce and distribute each of the Custom Applications, and to authorize Apple to permit End-Users to download and use each of the Custom Applications through the Custom App Distribution Site; (b) none of the Custom Applications, or Apple's or End-Users' permitted uses of those Custom Applications, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Custom Applications to Apple on behalf of one or more third parties other than under license grant from one or more Custom App Distribution Customers; (c) each of the Custom Applications is authorized for distribution, sale and use in, export to, and import into each of the regions designated by You pursuant to Section 2.1 of this Schedule 3, in accordance with the laws and regulations of those regions and all applicable export/import regulations; (d) none of the Custom Applications contains any obscene, offensive or other materials that are prohibited or restricted under the laws or regulations of any of the regions You designated pursuant to Section 2.1 of this Schedule 3; (e) all information You provided using the App Store Connect tool, including any information relating to the Custom Applications, is accurate and that, if any such information ceases to be accurate, You will promptly update it to be accurate using the App Store Connect tool; and (f) in the event a dispute arises over the content of Your Custom Applications or use of Your intellectual property in connection with the Custom App Distribution Site, You agree to permit Apple to share Your contact information with the party filing such dispute and to follow Apple's app dispute process on a non-exclusive basis and without any party waiving its legal rights.

5.2      You shall use the software rating tool set forth on App Store Connect to supply information regarding each of the Custom Applications delivered by You for marketing and fulfillment by Apple through the Custom App Distribution Site under this Schedule 3 in order to assign a rating to each such Custom Application. For purposes of assigning a rating to each of the Custom Applications, You shall use Your best efforts to provide correct and complete information about the content of that Custom Application with the software rating tool. You acknowledge and agree that Apple is relying on: (i) Your good faith and diligence in accurately and completely providing requested information for each Custom Application; and (ii) Your representations and warranties in Section 5.1 hereof, in making that Custom Application available for download by End-Users in each of the regions You designated hereunder. Furthermore, You authorize Apple to correct the rating of any Custom Application of Yours that has been assigned an incorrect rating; and You agree to any such corrected rating.

5.3      In the event that any region You designated hereunder requires the approval of, or rating of, any Custom Application by any government or industry regulatory agency as a condition for the distribution, sale and/or use of that Custom Application, You acknowledge and agree that Apple may elect not to make that Custom Application available for purchase by Custom App Distribution Customers and/or download by End-Users in that region from the Custom App Distribution Site.

5.4   Custom Applications that are targeted at children or otherwise likely to appeal to children, and which pressure children to make purchases (including, but not limited to, phrases such as "buy now" or "upgrade now") or persuade others to make purchases for them, should not be made available in any Territory that has deemed such marketing practices illegal.  You expressly accept and agree to take full responsibility for Your Custom Applications' compliance with applicable laws pursuant to Section 5.1(c) of this Schedule 3, including without limitation consumer protection, marketing, and gaming laws. For more information on legal requirements of regions in the European Union, see http://ec.europa.eu/justice/consumer-marketing/unfairtrade/index_en.htm.

**6.**     **Responsibility and Liability**

6.1      Apple shall have no responsibility for the installation and/or use of any of the Custom Applications by any End-User. You shall be solely responsible for any and all product warranties, End-User assistance and product support with respect to each of the Custom Applications.

6.2      You shall be solely responsible for, and Apple shall have no responsibility or liability whatsoever with respect to, any and all claims, suits, liabilities, losses, damages, costs and expenses arising from, or attributable to, the Custom Applications and/or the use of those Custom Applications by any End-User, including, but not limited to: (i) claims of breach of warranty, whether specified in the EULA or established

under applicable law; (ii) product liability claims; and (iii) claims that any of the Custom Applications and/or the End-User's possession or use of those Custom Applications infringes the copyright or other intellectual property rights of any third party.

6.3       In the event that Apple receives any notice or claim from any End-User that: (i) the End-User wishes to cancel its license to any of the Custom Applications within ninety (90) days of the date of download of that Custom Application by that End-User or the end of the auto-renewing subscription period offered pursuant to section 3.8 if such period is less than ninety (90) days; or (ii) a Custom Application fails to conform to Your specifications or Your product warranty or the requirements of any applicable law, Apple may refund to the Custom App Distribution Customer and/or End-User, as applicable, the full amount of the price paid by the Custom App Distribution Customer or End-User for that Custom Application. In the event that Apple refunds any such price to an End-User, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that Custom Application. In the event that Apple receives any notice or claim from a payment provider that an End-User has obtained a refund for a Custom Application, You shall reimburse, or grant Apple a credit for, an amount equal to the price for that Custom Application.

## 7.    Termination

7.1       This Schedule 3, and all of Apple's obligations hereunder, shall terminate upon the expiration or termination of the Agreement. Notwithstanding any such termination, Apple shall be entitled to: (i) all commissions on all Content Codes redeemable for copies of the Custom Applications provided to Custom App Distribution Customers prior to the date of termination (including the phase-out period set forth in Section 1.4 hereof); and (ii) reimbursement from You of refunds paid by Apple to Custom App Distribution Customers and/or End-Users, whether before or after the date of termination, in accordance with Section 6.3 of this Schedule 3.  When the Agreement terminates, Apple may withhold all payments due to You for a period that Apple determines is reasonable in order to calculate and offset any Custom App Distribution Customer and/or End-User refunds.  If at any time Apple determines or suspects that You or any developers with which You are affiliated have engaged in, or encouraged or participated with other developers to engage in, any suspicious, misleading, fraudulent, improper, unlawful or dishonest act or omission, Apple may withhold payments due to You or such other developers.

7.2       In the event that You no longer have the legal right to distribute the Custom Applications, or to authorize Apple to allow access to those Custom Applications by End-Users, in accordance with this Schedule 3, You shall promptly notify Apple and withdraw those Custom Applications from the Custom App Distribution Site using the tools provided on the App Store Connect tool; provided, however, that such withdrawal by You under this Section 7.2 shall not relieve You of any of Your obligations to Apple under this Schedule 3, or any liability to Apple and/or any End-User with respect to those Custom Applications.

7.3       Apple reserves the right to cease marketing, offering, and allowing purchase by Custom App Distribution Customers and download by End-Users of the Custom Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Custom Applications if Apple reasonably believes that: (i) those Custom Applications are not authorized for export to one or more of the regions listed on Exhibit A, in accordance with the Export Administration Regulations or other restrictions; (ii) those Custom Applications and/or any End-User's possession and/or use of those Custom Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party; (iii) the distribution, sale and/or use of those Custom Applications violates any applicable law in any region You designated pursuant to Section 2.1 of this Schedule 3; (iv) You have violated the terms of the Agreement, this Schedule 3, or other documentation including without limitation the App Store Review Guidelines; (v) Your Custom Applications violate Section 5.4 of this Schedule 3, including without limitation upon notice by a regulator of an alleged violation; or (vi) You or anyone representing You or Your company are subject to sanctions of any region in which Apple operates. An election by Apple to cease the marketing and allowing download of any Custom Applications, pursuant to this Section 7.3, shall not relieve You of Your obligations under this Schedule 3.

7.4       You may withdraw any or all of the Custom Applications from the Custom App Distribution Site, at any time, and for any reason, by using the tools provided on the App Store Connect site, except that, with respect to Your End-Users, You hereby authorize and instruct Apple to fulfill any outstanding Content Code redemption

requests by End-Users and to fulfill sections 1.2(b), (c), and (d) of this Schedule 3, which shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 5.1 and 7.2 of this Schedule 3.

**8.**     **Legal Consequences**

The relationship between You and Apple established by this Schedule 3 may have important legal and/or tax consequences for You. You acknowledge and agree that it is Your responsibility to consult with Your own legal and tax advisors with respect to Your legal and tax obligations hereunder.

**EXHIBIT A**

**1.      Apple as Agent**

You appoint Apple Canada, Inc. ("Apple Canada") as Your agent for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the following region:

Canada

You appoint Apple Pty Limited ("APL") as Your agent for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the following regions:

Australia
New Zealand

You appoint Apple Inc. as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the following region:

United States

You appoint Apple Services LATAM LLC as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the regions identified below, as updated from time to time via the App Store Connect site:

| | | | |
|---|---|---|---|
| Argentina* | Cayman Islands | Guatemala* | St. Lucia |
| Anguilla | Chile* | Honduras* | St. Vincent & The |
| Antigua & Barbuda | Colombia* | Jamaica | Grenadines |
| Bahamas | Costa Rica* | Mexico* | Suriname |
| Barbados | Dominica | Montserrat | Trinidad & Tobago |
| Belize | Dominican Republic* | Nicaragua* | Turks & Caicos |
| Bermuda | Ecuador* | Panama* | Uruguay |
| Bolivia* | El Salvador* | Paraguay* | Venezuela* |
| Brazil* | Grenada | Peru* | |
| British Virgin Islands | Guyana | St. Kitts & Nevis | |

*Custom Applications are only available in these regions.

You appoint iTunes KK as Your agent pursuant to Article 643 of the Japanese Civil Code for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the following region:

Japan

**2.      Apple as Commissionaire**

You appoint Apple Distribution International Ltd., as Your commissionaire for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in the following regions, as updated from time to time via the App Store Connect site. For the purposes of this Agreement, "commissionaire" means an agent who purports to act on their own behalf and concludes agreements in their own name but acts on behalf of other persons, as generally recognized in many Civil Law systems.

| | | | |
|---|---|---|---|
| Afghanistan | Belgium* | Cambodia | Croatia |
| Albania | Benin | Cameroon | Cyprus* |
| Algeria | Bhutan | Cape Verde | Czech Republic |
| Angola | Bosnia and | Chad | Denmark* |
| Armenia | Herzegovina | China* | Egypt* |
| Austria | Botswana | Congo (Democratic | Estonia* |
| Azerbaijan | Brunei | Republic of) | Fiji |
| Bahrain* | Bulgaria* | Congo (Republic of) | Finland* |
| Belarus | Burkina-Faso | Cote d'Ivoire | France* |

Gabon
Gambia
Georgia
Germany*
Ghana
Greece*
Guinea-Bissau
Hong Kong*
Hungary
Iceland*
India
Indonesia
Iraq
Ireland*
Israel*
Italy*
Jordan
Kazakhstan
Kenya
Korea*
Kosovo
Kuwait
Kyrgyzstan
Laos
Latvia*
Lebanon

Liberia
Libya
Lithuania*
Luxembourg*
Macau
Macedonia
Madagascar
Malawi
Malaysia*
Maldives
Mali
Malta, Republic of*
Mauritania
Mauritius
Micronesia, Fed
States of
Moldova
Mongolia
Montenegro
Morocco
Mozambique
Myanmar
Namibia
Nauru
Nepal
Netherlands*

Niger
Nigeria
Norway*
Oman
Pakistan
Palau
Papua New Guinea
Philippines*
Poland
Portugal
Qatar*
Romania*
Russia*
Rwanda
Sao Tome e
Principe
Saudi Arabia*
Senegal
Serbia
Seychelles
Sierra Leone
Singapore*
Slovakia*
Slovenia*
Solomon Islands
South Africa

Spain*
Sri Lanka
Swaziland
Sweden*
Switzerland*
Taiwan*
Tajikistan
Tanzania
Thailand*
Tonga
Tunisia
Turkey*
Turkmenistan
UAE*
Uganda
Ukraine*
United Kingdom*
Uzbekistan
Vanuatu
Vietnam*
Yemen
Zambia
Zimbabwe

*Custom Applications are only available in these regions.

**EXHIBIT B**

1.     If taxes apply, Apple shall collect and remit to the competent tax authorities the taxes described in Section 3.2 of Schedule 2 for sales of the Licensed Applications to End-Users and in Section 3.2 of Schedule 3 for sales of the Custom Applications to the Custom App Distribution Customers located in the following regions, as updated from time to time via the App Store Connect site:

| | | | |
|---|---|---|---|
| Albania | Czech Republic | Lithuania | Slovakia |
| Armenia | Denmark | Luxembourg | Slovenia |
| Australia | Estonia | Malaysia | South Africa |
| Austria | Finland | Malta, Republic of | Spain |
| Bahamas | France | Mexico*** | Sweden |
| Bahrain | Georgia | Moldova | Switzerland |
| Barbados | Germany | Netherlands | Taiwan |
| Belarus | Ghana | New Zealand | Tajikistan** |
| Belgium | Greece | Nigeria | Thailand** |
| Bosnia and | Hungary | Norway | Turkey |
| Herzegovina | Iceland | Oman | Ukraine |
| Bulgaria | India | Poland | United Arab |
| Canada | Indonesia** | Portugal | Emirates |
| Cambodia | Ireland | Romania | Uganda |
| Cameroon | Italy | Russia** | United Kingdom |
| Chile | Kazakhstan | Saudi Arabia | United States |
| China* | Kenya | Serbia | Uruguay† |
| Colombia | Korea** | Singapore** | Uzbekistan** |
| Croatia | Kosovo | | Zimbabwe |
| Cyprus | Kyrgyzstan | | |
| | Latvia | | |

* Except for certain taxes to be collected as required by the Chinese government, Apple shall not collect or remit additional taxes or levies in China.  You understand and agree that You shall be solely responsible for the collection and remittance of any taxes as may be required by local law.

** Solely applicable to non-resident Developers. Apple shall not collect and remit taxes for local Developers, and such developers shall be solely responsible for the collection and remittance of such taxes as may be required by local law.

*** Solely applicable to Developers who are not registered with the local tax authorities for VAT purposes in Mexico. For Developers who are registered for VAT purposes in Mexico, Apple shall collect and remit (i) the total VAT amount to local corporations and foreign residents, and (ii) the applicable VAT amount to local individuals and the remaining VAT amount to the local tax authorities, in accordance with local law. Developers shall be responsible for the remittance of such VAT to competent tax authorities as may be required by local law.

† Except for certain taxes on digital transactions that Apple must collect as required by the Uruguayan government, Apple shall not collect or remit additional taxes or levies in Uruguay. You understand and agree that You shall be solely responsible for the collection and remittance of any taxes imposed on Your earnings as may be required by local law.

2.     Apple shall not collect and remit the taxes described in Section 3.2 of Schedule 2 for sales of the Licensed Applications to End-Users and in Section 3.2 of Schedule 3 for sales of the Custom Applications to the Custom App Distribution Customers located in the regions not listed above in Section 1 of this Exhibit B. You shall be solely responsible for the collection and remittance of such taxes as may be required by local law.

**EXHIBIT C**

## 1. AUSTRALIA

### 1.1   General

(a)   Terms defined in the A New Tax System (Goods and Services Tax) Act 1999 ("GST Act") have the same meaning when used in this Section 1.

(b)   This Section 1 of Exhibit C survives the termination of the Agreement.

### 1.2   Delivery of Licensed and Custom Applications to End-Users in Australia

Where You designate APL to allow access to the Licensed and Custom Applications to End-Users in Australia:

1.2.1   You shall indemnify and hold Apple harmless against any and all claims by the Commissioner of Taxation ("Commissioner") for nonpayment or underpayment of GST under the *A New Tax System (Goods and Services Tax) Act 1999* ("GST Act") and for any penalties and / or interest thereon. In addition, You shall indemnify and hold Apple harmless against any penalties imposed by the Commissioner for failing to register for GST in Australia.

1.2.2   Goods and Services Tax (GST)

(a)   General

    (i)   This Section 1.2 of Exhibit C applies to supplies made by You, through APL, as agent, that are connected with Australia. Terms defined in the GST Act have the same meaning when used in this Section 1.2.

    (ii)   Unless expressly stated otherwise, any sum payable or amount used in the calculation of a sum payable under Schedule 2 and Schedule 3 has been determined without regard to GST and must be increased on account of any GST payable under this Section 1.2.

    (iii)   If any GST is payable on any taxable supply made under Schedule 2 and Schedule 3 by a supplier to a recipient, the recipient must pay the GST to the supplier at the same time and in the same manner as providing any monetary consideration. For the avoidance of doubt, this includes any monetary consideration that is deducted by APL as commission in accordance with Section 3.4 of Schedule 2 and Section 3.4 of Schedule 3.

    (iv)   The amount recoverable on account of GST under this clause by APL will include any fines, penalties, interest and other charges.

    (v)   This Section 1 of Exhibit C survives the termination of the Agreement.

(b)   Resident Developers or Non-resident GST-Registered Developers with an ABN

    (i)   If You are a resident of Australia, it is a condition of Schedule 2 and Schedule 3 that You have an Australian Business Number ("ABN") and are registered for GST or have submitted an application to register for GST to the Commissioner with an effective GST registration date of no later than the date of Schedule 2 and Schedule 3. You will provide Apple with satisfactory evidence of Your ABN and GST registration (by uploading to Apple, using the App Store Connect site, a copy of Your GST registration or print-out from the Australian Business Register) within 30 days of Schedule 2 and Schedule 3. You warrant that You will notify Apple if You cease to hold a valid ABN or be registered for GST.

(ii)    If You are a non-resident and are registered for GST with an ABN, it is a condition of Schedule 2 and Schedule 3 that You will provide Apple with satisfactory evidence of Your ABN and GST registration within 30 days of Schedule 2 and Schedule 3. You warrant that You will notify Apple if You cease to be registered for GST with an ABN.

(iii)   You and APL agree to enter into an arrangement for the purposes of s.153-50 of the GST Act. You and APL further agree that for taxable supplies made by You, through APL as agent, to any End-User:

(A)    APL will be deemed as making supplies to any End-User;

(B)    You will be deemed as making separate, corresponding supplies to APL;

(C)    APL will issue to any End-User, in APL's own name, all tax invoices and adjustment notes relating to supplies made under section 1.2.2(b)(iii)(A);

(D)    You will not issue to any End-User any tax invoices or adjustment notes relating to taxable supplies made under section 1.2.2(b)(iii)(A);

(E)    APL will issue a recipient created tax invoice to You in respect of any taxable supplies made by You to APL under Schedule 2 and Schedule 3, including taxable supplies made under section 1.2.2(b)(iii)(B); and

(F)    You will not issue a tax invoice to APL in respect of any taxable supplies made by You to APL under Schedule 2 and Schedule 3, including taxable supplies made under section 1.2.2(b)(iii)(B).

(c)    Non-resident, Non-GST-registered Developers

If You are a non-resident and are not registered for GST with an ABN, then:

(i)    APL will issue to any End-User, in APL's own name, all tax invoices and adjustment notes relating to taxable supplies made by You through APL as agent; and

(ii)    You will not issue to any End-User any tax invoices or adjustment notes relating to taxable supplies made by You through APL as agent.

## 1.3   Australian Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers Outside Australia

If You are a resident of Australia and You appoint Apple as Your agent or commissionaire for the marketing and End-User and Custom App Distribution Customer download of the Licensed and Custom Applications by End-Users and Custom App Distribution Customers located outside of Australia, it is a condition of this contract that You confirm that You have an Australian Business Number ("ABN") and are registered for GST under the A New Tax System (Goods and Services Tax Act 1999 ("GST Act").  You will provide Apple with satisfactory evidence of Your ABN and GST registration (by uploading to Apple, using the App Store Connect site, a copy of Your GST registration or print-out from the Australian Business Register) within 30 days of Schedule 2 and Schedule 3. You warrant that You will notify Apple if You cease to hold a valid ABN or be registered for GST.

## 2. BRAZIL

## Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Brazil

Where You designate Apple Services LATAM LLC to allow access to the Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Brazil:

**(A) General**

2.1    You acknowledge and agree that You have the sole responsibility for: (i) any indirect taxes liability (including but not limited to goods and services taxes), with respect to delivery on Your behalf of Your Licensed and Custom Applications to End-Users and Custom App Distribution Customers by Apple; (ii) filing of indirect tax returns and payment of indirect taxes to the Brazilian government, if applicable; and (iii) determining independently, or in consultation with Your own tax advisor, Your taxpayer status and tax payment obligations for indirect tax purposes.

2.2    You authorize, consent to, and acknowledge that Apple may use a third party in Brazil, an Apple subsidiary and/or a third party vendor (the "Collecting Entity"), to collect any amounts from End-Users or Custom App Distribution Customers for the Licensed or Custom Applications and remit such amounts out of Brazil to Apple to enable the remittance of Your proceeds to You.

2.3    To the extent withholding taxes are applicable on remittances out of Brazil of the prices payable by End Users or Custom App Distribution Customers for the Licensed or Custom Applications, the Collecting Entity will deduct the full amount of such withholding tax from the gross amount owed to You by Apple and will pay the amount withheld to the competent Brazilian tax authorities in Your name. The Collecting Entity will use commercially practical efforts to issue the respective withholding tax forms, which will be provided to You by Apple as provided in the Brazilian tax law. You are solely responsible for providing any additional documentation required by the tax authorities in Your region to be able to claim any foreign tax credits, if applicable.

**(B) Non-Resident Developers**

2.4    If You are not a resident of Brazil and to the extent withholding taxes are applicable on the remittances out of Brazil of the gross amount owed to You, You may provide to Apple Your region of residence certificate or equivalent documentation to claim a reduced rate of withholding tax under an applicable income tax treaty between Your region of residence and Brazil. The Collecting Entity will apply a reduced rate of withholding tax, if any, as provided in the applicable income tax treaty between Your region of residence and Brazil, only after You furnish Apple with the documentation as required under that income tax treaty or otherwise satisfactory to Apple, which is sufficient to establish Your entitlement to that reduced rate of withholding tax.  You acknowledge that the reduced rate will only take effect after Apple approves and accepts the tax residence certificate or equivalent documentation provided by You.  Notwithstanding section 3.3 of Schedule 2 and section 3.3 of Schedule 3, if Your funds will be remitted out of Brazil prior to receipt and approval by Apple of such tax documentation, the Collecting Entity may withhold and remit to the competent tax authorities the full amount of withholding tax unreduced by any tax treaty, and Apple will not refund to You any amount of such taxes withheld and remitted.

You will indemnify and hold Apple and the Collecting Entity harmless against any and all claims by any competent tax authority for any underpayment of any such withholding or similar taxes, and any penalties and/or interest thereon, including, but not limited to, underpayments attributable to any erroneous claim or representation by You as to Your entitlement to, or Your actual disqualification for, the benefit of a reduced rate of withholding tax.

**(C) Resident Developers**

2.5    If You are a resident of Brazil, You must update Your account with Your respective Brazilian taxpayer number (CNPJ or CPF, as applicable). You acknowledge that by not providing Your respective Brazilian taxpayer number, Your Licensed and Custom Applications may be removed from the Brazilian Store until such time as Your Brazilian taxpayer number is provided.

**3. CANADA**

**Delivery of Licensed and Custom Applications to End-Users in Canada**

If You are a resident of Canada, You must add to or update Your account with Your Canadian GST/HST number.  If You are a resident of Quebec, You must also add or update Your account with Your Quebec QST number.

Where You designate Apple Canada to allow access to the Licensed and Custom Applications to End-Users in Canada:

3.1     General

You shall indemnify and hold Apple harmless against any and all claims by the Canada Revenue Agency (the "CRA"), Ministere du Revenu du Quebec (the "MRQ") and the tax authorities of any province that has a provincial retail sales tax ("PST") for any failure to pay, collect or remit any amount(s) of goods and services tax/harmonized sales tax ("GST/HST") imposed under the Excise Tax Act (Canada) (The "ETA"), Quebec Sales Tax ("QST") or PST and any penalties and/or interest thereon in connection with any supplies made by Apple Canada to End-Users in Canada on Your behalf and any supplies made by Apple Canada to You.

3.2     GST/HST

(a)    This Section 3.2 of Exhibit C applies with respect to supplies made by You, through Apple Canada, as agent to End-Users in Canada. Terms defined in the ETA have the same meaning when used in this Section 3.2. Apple Canada is registered for GST/HST purposes, with GST/HST Registration No. R100236199.

(b)    If You are a resident of Canada or are a non-resident of Canada that is required to register for GST/HST purposes pursuant to the ETA, it is a condition of Schedule 2 and Schedule 3, that You are registered for GST/HST or have submitted an application to register for GST/HST to the CRA with an effective GST/HST registration date of no later than the date of Schedule 2 and Schedule 3. You shall provide Apple Canada with satisfactory evidence of Your GST/HST registration (*e.g.*, a copy of Your CRA confirmation letter or print-out from the GST/HST Registry on the CRA web site) at Apple Canada's request. You warrant that You will notify Apple Canada if You cease to be registered for GST/HST.

(c)    If You are registered for GST/HST purposes, You, by executing Schedule 2 and Schedule 3, (i) agree to enter into the election pursuant to subsection 177(1.1) of the ETA to have Apple Canada collect, account for and remit GST/HST on sales of Licensed Applications and Custom Applications made to End-Users in Canada on Your behalf and have completed (including entering its valid GST/HST registration number), signed and returned to Apple Canada Form GST506 (accessible on the App Store Connect site); and (ii) acknowledge that Apple will deduct from your remittance the applicable Canadian GST/HST and QST, based on Your address in Canada, on the commission payable by You to Apple.

(d)    If You are not registered for GST/HST purposes, by executing Schedule 2 and Schedule 3, and not completing, signing and returning Form GST506 to Apple Canada, You (i) certify that You are not registered for GST/HST purposes; (ii) certify that You are not resident in Canada and do not carry on business in Canada for purposes of the ETA; (iii) acknowledge that Apple Canada will charge, collect and remit GST/HST on sales of Licensed Applications and Custom Applications to End-Users in Canada made on Your behalf; (iv) acknowledge that the commission payable by You to Apple Canada is zero-rated for GST/HST purposes (*i.e.*, GST/HST rate is 0%); and (v) agree to indemnify Apple for any GST/HST, interest and penalty assessed against Apple Canada if it is determined that You should have been registered for GST/HST purposes such that the commission fees charged by Apple Canada were subject to GST/HST.

3.3     Quebec Sales Tax

Terms defined in an Act respecting the Quebec Sales Tax (the "QSTA") have the same meaning when used in this Section 3.3 of Exhibit C.

(a)    If You are a resident of Quebec, it is a condition of Schedule 2 and Schedule 3, that You are registered for QST or have submitted an application to register for QST to the MRQ with an effective QST registration date of no later than the date of Schedule 2 and Schedule 3. You shall provide Apple Canada with satisfactory evidence of Your QST registration (*e.g.*, a copy of Your MRQ confirmation letter or print-out from the QST Registry on the MRQ web site) at Apple Canada's request. You warrant that You will notify Apple Canada if You cease to be registered for QST.

(b)    If You are a resident of Quebec, You, by executing Schedule 2 and Schedule 3, (i) certify that You are registered for QST; (ii) agree to enter into the election pursuant to section 41.0.1 of the QSTA to have Apple Canada collect, account for and remit QST on sales of Licensed Applications and Custom Applications to End-Users in Quebec made on Your behalf and have completed (including entering its valid QST registration number), signed and returned to Apple Canada Form FP2506-V; and (iii) acknowledge that Apple Canada will not charge, collect or remit QST on sales of Licensed Applications and Custom Applications made on Your behalf to End-Users located outside Quebec on the assumption that the End-Users are not resident in Quebec and not registered for QST purposes such that the sales are zero-rated for QST purposes.

(c)    If You are not a resident of Quebec, by executing Schedule 2 and Schedule 3, and not completing, signing and returning Form FP2506-V to Apple Canada, You (i) certify that You are not resident in Quebec; (ii) certify that You do not have a permanent establishment in Quebec; and (iii) acknowledge Apple will charge, collect and remit QST on sales of Licensed Applications and Custom Applications to End-Users in Quebec made on Your behalf.

3.4    PST

This Section 3.4 of Exhibit C applies to supplies of Licensed and Custom Applications made by You, through Apple Canada, as agent, to End-Users in any province that has or that adopts a PST. You acknowledge and agree that Apple Canada may charge, collect and remit applicable PST on sales of Licensed and Custom Applications made to End-Users in such provinces by Apple Canada on Your behalf.


**4. CHILE**

**Chilean Developers - Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in or outside Chile**

If You are a resident of Chile, Apple will apply VAT on the commission payable by You to Apple to be deducted from Your remittance, pursuant to Chilean tax regulations, unless you confirm that you are a VAT taxpayer in such region and provide proof of your VAT status.


**5. JAPAN**

**(A)  Delivery of Licensed and Custom Applications to End-Users in Japan**

Where You designate iTunes KK to allow access to the Licensed and Custom Applications to End-Users in Japan:

5.1    You acknowledge and agree that You have the sole responsibility for: (i) consumption tax output liability, if any, with respect to delivery on Your behalf of Your Licensed and/or Custom Applications to End-Users by iTunes KK; (ii) filing of consumption tax returns and payment of consumption tax to the Japanese government, if applicable; and (iii) determining independently, in consultation with Your own tax advisor, Your taxpayer status and tax payment obligations, and appointing your own tax administrator for consumption tax purposes. If iTunes KK is requested by the Japanese tax authority as your tax administrator in Japan to collect, pay or file your taxes in Japan, iTunes KK will not be able to assist you and you agree that you will appoint your own tax administrator as soon as possible. Your remittance payment under section 3.5 of Schedule 2 and section 3.5 of

Schedule 3 may not be made for Your applicable Licensed or Custom Applications until such time as You appoint your own tax administrator.

5.2     Commissions charged by iTunes KK to Japan resident developers will include consumption tax.

**(B)  Japan Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers Outside Japan**

If Your principal or headquarters' office is located in Japan and You appoint Apple as Your agent or commissionaire for the marketing and End-User and Custom App Distribution Customer download of the Licensed and Custom Applications by End-Users and Custom App Distribution Customers located outside of Japan, You shall reverse charge any Japanese consumption tax that is payable on the commissions received by Apple in consideration for its services as Your agent or commissionaire under Schedule 2 and Schedule 3.

**6. KOREA**

**Korean Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Korea**

If You are a resident of Korea and You appoint Apple Distribution International Ltd. as Your agent or commissionaire to deliver Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Korea, it is a condition of Schedule 2 and Schedule 3 that You have a Korean Business Registration Number ("BRN") or a Registration Number with Korean National Tax Service (collectively "Korean Tax ID").

You must update Your account with Your respective Korean Tax ID when prompted in App Store Connect. You acknowledge that by not providing Your respective Korean Tax ID, Your Licensed or Custom Applications may be removed from the Korean Store or Your remittance payment under section 3.5 of Schedule 2 and section 3.5 of Schedule 3 may not be made for Your applicable Licensed or Custom Applications until such time as Your Korean Tax ID is provided.

At Apple Distribution International Ltd.'s request, You will provide Apple with satisfactory evidence of Your Korean Tax ID (e.g., business registration certificate or print-out from the Korean National Tax Service's Home Tax website). You warrant that You will notify Apple if You cease to hold a valid Korean Tax ID.

In order to comply with Apple's obligations under applicable law to validate Your Korean Tax ID, Apple will use a service provider to complete the validation process and will transfer Your Korean Tax ID to our service provider for such purpose. Any personal data collected by Apple will be treated in accordance with Apple's Privacy Policy which can be viewed at http://www.apple.com/legal/privacy.

If You do not provide a valid Korean Tax ID to Apple, Apple reserves the right to charge Korean VAT on any services provided to You under this Agreement.

**7. MALAYSIA**

**Malaysian Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in or outside Malaysia**

If You are a resident of Malaysia and You appoint Apple as Your agent or commissionaire to deliver Licensed and Custom Applications to End-Users and Custom App Distribution Customers in the jurisdictions specified in Exhibit A, pursuant to Malaysian tax regulations, Apple will apply Malaysia Service Tax on the commission payable by You to Apple to be deducted from Your remittance.

## 8. MEXICO

**Mexican Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in or outside Mexico**

If You are a resident of Mexico, Apple will apply VAT on the commission payable by You to Apple to be deducted from Your remittance, pursuant to Mexican tax regulations. Apple will issue the corresponding invoice for such commission.

Apple also will apply the withholding income tax rate applicable to individuals on remittances for sales of the Licensed and Custom Applications to End-Users and Custom App Distribution Customers located in or outside Mexico, pursuant to Mexican tax regulations. Apple will deduct the full amount of such withholding income tax from the gross amount owed to You by Apple and will pay the amount withheld to the competent Mexican tax authorities.

If You are registered and have a valid tax ID in Mexico (known as the R.F.C), You must provide Apple with a copy of Your Mexican tax ID registration by uploading it using the App Store Connect tool. You warrant that You will notify Apple if You cease to hold a valid tax ID.  If You do not provide proof to Apple of Your Mexican tax ID, Apple will apply the highest income tax rate in accordance with Mexican tax regulations.


## 9. NEW ZEALAND

### 9.1   General

(a)     Terms defined in the *Goods and Services Tax Act 1985* ("GST Act 1985") have the same meaning when used in Section 9 of Exhibit C.

(b)    This Section 9 of Exhibit C survives the termination of the Agreement.

### 9.2   Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in New Zealand

Where You designate APL to allow access to the Licensed and Custom Applications to End-Users and Custom App Distribution Customers in New Zealand:

9.2.1 General

(a)    You shall indemnify and hold APL harmless against any and all claims by the Inland Revenue for nonpayment or underpayment of GST under the GST Act 1985 and for any penalties and/or interest thereon.

(b)    This Section 9.2 of Exhibit C applies to supplies made by You, through APL as agent, to any End User or Custom App Distribution Customer who is resident in New Zealand.

(c)    You and Apple agree that APL is the operator of the electronic marketplace in respect of supplies made by You, through APL as agent, to any End-User or Custom App Distribution Customer who is resident in New Zealand, and is treated as the supplier of those supplies under s. 60C of the GST Act 1985 for GST purposes.

9.2.2 Resident Developers

(a)    If You are a resident of New Zealand, You and APL agree under s.60(1C) of the GST Act 1985 that supplies of services made by You through APL as agent to any End-User or Custom App Distribution Customer resident in New Zealand, are treated as 2 separate supplies for GST purposes, being—

        (i) a supply of services from You to APL; and

(ii) a supply of those services from APL to the End-User or Custom App Distribution Customer resident in New Zealand.

(b)    You and APL acknowledge that the supply of services from You to APL for GST purposes under Section 9.2.2(a)(i) of this Exhibit C is not subject to GST under the GST Act 1985.

9.2.3 Non Resident Developers

(a)    If You are a non resident of New Zealand, You and Apple agree under s. 60(1B) of the GST Act 1985 that supplies of services made by You through APL as agent to any End-User or Custom App Distribution Customer resident in New Zealand, are treated as 2 separate supplies for GST purposes, being –

(i) a supply of services from You to APL; and

(ii) a supply of those services from APL to the End-User or Custom App Distribution Customer resident in New Zealand.

(b)    You and APL acknowledge that the supply of services from You to APL for GST purposes under Section 9.2.3(a)(i) of this Exhibit C is not subject to GST under the GST Act 1985.

9.2.4 APL will issue to any End-User or Custom App Distribution Customer, in APL's own name, the required documentation relating to supplies made under Section 9 of this Exhibit C.

9.2.5 You will not issue to any End-User or Custom App Distribution Customer any documentation relating to supplies made under Section 9.2 of this Exhibit C.

**9.3   New Zealand Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers Outside New Zealand**

If You are a resident of New Zealand and You appoint Apple as Your agent or commissionaire for the marketing and End-User and Custom App Distribution Customer download of the Licensed and Custom Applications by End-Users and Custom App Distribution Customers located outside of New Zealand, You and Apple agree that under s.60C and 60(1C) of the GST Act 1985, supplies of services made by You through Apple as agent to any End-User or Custom App Distribution Customer resident outside of New Zealand are treated as 2 separate supplies for GST purposes under the GST Act 1985, being –

(i) a supply of services from You to Apple; and

(ii) a supply of those services from Apple to the End-User or Custom App Distribution Customer resident outside of New Zealand.

You and Apple acknowledge that the deemed supply of services from You to Apple under (i) above will not result in a GST cost to Apple under the GST Act 1985.

**10. SINGAPORE**

**Singapore Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in or outside Singapore**

If You are a resident of Singapore and You appoint Apple as Your agent or commissionaire to deliver Licensed and Custom Applications to End-Users and Custom App Distribution Customers in the jurisdictions specified in Exhibit A, it is a condition of Schedule 2 and Schedule 3 that You confirm to Apple whether You are registered for Singapore GST. If You are registered for GST, You are required to provide Your Singapore GST registration number upon request.

If You are not registered for Singapore GST or do not provided Your Singapore GST registration number to Apple, pursuant to Singapore tax regulations, Apple will apply Singapore GST on the commission payable by You to Apple to be deducted from Your remittance.

## 11. TAIWAN

**Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Taiwan**

If You file Income Tax in Taiwan and You appoint Apple Distribution International Ltd. as Your agent or commissionaire to deliver Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Taiwan, it is a condition of Schedule 2 and Schedule 3 that You provide Apple your unified business number in Taiwan if you are business or your personal identification card number in Taiwan if You are an individual (collectively "Taiwan Tax ID").

## 12. THAILAND

**Thailand Developers – Delivery of Licensed and Custom Applications to End-Users and Custom App Distribution Customers in Thailand**

If You are a resident of Thailand and You appoint Apple as Your agent or commissionaire to deliver Licensed and Custom Applications to End-Users and Custom App Distribution Customers in the jurisdictions specified in Exhibit A, it is a condition of Schedule 2 and Schedule 3 that You confirm to Apple whether You are registered for Thailand VAT. If You are registered for VAT, You are required to provide Your Thailand VAT registration number upon request.

If You are not registered for Thailand VAT or do not provide Your Thailand VAT registration number to Apple, pursuant to Thailand tax regulations, Apple will apply Thailand VAT on the commission payable by You to Apple to be deducted from Your remittance with respect to your sales to Thailand customers.

## 13. UNITED STATES

**Delivery of Licensed and Custom Applications to End-Users in the United States**

Where You designate Apple Inc. to allow access to the Licensed and Custom Applications to End-Users in the United States:

13.1  If You are not a resident of the United States for U.S. federal income tax purposes, You will complete Internal Revenue Service Form W-8BEN and/or any other required tax forms and provide Apple with a copy of such completed form(s), and any other information necessary for compliance with applicable tax laws and regulations, as instructed on the App Store Connect site.

13.2  If Apple, in its reasonable belief, determines that any state or local sales, use or similar transaction tax may be due from Apple or You in connection with the sale or delivery of any of the Licensed and Custom Applications, Apple will collect and remit those taxes to the competent tax authorities. To the extent that the incidence of any such tax, or responsibility for collecting that tax, falls upon You, You authorize Apple to act on Your behalf in collecting and remitting that tax, but to the extent that Apple has not collected any such tax, or has not received reimbursement for that tax, from End-Users, You shall remain primarily liable for the tax, and You will reimburse Apple for any tax payments that Apple is required to make, but is not otherwise able to recover.

13.3  In the event that You incur liability for income tax, franchise tax, business and occupation tax, or any similar taxes based on Your income, You shall be solely responsible for that tax.

**14. END-USERS IN REGIONS LISTED IN EXHIBIT A, SECTION 2**

**Delivery of Licensed and Custom Applications to End-Users in regions listed in Exhibit A, Section 2**

Where You designate Apple Distribution International Ltd., located at Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, to allow access to the Licensed and Custom Applications to End-Users in Exhibit A, Section 2:

You acknowledge that in the event Apple Distribution International Ltd. is subject to any sales, use, goods and services, value added, or other tax or levy with respect to any remittance to You, the full amount of such tax or levy shall be solely for Your account. For the avoidance of doubt, any invoice issued by You to Apple Distribution International Ltd. will be limited to amounts actually due to You, which amounts shall be inclusive of any value added or other tax or levy as set forth above. You will indemnify and hold Apple harmless against any and all claims by any competent tax authorities for any underpayment of any such sales, use, goods and services, value added, or other tax or levy, and any penalties and/or interest thereon.

**EXHIBIT D**

**Instructions for Minimum Terms of Developer's End-User License Agreement**

**1.   Acknowledgement**: You and the End-User must acknowledge that the EULA is concluded between You and the End-User only, and not with Apple, and You, not Apple, are solely responsible for the Licensed and Custom Applications and the content thereof. The EULA may not provide for usage rules for Licensed and Custom Applications that are in conflict with, the Apple Media Services Terms and Conditions or the Volume Content Terms as of the Effective Date (which You acknowledge You have had the opportunity to review).

**2.   Scope of License**: Each license granted to the End-User for the Licensed and Custom Applications must be limited to a non-transferable license to use the Licensed or Custom Application on any Apple-branded Products that the End-User owns or controls and as permitted by the Usage Rules set forth in the Apple Media Services Terms and Conditions, except that such Licensed Application may be accessed and used by other accounts associated with the purchaser via Family Sharing, volume purchasing, or Legacy Contacts. Solely in connection with certain Apple licensed software, the EULA must authorize a Custom App Distribution Customer to distribute a single license of Your free Custom Applications to multiple End-Users.

**3.   Maintenance and Support**: You must be solely responsible for providing any maintenance and support services with respect to the Licensed and Custom Applications, as specified in the EULA, or as required under applicable law. You and the End-User must acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the Licensed and Custom Applications.

**4.   Warranty**: You must be solely responsible for any product warranties, whether express or implied by law, to the extent not effectively disclaimed. The EULA must provide that, in the event of any failure of the Licensed or Custom Applications to conform to any applicable warranty, the End-User may notify Apple, and Apple will refund the purchase price for such Application to that End-User; and that, to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the Licensed and Custom Applications, and any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be Your sole responsibility.

**5.   Product Claims**: You and the End-User must acknowledge that You, not Apple, are responsible for addressing any claims of the End-User or any third party relating to the Licensed and Custom Applications or the end- user's possession and/or use of the Licensed and Custom Applications, including, but not limited to: (i) product liability claims; (ii) any claim that the Licensed or Custom Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection, privacy, or similar legislation, including in connection with Your Licensed Application's use of the HealthKit and HomeKit frameworks. The EULA may not limit Your liability to the End-User beyond what is permitted by applicable law.

**6.   Intellectual Property Rights**: You and the End-User must acknowledge that, in the event of any third party claim that the Licensed or Custom Application or the End-User's possession and use of the Licensed or Custom Application infringes that third party's intellectual property rights, You, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim.

**7.   Legal Compliance**: The End-User must represent and warrant that (i) the end-user is not located in a region that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" region; and (ii) the end-user is not listed on any U.S. Government list of prohibited or restricted parties.

**8.   Developer Name and Address**: You must state in the EULA Your name and address, and the contact information (telephone number; E-mail address) to which any End-User questions, complaints or claims with respect to the Licensed and Custom Applications should be directed.

**9.   Third Party Terms of Agreement:** You must state in the EULA that the End-User must comply with applicable third party terms of agreement when using Your Application, e.g., if You have a VoIP application,

then the End-User must not be in violation of their wireless data service agreement when using Your Application.

**10.   Third Party Beneficiary**: You and the End-User must acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the EULA, and that, upon the End-User's acceptance of the terms and conditions of the EULA, Apple will have the right (and will be deemed to have accepted the right) to enforce the EULA against the End-User as a third party beneficiary thereof.

**EXHIBIT E**

**Additional App Store Terms**

**1.      Discoverability on the App Store**:  The discoverability of Your Licensed Application in the App Store depends on several factors, and Apple is under no obligation to display, feature, or rank Your Licensed Application in any particular manner or order in the App Store.

(a)    The main parameters used for app ranking and discoverability are text relevance, such as using an accurate title, adding relevant keywords/metadata, and selecting descriptive categories in the Licensed Application; customer behavior relating to the number and quality of ratings and reviews and application downloads; date of launch in the App Store may also be considered for relevant searches; and whether You have violated any rules promulgated by Apple.  These main parameters deliver the most relevant results to customer search queries.

(b)    When considering apps to feature in the App Store, our editors look for high-quality apps across all categories, with a particular focus on new apps and apps with significant updates. The main parameters that our editors consider are UI design, user experience, innovation and uniqueness, localizations, accessibility, App Store product page screenshots, app previews, and descriptions; and additionally for games, gameplay, graphics and performance, audio, narrative and story depth, ability to replay, and gameplay controls.  These main parameters showcase high-quality, well-designed, and innovative apps.

(c)    If You use an Apple service for paid promotion of Your app on the App Store, Your app may be presented in a promotional placement and designated as advertising content.

To learn more about app discoverability, visit https://developer.apple.com/app-store/discoverability/.

**2.      Access to App Store Data**

You can access data concerning your Licensed Application's financial performance and user engagement in App Store Connect by using App Analytics, Sales and Trends, and Payments and Financial Reports. Specifically, You can obtain all of Your Licensed Application's financial results for individual app sales and in-app purchases (including subscriptions) in Sales and Trends, or download the data from Financial Reports; and You can view App Analytics for non-personally identifiable data that allows You to understand how consumers engage with your Licensed Applications. More information can be found at https://developer.apple.com/app-store/measuring-app-performance/. App Analytics data is provided only with the consent of our customers. For more information, see https://developer.apple.com/app-store-connect/analytics/. Apple does not provide You with access to personal or other data provided by or generated through use of the App Store by other developers; nor does Apple provide other developers with access to personal or other data provided by or generated through Your use of the App Store. Such data sharing would conflict with Apple's Privacy Policy, and with our customers' expectations about how Apple treats their data. You can seek to collect information from customers directly, so long as such information is collected in a lawful manner, and You follow the App Store Review Guidelines.

Apple handles personal and non-personal information as outlined in Apple's Privacy Policy. Information about Apple's access to and practices concerning developer and customer data can be found in "App Store & Privacy," accessible at https://www.apple.com/legal/privacy/data/en/app-store.  Apple may provide some non-personal information to strategic partners that work with Apple to provide our products and services, help Apple market to customers, and sell ads on Apple's behalf to display in the App Store and Apple News and Stocks. Such partners are obligated to protect that information and may be located wherever Apple operates.

**3.      P2B Regulation Complaints and Mediation**

Developers established in, and which offer goods or services to customer located in, a region subject to a platform-to-business regulation ("P2B Regulation"), such as the Regulation of the European Parliament and of the Council on promoting fairness and transparency for business users of online intermediation services, may submit complaints pursuant to such P2B Regulation related to the following issues at

https://developer.apple.com/contact/p2b/: (a) Apple's alleged noncompliance with any obligations set forth in the P2B Regulation which affect You in the region in which you are established; (b) technological issues that affect You and relate directly to distribution of Your Licensed Application on the App Store in the region in which you are established; or (c) measures taken by or behavior of Apple that affect You and relate directly to distribution of Your Licensed Application on the App Store in the region in which you are established.  Apple will consider and process such complaints and communicate the outcome to You.

For Developers established in, and which offer goods or services to customer located in, the European Union, Apple identifies the following panel of mediators with which Apple is willing to engage to attempt to reach an agreement with developers established in, and which offer goods or services to customer located in, the European Union on the settlement, out of court, of any disputes between Apple and You arising in relation to the provision of the App Store services concerned, including complaints that could not be resolved by means of our complaint-handling system:

Centre for Effective Dispute Resolution
P2B Panel of Mediators
70 Fleet Street
London
EC4Y 1EU
United Kingdom
https://www.cedr.com/p2bmediation/

# EXHIBIT B

News          Discover          Design          Develop          Distribute          Support          Account

**App Store**                                                    Overview    What's New    Features    Articles    Guidelines

# App Store Review Guidelines

Apps are changing the world, enriching people's lives, and enabling developers like you to innovate like never before. As a result, the App Store has grown into an exciting and vibrant ecosystem for millions of developers and more than a billion users. Whether you are a first time developer or a large team of experienced programmers, we are excited that you are creating apps for the App Store and want to help you understand our guidelines so you can be confident your app will get through the review process quickly.

Introduction

Before You Submit

1. Safety

2. Performance

3. Business

4. Design

5. Legal

After You Submit

## Introduction

The guiding principle of the App Store is simple—we want to provide a safe experience for users to get apps and a great opportunity for all developers to be successful. We do this by offering a highly curated App Store where every app is reviewed by experts and an editorial team helps users discover new apps every day. For everything else there is always the open Internet. If the App Store model and guidelines are not best for your app or business idea that's okay, we provide Safari for a great web experience too.

On the following pages you will find our latest guidelines arranged into five clear sections: Safety, Performance, Business, Design, and Legal. The App Store is always changing and improving to keep up with the needs of our customers and our products. Your apps should change and improve as well in order to stay on the App Store.

A few other points to keep in mind:

- We have lots of kids downloading lots of apps. Parental controls work great to protect kids, but you have to do your part too. So know that we're keeping an eye out for the kids.

- The App Store is a great way to reach hundreds of millions of people around the world. If you build an app that you just want to show to family and friends, the App Store isn't the best way to do that. Consider using Xcode to install your app on a device for free or use Ad Hoc distribution available to Apple Developer Program members. If you're just getting started, learn more about the Apple Developer Program.

- We strongly support all points of view being represented on the App Store, as long as the apps are respectful to users with differing opinions and the quality of the app experience is great. We will reject apps for any content or behavior that we believe is over the line. What line, you ask? Well, as a Supreme Court Justice once said, "I'll know it when I see it". And we think that you will also know it when you cross it.

- If you attempt to cheat the system (for example, by trying to trick the review process, steal user data, copy another developer's work, manipulate ratings or App Store discovery) your apps will be removed from the store and you will be expelled from the Apple Developer Program.

- You are responsible for making sure everything in your app complies with these guidelines, including ad networks, analytics services, and third-party SDKs, so review and choose them carefully.

- Some features and technologies that are not generally available to developers may be offered as an entitlement for limited use cases. For example, we offer entitlements for CarPlay Audio, HyperVisor, and Privileged File Operations. Review our documentation on developer.apple.com to learn more about entitlements.

We hope these guidelines help you sail through the App Review process, and that approvals and rejections remain consistent across the board. This is a living document; new apps presenting new questions may result in new rules at any time. Perhaps your app will trigger this. We love this stuff too, and honor what you do. We're really trying our best to create the best platform in the world for you to express your talents and make a living, too.

---

# Before You Submit

To help your app approval go as smoothly as possible, review the common missteps listed below that can slow down the review process or trigger a rejection. This doesn't replace the guidelines or guarantee approval, but making sure you can check every item on the list is a good start. If your app no longer functions as intended or you're no longer actively supporting it, it will be removed from the App Store. Learn more about App Store Improvements.

Make sure you:

- Test your app for crashes and bugs

- Ensure that all app information and metadata is complete and accurate

- Update your contact information in case App Review needs to reach you

- Provide an active demo account and login information, plus any other hardware or resources that might be needed to review your app (e.g. login credentials or a sample QR code)

- Enable backend services so that they're live and accessible during review

- Include detailed explanations of non-obvious features and in-app purchases in the App Review notes, including supporting documentation where appropriate

- Check whether your app follows guidance in other documentation, such as:

    **Development Guidelines**

    UIKit

    AppKit

    WatchKit

    App Extensions

    iOS Data Storage Guidelines

    Apple File System

    App Store Connect Help

    Developer Account Help

    **Design Guidelines**

    Human Interface Guidelines

Brand and Marketing Guidelines

Marketing Resources and Identity Guidelines

Apple Pay Marketing Guidelines

Add to Apple Wallet Guidelines

Guidelines for Using Apple Trademarks and Copyrights

# 1. Safety

When people install an app from the App Store, they want to feel confident that it's safe to do so —that the app doesn't contain upsetting or offensive content, won't damage their device, and isn't likely to cause physical harm from its use. We've outlined the major pitfalls below, but if you're looking to shock and offend people, the App Store isn't the right place for your app.

### 1.1 Objectionable Content

Apps should not include content that is offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy. Examples of such content include:

**1.1.1** Defamatory, discriminatory, or mean-spirited content, including references or commentary about religion, race, sexual orientation, gender, national/ethnic origin, or other targeted groups, particularly if the app is likely to humiliate, intimidate, or harm a targeted individual or group. Professional political satirists and humorists are generally exempt from this requirement.

**1.1.2** Realistic portrayals of people or animals being killed, maimed, tortured, or abused, or content that encourages violence. "Enemies" within the context of a game cannot solely target a specific race, culture, real government, corporation, or any other real entity.

**1.1.3** Depictions that encourage illegal or reckless use of weapons and dangerous objects, or facilitate the purchase of firearms or ammunition.

**1.1.4** Overtly sexual or pornographic material, defined as "explicit descriptions or displays of sexual organs or activities intended to stimulate erotic rather than aesthetic or emotional feelings." This includes "hookup" apps that may include pornography or be used to facilitate prostitution.

**1.1.5** Inflammatory religious commentary or inaccurate or misleading quotations of religious texts.

**1.1.6** False information and features, including inaccurate device data or trick/joke functionality, such as fake location trackers. Stating that the app is "for entertainment purposes" won't overcome this guideline. Apps that enable anonymous or prank phone calls or SMS/MMS messaging will be rejected.

### 1.2 User-Generated Content

Apps with user-generated content present particular challenges, ranging from intellectual property infringement to anonymous bullying. To prevent abuse, apps with user-generated content or social networking services must include:

- A method for filtering objectionable material from being posted to the app

- A mechanism to report offensive content and timely responses to concerns

- The ability to block abusive users from the service

- Published contact information so users can easily reach you

Apps with user-generated content or services that end up being used primarily for pornographic content, Chatroulette-style experiences, objectification of real people (e.g. "hot-or-not" voting), making physical threats, or bullying do not belong on the App Store and may be removed without notice. If your app includes user-generated content from a web-based service, it may display incidental mature "NSFW" content, provided that the content is hidden by default and only displayed when the user turns it on via your website.

### 1.2.1 Creator Content

Apps which feature content from a specific community of users called "creators" are a great opportunity if properly moderated. These apps present a singular, unified experience for customers to interact with various kinds of creator content. They offer tools and programs to help this community of non-developer creators to author, share, and monetize user-generated experiences. These experiences must not change the core features and functionality of the native app—rather, they add content to those structured experiences. These experiences are not native "apps" coded by developers—they are content within the app itself and are treated as user-generated content by App Review. Such creator content may include video, articles, audio, and even casual games. The App Store supports apps offering such user-generated content so long as they follow all Guidelines, including Guideline 1.2 for moderating user-generated content and Guideline 3.1.1 for payments and in-app purchases. Creator apps should share the age rating of the highest age-rated creator content available in the app, and communicate to users which content requires additional purchases.

### 1.3 Kids Category

The Kids Category is a great way for people to easily find apps that are designed for children. If you want to participate in the Kids Category, you should focus on creating a great experience specifically for younger users. These apps must not include links out of the app, purchasing opportunities, or other distractions to kids unless reserved for a designated area behind a parental gate. Keep in mind that once customers expect your app to follow the Kids Category requirements, it will need to continue to meet these guidelines in subsequent updates, even if you decide to deselect the category. Learn more about parental gates.

You must comply with applicable privacy laws around the world relating to the collection of data from children online. Be sure to review the Privacy section of these guidelines for more information. In addition, Kids Category apps may not send personally identifiable information or device information to third parties. Apps in the Kids Category should not include third-party analytics or third-party advertising. This provides a safer experience for kids. In limited cases, third-party analytics may be permitted provided that the services do not collect or transmit the IDFA or any identifiable information about children (such as name, date of birth, email address), their location, or their devices. This includes any device, network, or other information that could be used directly or combined with other information to identify users and their devices. Third-party contextual advertising may also be permitted in limited cases provided that the services have publicly documented practices and policies for Kids Category apps that include human review of ad creatives for age appropriateness.

### 1.4 Physical Harm

If your app behaves in a way that risks physical harm, we may reject it. For example:

**1.4.1** Medical apps that could provide inaccurate data or information, or that could be used for diagnosing or treating patients may be reviewed with greater scrutiny.

- Apps must clearly disclose data and methodology to support accuracy claims relating to health measurements, and if the level of accuracy or methodology cannot be validated, we will reject your app. For example, apps that claim to take x-rays, measure blood

pressure, body temperature, blood glucose levels, or blood oxygen levels using only the sensors on the device are not permitted.

- Apps should remind users to check with a doctor in addition to using the app and before making medical decisions.

If your medical app has received regulatory clearance, please submit a link to that documentation with your app.

**1.4.2** Drug dosage calculators must come from the drug manufacturer, a hospital, university, health insurance company, pharmacy or other approved entity, or receive approval by the FDA or one of its international counterparts. Given the potential harm to patients, we need to be sure that the app will be supported and updated over the long term.

**1.4.3** Apps that encourage consumption of tobacco and vape products, illegal drugs, or excessive amounts of alcohol are not permitted on the App Store. Apps that encourage minors to consume any of these substances will be rejected. Facilitating the sale of controlled substances (except for licensed pharmacies and licensed or otherwise legal cannabis dispensaries), or tobacco is not allowed.

**1.4.4** Apps may only display DUI checkpoints that are published by law enforcement agencies, and should never encourage drunk driving or other reckless behavior such as excessive speed.

**1.4.5** Apps should not urge customers to participate in activities (like bets, challenges, etc.) or use their devices in a way that risks physical harm to themselves or others.

### 1.5 Developer Information
People need to know how to reach you with questions and support issues. Make sure your app and its Support URL include an easy way to contact you; this is particularly important for apps that may be used in the classroom. Failure to include accurate and up-to-date contact information not only frustrates customers, but may violate the law in some countries or regions. Also ensure that Wallet passes include valid contact information from the issuer and are signed with a dedicated certificate assigned to the brand or trademark owner of the pass.

### 1.6 Data Security
Apps should implement appropriate security measures to ensure proper handling of user information collected pursuant to the Apple Developer Program License Agreement and these Guidelines (see Guideline 5.1 for more information) and prevent its unauthorized use, disclosure, or access by third parties.

### 1.7 Reporting Criminal Activity
Apps for reporting alleged criminal activity must involve local law enforcement, and can only be offered in countries or regions where such involvement is active.

---

## 2. Performance

### 2.1 App Completeness
Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. Make sure your app has been tested on-device for bugs and stability before you submit it, and include demo account info (and turn on your back-end service!) if your app includes a login. If

you offer in-app purchases in your app, make sure they are complete, up-to-date, and visible to the reviewer, or that you explain why not in your review notes. Please don't treat App Review as a software testing service. We will reject incomplete app bundles and binaries that crash or exhibit obvious technical problems.

## 2.2 Beta Testing

Demos, betas, and trial versions of your app don't belong on the App Store – use TestFlight instead. Any app submitted for beta distribution via TestFlight should be intended for public distribution and should comply with the App Review Guidelines. Note, however, that apps using TestFlight cannot be distributed to testers in exchange for compensation of any kind, including as a reward for crowd-sourced funding. Significant updates to your beta build should be submitted to TestFlight App Review before being distributed to your testers. To learn more, visit the TestFlight Beta Testing page.

## 2.3 Accurate Metadata

Customers should know what they're getting when they download or buy your app, so make sure all your app metadata, including privacy information, your app description, screenshots, and previews accurately reflect the app's core experience and remember to keep them up-to-date with new versions.

**2.3.1** Don't include any hidden, dormant, or undocumented features in your app; your app's functionality should be clear to end users and App Review. All new features, functionality, and product changes must be described with specificity in the Notes for Review section of App Store Connect (generic descriptions will be rejected) and accessible for review. Similarly, marketing your app in a misleading way, such as by promoting content or services that it does not actually offer (e.g. iOS-based virus and malware scanners) or promoting a false price, whether within or outside of the App Store, is grounds for removal of your app from the App Store and termination of your developer account. Egregious or repeated behavior is grounds for removal from the Apple Developer Program. We work hard to make the App Store a trustworthy ecosystem and expect our app developers to follow suit; if you're dishonest, we don't want to do business with you.

**2.3.2** If your app includes in-app purchases, make sure your app description, screenshots, and previews clearly indicate whether any featured items, levels, subscriptions, etc. require additional purchases. If you decide to promote in-app purchases on the App Store, ensure that the in-app purchase Display Name, Screenshot and Description are appropriate for a public audience, that you follow the guidance found in Promoting Your In-App Purchases, and that your app properly handles the SKPaymentTransactionObserver method so that customers can seamlessly complete the purchase when your app launches.

**2.3.3** Screenshots should show the app in use, and not merely the title art, login page, or splash screen. They may also include text and image overlays (e.g. to demonstrate input mechanisms, such as an animated touch point or Apple Pencil) and show extended functionality on device, such as Touch Bar.

**2.3.4** Previews are a great way for customers to see what your app looks like and what it does. To ensure people understand what they'll be getting with your app, previews may only use video screen captures of the app itself. Stickers and iMessage extensions may show the user experience in the Messages app. You can add narration and video or textual overlays to help explain anything that isn't clear from the video alone.

**2.3.5** Select the most appropriate category for your app, and check out the App Store Category Definitions if you need help. If you're way off base, we may change the category for you.

**2.3.6** Answer the age rating questions in App Store Connect honestly so that your app aligns properly with parental controls. If your app is mis-rated, customers might be surprised by what they get, or it could trigger an inquiry from government regulators. If

your app includes media that requires the display of content ratings or warnings (e.g. films, music, games, etc.), you are responsible for complying with local requirements in each territory where your app is available.

**2.3.7** Choose a unique app name, assign keywords that accurately describe your app, and don't try to pack any of your metadata with trademarked terms, popular app names, pricing information, or other irrelevant phrases just to game the system. App names must be limited to 30 characters. Metadata such as app names, subtitles, screenshots, and previews should not include prices, terms, or descriptions that are not specific to the metadata type. App subtitles are a great way to provide additional context for your app; they must follow our standard metadata rules and should not include inappropriate content, reference other apps, or make unverifiable product claims. Apple may modify inappropriate keywords at any time or take other appropriate steps to prevent abuse.

**2.3.8** Metadata should be appropriate for all audiences, so make sure your app and in-app purchase icons, screenshots, and previews adhere to a 4+ age rating even if your app is rated higher. For example, if your app is a game that includes violence, select images that don't depict a gruesome death or a gun pointed at a specific character. Use of terms like "For Kids" and "For Children" in app metadata is reserved for the Kids Category. Remember to ensure your metadata, including app name and icons (small, large, Apple Watch app, alternate icons, etc.), are similar to avoid creating confusion.

**2.3.9** You are responsible for securing the rights to use all materials in your app icons, screenshots, and previews, and you should display fictional account information instead of data from a real person.

**2.3.10** Make sure your app is focused on the iOS, iPadOS, macOS, tvOS or watchOS experience, and don't include names, icons, or imagery of other mobile platforms in your app or metadata, unless there is specific, approved interactive functionality. Make sure your app metadata is focused on the app itself and its experience. Don't include irrelevant information.

**2.3.11** Apps you submit for pre-order on the App Store must be complete and deliverable as submitted. Ensure that the app you ultimately release is not materially different from what you advertise while the app is in a pre-order state. If you make material changes to the app (e.g. change business models), you should restart your pre-order sales.

**2.3.12** Apps must clearly describe new features and product changes in their "What's New" text. Simple bug fixes, security updates, and performance improvements may rely on a generic description, but more significant changes must be listed in the notes.

**2.3.13** In-app events are timely events that happen within your app. To feature your event on the App Store, it must fall within an event type provided in App Store Connect. All event metadata must be accurate and pertain to the event itself, rather than the app more generally. Events must happen at the times and dates you select in App Store Connect, including across multiple storefronts. You may monetize your event so long as you follow the rules set forth in Section 3 on Business. And your event deep link must direct users to the proper destination within your app. Read In-App Events for detailed guidance on acceptable event metadata and event deep links.

### 2.4 Hardware Compatibility

**2.4.1** To ensure people get the most out of your app, iPhone apps should run on iPad whenever possible. We encourage you to consider building universal apps so customers can use them on all of their devices. Learn more about Universal apps.

**2.4.2** Design your app to use power efficiently and be used in a way that does not risk damage to the device. Apps should not rapidly drain battery, generate excessive heat, or put unnecessary strain on device resources. For example, apps should not encourage

placing the device under a mattress or pillow while charging or perform excessive write cycles to the solid state drive. Apps, including any third-party advertisements displayed within them, may not run unrelated background processes, such as cryptocurrency mining.

2.4.3 People should be able to use your Apple TV app without the need for hardware inputs beyond the Siri remote or third-party game controllers, but feel free to provide enhanced functionality when other peripherals are connected. If you require a game controller, make sure you clearly explain that in your metadata so customers know they need additional equipment to play.

2.4.4 Apps should never suggest or require a restart of the device or modifications to system settings unrelated to the core functionality of the app. For example, don't encourage users to turn off Wi-Fi, disable security features, etc.

2.4.5 Apps distributed via the Mac App Store have some additional requirements to keep in mind:

> (i) They must be appropriately sandboxed, and follow macOS File System Documentation. They should also only use the appropriate macOS APIs for modifying user data stored by other apps (e.g. bookmarks, Address Book, or Calendar entries).
>
> (ii) They must be packaged and submitted using technologies provided in Xcode; no third-party installers allowed. They must also be self-contained, single app installation bundles and cannot install code or resources in shared locations.
>
> (iii) They may not auto-launch or have other code run automatically at startup or login without consent nor spawn processes that continue to run without consent after a user has quit the app. They should not automatically add their icons to the Dock or leave shortcuts on the user desktop.
>
> (iv) They may not download or install standalone apps, kexts, additional code, or resources to add functionality or significantly change the app from what we see during the review process.
>
> (v) They may not request escalation to root privileges or use setuid attributes.
>
> (vi) They may not present a license screen at launch, require license keys, or implement their own copy protection.
>
> (vii) They must use the Mac App Store to distribute updates; other update mechanisms are not allowed.
>
> (viii) Apps should run on the currently shipping OS and may not use deprecated or optionally installed technologies (e.g. Java)
>
> (ix) Apps must contain all language and localization support in a single app bundle.

### 2.5 Software Requirements

2.5.1 Apps may only use public APIs and must run on the currently shipping OS. Learn more about public APIs. Keep your apps up-to-date and make sure you phase out any deprecated features, frameworks or technologies that will no longer be supported in future versions of an OS. Apps should use APIs and frameworks for their intended purposes and indicate that integration in their app description. For example, the HomeKit framework should provide home automation services; and HealthKit should be used for health and fitness purposes and integrate with the Health app.

2.5.2 Apps should be self-contained in their bundles, and may not read or write data outside the designated container area, nor may they download, install, or execute code which introduces or changes features or functionality of the app, including other apps. Educational apps designed to teach, develop, or allow students to test executable code

may, in limited circumstances, download code provided that such code is not used for other purposes. Such apps must make the source code provided by the app completely viewable and editable by the user.

**2.5.3** Apps that transmit viruses, files, computer code, or programs that may harm or disrupt the normal operation of the operating system and/or hardware features, including Push Notifications and Game Center, will be rejected. Egregious violations and repeat behavior will result in removal from the Apple Developer Program.

**2.5.4** Multitasking apps may only use background services for their intended purposes: VoIP, audio playback, location, task completion, local notifications, etc.

**2.5.5** Apps must be fully functional on IPv6-only networks.

**2.5.6** Apps that browse the web must use the appropriate WebKit framework and WebKit Javascript.

**2.5.7** Video streaming content over a cellular network longer than 10 minutes must use HTTP Live Streaming and include a baseline 192 kbps HTTP Live stream.

**2.5.8** Apps that create alternate desktop/home screen environments or simulate multi-app widget experiences will be rejected.

**2.5.9** Apps that alter or disable the functions of standard switches, such as the Volume Up/Down and Ring/Silent switches, or other native user interface elements or behaviors will be rejected. For example, apps should not block links out to other apps or other features that users would expect to work a certain way. Learn more about proper handling of links.

**2.5.10** Apps should not be submitted with empty ad banners or test advertisements.

**2.5.11** SiriKit and Shortcuts

    **(i)** Apps integrating SiriKit and Shortcuts should only sign up for intents they can handle without the support of an additional app and that users would expect from the stated functionality. For example, if your app is a meal planning app, you should not incorporate an intent to start a workout, even if the app shares integration with a fitness app.

    **(ii)** Ensure that the vocabulary and phrases in your plist pertains to your app and the Siri functionality of the intents the app has registered for. Aliases must relate directly to your app or company name and should not be generic terms or include third-party app names or services.

    **(iii)** Resolve the Siri request or Shortcut in the most direct way possible and do not insert ads or other marketing between the request and its fulfillment. Only request a disambiguation when required to complete the task (e.g. asking the user to specify a particular type of workout).

**2.5.12** Apps using CallKit or including an SMS Fraud Extension should only block phone numbers that are confirmed spam. Apps that include call-, SMS-, and MMS- blocking functionality or spam identification must clearly identify these features in their marketing text and explain the criteria for their blocked and spam lists. You may not use the data accessed via these tools for any purpose not directly related to operating or improving your app or extension (e.g. you may not use, share, or sell it for tracking purposes, creating user profiles, etc.).

**2.5.13** Apps using facial recognition for account authentication must use LocalAuthentication (and not ARKit or other facial recognition technology) where possible, and must use an alternate authentication method for users under 13 years old.

**2.5.14** Apps must request explicit user consent and provide a clear visual and/or audible indication when recording, logging, or otherwise making a record of user activity. This includes any use of the device camera, microphone, screen recordings, or other user inputs.

**2.5.15** Apps that enable users to view and select files should include items from the Files app and the user's iCloud documents.

**2.5.16** App Clips, widgets, extensions, and notifications should be related to the content and functionality of your app. Additionally, all App Clip features and functionality must be included in the main app binary. App Clips cannot contain advertising.

---

# 3. Business

There are many ways to monetize your app on the App Store. If your business model isn't obvious, make sure to explain in its metadata and App Review notes. If we can't understand how your app works or your in-app purchases aren't immediately obvious, it will delay your review and may trigger a rejection. And while pricing is up to you, we won't distribute apps and in-app purchase items that are clear rip-offs. We'll reject expensive apps that try to cheat users with irrationally high prices.

If we find that you have attempted to manipulate reviews, inflate your chart rankings with paid, incentivized, filtered, or fake feedback, or engage with third-party services to do so on your behalf, we will take steps to preserve the integrity of the App Store, which may include expelling you from the Apple Developer Program.

### 3.1 Payments

#### 3.1.1 In-App Purchase:

- If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, etc. Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase, except as set forth in 3.1.3(a).

- Apps may use in-app purchase currencies to enable customers to "tip" the developer or digital content providers in the app.

- Any credits or in-game currencies purchased via in-app purchase may not expire, and you should make sure you have a restore mechanism for any restorable in-app purchases.

- Apps may enable gifting of items that are eligible for in-app purchase to others. Such gifts may only be refunded to the original purchaser and may not be exchanged.

- Apps distributed via the Mac App Store may host plug-ins or extensions that are enabled with mechanisms other than the App Store.

- Apps offering "loot boxes" or other mechanisms that provide randomized virtual items for purchase must disclose the odds of receiving each type of item to customers prior to purchase.

- Digital gift cards, certificates, vouchers, and coupons which can be redeemed for digital goods or services can only be sold in your app using in-app purchase. Physical gift cards that are sold within an app and then mailed to customers may use payment methods other than in-app purchase.

- Non-subscription apps may offer a free time-based trial period before presenting a full unlock option by setting up a Non-Consumable IAP item at Price Tier 0 that follows the naming convention: "XX-day Trial." Prior to the start of the trial, your app must clearly identify its duration, the content or services that will no longer be accessible when the trial ends, and any downstream charges the user would need to pay for full functionality. Learn more about managing content access and the duration of the trial period using Receipts and Device Check.

**3.1.2 Subscriptions:** Apps may offer auto-renewing in-app purchase subscriptions, regardless of category on the App Store. When incorporating auto-renewable subscriptions into your app, be sure to follow the guidelines below.

**3.1.2(a) Permissible uses:** If you offer an auto-renewing subscription, you must provide ongoing value to the customer, and the subscription period must last at least seven days and be available across all of the user's devices. While the following list is not exhaustive, examples of appropriate subscriptions include: new game levels; episodic content; multiplayer support; apps that offer consistent, substantive updates; access to large collections of, or continually updated, media content; software as a service ("SAAS"); and cloud support. In addition:

- Subscriptions may be offered alongside à la carte offerings (e.g. you may offer a subscription to an entire library of films as well the purchase or rental of a single movie).

- You may offer a single subscription that is shared across your own apps and services.

- Games offered in a streaming game service subscription may offer a single subscription that is shared across third-party apps and services; however, they must be downloaded directly from the App Store, must be designed to avoid duplicate payment by a subscriber, and should not disadvantage non-subscriber customers.

- Subscriptions must work on all of the user's devices where the app is available. Learn more about sharing a subscription across your apps.

- Apps must not force users to rate the app, review the app, download other apps, or other similar actions in order to access functionality, content, or use of the app.

- As with all apps, those offering subscriptions should allow a user to get what they've paid for without performing additional tasks, such as posting on social media, uploading contacts, checking in to the app a certain number of times, etc.

- Subscriptions may include consumable credits, gems, in-game currencies, etc., and you may offer subscriptions that include access to discounted consumable goods (e.g. a platinum membership that exposes gem-packs for a reduced price).

- If you are changing your existing app to a subscription-based business model, you should not take away the primary functionality existing users have already paid for. For example, let customers who have already purchased a "full game unlock" continue to access the full game after you introduce a subscription model for new customers.

- Auto-renewing subscription apps may offer a free trial period to customers by providing the relevant information set forth in App Store Connect. Learn more about providing subscription offers.

- Apps that attempt to scam users will be removed from the App Store. This includes apps that attempt to trick users into purchasing a subscription under false pretenses or

engage in bait-and-switch and scam practices; these will be removed from the App Store and you may be removed from the Apple Developer Program.

- Cellular carrier apps may include auto-renewing music and video subscriptions in pre-defined bundles with cellular data plans, with prior approval by Apple. Other auto-renewing subscriptions may also be included in pre-defined bundles with cellular data plans, with prior approval by Apple, if the cellular carrier apps support in-app purchase for new users and the carrier provides a mechanism for customers to revert to in-app purchase upon termination of the customer's bundled service. Such subscriptions cannot include access to or discounts on consumable items.

**3.1.2(b) Upgrades and Downgrades:** Users should have a seamless upgrade/downgrade experience and should not be able to inadvertently subscribe to multiple variations of the same thing. Review best practices on managing your subscription upgrade and downgrade options.

**3.1.2(c) Subscription Information:** Before asking a customer to subscribe, you should clearly describe what the user will get for the price. How many issues per month? How much cloud storage? What kind of access to your service? Ensure you clearly communicate the requirements described in Schedule 2 of the Apple Developer Program License Agreement, found in Agreements, Tax, and Banking.

**3.1.3 Other Purchase Methods:** The following apps may use purchase methods other than in-app purchase. Apps in this section cannot, within the app, encourage users to use a purchasing method other than in-app purchase, except as set forth in 3.1.3(a). Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase.

**3.1.3(a) "Reader" Apps:** Apps may allow a user to access previously purchased content or content subscriptions (specifically: magazines, newspapers, books, audio, music, and video). Reader apps may offer account creation for free tiers, and account management functionality for existing customers. Reader app developers may apply for the External Link Account Entitlement to provide an informational link in their app to a web site the developer owns or maintains responsibility for in order to create or manage an account. Learn more about the External Link Account Entitlement.

**3.1.3(b) Multiplatform Services:** Apps that operate across multiple platforms may allow users to access content, subscriptions, or features they have acquired in your app on other platforms or your web site, including consumable items in multi-platform games, provided those items are also available as in-app purchases within the app.

**3.1.3(c) Enterprise Services:** If your app is only sold directly by you to organizations or groups for their employees or students (for example professional databases and classroom management tools), you may allow enterprise users to access previously-purchased content or subscriptions. Consumer, single user, or family sales must use in-app purchase.

**3.1.3(d) Person-to-Person Services:** If your app enables the purchase of real-time person-to-person services between two individuals (for example tutoring students, medical consultations, real estate tours, or fitness training), you may use purchase methods other than in-app purchase to collect those payments. One-to-few and one-to-many real-time services must use in-app purchase.

**3.1.3(e) Goods and Services Outside of the App:** If your app enables people to purchase physical goods or services that will be consumed outside of the app, you must use purchase methods other than in-app purchase to collect those payments, such as Apple Pay or traditional credit card entry.

**3.1.3(f) Free Stand-alone Apps:** Free apps acting as a stand-alone companion to a paid web based tool (eg. VOIP, Cloud Storage, Email Services, Web Hosting) do not need to use

Case 4:22-cv-04437-YGR   Document 48   Filed 12/02/22   Page 240 of 261

in-app purchase, provided there is no purchasing inside the app, or calls to action for purchase outside of the app.

**3.1.4 Hardware-Specific Content:** In limited circumstances, such as when features are dependent upon specific hardware to function, the app may unlock that functionality without using in-app purchase (e.g. an astronomy app that adds features when synced with a telescope). App features that work in combination with an approved physical product (such as a toy) on an *optional* basis may unlock functionality without using in-app purchase, provided that an in-app purchase option is available as well. You may not, however, require users to purchase unrelated products or engage in advertising or marketing activities to unlock app functionality.

**3.1.5 Cryptocurrencies:**

- (i) Wallets: Apps may facilitate virtual currency storage, provided they are offered by developers enrolled as an organization.

- (ii) Mining: Apps may not mine for cryptocurrencies unless the processing is performed off device (e.g. cloud-based mining).

- (iii) Exchanges: Apps may facilitate transactions or transmissions of cryptocurrency on an approved exchange, provided they are offered by the exchange itself.

- (iv) Initial Coin Offerings: Apps facilitating Initial Coin Offerings ("ICOs"), cryptocurrency futures trading, and other crypto-securities or quasi-securities trading must come from established banks, securities firms, futures commission merchants ("FCM"), or other approved financial institutions and must comply with all applicable law.

- (v) Cryptocurrency apps may not offer currency for completing tasks, such as downloading other apps, encouraging other users to download, posting to social networks, etc.

**3.1.6 Apple Pay:** Apps using Apple Pay must provide all material purchase information to the user prior to sale of any good or service and must use Apple Pay branding and user interface elements correctly, as described in the Apple Pay Marketing Guidelines and Human Interface Guidelines. Apps using Apple Pay to offer recurring payments must, at a minimum, disclose the following information:

- The length of the renewal term and the fact that it will continue until canceled

- What will be provided during each period

- The actual charges that will be billed to the customer

- How to cancel

**3.1.7 Advertising:** Display advertising should be limited to your main app binary, and should not be included in extensions, App Clips, widgets, notifications, keyboards, watchOS apps, etc. Ads displayed in an app must be appropriate for the app's age rating, allow the user to see all information used to target them for that ad (without requiring the user to leave the app), and may not engage in targeted or behavioral advertising based on sensitive user data such as health/medical data (e.g. from the HealthKit APIs), school and classroom data (e.g. from ClassKit), or from kids (e.g. from apps in the Kids Category), etc. Interstitial ads or ads that interrupt or block the user experience must clearly indicate that they are an ad, must not manipulate or trick users into tapping into them, and must provide easily accessible and visible close/skip buttons large enough for people to easily dismiss the ad.

**3.2 Other Business Model Issues**

The lists below are not exhaustive, and your submission may trigger a change or update to our policies, but here are some additional dos and don'ts to keep in mind:

### 3.2.1 Acceptable

(i) Displaying your own apps for purchase or promotion within your app, provided the app is not merely a catalog of your apps.

(ii) Displaying or recommending a collection of third-party apps that are designed for a specific approved need (e.g. health management, aviation, accessibility). Your app should provide robust editorial content so that it doesn't seem like a mere storefront.

(iii) Disabling access to specific approved rental content (e.g. films, television programs, music, books) after the rental period has expired; all other items and services may not expire.

(iv) Wallet passes can be used to make or receive payments, transmit offers, or offer identification (such as movie tickets, coupons, and VIP credentials). Other uses may result in the rejection of the app and the revocation of Wallet credentials.

(v) Insurance apps must be free, in legal compliance in the regions distributed, and cannot use in-app purchase.

(vi) Approved nonprofits may fundraise directly within their own apps or third-party apps, provided those fundraising campaigns adhere to all App Review Guidelines and offer Apple Pay support. These apps must disclose how the funds will be used, abide by all required local and federal laws, and ensure appropriate tax receipts are available to donors. Additional information shall be provided to App Review upon request. Nonprofit platforms that connect donors to other nonprofits must ensure that every nonprofit listed in the app has also gone through the nonprofit approval process. Learn more about becoming an approved nonprofit.

(vii) Apps may enable individual users to give a monetary gift to another individual without using in-app purchase, provided that (a) the gift is a completely optional choice by the giver, and (b) 100% of the funds go to the receiver of the gift. However, a gift that is connected to or associated at any point in time with receiving digital content or services must use in-app purchase.

(viii) Apps used for financial trading, investing, or money management should be submitted by the financial institution performing such services.

### 3.2.2 Unacceptable

(i) Creating an interface for displaying third-party apps, extensions, or plug-ins similar to the App Store or as a general-interest collection.

(ii) Monetizing built-in capabilities provided by the hardware or operating system, such as Push Notifications, the camera, or the gyroscope; or Apple services, such as Apple Music access or iCloud storage.

(iii) Artificially increasing the number of impressions or click-throughs of ads, as well as apps that are designed predominantly for the display of ads.

(iv) Unless you are an approved nonprofit or otherwise permitted under Section 3.2.1 (vi) above, collecting funds within the app for charities and fundraisers. Apps that seek to raise money for such causes must be free on the App Store and may only collect funds outside of the app, such as via Safari or SMS.

(v) Arbitrarily restricting who may use the app, such as by location or carrier.

**(vi)** Apps should allow a user to get what they've paid for without performing additional tasks, such as posting on social media, uploading contacts, checking in to the app a certain number of times, etc. Apps should not require users to rate the app, review the app, watch videos, download other apps, tap on advertisements, enable tracking, or take other similar actions in order to access functionality, content, use the app, or receive monetary or other compensation, including but not limited to gift cards and codes.

**(vii)** Artificially manipulating a user's visibility, status, or rank on other services unless permitted by that service's Terms and Conditions.

**(viii)** Apps that facilitate binary options trading are not permitted on the App Store. Consider a web app instead. Apps that facilitate trading in contracts for difference ("CFDs") or other derivatives (e.g. FOREX) must be properly licensed in all jurisdictions where the service is available.

**(ix)** Apps offering personal loans must clearly and conspicuously disclose all loan terms, including but not limited to equivalent maximum Annual Percentage Rate (APR) and payment due date. Apps may not charge a maximum APR higher than 36%, including costs and fees, and may not require repayment in full in 60 days or less.

---

# 4. Design

Apple customers place a high value on products that are simple, refined, innovative, and easy to use, and that's what we want to see on the App Store. Coming up with a great design is up to you, but the following are minimum standards for approval to the App Store. And remember that even after your app has been approved, you should update your app to ensure it remains functional and engaging to new and existing customers. Apps that stop working or offer a degraded experience may be removed from the App Store at any time.

### 4.1 Copycats
Come up with your own ideas. We know you have them, so make yours come to life. Don't simply copy the latest popular app on the App Store, or make some minor changes to another app's name or UI and pass it off as your own. In addition to risking an intellectual property infringement claim, it makes the App Store harder to navigate and just isn't fair to your fellow developers.

### 4.2 Minimum Functionality
Your app should include features, content, and UI that elevate it beyond a repackaged website. If your app is not particularly useful, unique, or "app-like," it doesn't belong on the App Store. If your App doesn't provide some sort of lasting entertainment value or adequate utility, it may not be accepted. Apps that are simply a song or movie should be submitted to the iTunes Store. Apps that are simply a book or game guide should be submitted to the Apple Books Store.

**4.2.1** Apps using ARKit should provide rich and integrated augmented reality experiences; merely dropping a model into an AR view or replaying animation is not enough.

**4.2.2** Other than catalogs, apps shouldn't primarily be marketing materials, advertisements, web clippings, content aggregators, or a collection of links.

**4.2.3**

- (i) Your app should work on its own without requiring installation of another app to function.

- (ii) If your app needs to download additional resources in order to function on initial launch, disclose the size of the download and prompt users before doing so.

**4.2.4** Apple Watch apps that appear to be a watch face are confusing, because people will expect them to work with device features such as swipes, notifications, and third-party complications. Creative ways of expressing time as an app interface is great (say, a tide clock for surfers), but if your app comes too close to resembling a watch face, we will reject it.

**4.2.5** Apps that are primarily iCloud and iCloud Drive file managers need to include additional app functionality to be approved.

**4.2.6** Apps created from a commercialized template or app generation service will be rejected unless they are submitted directly by the provider of the app's content. These services should not submit apps on behalf of their clients and should offer tools that let their clients create customized, innovative apps that provide unique customer experiences. Another acceptable option for template providers is to create a single binary to host all client content in an aggregated or "picker" model, for example as a restaurant finder app with separate customized entries or pages for each client restaurant, or as an event app with separate entries for each client event.

**4.2.7 Remote Desktop Clients:** If your remote desktop app acts as a mirror of specific software or services rather than a generic mirror of the host device, it must comply with the following:

- (a) The app must only connect to a user-owned host device that is a personal computer or dedicated game console owned by the user, and both the host device and client must be connected on a local and LAN-based network.

- (b) Any software or services appearing in the client are fully executed on the host device, rendered on the screen of the host device, and may not use APIs or platform features beyond what is required to stream the Remote Desktop.

- (c) All account creation and management must be initiated from the host device.

- (d) The UI appearing on the client does not resemble an iOS or App Store view, does not provide a store-like interface, or include the ability to browse, select, or purchase software not already owned or licensed by the user. For the sake of clarity, transactions taking place within mirrored software do not need to use in-app purchase, provided the transactions are processed on the host device.

- (e) Thin clients for cloud-based apps are not appropriate for the App Store.

## 4.3 Spam

Don't create multiple Bundle IDs of the same app. If your app has different versions for specific locations, sports teams, universities, etc., consider submitting a single app and provide the variations using in-app purchase. Also avoid piling on to a category that is already saturated; the App Store has enough fart, burp, flashlight, fortune telling, dating, drinking games, and Kama Sutra apps, etc. already. We will reject these apps unless they provide a unique, high-quality experience. Spamming the store may lead to your removal from the Apple Developer Program.

## 4.4 Extensions

Apps hosting or containing extensions must comply with the App Extension Programming Guide or the Safari App Extensions Guide and should include some functionality, such as help screens and settings interfaces where possible. You should clearly and accurately disclose

what extensions are made available in the app's marketing text, and the extensions may not include marketing, advertising, or in-app purchases.

**4.4.1** Keyboard extensions have some additional rules. They must:

- Provide keyboard input functionality (e.g. typed characters);

- Follow Sticker guidelines if the keyboard includes images or emoji;

- Provide a method for progressing to the next keyboard;

- Remain functional without full network access and without requiring full access;

- Collect user activity only to enhance the functionality of the user's keyboard extension on the iOS device.

They must not:

- Launch other apps besides Settings; or

- Repurpose keyboard buttons for other behaviors (e.g. holding down the "return" key to launch the camera).

**4.4.2** Safari extensions must run on the current version of Safari on macOS. They may not interfere with System or Safari UI elements and must never include malicious or misleading content or code. Violating this rule will lead to removal from the Apple Developer Program. Safari extensions should not claim access to more websites than strictly necessary to function.

**4.4.3** Stickers

Stickers are a great way to make Messages more dynamic and fun, letting people express themselves in clever, funny, meaningful ways. Whether your app contains a sticker extension or you're creating free-standing sticker packs, its content shouldn't offend users, create a negative experience, or violate the law.

(i) In general, if it wouldn't be suitable for the App Store, it doesn't belong in a sticker.

(ii) Consider regional sensitivities, and do not make your sticker pack available in a country or region where it could be poorly received or violate local law.

(iii) If we don't understand what your stickers mean, include a clear explanation in your review notes to avoid any delays in the review process.

(iv) Ensure your stickers have relevance beyond your friends and family; they should not be specific to personal events, groups, or relationships.

(v) You must have all the necessary copyright, trademark, publicity rights, and permissions for the content in your stickers, and shouldn't submit anything unless you're authorized to do so. Keep in mind that you must be able to provide verifiable documentation upon request. Apps with sticker content you don't have rights to use will be removed from the App Store and repeat offenders will be removed from the Apple Developer Program. If you believe your content has been infringed by another provider, submit a claim here.

### 4.5 Apple Sites and Services

**4.5.1** Apps may use approved Apple RSS feeds such as the iTunes Store RSS feed, but may not scrape any information from Apple sites (e.g. apple.com, the iTunes Store, App Store, App Store Connect, developer portal, etc.) or create rankings using this information.

#### 4.5.2 Apple Music

(i) MusicKit on iOS lets users play Apple Music and their local music library natively from your apps and games. When a user provides permission to their Apple Music account, your app can create playlists, add songs to their library, and play any of the millions of songs in the Apple Music catalog. Users must initiate the playback of an Apple Music stream and be able to navigate using standard media controls such as "play," "pause," and "skip." Moreover, your app may not require payment or indirectly monetize access to the Apple Music service (e.g. in-app purchase, advertising, requesting user info, etc.). Do not download, upload, or enable sharing of music files sourced from the MusicKit APIs, except as explicitly permitted in MusicKit documentation.

(ii) Using the MusicKit APIs is not a replacement for securing the licenses you might need for a deeper or more complex music integration. For example, if you want your app to play a specific song at a particular moment, or to create audio or video files that can be shared to social media, you'll need to contact rights-holders directly to get their permission (e.g. synchronization or adaptation rights) and assets. Cover art and other metadata may only be used in connection with music playback or playlists (including App Store screenshots displaying your app's functionality), and should not be used in any marketing or advertising without getting specific authorization from rights-holders. Make sure to follow the Apple Music Identity Guidelines when integrating Apple Music services in your app.

(iii) Apps that access Apple Music user data, such as playlists and favorites, must clearly disclose this access in the purpose string. Any data collected may not be shared with third parties for any purpose other than supporting or improving the app experience. This data may not be used to identify users or devices, or to target advertising.

4.5.3 Do not use Apple Services to spam, phish, or send unsolicited messages to customers, including Game Center, Push Notifications, etc. Do not attempt to reverse lookup, trace, relate, associate, mine, harvest, or otherwise exploit Player IDs, aliases, or other information obtained through Game Center, or you will be removed from the Apple Developer Program.

4.5.4 Push Notifications must not be required for the app to function, and should not be used to send sensitive personal or confidential information. Push Notifications should not be used for promotions or direct marketing purposes unless customers have explicitly opted in to receive them via consent language displayed in your app's UI, and you provide a method in your app for a user to opt out from receiving such messages. Abuse of these services may result in revocation of your privileges.

4.5.5 Only use Game Center Player IDs in a manner approved by the Game Center terms and do not display them in the app or to any third party.

4.5.6 Apps may use Unicode characters that render as Apple emoji in their app and app metadata. Apple emoji may not be used on other platforms or embedded directly in your app binary.

#### 4.6 Alternate App Icons

Apps may display customized icons, for example, to reflect a sports team preference, provided that each change is initiated by the user and the app includes settings to revert to the original icon. All icon variants must relate to the content of the app and changes should be consistent across all system assets, so that the icons displayed in Settings, Notifications, etc. match the new springboard icon. This feature may not be used for dynamic, automatic, or serial changes, such as to reflect up-to-date weather information, calendar notifications, etc.

### 4.7 HTML5 Games, Bots, etc.

Apps may contain or run code that is not embedded in the binary (e.g. HTML5-based games, bots, etc.), as long as code distribution isn't the main purpose of the app, the code is not offered in a store or store-like interface, and provided that the software adheres to the additional rules that follow in 4.7.1 and 4.7.2. These additional rules are important to preserve the experience that App Store customers expect, and to help ensure user safety.

**4.7.1** Software offered under this rule must:

- be free or purchased using in-app purchase;

- only use capabilities available in a standard WebKit view (e.g. it must open and run natively in Safari without modifications or additional software); and use WebKit and JavaScript Core to run third-party software and should not attempt to extend or expose native platform APIs to third-party software;

- be offered by developers that have joined the Apple Developer Program and signed the Apple Developer Program License Agreement;

- not provide access to real money gaming;

- adhere to the terms of these App Store Review Guidelines (e.g. do not include objectionable content); and

- not offer digital goods or services for sale.

**4.7.2** Upon request, you must provide an index of software and metadata available in your app. It must include Apple Developer Program Team IDs for the providers of the software along with a URL which App Review can use to confirm that the software complies with the requirements above.

### 4.8 Sign in with Apple

Apps that use a third-party or social login service (such as Facebook Login, Google Sign-In, Sign in with Twitter, Sign In with LinkedIn, Login with Amazon, or WeChat Login) to set up or authenticate the user's primary account with the app must also offer Sign in with Apple as an equivalent option. A user's primary account is the account they establish with your app for the purposes of identifying themselves, signing in, and accessing your features and associated services.

Sign in with Apple is not required if:

- Your app exclusively uses your company's own account setup and sign-in systems.

- Your app is an education, enterprise, or business app that requires the user to sign in with an existing education or enterprise account.

- Your app uses a government or industry-backed citizen identification system or electronic ID to authenticate users.

- Your app is a client for a specific third-party service and users are required to sign in to their mail, social media, or other third-party account directly to access their content.

### 4.9 Streaming games

Streaming games are permitted so long as they adhere to all guidelines—for example, each game update must be submitted for review, developers must provide appropriate metadata for search, games must use in-app purchase to unlock features or functionality, etc. Of course, there is always the open Internet and web browser apps to reach all users outside of the App Store.

**4.9.1** Each streaming game must be submitted to the App Store as an individual app so that it has an App Store product page, appears in charts and search, has user ratings and

Case 4:22-cv-04437-YGR   Document 48   Filed 12/02/22   Page 247 of 261

review, can be managed with ScreenTime and other parental control apps, appears on the user's device, etc.

4.9.2 Streaming game services may offer a catalog app on the App Store to help users sign up for the service and find the games on the App Store, provided that the app adheres to all guidelines, including offering users the option to pay for a subscription with in-app purchase and use Sign in with Apple. All the games included in the catalog app must link to an individual App Store product page.

---

# 5. Legal

Apps must comply with all legal requirements in any location where you make them available (if you're not sure, check with a lawyer). We know this stuff is complicated, but it is your responsibility to understand and make sure your app conforms with all local laws, not just the guidelines below. And of course, apps that solicit, promote, or encourage criminal or clearly reckless behavior will be rejected. In extreme cases, such as apps that are found to facilitate human trafficking and/or the exploitation of children, appropriate authorities will be notified.

### 5.1 Privacy

Protecting user privacy is paramount in the Apple ecosystem, and you should use care when handling personal data to ensure you've complied with privacy best practices, applicable laws, and the terms of the Apple Developer Program License Agreement, not to mention customer expectations. More particularly:

#### 5.1.1 Data Collection and Storage

**(i) Privacy Policies:** All apps must include a link to their privacy policy in the App Store Connect metadata field and within the app in an easily accessible manner. The privacy policy must clearly and explicitly:

- Identify what data, if any, the app/service collects, how it collects that data, and all uses of that data.

- Confirm that any third party with whom an app shares user data (in compliance with these Guidelines)—such as analytics tools, advertising networks and third-party SDKs, as well as any parent, subsidiary or other related entities that will have access to user data—will provide the same or equal protection of user data as stated in the app's privacy policy and required by these Guidelines.

- Explain its data retention/deletion policies and describe how a user can revoke consent and/or request deletion of the user's data.

**(ii) Permission:** Apps that collect user or usage data must secure user consent for the collection, even if such data is considered to be anonymous at the time of or immediately following collection. Paid functionality must not be dependent on or require a user to grant access to this data. Apps must also provide the customer with an easily accessible and understandable way to withdraw consent. Ensure your purpose strings clearly and completely describe your use of the data. Apps that collect data for a legitimate interest without consent by relying on the terms of the European Union's General Data Protection Regulation ("GDPR") or similar statute must comply with all terms of that law. Learn more about Requesting Permission.

**(iii) Data Minimization:** Apps should only request access to data relevant to the core functionality of the app and should only collect and use data that is required to

accomplish the relevant task. Where possible, use the out-of-process picker or a share
sheet rather than requesting full access to protected resources like Photos or Contacts.

**(iv) Access:** Apps must respect the user's permission settings and not attempt to
manipulate, trick, or force people to consent to unnecessary data access. For example,
apps that include the ability to post photos to a social network must not also require
microphone access before allowing the user to upload photos. Where possible, provide
alternative solutions for users who don't grant consent. For example, if a user declines
to share Location, offer the ability to manually enter an address.

**(v) Account Sign-In:** If your app doesn't include significant account-based features, let
people use it without a login. If your app supports account creation, you must also offer
account deletion within the app. Apps may not require users to enter personal
information to function, except when directly relevant to the core functionality of the
app or required by law. If your core app functionality is not related to a specific social
network (e.g. Facebook, WeChat, Weibo, Twitter, etc.), you must provide access without
a login or via another mechanism. Pulling basic profile information, sharing to the social
network, or inviting friends to use the app are not considered core app functionality. The
app must also include a mechanism to revoke social network credentials and disable
data access between the app and social network from within the app. An app may not
store credentials or tokens to social networks off of the device and may only use such
credentials or tokens to directly connect to the social network from the app itself while
the app is in use.

**(vi)** Developers that use their apps to surreptitiously discover passwords or other
private data will be removed from the Apple Developer Program.

**(vii)** SafariViewController must be used to visibly present information to users; the
controller may not be hidden or obscured by other views or layers. Additionally, an app
may not use SafariViewController to track users without their knowledge and consent.

**(viii)** Apps that compile personal information from any source that is not directly from
the user or without the user's explicit consent, even public databases, are not permitted
on the App Store.

**(ix)** Apps that provide services in highly-regulated fields (such as banking and financial
services, healthcare, gambling, legal cannabis use, and air travel) or that require
sensitive user information should be submitted by a legal entity that provides the
services, and not by an individual developer. Apps that facilitate the legal sale of
cannabis must be geo-restricted to the corresponding legal jurisdiction.

**(x)** Apps may request basic contact information (such as name and email address) so
long as the request is optional for the user, features and services are not conditional on
providing the information, and it complies with all other provisions of these guidelines,
including limitations on collecting information from kids.

### 5.1.2 Data Use and Sharing

**(i)** Unless otherwise permitted by law, you may not use, transmit, or share someone's
personal data without first obtaining their permission. You must provide access to
information about how and where the data will be used. Data collected from apps may
only be shared with third parties to improve the app or serve advertising (in compliance
with the Apple Developer Program License Agreement). You must receive explicit
permission from users via the App Tracking Transparency APIs to track their activity.
Learn more about tracking. Apps that share user data without user consent or otherwise
complying with data privacy laws may be removed from sale and may result in your
removal from the Apple Developer Program.

(ii) Data collected for one purpose may not be repurposed without further consent unless otherwise explicitly permitted by law.

(iii) Apps should not attempt to surreptitiously build a user profile based on collected data and may not attempt, facilitate, or encourage others to identify anonymous users or reconstruct user profiles based on data collected from Apple-provided APIs or any data that you say has been collected in an "anonymized," "aggregated," or otherwise non-identifiable way.

(iv) Do not use information from Contacts, Photos, or other APIs that access user data to build a contact database for your own use or for sale/distribution to third parties, and don't collect information about which other apps are installed on a user's device for the purposes of analytics or advertising/marketing.

(v) Do not contact people using information collected via a user's Contacts or Photos, except at the explicit initiative of that user on an individualized basis; do not include a Select All option or default the selection of all contacts. You must provide the user with a clear description of how the message will appear to the recipient before sending it (e.g. What will the message say? Who will appear to be the sender?).

(vi) Data gathered from the HomeKit API, HealthKit, Clinical Health Records API, MovementDisorder APIs, ClassKit or from depth and/or facial mapping tools (e.g. ARKit, Camera APIs, or Photo APIs) may not be used for marketing, advertising or use-based data mining, including by third parties. Learn more about best practices for implementing CallKit, HealthKit, ClassKit, and ARKit.

(vii) Apps using Apple Pay may only share user data acquired via Apple Pay with third parties to facilitate or improve delivery of goods and services.

### 5.1.3 Health and Health Research

Health, fitness, and medical data are especially sensitive and apps in this space have some additional rules to make sure customer privacy is protected:

(i) Apps may not use or disclose to third parties data gathered in the health, fitness, and medical research context—including from the Clinical Health Records API, HealthKit API, Motion and Fitness, MovementDisorderAPIs, or health-related human subject research—for advertising, marketing, or other use-based data mining purposes other than improving health management, or for the purpose of health research, and then only with permission. Apps may, however, use a user's health or fitness data to provide a benefit directly to that user (such as a reduced insurance premium), provided that the app is submitted by the entity providing the benefit, and the data is not shared with a third party. You must disclose the specific health data that you are collecting from the device.

(ii) Apps must not write false or inaccurate data into HealthKit or any other medical research or health management apps, and may not store personal health information in iCloud.

(iii) Apps conducting health-related human subject research must obtain consent from participants or, in the case of minors, their parent or guardian. Such consent must include the (a) nature, purpose, and duration of the research; (b) procedures, risks, and benefits to the participant; (c) information about confidentiality and handling of data (including any sharing with third parties); (d) a point of contact for participant questions; and (e) the withdrawal process.

(iv) Apps conducting health-related human subject research must secure approval from an independent ethics review board. Proof of such approval must be provided upon request.

### 5.1.4 Kids

Case 4:22-cv-04437-YGR   Document 48   Filed 12/02/22   Page 250 of 261

For many reasons, it is critical to use care when dealing with personal data from kids, and we encourage you to carefully review all the requirements for complying with laws like the Children's Online Privacy Protection Act ("COPPA"), the European Union's General Data Protection Regulation ("GDPR"), and any other applicable regulations or laws.

Apps may ask for birthdate and parental contact information only for the purpose of complying with these statutes, but must include some useful functionality or entertainment value regardless of a person's age.

Apps intended primarily for kids should not include third-party analytics or third-party advertising. This provides a safer experience for kids. In limited cases, third-party analytics and third-party advertising may be permitted provided that the services adhere to the same terms set forth in Guideline 1.3.

Moreover, apps in the Kids Category or those that collect, transmit, or have the capability to share personal information (e.g. name, address, email, location, photos, videos, drawings, the ability to chat, other personal data, or persistent identifiers used in combination with any of the above) from a minor must include a privacy policy and must comply with all applicable children's privacy statutes. For the sake of clarity, the parental gate requirement for the Kid's Category is generally not the same as securing parental consent to collect personal data under these privacy statutes.

As a reminder, Guideline 2.3.8 requires that use of terms like "For Kids" and "For Children" in app metadata is reserved for the Kids Category. Apps not in the Kids Category cannot include any terms in app name, subtitle, icon, screenshots or description that imply the main audience for the app is children.

### 5.1.5 Location Services
Use Location services in your app only when it is directly relevant to the features and services provided by the app. Location-based APIs shouldn't be used to provide emergency services or autonomous control over vehicles, aircraft, and other devices, except for small devices such as lightweight drones and toys, or remote control car alarm systems, etc. Ensure that you notify and obtain consent before collecting, transmitting, or using location data. If your app uses location services, be sure to explain the purpose in your app; refer to the Human Interface Guidelines for best practices for doing so.

### 5.2 Intellectual Property
Make sure your app only includes content that you created or that you have a license to use. Your app may be removed if you've stepped over the line and used content without permission. Of course, this also means someone else's app may be removed if they've "borrowed" from your work. If you believe your intellectual property has been infringed by another developer on the App Store, submit a claim via our web form. Laws differ in different countries and regions, but at the very least, make sure to avoid the following common errors:

**5.2.1 Generally:** Don't use protected third-party material such as trademarks, copyrighted works, or patented ideas in your app without permission, and don't include misleading, false, or copycat representations, names, or metadata in your app bundle or developer name. Apps should be submitted by the person or legal entity that owns or has licensed the intellectual property and other relevant rights.

**5.2.2 Third-Party Sites/Services:** If your app uses, accesses, monetizes access to, or displays content from a third-party service, ensure that you are specifically permitted to do so under the service's terms of use. Authorization must be provided upon request.

**5.2.3 Audio/Video Downloading:** Apps should not facilitate illegal file sharing or include the ability to save, convert, or download media from third-party sources (e.g. Apple Music, YouTube, SoundCloud, Vimeo, etc.) without explicit authorization from those sources.

Case 4:22-cv-04437-YGR   Document 49   Filed 12/02/22   Page 251 of 261

Streaming of audio/video content may also violate Terms of Use, so be sure to check before your app accesses those services. Documentation must be provided upon request.

**5.2.4 Apple Endorsements:** Don't suggest or imply that Apple is a source or supplier of the App, or that Apple endorses any particular representation regarding quality or functionality. If your app is selected as an "Editor's Choice," Apple will apply the badge automatically.

**5.2.5 Apple Products:** Don't create an app that appears confusingly similar to an existing Apple product, interface (e.g. Finder), app (such as the App Store, iTunes Store, or Messages) or advertising theme. Apps and extensions, including third-party keyboards and Sticker packs, may not include Apple emoji. iTunes music previews may not be used for their entertainment value (e.g. as the background music to a photo collage or the soundtrack to a game) or in any other unauthorized manner. If your app displays Activity rings, they should not visualize Move, Exercise, or Stand data in a way that resembles the Activity control. The Human Interface Guidelines have more information on how to use Activity rings. If your app displays Apple Weather data, it should follow the attribution requirements provided in the WeatherKit documentation.

### 5.3 Gaming, Gambling, and Lotteries

Gaming, gambling, and lotteries can be tricky to manage and tend to be one of the most regulated offerings on the App Store. Only include this functionality if you've fully vetted your legal obligations everywhere you make your app available and are prepared for extra time during the review process. Some things to keep in mind:

**5.3.1** Sweepstakes and contests must be sponsored by the developer of the app.

**5.3.2** Official rules for sweepstakes, contests, and raffles must be presented in the app and make clear that Apple is not a sponsor or involved in the activity in any manner.

**5.3.3** Apps may not use in-app purchase to purchase credit or currency for use in conjunction with real money gaming of any kind.

**5.3.4** Apps that offer real money gaming (e.g. sports betting, poker, casino games, horse racing) or lotteries must have necessary licensing and permissions in the locations where the app is used, must be geo-restricted to those locations, and must be free on the App Store. Illegal gambling aids, including card counters, are not permitted on the App Store. Lottery apps must have consideration, chance, and a prize.

### 5.4 VPN Apps

Apps offering VPN services must utilize the NEVPNManager API and may only be offered by developers enrolled as an organization. You must make a clear declaration of what user data will be collected and how it will be used on an app screen prior to any user action to purchase or otherwise use the service. Apps offering VPN services may not sell, use, or disclose to third parties any data for any purpose, and must commit to this in their privacy policy. VPN apps must not violate local laws, and if you choose to make your VPN app available in a territory that requires a VPN license, you must provide your license information in the App Review Notes field. Parental control, content blocking, and security apps, among others, from approved providers may also use the NEVPNManager API. Apps that do not comply with this guideline will be removed from the App Store and you may be removed from the Apple Developer Program.

### 5.5 Mobile Device Management

Mobile Device Management Apps that offer Mobile Device Management (MDM) services must request this capability from Apple. Such apps may only be offered by commercial enterprises, educational institutions, or government agencies, and in limited cases, companies using MDM for parental control services or device security. You must make a clear declaration of what user data will be collected and how it will be used on an app screen prior

to any user action to purchase or otherwise use the service. MDM apps must not violate any applicable laws. Apps offering MDM services may not sell, use, or disclose to third parties any data for any purpose, and must commit to this in their privacy policy. In limited cases, third-party analytics may be permitted provided that the services only collect or transmit data about the performance of the developer's MDM app, and not any data about the user, the user's device, or other apps used on that device. Apps offering configuration profiles must also adhere to these requirements. Apps that do not comply with this guideline will be removed from the App Store and you may be removed from the Apple Developer Program.

## 5.6 Developer Code of Conduct

Please treat everyone with respect, whether in your responses to App Store reviews, customer support requests, or when communicating with Apple, including your responses in App Store Connect. Do not engage in harassment of any kind, discriminatory practices, intimidation, bullying, and don't encourage others to engage in any of the above. Repeated manipulative or misleading behavior or other fraudulent conduct will lead to your removal from the Apple Developer Program.

Customer trust is the cornerstone of the App Store's success. Apps should never prey on users or attempt to rip off customers, trick them into making unwanted purchases, force them to share unnecessary data, raise prices in a tricky manner, charge for features or content that are not delivered, or engage in any other manipulative practices within or outside of the app.

Your Developer Program account will be terminated if you engage in activities or actions that are not in accordance with the Developer Code of Conduct. To restore your account, you may provide a written statement detailing the improvements you plan to make. If your plan is approved by Apple and we confirm the changes have been made, your account may be restored.

### 5.6.1 App Store Reviews

App Store customer reviews can be an integral part of the app experience, so you should treat customers with respect when responding to their comments. Keep your responses targeted to the user's comments and do not include personal information, spam, or marketing in your response.

Use the provided API to prompt users to review your app; this functionality allows customers to provide an App Store rating and review without the inconvenience of leaving your app, and we will disallow custom review prompts.

### 5.6.2 Developer Identity

Providing verifiable information to Apple and customers is critical to customer trust. Your representation of yourself, your business, and your offerings on the App Store must be accurate. The information you provide must be truthful, relevant, and up-to-date so that Apple and customers understand who they are engaging with and can contact you regarding any issues.

### 5.6.3 Discovery Fraud

Participating in the App Store requires integrity and a commitment to building and maintaining customer trust. Manipulating any element of the App Store customer experience such as charts, search, reviews, or referrals to your app erodes customer trust and is not permitted.

### 5.6.4 App Quality

Customers expect the highest quality from the App Store, and maintaining high quality content, services, and experiences promotes customer trust. Indications that this expectation is not being met include excessive customer reports about concerns with your app, such as negative customer reviews, and excessive refund requests. Inability to

maintain high quality may be a factor in deciding whether a developer is abiding by the Developer Code of Conduct.

---

# After You Submit

Once you've submitted your app and metadata in App Store Connect and you're in the review process, here are some things to keep in mind:

- **Timing:** App Review will examine your app as soon as we can. However, if your app is complex or presents new issues, it may require greater scrutiny and consideration. And remember that if your app is repeatedly rejected for the same guideline violation or you've attempted to manipulate the App Review process, review of your app will take longer to complete. Learn more about App Review.

- **Status Updates:** The current status of your app will be reflected in App Store Connect, so you can keep an eye on things from there.

- **Expedite Requests:** If you have a critical timing issue, you can request an expedited review. Please respect your fellow developers by seeking expedited review only when you truly need it. If we find you're abusing this system, we may reject your requests going forward.

- **Release Date:** If your release date is set for the future, the app will not appear on the App Store until that date, even if it is approved by App Review. And remember that it can take up to 24-hours for your app to appear on all selected storefronts.

- **Rejections:** Our goal is to apply these guidelines fairly and consistently, but nobody's perfect. If your app has been rejected and you have questions or would like to provide additional information, please use App Store Connect to communicate directly with the App Review team. This may help get your app on the store, and it can help us improve the App Review process or identify a need for clarity in our policies.

- **Appeals:** If you disagree with the outcome of your review, or would like to suggest a change to the guideline itself, please submit an appeal. This may help get your app on the store, and it can help us improve the App Review process or identify a need for clarity in our policies.

- **Bug Fix Submissions:** For apps that are already on the App Store, bug fixes will no longer be delayed over guideline violations except for those related to legal or safety issues. If your app has been rejected, and qualifies for this process, please use App Store Connect to communicate directly with the App Review team indicating that you would like to take advantage of this process and plan to address the issue in your next submission.

We're excited to see what you come up with next!

Last Updated: June 06, 2022

Developer    App Store    App Review    App Store Review Guidelines

| Platforms | Topics & Technologies | Resources | Programs |
|---|---|---|---|
| iOS | Accessibility | Documentation | Apple Developer Program |
| iPadOS | Accessories | Curriculum | Apple Developer Enterprise Program |
| macOS | App Extensions | Downloads | App Store Small Business Program |
| tvOS | App Store | Forums | MFi Program |

Case 4:22-cv-04437-YGR    Document 48    Filed 12/02/22    Page 254 of 261

watchOS

**Tools**

Swift

SwiftUI

Swift Playgrounds

TestFlight

Xcode

Xcode Cloud

SF Symbols

Audio & Video

Augmented Reality

Business

Design

Distribution

Education

Fonts

Games

Health & Fitness

In-App Purchase

Localization

Maps & Location

Machine Learning

Security

Safari & Web

Videos

**Support**

Support Articles

Contact Us

Bug Reporting

System Status

**Account**

Apple Developer

App Store Connect

Certificates, IDs, & Profiles

Feedback Assistant

News Partner Program

Video Partner Program

Security Bounty Program

Security Research Device Program

**Events**

App Accelerators

App Store Awards

Apple Design Awards

Apple Developer Academies

Entrepreneur Camp

Tech Talks

WWDC

To view the latest developer news, visit News and Updates.

Light    Dark    Auto

Copyright © 2022 Apple Inc. All rights reserved.    Terms of Use  |  Privacy Policy  |  Agreements and Guidelines

English

# EXHIBIT C

**THIS IS A LEGAL AGREEMENT BETWEEN YOU AND APPLE INC. ("APPLE") STATING THE TERMS THAT GOVERN YOUR PARTICIPATION AS AN APPLE DEVELOPER. PLEASE READ THIS APPLE DEVELOPER AGREEMENT ("AGREEMENT") BEFORE PRESSING THE "AGREE" BUTTON AND CHECKING THE BOX AT THE BOTTOM OF THIS PAGE. BY PRESSING "AGREE," YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, PRESS "CANCEL".**

# Apple Developer Agreement

**1. Relationship With Apple; Apple ID and Password.** You understand and agree that by registering with Apple to become an Apple Developer ("**Apple Developer**"), no legal partnership or agency relationship is created between you and Apple. You agree not to represent otherwise. You also certify that you are at least thirteen years of age and you represent that you are legally permitted to register as an Apple Developer. This Agreement is void where prohibited by law and the right to register as an Apple Developer is not granted in such jurisdictions. Unless otherwise agreed or permitted by Apple in writing, you cannot share or transfer any benefits you receive from Apple in connection with being an Apple Developer. The Apple ID and password you use to log into your Apple Developer account cannot be shared in any way or with anyone. You are responsible for maintaining the confidentiality of your Apple ID and password and for any activity in connection with your account.

**2. Developer Benefits.** As an Apple Developer, you may have the opportunity to attend certain Apple developer conferences, technical talks, and other events (including online or electronic broadcasts of such events) ("**Apple Events**"). In addition, Apple may offer to provide you with certain services ("**Services**"), as described more fully herein and on the Apple Developer web pages ("**Site**"), solely for your own use in connection with your participation as an Apple Developer. Services may include, but not be limited to, any services Apple offers at Apple Events or on the Site as well as the offering of any content or materials displayed on the Site ("**Content**"). Apple may change, suspend or discontinue providing the Services, Site and Content to you at any time, and may impose limits on certain features and materials offered or restrict your access to parts or all of such materials without notice or liability.

**3. Restrictions**. You agree not to exploit the Site, or any Services, Apple Events or Content provided to you by Apple as an Apple Developer, in any unauthorized way, including but not limited to, by trespass, burdening network capacity or using the Services, Site or Content other than for authorized purposes. Copyright and other intellectual property laws protect the Site and Content provided to you, and you agree to abide by and maintain all notices, license information, and restrictions contained therein. Unless expressly permitted herein or otherwise permitted in a separate agreement with Apple, you may not modify, publish, network, rent, lease, loan, transmit, sell, participate in the transfer or sale of, reproduce, create derivative works based on, redistribute, perform, display, or in any way exploit any of the Site, Content or Services. You may not decompile, reverse engineer, disassemble, or attempt to derive the source code of any software or security components of the Services, Site, or Content (except as and only to the extent any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by any licensing terms accompanying the foregoing). Use of the Site, Content or Services to violate, tamper with, or circumvent the security of any computer network, software, passwords, encryption codes, technological protection measures, or to otherwise engage in any kind of illegal activity, or to enable others to do so, is expressly prohibited. Apple retains ownership of all its rights in the Site, Content, Apple Events and Services, and except as expressly set forth herein, no other rights or licenses are granted or to be implied under any Apple intellectual property.

**4. Confidentiality.** Except as otherwise set forth herein, you agree that any Apple pre- release software, services, and/or hardware (including related documentation and materials) provided to you as an Apple Developer ("**Pre-Release Materials**") and any information disclosed

by Apple to you in connection with Apple Events will be considered and referred to as "**Apple Confidential Information**".

Notwithstanding the foregoing, Apple Confidential Information will not include: (a) information that is generally and legitimately available to the public through no fault or breach of yours; (b) information that is generally made available to the public by Apple; (c) information that is independently developed by you without the use of any Apple Confidential Information; (d) information that was rightfully obtained from a third party who had the right to transfer or disclose it to you without limitation; or (e) any third party software and/or documentation provided to you by Apple and accompanied by licensing terms that do not impose confidentiality obligations on the use or disclosure of such software and/or documentation. Further, Apple agrees that you will not be bound by the foregoing confidentiality terms with regard to technical information about Apple pre- release software, services and/or hardware disclosed by Apple at WWDC (Apple's Worldwide Developers Conference), except that you may not post screen shots of, write public reviews of, or redistribute any such materials.

**5. Nondisclosure and Nonuse of Apple Confidential Information**. Unless otherwise expressly agreed or permitted in writing by Apple, you agree not to disclose, publish, or disseminate any Apple Confidential Information to anyone other than to other Apple Developers who are employees and contractors working for the same entity as you and then only to the extent that Apple does not otherwise prohibit such disclosure. Except for your authorized purposes as an Apple Developer or as otherwise expressly agreed or permitted by Apple in writing, you agree not to use Apple Confidential Information in any way, including, without limitation, for your own or any third party's benefit without the prior written approval of an authorized representative of Apple in each instance. You further agree to take reasonable precautions to prevent any unauthorized use, disclosure, publication, or dissemination of Apple Confidential Information. You acknowledge that unauthorized disclosure or use of Apple Confidential Information could cause irreparable harm and significant injury to Apple that may be difficult to ascertain. Accordingly, you agree that Apple will have the right to seek immediate injunctive relief to enforce your obligations under this Agreement in addition to any other rights and remedies it may have. If you are required by law, regulation or pursuant to the valid binding order of a court of competent jurisdiction to disclose Apple Confidential Information, you may make such disclosure, but only if you have notified Apple before making such disclosure and have used commercially reasonable efforts to limit the disclosure and to seek confidential, protective treatment of such information. A disclosure pursuant to the previous sentence will not relieve you of your obligations to hold such information as Apple Confidential Information.

**6. Confidential Pre-Release Materials License and Restrictions.** If Apple provides you with Pre-Release Materials, then subject to your compliance with the terms and conditions of this Agreement, Apple hereby grants you a nonexclusive, nontransferable, right and license to use the Pre-Release Materials only for the limited purposes set forth in this Section 6; provided however that if such Pre-Release Materials are subject to a separate license agreement, you agree that the license agreement accompanying such materials in addition to Sections 4 and 5 of this Agreement shall also govern your use of the Pre-Release Materials. You further agree that in the event of any inconsistency between Section 4 and 5 of this Agreement and the confidentiality restrictions in the license agreement, the license agreement shall govern. You agree not to use the Pre-Release Materials for any purpose other than testing and/or development by you of a product designed to operate in combination with the same operating system for which the Pre-Release Materials are designed. This Agreement does not grant you any right or license to incorporate or make use of any Apple intellectual property (including for example and without limitation, trade secrets, patents, copyrights, trademarks and industrial designs) in any product. Except as expressly set forth herein, no other rights or licenses are granted or to be implied under any Apple intellectual property. You agree not to decompile, reverse engineer, disassemble, or otherwise reduce the Pre-Release Materials to a human-perceivable form, and you will not modify, network, rent, lease, transmit, sell, or loan the Pre-Release Materials in whole or in part.

**7. Developer Content License and Restrictions.** As an Apple Developer, you may have access to certain proprietary content (including, without limitation, video presentations and audio recordings) that Apple may make available to you from time to time ("**Content**"). Content shall be considered Apple Confidential Information, unless otherwise agreed or permitted in writing by Apple. You may not share the Content with anyone, including, without limitation, employees and contractors working for the same entity as you, regardless of whether they are Apple Developers, unless otherwise expressly permitted by Apple.

Subject to these terms and conditions, Apple grants you a personal and nontransferable license to access and use the Content for authorized purposes as an Apple Developer; provided that you may only download one (1) copy of the Content and such download must be completed within the time period specified by Apple for such download. Except as expressly permitted by Apple, you shall not modify, translate, reproduce, distribute, or create derivative works of the Content or any part thereof. You shall not rent, lease, loan, sell, sublicense, assign or otherwise transfer any rights in the Content. Apple and/or Apple's licensor(s) retain ownership of the Content itself and any copies or portions thereof. The Content is licensed, not sold, to you by Apple for use only under this Agreement, and Apple reserves all rights not expressly granted to you. Your rights under this license to use and access the Content will terminate automatically without notice from Apple if you fail to comply with any of these provisions.

**8. Compatibility Labs; Developer Technical Support (DTS).** As an Apple Developer, you may have access to Apple's software and/or hardware compatibility testing and development labs ("**Labs**") and/or developer technical support incidents ("**DTS Services**") that Apple may make available to you from time to time as an Apple developer benefit or for a separate fee. You agree that all use of such Labs and DTS Services will be in accordance with Apple's usage policies for such services, which are subject to change from time to time, with or without prior notice to you. Without limiting the foregoing, Apple may post on the Site and/or send an email to you with notices of such changes. It is your responsibility to review the Site and/or check your email address registered with Apple for any such notices. You agree that Apple shall not be liable to you or any third party for any modification or cessation of such services. As part of the DTS Services, Apple may supply you with certain code snippets, sample code, software, and other materials ("**Materials**"). You agree that any Materials that Apple provides as part of the DTS Services are licensed to you and shall be used by you only in accordance with the terms and conditions accompanying the Materials. Apple retains ownership of all of its right, title and interest in such Materials and no other rights or licenses are granted or to be implied under any Apple intellectual property. You have no right to copy, decompile, reverse engineer, sublicense or otherwise distribute such Materials, except as may be expressly provided in the terms and conditions accompanying the Materials. **YOU AGREE THAT WHEN REQUESTING AND RECEIVING TECHNICAL SUPPORT FROM DTS SERVICES, YOU WILL NOT PROVIDE APPLE WITH ANY INFORMATION, INCLUDING THAT INCORPORATED IN YOUR SOFTWARE, THAT IS CONFIDENTIAL TO YOU OR ANY THIRD PARTY. YOU AGREE THAT ANY NOTICE, LEGEND, OR LABEL TO THE CONTRARY CONTAINED IN ANY SUCH MATERIALS PROVIDED BY YOU TO APPLE SHALL BE WITHOUT EFFECT. APPLE SHALL BE FREE TO USE ALL SUCH INFORMATION IT RECEIVES FROM YOU IN ANY MANNER IT DEEMS APPROPRIATE, SUBJECT TO ANY APPLICABLE PATENTS OR COPYRIGHTS.** Apple reserves the right to reject a request for access to Labs or for DTS Services at any time and for any reason, in which event Apple may credit you for the rejected lab or support request. You shall be solely responsible for any restoration of lost or altered files, data, programs or other materials provided.

**9. Amendment; Communication.** Apple reserves the right, at its discretion, to modify this Agreement, including any rules and policies at any time. You will be responsible for reviewing and becoming familiar with any such modifications (including new terms, updates, revisions, supplements, modifications, and additional rules, policies, terms and conditions)("**Additional Terms**") communicated to you by Apple. All Additional Terms are hereby incorporated into this Agreement by this reference and your continued use of the Site will indicate your acceptance of any Additional Terms. In addition, Apple may be sending communications to you from time to time. Such communications may be in the form of phone calls and/or emails and may include, but not be limited to, membership information, marketing materials, technical information, and updates and/or changes regarding your participation as an Apple Developer. By agreeing to this Agreement, you consent that Apple may provide you with such communications.

**10. Term and Termination.** Apple may terminate or suspend you as a registered Apple Developer at any time in Apple's sole discretion. If Apple terminates you as a registered Apple Developer, Apple reserves the right to deny your reapplication at any time in Apple's sole discretion. You may terminate your participation as a registered Apple Developer at any time, for any reason, by notifying Apple in writing of your intent to do so. Upon any termination or, at Apple's discretion, suspension, all rights and licenses granted to you by Apple will cease, including your right to access the Site, and you agree to destroy any

and all Apple Confidential Information that is in your possession or control. At Apple's request, you agree to provide certification of such destruction to Apple. No refund or partial refund of any fees paid hereunder or any other fees will be made for any reason. Following termination of this Agreement, Sections 1, 3-5, 7 (but only for so long as the duration specified by Apple for such usage), 10-19 shall continue to bind the parties.

**11. Apple Independent Development.** Nothing in this Agreement will impair Apple's right to develop, acquire, license, market, promote or distribute products, software or technologies that perform the same or similar functions as, or otherwise compete with, any other products, software or technologies that you may develop, produce, market, or distribute.

**12. Use Of Apple Trademarks, Logos, etc.** You agree to follow Apple's trademark and copyright guidelines as published at: www.apple.com/legal/guidelinesfor3rdparties.html ("**Guidelines**") and as may be modified from time to time. You agree not to use the marks "Apple," the Apple Logo, "Mac", "iPhone," "iPod touch" or any other marks belonging or licensed to Apple in any way except as expressly authorized in writing by Apple in each instance or as permitted in Apple's Guidelines. You agree that all goodwill arising out of your authorized use of Apple's marks shall inure to the benefit of and belong to Apple.

**13. No Warranty.** APPLE AND ITS AFFILIATES, SUBSIDIARIES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, PARTNERS, AND LICENSORS (COLLECTIVELY, "**APPLE**" FOR PURPOSES OF THIS SECTION 13 AND 14) DO NOT PROMISE THAT THE SITE, CONTENT, SERVICES (INCLUDING, FUNCTIONALITY OR FEATURES OF THE FOREGOING), LABS, DTS SERVICES, OR ANY OTHER INFORMATION OR MATERIALS THAT YOU RECEIVE HEREUNDER AS AN APPLE DEVELOPER (COLLECTIVELY, THE "**SERVICE**" FOR PURPOSES OF THIS SECTION 13 AND 14) WILL BE ACCURATE, RELIABLE, TIMELY, SECURE, ERROR- FREE OR UNINTERRUPTED, OR THAT ANY DEFECTS WILL BE CORRECTED. THE SERVICE IS PROVIDED ON AN "AS-IS" AND "AS-AVAILABLE" BASIS AND THE SERVICE IS SUBJECT TO CHANGE WITHOUT NOTICE. APPLE CANNOT ENSURE THAT ANY CONTENT (INCLUDING FILES, INFORMATION OR OTHER DATA) YOU ACCESS OR DOWNLOAD FROM THE SERVICE WILL BE FREE OF VIRUSES, CONTAMINATION OR DESTRUCTIVE FEATURES. FURTHER, APPLE DOES NOT GUARANTEE ANY RESULTS OR IDENTIFICATION OR CORRECTION OF PROBLEMS AS PART OF THE SERVICE AND APPLE DISCLAIMS ANY LIABILITY RELATED THERETO. APPLE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF ACCURACY, NON- INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. APPLE DISCLAIMS ANY AND ALL LIABILITY FOR THE ACTS, OMISSIONS AND CONDUCT OF ANY THIRD PARTIES IN CONNECTION WITH OR RELATED TO YOUR USE OF THE SERVICE. YOU ASSUME TOTAL RESPONSIBILITY AND ALL RISKS FOR YOUR USE OF THE SERVICE, INCLUDING, BUT NOT LIMITED TO, ANY INFORMATION OBTAINED THEREON. YOUR SOLE REMEDY AGAINST APPLE FOR DISSATISFACTION WITH THE SERVICE IS TO STOP USING THE SERVICE. THIS LIMITATION OF RELIEF IS A PART OF THE BARGAIN BETWEEN THE PARTIES. TO THE EXTENT THAT APPLE MAKES ANY PRE-RELEASE SOFTWARE, HARDWARE OR OTHER PRODUCTS, SERVICES OR INFORMATION RELATED THERETO AVAILABLE TO YOU AS AN APPLE DEVELOPER, YOU UNDERSTAND THAT APPLE IS UNDER NO OBLIGATION TO PROVIDE UPDATES, ENHANCEMENTS, OR CORRECTIONS, OR TO NOTIFY YOU OF ANY PRODUCT OR SERVICES CHANGES THAT APPLE MAY MAKE, OR TO PUBLICLY ANNOUNCE OR INTRODUCE THE PRODUCT(S) OR SERVICE AT ANY TIME IN THE FUTURE.

**14. Disclaimer of Liability.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL APPLE BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES RESULTING FROM DELAY OF DELIVERY, FOR LOSS OF PROFITS, DATA, BUSINESS OR GOODWILL, FOR BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR YOUR USE OR INABILITY TO USE THE SERVICE, HOWEVER CAUSED, WHETHER UNDER A THEORY OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCTS LIABILITY, OR OTHERWISE, EVEN IF

APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY. IN NO EVENT SHALL APPLE'S TOTAL LIABILITY TO YOU UNDER THIS AGREEMENT FOR ALL DAMAGES (OTHER THAN AS MAY BE REQUIRED BY APPLICABLE LAW IN CASES INVOLVING PERSONAL INJURY) EXCEED THE AMOUNT OF FIFTY DOLLARS ($50.00).

**15. Third-Party Notices and Products.** Third-party software provided by Apple to you as an Apple Developer may be accompanied by its own licensing terms, in which case such licensing terms will govern your use of that particular third-party software. Mention of third-parties and third- party products in any materials, documentation, advertising, or promotions provided to you as an Apple Developer is for informational purposes only and constitutes neither an endorsement nor a recommendation. All third-party product specifications and descriptions are supplied by the respective vendor or supplier, and Apple shall have no responsibility with regard to the selection, performance, or use of these vendors or products. All understandings, agreements, or warranties, if any, take place directly between the vendors and the prospective users.

**16. Export Control.**

A. You may not use or otherwise export or re-export any Apple Confidential Information received from Apple except as authorized by United States law and the laws of the jurisdiction in which the Apple Confidential Information was obtained. In particular, but without limitation, the Apple Confidential Information may not be exported or re-exported (a) into any U.S. embargoed countries or regions or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or any other restricted party lists without required approvals from applicable authorities. By becoming an Apple Developer or using any Apple Confidential Information, you represent and warrant that you are not located in any such country or region or on any such list. You also agree that you will not use any Apple Confidential Information for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of nuclear, chemical or biological weapons or any other military end uses.

B. You represent and warrant that You and any entity or person that directly or indirectly controls You, or is under common control with You, are not: (a) on any sanctions lists in the countries or regions in which the App Store is available, (b) doing business in any of the U.S. embargoed countries or regions, or (c) a military end user as defined and scoped in 15 C.F.R. § 744.  As used in this Section 16, "control" means that an entity or person possesses, directly or indirectly, the power to direct or cause the direction of the management policies of the other entity, whether through ownership of voting securities, an interest in registered capital, by contract, or otherwise.

**17. Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law provisions. The parties further submit to and waive any objections to personal jurisdiction of and venue in any of the following forums: U.S. District Court for the Northern District of California, California Superior Court for Santa Clara County, Santa Clara County Municipal Court, or any other forum in Santa Clara County, for any disputes arising out of this Agreement.

**18. Government End Users.** Certain Apple Confidential Information may be considered "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

**19. Miscellaneous.** No delay or failure to take action under this Agreement will constitute a waiver unless expressly waived in writing, signed by a duly authorized representative of Apple, and no single waiver will constitute a continuing or subsequent waiver. This Agreement will bind your successors but may not be assigned, in whole or part, by you without the written approval of an authorized representative of Apple. Any non-conforming assignment shall be null and void. If any provision is found to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior or contemporaneous understandings regarding such subject matter. No addition to or removal or modification of any of the provisions of this Agreement will be binding upon Apple unless made in writing and signed by an authorized representative of Apple. The parties hereto confirm that they have requested that this Agreement and all attachments and related documents be drafted in English. *Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglais.*

LYL116 06/06/2022