CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
  crichman@gibsondunn.com
VICTORIA C. GRANDA (D.C. Bar No. 1673034; *pro hac vice*)
  vgranda@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

DANIEL G. SWANSON (SBN 116556)
  dswanson@gibsondunn.com
DANA LYNN CRAIG (SBN 251865)
  dcraig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY (SBN 268644)
  chigney@gibsondunn.com
ELI M. LAZARUS (SBN 284082)
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>APPLE INC., a California corporation,<br><br>          Defendant. | CASE NO. 4:22-cv-04437-YGR<br><br>**DEFENDANT APPLE INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>**Hearing:**<br>Date:       March 14, 2023<br>Time:       2:00 p.m.<br>Place:      Courtroom 1<br>Judge:     Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn & Crutcher LLP

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on March 14, 2023 at 2:00 p.m. before the Honorable Yvonne

3   Gonzalez Rogers, in Courtroom 1 of the United States District Court, Northern District of California,

4   located at 1301 Clay Street, Oakland, CA 94612, defendant Apple Inc. ("Apple") moves this Court to

5   dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), with prejudice, the

6   amended claims, in whole, or alternatively, in part, brought by plaintiffs Société du Figaro, SAS,

7   L'Équipe 24/24 SAS, and le GESTE.  Apple's motion is based on the grounds that (1) plaintiffs'

8   foreign-sales claims are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a;

9   (2) plaintiffs lack Article III and statutory standing to challenge, and fail to state a claim challenging,

10   Apple's App Tracking Transparency functionality; (3)  plaintiff le GESTE lacks Article III and

11   statutory standing; (4) all claims are time-barred or barred by laches; and (5) plaintiffs fail to state a

12   claim for restitution.

13       This motion is based on this Notice of Motion and Motion, the following Memorandum of

14   Points and Authorities, the concurrently filed Request for Judicial Notice, the Declaration of Caeli A.

15   Higney, the pleadings and papers on file, and the argument received by the Court.

16

17                                 GIBSON, DUNN & CRUTCHER LLP
                                 Daniel G. Swanson

18                                    Cynthia E. Richman
                                 Caeli A. Higney

19                                    Dana Lynn Craig
                                 Eli M. Lazarus

20                                    Victoria C. Granda

21                          By: */s/ Cynthia E. Richman*

22                               *Attorneys for defendant Apple Inc.*

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND .............................................................................................. 3

    A.  *Cameron* and the Present Dispute ........................................................... 3

    B.  The Plaintiffs and Proposed Classes ...................................................... 4

    C.  The Amended Complaint's Allegations ................................................... 5

    D.  The App Store's Foreign Storefronts ..................................................... 6

III.  LEGAL STANDARDS ..................................................................................... 7

IV.  PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA ..................... 8

    A.  The FTAIA Applies to Alleged Restraints on Plaintiffs' Foreign-Storefront Transactions That Involve Foreign Commerce ........................................... 8

    B.  Plaintiffs' Arguments Against Application of the FTAIA Are Unavailing ................. 9

        1.  The DPLA's Choice-of-Law Clause Does Not Nullify the FTAIA ................. 9

        2.  France-Resident Plaintiffs' Allegation that Their Commerce Occurred "in America" Is a Fiction Entitled to No Deference ....................... 10

        3.  Plaintiffs' Claims Do Not Arise from Any Alleged Domestic Effect ........... 11

        4.  Plaintiffs' Claims Do Not Arise from Any Alleged Effect on U.S. Exports ....................................................... 12

    C.  State Antitrust Law Does Not Reach Foreign Commerce ......................................... 13

    D.  International Comity Favors Dismissal ........................................................... 14

V.  PLAINTIFFS ARE BARRED FROM CHALLENGING APPLE'S ATT FEATURE .......... 14

VI.  PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS ....................... 17

    A.  Le GESTE Cannot Sue in Its Own Right ........................................................ 17

    B.  Le GESTE Lacks Article III Standing to Sue on Behalf of Its Members ................. 18

        1.  Le GESTE cannot rely on of Figaro's and L'Équipe's standing .................. 18

        2.  This litigation is not germane to le GESTE's purpose .................................. 19

    C.  Le GESTE Lacks Statutory Standing to Sue on Behalf of its Members .................... 20

VII.  PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES .................... 21

    A.  Plaintiffs' Sherman Act Claims Are Untimely or Barred by Laches ......................... 21

    B.  Plaintiffs' UCL Claims Are Barred as Untimely or by Laches ................................. 24

ii

Gibson, Dunn &
Crutcher LLP

1

C.      Plaintiffs' Cartwright Act Claims Are Untimely ........................................................ 25

VIII.   PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED ........................................... 25

IX.     CONCLUSION ...................................................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
CASE NO 4:22-CV-04437-YGR

# TABLE OF AUTHORITIES

**CASES**

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
 465 F.3d 1123 (9th Cir. 2006)..................................................................................19

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*,
 46 Cal. 4th 993 (2009) .............................................................................................21

*Ass'n of Am. Physicians & Surgeons v. FDA*,
 13 F.4th 531 (6th Cir. 2021) ....................................................................................20

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*,
 713 F.3d 1187 (9th Cir. 2013)..................................................................................18

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
 459 U.S. 519 (1983)..................................................................................................16

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
 950 F.2d 1401 (9th Cir. 1991)..................................................................................19

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
 688 F.2d 689 (9th Cir. 1982)....................................................................................23

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).............................................................................................7, 10

*Blix Inc. v. Apple Inc.*,
 2021 WL 2895654 (D. Del. July 9, 2021) .............................................................3, 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)..................................................................................................18

*California v. Texas*,
 141 S. Ct. 2104 (2021)..............................................................................................16

*In re Capacitors Antitrust Litig.*,
 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018) .....................................................9, 13

*Cargill, Inc. v. Monfort of Colo., Inc.*,
 479 U.S. 104 (1986)..................................................................................................21

*Cetacean Cmty. v. Bush*,
 386 F.3d 1169 (9th Cir. 2004)....................................................................................8

*Chavez v. Whirlpool Corp.*,
 93 Cal. App. 4th 363 (2001) .....................................................................................25

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..................................................................................................16

Gibson, Dunn &
Crutcher LLP

*Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*,
  452 F. Supp. 2d 924 (N.D. Cal. 2006) ........................................................................21

*Coronavirus Reporter v. Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ...............................................................1

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (2000) ...............................................................................................24

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .....................................................................................25

*Darensburg v. Metro. Transp. Comm'n*,
  611 F. Supp. 2d 994 (N.D. Cal. 2009) ........................................................................19

*David Orgell, Inc. v. Geary's Stores, Inc.*,
  640 F.2d 936 (9th Cir. 1981) ......................................................................................23

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
  392 F. Supp. 3d 1074 (N.D. Cal. 2019) ......................................................................14

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) .....................................................................................17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ............................................................................8, 12, 18

*Eagle v. Star-Kist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987) ......................................................................................15

*Electroglas, Inc. v. Dynatex Corp.*,
  497 F. Supp. 97 (N.D. Cal. 1980) ...............................................................................22

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
  417 F.3d 1267 (D.C. Cir. 2005) ..................................................................................12

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ..................................................................1, 2, 14

*Eurim-Pharm GmbH v. Pfizer Inc.*,
  593 F. Supp. 1102 (S.D.N.Y. 1984)............................................................................12

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004).......................................................................................8, 9, 12, 14

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*,
  2005 WL 1629813 (N.D. Cal. July 8, 2005)................................................................20

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)...............................................................9

Gibson, Dunn &
Crutcher LLP

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..............................................................................16, 17

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)........................................................................................................25

*Hameed v. IHOP Franchising LLC*,
    520 F. App'x 520 (9th Cir. 2013) .................................................................................24

*Hartford Fire Ins. Co. v. California*,
    509 U.S. 764 (1993)........................................................................................................13

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................................17

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)........................................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................................................................18

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
    518 F.2d 913 (9th Cir. 1975)..........................................................................................23

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002)..........................................................................................25

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)..........................................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)..........................................................................................22

*LA All. for Human Rights v. Cnty. of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ..........................................................................................18

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010)........................................................................................17

*LaSalvia v. United Dairymen of Ariz.*,
    804 F.2d 1113 (9th Cir. 1986)........................................................................................23

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014)...........................................................................................10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................................15

*Med. Ass'n of Ala. v. Schweiker*,
    554 F. Supp. 955 (M.D. Ala. 1983) ...............................................................................19

*Motorola Mobility LLC v. AU Optronics Corp.*,
   775 F.3d 816 (7th Cir. 2015).................................................................................9

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
   9 Cal. 5th 279 (2020) ...........................................................................................25

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .........................................................................................16

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014)..............................................................................23

*Openiano v. Hartford Life & Annuity Ins. Co.*,
   829 F. App'x 829 (9th Cir. 2020) .........................................................................11

*Pace Indus., Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987)...........................................................................21, 23

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ..................................................................................2

*Polaroid Corp. v. Disney*,
   862 F.2d 987 (3d Cir. 1988)..................................................................................20

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................1

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................24

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
   133 Cal. App. 4th 1277 (2005) ............................................................................14

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020)................................................................................25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .............................................................................................17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) .....................................................13

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .............................................................................................18

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*,
   830 F.2d 1374 (7th Cir. 1987)..............................................................................20

*In re TFT-LCD Antitrust Litig.*,
   2012 WL 3763616 (N.D. Cal. Aug. 29, 2012)......................................................13

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
CASE NO 4:22-CV-04437-YGR

*Turicentro, S.A. v. Am. Airlines Inc.*,
    303 F.3d 293 (3d Cir. 2002)................................................................................10, 11

*UAW v. Brock*,
    477 U.S. 274 (1986)................................................................................................19

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    2013 WL 368365 (N.D. Cal. Jan. 29, 2013) ..........................................................14

*United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996)................................................................................................20

*United States v. Hui Hsiung*,
    778 F.3d 738 (9th Cir. 2015).....................................................................................8

*United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*,
    919 F.2d 1398 (9th Cir. 1990).................................................................................18

*US Airways, Inc. v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015).....................................................................22

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................................20

*Whitaker v. Sherwood Mgmt. Co.*,
    2022 WL 2357003 (N.D. Cal. June 30, 2022) .......................................................14

**STATUTES**

15 U.S.C. § 2 ..................................................................................................................2

15 U.S.C. § 6a ........................................................................................................11, 12

15 U.S.C. § 15 ..............................................................................................................21

15 U.S.C. § 15b ......................................................................................................21, 23

15 U.S.C. § 26 ..............................................................................................................20

1941 Cal. Stat. 1836.....................................................................................................21

Cal. Bus. & Prof. Code §§ 16700 *et seq.* .....................................................................2

Cal. Bus. & Prof. Code § 16750(a) ..............................................................................21

Cal. Bus. & Prof. Code § 16750.1 ...............................................................................25

Cal. Bus. & Prof. Code §§ 17200 *et seq.* .....................................................................2

Cal. Bus. & Prof. Code § 17204 ..................................................................................21

Gibson, Dunn & Crutcher LLP

Cal. Bus. & Prof. Code § 17208 ...........................................................................24

Clayton Antitrust Act of 1914, Pub. L. No. 63-212, § 16, 38 Stat. 730................................20

**OTHER AUTHORITIES**

H.R. Rep. No. 97-686 (1982)..................................................................8, 9, 13

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (5th ed. 2022) ..........................8, 9

**RULES**

Fed. R. Civ. P. 12(b)(1)..........................................................................7

Fed. R. Civ. P. 12(b)(6)..........................................................................7

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 3..........................................................................13

Gibson, Dunn &
Crutcher LLP

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Court dismiss the amended complaint with prejudice because:

1.      plaintiffs' claims based on foreign sales are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a;

2.      plaintiffs lack standing to challenge, and fail to state a claim challenging, Apple's App Tracking Transparency functionality;

3.      plaintiff le GESTE lacks standing to sue;

4.      plaintiffs' claims are barred by the statute of limitations and laches; and

5.      plaintiffs fail to state a claim for restitution?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

On July 15, 2022, "in accordance with the terms of the Settlement," this Court entered final judgment in *Cameron, et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), a putative class action brought by U.S. iOS app developers.  *See* Amended Final Judgment, *Cameron* Dkt. 494; Consolidated Complaint, *Cameron* Dkt. 53 ("*Cameron* Compl.").  Barely two weeks later, "fresh off the heels of [that] hard-won settlement with Apple," plaintiffs, represented by the same counsel as the putative class in *Cameron*, filed this almost identical antitrust lawsuit.  *See* Complaint, Dkt. 1 ("Compl."); Apple's Request for Judicial Notice in Support of Motion to Dismiss Plaintiffs' Amended Complaint ("RJN"), Ex. A, *France-Based iOS Developers Team up with U.S. Firm Hagens Berman*. Notwithstanding plaintiffs' counsel's prior assertion that the relief obtained through the *Cameron* settlement "will benefit" not just the Settlement Class but "*other developers*" too, Motion for Preliminary Approval of Class Action Settlement, *Cameron* Dkt. 396 at 20 (emphasis added), the present complaint claims the alleged conduct "will never abate unless Apple is called to account for its unlawful behavior," First Amended Complaint, Dkt. 48 ("complaint" or "FAC") ¶ 29.

Plaintiffs allege the same single-brand markets that have been considered and rejected by this Court and others.  *See*, *e.g.*, *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107-09 (N.D. Cal. 2022); *Coronavirus Reporter v. Apple Inc.*, 2021 WL 5936910 at *8-13 (N.D. Cal. Nov. 30, 2021); *Epic*

*Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021-26 (N.D. Cal. 2021).[1]  They challenge the same conduct—Apple's centralized system of app distribution and the App Store's 30% commission—at issue in *Cameron*, and carefully analyzed by this Court following a three-week trial in *Epic*.  Plaintiffs selectively quote from this Court's decision in *Epic*, *see*, *e.g.*, FAC ¶¶ 13-14 (discussing alternative models for app distribution proposed by Epic), but conveniently ignore the portions that undermine their claims, *see*, *e.g.*, *Epic*, 559 F. Supp. 3d at 1041 (rejecting Epic's proposed alternative models); *see also id.* at 1049 ("Epic Games has failed to prove that Apple is an illegal monopolist in control of the iOS platform.").  Despite all this, plaintiffs, indifferent to the waste of party and judicial resources, demand the opportunity to relitigate these issues.

There is only one meaningful difference between the instant case and *Cameron*:  this action seeks relief related to transactions by putative classes of "France-resident iOS developers," primarily on non-U.S. Apple storefronts.  FAC ¶¶ 5, 220, 224-29.  The complaint, in passing, also criticizes Apple's App Tracking Transparency ("ATT") feature, which gives consumers the choice to opt out of certain third-party tracking by developers.  *Id.* ¶¶ 198-202.  Neither of these differences suffices to give rise to a new, timely developer action subject to the proper jurisdiction of this Court.  And plaintiffs' efforts to cure the complaint's deficiencies through their amendment do not alter this conclusion.  Plaintiffs' litigation opportunism falters for several reasons:

*First*, plaintiffs' purely foreign claims, brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and California's Unfair Competition Law ("UCL"), *id.* §§ 17200 *et seq.*, are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA").  Transactions between French developers and foreign consumers, made on foreign App Store storefronts, in foreign currency, and through a foreign (non-party) Apple entity are foreign nonimport commerce, not subject to any FTAIA exception.  Dismissing these bellwether

---

[1] Although it is not raised in this Motion as a basis for dismissal on the pleadings, Apple reserves its defense that plaintiffs' single-brand market definition fails as a matter of law.  Further, although the complaint describes the commerce at issue as "distribution services," as this Court noted in *Epic*, the "Supreme Court has seemingly resolved the question:  two-sided transaction platforms sell transactions. . . . Plaintiff[s] only sell[] to iOS users through the App Store on Apple's platform.  No other channel exists for the transaction to characterize the market as one involving 'distribution services.'"  *Epic*, 559 F. Supp. 3d at 1016; *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 837-38 (9th Cir. 2022).

foreign claims will also conserve U.S. court resources.

*Second*, all plaintiffs lack standing to challenge ATT, a pro-consumer and privacy-enhancing feature that does not (and cannot) give rise to any injury in fact to plaintiffs. Even if plaintiffs could allege that some kind of loss flows from consumers' exercising their options under ATT, those losses would not amount to injury to *competition* in any alleged relevant market. *See, e.g.*, *Blix Inc. v. Apple Inc.*, 2021 WL 2895654 at *4 (D. Del. July 9, 2021) (plaintiff failed to allege harm to competition caused by a requirement that developers offer consumers an *optional* sign-in process), *aff'd*, 2022 WL 17421225 (Fed. Cir. Dec. 6, 2022).

*Third*, plaintiff le GESTE, a self-described association of "online publishers" that lists on its website a diverse array of members such as Google, several French law firms, magazines, consulting businesses, and an adult entertainment company, lacks any injury to support Article III or statutory standing to sue on its own behalf and lacks associational standing. Among other problems, this litigation is not germane to le GESTE's purpose and neither federal nor state antitrust or unfair competition laws provide a right of action to an uninjured association. Le GESTE must be dismissed.

*Fourth*, plaintiffs' claims are untimely. The App Store opened in 2008, and in-app purchase ("IAP") was introduced a year later. Filed in late 2022, this action comes 38 months after plaintiffs' counsel filed the *Cameron* case and 11 months after they requested preliminary approval to settle that case. Plaintiffs' unexcused delay should not be rewarded.

*Fifth*, equitable restitution is barred because plaintiffs do not allege that damages would be inadequate, and their causes of action do not provide for restitution at law.

After getting a preview of these critiques, plaintiffs attempted, but failed, to remedy these deficiencies. This complaint should now be dismissed with prejudice.

## II.    BACKGROUND

### A.    *Cameron* and the Present Dispute

On June 4, 2019, plaintiffs' counsel Hagens Berman Sobol Shapiro LLP filed the complaint in *Cameron, et al. v. Apple Inc.*  *Cameron* Dkt. 1. A consolidated amended complaint followed on September 30, 2019. *Cameron* Compl. Over a year after filing their initial complaint, the *Cameron* plaintiffs notified the Court of a potential further amendment to encompass foreign transactions. Case

Management Conference Statement, *Cameron* Dkt. 99 at 2.  Yet the *Cameron* plaintiffs quickly abandoned that posture after Apple indicated it would oppose the amendment because such "transactions 'involv[e] trade or commerce with foreign nations' within the meaning of the Foreign Trade Antitrust Improvement[s] Act, 15 U.S.C. 6a."  *Id.*  The *Cameron* plaintiffs and Apple ultimately entered a settlement which received final approval from the Court on June 10, 2022, *see* Order Approving Settlement, *Cameron* Dkt. 491 ("*Cameron* Settlement"), and resulted in a final judgment on July 15, 2022, *see* Amended Final Judgment of Dismissal with Prejudice as to Apple Inc., *Cameron* Dkt. 494.  That settlement agreement, signed by the same counsel appearing here, included an "express[] agree[ment] to the appropriateness of Apple's commission structure."  *Cameron* Settlement, § 5.2.[2]

Two years after it declined to seek expansion of the *Cameron* lawsuit to encompass foreign transactions, Hagens Berman filed the instant lawsuit.  Recognizing that the allegations in this case overlap almost entirely with others presented to this Court, plaintiffs moved to relate this case to *Cameron*, *Epic*, Case No. 4:20-cv-05640-YGR, and *In re Apple iPhone Antitrust Litigation*, Case. No. 4:11-cv-06714-YGR (N.D. Cal.) ("*Pepper*").  *See* Plaintiffs' Motion to Relate, *Pepper* Dkt. 660. Plaintiffs explained that "each of these matters is based on claims . . . that same-defendant Apple has violated U.S. federal antitrust and related state law by way of its policies and practices relating to its iOS App Store," that the "actions concern substantially the same parties," and "the same sort of transactions or events—iOS developer payments for Apple's provision of iOS app-distribution or IAP (in-app payment for digital in-app product) services."  *Id.* at 2-3.  This Court granted the motion, relating the case to *Pepper* and *Epic*.  Dkt. 28.  On October 28, 2022, Apple moved to dismiss the complaint on grounds materially identical to those asserted here.  Dkt. 41.  Rather than oppose, plaintiffs attempted to fortify their complaint through amendment, but the changes were inconsequential and only demonstrate the futility of further amendment.

### B.    The Plaintiffs and Proposed Classes

Plaintiff Société du Figaro, SAS, is a French company and developer of the iOS Figaro news

---

[2]  The settlement agreement also requires various adjustments to the App Store, including changes applying outside the U.S.  *See*, *e.g.*, *Cameron* Settlement, § 5.1.4 (price point expansion), § 5.1.6 (annual transparency report).

Gibson, Dunn & Crutcher LLP

app and in-app products (*e.g.*, content subscriptions), among other apps.  FAC ¶ 36.  Plaintiff L'Équipe 24/24 SAS is a French company and developer of the L'Équipe sports-news and streaming app and in-app products (content subscriptions), among other apps.  *Id.* ¶ 46.  Figaro and L'Équipe are each a party to Apple's Developer Program License Agreement ("DPLA") attached to the complaint.  *Id.* ¶¶ 36, 46.  Plaintiff le GESTE is "an association of publishers of online content and service[s] based in Paris, France."  *Id.* ¶ 56.  Le GESTE itself is not an app developer (much less a party to the DPLA), but it alleges that some of its members "have developed iOS apps and in-app products available for sale in or via the App Store since May 2018 (and prior to that date)."  *Id.*  The complaint, however, does not identify any such members beyond Figaro and L'Équipe.

Figaro and L'Équipe seek to represent themselves and two overlapping classes of "current or former France-resident persons or entities": (1) those that "paid Apple a commission (or fee or royalty) for iOS app-distribution or IAP services" and (2) those "whose iOS apps or in-app products were sold or otherwise distributed in or via the App Store . . . regardless of [any] commission (or fee or royalty)."  FAC ¶¶ 224-25 (federal law classes), ¶¶ 227-28 (California law classes).  Le GESTE seeks to represent "itself, and, alternatively and additionally," the latter class "or, at minimum, le GESTE iOS-developer members."  *Id.* ¶¶ 226, 229.  In all instances, plaintiffs sue "whatever the iOS App Store digital storefront [involved], whether French, U.S., or otherwise."  *Id.* ¶¶ 224-29.

### C.      The Amended Complaint's Allegations

As in the related lawsuits, plaintiffs' fundamental grievances flow from the design of the App Store, namely Apple's requirement that apps developed using Apple's software must be submitted to the App Store for review and distribution and the requirement that developers use the IAP functionality if they choose to monetize their apps through the in-app sale of digital goods and services.  *See*, *e.g.*, FAC ¶¶ 2, 75, 79.  Plaintiffs claim that these design decisions have allowed Apple to wield monopoly power in a "market (or markets) for iOS app-distribution and IAP services."  *Id.* ¶ 2.[3]  According to the

---

[3] As in *Cameron*, plaintiffs here assert an alternative characterization under which Apple has "monopsony power—*i.e.*, buy-side monopoly power."  FAC ¶ 28; *Cameron* Compl. ¶ 6 (same).  While monopoly and monopsony are quite distinct and different things, plaintiffs treat this as a mere semantic difference.  *See* FAC ¶ 106 ("circumstances and effects" under the monopsony characterization "are essentially the same as with monopoly or attempted monopoly"); *Cameron* Compl. ¶ 56 (same).

complaint, Apple's purported monopoly in its own technology has allowed it to charge a "default supracompetitive 30% commission . . . *for 14 years now*," *i.e.*, since the moment the App Store opened. *Id.* ¶ 17.[4]   Plaintiffs tack on to these well-trodden allegations a superficial attack on Apple's recently implemented ATT feature that allows consumers to make their own independent decision to accept or opt out of certain third-party tracking. *Id.* ¶¶ 198, 200.  Plaintiffs allege that enabling consumer "choice as to third-party tracking of personal data" may "rob[]" developers of the "use of consumer data for targeted advertising." *Id.* ¶¶ 198-99.  But plaintiffs do not plead that they have suffered any concrete injuries, much less advanced any plausible theory of *anticompetitive* harm caused by the ATT feature.[5]  The complaint also alleges that Apple requires developers to pay an annual fee and "dictates minimum and greater price points" for paid downloads and in-app content.  *Id.* ¶¶ 18-22.  Plaintiffs take issue with a recent change in price tiers for storefronts within euro-currency territories.  *Id.*

## D.   The App Store's Foreign Storefronts

Plaintiffs allege that Figaro, L'Équipe, and any developer members of le GESTE (collectively, the "French Developer Plaintiffs") have distributed app-related content through both the App Store's U.S. storefront to consumers in the United States and through App Store storefronts outside the United States to foreign consumers.  FAC ¶¶ 38, 48, 58, 250.  Under the DPLA, the availability and features of apps depend on the country in which the consumer resides and from which the consumer accesses the App Store.  A consumer account can access only one storefront at a time, and while consumers may change their storefront country or region, the process involves several conditions and steps.  *See* Dkt. 48 at 210.  Meanwhile, developers can, but are not required to, sell in multiple storefronts.  *See* FAC

---

[4] Originally, plaintiffs did not challenge Apple's 15% commission tier.  Compl. ¶¶ 214, 216 (contesting any commission "of *greater than* 15% for iOS app-distribution or IAP services" (emphasis added)).  The amended complaint now sweeps in *any* commission including 15%, FAC ¶¶ 17 n.18, 68 n.60, 125, 224-29, without explaining how the 15% rate could be supracompetitive, *cf.*, *e.g.*, *id.* ¶ 129.

[5] Similarly, plaintiffs fail to allege any concrete harm from alleged "anti-steering provisions" in the App Store Review Guidelines.  FAC ¶ 102.  They claim that Apple prohibits French Developer Plaintiffs "from communicating in-app *or otherwise* with their customers about alternative, lower-priced payment options," *id.* ¶ 286 (emphasis added), even though the Guidelines attached to the complaint state, "Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase," FAC, Ex. B, ¶ 3.1.3.  Regardless, plaintiffs do not allege that French Developer Plaintiffs have sought to communicate in-app (such as through a link) with end-users regarding non-IAP purchasing methods or would do so but for the Guidelines.

¶¶ 38, 48, 58; Dkt. 48 at 191 (§ 2.1) & 201 (§ 1.1).  Content is generally priced in local currency as appropriate to the storefront—thus, prices on the French storefront are set in euros.  *See* Dkt. 48 at 192 (§ 3.1); *see also* FAC ¶ 19 n.20 (citing "App Store Pricing, Effective August 2021," tinyurl.com/2tf4t4u5).  Pricing tiers vary depending on country and currency.  *See* FAC ¶ 19 n.20.

For all storefronts, plaintiffs allege that "developers . . . buy Apple's iOS app-distribution and IAP services in America."  *Id.* ¶ 4.  Alternatively, they allege that Apple exports services to developers in France:  "Apple sells its iOS app-distribution and IAP services to developers across . . . international lines."  *Id.* ¶ 211.[6]  They allege that "France-resident iOS developers buy the referenced iOS app-distribution and IAP services not from a . . . foreign affiliate of Apple Inc., but from the company in the U.S."  *Id.* ¶ 244(f).  However, the DPLA attached to the complaint provides different terms for sales through different storefronts, and developers likewise appoint different Apple entities as agent or commissionaire for app distribution and collection of consumer payments.  *See* Dkt. 48 at 140 (§ 7.1), 174 (§ 1.1), 181, 210.  Developers appoint an Irish company, "Apple Distribution International Ltd. [ADI], as . . . commissionaire for the marketing and End-User download of the Licensed and Custom Applications by End-Users located in . . . France," and other foreign Apple entities serve in a similar role for other foreign storefronts.  *Id.*; *see also id.* at 173, 222.

## III.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard is particularly critical in antitrust cases, *id.* at 558-59, "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008).

An action lacking subject-matter jurisdiction must be dismissed.  Fed. R. Civ. P. 12(b)(1).  To establish that a federal court has subject-matter jurisdiction over an action, a plaintiff must allege that it has standing under Article III of the U.S. Constitution, which requires showing injury in fact that is

---

[6] Plaintiffs refer to "iOS" to include Apple services and policies related to iOS, iPadOS, watchOS, and any iPhone or iPad apps or in-app products sold for use on Apple Silicon Macs.  FAC ¶ 4 n.3.

Gibson, Dunn &
Crutcher LLP

(1) concrete and particularized, and actual or imminent; (2) is fairly traceable to the challenged conduct of the defendant; and (3) likely to be redressed by a favorable decision. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

## IV.   PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA

Plaintiffs' claims based on *foreign*-storefront sales by *foreign* app developers to *foreign* consumers are outside the reach of U.S. antitrust laws.  In the FTAIA, "Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 166 (2004).  The FTAIA "plac[es] *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach" unless "the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.* at 162.

Because the FTAIA is "a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations," a plaintiff challenging conduct involving such trade or commerce "must plead . . . the requirements for [an] exception to the FTAIA." *United States v. Hui Hsiung*, 778 F.3d 738, 751, 756 (9th Cir. 2015); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 272 (5th ed. 2022) (same).  Plaintiffs fail to meet this burden:  their foreign-storefront sales claims are clearly barred by the FTAIA, *see infra* at IV.A, and they do not plead a plausible basis for an exception from the statute, *see infra* at IV.B.

### A.   The FTAIA Applies to Alleged Restraints on Plaintiffs' Foreign-Storefront Transactions That Involve Foreign Commerce

Plaintiffs assert that "the FTAIA does not bar plaintiffs' claims" arising from transactions with U.S. consumers, FAC ¶ 250, but whether that is so—a question reserved for a later date—the FTAIA clearly bars claims arising out of plaintiffs' French (and other foreign-storefront) sales.[7]  Plaintiffs

---

[7] Whether labeled as "distribution services" or "two-sided transaction services," the commerce at issue in this motion is foreign.  *See Empagran*, 542 U.S. at 163 (discussing "wholly foreign transactions" as outside the reach of the U.S. antitrust law (emphasis omitted) (quoting H.R. Rep. No. 97-686 at 10 (1982))); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 986 (9th Cir. 2008) (the FTAIA "clarifies that U.S. antitrust laws concern the protection of '*American* consumers

expressly contend that the "activities of Apple as alleged in this complaint were within the flow of, and substantially affected . . . trade or commerce with foreign nations."  FAC ¶ 211.[8]  Indeed, since plaintiffs are French publishers in the business of selling French news and content to a French-speaking audience, they can hardly deny that the crux of their case is Apple's alleged restraint of French transactions.  *See id.* ¶¶ 19 n.20, 36, 38, 46, 48, 56, 58.

Foreign transactions such as these are properly analyzed and resolved separately from U.S.-storefront sales because "the focus of the [FTAIA] is on *transactions*."  Areeda & Hovenkamp, Antitrust Law 272 (emphasis added); *see also* H.R. Rep. No. 97-686 at 9-10 ("A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws."); *see also Empagran*, 542 U.S. at 159 (A "purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm.").  Thus, when faced with allegations involving multiple types of transactions, courts frequently analyze them by category and dismiss those claims based on foreign transactions as barred by the FTAIA.  *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) (analyzing transactions by category based on where products were bought and delivered); *In re Capacitors Antitrust Litig.*, 2018 WL 4558265 at *7 (N.D. Cal. Sept. 20, 2018) (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131 at *11 (S.D.N.Y. Sept. 20, 2016) (same).

### B.   Plaintiffs' Arguments Against Application of the FTAIA Are Unavailing

The complaint lists four reasons that the FTAIA does not bar plaintiffs' foreign-storefront claims: (1) the DPLA's U.S. choice-of-law clause; (2) plaintiffs' allegation that they purchased Apple services "in the U.S."; (3) the FTAIA exception relating to domestic and import commerce; and (4) the FTAIA exception relating to export commerce.  *See* FAC ¶¶ 238-49.  These purported reasons all fail.

### 1.   The DPLA's Choice-of-Law Clause Does Not Nullify the FTAIA

Short shrift may be made of the complaint's first argument that the DPLA's U.S. choice-of-law

---

and *American* exporters, not foreign consumers or producers'" (citation omitted)).

[8] Plaintiffs also allege "interstate commerce" is implicated.  FAC ¶ 211.  This motion addresses the FTAIA's application to foreign transactions only, but Apple reserves its right under the FTAIA and on a developed record to contest claims based on French developers' U.S.-storefront transactions.

provision somehow defeats application of the FTAIA.  *See* FAC ¶¶ 238, 244(j).  The plaintiff in *Lotes Co. v. Hon Hai Precision Industry Co.* made the same argument, asserting that defendants had waived FTAIA defenses through U.S. choice-of-law and forum-selection clauses.  753 F.3d 395, 408-09 (2d Cir. 2014).  But, as the court explained, such "contractual provisions do not waive any statutory requirements or otherwise alter the scope of the signatories' legal obligations.  Put differently, the . . . Agreement affirms that the defendants must abide by the Sherman Act to the extent it properly applies.  But the defendants remain free to argue that, under the FTAIA, the Sherman Act does not apply to or regulate the conduct at issue in this case."  *Id.*  The DPLA's choice-of-law provision thus offers plaintiffs no escape from the FTAIA here.

## 2. France-Resident Plaintiffs' Allegation that Their Commerce Occurred "in America" Is a Fiction Entitled to No Deference

As a second escape hatch, plaintiffs posit that "there is no 'conduct involving trade or commerce . . . with foreign nations'" here because the conduct at issue "was done in the U.S., including via the Internet," so French Developer Plaintiffs "bought Apple's app-distribution and IAP services literally in the United States."  FAC ¶ 239.[9]  Plaintiffs go on to allege that "their antitrust injuries were suffered in the U.S. domestic setting, just as if they were U.S. residents."  *Id.* ¶¶ 239-40.  These conclusory allegations are implausible.  French Developer Plaintiffs are "literally" France-resident developers who, if they "bought" anything, did so in France.[10]  Compl. ¶¶ 36, 46, 56, 224-29.  Hollow rhetoric about French Developer Plaintiffs' purchases being "in America" is entitled to no deference.  *See Twombly*, 550 U.S. at 555.  Mere "access to a computer system based in the United States [cannot] 'transform[]' 'foreign commerce' into [domestic or] 'import commerce.'"  *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 304 (3d Cir. 2002) ("[U]nder plaintiffs' interpretation, a legion of activities transacted by foreign merchants with some connection to instruments in the United States economy—

---

[9] Plaintiffs do not contend that the alleged restraints on foreign-storefront transactions constitute or involve import commerce.  They allege only that transactions with U.S. consumers involve import commerce.  FAC ¶ 250.

[10] French developers pay an annual amount in euros (equivalent to $99) to participate in Apple's Developer Program and use Apple's intellectual property in developing their apps.  FAC ¶ 159; Dkt. 48 at 142 (§ 8).  Setting aside the failure to allege anything anticompetitive in charging a nominal fee for a valuable program, plaintiffs' bald assertion that the fee "cuts into funds available to market . . . wares" abroad fails to allege antitrust injury in the United States.  FAC ¶ 159.

Gibson, Dunn & Crutcher LLP

a telephone, a fax machine, an Internet connection—would constitute 'import commerce.'").

The complaint alleges that Apple Inc. is "payor" on certain "payment documents" of Figaro and L'Équipe, FAC ¶ 244(i), but this is immaterial. A consolidated payment for transactions occurring across multiple storefronts may come from a single corporate bank account,[11] but a non-defendant foreign Apple entity remains the intermediary for the foreign transactions at issue.[12] Regardless, transactions between French developers and non-U.S. consumers are foreign transactions. As the Third Circuit observed in similar circumstances, "[a]lthough defendants paid commissions in United States dollars, neither the payments nor their calculations on computers based in the United States are properly considered 'imports.'" *Turicentro*, 303 F.3d at 304. Stripped of conclusory legal assertions, the complaint alleges nothing but independent foreign injury with respect to foreign-storefront sales.[13]

### 3. Plaintiffs' Claims Do Not Arise from Any Alleged Domestic Effect

Plaintiffs next attempt to invoke the FTAIA exception requiring that the conduct involving foreign trade must have a direct, substantial, and reasonably foreseeable anticompetitive effect on U.S. domestic or import commerce, *and* that effect must "give[] rise to" plaintiff's claim. 15 U.S.C. § 6a(2).

Plaintiffs allege that Apple "has imposed from its U.S. base supracompetitive pricing and anticompetitive terms on iOS developers wherever they reside," FAC ¶ 241, regardless of storefront, *id.* ¶ 220. But in *Empagran*, the Supreme Court held that the FTAIA's "gives rise to" requirement is

---

[11] As a service to developers, "Apple's bank will consolidate proceeds for each currency in which [a developer] ha[s] sales on the App Store, resulting in a single payment to [the developer's] bank each fiscal month." "Getting paid overview," available at: https://help.apple.com/app-store-connect/#/dev6a92b6d7b (cited at FAC ¶ 166 n.159). This service does not transform a foreign transaction into domestic or import commerce.

[12] The DPLA establishes that the Irish entity Apple Distribution International Ltd.—not Apple Inc.—was responsible for marketing and delivering purchases to end users and collecting commissions on and payments for developers' sales through the French App Store storefront. *See* Dkt. 48 at 190 (§ 1.1), 192-95 (§§ 3.1, 3.4, 3.5), 210. These specific terms governing developers' foreign transactions control and supersede plaintiffs' conclusory allegation that "France-resident iOS developers buy . . . iOS app-distribution and IAP services not from a . . . foreign affiliate of Apple Inc., but from the company in the U.S." FAC ¶ 244(f); *see Openiano v. Hartford Life & Annuity Ins. Co.*, 829 F. App'x 829, 830 (9th Cir. 2020) ("[W]here attached exhibits contradict allegations in the complaint, the court need not accept such allegations as true." (quotation marks and citation omitted)).

[13] Plaintiffs' alternative characterization of the alleged conduct as monopsonistic does not save their foreign-sales claims from the FTAIA. Assuming *arguendo* that Apple buys French Developer Plaintiffs' apps, it would only "buy" them when a foreign transaction with a foreign consumer occurs. *Cf. Turicentro*, 303 F.3d at 304 ("No items or services were brought into the United States by the payments alone.").

Gibson, Dunn &
Crutcher LLP

not satisfied when "conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect." 542 U.S. at 164, 173-75. The same holds true here, where the alleged foreign effects and domestic effects are independent of each other. Plaintiffs do not identify any plausible direct effect on U.S. domestic commerce (or imports) that flows from the alleged restraints and resulting overcharge on foreign-storefront transactions. Even assuming such an effect *arguendo*, it could not plausibly "give rise to" plaintiffs' foreign-storefront claims. To "give rise to" a claim, the effect must have a "direct or proximate causal relationship" to that claim. *DRAM*, 546 F.3d at 988. Something more than an arguable linkage is required, and but-for causation does not suffice.

In *DRAM*, for example, the plaintiff alleged that collusive U.S. prices "gave rise to" collusively fixed foreign prices because the latter could not be sustained without the former. The Ninth Circuit held that to be legally insufficient under the applicable standard of proximate causation and affirmed dismissal. *DRAM*, 546 F.3d 981; *see also Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) (holding that at most "but-for," not proximate, causation could be shown by "arbitrage" allegations that fixed foreign prices for fungible products could not be sustained without high prices in the United States). The Court should dismiss for the same reason here.

### 4.   Plaintiffs' Claims Do Not Arise from Any Alleged Effect on U.S. Exports

Finally, plaintiffs assert that "the conduct at issue falls within the export exception to the bar otherwise set forth in the FTAIA."[14] FAC ¶ 249. That exception applies where challenged conduct has a direct, substantial, and reasonably foreseeable effect on export commerce, and that effect injures a *plaintiff's* U.S. export business and gives rise to its claim.

This argument fails for several reasons. First, a Sherman Act claim based on conduct affecting export commerce can arise only for "injury to [plaintiff's] export business *in the United States*." 15 U.S.C. § 6a (emphasis added). Even assuming *arguendo* that export commerce is involved here, plaintiffs are not domestic exporters within the meaning of the FTAIA. *See Eurim-Pharm GmbH v.*

---

[14] Plaintiffs' export commerce theory is an alternative one (*see* FAC ¶¶ 246-49), that is inconsistent with their primary contention that the conduct is somehow domestic. *See supra* at IV.A. At any rate, the export argument concedes application of the FTAIA's "general rule placing all (non-import) activity involving foreign commerce outside the Sherman Act's reach." *Empagran*, 542 U.S. at 162.

*Pfizer Inc.*, 593 F. Supp. 1102, 1106 n.5 (S.D.N.Y. 1984) ("only domestic exporters (injured in the United States) have a remedy under the Sherman Act"). Plaintiffs are French companies, resident in France, with principal places of business in France. FAC ¶¶ 36, 46, 56. Their case centers on alleged "distribution services" by a foreign Apple entity for developers *in France*. *See* Dkt. 48 at 210. A "foreign firm whose non-domestic operations [a]re injured by . . . export oriented conduct would have no remedy under [U.S.] antitrust laws." H.R. Rep. No. 97-686 at 11.

Plaintiffs assert that "Apple's own contracts designate France-resident iOS developers as U.S. exporters." FAC ¶ 5; *see also id.* ¶ 246. But those provisions address whether apps are "considered a U.S. export . . . subject to U.S. export laws," *id.* ¶ 244(f), not whether plaintiffs are U.S. exporters within the meaning of the FTAIA. "[D]efinitions arising under different statutes are irrelevant to determining whether a good is an 'import' [or, here, an export] under the FTAIA." *In re TFT-LCD Antitrust Litig.*, 2012 WL 3763616 at *2 (N.D. Cal. Aug. 29, 2012). French Developer Plaintiffs do not conduct their business in the United States and accordingly do not qualify for the export exception.[15]

Finally, and in any event, even if the conduct at issue with respect to foreign storefront transactions *involves* export commerce, it does not have a direct, substantial, and reasonably foreseeable anticompetitive *effect* on U.S. export commerce. Plaintiffs' allegations to the contrary are purely conclusory. FAC ¶¶ 247-48. Congress passed the FTAIA to "exempt from the Sherman Act export transactions that did not injure the United States economy." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 n.23 (1993); *see also Capacitors*, 2018 WL 4558265 at *7 (the FTAIA bars claims regarding goods "sold and shipped by a defendant entity in the United States to a Foreign [plaintiff]").

### C.   State Antitrust Law Does Not Reach Foreign Commerce

Courts have concluded that the FTAIA applies to state-law claims, reasoning that a contrary position would infringe on Congress's "express power to 'regulate Commerce with foreign Nations,'" and frustrate the congressional purpose of the FTAIA. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313 at *4 (N.D. Cal. Dec. 31, 2010) (quoting U.S. Const. art. I, § 8, cl. 3); *see also Capacitors*, 2018 WL 4558265 at *2 (recognizing that "the FTAIA govern[s] plaintiffs'"

---

[15] The alleged pre-sale upload of apps to a U.S. server changes nothing; the actual sale occurs later in a transaction between a French developer and a consumer in France (or another foreign country).

Gibson, Dunn &
Crutcher LLP

state antitrust and consumer protection claims").  Plaintiffs acknowledge that the FTAIA can "affect, bar, or limit plaintiffs' . . . state-law claims."  FAC ¶ 252.  Accordingly, plaintiffs' Cartwright Act and UCL claims must be dismissed to the extent they are based on foreign transactions.  *Id.* ¶¶ 279-99.[16]

Even without regard to the FTAIA, the Cartwright Act does not reach extraterritorial conduct.  *See Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2013 WL 368365 at *9 (N.D. Cal. Jan. 29, 2013) (Cartwright Act is meant to protect against "anticompetitive conduct that causes injury in California" (quoting *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1281-82 (2005))).  Similarly, "the UCL does not apply extraterritorially."  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. 2019); *see also Epic*, 559 F. Supp. 3d at 1058 (issuing a nationwide injunction, given a lack of "authority that an injunction could issue globally based upon a violation of California's UCL").  Plaintiffs' state-law claims concerning foreign sales therefore fail.

## D.  International Comity Favors Dismissal

Dismissal of plaintiffs' foreign-sales claims under the FTAIA is also consistent with the respect for comity.  In *Empagran*, the Supreme Court construed the FTAIA "to avoid unreasonable interference with the sovereign authority of other nations," including "a foreign nation's ability independently to regulate its own commercial affairs."  542 U.S. at 164-65.  The complaint's own citations to EU and other non-U.S. investigations and precedents underscore the ability of other nations to regulate their own commerce (or not) as they deem appropriate.  *See* FAC ¶¶ 95-96, 179, 200.  Plaintiffs themselves seem to believe that they have legal recourses in France.  *See* RJN, Ex. B, Le GESTE Press Release ("In 2021 and 2022, Le GESTE . . . fil[ed] 2 successive complaints against Apple before the French Competition Authority.").  Allowing this complaint would also invite a flood of cases, particularly as foreign plaintiffs may forum-shop with an eye toward treble damages.  *See* RJN, Ex. A (plaintiffs' counsel is "ready to get back in the ring" and "happy to see iOS developers from other countries seeking the same justice . . . achieve[d] for U.S. developers").

## V.  PLAINTIFFS ARE BARRED FROM CHALLENGING APPLE'S ATT FEATURE

The Court should dismiss any claims challenging Apple's ATT feature—the only apparent basis

---

[16] Indeed, if the Court dismisses plaintiffs' Sherman Act claims for any reason, it should decline to exercise supplemental jurisdiction over any remaining California law claims.  *See*, *e.g.*, *Whitaker v. Sherwood Mgmt. Co.*, 2022 WL 2357003 at *1 (N.D. Cal. June 30, 2022).

Gibson, Dunn &
Crutcher LLP

14

for plaintiffs' effort to sue over the distribution of free-to-download apps. Plaintiffs complain that ATT allegedly hampers developers' ability to monetize free-to-get apps through ads targeted through the use of consumer data, FAC ¶ 199, but they also acknowledge that ATT is "good for end-user consumers because it gives them more choice as to third-party tracking of personal data" by allowing them to decide whether to opt-out of certain third-party tracking, *id.* ¶ 198. Plaintiffs nonetheless assert that ATT *may* be anticompetitive "because [certain developers] will be unable to make a living by means of advertising," *id.* ¶ 199, relying heavily on a UK regulator's publication applying a UK legal framework, including "a UK data protection law perspective," *id.* ¶ 201 n.202; *see also id.* ¶¶ 198-202 nn.196-205. Plaintiffs fail to establish standing or to state a valid claim under U.S. law.

First, because there are no allegations that any plaintiff or member of le GESTE engages in targeted advertising—nor that any plaintiff or member of le GESTE would be "unable to make a living by means of advertising" or "unfairly robbed of their ability to monetize their work"—plaintiffs lack standing to challenge ATT. FAC ¶ 199. Plaintiffs speculate that ATT might make some of Apple's auction-based App Store Search Ads more expensive, but there are no allegations that plaintiffs (or any member of le GESTE) even pay for search advertising, much less that ATT has in fact caused them to pay more to Apple. *Id.* ¶ 202. Accordingly, plaintiffs have not pleaded causal injury in fact sufficient to support Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("[T]he 'injury in fact' test requires . . . that the party seeking review be himself among the injured." (quotation marks and citation omitted)). Nor do they plead a sufficiently direct causal connection between ATT and any injury they suffered to support antitrust standing. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987) ("The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation.").

Plaintiffs only speculate about the impact of consumer choices under ATT on certain unidentified developers who use targeted advertising or pay for search advertising. Plaintiffs surmise that allegedly affected (but unidentified) developers *might* have different options, for example, if "Apple might be persuaded to change the ways in which it presents the opt-out screen to consumers." FAC ¶¶ 200-02. Such conjecture is insufficient to plead injury for Article III standing. *See Lujan*, 504 U.S. at 563-67. Here, any alleged harm depends on an extended chain of causation mediated entirely

by consumers' "choice[s]" when presented with "the option to opt-out of certain third-party tracking." FAC ¶ 200; *see id.* ¶ 198 n.196 ("[T]he way [ATT] has been implemented . . . *may* distort *user choice*[.]" (emphases added; quotation marks and citation omitted)).  But a plaintiff cannot meet the Article III or statutory standing requirements when its theory of harm relies "on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983) (plaintiff lacked antitrust standing where alleged harm was "highly speculative" and "may have been produced by independent factors").

Second, even if plaintiffs had Article III standing, or could otherwise establish statutory standing, plaintiffs cannot allege *antitrust* injury stemming from ATT.  The purported "harm to iOS developers by [Apple's] denying them the opportunity to *choose* other means to get paid for their work," FAC at 65 & ¶ 202 (emphasis added), is not an antitrust injury—especially when, as here, it flows from Apple offering *more choice* to consumers.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) ("Allegations that conduct has the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition because both effects are fully consistent with a free, competitive market." (quotation marks and alterations omitted)); *Blix*, 2021 WL 2895654 at *4 (conduct is not anticompetitive where "Apple actually expands consumer choice").

Third, "an accurate definition of the relevant market" is required to assess whether ATT is anticompetitive, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018), but plaintiffs plead no market that is *relevant* to their claim about the effect of ATT on their ability "to make a living by means of advertising."[17]  FAC ¶¶ 199-200, 202.  Although this point was clearly raised in Apple's initial motion to dismiss, Dkt. 41 at 26, plaintiffs persist in relying on their alleged (non-advertising) relevant market consisting of "iOS-app distribution and IAP services."  *See FAC* ¶¶ 212-22.  Plaintiffs assert that "[b]y monopolizing [that] relevant market, Apple affords iOS developers who do not wish to participate in ATT, especially as implemented, nowhere to go."  *Id.* ¶ 201.  But the pertinent market definition for a claim about an alleged restraint on advertising is about alternative *advertising* options, not alternative

---

[17] Moreover, plaintiffs would need to clear the bar of the FTAIA, which would plainly be implicated insofar as the conduct at issue affects choices open to foreign consumers that may affect foreign advertising by foreign publishers.  Plaintiffs allege nothing that would permit such a foreign claim.

Gibson, Dunn &
Crutcher LLP

app distribution options.  *See, e.g., Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-24 (9th Cir. 2018).

By failing to define *any* market for advertising, plaintiffs patently fail to state a claim.  *See id.* at 1123-

24; *Qualcomm*, 969 F.3d at 992 ("A threshold step in any antitrust case is to accurately define the

relevant market"); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1138-42 (9th Cir. 2022)

(affirming dismissal with prejudice of Section 2 claim where the plaintiff's defined relevant market did

not include the alleged anticompetitive conduct, and it already had the chance to amend its complaint).

Accordingly, the Court should dismiss plaintiffs' claims challenging ATT.

## VI.    PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS

The Court should dismiss le GESTE from this action entirely.  Le GESTE lacks standing to sue

in its own right, associational standing, and statutory standing to bring claims on behalf of its members.

### A.    Le GESTE Cannot Sue in Its Own Right

The complaint does not establish that le GESTE can sue in its own right because it does not

allege a concrete injury to itself *qua* association:  le GESTE is not itself an app developer, *see* FAC

¶ 56, and le GESTE has not alleged it suffered an injury sufficient to support organizational standing.

*See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs' amended complaint now claims that

le GESTE was harmed by its voluntary decision to devote resources in the "many months before this

suit was filed" to analyzing app-distribution and IAP-related issues.  FAC ¶¶ 62-63. "An organization

suing on its own behalf can establish an injury when it suffered both a diversion of its resources and a

frustration of its mission," but "[i]t cannot manufacture the injury by incurring litigation costs or simply

choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La

Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)

(quotation marks and citation omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

(1982) (challenged conduct must have "perceptibly impaired" organization's ability to provide core

services; the alleged injury cannot be "simply a setback to the organization's abstract social interests").

Le GESTE's decision to "spen[d] hours and hours" "research[ing], investigat[ing], and analyz[ing]

. . . specific iOS app-distribution and IAP-related issues . . . for many months now" was obviously

litigation-driven.  FAC ¶ 62-63.  And le GESTE fails to allege "that it would have suffered some other

injury if it had not diverted resources" to studying Apple's alleged conduct. *Trabajadores*, 624 F.3d

at 1088.  Le GESTE therefore lacks Article III standing on its own behalf.  Moreover, le GESTE's alleged injury in no way qualifies as an *antitrust* injury, *i.e.*, an "injury of the type the antitrust laws were intended to prevent," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), because a diversion of resources is not an injury to *competition*.[18]  The FAC fails to state a claim based on a direct injury to le GESTE.

### B.   Le GESTE Lacks Article III Standing to Sue on Behalf of Its Members

Lacking standing to sue in its own right, le GESTE's claims must be dismissed unless it can establish associational standing to sue on behalf of its members, which requires, *inter alia*, a showing that "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to [its] purpose."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Le GESTE fails these requirements of the *Hunt* test.[19]

### 1.   Le GESTE cannot rely on of Figaro's and L'Équipe's standing

Le GESTE cannot satisfy the first requirement of the *Hunt* test because plaintiffs identify *only* the two individual plaintiffs—Figaro and L'Équipe—as members of the association that allegedly suffered harm.[20]  FAC ¶ 56.  Unless "*all* the members of the organization are affected by the challenged activity"—which plaintiffs do not allege—"plaintiff-organizations [are required] to make specific allegations establishing that at least one *identified* member ha[s] suffered or w[ill] suffer harm."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (second emphasis added); *see Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).  Because associational standing "turn[s] on the fiction that an individual member authorizes the group to sue on

---

[18] Furthermore, this alleged injury does not qualify under the FTAIA as an "effect" that proximately causes (gives rise to) le GESTE's claim.  *DRAM*, 546 F.3d at 988.

[19] To the extent that the "other relief" le GESTE seeks as a representative includes monetary relief, FAC ¶ 229, the third *Hunt* requirement—which bars associations from seeking monetary relief—would apply.  *See United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990).

[20] Plaintiffs also refer to the publicly available le GESTE member list submitted with Apple's first motion to dismiss, Dkt. 42-1, Ex. B, and name "TF1, M6, France TV, Radio France, Groupe Canal+, RTL, and Deezer" as entities that "are iOS developers that also produce and publish digital content for use within their iOS apps."  FAC ¶ 56 n.50.  But plaintiffs do not allege that these entities would have standing in their own right to challenge conduct that Figaro and L'Équipe lack standing to challenge.  *See LA All. for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 959-60 (9th Cir. 2021) (dismissing claims for which individual plaintiffs lacked standing and the associational plaintiff did not show that its members would otherwise have standing to sue in their own right).

Gibson, Dunn &
Crutcher LLP

[its] behalf," *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006), there is no reason in equity to permit le GESTE to sue on behalf of Figaro and L'Équipe when these two entities are already suing on their own.  The scope of an association's standing extends only as far as the standing of the members it identifies, so le GESTE cannot challenge conduct beyond what Figaro and L'Équipe may challenge in their own right.  Any relief that le GESTE may seek would therefore be entirely duplicative of that which may be available to Figaro and L'Équipe.

## 2.      This litigation is not germane to le GESTE's purpose

The complaint makes clear that this litigation is not germane to any purpose of le GESTE. Germaneness requires that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Darensburg v. Metro. Transp. Comm'n*, 611 F. Supp. 2d 994, 1038 (N.D. Cal. 2009) (quotation marks and citation omitted).  Attempting to conjure a direct injury to le GESTE, plaintiffs allege that diverting its resources to studying Apple's App Store policies "significantly *interfered* with le GESTE's mission." FAC ¶¶ 62-63 (emphasis added).  But these new allegations only confirm that the mission of le GESTE, an association of *online publishers* that analyzes publication of online content and services, *id.* ¶¶ 56, 62, has nothing to do with antitrust litigation for *app developers*—even if some of those online publishers happen to be app developers too.  *See Med. Ass'n of Ala. v. Schweiker*, 554 F. Supp. 955, 965 (M.D. Ala. 1983) ("Members . . . joined [a medical] association because they were physicians, not because they were taxpayers.").

Furthermore, conflicts among the members of le GESTE show that this litigation cannot be germane to its purpose.  While associational standing in the Ninth Circuit does not require strict unanimity among an association's members, the conflicts here go well beyond not satisfying Rule 23 commonality.  *See Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1408-09 (9th Cir. 1991) (relying on *UAW v. Brock*, 477 U.S. 274, 289 (1986), which rejected arguments that members of an association wishing to litigate together may proceed only under Rule 23).  Le GESTE publicizes that Google, for example, is among its members, *see* Dkt. 42-1, Ex. B, GESTE, *Les Membres*, yet assails Google throughout the complaint for conduct allegedly similar to that challenged here, *e.g.*, FAC ¶¶ 114, 116 & n.107, 133, 200.  Associational standing should not be "granted in the presence of serious conflicts of interest either among the members of an association or between an

association and its members." *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir. 1988).  The interests of the entities that le GESTE lists online as its members are too diverse to make le GESTE an appropriate vehicle for this case.  *See generally* Dkt. 42-1, Ex. B (its wide-ranging membership appears to include magazine publications, law firms, and even an adult entertainment company).  These conflicts, at a minimum, evince that this litigation is not germane to le GESTE's purpose.  *See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1380-81 (7th Cir. 1987).

### C.     Le GESTE Lacks Statutory Standing to Sue on Behalf of its Members

Even if the associational-standing doctrine might allow le GESTE to sue under Article III in a proper case, the federal antitrust laws do not provide it a vehicle to do so.  *See Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813 at *3 (N.D. Cal. July 8, 2005) (rejecting associational standing in antitrust case given Supreme Court directive that antitrust plaintiffs must prove that they have suffered or face the threat of antitrust injury).  Section 16 of the Clayton Act—which permits "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws"—does not contemplate granting a right of action to associations that do not face threatened antitrust injury *themselves*.  15 U.S.C. § 26.  There is simply no indication Congress intended to permit uninjured associations to sue on behalf of their members.  *See* Clayton Antitrust Act of 1914, Pub. L. No. 63-212, § 16, 38 Stat. 730, 737.  Indeed, the Clayton Act was passed over half a century before the Supreme Court "first squarely recognized an organization's standing to bring . . . suit" under the "modern doctrine of associational standing" in *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552, 558 (1996) (addressing a 1988 statute that expressly granted unions authority to sue on behalf of their members).  In any event, the plain language of the statute shows that "threatened loss or damage" must have the same meaning in relation to an "association" as it does to a "person, firm, [or] corporation"—*i.e.*, "threatened loss or damage" that the same person or entity faces, which is *not* what le GESTE pleads.  Moreover, if an association obtained injunctive relief in reliance on the standing of one member, that relief would not be "against threatened loss or damage" faced by the association itself, creating a fatal mismatch between injury and relief under Section 16.  *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 540 (6th Cir. 2021) ("Associational

20

Gibson, Dunn &
Crutcher LLP

standing . . . creates an inherent mismatch between the plaintiff and the remedy.").  As the Supreme Court has explained, Sections 4 and 16 of the Clayton Act are "best understood as providing *complementary* remedies for a single set of injuries."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (emphasis added).  It would be inconsistent for Section 16 to permit a plaintiff-association to sue for an injunction when it faces no concrete threat of antitrust injury to its business or property when Section 4 allows only a "person who [is] *injured* in *his* business or property by reason of anything forbidden in the antitrust laws" to sue for damages.  15 U.S.C. § 15(a) (emphases added).

Nor can le GESTE establish associational standing under the UCL.  *See Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*, 46 Cal. 4th 993, 1003-05 (2009).  The UCL expressly requires that a plaintiff have "suffered '*injury in fact,*'" *id.* at 1004 (quoting Cal. Bus. & Prof. Code § 17204), which is "inconsistent with the federal doctrine of associational standing," *id.*; *see also Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 939 (N.D. Cal. 2006).  Similarly, le GESTE's Cartwright Act claim also fails because that law provides a right of action to only "[a] person . . . injured in his or her business or property" by a Cartwright Act violation.  Cal. Bus. & Prof. Code § 16750(a); *see also* 1941 Cal. Stat. 1836.  The California Supreme Court's holding in *Amalgamated Transit* squarely applies to this statutory language as well.  *See* 46 Cal. 4th at 1004.  Accordingly, le GESTE's UCL and Cartwright Act claims must be dismissed.

## VII.   PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES

This complaint is too late—prejudicially so.  The four-year statute of limitations applicable to plaintiffs' claims for damages under the Sherman Act (regardless of storefront) ran out years ago, 15 U.S.C. § 15b, and their claims for injunctive relief are barred by laches.  Their UCL and Cartwright Act claims are similarly time-barred.

### A.   Plaintiffs' Sherman Act Claims Are Untimely or Barred by Laches

Figaro and L'Équipe sat on their claims for over a decade, deferring filing them even longer than the U.S. developers who filed a putative class action in 2019.[21]  These plaintiffs are now too late.

"A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act."  *Pace Indus., Inc. v. Three Phoenix*

---

[21] Apple preserved its statute of limitations defense in *Cameron.*  Answer, *Cameron* Dkt. 74 at 21-22.

Gibson, Dunn &
Crutcher LLP

*Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  Here, Figaro and L'Équipe allege that they have been injured by Apple's "fiat that it be the sole provider of iOS app-distribution and IAP services." FAC ¶ 181; *see also id.* ¶ 79 (challenging "Apple's anticompetitive fiat").  According to the FAC, by "[s]hutting out competition," Apple "monopolized the market for iOS app-distribution and IAP services."  *Id.* at 30, ¶ 87; *see also id.* ¶ 75 ("Apple determined that it would shut out competition in distribution of native apps."); *id.* ¶ 115 (similar).  In other words, Figaro's and L'Équipe's alleged antitrust injuries stem from Apple's decisions to implement its distribution and IAP restrictions in 2008 and 2009.[22]  *See id.* ¶¶ 17 n.19, 44, 54, 61, 74, 79.  Plaintiffs' claims therefore accrued and expired long ago.

Figaro and L'Équipe could have brought these claims as soon as they became subject to the DPLA to develop and launch apps on the App Store.  FAC ¶¶ 44, 54, 61.  According to the FAC, Apple improperly "boxed out all potential competition deliberately, by way of technical means and adhesive contract."  *Id.* ¶ 181.  "Where the alleged anticompetitive harm arises from a contract, . . . the cause of action accrues on the date the contract takes effect."  *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 276-77 (S.D.N.Y. 2015); *see also Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980) (deciding that "any harm to competition occurred and was complete" with the act "foreclosing" competition).  As plaintiffs now acknowledge, Figaro first executed the DPLA on January 19, 2009, and L'Équipe on May 18, 2009.  *See* Dkt. 42-1, Ex. C, Record of Figaro's Execution of the DPLA; *id.*, Ex. D, Record of L'Équipe's Execution of the DPLA.[23]  Therefore, any alleged injuries stemming from Apple's restrictions were felt at the latest in 2009, meaning that the limitations periods closed four years later in 2013—nearly a decade before plaintiffs filed this complaint.[24]

The continuing-violation doctrine cannot salvage Figaro's and L'Équipe's Sherman Act damages claims.  Plaintiffs allege that "each [DPLA] renewal is a discrete, new, and independent event" and "Apple's anticompetitive behavior and offenses, mandates, and application of supracompetitive pricing apply, take place, and occur anew and separately with the inception of each annual term at

---

[22] These alleged injuries include all those that plaintiffs plead result from Apple's "be[ing] the sole provider of iOS app-distribution and IAP services."  FAC ¶¶ 181 *et seq.*

[23] The complaint incorporates these records by reference.  FAC ¶¶ 37 n.39, 47 n.46; *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

[24] Plaintiffs fail to allege any basis for tolling any applicable statute of limitations.

1    minimum." FAC ¶¶ 37, 47, 57.  But the gist of plaintiffs' complaint is the challenge to product design

2    and licensing decisions made when the iPhone, and later the App Store, were introduced.

3         Regardless, under the continuing-violation doctrine, a limitations period for Sherman Act

4    claims restarts with every "overt act" of the defendant *only* if it (1) is "a new and independent act that

5    is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating injury on the

6    plaintiff." *Pace Indus.*, 813 F.2d at 238.  "[N]ot every act by an antitrust defendant is sufficient to

7    restart the statute of limitations." *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir.

8    1982).  Here, no matter plaintiffs' conclusory allegations, it is not plausible that any "new and

9    independent" acts caused "new and accumulating injury" to Figaro and L'Équipe in the last four years.

10   Developers' confirmation of their continued agreement to the DPLA every year does not transform a

11   rollover into a "new" and "independent" act inflicting a "new" and "accumulating" injury.  *See*, *e.g.*,

12   *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981) (holding statute of

13   limitations did not restart where subsequent refusals to deal were only "reaffirmation[s] of the original

14   decision not to deal with the plaintiff").  Nor can plaintiffs use alleged fee payments by Figaro and

15   L'Équipe to keep their claims alive:  the complaint does not allege that the annual license fee (the euro

16   equivalent of $99)—mandated without change since Figaro and L'Équipe first agreed to the DPLA in

17   2009—is in any way anticompetitive.  Similarly, adding new euro price tiers to reflect shifts in currency

18   valuations, FAC ¶ 19, does not restart the limitations periods.  Plaintiffs take issue with the imposition

19   of *any* price-tier requirement, which has not changed in the last four years.[25]

20        Plaintiffs' claims for injunctive relief under the Sherman Act are also too late.  Such claims are

21   subject to the doctrine of laches.  *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926

22   (9th Cir. 1975).  Under laches, courts look to the four-year statute of limitations for antitrust damages

23   claims, 15 U.S.C. § 15b, as a "guideline" to compute the period of delay.  *Int'l Tel.*, 518 F.2d at 928;

24   *see also Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).  Using that guideline, plaintiffs'

---

25   [25] Even if the Court finds that the continuing-violation doctrine applies, plaintiffs cannot recover

26   damages allegedly incurred because of conduct that occurred over four years before they filed this
     action.  *See*, *e.g.*, *LaSalvia v. United Dairymen of Ariz.*, 804 F.2d 1113, 1119 (9th Cir. 1986); *CSX*

27   *Transp., Inc. v. Norfolk S. Ry. Co.*, Case No. 2:18-cv-00530-MSD-RJK, slip op. 16-19, 26 (E.D. Va.
     Jan. 3, 2023) ("[T]he limitations period restarts only as to the new damages arising from new overt acts

28   committed during the limitations period.").

Sherman Act claims for injunctive relief are late for the same reasons the damages claims are untimely.[26]  And, by any metric, plaintiffs' delay is unreasonable.  Plaintiffs waited to see the litigation strategies of other plaintiffs—such as Epic—and the defenses of Apple, and the rulings of this Court, before bringing their copycat claims.  It is inequitable to reward this wait-and-see approach.  *See, e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991-92, 996 (N.D. Cal. 2020).

Apple has faced concrete prejudice as a result.  The complaint makes clear that Apple has operated its business for many years on a model that includes the challenged restrictions.  *E.g.*, FAC ¶¶ 17, 77, 122-23.  Plaintiffs stood idly by all that time, waiting to file until *after* this Court tried *Epic* and Apple settled *Cameron*, a nearly identical U.S. developer action.  Apple agreed to changes to its business model in settling *Cameron*, only to face the same claims right after the case closed.  This action burdens Apple with having to relitigate issues from those cases (including incurring duplicative litigation expenses), undoubtedly prejudicing Apple.

### B.       Plaintiffs' UCL Claims Are Barred as Untimely or by Laches

To the extent that plaintiffs' UCL claims are directed toward the same conduct as their Sherman Act claims, the UCL claims are untimely too as a four-year statute of limitation applies to any UCL action.  *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179 (2000) (citing Cal. Bus. & Prof. Code § 17208).  Plaintiffs' request for injunctive relief under the UCL to undo alleged anti-steering provisions is also too late.  FAC ¶¶ 102, 286.  Any alleged harm would have stemmed from Apple's decision to implement an alleged anti-steering provision in the Guidelines, which plaintiffs do not allege occurred within the four years preceding the filing of this action—indeed, the complaint contemplates that developers agreed to these provisions well before then.  *See id.* ¶ 102; *see also Hameed v. IHOP Franchising LLC*, 520 F. App'x 520, 522 (9th Cir. 2013) (no continuing violation under UCL when "alleged unfairness stems not from a course of conduct, but from the terms of the initial contract").  Because more than four years have passed since Apple required that Figaro and L'Équipe abide by the provisions at issue, their UCL claims are too old to bring now.[27]

---

[26] The limitation periods for le GESTE's claims are the same as for Figaro's and L'Équipe's claims to the extent that le GESTE allegedly represents them.  *Supra* at 18-19.

[27] Plaintiffs offer *no* excuse for their prejudicial, years-long delay.  Thus, even if the Court determines plaintiffs' UCL claims came within the limitations period, those claims are barred by laches.  *See*

1

### C.   Plaintiffs' Cartwright Act Claims Are Untimely

2

Like their Sherman Act and UCL claims, Plaintiffs' claims for injunctive relief and damages

3

under the Cartwright Act are untimely.  Cartwright Act claims are also subject to a four-year statute of

4

limitations.  Cal. Bus. & Prof. Code § 16750.1.  Plaintiffs' Cartwright Act claims are based on an

5

alleged combination created by Apple's requirement that app developers enter the DPLA.  FAC ¶¶ 290-

6

99.[28]  Thus, these claims stem from Apple's decision to require adherence to the DPLA, and, *at the*

7

*latest*, from each of the identified French Developer Plaintiffs' becoming party to the DPLA.  As

8

discussed, Figaro and L'Équipe have sat on these claims since at least 2009.  *See supra* at 22.

9

### VIII.   PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED

10

Finally, restitution is unavailable to Figaro and L'Équipe.  They seek restitution under the

11

UCL—an equitable remedy, *see Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 292

12

(2020)—or in equity generally as an alternative to damages without any explanation as to why damages

13

would be inadequate to redress their alleged harms.  *See* FAC at 94, ¶¶ 227-28.  But equitable relief is

14

not available unless a plaintiff demonstrates that a legal remedy is inadequate, so these plaintiffs cannot

15

obtain equitable restitution.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

16

Nor is legal restitution available to them, FAC at 94, because the causes of action at issue do not provide

17

for it.  *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212-18 (2002) (party sought

18

legal not equitable restitution because it did not seek to recover specific funds, but the statute did not

19

make the former available).

20

### IX.   CONCLUSION

21

The Court should dismiss the complaint in whole, or alternatively, in part, with prejudice.

22

//

23

//

24

---

25

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 842 (9th Cir. 2002) (affirming application of laches to a UCL claim); *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001) ("[L]aches may sometimes bar a statutorily timely claim.").

26

27

[28] Plaintiffs' Cartwright Act claims also fail because a claim under that statute requires a "combination" of more than one actor.  Plaintiffs allege that Apple "coerced" the Developer Plaintiffs into a combination, but the Act does not recognize "coercion" or "combination" where a party creates terms and refuses to deal with others who do not adhere to them.  *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 372 (2001); RJN, Ex. C, *Beverage* Order at 9-11; Ex. D, *Beverage* Order at 5-7.

28

Gibson, Dunn & Crutcher LLP

25

1    Dated:  January 20, 2023              GIBSON, DUNN & CRUTCHER LLP

2                                                    Daniel G. Swanson
                                                      Cynthia E. Richman
3                                                    Caeli A. Higney
                                                      Dana Lynn Craig
4                                                    Eli M. Lazarus
                                                      Victoria C. Granda

5                                            By: */s/ Cynthia E. Richman*

6                                                  *Attorneys for defendant Apple Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
CASE NO 4:22-CV-04437-YGR