# EXHIBIT D

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 8/29/2022 1:48 PM
Reviewed By: R. Walker
Case #20CV370535
Envelope: 9832131

ORDER ON SUBMITTED MATTER

## SUPERIOR COURT OF CALIFORNIA

### COUNTY OF SANTA CLARA

| | |
|---|---|
| MICHELLE BEVERAGE, et al., | Case No.: 20CV370535 |
| Plaintiffs, | **ORDER CONCERNING APPLE INC.'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| v. | |
| APPLE INC., et al., | |
| Defendants. | |

Plaintiffs bring this action against Defendant Apple Inc. on behalf of a putative class of California consumers. They challenge Apple's removal of the social and gaming software application "Fortnite" from its application marketplace (the "App Store") and Apple's related alleged abuse of monopolistic power.

Following a pause on merits-related proceedings to allow the parties to address the post-trial decision in a related federal case, *Epic Games Inc. v. Apple Inc.* (N.D. Cal., No. 4:20-CV-05640) ("*Epic*"), Plaintiffs filed a First Amended Class Action Complaint ("FAC").[1] Apple demurred, and in an order filed on February 4, 2022 ("February Order"), the Court sustained its demurrer with leave to amend. The Court held that Plaintiffs failed to state a claim under the

---

[1] An appeal of the trial court's decision in *Epic* is pending.

1

Cartwright Act because, under the *Colgate* doctrine, the conduct they alleged in restraint of trade was Apple's unilateral conduct.  Applying *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375 (*Chavez*), the Court held that because the *Colgate* doctrine permitted Apple's conduct, that same conduct could not be deemed unfair under the Unfair Competition Law, Business & Professions Code section 17200 et seq. (the "UCL").

Plaintiffs filed the operative Second Amended Class Action Complaint ("SAC") on April 5, 2022.  The SAC adds new allegations to support the claims for violation of the Cartwright Act and of the unlawful and unfair prongs of the UCL.[2]  Apple again demurs, urging that the new allegations do not avoid the *Colgate* doctrine and all three causes of action otherwise fail to state a claim.  (Code Civ. Proc., § 430.10, subd. (e).)  Plaintiffs oppose the demurrer.

The Court issued a tentative ruling on August 24, 2022.  It heard oral argument on August 25 and took the matter under submission.  The Court now issues its final order, which again SUSTAINS Apple's demurrer, this time without leave to amend.

I.   THE SAC'S NEW ALLEGATIONS

The February Order summarizes Plaintiffs' allegations in the FAC at length, and that summary is not repeated here.  As reflected in the redline attached to Apple's demurrer, the SAC largely repeats these allegations, relying on a handful of new ones to avoid the application of the *Colgate* doctrine.  This order will focus on Plaintiffs' new allegations, although the Court has taken a fresh look at the previous allegations as well.

As an initial matter, the SAC now specifically defines the "Relevant Market" as the market for "mobile gaming transactions."  (SAC, ¶ 5.)  (The February Order had assumed this was the case.)  Plaintiffs allege that the App Store marketplace "makes up roughly half of the Relevant Market as a whole." (*Id.*, ¶ 16.)  Plaintiffs also include additional context about potential legislation and regulatory action in the United States and other countries "targeted at big tech companies like Apple," in-app payment systems, and/or Apple specifically.  (*Id.*, ¶¶ 102–106.)

---

[2] The SAC omits a claim for breach of the implied covenant of good faith and fair dealing that was included in the FAC.

2

The most significant new allegations in the SAC concern asserted retaliatory/coercive conduct by Apple. According to Plaintiffs, these new allegations show more than just the mere "announcement" of a policy and refusal to deal with those who do not comply (*Chavez, supra*, 93 Cal.App.4th at p. 373); rather, they bring this case outside the *Colgate* doctrine. Those allegations are:

119. "Rubbing salt in the wound of its current adversary Epic Games, the Apple App Store is promoting Fortnite's biggest competitor, PlayerUnknown's Battlegrounds, a day after Fortnite Season 4 began. Apple is striking back after Epic's attempts to use its massive fanbase to pressure the tech giant in their ongoing legal battle." [(This is a quotation from a news article.)] This promotion occurred the same day Apple said they would terminate Epic's developer account related to Fortnite, on both the App Store and on Twitter.

120. Apple is seeking to amplify harm on Epic for challenging its unfair business practices by heavily promoting competitors and making an example of Epic. Essentially, Apple is coercing Epic and any future dissenters by directly promoting the biggest competitor of its biggest dissenter. Apple retaliated against Epic for breaking its rules — going above and beyond the punitive measures available to it contractually. This serves as a message that not only will Apple remove you from the App Store, they will directly assist your closest competitors.

121. Apple did not satisfy itself with promoting Epic's biggest mobile competitor, but even threatened Unreal Engine's existence on the app store, a system non-Epic companies license from Epic to develop video game and other applications on iOS, among numerous other uses. This threat goes well above and beyond any simple "refusal to deal" with Epic — it would have prevented anyone independently contracting with Epic to develop their applications from hosting

3

those applications on the App Store. Instead of Apple refusing to deal with Epic, Apple would have forced everyone else to follow their iron will.

122. The Unreal developer account is part of the same developer account as Fortnite — Apple threatened to terminate an account completely independent of Fortnite and the conduct leading to its removal in an attempt to punish and retaliate against Epic for trying to escape its anticompetitive fee.

123. Apple considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases, showing how Apple coerces developers to play by their rules via more than just economic pressure. In an email with Apple employees, Apple seemed to want to find ways to torpedo Netflix's test removal of in-app purchases, wanting to deliberately sabotage it to keep them in the IAP ecosystem.

124. In the US District Court for the District of Columbia, a coalition of app developers moved to quash Apple's subpoenas in connection to antitrust lawsuits, claiming that the disclosure of the information Apple requested would leave them open to retaliation for their role in the coalition — a clear risk as shown by Apple's treatment of Epic.

Below, the Court will address whether these new allegations make a difference.

## II.  LEGAL STANDARD

A demurrer tests the legal sufficiency of the complaint. (*Chen v. PayPal, Inc.* (2021) 61 Cal.App.5th 559, 568.) Consequently, it "reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*Weil v. Barthel* (1955) 45 Cal.2d 835, 837; see also Code Civ. Proc., § 430.30, subd. (a).) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he

1  describes the defendant's conduct. … Thus, … the facts alleged in the pleading are deemed to be
2  true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179
3  Cal.App.4th 949, 958, internal citations and quotations omitted.)
4       In ruling on a demurrer, the allegations of the complaint must be liberally construed,
5  with a view to substantial justice between the parties.  (*Glennen v. Allergan, Inc.* (2016) 247
6  Cal.App.4th 1, 6.)  Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does]
7  not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club*
8  *of Southern California* (2011) 201 Cal.App.4th 1112, 1120.)  A demurrer will succeed where the
9  allegations and matters subject to judicial notice clearly disclose a defense or bar to recovery.
10 (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.)

**III.    CARTWRIGHT ACT AND DERIVATIVE UCL UNLAWFUL CLAIM**

As summarized in the February Order, recovery under the Cartwright Act "is provided where the activities of a combination of capital, skill, or acts by two or more persons result in a restraint of trade. ([*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256,] 264–265 [(*G.H.I.I.*)], citing Bus. & Prof. Code, §§ 16720 [defining a 'trust' for purposes of the Act] & 16750 [establishing a private right of action].)" (February Order, p. 7.)

> "It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business.  An antitrust case must be based upon conspiratorial rather than unilateral conduct." (G.*H.I.I., supra*, 147 Cal.App.3d at pp. 267–268, citations omitted.)  "It is also established, however, that a necessary 'conspiracy' or 'combination' cognizable as an antitrust action is formed where a trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses.  If a 'single trader' pressures customers or dealers into pricing arrangements, an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a trader to determine with whom it will deal."  (*Id.* at p. 268.)

(February Order, pp. 9–10.)

Coercion in this context requires something more than a simple policy that business partners agree to certain terms. "[A]n illegal combination may be found where a supplier secures compliance with announced policies in restraint of trade by means which go beyond mere announcement of policy and the refusal to deal," for example, by "tak[ing] 'affirmative action' to bring about the involuntary acquiescence of its dealers…." (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 721 [*Kolling*].) This might include "threatening commands" aimed at price-fixing. (*Id.* at pp. 721–722.) Or it could include a "boycott" to extract price concessions. (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 263, fn. 3, 269 [contrasting adequate allegations of one record store's boycott of distributors accompanied by threats with inadequate allegations as to other stores that apparently obtained favorable terms from distributors "in an atmosphere of free competition"].)

Coercion must be alleged with specificity. (See *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 196 (*Freeman*).) And critically, under the so-called *Colgate* doctrine, coercion does not include the mere "announcement" of a policy and refusal to deal with those who do not comply, even when coupled with "measures to monitor compliance that do not interfere with … freedom of choice." (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 373 (*Chavez*).) Accordingly, in *Chavez*, allegations "that Whirlpool announced [a] price policy prescribing minimum resale prices … and informed retailers that it would refuse to sell products to any retailer who did not comply," and "would monitor the retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and sending 'mystery shoppers' to retail stores," were deemed "insufficient to establish a coerced agreement in violation of the Cartwright Act…." (*Ibid*.)

6

(February Order, p. 10.)

The Court found the FAC's allegations that Apple forces developers to pay its 30 percent fee and abide by other terms stated in its contracts with them "amounts to open, unilateral conduct by Apple, essentially a 'take it or leave it' deal—not threats, boycotts or other such 'affirmative action' to coerce developers into a conspiracy with Apple against others." (February Order, p. 11.) Despite Plaintiffs' renewed emphasis on *Kolling* and on *In re Qualcomm Antitrust Litig.* (N.D.Cal. 2017) 292 F. Supp. 3d 948 (*Qualcomm*), the Court stands by this analysis.

### A.   *Kolling* and *Qualcomm*

In *Kolling*, a newspaper publisher coerced retailers and distributors to sell its papers at lower, "suggested" retail prices. (See *Kolling, supra*, 137 Cal.App.3d at pp. 713–714.) The publisher did not openly require distributors to abide by its suggested prices, but "dealt with 'dissident' distributors by strongly suggesting a price roll back. Given the company's vastly superior bargaining strength, such 'suggestions' were in fact thinly disguised and threatening commands," and some distributors unwillingly lowered their prices while at least one was terminated for refusing to do so. (*Kolling, supra*, 137 Cal.App.3d at p. 722.) While *Kolling* emphasized the publisher's bargaining strength and ability to terminate distributors, it did not suggest that these factors could turn a "mere announcement of policy and the refusal to deal" (*id.* at p. 721) into an illegal combination. Rather, *Kolling* expressly considered evidence on these points "in the light of [the publisher's] price-fixing policy and the intimidating 'suggestions' made to recalcitrant distributors…." (*Id.* at p. 722.)

In *Qualcomm*,[3] the district court found coercion was pleaded through detailed allegations of a multi-pronged campaign by Qualcomm to force cellphone handset manufacturers ("OEM"s),

---

[3] In a footnote, the February Order noted Apple's statement "that the district court's eventual ruling against Qualcomm in this case was reversed on appeal. (See *FTC v. Qualcomm Inc.* (9th Cir. 2020) 969 F.3d 974 [('*FTC v. Qualcomm*')].)" (See Apple's 12/22/21 Reply, p. 10.) Plaintiffs correctly point out that *FTC v. Qualcomm* is not the same case as the *Qualcomm* consumer action discussed above—but the two matters are closely related because they address the same practices by Qualcomm. For that reason, the Ninth Circuit directed the district court in *Qualcomm* to "reconsider the viability of Plaintiffs' claims given *FTC v. Qualcomm*." (*Stromberg v. Qualcomm Inc.* (9th Cir. 2021) 14 F.4th 1059, 1063 (*Stromberg*).) As the Ninth Circuit explained, "[w]e concluded in *FTC v. Qualcomm* that Qualcomm's SEP licensing

7

including Apple, to agree to unreasonable and anticompetitive licensing terms.  (See *Qualcomm, supra*, 292 F. Supp. 3d at pp. 958–962 [summarizing allegations].)  The campaign involved Qualcomm's leveraging of its dominance in the modem chip market to extract unfair licensing fees in the separate market for standard essential patents ("SEP"s), as well as its pressuring of Apple into exclusive dealing arrangements in part by offering a rebate of some of these excessive royalties.  (See *ibid.*)  Qualcomm acknowledged *Chavez*'s holding that "allegations that the defendant refused to deal with dealers who did not comply with a resale price policy and used 'other unspecified 'threats, coercion, intimidation and boycott' to cause the dealers to comply" were insufficient to show coercion.  (*Qualcomm, supra*, 292 F. Supp. 3d at p. 976.)  But it explained that the allegations before it were "significantly more detailed," emphasizing allegations that Qualcomm "employed its superior market power and *threatened to withhold chips* if OEMs did not agree to Qualcomm's licensing terms."  (*Ibid.*, italics added.)  As with *Kolling*, *Qualcomm* did not hold that a mere announcement of terms and refusal to deal became coercive simply by virtue of Qualcomm's power in the relevant market.  Rather, *Qualcomm*'s leveraging of its power in interrelated markets was the required "affirmative action."

With that requirement in mind, the Court turns to the new allegations in the SAC.

**B.     New Allegations**

The SAC newly alleges that on the same day Apple said it would terminate Epic's developer account related to Fortnite and a day after Fortnite Season 4 began, Apple promoted Fortnite's biggest competitor.  (SAC, ¶ 119.)  Plaintiffs characterize this as "retaliat[ion] against Epic for breaking its rules — going above and beyond the punitive measures available to it contractually."  (*Id.*, ¶ 120.)  Similarly, Apple "threatened to terminate" Epic's Unreal developer account "in an attempt to punish and retaliate against Epic for trying to escape its anticompetitive fee."  (*Id.*, ¶ 122.)

---

practices, the same practices complained of here, are lawful and not anticompetitive. [Citation.] Because Plaintiffs' arguments in this case overlap with those brought in *FTC v. Qualcomm*, there would have to be some extraordinary difference for Plaintiffs' claims here to not fail as a matter of law…." (*Id.* at p. 1075.)

These types of actions might constitute "affirmative action" (see *Kolling, supra,* 137 Cal.App.3d at 721) in a different context. (The Court takes no position on the issue.) But even if these actions were considered affirmative actions under *Kolling*, there is a significant timing problem here. Plaintiffs themselves characterize these actions as "retaliat[ion]" for Epic's decision to launch its own payment system in violation of its agreements with Apple—not an attempt to coerce Epic to comply. And significantly, Plaintiffs bring this action on behalf of a putative class of *Fortnite* users who purchased digital currency or goods using Apple's in-app purchase system. While Apple's "retaliat[ory]" actions towards Epic might coerce future developers to do what Apple wants, it does not appear that Fortnite users could have been harmed by Apple's alleged retaliation against Epic *after* Epic had decided to openly break with Apple.

The other new allegations fare no better. The SAC alleges that Apple "considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases" (SAC, ¶ 123), but there is no indication that Epic or anyone else knew about this at the time, or that Apple ever followed through. And the SAC's vague allegation that "a coalition of app developers" moved to quash Apple's subpoenas in certain antitrust lawsuits out of fear of retaliation (*id.*, ¶ 124) again appears to relate to events *after* Epic broke with Apple, which could not have impacted Epic or Fortnite users. The Court understands Plaintiffs' argument that these other situations could provide evidence a coercive atmosphere, but again, there is a timing problem. The SAC itself suggests that the fears of the "coalition" are justified "by Apple's treatment of Epic." (*Id.*, ¶ 124.) Plaintiffs' allegations do not show that a coercive atmosphere existed during a timeframe that would have impacted Fortnite users who made purchases using Apple's in-app purchase system.

As for Plaintiffs' old allegations that were carried over into the SAC, the Court stands by its previous analysis.

### C.     Conclusion

The SAC still fails to plead facts avoiding the *Colgate* doctrine. And Plaintiffs did not explain in their papers how they could amend their complaint to do so. At oral argument, they

9

argued they could broaden the class definition to include all App Store users. But such a broadening—even if it were to overcome the *Chavez* and *Colgate* issues identified above—would transmogrify Plaintiffs' claims into something far removed from the subject matter of this complaint, which is how Apple's treatment of Epic hurt Fortnite users specifically.

Therefore, the Court will sustain Apple's demurrer to the Cartwright Act claim without leave to amend. The same goes for the derivative claim under the UCL's "unlawful" prong. (See *Camsi IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1542 ["absent an effective request for leave to amend in specified ways," it is an abuse of discretion to deny leave to amend "only if a potentially effective amendment were both apparent and consistent with the plaintiff's theory of the case"].)

IV.     **UCL UNFAIR PRONG**

That leaves the third cause of action under the UCL's "unfair" prong, which is unchanged from the FAC aside from some new (but essentially repetitive) details and legal conclusions. In the February Order, the Court explained that *Chavez* and subsequent authorities have held "as a matter of law that conduct that the courts have determined to be permissible under the *Colgate* doctrine cannot be deemed 'unfair' under the unfair competition law." (*Chavez, supra*, 93 Cal.App.4th at p. 375.) Plaintiffs suggest that the Court should reconsider this holding, but the Court is not persuaded by their argument. Notably, while Plaintiffs urge the Court to apply the standard stated in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 (*Cel-Tech*) to their allegations, *Chavez* held that even if *Cel-Tech* applied in consumer (as opposed to competitor) actions, it *supported* the conclusion that conduct allowed under the *Colgate* doctrine should not be deemed "unfair":

> If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason--because it unreasonably restrains competition and harms consumers--the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and

10

uncertainty and could lead to the enjoining of procompetitive conduct. (See *Cel-Tech*, *supra*, 20 Cal. 4th at p. 185.) (*Chavez, supra*, 93 Cal.App.4th at p. 375.) The Court will follow *Chavez* here.

Plaintiffs further urge that their "anti-steering" theory is not subject to the *Colgate* doctrine. But they provide no reasoning to support this conclusion and cite no authorities addressing the application of the *Colgate* doctrine to similar practices—rather, they merely cite general authorities concerning First Amendment protection of commercial speech (*Bates v. State Bar of Ariz.* (1977) 433 U.S. 350), the standard governing violations of Section 5 of the FTC Act (15 U.S.C. § 45) (*FTC v. Neovi, Inc.* (9th Cir. 2010) 604 F.3d 1150), and unrelated antitrust issues (*Eastman Kodak Co. v. Image Tech. Servs.* (1992) 504 U.S. 451, 472–477 [finding question of fact on issue of power in a "tying market" based on evidence concerning information costs and other subjects]).

Plaintiffs fail to persuade the Court to take a different approach to this claim than it did in the February Order, or to plead any new facts or provide any new authority supporting their theory. The Court will sustain Apple's demurrer without leave to amend as to this claim, too.

## V.  CONCLUSION

The Court SUSTAINS WITHOUT LEAVE TO AMEND Apple's demurrer, as to all three causes of action in the SAC. Plaintiffs fail to state a cause of action that avoids *Chavez* and the *Colgate* doctrine. For this reason, the Court does not need to address Apple's other arguments in support of its demurrer.

**IT IS SO ORDERED.**

Date: August 29, 2022

_____
The Honorable Sunil R. Kulkarni
Judge of the Superior Court

11