Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

*Attorneys for Plaintiffs Société du Figaro,
SAS; L'Équipe 24/24 SAS; le GESTE; and the
Proposed Classes*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | No. No. 4:22-cv-04437-YGR <br><br> PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT <br><br> Date: Mar. 14, 2023 <br> Time: 2:00 p.m. <br> Courtroom: 1, 4th Floor <br> Judge: Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................................1

II. FACTS ..........................................................................................................................2

    A. Plaintiffs' participation and injury in the domestic U.S. marketplace ......................................................................................................2

    B. The *Cameron* U.S. iOS developer suit ...........................................................3

III. STANDARDS FOR DECISION ....................................................................................4

IV. ARGUMENT ................................................................................................................5

    A. Plaintiffs' antitrust claims are viable notwithstanding the FTAIA. ...........................5

        1. Under the instant circumstances, the FTAIA does not apply. ................................................................................................5

            a. Apple fails to demonstrate trade or commerce with "foreign nations." ......................................................................5

            b. By contrast, plaintiffs have amply alleged their participation in the U.S. domestic marketplace, underscoring the FTAIA's inapplicability .......................................6

        2. Even if the FTAIA applied, the domestic-effects and export exceptions save plaintiffs' claims. ....................................................8

            a. Apple's anticompetitive conduct resulted in domestic effects that were the direct cause of plaintiffs' injuries, such that plaintiffs may proceed with their antitrust claims. .................................................8

            b. Per Apple itself, plaintiffs are exporters, such that plaintiffs may proceed with their antitrust claims ...........................11

        3. The balance of Apple's theories regarding the FTAIA are unavailing. ...............................................................................11

            a. Apple's references to its *consumer-facing* digital storefronts are of no consequence. .......................................11

            b. Apple's references to ADI are unavailing. .........................................12

            c. Plaintiffs' state law claims are not barred by the FTAIA (nor any territorial limits). .............................................12

            d. "Comity" also not give rise to dismissal, either on the basis of the FTAIA or otherwise. .................................14

B.    Apple's implementation of ATT is another redressable abuse of its monopoly power. ...............................................................................15

C.    Le GESTE, an association representing certain iOS developers, may proceed with its claims for non-monetary relief. ...............................17

    1.    Le GESTE has standing to sue in its own right. ...........................17

    2.    Le GESTE has associational Article III standing to sue on behalf of its members. ...............................................................18

        a.    Le GESTE can rely on its members' standing for associational standing purposes. ..........................................18

        b.    Allegations of le GESTE's purpose are sufficient to prevail against Apple's challenge on a motion to dismiss. ...............................................................................19

    3.    Le GESTE's allegations also are sufficient for statutory standing purposes. ..........................................................................20

D.    Plaintiffs' claims are timely; nor does laches bar any of them. ...............21

    1.    Plaintiffs' Sherman Act claims are timely; nor does laches bar them. ...........................................................................................21

    2.    Plaintiffs' UCL claims are timely; nor does laches bar them. ...........................................................................................23

    3.    Plaintiffs' Cartwright Act claims are timely and otherwise viable. ..........................................................................................24

E.    Plaintiffs may proceed with their alternative claims for restitution. ........24

V.    CONCLUSION ...............................................................................................25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alexander v. Select Comfort Retail Corp.*,
5
    2018 WL 6726639 (N.D. Cal. Dec. 21, 2018) ..................................................24

6

*Animal Legal Def. Fund v. LT Napa Partners LLC*,
    234 Cal. App. 4th 1270 (2015)..........................................................20, 21

7

*Animal Sci. Prods., Inc. v China Minmetals Corp.*,
8
    654 F.3d 462 (3d Cir. 2022) ..................................................................8

9

*Apple Inc. v. Pepper*,
10
    139 S. Ct. 1514 (2019) .........................................................................12

11

*Aryeh v. Canon Bus. Sols.*,
    55 Cal.4th. 1185 (2013)................................................................23, 24

12

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13
    13 F.4th 531 (6th Cir. 2021) .................................................................20

14

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
15
    950 F.2d 1401 (9th Cir. 1991) ..............................................................19

16

*Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*,
    611 F.2d 684 (8th Cir. 1979) .................................................................20

17

*Blix Inc. v. Apple Inc.*,
18
    2021 WL 2895654 (D. Del. July 9, 2021) ..............................................15

19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
20
    429 U.S. 477 (1977) .............................................................................17

21

*California Dental Ass'n. v. California Dental Hygienists' Ass'n*,
    222 Cal. App. 3d 49 (1990) ..................................................................20

22

*California Med. Ass'n. v. Aetna Health of California Inc.*,
23
    63 Cal. App. 5th 660 (2021) .................................................................21

24

*Cameron v. Apple Inc.*,
    N.D. Cal. No. 4:19-cv-03074-YGR.........................................3, 4, 21, 23
25

26

*In re Capacitors Antitrust Litig.*,
    2016 WL 5724960 (N.D. Cal. Sept. 30, 2016)......................................14

27

*In re Cipro Cases I & II*,
28
    61 Cal. 4th 116 (2015)..........................................................................13

*Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*,
   2007 WL 9734349 (N.D. Cal. May 14, 2007)..................................................................20

*Cruz v. United States*,
   387 F. Supp. 2d 1057 (N.D. Cal. 2005)......................................................................14

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
   392 F. Supp. 3d 1074 (N.D. Cal. 2019)......................................................................13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   546 F.3d 981 (9th Cir. 2008).....................................................................................10

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021).....................................................................................17

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987).....................................................................................16

*Epic Games, Inc. v. Apple Inc.*,
   559 F.Supp.3d 898 (N.D. Cal. 2021)................................................................*passim*

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004).............................................................................................6, 10

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*,
   2005 WL 1629813 (N.D. Cal. July 8, 2005)...............................................................20

*Gen. Elec. Co. v. Latin Am. Imps., S.A.*,
   187 F. Supp. 2d 749 (W.D. Ky. 2001).......................................................................11

*In re Glumetza Antitrust Litig.*,
   2020 WL 1066934 (N.D. Cal. Mar. 5, 2020).........................................................21, 22

*Hameed v. IHOP Franchising LLC*,
   520 Fed. App'x. 520 (9th Cir. 2013)...........................................................................23

*Hatamian v. Advanced Micro Devices*,
   N.D. Cal. No.: 14-cv-00226-YGR (Dec. 8, 2015)......................................................18

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977)............................................................................................18, 19

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002)................................................................................22, 23

*Kasky v. Nike, Inc.*,
   27 Cal.4th 939 (2002)................................................................................................21

*Kwikset Corp. v. Superior Court*,
   51 Cal.4th 310 (2011)................................................................................................21

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ................................................................. 17

*In re Lithium Ion Batteries Antitrust Litig.*,
    2017 WL 2021361 (N.D. Cal. May 12, 2017) ..................................... 4, 10, 14

*Med. Ass'n of State of Ala. v. Schweiker*,
    554 F. Supp. 955 (M.D. Ala. 1983) ........................................................ 19

*Mission Hills Condo. Ass'n M-1 v. Corley*,
    570 F. Supp. 453 (N.D. Ill. 1983) ........................................................... 20

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ........................................................... 21, 22

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
    747 F.3d 1199 (2014) ........................................................................ 21, 22

*Sanner v. Bd. of Trade of City of Chicago*,
    62 F.3d 918 (7th Cir. 1995) ................................................................... 20

*Shulman v. Kaplan*,
    2023 WL 225625 (9th Cir. Jan. 18, 2023) ................................................ 4

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ................................................................. 25

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ....................................................................... 16, 17

*Stuart v. Radioshack Corp.*,
    2009 WL 281941 (N.D. Cal. Feb. 5, 2009) .............................................. 24

*Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    851 F.3d 976 (9th Cir. 2017) ................................................................ 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    785 F. Supp. 2d 835 (N.D. Cal. 2011) ............................................... 10, 11

*In re Tobacco II Cases*,
    46 Cal.4th 298 (2009) ........................................................................ 13

*Trump v. Intuitive Surgical, Inc.*,
    2020 WL 3163185 (N.D. Cal. June 12, 2020) ......................................... 17

*Turicentro, S.A. v. Am. Airlines Inc.*,
    303 F.3d 293 (3d Cir. 2002) ................................................................... 8

*U.S. v. Hui Hsiung*,
    778 F.3d 738 (9th Cir. 2015) .......................................................... 4, 6, 9, 15

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
   2013 WL 368365 (N.D. Cal. Jan. 29, 2013) ........................................................................... 13

*US Airways, Inc. v. Sabre Holdings Corp.*,
   105 F. Supp. 3d 265 (S.D.N.Y. 2015) ..................................................................................... 22

*Warren v. Whole Foods Mkt. California*,
   2022 WL 2644103 (N.D. Cal. July 8, 2022) ........................................................................... 25

*Wershba v. Apple Comput., Inc.*,
   91 Cal. App. 4th 224 (2001) ................................................................................................... 13

**Statutes**

15 U.S.C. § 6a ................................................................................................................. *passim*

15 U.S.C. §15b ............................................................................................................................ 21

Cartwright Act ................................................................................................................. 13, 20, 24

Clayton Act ................................................................................................................................... 20

Sherman Act ................................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b) .......................................................................................................... 4, 5, 14

**Other Authorities**

H.R. Rep. 97-686 (1982) ....................................................................................................... 5, 10, 14

# I.    INTRODUCTION

France-resident and all iOS developers build digital products that add immense value to Apple Inc.'s (Apple or Apple Inc.) mobile-device ecosystem. Imagine the iPhone without apps; few customers would want it. Thus, iOS developers enrich Apple greatly, both by enabling it to sell more expensive hardware and by paying it super-high fees in order to get their digital products to end-users. Yet Apple resorts to calling plaintiffs "opportunists" for having the audacity to challenge its anticompetitive abuses in the forum, and under the U.S. and California laws, that *Apple* chose to govern disputes. Also, Apple frets that non-U.S.-resident iOS developers might "forum-shop with an eye toward treble damages," MTD at 14, but again, Apple chose the forum and applicable law—which in any event comports with the commercial reality that it conducts its business with iOS developers, wherever they reside, in and from the U.S. and California, per its U.S. and California contracts, policies, and practices. So now on to substance of Apple's motion.

*First*, Apple's FTAIA defense fails. (*See* Sec. IV.A.1-3, *infra*.) Apple conducts its sales of iOS app-distribution and in-app purchase (IAP) services to iOS developers, wherever they reside in the world, in and from the United States, under uniform anticompetitive terms. To get their digital products to end-users, plaintiffs had no choice but to deal with Apple Inc., which has monopolized the market for iOS app-distribution and IAP services. As plaintiffs allege, Apple's anticompetitive behavior affected U.S. commerce and trade directly, which in turn led directly to plaintiffs' injuries, given their participation in U.S. domestic commerce. Accordingly, U.S. antitrust law properly applies to the anticompetitive acts and injuries alleged. If the FTAIA pertains at all, plaintiffs' antitrust claims are saved by the domestic-effects and export exceptions set forth in that Act itself. 15 U.S.C. § 6a(1)(A)-(B) and (2).

*Second*, Apple engages in anticompetitive, unlawful, and unfair conduct within, and emanating from, California, which California law proscribes. (*See* Sec. IV.A.3.c, *infra*.) Therefore, the Cartwright Act and UCL apply as claimed. Further, the FTAIA does not disturb these claims because it does not apply to the injuries plaintiffs sustained as a direct result of Apple's anticompetitive behavior in U.S. commerce or trade.

*Third*, there is no reason to defer to hypothetical foreign-based actions. Again, Apple chose the applicable law and forum—which, from its vantage point makes sense, given its U.S.- and California-based operations. Comity is no obstacle to plaintiffs' claims. (*See* Sec. IV.A.3.d, *infra*.)

*Fourth*, Apple's so-called "App Tracking Transparency (ATT) functionality" is further abuse of Apple's willfully acquired monopoly. It injures iOS developers, including plaintiffs, and it injures competition, too. (*See* Sec. IV.B, *infra*.). Plaintiffs' claims addressing ATT should go forward.

*Fifth*, the ability of le GESTE to sue on its own behalf, and on behalf of its France-based iOS developer members, is well-settled. Le GESTE seeks only injunctive relief, even though it has incurred expenses by diverting from its longstanding mission to advocate on behalf of digital publishers, including plaintiffs. Its claims should not be dismissed. (*See* Sec. IV.C, *infra*.)

*Sixth*, plaintiffs' claims are timely per applicable limitation periods, and notwithstanding the doctrine of laches, too. Not only have their claims accrued under contracts entered anew every year, but the continuing violation and continuous accrual doctrines apply as well. (*See* Sec. IV.D, *infra*.)

*Seventh*, plaintiffs have properly alleged monetary injury giving rise to restitution pursuant to the UCL, including alternatively to their claims at law. Accordingly, their UCL claims are not subject to dismissal, particularly at this stage of the case. (*See* Sec. IV.E, *infra*.)

## II.    FACTS

### A.    Plaintiffs' participation and injury in the domestic U.S. marketplace

Plaintiffs are two individual French-resident iOS developers, Société du Figaro, SAS (Figaro) and L'Équipe 24/24 SAS (L'Équipe), together with a French-resident association, le GESTE, that represents French-resident iOS developers (among others). (*Id.*, ¶¶ 36-64.) Figaro and L'Équipe have paid Apple commissions at the rate of 30% on sales of in-app products; sales of in-app products required use of Apple's IAP system. (*Id.*, ¶¶ 40, 50.)

Apple monopolizes iOS app-distribution and IAP services in and from the U.S. (*E.g.*, FAC, ¶¶ 34, 66, 241-45) Accordingly, Apple interacts with French-resident iOS developers such as Figaro and L'Équipe by way of its global headquarters and operations in the United States. (*E.g.*, *id.*, ¶ 244.) For example, Apple Inc. takes applications for its developer program through the web. (*See, e.g.*, *id.*, ¶¶ 235, 239, 244 nn.232 and 235 (uniform agreement accessed via Apple's website).) Also, in order

1  to be eligible to distribute paid apps or in-app products, iOS developers must enter into Apple's

2  Developer Program License Agreement (DPLA) and certain adjuncts, which also are Internet based,

3  and they must pay a $99 USD, or equivalent, fee. (*E.g.*, *id.*, ¶¶ 36, 46, 239, 244 n.235.) Membership

4  in the program must be renewed annually, with a new payment of that fee. (*Id.*, ¶¶ 37, 47.) iOS

5  developers must also submit their digital products to the U.S. Apple Inc. for review, approval, and

6  publishing. (*Id.*, ¶¶ 23 n.28, 118, 244(f) and Ex. A, Sec. 6.1.) Further, Apple requires them to act as

7  exporters of their digital products *from the U.S.*, and to deem themselves exporters. (*Id.*, ¶ 244(f)-

8  (g).) And all developers must remit *U.S.* tax information with respect to the sale of their digital

9  products. ("Provide U.S. tax information," available at: https://developer.apple.com/help/app-store-

10 connect/provide-tax-information/provide-us-tax-information.)

11      Developers pay Apple super-high commissions set by the U.S. Apple Inc., and Apple pays

12 developers remittances *from the United States*. (*Id.*, ¶ 244(e) and (i).) Thus, Apple's sale of app-

13 distribution and IAP services occur *in the U.S.*, with French-resident developers participating *in the*

14 *domestic U.S. market*. (*E.g.*, *id.*, ¶ 244.) Plaintiffs also must abide by harmful rules imposed by

15 Apple Inc. (*See id.*, ¶¶ 34, 244(a), (c), and (e).) Furthermore, there is only *one* App Store, which is

16 based in the U.S. (*E.g.*, *id.*, ¶ 244(b).) As this Court stated in *Epic Games, Inc. v. Apple Inc.*, 559

17 F.Supp.3d 898, 990-91 (N.D. Cal. 2021), Apple "treats app distribution as a global enterprise" with

18 "rules and guidelines [that] apply globally."

19 **B.      The *Cameron* U.S. iOS developer suit**

20      A *U.S.* iOS developer suit, *Cameron v. Apple Inc.*, N.D. Cal. No. 4:19-cv-03074-YGR, was

21 filed in June 2019. It settled in August 2021, *Cameron* ECF No. 451-1, with final judgment entered

22 in July 2022, ECF No. 494. *U.S.* iOS developers only—and not French developers—are guaranteed

23 relief pursuant to the compromise agreement. (*See, e.g.*, *Cameron* ECF Nos. 53, ¶¶ 13-21, 113-14;

24 332 at 1; 451-1, 1.1, 1.13, 5.2, and 10.1.) In fact, this Court was keen that the parties should avoid

25 any over-reading of their release; thus, it suggested that the terms of the release should reference

26 "claims," *et al.*, "arising" from the same facts asserted in the *Cameron* matter, as distinct from those

27 that "are related to" the *Cameron* "claims," etc. (*Cameron* ECF No. 448 at 11-12.) Apple and the

28

1   *Cameron* plaintiffs agreed. (*Cameron* ECF Nos. 448 at 12 and 451-1, ¶ 10.1.) The final judgment in

2   *Cameron* was entered "in accordance with the terms of the Settlement." (*Cameron* ECF No. 494.)

3       As for Apple's references to a discovery dispute in *Cameron* regarding sales by U.S.

4   developers via its so-called foreign storefronts, they are merely self-serving characterizations of

5   case-specific dialogue. (*See* MTD at 3-4.) Apple can point to no acquiescence by the *Cameron*

6   plaintiffs in whatever views Apple expressed as to the FTAIA because there was no such

7   acquiescence. (*Cf. id.* at 4.)

8               **III.       STANDARDS FOR DECISION**

9       Apple seeks dismissal of certain of plaintiffs' claims—not those claims corresponding to

10   sales of plaintiffs' apps and in-app products to U.S. residents, MTD at 8—pursuant to Fed. R. Civ. P.

11   12(b)(1) and 12(b)(6). (MTD at i and 7.) The standard for decisions under these rules are familiar to

12   the Court. *E.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 2021361, at *1 (N.D. Cal. May

13   12, 2017). Because Apple attempts only facial attacks pursuant to *Rule 12(b)(1)*, MTD at 14-20

14   (referring to supposed pleading deficiencies), "the court assumes the allegations in the complaint are

15   true and draws all reasonable inferences in favor of the party opposing dismissal." 2017 WL

16   2021361, at *1. As for the rest of Apple's motion, the *Rule 12(b)(6)* inquiry is whether the complaint

17   "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

18   face." *Id.* (citation omitted).

19       As for which parts of Rule 12 apply to Apple's various challenges:

20       *First*, Apple disputes (a) plaintiffs' Article III standing as to their ATT-related claims, MTD

21   at 14-16; and (b) le GESTE's Article III standing to sue on its own behalf or on behalf of its

22   members, MTD at 17-20. It evidently intends these as *Rule 12(b)(1)* attacks, though it fails to say.

23       *Second*, Apple evidently seeks to apply *Rule 12(b)(6)*. For example, Apple's challenges to

24   plaintiffs' *statutory* standing must be assessed under Rule 12(b)(6). *See Shulman v. Kaplan*, 2023

25   WL 225625, at *2 (9th Cir. Jan. 18, 2023). Also, the Ninth Circuit has held that the FTAIA does not

26   give rise to a subject-matter jurisdiction defense; rather, its terms are substantive. *See U.S. v. Hui*

27   *Hsiung*, 778 F.3d 738, 753 (9th Cir. 2015) ("The FTAIA does not limit the power of the federal

28   courts; rather, it provides substantive elements under the Sherman Act in cases involving nonimport

1    trade with foreign nations."). Thus, Apple's challenges that it bases on the FTAIA also must be

2    examined pursuant to Rule 12(b)(6) standards.

3                                    **IV.    ARGUMENT**

4    **A.    Plaintiffs' antitrust claims are viable notwithstanding the FTAIA.**

5            *NB*: Apple moves *only* to dismiss as to those developer service purchases corresponding to

6    sales of iOS digital products to end-user consumers in or via its so-called foreign App Store

7    storefronts. (MTD at 8.)

8            As for the claims Apple seeks to dismiss, plaintiffs complain of U.S. domestic behavior that

9    harms France-resident developers, including themselves. This situation is not unlike France-resident

10   visitors to the U.S. buying surpacompetitively priced goods from an abusive monopolist in a brick-

11   and-mortar California store. The FTAIA was not designed to grant *carte blanche* in situations where

12   a U.S. company's anticompetitive conduct hurts non-U.S. residents directly. In fact, the legislative

13   history to the FTAIA, which is excerpted in greater detail in Sec. IV.A.2.a below, explains clearly

14   that the Act was not meant to bar antitrust claims by foreign-resident plaintiffs in these

15   circumstances. *See* H.R. Rep. 97-686, 1982 WL 25066, at *2495 (1982) ("Foreign purchasers should

16   enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do.")

17   (capitalization normalized). Under the facts alleged here, the FTAIA does not apply. (*See* Sec.

18   IV.A.1(a) and (b), *infra*.)

19           But even if the FTAIA did apply, two built-in exceptions—the domestic-effects and export

20   exceptions—save plaintiffs' claims. (*See* Secs. A.2(a) and (b), *infra*.)

21           As for the balance of Apple's FTAIA-related arguments—contentions as to *consumer-facing*

22   digital storefronts, the role of Apple Distribution International Ltd. (ADI), state-law limitations, and

23   international comity—these fail under scrutiny. None undercuts the fundamental analysis regarding

24   the FTAIA in this case. In short, the Sherman and Clayton Acts apply as alleged.

25           **1.    Under the instant circumstances, the FTAIA does not apply.**

26                   **a.    Apple fails to demonstrate trade or commerce with "foreign nations."**

27           Apple bears the burden as movant to show that plaintiffs' claims implicate or involve

28   "conduct involving trade or commerce (other than import trade or import commerce) *with foreign*

1   *nations.*" *Cf.* 15 U.S.C. § 6a (chapeau) (emphasis added). But Apple does not meet this burden. It

2   does not explain how there was commerce with "foreign nations" here, nor does it surface how

3   courts construe the term "foreign nations"; it simply argues that because French "news and content"

4   and French speakers are involved, that must be enough. (MTD at 9.)

5        Instead of addressing this initial matter directly, Apple begins its FTAIA excursion by

6   presenting a quotation from *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 166

7   (2004). (MTD at 8.) But the quote is misleading in its reference to "foreign harm," due to Apple's

8   omission of critical context. Per the court in the sentence preceding the (incompletely) quoted line:

9   "[T]he higher foreign prices of which the foreign plaintiffs here complain *are not the consequence of*

10  *any domestic anticompetitive conduct that Congress sought to forbid,* for Congress did not seek to

11  forbid any such conduct insofar as it is here relevant, *i.e., insofar as it is intertwined with foreign*

12  *conduct that causes independent foreign harm.*" *Id.* at 165-66 (emphasis in original and added).

13       Here, in contrast, plaintiffs allege that they participated in domestic U.S. commerce with

14  Apple and that their injuries were the direct consequence of Apple's "domestic anticompetitive

15  conduct that Congress sought to forbid," *e.g.*, FAC, ¶¶ 239-40; *see also, e.g.*, *id.*, 241-45. *See*

16  *Empagran*, 542 U.S. at 166; *see also Hui Hsiung*, 778 F.3d at 751 ("For the Sherman Act to apply to

17  nonimport trade or commerce with foreign nations, *the conduct at issue* must have a direct,

18  substantial, and reasonably foreseeable effect. . . on trade or commerce which is not trade or

19  commerce with foreign nations.") (emphasis added). In this case, there is no "foreign harm" in the

20  way that Apple would have it.

21       Because Apple fails to meet its burden, its challenges to plaintiffs' claims that are based on

22  the FTAIA should be rejected outright.

23                    **b.    By contrast, plaintiffs have amply alleged their participation in the U.S.
                           domestic marketplace, underscoring the FTAIA's inapplicability.**

24       By contrast, plaintiffs have amply alleged that they participated in the *domestic* marketplace

25  by doing business with Apple Inc., per its anticompetitive terms and pricing, including by electronic

26  means. (*See, e.g.*, FAC, ¶¶ 239-45.)

27

28

1    To begin, the governing contracts and guidelines between Apple and iOS developers,

2  including plaintiffs, underscore that Apple Inc., the U.S. entity, sets and applies the terms under

3  which it provides iOS app-distribution and IAP services to iOS developers, wherever they reside.

4  (*See, e.g.*, FAC, ¶¶ 241, 244; *see also, generally,* Exs. A at 1-2 (DPLA, referring to "LEGAL

5  AGREEMENT BETWEEN YOU AND APPLE" and "Apple" as "Apple Inc., a California

6  corporation, with its principal place of business at . . . Cupertino, California, . . . U.S.A.") and B at 1,

7  20 (guidelines referring to "*the* App Store," "*the* Apple ecosystem," and Apple, as well as the DPLA,

8  to which Apple is the counter-party) (emphasis added).) To the nth degree, Apple's business model

9  is built on uniformity and control worldwide. (*See, e.g., Id.*, ¶ 244.) *See Epic Games*, 559 F. Supp. 3d

10  at 943 ("Apple does not negotiate terms [with developers] generally."). What's more, Apple provides

11  in these contracts that disputes between the parties are to be governed by U.S. and California law and

12  brought in a California-based forum, underscoring the domestic nature of the parties' trade or

13  commerce. (*Id.*, ¶¶ 244 and Ex. A, Sec. 14.10; *see also id.*, ¶ 253 and Ex. C at Sec. 17.)

14    In addition to their U.S.-based contractual relationship, plaintiffs have alleged plausibly that

15  they participated in domestic U.S. commerce in their interactions with Apple as to iOS app-

16  distribution and IAP services. (*E.g., id.*, ¶¶ 239-44.) Apple's monopoly of iOS app-distribution and

17  IAP services means developers are limited to procuring these services from Apple, a domestic

18  company, in the United States. (*E.g., id.*, ¶¶ 44, 54, 239-44.)

19    As for Apple's reference to plaintiffs' allegation referring disjunctively to "interstate

20  commerce or trade or commerce with foreign nations," *Id.*, ¶ 211, it does not survive scrutiny.

21  Plaintiffs do not "contend" that Apple's pertinent activities constitute "trade or commerce with

22  foreign nations." (*Cf.* MTD at 9.) To the contrary, plaintiffs' complaint is replete with supported

23  allegations that plaintiffs participated in the *domestic* U.S. marketplace. (*See, e.g.*, FAC, ¶ 244.)

24  Plaintiffs allege that Apple's activities "were within the flow of, and substantially affected, interstate

25  commerce or trade *or* commerce with foreign nations." (*Id.*, ¶ 211 (emphasis added).) And they add

26  in the alternative that as a monopsonist, Apple acts without regard to state or international lines

27  "from or within California." (*See id.*) In any event, these allegations also are made in view of the

28  reference in Sherman Act Sec. 2 to "trade or commerce among the several States, or with foreign

nations," 15 U.S.C. § 2, and in light of plaintiffs' *alternative* allegations referring to import and export activities, FAC, ¶¶ 247-49.

Neither does *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293 (3d Cir. 2002) (overruled by *Animal Sci. Prods., Inc. v China Minmetals Corp.*, 654 F.3d 462, 469 (3d Cir. 2011), for erroneously analyzing the FTAIA as if it imposed a jurisdictional bar rather than a substantive merits limitation), aid Apple's cause. (*See* MTD at 10-11.) There, the court affirmed a dismissal of plaintiffs' claims where they had "'aver[red] nothing from which [the trial court] could find that Defendants' purported conspiracy caused any injury which was felt in the U.S. or which affected the American economy in any way.'" *Id.* (citation omitted). Here, by contrast, plaintiffs have averred much to show that Apple's anticompetitive conduct has had direct, deleterious effects on U.S. trade or commerce. (FAC, ¶¶ 239-55.) Further, these effects have given direct rise to plaintiffs' injuries. (*Id.*)

Apple also makes spurious claims regarding that court's references to computer systems and instruments in the U.S. (MTD at 10-11.) But the references regarding connections to computers and instruments in the U.S., and to commissions paid in U.S. dollars, were made in evaluating plaintiff's assertion that "a foreign travel agent's access to a computer system based in the United States 'transforms' 'foreign commerce' into 'import commerce,'" even though the inquiry there should have focused on "the conduct of the defendants—not the plaintiffs." 303 F.3d at 303-304. Apple's bracketed insertion of "domestic" into an analysis cabined to the FTAIA's *import exception* is not supported by the text and thus is unavailing. (*Compare* MTD at 10-11, *with* 303 F.3d at 303-04.)

In short, plaintiffs' participation in the domestic marketplace further illustrates that there is no commerce with foreign nations here, within the meaning of the FTAIA.

**2.    Even if the FTAIA applied, the domestic-effects and export exceptions save plaintiffs' claims.**

**a.    Apple's anticompetitive conduct resulted in domestic effects that were the direct cause of plaintiffs' injuries, such that plaintiffs may proceed with their antitrust claims.**

But even if Apple had met its burden to demonstrate the applicability of the FTAIA, the domestic-effects exception to that Act, 15 U.S.C. 6a(1)(A), would save plaintiffs' claims. Here, the anticompetitive conduct alleged—including willful acquisition and maintenance of monopoly power

and abuses thereof—is *U.S. domestic conduct* undertaken by a U.S. company. Further, this "conduct has a direct, substantial, and reasonably foreseeable effect . . . on trade or commerce which is not trade or commerce with foreign nations." *Id.*

And it is this U.S. conduct, which "has a direct, substantial, and reasonably foreseeable effect" on domestic "trade or commerce," that has harmed plaintiffs and other France-resident developers directly, FAC, ¶ 241, just as it has harmed U.S.-resident iOS developers. *See Hui Hsiung*, 778 F.3d at 758 ("Conduct has a 'direct' effect for purposes of the domestic effects exception to the FTAIA if it follows as an immediate consequence of the defendants' activity.") (citation omitted). There was no attenuation or intervening causation—Apple simply applied its anticompetitive commission rates, policies, and practices, *as conceived and implemented in and from the U.S.*, to plaintiffs. After all, Figaro, L'Équipe, and other proposed class members had no choice but to transact with Apple to get their digital products to end-users. Under these circumstances, plaintiffs' France residency does not bar their claims; to the contrary, the FTAIA was not meant to, and does not, provide Apple with an escape from plaintiffs' efforts at redress. *See* 15 U.S.C. 6a(1)(A) and (2).

The FTAIA's legislative history explains the reason for its adoption, and what it was and was not meant to do. It thus illuminates the wording of the statute, so it bears excerpting at length:

> The intent of the Sherman and FTC Act amendments in H.R. 5235 is to exempt from the antitrust laws *conduct that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States-- e.g., price fixing not limited to the export market-- would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The conduct has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. Cf., e.g., Pfizer Inc., et al v. Government of India, et al, 434 U.S. 308 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny them this protection could violate the friendship, commerce and navigation treaties this country has entered into with a number of foreign nations.*
>
> *There are other reasons for preserving the rights of foreign persons to sue under our laws when the conduct in question has a substantial nexus to this country. As the Supreme Court pointed out in Pfizer, supra, 434 U.S. at 314-315, to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons.*
>
> *While H.R. 5235 preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business*, a different result will obtain when the conduct is *solely* export-oriented. Thus, a price-fixing conspiracy

1
2
3

directed *solely* to exported products or services, absent a spillover effect on the domestic marketplace (see Pt. E(2), *infra*), would normally not have the requisite effects on domestic or import commerce. Foreign buyers injured by *such* export conduct would have to seek recourse in their home courts.

\*\*\*

4
5
6
7
8
9

The Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons *when that injury arose from conduct with no anticompetitive effects in the domestic marketplace*. Consistent with this conclusion, the full Committee added language to the Sherman and FTC Act amendments to require that the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. *This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States. As previously set forth, it is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States*, or, in the case of conduct lacking such an impact, on an export opportunity of a person doing business in the United States.

10   H.R. Rep. 97-686, 1982 WL 25066, at \*2495, 2496-97 (1982) (capitalization normalized) (emphasis

11   added).

12        Consistent with the Act's legislative history, this Court has stated that the "locus of a

13   transaction is not dispositive under the FTAIA," which "does not state or support a *per se* rule

14   excluding foreign purchasers just because they did their buying abroad." *Batteries*, 2017 WL

15   2021361, at \*4 (citation omitted). So even if plaintiffs were considered "foreign purchasers" that

16   "did their buying abroad," they were injured by way of anticompetitive conduct impacting the

17   domestic commerce of the United States. For example, they paid *the* supracompetitive rates set and

18   charged in the United States. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835,

19   844 (N.D. Cal. 2011) (denying motion to dismiss where plaintiffs alleged sufficiently for purposes of

20   the "domestic injury exception" that "U.S. prices therefore were not simply 'the source of' the

21   foreign prices; both the domestic and foreign prices were one and the same.").

22        As for Apple's attempted counter to the domestic-effects exception, its reliance on *In re*

23   *Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981 (9th Cir. 2008), and

24   *Empagran* is misplaced. Plaintiffs do not allege that effects from a "price-fixing conspiracy" gave

25   rise to "foreign injury," *DRAM*, 546 F.3d at 988, or that an "international price-fixing arrangement"

26   with roundabout domestic effects led to their "foreign injury," *Empagran*, 542 U.S. at 175. Rather,

27   plaintiffs allege that Apple on its own behaves anticompetitively in the U.S. and uses its monopoly

28   power to set abusive prices and policies; these deleteriously affect U.S. commerce and *directly* harm

U.S. developers and non-U.S.-resident developers such as plaintiffs, wherever they reside, FAC, ¶ 241. *See TFT-LCD*, 785 F. Supp. 2d at 844 (referring to allegations that U.S. prices were not merely the source of foreign prices, but were one and the same).

> **b.      Per Apple itself, plaintiffs are exporters, such that plaintiffs may proceed with their antitrust claims**

As an *alternative* basis for an exception from the FTAIA, plaintiffs qualify as exporters as referenced therein, per Apple's designation of non-U.S.-resident iOS developers (including plaintiffs) as exporters and its requirements that they behave as such. (FAC, ¶¶ 244-49 and Ex. A, Schedule 1, ¶¶ 2.1-2.3.) The Act refers to "export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States," 15 U.S.C. § 6a(1)(B), and the policies and supra-competitive prices that Apple imposes on developers as exporters of iOS digital products has "direct, substantial, and reasonably foreseeable effect" on their sales *under Apple's own theory of how iOS digital product business is conducted.* (*See* MTD at 6-7.) As for Apple's claim that there is no injury to export business in the U.S. under this alternative theory, MTD at 12-13, the Act refers only to persons engaged in export trade or commerce in the U.S., 15 U.S.C. § 6a(1)(B), which Apple deems plaintiffs to be. (FAC, ¶ 246.) This meets the export exception to the FTAIA, particularly at this stage of the case, where plaintiffs have not been able to explore all the reasons for, and consequences of, Apple deeming them exporters. *See Gen. Elec. Co. v. Latin Am. Imps., S.A.*, 187 F. Supp. 2d 749 (W.D. Ky. 2001) (declining to dismiss Sherman Act counterclaims on motion to dismiss where foreign-company plaintiff alleged it was "engaged in U.S. export trade in its complaint").

> **3.      The balance of Apple's theories regarding the FTAIA are unavailing.**

Per the foregoing, the FTAIA does not affect the viability of plaintiffs' antitrust claims, despite Apple's assertions. Apple's remaining FTAIA arguments also do not compel dismissal.

> **a.      Apple's references to its *consumer-facing* digital storefronts are of no consequence.**

Apple's foreign-storefront characterizations, MTD at 2, 6-7, do not affect the viability of plaintiffs' claims. This case is about Apple's willful acquisition of monopoly power, and its abuses of that power, with respect to *developers*. The Supreme Court has recognized that Apple does

business with both developers and end-user consumers directly, but separately. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019). Apple itself observes that it sells app-related distribution services *to developers*. (FAC, ¶ 220.) Although there may be multiple *consumer-facing digital façades* of the App Store, there is only *one* App Store with which *developers* interact—the one U.S.-based and operated App Store. (*E.g., id.*, ¶¶ 3, 10, 244.) Thus, Apple's sales of the services at issue occur in the U.S. (*Id.*, ¶¶ 26, 67, 239.) Apple's "categorization" authorities, MTD at 9, are inapposite because *all* sales and purchases of iOS app-distribution and IAP services were and are directly affected by Apple's U.S. unlawful conduct. (*Id.*, ¶¶ 5, 239-42.) Which "storefront" *end-users consumers* interact with is irrelevant to claims based on plaintiffs' *developer* commerce with Apple.

**b.      Apple's references to ADI are unavailing.**

In a footnote, Apple raises its related company ADI as a supposed foreign participant in Apple's business with plaintiffs, evidently in an attempt to undercut plaintiffs' allegations as to their participation in the U.S. domestic marketplace. (MTD at 11 n.12.) But notably, Apple does not assert that ADI undertook any of the behavior that plaintiffs allege to be anticompetitive, *see id.*, nor was ADI the counter-party to the DPLA—Apple Inc. was. (FAC, Ex. A at 1.) Apple Inc.'s possible use of ADI to help perform certain of its duties as signatory to the contracts at issue could at most bear further inquiry and analysis. Indeed, Apple itself refers to ADI as a mere "intermediary," MTD at 11, which makes sense given that plaintiffs already have demonstrated that *Apple Inc.* pays them proceeds. (FAC, ¶ 244(i).) In short, Apple's references to ADI are unavailing.

**c.      Plaintiffs' state law claims are not barred by the FTAIA (nor any territorial limits).**

Because plaintiffs' federal antitrust claims are not subject to dismissal on the basis of the FTAIA, plaintiffs' state law claims are not subject to dismissal on that basis, either. Apple's claim that plaintiffs "acknowledge that the FTAIA can 'affect, bar, or limit plaintiffs' . . . state-law claims,'" MTD at 14, is disingenuous. Plaintiffs *actually* plead that, even under theories advocated by Apple, the FTAIA would not bar plaintiffs' claims. Plaintiffs allege Apple has undertaken unlawful behavior in the U.S., FAC, ¶¶ 258-78, specifically in California. (*Id.*, ¶¶ 283-85, 297-99.) That is, Apple, a California company headquartered in California, with its principal place of business

1   therein, *id.*, ¶ 34, has conducted itself unlawfully, per California law, by monopolizing the posited

2   markets, abusing its market power as alleged, and contravening the UCL. (*Id.*, ¶¶ 283-85, 297-99.)

3   And these actions, taken in California, have resulted in the harms alleged by plaintiffs.

4           Notably, *Apple* chose California law to govern this dispute. And California has a strong

5   interest in regulating and deterring unlawful behavior by a California corporate citizen and resident.

6   *See, e.g.*, *Wershba v. Apple Comput., Inc.*, 91 Cal. App. 4th 224, 243 (2001), (referring to "conduct

7   emanat[ing] from California,"); *see also In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009) (UCL

8   provisions focus "on the defendant's conduct, rather than the plaintiff's damages, in service of the

9   statute's larger purpose of protecting the general public against unscrupulous business practices.").

10  Further, the Cartwright Act and UCL are not co-extensive with federal antitrust law, so even if the

11  FTAIA were to apply to plaintiffs' federal claims, such would not automatically bar these state-law

12  claims. *See, e.g.*, *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160-161 (2015) (Cartwright Act is

13  "broader in range and deeper in reach than the Sherman Act") (citation omitted); *Epic Games*, 559 F.

14  Supp. 3d at 1053-55 (UCL is broader than Sherman and Cartwright Acts, and reaches "incipient"

15  violations of antitrust laws).

16          Apple's other assertions—that plaintiffs' claims fail because California law was not meant to

17  apply to "extraterritorial conduct," or exterritorialy, MTD at 14—likewise fail because plaintiffs

18  copiously allege that Apple's bad conduct took place in California. (*E.g.*, FAC, ¶¶ 244, 253-254.)

19  Apple's authorities do not counsel dismissal under these circumstances. *See Ubiquiti Networks, Inc.*

20  *v. Kozumi USA Corp.*, 2013 WL 368365 at *9 (N.D. Cal. Jan. 29, 2013) ("Defendants' failure to

21  explain how Plaintiff's conduct undermined competition in domestic markets means that they have

22  similarly failed to explain how Plaintiff's conduct undermined competition in a California market

23  [under the Cartwright Act]."); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094

24  (N.D. Cal. 2019) ("[The UCL] appl[ies] where the relevant conduct occur[s] in California.")

25  (citations omitted). At most, Apple raises issues of material fact as to its conduct.

26

27

28

1

2

    **d.**  **"Comity" also not give rise to dismissal, either on the basis of the FTAIA or otherwise.**

3

    Apple also invokes international comity, which "is the recognition which one nation allows

4

within its territory to the legislative, executive, or judicial acts of another nation, having due regard

5

both to international duty and convenience, and to the rights of its own citizens, or of other persons

6

who are under the protection its laws." *Cruz v. United States*, 387 F. Supp. 2d 1057, 1069 (N.D. Cal.

7

2005) (citation omitted). Comity is an affirmative defense for which the moving party bears the

8

burden of proof. *Id.* But Apple has not met that burden, as it points to no "legislative, executive, or

9

judicial act[]" to which the Court should defer. Mere investigations, like those undertaken by the

10

European Commission, do not qualify as "acts" that counsel deference. *Cf. id.* at 1069-1070 (denying

11

motion to dismiss on comity grounds despite recommendations issued by a special commission of

12

the Mexican Congress). Also, Apple points to no rulings from the French Competition Authority

13

regarding Apple's monopoly over the market for iOS apps and IAP. In any event, Apple has not

14

explained how a decision by this Court to abstain would demonstrate "due regard" to the rights of

15

plaintiffs in this case under the U.S. federal and California laws that Apple chose to govern this

16

matter, *Cruz*, 387 F. Supp. 3d at 1069. *See* H.R. Rep. 97-686, 1982 WL 25066, at *at 2495 ("Foreign

17

purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our

18

citizens do.") (capitalization normalized). Apple's comity theory does not give rise to dismissal.

19

    *Finally*, as to all of Apple's FTAIA-based challenges, it would be improper to dismiss

20

plaintiffs' antitrust or other claims on a Rule 12(b)(6) motion. *See Batteries*, 2017 WL 2021361, at

21

*5 ("The Court finds the allegations of proximate causation sufficient as a pleading matter and

22

declines to reach the merits of plaintiffs' theory without further factual development."); *see also In re*

23

*Capacitors Antitrust Litig.*, 2016 WL 5724960, at *1-2, 4 (N.D. Cal. Sept. 30, 2016) (discussing

24

summary judgment procedures for deciding FTAIA issues, where evidence was and could be

25

adduced). Should the Court hesitate to rule outright that Apple's FTAIA defense is unavailing

26

without further inquiry, then discovery should continue toward further factual development and

27

resolution at a later date, perhaps on summary judgment if not at trial, per *Batteries* and *Capacitors*,

28

      - 14 -

1    as well as the Ninth Circuit's conclusion that the FTAIA raises substantive merits issues, *Hui*

2    *Hsiung*, 778 F.3d at 751.

3    **B.      Apple's implementation of ATT is another redressable abuse of its monopoly power.**

4            Apple apparently challenges plaintiffs' right to seek relief with respect to its ATT regime—a

5    recent program that mandates certain advertising-related developer terms, *see* FAC, ¶¶ 198-201—

6    only insofar as plaintiffs' Sherman Act claims are concerned. (MTD at 3, 6, 14-17.) It makes no

7    mention of plaintiffs' UCL or Cartwright Act claims insofar as those Acts provide for redress as to

8    ATT.

9            Where plaintiffs' Sherman Act claim is concerned: Apple's implementation of its ATT

10   regime is another abuse of its monopoly power in the services market that plaintiffs have pled. (FAC,

11   ¶¶ 198-202.) Apple can implement ATT because it is the sole gateway between developers and

12   customers for their iOS apps; it has monopolized iOS app-distribution services, so it can cut off

13   developers from distributing their iOS digital products to end-users if they do not adhere to its

14   policies.

15           ATT *requires* developers, including Figaro, L'Équipe, and le GESTE's developer members

16   to conform to its ATT requirements if they wish to "track" consumers for advertising purposes—a

17   concept defined by Apple for purposes of the program. (FAC, ¶¶ 200 (*citing* "Mobile Ecosystems:

18   Market Study Final Report," U.K. Competition & Markets Authority (CMA Final Report), at 236-

19   40.) This definition of "tracking" advantages Apple. (*Id.*, ¶ 200.) Further, Apple's program rules

20   inhibit consumers from making truly informed choices about whether to opt-in or out of "tracking";

21   Apple also prohibits developers, including Figaro and L'Équipe, from incentivizing consumers in

22   exchange for opting-in. (*Id.*, ¶ 201 and Ex. B at 3.2.2(vi) (per new ATT provision, developers may

23   not pay or otherwise compensate consumers for enabling tracking); *see also* CMA Report at 235

24   (discussing Apple's prohibition on incentivizing consumers to opt-in).) So this is *not* benignly

25   offering consumers more choice, *cf. Blix Inc. v. Apple Inc.*, 2021 WL 2895654, at *4 (D. Del. July 9,

26   2021) (developers only required to offer Apple's SSO product if they offered another); it is a ham-

27   fisted injection of Apple between developers and *their* app customers undertaken as yet another

28   abuse of its monopoly power, as plaintiffs allege. (FAC, ¶¶ 198-201.) (Accordingly, developers do

1   not "acknowledge that ATT is 'good for end-user consumers.'" (MTD at 15.) In falsely portraying

2   plaintiffs' view in this regard, Apple omits their framing of the partially excerpted allegation with

3   *ostensibly*, as well as plaintiffs' immediately following allegations that "Apple's ATT program will

4   mean less free-to-get apps [available for consumers]; developers will forgo creating them, or will

5   begin to charge fees for heretofore free-to-get apps, because they will be unable to make a living by

6   means of advertising." (FAC, ¶ 199.))

7           Monetization for free-to-get apps ought properly to be worked out between developers and

8   their customers—particularly when Apple's implementation of ATT is tilted to Apple's commercial

9   advantage. (*See* FAC, ¶¶ 200, 202.) Apple's cramming of 1.8 million apps into *one* iOS app store

10  frequently requires app-install advertising, and now Apple has made its App Store search ads more

11  attractive by unfair means, and more expensive, too (when already they were uniquely advantaged

12  because Apple exclusively controls App Store space). (*Id.*, ¶ 202.)

13          Figaro and L'Équipe, as well as le GESTE's developer members, have suffered "concrete and

14  particularized" injury that is "actual or imminent," as required for Article III standing, *see Spokeo,*

15  *Inc. v. Robins,* 578 U.S. 330, 339 (2016), by way of Apple's implementation of ATT: the program

16  presently inhibits how they can utilize space within *their*—not Apple's—free-to-get apps, and within

17  *their*—not Apple's—subscription in-app products, for paid advertising. (*See* FAC, ¶¶ 199-201.) This

18  affects the number of transactions within plaintiffs' posited market. Apple, via ATT, also affects the

19  availability of, and innovation as to, apps, particularly free-to-get apps, as it hijacks the

20  developer/end-user relationship and developers' ability to monetize. (*Id.*, ¶ 199.) And it also affects

21  developers' ability to have their apps seen and downloaded, due to its deleterious effects on app-

22  install advertising. (*Id.*, ¶ 202.) Figaro, L'Équipe, and le GESTE's developer members are, therefore,

23  the "immediate victims" of Apple's antitrust violations. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d

24  538, 542 (9th Cir. 1987) (*citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of*

25  *Carpenters*, 459 U.S. 519, 541 (1983)). All of this, in turn, injures competition in the pled app-

26  distribution and IAP services market: fewer and less-innovated apps available and distributed to

27  consumers also means fewer sales of these distribution services (including with respect to in-app

28  products).

1   ATT as a required program should be rescinded or altered, by injunction if necessary. *See,*

2   *e.g., Spokeo,* 578 U.S. at 338 (Article III standing requires that injury is "likely to be redressed by a

3   favorable judicial decision"). At the very least, plaintiffs' claims as to ATT, including its effect on

4   competition in the posited market, raise issues of material fact that require resolution before their

5   disposition.

6   **C.   Le GESTE, an association representing certain iOS developers, may proceed with its claims for non-monetary relief.**

7   

8   Le GESTE has standing to sue in its own right because Apple's actions have caused it

9   concrete injuries. It also has associational standing, as well as federal and state statutory standing.

10   **1.   Le GESTE has standing to sue in its own right.**

11   The Ninth Circuit has held that "an organization has direct standing to sue where it

12   establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in

13   response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th

14   Cir. 2021). Given these criteria, le GESTE has direct standing to sue. Apple's anticompetitive

15   behavior is anathema to le GESTE's goal of ensuring competitive markets for online publishers,

16   FAC, ¶ 62, because it undermines competition in the app world (which many online publishers use to

17   broadcast their work). Apple's misconduct therefore presents an injury to le GESTE's organizational

18   mission. *Cf. La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083,

19   1088 (9th Cir. 2010). Apple's citation to *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477

20   (1977), to claim that le GESTE's injury must be a direct antitrust injury (MTD at 18) is not

21   persuasive here because that case did not address the requirements for *associational* standing under

22   federal or state antitrust laws. (*See also* Sec. IV(C)(3), *infra* (discussing le GESTE's associational

23   standing under both federal and state antitrust laws).)

24   Finally, Apple's argument that le GESTE's injury does not qualify under the FTAIA as an

25   "effect" that proximately causes le GESTE's harm is irrelevant. As Plaintiffs have already explained,

26   the FTAIA does not apply here. (*See* Sec. IV(A)(2), *supra*.) Further, Apple has made this argument

27   in one of its many substantive-argument footnotes, so it ought to be ignored, as should all such

28   arguments. *See Trump v. Intuitive Surgical, Inc*., 2020 WL 3163185, at *6 n.4 (N.D. Cal. June 12,

1    2020) ("A footnote is the wrong place for substantive arguments on the merits of a motion,

2    particularly where such arguments provide independent bases for dismissing a claim not otherwise

3    addressed in the motion.") (citation omitted); *see also* Order Striking Pls.' Reply Brief in Supp. of

4    Class Certification, *Hatamian v. Advanced Micro Devices*, N.D. Cal. No.: 14-cv-00226-YGR (Dec.

5    8, 2015), at ECF. No. 166 therein.

6         In response to Apple's actions, le GESTE "diverted and devoted" significant human and

7    financial resources "to research, investigate, and analyze these specific iOS app-distribution and

8    IAP-related issues." (FAC, ¶ 62.) Plaintiffs described this diversion of resources in detail, noting that

9    "all four of le GESTE's permanent employees" have set aside other matters that are central to le

10   GESTE's mission to focus on "addressing Apple's anticompetitive practices." (*Id.*, ¶ 63.) Le GESTE

11   has been forced to deprioritize "several planned projects concerning media corporate social

12   responsibility; research to address issues around emerging technologies, including artificial

13   intelligence; and a project to publish guidelines on the ad tech value chain." (*Id.*, ¶ 63.) Postponing

14   these activities "has significantly interfered with le GESTE's mission" of "advocat[ing] generally for

15   competitive markets for online publishers." (*Id.*, ¶¶ 62, 63.) Le GESTE specifically disavows that

16   any of these efforts were "in anticipation of litigation, or for litigation purposes." (*Id.*)

17        **2.    Le GESTE has associational Article III standing to sue on behalf of its members.**

18        In addition to having standing to sue in its own right, le GESTE also has associational

19   standing under the *Hunt* test because "(a) its members would otherwise have standing to sue in their

20   own right; [and] (b) the interests it seeks to protect are germane to [its] purpose." *Hunt v. Wash. State*

21   *Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

22        **a.    Le GESTE can rely on its members' standing for associational standing**
              **purposes.**

23

24        Aside from the FTAIA issues briefed above, Apple does not contest that Figaro and L'Équipe

25   have individual standing to sue. Apple's argument that Figaro and L'Équipe's individual standing

26   cannot provide associational standing for le GESTE, simply because those entities have also sued

27   Apple in their individual capacity, has no basis in any of the caselaw Apple cites. Furthermore, other

28   members of le GESTE—including TF1, M6, France TV, Radio France, Groupe Canal+, RTL, and

1   Deezer—also have standing to sue in their own right. As plaintiffs alleged in their Amended

2   Complaint, these developers have been harmed by Apple's anticompetitive behavior because they

3   "have paid Apple's mandatory USD $99 annual developer fee" and are subject to Apple's 30%

4   default commission on sales. (FAC, ¶ 56.) Because its members have standing to sue, le GESTE

5   meets the first requirement of the *Hunt* test.

   **b.    Allegations of le GESTE's purpose are sufficient to prevail against Apple's challenge on a motion to dismiss.**

7        Le GESTE is seeking injunctive relief to prevent Apple from engaging in anticompetitive

8   behavior that directly affects online publishers who participate in the market via iOS apps. (*Id.* ¶¶

9   266, 278, 285, 288, 298.) This litigation therefore is germane to le GESTE's mission to promote

10  "competitive markets for online publishers." (*Id.*, ¶ 62.) Apple's citation to *Med. Ass'n of State of

11  Ala. v. Schweiker*, 554 F. Supp. 955 (M.D. Ala. 1983), does not change this analysis. In that case, an

12  association attempted to represent its members, all of whom were physicians, in their capacity as

13  taxpayers. The court denied standing to the Association because there was no "reasonable

14  connection" between the organization's objectives in the litigation and "the reasons the members

15  joined the organization." *Id.* at 965. But here, online publishers joined le GESTE knowing its

16  mission of ensuring competitive markets for them. (FAC, ¶ 62.) At the very least, determining

17  whether a sufficient nexus exists between le GESTE's stated goals and the subject matter of this suit

18  is a question of material fact that cannot be answered at this stage of the proceedings.

19       Apple's theory that a conflict of interest among le GESTE's members precludes associational

20  standing also fails. In *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d

21  1401 (9th Cir. 1991), which Apple itself cites, the Ninth Circuit explicitly "reject[ed] the invitation to

22  expand our interpretation of *Hunt*'s third prong to require that no actual or potential conflict exist

23  between the organization's members." *Id.* at 1408. Organizations should resolve conflicts "through

24  [their] own internal procedures," and courts should not intervene "through limitations on standing."

25  *Id.* at 1409. Apple's citations to other circuit court cases are irrelevant given that the Ninth Circuit

26  has directly ruled on this question.

27

28

**3.     Le GESTE's allegations also are sufficient for statutory standing purposes.**

Federal law: Contrary to Apple's claims, courts have regularly upheld associational standing in federal antitrust actions seeking injunctive relief pursuant to Section 16 of the Clayton Act. *See, e.g.*, *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 923 (7th Cir. 1995); *Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 689 (8th Cir. 1979); *Mission Hills Condo. Ass'n M-1 v. Corley*, 570 F. Supp. 453, 458 (N.D. Ill. 1983). Apple's citation to *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 540 (6th Cir. 2021), fails to note that the Sixth Circuit ultimately applied the associational standing test given "directly on-point precedent" from the Supreme Court. *Id.* at 542. And Apple's citation to one court's equivocal view on this question, expressed in preliminary injunction proceedings, rather than dispositively, in *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813 (N.D. Cal. July 8, 2005), ignores that this view is squarely a minority position. The majority of courts, including this Court in *Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*, 2007 WL 9734349, at *6 (N.D. Cal. May 14, 2007), find that organizations can seek associational standing under Section 16 of the Clayton Act. As such, le GESTE's allegations are sufficient for statutory standing purposes under Section 16 of the Clayton Act.

State law: As for state-law statutory standing, "federal courts are bound by decisions of the state's highest court." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976, 982 (9th Cir. 2017). In the absence of such a ruling, "a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions." *Id.*

California state courts have explicitly recognized associational standing for organizations seeking injunctive relief under the Cartwright Act. *See California Dental Ass'n. v. California Dental Hygienists' Ass'n*, 222 Cal. App. 3d 49, 61, 271 (1990). Because le GESTE seeks only injunctive relief under the Cartwright Act (FAC, ¶ 298), and because all the other elements of associational standing are met as described above, le GESTE demonstrates such standing.

While there is not yet a ruling by the Supreme Court of California regarding associational standing under the UCL since the passage of Proposition 64, again, there is well-reasoned intermediate-appellate court authority consistent with le GESTE's standing here. *See Animal Legal Def. Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1281 (2015) (granting organizational

standing under the UCL). While another appellate division in *California Med. Ass'n. v. Aetna Health of California Inc.*, 63 Cal. App. 5th 660 (2021), denied associational standing to a plaintiff organization after holding that Proposition 64 eliminated access to such standing, that ruling rests on the assumption that California voters intended to dismantle associational standing despite those words never appearing within the text of Proposition 64. Given that the UCL's purpose is to "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services," *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949 (2002), and that the outcome in *Animal Legal Def. Fund* is consistent with the California Supreme Court's decision in another key UCL case, *Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 317 (2011) (holding Proposition 64 should be read to "strip [] unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices"), the California Supreme Court is likely to find that organizations such as le GESTE have associational standing under the UCL where they have been actually harmed, as has le GESTE.

**D.    Plaintiffs' claims are timely; nor does laches bar any of them.**

      **1.    Plaintiffs' Sherman Act claims are timely; nor does laches bar them.**

Plaintiffs' Sherman Act claims for damages are timely because of the continuous violation doctrine, or alternatively, because plaintiffs entered into new contracts annually. (*Cf.* MTD at 22-23.) Furthermore, there is no statute of limitations for their claims for injunctive relief. *See, e.g.*, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014). And laches does not bar those claims per the four-year statute of limitations guideline that Apple itself references in its motion.

Although Figaro and L'Équipe entered into the DPLA in 2009, MTD at 22, plaintiffs allege that they have been subject to Apple's abuse within the four-year limitations period for antitrust damages claims. *See* 15 U.S.C. §15b; FAC, ¶¶ 80, 129, 215, 253 n.245. (Apple argues—in another footnote—that it "preserved its statute of limitations defense in *Cameron*," MTD at 21 n.21. But *Cameron* is a different case, and Apple never actually filed a motion to dismiss there.) Thus, per the continuing violation doctrine, plaintiffs' claims are timely. *See, e.g.*, *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (2014); *In re Glumetza Antitrust Litig.*, 2020 WL 1066934, *5-6 (N.D. Cal. Mar. 5, 2020). As the Ninth Circuit stated, "This standard is meant to differentiate

those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation." *Samsung*, 747 F.3d at 1202.

Here, nothing about plaintiffs' entry the first time into the DPLA established immutable obligations, such that "all of the harm occurred" at entry into the first contract (or upon the first overcharge or other abuse of monopoly power), and Apple points to none. *Cf. Samsung*, 747 F.3d at 1203 (referring to illustrative precedent where the Ninth Circuit "held that a cause of action accrued each and every time that a tourist was shepherded away from the plaintiff's non-preferred shop because even though the agreement predated the limitations period, the agreement itself did not 'immediately and permanently destroy' plaintiff's business nor did it cause irrevocable, immutable, permanent, and final injury.") (citation omitted); *Glumetza*, 2020 WL 1066934, at *5. In fact, Apple has altered its commission rate for certain developers and changed the terms of other restrictions, too, notwithstanding the terms of the DPLA, FAC, ¶¶ 17 n.18, 125, 128, which also have changed over time. And unlike the situation in the out-of-circuit case *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265 (S.D.N.Y. 2015), where the statute-of-limitations issue was decided *after discovery*, and not on a motion to dismiss, the parties enter into a new contract here, punctuated by the mandatory payment of a fee, every year. (FAC, ¶¶ 37, 47, 57.)

As for laches, it does not prevent plaintiffs' prosecution of their claims for injunctive relief. First, Apple provides no authority for the proposition that French-resident developers are under some obligation to learn of litigation undertaken by plaintiffs in the U.S. in order to seek redress under the laws and in a forum of Apple's choosing. Second, Apple offers no compelling reason to ignore the four-year guideline of the statute of limitations, which does not bar plaintiffs' claims based on injuries during the four-year limitations period for the reasons stated above. *Cf. Oliver*, 751 F.3d at 1087; *see also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) ("[A] laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable.") (citation omitted). There also is no prejudice to Apple. Plaintiffs allege that Apple inflicted anticompetitive, abusive acts during the four-year period before filing. (FAC, ¶ 80, 129,

1   215, 253 n.245.) Further, while Apple complains that it settled *Cameron* only to be faced with further

2   litigation, these are different plaintiffs not covered by *Cameron*'s negotiated release or the litigation

3   in that case. It was Apple that did nothing to try to dispose of claims by these *different* plaintiffs,

4   despite well-knowing that it subjects iOS developers worldwide to the same agreements and conduct,

5   pursuant to its self-same willfully acquired and maintained monopoly power.

6   **2.      Plaintiffs' UCL claims are timely; nor does laches bar them.**

7          Plaintiffs' UCL claims are timely just as their Sherman Act claims are timely. Apple's

8   unpublished authority, *Hameed v. IHOP Franchising LLC*, 520 Fed. App'x. 520 (9th Cir. 2013)

9   illustrates this. In *Hameed*, claims accrued on a date outside the limitations period "when the

10  contracts were formed." *Id.* at 522. Here, plaintiffs' claims accrued *at the earliest* under Apple's

11  theory when the parties entered into new yearly contracts. (*See* FAC, ¶¶ 37, 47, 57.) Likewise,

12  Apple's Developer Guidelines, which contain its anti-steering provisions, *cf.* MTD at 24, that

13  repeatedly and continually rob plaintiffs of the ability to communicate with their customers via their

14  digital products as they choose, *cf.* MTD at 6 n.5, also come into effect anew every year for

15  developers that opt to renew the DPLA, such that plaintiffs' claims for injunctive relief are timely.

16  (MTD at 24.) Further, continuous accrual would apply here since, unlike in *Hameed*, plaintiffs here

17  claim that there are "recurring wrongful act[s]," including payments of super-high commissions

18  during the limitations period. *Cf. Hameed*, 520 Fed. App'x. at 522; *see also Aryeh v. Canon Bus.*

19  *Sols.*, 55 Cal.4th. 1185, 1199 (2013) ("Generally speaking, continuous accrual applies whenever

20  there is a continuing or recurring obligation."). Finally, plaintiffs do allege continuous violations that

21  stem from a course of conduct, FAC, ¶¶ 17, 22. *Cf. Hameed*, 520 Fed. App'x. at 522.

22          As for laches—an argument Apple raises in yet another footnote—the "strong presumption"

23  is that it should not apply given plaintiffs' compliance with the statute of limitations, as Apple's own

24  authority states. *See, e.g.*, *Jarrow*, 304 F.3d at 835. Moreover, there is no unreasonable delay here,

25  where Apple's behavior are a function of contracts and guidelines that are entered into anew every

26  year, and effects that injuries that continually occur and constitute a deleterious course of action.

27  Further, unlike the defendant in *Jarrow*, upon which Apple relies, there is no prejudice to Apple

28  from plaintiffs seeking redress under these circumstances, where injuries continue to accrue. *Cf. id.*

at 840 (prejudice noted where defendant had invested sums into presentation of its product to the product over the period of delay). Moreover, at most, laches in proper circumstances applies only in determining a UCL *remedy*, not to preclude a UCL cause of action, such that laches should not be applied on the instant motion to bar plaintiffs' UCL *claims*. *E.g.*, *Stuart v. Radioshack Corp.*, 2009 WL 281941, at *7 n.1 (N.D. Cal. Feb. 5, 2009).

### 3. Plaintiffs' Cartwright Act claims are timely and otherwise viable.

Without authority, Apple contends that plaintiffs' Cartwright Act claims are untimely per the applicable four-year statute of limitations. Apple's theory is that plaintiffs' entry into their contracts with it began the running of the limitations period. But again, plaintiffs entered into these contracts every year anew, and paid a new program fee just as they did with the first contract. Apple would not have allowed them to distribute their digital products under the last year's contract, FAC Ex. A, ¶ 11.1, so the limitations period began again every year. Further, the continuous accrual doctrine applies to preserve their claims as well. *See Aryeh*, 55 Cal.4th. at 1192, 1198-99.

Apple also argues in another improper footnote, on the basis of state trial court rulings that cannot be relied upon as reflecting settled law, *see, e.g.*, *Alexander v. Select Comfort Retail Corp.*, 2018 WL 6726639, at *3 (N.D. Cal. Dec. 21, 2018) (Gonzalez Rogers, J.), that plaintiffs' Cartwright Act fails because the "statute requires a 'combination of more than one actor.'" (MTD at 25 n.28) Apple further takes issue with respect to the concept of a coerced agreement. (*Id.*) But this Court disagreed with a similar argument Apple made in the *Epic Games* matter, where Apple contended that plaintiff's claim failed for failure to show "concerted action" as distinct from "unilateral conduct." 559 F. Supp. 3d 1048 n.624. As the Court noted, the DPLA might "include particular terms that would constitute unreasonable restraints of trade," per plaintiff's complaint. *Id.* Here, too. (*See* FAC, ¶¶ 80-86, 168-170, 292-294.) In any event, even if Apple had properly supported its theory, it would at best raise issues that require factual development for disposition—including as to whether there was a "coerced" agreement. (*Cf.* MTD 25 n.28.)

### E. Plaintiffs may proceed with their alternative claims for restitution.

Finally, Apple is wrong that Figaro and L'Équipe cannot proceed with their claims for restitution under the UCL. (MTD at 25.) The parties are at the pleading stage, before the

development of the record. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), is inapplicable because restitution claims in that case were addressed "[o]n the brink of trial, after more than four years of litigation," and after plaintiff sought to create conditions for restitution by dismissing her sole claim for damages. *Id.* at 837-38. Further, in that case, "[b]oth sides took discovery, engaged in motion practice, and prepared for the looming jury trial," and "nothing *in the record*," *i.e.*, the developed record, supported the conclusion that "the same amount of money for the exact same harm [wa]s inadequate or incomplete." *Id.* (emphasis added). Under these circumstances, *Sonner* does not require dismissal of plaintiffs' claims for restitution, which they have pled in the alternative, FAC, ¶¶ 227, 284, 287, and given their plea that such relief would obtain should there be no adequate remedy at law, *id.*, Prayer for Relief Sec. D. *See Warren v. Whole Foods Mkt. California*, 2022 WL 2644103, at *9-10 (N.D. Cal. July 8, 2022) ("*Sonner* has limited applicability to the pleading stage and the general liberal policy courts have toward pleading in the alternative allow[s] the equitable restitution claim to proceed past the pleading stage even though the plaintiff [is] also seeking contract damages."). Respectfully, plaintiffs should be allowed to proceed with their alternative restitution claim, which can be revisited if needed following discovery and development of the record. *See id.* at *9.

## V.    CONCLUSION

For the foregoing reasons, Apple's motion should be denied in its entirety. Alternatively, plaintiffs should be permitted to amend their complaint as needed to preserve each and every of their claims. Given Apple's forum-selection provisions, such leave should include, as necessary, the right to plead the applicability of French or European Union law herein if the Court were to conclude at this time, notwithstanding the lack of a factual record, that the FTAIA bars any of plaintiffs' claims.

DATED: February 10, 2023

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Steve W. Berman_____
          Steve W. Berman
Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Ben M. Harrington
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
abigailp@hbsslaw.com

*Attorneys for Plaintiffs Société du Figaro, SAS;*
*L'Équipe 24/24 SAS; le GESTE; and the Proposed*
*Classes*