CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
crichman@gibsondunn.com
VICTORIA C. GRANDA (D.C. Bar No. 1673034; *pro hac vice*)
vgranda@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

DANIEL G. SWANSON (SBN 116556)
dswanson@gibsondunn.com
DANA LYNN CRAIG (SBN 251865)
dcraig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY (SBN 268644)
chigney@gibsondunn.com
ELI M. LAZARUS (SBN 284082)
elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SOCIÉTÉ DU FIGARO, SAS, a French simplified joint-stock company; L'ÉQUIPE 24/24 SAS, a French simplified joint-stock company, on behalf of themselves and all others similarly situated; and LE GESTE, a French association, on behalf of itself, its members, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | CASE NO. 4:22-cv-04437-YGR <br><br> **DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** <br><br> **Hearing:** <br> Date: March 14, 2023 <br> Time: 2:00 p.m. <br> Place: Courtroom 1 <br> Judge: Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn & Crutcher LLP

# **TABLE OF CONTENTS**

Page

I.    PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA ..................... 1

      A.    The FTAIA Applies to Alleged Restraints on Plaintiffs' Foreign-Storefront
            Transactions That Involve Foreign Commerce .............................................. 1

      B.    Plaintiffs Plead No Plausible Exception to the FTAIA ................................. 4

            1.    Plaintiffs' Claims Do Not Arise from Any Alleged Domestic Effect ............. 4

            2.    Plaintiffs' Claims Do Not Arise from Any Alleged Effect on U.S.
                  Exports ...................................................................................... 5

      C.    State Antitrust Law Does Not Reach Foreign Commerce ............................. 6

II.   PLAINTIFFS ARE BARRED FROM CHALLENGING APPLE'S ATT FEATURE ........... 6

III.  PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS ........................ 8

      A.    Le GESTE Cannot Sue in Its Own Right .................................................... 8

      B.    Le GESTE Lacks Article III Standing to Sue on Behalf of Its Members ................... 9

      C.    Le GESTE Lacks Statutory Standing to Sue on Behalf of Its Members ................... 10

IV.   PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES ..................... 12

V.    PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED ........................................... 13

VI.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR LEAVE TO
      AMEND THEIR COMPLAINT AGAIN ................................................................ 14

VII.  CONCLUSION ........................................................................................ 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
465 F.3d 1123 (9th Cir. 2006)..........................................................................................9

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*,
46 Cal. 4th 993 (2009) ...................................................................................................11

*Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999)..........................................................................................9

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
465 F.3d 946 (9th Cir. 2006)..........................................................................................14

*Animal Legal Def. Fund v. LT Napa Partners LLC*,
234 Cal. App. 4th 1270 (2015) ......................................................................................11

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
808 F.3d 144 (2d Cir. 2015)...........................................................................................15

*Aryeh v. Canon Bus. Solutions, Inc.*,
55 Cal. 4th 1185 (2013) ...........................................................................................12, 13

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531 (6th Cir. 2021) ..........................................................................................11

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983).........................................................................................................7

*Associated General Contractors of North Dakota v. Otter Tail Power Co.*,
611 F.2d 684 (8th Cir. 1979)..........................................................................................10

*Blix Inc. v. Apple Inc.*,
2021 WL 2895654 (D. Del. July 9, 2021) .......................................................................8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).........................................................................................................9

*Cal. Dental Ass'n. v. Cal. Dental Hygienists' Ass'n*,
222 Cal. App. 3d 49 (1990) ...........................................................................................12

*Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
137 S. Ct. 2042 (2017)...................................................................................................12

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986).......................................................................................................10

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Cervantes v. Countrywide Home Loans, Inc.*,
  656 F.3d 1034 (9th Cir. 2011).....................................................................................................14

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).......................................................................................................................7

*Coalition for ICANN Transparency Inc. v. Verisign, Inc.*,
  2007 WL 9734349 (N.D. Cal. May 14, 2007) .............................................................................11

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001).......................................................................................................13

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ....................................................................................................7, 8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008).....................................................................................................4, 6

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021).........................................................................................................8

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)...............................................................................................................2, 4, 5

*Fin. & Sec. Prods. Ass'n v. Diebold*,
  2005 WL 1629813 (N.D. Cal. July 8, 2005) ...............................................................................10

*Freeman v. Continental Gin Co.*,
  381 F.2d 459 (5th Cir. 1967).......................................................................................................15

*FTC v. Qualcomm*,
  969 F.3d 974 (9th Cir. 2020).....................................................................................................7, 8

*Giordano v. Saks Inc.*,
  2023 WL 1451534 (E.D.N.Y. Feb. 1, 2023)................................................................................12

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993).......................................................................................................................1

*Julian v. TTE Tech., Inc.*,
  2020 WL 6743912 (N.D. Cal. Nov. 17, 2020).............................................................................13

*Kwikset Corp. v. Super. Ct.*,
  51 Cal.4th 310 (2010) ..................................................................................................................11

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010).......................................................................................................8

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Lee v. Am. Nat. Ins. Co.*,
260 F.3d 997 (9th Cir. 2001) .................................................................................6

*Legal Aid Soc. of Hawaii v. Legal Servs. Corp*,
145 F.3d 1017 (9th Cir. 1998) ...............................................................................9

*In re Lithium Ion Batteries Antitrust Litig.*,
2017 WL 2021361 (N.D. Cal. May 12, 2017) .......................................................1

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ..................................................................................3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...............................................................................................7

*Minden Pictures, Inc. v. Pearson Edu., Inc.*,
2013 WL 71774 (N.D. Cal. Jan. 7, 2013) ............................................................14

*Mission Hills Condominium Ass'n M-1 v. Corley*,
570 F. Supp. 453 (N.D. Ill. 1983) ........................................................................11

*Morrison v. Viacom, Inc.*,
66 Cal. App. 4th 534 (1998) ..................................................................................9

*Pace Indus., Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) ...............................................................................12

*Rotella v. Ward*,
528 U.S. 549 (2000) .............................................................................................12

*Sanner v. Bd. of Trade of City of Chi.*,
62 F.3d 918 (7th Cir. 1995) .................................................................................10

*Schiff v. City & Cnty. of San Francisco*,
2011 WL 573825 (N.D. Cal. Feb. 14, 2011) .......................................................15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) .......................................................6

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ...............................................................................................9

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*,
830 F.2d 1374 (7th Cir. 1987) .........................................................................10, 11

*In re TFT-LCD Antitrust Litig.*,
2012 WL 3763616 (N.D. Cal. Aug. 29, 2012) .......................................................5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Turicentro, S.A. v. Am. Airlines Inc.*,
 303 F.3d 293 (3d Cir. 2002)...........................................................................1, 3

*United States v. Brown Univ.*,
 5 F.3d 658 (3d Cir. 1993)......................................................................................8

*Verizon Commc'ns. Inc. v. Law Off. of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)..............................................................................................7

**STATUTES**

15 U.S.C. § 6a ..........................................................................................1, 3, 4, 5

15 U.S.C. § 26 ....................................................................................................10

**OTHER AUTHORITIES**

H.R. Rep. No. 97-686 ...........................................................................................4

**REGULATIONS**

15 C.F.R. § 772.1 ..................................................................................................5

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 3 ..................................................................................6

Gibson, Dunn &
Crutcher LLP

Plaintiffs do not (and cannot) muster an effective response to Apple's Motion to Dismiss Plaintiffs' Amended Complaint (Dkt. 61). In their opposition, Dkt. 67 ("Opp."), plaintiffs fail to refute that: (1) their foreign-sales claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a; (2) their claim challenging Apple's App Tracking Transparency ("ATT") functionality fails both for lack of Article III standing and for failure to plead any plausible injury to competition in any relevant advertising market; (3) le GESTE has no standing to sue in any capacity; (4) their complaint is time-barred because of their inexcusable decade-long delay in bringing suit; and (5) restitution is unavailable because they have not alleged that damages would be an inadequate remedy. In view of these insurmountable obstacles, and despite having already amended their complaint, plaintiffs ask this Court to allow a further opportunity to amend, this time for the purpose of adding claims under French or European Union ("EU") law. But amendment will only result in further fruitless expenditure of judicial and party resources. The First Amended Complaint (Dkt. 48, "FAC" or "complaint") should be dismissed with prejudice and without leave to amend.

## I.   PLAINTIFFS' FOREIGN-SALES CLAIMS ARE BARRED BY THE FTAIA

### A.   The FTAIA Applies to Alleged Restraints on Plaintiffs' Foreign-Storefront Transactions That Involve Foreign Commerce

As a general rule, the FTAIA places all nonimport "conduct involving trade or commerce . . . with foreign nations" outside the reach of U.S. antitrust laws.[1] 15 U.S.C. § 6a. Plaintiffs' suggestion (Opp. at 5-6) that Apple has not explained how commerce with "*foreign nations*" is at issue in this case is puzzling, particularly given that plaintiffs use the term in their complaint, FAC ¶ 201 (alleged conduct "affected, interstate commerce or trade or commerce with foreign nations"), and must be aware of its legal meaning. "The phrase 'trade or commerce with foreign nations' includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign." *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 301-02 (3d Cir. 2002) (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993)). The complaint unquestionably alleges such foreign

---

[1] Plaintiffs make no contention that the conduct at issue involves import commerce. That alone distinguishes this case from *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 2021361 at *1 (N.D. Cal. May 12, 2017), where there was a plausible allegation that import commerce was involved.

commercial transactions: French Developer Plaintiffs[2] are *France-resident* app developers (FAC ¶¶ 36, 46, 56) who transacted through the App Store's *French* storefront with consumers *in France* (*id.* ¶¶ 38, 48, 58) to sell *French-language content* at prices set in *foreign currency* with an Apple entity *in Ireland* acting as intermediary (Dkt. 48 at 210).  Plaintiffs' assertion that "[i]n this case, there is no 'foreign harm'" alleged in the complaint (Opp. at 6) is just not plausible.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 163 (2004) (FTAIA applies to "wholly foreign transactions" (emphasis omitted)).[3]

Ignoring the comprehensive involvement of foreign commerce evident on the face of the complaint, plaintiffs assert that the FTAIA does not apply at all because "they participated in the *domestic* marketplace by doing business with Apple Inc. . . . including by electronic means."  Opp. at 6.  But plaintiffs are quite unlike "France-resident visitors to the U.S. buying supracompetitively-priced goods . . . in a brick-and-mortar California store."  *Id.* at 5.  Plaintiffs are not U.S. visitors, and the commerce at issue with respect to foreign-storefront transactions does not involve the domestic sales of a "California store," much less a brick-and-mortar one.  Plaintiffs' complaint as to French (and other foreign) storefront transactions is necessarily all about "distribution" of apps and in-app content to Apple device owners *outside the United States*.  FAC ¶ 93 (Apple "shuts out all competition from app distribution and IAP services *to iOS device consumers*.") (emphasis added).

Plaintiffs argue that "[w]hich 'storefront' *end-users consumers* [sic] interact with is irrelevant based on plaintiffs' *developer* commerce with Apple," (Opp. at 12), but that is nonsensical because plaintiffs' own theory is that the relevant product that Apple sells to them is *distribution to iOS device users*.  FAC ¶ 83 (relevant product is distribution services for "apps and in-app products [that] were programmed and otherwise designed for use on for use on iOS-powered devices"); *id*. ¶ 92 n.77 ("there is no approved way to distribute iOS apps to end-user consumers writ large except through the App Store"); *id*. ¶ 217 ("plaintiff developers have nowhere to go to serve the iOS end-user market with their

---

[2] Figaro, L'Équipe, and members of le GESTE who are France-resident app developers are referred to collectively as "French Developer Plaintiffs."

[3] Plaintiffs assert that comity has no role to play here, Opp. at 14, but the Supreme Court in *Empagran* directed that interpretation of FTAIA should be guided by "principles of prescriptive comity."  542 U.S. at 169.

Gibson, Dunn &
Crutcher LLP

iOS native apps and in-app products—they need iOS app-distribution and IAP services"). "Distribution" to foreign end-users of Apple devices via foreign storefronts is wholly foreign commerce subject to the FTAIA.

Plaintiffs' reliance on "the governing contracts and guidelines between Apple and iOS developers" (Opp. at 7) does not and cannot change this fundamental reality—especially because those contracts expressly recognize the foreign nature of commerce through foreign storefronts with foreign consumers. *See* Dkt. 48 at 210 (DPLA agreement designating various foreign entities as agent and commissionaire for foreign storefronts).[4]  Plaintiffs also list a number of alleged facts that are connected to America in one way or another but are irrelevant under the FTAIA: that Apple Inc. is a U.S. entity; that it drafted the terms of the DPLA in English;[5] that those terms include U.S. choice-of-law and forum selection clauses.[6]  Rather, what matters under the statute is whether the *commerce* at issue is import, export, foreign, or domestic. 15 U.S.C. § 6a.  Fundamentally *foreign commerce* cannot be transmuted into domestic commerce by reciting mere connections with the U.S. economy. *Turicentro, S.A. v. American Airlines Inc.* teaches that Sherman Act jurisdiction cannot be conjured by alleging "a legion of activities transacted by foreign merchants with some connection to instruments in the United States economy—a telephone, a fax machine, an Internet connection."  303 F.3d at 304. Plaintiffs dispute this (Opp. at 8), but they articulate no limits to their sweeping claim that all digital activity worldwide involving Apple's App Store is, without more, subject to the Sherman Act.

---

[4] While acknowledging that Apple Distribution International Ltd. (ADI) acts as an intermediary in supporting French Developer Plaintiffs' transactions with French consumers, Plaintiffs attempt to trivialize its role. Opp. at 12.  But having incorporated the DPLA and its Schedule 2 into the complaint, plaintiffs cannot ignore their terms.  ADI is a party to Schedule 2.  Dkt. 48 at 190 (offer of Schedule 2 made by Apple, defined to include Apple Subsidiaries).  And by the terms of Schedule 2, iOS developers appoint ADI as their commissionaire for sales to consumers in France, responsible for marketing and delivering developers' apps to consumers, collecting commissions from them, and remitting proceeds to developers. *Id.* at 210, 222.

[5] But also partly in French: "Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglaise," which confirms that the parties "have requested that this Agreement and all related documents be drafted in English."  FAC ¶ 231(b).

[6] Given that a U.S. choice-of-law clause cannot excise the FTAIA from the applicable body of U.S. law, *see Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 408-09 (2d Cir. 2014), plaintiffs no longer argue (as they once seemed to, *see* FAC ¶¶ 225-26) that the DPLA's choice-of-law provision alone shields them from the FTAIA.

Plaintiffs seek far more than the FTAIA's text or governing case law will support.

**B.    Plaintiffs Plead No Plausible Exception to the FTAIA**

**1.    Plaintiffs' Claims Do Not Arise from Any Alleged Domestic Effect**

Plaintiffs' next argument for evading the FTAIA is that "the domestic-effects exception to that Act would save plaintiffs' claims."  Opp. at 8 (citation omitted).  But that escape route is barred by the Supreme Court's decision in *Empagran,* which plaintiffs misread.  *Id.* at 6, 10.  As was true in *Empagran*, the "higher foreign prices of which the foreign plaintiffs here complain" are attributed to alleged "conduct [that] significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect."  542 U.S. at 164.  Even if domestic and foreign conduct are "intertwined," "Congress did not seek to forbid any such conduct insofar as it . . . causes independent foreign harm." *Id.* at 165-66.

Plaintiffs' reliance on the "legislative history" (Opp. at 9-10) from a draft version of the FTAIA *that was not enacted* (*see* H.R. Rep. No. 97-686 at 1-17) has no bearing on the application of *Empagran* to this case and certainly does not validate plaintiffs' effort to litigate independent foreign harm.  The last page of the cited House report explains that an amendment was made to the bill—and that amendment, which was adopted and passed as part of the FTAIA, clarified that for the Sherman Act to apply, the effect on the U.S. economy must itself give rise to the plaintiffs' foreign injury.  *Id.* at 18; *see* 15 U.S.C. § 6a(2).  This imposes a standard of proximate (not mere but-for) causation.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008) (to "give rise to" a claim, an effect must have a "direct or proximate causal relationship" to the claim).  Here, French Developer Plaintiffs' alleged injury is that they paid an "excessive" commission on foreign-storefront transactions because Apple "shuts out all competition from app distribution and IAP services to [foreign] iOS device consumers."  FAC ¶ 93.  That injury is independent foreign harm: it is not alleged (much less plausibly alleged) to be proximately caused by any foreclosure of distribution to iOS device consumers in the United States, and accordingly, the FTAIA's domestic-effects exception is not available to plaintiffs here.  *See DRAM*, 546 F.3d at 988 (affirming dismissal of complaint because, "[a]pplying the proximate cause standard . . ., we conclude that the domestic effect of the

1    defendants' alleged price-fixing conspiracy did not give rise to [plaintiff's] alleged foreign injury so as

2    to satisfy the second prong of the FTAIA domestic injury exception.").

3              **2.      Plaintiffs' Claims Do Not Arise from Any Alleged Effect on U.S. Exports**

4              Finally, plaintiffs argue in the alternative (Opp. at 11) that if they do not qualify for a domestic-

5    effects exception, they should qualify for the FTAIA's exception for conduct harming "exporting

6    activities of one engaged in such activities within the United States." *Empagran*, 542 U.S. at 161.

7    Plaintiffs rest this argument entirely on the premise that "Apple deems plaintiffs to be" persons

8    "engaged in export trade or commerce in the U.S." Opp. at 11. But that is neither correct nor even

9    what plaintiffs actually allege. Plaintiffs' allegations point to language in the DPLA stating that: "You

10   hereby certify that all of the Licensed Applications You deliver to Apple under this Schedule 1 are

11   authorized for export from the United States to each of the regions designated by You under Section

12   2.1 hereof, in accordance with the requirements of all applicable laws, including but not limited to the

13   United States Export Administration Regulations, 15 C.F.R. Parts 730-774."[7]  That an app may be

14   authorized for "export" under Export Administration Regulations does not mean that plaintiffs (as

15   distinct from Apple) are doing any "exporting"[8] and, in any event, is irrelevant for purposes of

16   determining whether any plaintiff is "an American export competitor," *Empagran*, 542 U.S. at 161-62,

17   within the meaning of the FTAIA. "[D]efinitions arising under different statutes are irrelevant to

18   determining whether a good is an 'import' [or, here, an 'export'] under the FTAIA." *In re TFT-LCD*

19   *Antitrust Litig.*, 2012 WL 3763616 at *2 (N.D. Cal. Aug. 29, 2012).

20             Further, plaintiffs' argument that "the Act refers only to persons engaged in export trade or

21   commerce in the U.S.," Opp. at 11, ignores the last sentence of the FTAIA, which states that the

22   statute's export exception applies "only for injury to export business in the United States." 15 U.S.C.

---

23

24   [7] Plaintiffs do not quote this full language in FAC ¶ 244(f) but it is contained in the DPLA attached as
     an exhibit to the FAC. *See* Dkt. 48 at 176 (§ 2.3); *see also id.* at 192 (§ 2.3).

25

26   [8] Plaintiffs are not U.S. exporters within the meaning of the cited Export Regulations. As the DPLA
     makes clear, save for the developer's enumerated duties, "Apple will be responsible for compliance

27   with the requirements of the Export Administration Regulations in allowing end-users to access and
     download the Licensed Applications under this Schedule 1." Dkt. 48 at 176 (§ 2.3); *see also id.* at 192

28   (§ 2.3); 15 C.F.R. § 772.1 (defining "exporter" as "[t]he person in the United States who has the
     authority of a principal party in interest to determine and control the sending of items out of the United
     States.").

§ 6a; *see also DRAM*, 546 F.3d at 986 (The FTAIA "clarifies that U.S. antitrust laws concern the protection of '*American* consumers and *American* exporters, not foreign consumers or producers'" (citation omitted)).  Plaintiffs are "France-resident" developers who do business in France.  FAC ¶¶ 33, 42, 231(e).  Apple has not deemed them to be American or to have an export business based in the United States.  FAC ¶ 231(e) (quoting Apple website noting that export regulations apply to apps "*regardless* of where your legal entity is based").  Plaintiffs cannot escape the bar of the FTAIA.

### C.     State Antitrust Law Does Not Reach Foreign Commerce

Plaintiffs cannot deny (and do not contest) that the FTAIA applies to state-law claims.  A contrary position would infringe on Congress's "express power to 'regulate Commerce with foreign Nations,'" and frustrate the congressional purpose of the FTAIA.  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313 at *4 (N.D. Cal. Dec. 31, 2010) (quoting U.S. Const. art. I, § 8, cl. 3).  Instead, plaintiffs argue that California's Unfair Competition Law and Cartwright Act are "not co-extensive with federal antitrust law" and so an FTAIA bar on their federal claim might "not automatically bar these state-law claims."  Opp. at 12-13.  But plaintiffs do not explain why the foreign-storefront conduct at issue in their California claims is any less foreign than the conduct in their federal claim that is subject to the FTAIA.  *See* Mot. at 13-14.  And the California laws that plaintiffs invoke do not extend to foreign commerce in any event.  *Id.* at 14.  The cases cited by plaintiffs (Opp. at 13) do not hold otherwise.  Accordingly, plaintiffs' state-law foreign-storefront claims are barred.

## II.     PLAINTIFFS ARE BARRED FROM CHALLENGING APPLE'S ATT FEATURE

Plaintiffs fail to plead standing to bring their challenge to Apple's App Tracking Transparency ("ATT") functionality.  Plaintiffs are wrong that this failing affects only their federal antitrust claims.  Apple seeks dismissal of all of plaintiffs' ATT claims based on their lack of Article III standing.  *See*, *e.g.*, Mot. at 15 ("[P]laintiffs have not pleaded causal injury in fact sufficient to support Article III standing.").  Article III standing is required for any claim, no matter the substantive law.  *See Lee v. Am. Nat. Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001) (regardless of whether a state-law claim could be brought in state court, in federal court a plaintiff must establish the requisite injury under Article III).

While plaintiffs focus their claim of standing on the ATT feature's alleged potential to affect

developers who wish to track consumers and deploy targeted advertising strategies, they do not respond to Apple's arguments about how plaintiffs have alleged *nothing* to suggest that they use those strategies themselves. *See* Mot. at 15. Plaintiffs do not plead that they have ever engaged in consumer tracking and targeted advertising, or that they themselves cannot now "monetize their work," or that the ATT feature has caused them to pay more for Search Ads. *See id.*; Opp. at 15-17. That ATT allegedly affects "how they can utilize space … for paid advertising" (Mot. at 16) pleads no impact on plaintiffs unless they were previously tracking their subscribers across the web for purposes of targeted advertising—which they do not allege. The complaint simply speculates about possible effects of the ATT feature on those developers who seek to track customers and who do engage in targeted advertising, based on extended (and dubious) chains of causation. FAC ¶¶ 199-202. And any speculated harm unavoidably links through the independent choices of third parties—consumers who do not wish to be tracked—which renders allegations of standing especially conjectural. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Article III does not allow plaintiffs to bring claims based on speculation at every turn. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563-67 (1992). Nor does the Sherman Act. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

Plaintiffs also double down on their refusal to allege any relevant advertising market that has been restrained; no doubt because they cannot plausibly do so. Instead, they doggedly claim that an alleged restraint on *advertising* that supposedly results in supracompetitive *advertising* rates "injures competition in the pled app-distribution and IAP services market." Opp. at 16. If this is a monopoly "leveraging" claim, it fails because plaintiffs would need to plead and prove competitive impact in two relevant markets. *See Verizon Commc'ns. Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1138-43 (9th Cir. 2022). If this is a single-market claim of monopolization of plaintiffs' alleged non-advertising market, it fails because "in assessing alleged antitrust injuries, courts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'" *FTC v. Qualcomm*, 969 F.3d 974, 992 (9th Cir. 2020). The theoretical advertising harms of which plaintiffs complain "even if real, are not 'anticompetitive' in the antitrust sense—at least not directly—because they do not involve restraints

on trade or exclusionary conduct in 'the area of effective competition.'"  *Id*.  Plaintiffs' convoluted efforts to argue that there are linkages giving rise to the potential for ripple effects on the alleged app "distribution" market cannot suffice here when they plead no harm to competition in any advertising market.  "Whatever injuries [plaintiff] may have itself suffered, [plaintiff] is missing the necessary harm to competition in the relevant market with which [plaintiff's] injuries are [supposedly] 'inextricably intertwined.'"  *Dreamstime.com,* 54 F.4th at 1143.  Moreover, offering consumers more choices cannot injure competition, *Blix Inc. v. Apple Inc.*, 2021 WL 2895654 at *4 (D. Del. July 9, 2021), *aff'd*, 2022 WL 17421225 (Fed. Cir. Dec. 6, 2022), and hence plaintiffs could allege no antitrust injury here even if they pleaded a proper relevant market.  Whether Apple's requirement that developers ask for consent to track consumers is "benign[]" (Opp. at 15) is legally irrelevant.  "Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit."  *United States v. Brown Univ.*, 5 F.3d 658, 675 (3d Cir. 1993).  This Court should dismiss all of plaintiffs' ATT claims.

## III.   PLAINTIFF LE GESTE IS BARRED FROM PURSUING ANY CLAIMS

Plaintiffs' arguments supporting le GESTE's standing to remain in this lawsuit are meritless; it lacks standing to sue in its own right or on behalf of its members.

### A.   Le GESTE Cannot Sue in Its Own Right

Le GESTE cannot establish that it has organizational standing—standing based on a direct injury to the organization itself, such as an organization's diversion of resources caused by a frustration of its purpose.  *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087-88 (9th Cir. 2010).  Apple's App Store policies did not "force" le GESTE to divert its resources (Opp. at 18) from its stated purpose of studying "economic, legislative, and competitive conditions" affecting online publishers (FAC ¶ 62).  Plaintiffs do not even attempt to argue that le GESTE "would have suffered some other injury" had it "not diverted resources to [supposedly] counteracting" Apple's policies.  *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citation and quotation marks omitted).  Le GESTE's decision to use its resources researching Apple's policies was entirely voluntary and is therefore no injury at all.  *Cf. id.* (organizations that assist asylum-seekers suffered cognizable injuries caused by U.S. government policies under which

migrants were being detained near the U.S.-Mexico border, as they forced the organizations to expend significant resources in sending staff to the border).

What is more, plaintiffs have no argument that any such diversion of human or financial resources in France is cognizable under the antitrust laws, including the FTAIA.  The law is clear: an antitrust claim requires a causal antitrust injury, *i.e.*, "the type the antitrust laws were intended to prevent."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 548 (1998) (antitrust injury required under Cartwright Act).[9] Plaintiffs plead no such injury here.  "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained" but le GESTE is not even a participant in the alleged relevant market.  *Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F. 3d 1051, 1057 (9th Cir. 1999). Le GESTE lacks both Article III and statutory standing to sue on its own behalf.

### B.   Le GESTE Lacks Article III Standing to Sue on Behalf of Its Members

Le GESTE cannot satisfy the associational-standing doctrine either.  Le GESTE says it represents some of its members in this litigation, but bases that representation on members who *are already suing*—Figaro and L'Équipe.  Opp. 18.  The entire point of the associational-standing doctrine is for an association to serve as a representative of its absent members who themselves have standing to sue.  *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006).  Representative suits are a creation of equity, and there is no reason why justice requires that le GESTE act as a representative for Figaro and L'Équipe when they are already suing.  And le GESTE cannot rest on the standing of other purported members to establish associational standing (Opp. 18-19) when the complaint does not allege any specific facts about those members that would establish their standing.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations [are required] to make *specific allegations* establishing that at least one identified member ha[s] suffered or w[ill] suffer harm." (emphasis added)).

---

[9] Plaintiffs argue that *Brunswick* does not apply because it did not address *associational* standing, by which an *uninjured* association may serve as a representative of its members, but this erroneously "conflat[es] the question of whether [an organization] ha[d] standing to press claims for injury *on its own behalf* with the question of whether [it] ha[d] representative standing to assert claims *on behalf of its members*."  *Legal Aid Soc. of Hawaii v. Legal Servs. Corp*, 145 F.3d 1017, 1030 (9th Cir. 1998).

Gibson, Dunn &
Crutcher LLP

Plaintiffs fail to refute that this litigation is not germane to le GESTE's purpose.  *See* Mot. at 19-20; Opp. at 19.  It is not plausible that entities would join le GESTE based on the expectation that the online-publisher association would bring app-developer litigation.  *See* FAC ¶¶ 56, 62.  The conflicts among the interests of le GESTE's diverse membership are evidence of that: it is doubtful that entities such as Google (which is assailed in the complaint) or various law firms (with their numerous client representations) would have joined for the purpose of le GESTE bringing lawsuits on behalf of app developers.  Mot. at 19-20; *see Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1380-81 (7th Cir. 1987).  Further factual development on this issue is not needed when le GESTE has been unable to allege sufficiently that this lawsuit is germane to its purpose.  Le GESTE accordingly cannot invoke associational standing.

## C.      Le GESTE Lacks Statutory Standing to Sue on Behalf of Its Members

Even if le GESTE could in theory assert associational standing in a proper case, it cannot do so here under the terms of Section 16 of the Clayton Act, 15 U.S.C. § 26, which require, at a minimum, that all private litigants including "associations" face a threat of antitrust injury to themselves to have standing to sue.  *See Cargill, Inc. v. Monfort of Colo.*, Inc., 479 U.S. 104, 111 (1986).  As already shown, le GESTE has alleged no such antitrust injury to itself.  Le GESTE instead points to a pre-*Cargill* decision, *Associated General Contractors of North Dakota v. Otter Tail Power Co.*, which considered neither the language of Section 16 nor the direct-antitrust-injury requirement articulated in *Brunswick* when evaluating whether uninjured associations could sue on behalf of their members.  *See* 611 F.2d 684, 690 (8th Cir. 1979).  *Otter Tail Power* ultimately concluded that the association there could not satisfy the associational-standing test due to members' "status and interests" being "too diverse" and "the possibilities of conflict too obvious to make the association an appropriate vehicle to litigate the claims of its members."  611 F.2d at 691.  To the extent that *Otter Tail Power*'s scant and unpersuasive reasoning regarding Section 16, "written before *Cargill*" and "not refer[ing] to *Brunswick* at all," is even a holding, this Court should not follow it.  *See Fin. & Sec. Prods. Ass'n v. Diebold*, 2005 WL 1629813 at *3 n.2 (N.D. Cal. July 8, 2005) (distinguishing *Otter Tail Power*).  Plaintiffs also point to *Sanner v. Board of Trade of City of Chicago*, but the Seventh Circuit there did not analyze associational standing under Section 16; it held only that an association could not sue for damages

under Section 4 of the Clayton Act on behalf of its members.  62 F.3d 918, 922-23 (7th Cir. 1995).  In an earlier decision, *Southwest Suburban Board of Realtors*, that same court expressed skepticism that an association could ever satisfy the associational-standing test "in light of the *Cargill* decision requiring § 16 plaintiffs to demonstrate the threat of antitrust injury."  830 F.2d at 1381.  Finally, the analysis in a 1983 Northern District of Illinois case cited by plaintiffs is faulty: that district court emphasized that Section 16 allows an "association" to sue for injunctive relief, *Mission Hills Condominium Ass'n M-1 v. Corley*, 570 F. Supp. 453, 457 (N.D. Ill. 1983), but it failed to recognize that it is precisely because Section 16 lists "association[s]" among the kinds of entities that can be plaintiffs that associations must also face the threat of antitrust injury in order to sue under Section 16.[10]  *See* Mot. at 20.

With regard to associational standing under the UCL, plaintiffs' response wholly ignores California Supreme Court precedent.  Mot. at 21 (citing *Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*, 46 Cal. 4th 993, 1003-05 (2009)).  Plaintiffs argue that the high court has not yet ruled on associational standing since the passage of Proposition 64 in 2004, when in fact the basis of *Amalgamated Transit*'s reasoning *was* the enactment of Proposition 64.  *See Amalgamated Transit*, 46 Cal. 4th at 1004 ("the amended statutory language" reflects California voters' intent in approving Proposition 64 to prohibit UCL actions by plaintiffs who have suffered no injury in fact).  As plaintiffs recognize, Proposition 64 stripped "unaffected parties" of the ability to sue under the UCL.  Opp. at 21 (quoting *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 317 (2010)).[11]  Plaintiffs' citation to a pre-*Amalgamated Transit* decision to support associational standing under the Cartwright Act is unavailing.

---

[10] Furthermore, neither *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531 (6th Cir. 2021), nor *Coalition for ICANN Transparency Inc. v. Verisign, Inc.*, 2007 WL 9734349 (N.D. Cal. May 14, 2007), considered statutory arguments regarding standing for "associations" under Section 16.

[11] Ignoring the issue-dispositive *Amalgamated Transit* holding, plaintiffs turn to arguing that le GESTE allegedly suffered a direct injury—pointing to an intermediate state court's decision regarding organizational standing in support of their argument that le GESTE has associational standing under the UCL.  Opp. at 20-21; *see Animal Legal Def. Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1281-82 (2015) (holding that an organization can have direct standing to sue under the UCL if it can show "both a diversion of its resources and frustration of its mission" (citation and quotation marks omitted)).  But associational standing "applies only when the plaintiff association has not itself suffered actual injury but is seeking to act on behalf of its members who have sustained such injury." *Amalgamated Transit*, 46 Cal. 4th at 1004.  Le GESTE cannot mix and match associational- and organizational-standing theories to establish that it can sue.

Gibson, Dunn &
Crutcher LLP

Opp. at 20 (citing *Cal. Dental Ass'n. v. Cal. Dental Hygienists' Ass'n*, 222 Cal. App. 3d 49, 61, 271 (1990)).  The best guide to how the California Supreme Court would decide this issue is *Amalgamated Transit*, not an intermediate court decision from 1990.  *See* Mot. at 21.  As an uninjured party, le GESTE must be dismissed from this suit.

## IV.  PLAINTIFFS' CLAIMS ARE TIME-BARRED OR BARRED BY LACHES

Figaro and L´Équipe cannot avoid the statutes of limitations applicable to their claims for damages under the Sherman Act, UCL, or Cartwright Act.  The challenged policy decisions occurred in 2008 and 2009, and Figaro and L´Équipe accepted Apple's distribution and IAP restrictions when they signed the DPLA in 2009.  Mot. at 21-22.  Plaintiffs hammer on their allegations that the conduct at issue continued into the four years preceding the filing of this action, Opp. at 21-24, but they cannot explain how the conduct they actually challenge as anticompetitive has materially changed within this limitations period.  This is not "a case in which a[n alleged] wrongful course of conduct became apparent only through the accumulation of a series of [alleged] harms." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1198 (2013) (rejecting the application of the continuing-violation doctrine). Plaintiffs cannot extend the applicable statutes of limitations when they have known about Apple's distribution and IAP policies since 2009.  *See Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) ("Statutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims."); *see also Giordano v. Saks Inc.*, 2023 WL 1451534 at *9 (E.D.N.Y. Feb. 1, 2023) (declining to apply the continuous-violation doctrine to Sherman Act claims, reasoning that "[i]n similar cases, the Supreme Court has declined to extend the limitations period . . . 'because the provision of treble damages is justified by the benefit of vindicating the public interest, it would be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [the statute] might realize.'" (quoting *Rotella v. Ward*, 528 U.S. 549, 558 (2000))).

*Reaffirming* the same distribution and IAP-related provisions in the DPLA every year does not constitute an "overt act" sufficient to restart the limitations periods under the continuing-violation doctrine.  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).  Nor does the limitations period for claims challenging distribution and IAP policies restart because of different

1  conduct, like charging an eminently reasonable annual fee.  The same goes for the continuous-accrual

2  doctrine.  For example, plaintiffs' UCL claims against so-called anti-steering provisions, which they

3  allege prevent developers from communicating with consumers, do not accrue continuously because

4  developers pay commissions and fees every year.  *Cf.* Opp. at 23; *see Aryeh* 55 Cal. 4th at 1198

5  (continuous-accrual doctrine applies to "separate, recurring invasions of *the same right*" (emphasis

6  added)).

7          Further, equity demands that laches bar all the claims for injunctive relief in this action.

8  Plaintiffs articulate no reason why this same complaint could not have been filed more than a decade

9  ago.  *See*, *e.g.*, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954-55 (9th Cir. 2001).  These plaintiffs did

10  not challenge App Store policies until years *after* other litigants (including a putative class of

11  developers) sued Apple, and it is certainly not equitable to reward such opportunistic behavior.

12  Plaintiffs remain indifferent to the waste of party and judicial resources in their contention that Apple

13  has not been prejudiced by their delay.  Apple is being forced to expend duplicative litigation costs

14  after already settling a nearly identical suit filed by the same plaintiffs' counsel; in response plaintiffs

15  simply say that they are different plaintiffs, so those costs do not matter.  Opp. at 23.  This Court should

16  dismiss this untimely suit.

17  **V.      PLAINTIFFS' CLAIMS FOR RESTITUTION ARE BARRED**

18          Neither plaintiffs' complaint nor their opposition brief explains why damages would not

19  adequately address any alleged injuries suffered by plaintiffs, such that the request for restitution should

20  not be dismissed.[12]  Plaintiffs cannot keep a claim alive by saying that restitution could serve as an

21  alternative remedy in the abstract.  Opp. at 24-25.  Without a plausible reason as to why damages would

22  be inadequate, it is proper to dismiss a claim for restitution on the pleadings.  *See Julian v. TTE Tech.,*

23  *Inc.*, 2020 WL 6743912 at *4 (N.D. Cal. Nov. 17, 2020) (dismissing claim for restitution where the

24  complaint "failed to explain how restitution could be different from damages.").

25

26

27

28  [12] Plaintiffs apparently concede that legal restitution is unavailable to them, as they do not respond to
Apple's arguments for dismissal of their request for that remedy.  Mot. at 25.

1
2

## VI.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR LEAVE TO AMEND THEIR COMPLAINT AGAIN

3
4
5
6
7

Plaintiffs request to amend their complaint again, including "as necessary" in order to raise French- or EU-law claims in the event "that the FTAIA bars any of their claims." Opp. at 25.  Leave to amend should be denied, and certainly with regard to new foreign-law claims, because (to the extent not futile) that request is untimely and prejudicial to Apple. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006).

8
9
10
11
12
13
14
15

Further amendment to plaintiffs' claims would be futile because their complaint is deficient regardless of the FTAIA's bar to their foreign-sales claims. *See*, *e.g.*, *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1046-47 (9th Cir. 2011) (denial of leave to further amend complaint was proper where amendment would be futile because claims had multiple deficiencies).  Among other issues: all of plaintiffs' claims are either time-barred or barred by laches, and no amendment can turn back the clock, *see supra* at IV; le GESTE cannot overcome its lack of Article III standing, *see supra* at III; and no plaintiff has Article III standing to challenge Apple's ATT functionality, *see supra* at II. These problems would apply to any foreign-law claims too.

16
17
18
19
20

In assessing the timeliness of requests for leave to amend, the Ninth Circuit looks beyond the deadlines set by Rules 15 and 16 and "also inquire[s] 'whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading.'" *AmerisourceBergen*, 465 F.3d at 953 (citation omitted).  The Circuit has "held that an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable." *Id.* (citation omitted).

21
22
23
24
25
26
27
28

Here, plaintiffs were aware of the relevant facts 14 years ago. *See supra* at IV.  And, at the very latest, their counsel was aware as of July 2020 that Apple would oppose foreign-storefront claims under U.S. law as barred by the FTAIA. *See Cameron* Dkt. 99 at 2.  But in filing this lawsuit plaintiffs chose to bring only U.S.-law claims. *See* Dkt. 1 ¶¶ 241-81.  Then, after seeing Apple's FTAIA arguments for dismissing their initial complaint, plaintiffs used their opportunity to amend as of right, again declining to plead French- or EU-law claims.  They offer no explanation for this undue delay. *See Minden Pictures, Inc. v. Pearson Edu., Inc.*, 2013 WL 71774 at *1 (N.D. Cal. Jan. 7, 2013) ("A court does not abuse its discretion in denying a motion to amend a complaint when the movant presents no

1  new facts but only new theories, and provides no satisfactory explanation for his failure to develop his

2  contentions originally.").

3        Leave to amend would also result in prejudice to Apple because adding the "new claims will

4  alter the nature of the litigation, and will require defendants to undertake, at this relatively late date, a

5  new course of defense." *Schiff v. City & Cnty. of San Francisco*, 2011 WL 573825 at *2 (N.D. Cal.

6  Feb. 14, 2011).  This prejudice would not be mere extension of the schedule—Apple would need to

7  assemble a new legal team with expertise in foreign law.  That plaintiffs provide no specificity as to

8  the bases for such purported foreign-law claims shows that their request is merely a means to prolong

9  the litigation unnecessarily.  Forcing a third round of motion-to-dismiss briefing is unfair to Apple and

10  will waste judicial resources.  *See In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 159-

11  60 (2d Cir. 2015) (rejecting the plaintiffs' request to re-plead under state- or foreign-law claims

12  originally pleaded under federal law, reasoning that they "did not put the defendant on notice of specific

13  state or foreign common-law claims that it might be called upon to defend against in this litigation");

14  *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967) ("A busy district court need not

15  allow itself to be imposed upon by the presentation of theories seriatim.").

16        Under Rule 15, "the court should freely give leave when justice so requires," but justice does

17  not so require here.  It would now be unfair and a waste of the Court's and Apple's time and resources

18  for plaintiffs to transform this into an entirely different case.  If leave is granted, Apple reserves all of

19  its rights to respond to the propriety and substance of any amendment.

20  **VII.   CONCLUSION**

21        The Court should dismiss the complaint in whole, or alternatively, in part, with prejudice.

22

23  Dated:  February 24, 2023        GIBSON, DUNN & CRUTCHER LLP

24                             Daniel G. Swanson
Cynthia E. Richman
25                             Caeli A. Higney
Dana Lynn Craig
26                             Eli M. Lazarus
Victoria C. Granda

27                 By: */s/ Cynthia E. Richman*

28                 *Attorneys for defendant Apple Inc.*