# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SOCIETE DU FIGARO, SAS, ET AL.,**<br><br>　　Plaintiffs,<br><br>　　v.<br><br>**APPLE, INC.,**<br><br>　　Defendant. | Case No.: 4:22-cv-4437-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART APPLE'S MOTION TO DISMISS WITH PARTIAL LEAVE TO AMEND**<br><br>Re: Dkt. No. 61 |

Shortly after this Court approved the final settlement of a class of U.S.-based app developers bringing antitrust claims against Apple's App Store in *Cameron, et al. v. Apple, Inc.*, Case No. 4:19-cv-3074-YGR (N.D. Cal.), plaintiffs, through the same counsel, filed this almost-identical case. The main difference? Plaintiffs here seek to represent a putative class of France-based developers who they claim have both foreign and U.S. customers. Defendant Apple moves to dismiss in part plaintiffs' First Amended Class Action Complaint (Dkt. No. 48, "FACAC").[1] (Dkt. No. 61, Motion to Dismiss, "MTD.") The motion is based primarily on the ground that plaintiffs'

---

[1] Apple has also filed a request for judicial notice and presents four documents in support of its motion to dismiss: **Exhibit A**, a copy of an August 1, 2022, press release titled *France-based iOS Developers Team up with U.S. Firm Hagens Berman in Antitrust Class-Action Lawsuit Against Apple's App Store Fees*; **Exhibit B** a copy of the press released titled *Why a French Association of Developers Together with Two of the Highest Profile Press Publishers—Le Figaro and L'Equipe, Filed a Class Action against Apple in the U.S.?* from le Geste's website; **Exhibit C** a copy of the Order Concerning Defendant Apple Inc.'s Demurrer to Plaintiffs' Complaint, entered on February 4, 2022, in *Beverage v. Apple Inc.*, Case No. 20-cv-370535 (Cal. Sup. Ct., Santa Clara Cnty.); **Exhibit D** a copy of the Order Concerning Defendant Apple Inc.'s Demurrer to Plaintiffs' Second Amended Complaint, entered on August 29, 2022, in *Beverage v. Apple Inc.* (Dkt. No. 62.) Plaintiffs oppose the request to the extent Apple is relying on the truth of the contents of these documents. (Dkt. No. 67-1.) Because these documents are not relevant to the Court's decision, the Court in its discretion **DENIES** the request for judicial notice.

foreign-sales claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. Having carefully considered the papers submitted, the pleadings in this action, argument presented at the July 11, 2023, hearing, and for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Apple's motion to dismiss **WITH PARTIAL LEAVE TO AMEND**.

**I.  BACKGROUND**

The FACAC alleges:

By design, iOS apps can only be sold on Apple's App Store. (FACAC ¶ 2.) Apple is a U.S. company that sets its App Store policies in the U.S. (*Id.* ¶ 3.) To sell apps on its App Store, developers must sign the Developer Program License Agreement ("DPLA"). (*Id.* ¶ 1 n.2.) The DPLA must be renewed once a year. (*Id.* ¶ 37.) To do so, developers pay a yearly fee. (*Id.*) Among other things, the DPLA sets out the commission developers must pay for every sale. (*Id.* ¶ 17.) Apple's monopolistic position has allowed it to charge app developers a 30% commission for fourteen years. (*Id.*)

Notable here, Apple has also recently implemented a feature called the App Tracking Transparency ("ATT") program. (*Id.* ¶ 198.) Ostensibly this program allows customers to control how developers use their personal data. (*Id.*) Plaintiff developers, however, "claim that [this feature] is implemented in such a way that they are unfairly robbed of their ability to monetize their work by fair use of consumer data for targeted advertising." (*Id.* ¶ 199.)

Wherever app developers that wish to sell their apps on Apple's App Store reside, they must purchase Apple's iOS app-distribution and IAP services in the United States. (*Id.* ¶ 4.) Moreover, customers of those app developers must purchase their apps solely through the App Store. (*Id.* ¶ 8.) Though apps must all be purchased through the App Store, the App Store has different digital storefronts depending on the location of the customer. (*Id.* ¶ 19.) For example, there is a French storefront for French customers. (*Id.*) The DPLA states that all "Licensed Applications the Developer delivers to Apple . . . are authorized for export from the United States." (*Id.* ¶ 244.) Based on this, among other things, plaintiffs allege that, "[b]ecause of their participation in the U.S.

1  domestic marketplace as consumers of Apple's services," plaintiffs were injured directly by the
2  U.S. domestic effects of Apple's anticompetitive conduct. (*Id.* ¶ 27.)
3     The three plaintiffs include two French online publishers and app developers named Societe
4  du Figaro, SAS and L'Equipe 24/24, SAS, and one French association of online publishers to
5  which they belong, named Le Geste. (*Id.* ¶¶ 36, 46, 56.) Figaro and L'Equipe are both parties to the
6  DPLA, which they first signed back in 2009. (Dkt. No. 42, Exs. C, D.) These plaintiffs have
7  customers both in the U.S. and France. (*Id.* ¶¶ 38, 48.)
8     Based on the factual allegations outlined above, plaintiffs bring four causes of action: two
9  for violations under Section 2 of the Sherman Act, 15 U.S.C. § 2; a violation under California's
10 Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and a violation of
11 California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* (*Id.* ¶¶ 258–299.) Plaintiffs
12 seek to represent two classes, one for federal claims and the other for state claims. The putative
13 class consists of all current or former France-resident persons or entities that paid Apple a
14 commission to distribute their apps. (*Id.* ¶¶ 224–29.)
15    Apple brought the pending motion to dismiss the FACAC under Fed. Rs. of Civ. P. 12(b)(1)
16 and (b)(6).

## II.  LEGAL FRAMEWORK

18    A motion to dismiss under Fed. R. of Civ. P. 12(b)(1) tests the subject matter jurisdiction of
19 the court. *See, e.g., Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 (9th Cir. 2003).
20 Motions under Rule 12(b)(1) may be either "facial or factual." *Safe Air for Everyone v. Meyer*, 373
21 F.3d 1035, 1039 (9th Cir. 2004) (internal citation omitted.) In a facial attack, the jurisdictional
22 challenge is confined to the allegations pleaded in the complaint. *Wolfe v. Strankman*, 392 F.3d
23 358, 362 (9th Cir. 2004). While the plaintiff bears the burden to establish jurisdiction, on a facial
24 challenge the court assumes the allegations in the complaint are true and draws all reasonable
25 inferences in favor of the party opposing dismissal. *Id.* The standard for dismissal under Fed. R. of
26 Civ. P. 12(b)(6) is well-known and not in dispute. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
27 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3

A district court may dismiss a case without leave to amend if it finds the plaintiff is unable to cure the defect by amendment. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

### III. ANALYSIS

Apple's motion is based on five arguments, namely that (a) plaintiffs' foreign-sales claims are barred by the FTAIA; (b) plaintiffs lack Article III and statutory standing to challenge, and fail to state a claim challenging, Apple's ATT functionality; (c) plaintiff Le Geste lacks Article III and statutory standing; (d) all claims are time-barred or barred by laches; and (e) plaintiffs fail to state a claim for restitution. The Court addresses each.

#### A. APPLICATION OF THE FTAIA

The main thrust of Apple's motion to dismiss is that the FTAIA bars plaintiffs from bringing antitrust claims for their foreign sales. Plaintiffs disagree, asserting either that the FTAIA does not apply, or if it did, two exceptions allow the claims to survive. As to the latter, plaintiffs argue (1) that the effects of Apple's anticompetitive conduct against French developers selling to French customers reverberated in the U.S. under the "domestic effects" exception; and (2) because Apple designates all app developers as exporters under the DPLA, plaintiffs are exporters not covered by the FTAIA.

##### 1. Application of the FTAIA

The Court begins with the statute. The FTAIA states that the Sherman Act:

> [S]hall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>
> (1) such conduct has direct, substantial, and reasonably foreseeable effect—
>   (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce in the United States; and
>   (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act]
> If [the provisions of the Sherman Act] apply to such conduct only because of the operation of paragraph (1)(B), then [those provisions]

4

>shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. Stated differently, the Supreme Court has held that the FTAIA places "*all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach" unless the conduct "*both* (1) sufficiently affects American commerce" and "(2) has an effect of a kind that antitrust law considers harmful." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).[2]

In *Empagran*, plaintiffs alleged that U.S. and foreign companies conspired to raise the prices of vitamins on both U.S. and foreign consumers. *Id.* at 159. Plaintiffs alleged a price-fixing conspiracy by both domestic and foreign entities. *Id*. Defendants moved to dismiss the suit as to foreign purchasers' sales only. *Id.* The district court granted the motion, but the D.C. Circuit reversed. *Id.* at 160. The Supreme Court ultimately held that the FTAIA barred the foreign-sales claims. It did so on the basis that where antitrust conduct "significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect," its foreign effect is outside the scope of the Sherman Act. *Id.* at 164. The Supreme Court's decision relied on a variety of factors, including that of international comity and the goal of "avoid[ing] unreasonable interference with the sovereign authority of other nations." *Id*. Antitrust laws of the United States can still apply to foreign anticompetitive conduct to redress resulting "*domestic* antitrust injury that foreign anticompetitive conduct has caused." *Id.* at 165. That does not mean that those laws should apply to anticompetitive conduct that "*causes independent foreign harm and that foreign harm alone gives rise to plaintiff's claim.*" *Id*. In such a situation, "Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm." *Id*.

*Empagran* is dispositive here. Plaintiffs allege that they were harmed when a domestic company, Apple, forced their foreign consumers to pay supra competitive prices to the detriment of foreign developers. The foreign anticompetitive injury at issue is independent of any domestic effect, even if the contractual relationship from which the alleged anticompetitive conduct arises

---

[2] All quoted emphases in *Empagran* are in the original.

was set in California.[3] The case is not about that contract; it is about antitrust injury. The FTAIA applies.

Plaintiffs' arguments otherwise do not persuade. First, plaintiffs' focus on the term "foreign nations" implies that the FTAIA applies only when foreign governments are involved. Not so. "The phrase 'trade or commerce with foreign nations' includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign." *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 301–02 (3d. Cir. 2002), *overruled on other grounds by Animal Science Prods. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011).

Second, plaintiffs argue that the DPLA's U.S. choice-of-law provision underscores the domestic nature of the parties' commerce. The FTAIA is a law of the United States. All the agreement does is affirm that the parties will comply with its strictures to the extent it applies. *See Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 409 (2d. Cir. 2014) (holding that "contractual provisions do not waive any statutory requirements or otherwise alter the scope of the signatories' legal obligations. Put differently, the [U.S. choice-of-law provision there] affirms that the defendants must abide by the Sherman Act to the extent it properly applies. But the defendants remain free to argue that, under the FTAIA, the Sherman Act does not apply").

Third, plaintiffs argue that, under *Empagran*, because French app developers' injuries were the direct consequence of Apple's domestic anticompetitive conduct, the FTAIA does not apply. They state "[t]his situation is not unlike France-resident visitors to the U.S. buying supercompetitively priced goods from an abusive monopolist in a brick-and-mortar California store." Plaintiffs misread *Empagran*. There, the Supreme Court held that, under the FTAIA, antitrust claims must be brought where antitrust injuries are felt, not where anticompetitive policies are set. 542 U.S. at 165. Moreover, plaintiffs' analogy is not at all apt. Plaintiffs allege that French

---

[3] Further, plaintiffs' insistence that they should be seen as residents of the United States may also implicate the settlement release in *Cameron, et al. v Apple, Inc.* (19-cv-3074-YGR, Dkt. No. 491, "Final Approval of Class Settlement" at 5–6.). On the one hand, plaintiffs brought this suit because, they state, they were not remedied by that settlement. On the other, for purposes of the FTAIA, they argue that the Court should consider that their antitrust injuries were felt in the United States, "just as if they were U.S. residents." (FACAC ¶¶ 239–40.) Plaintiffs cannot have it both ways.

1  consumers bought apps from French developers in a French iOS App Store front. (FACAC ¶ 19.)
2  For those reasons, the Court finds that the FTAIA applies.[4]
3  The Court next considers whether the two FTAIA exceptions identified by plaintiffs save
4  the claims.

### 2. Domestic Effects Exception

Plaintiffs first raise the domestic effects exception which allow claims where the alleged anticompetitive conduct had a "direct, substantial, and reasonably foreseeable effect" on "trade or commerce which is not trade or commerce with foreign nations." 15 U.S.C. § 6a(1)(A). Citing to the legislative history of the FTAIA, plaintiffs argue, in essence, that because the anticompetitive conduct alleged was set in the United States, it gave rise to domestic effects no matter where the antitrust injury was felt.

The Court disagrees. Plaintiffs' domestic-effects argument is merely a repackaging of their arguments about the application of the FTAIA. The Court rejects this argument for the same reason. As explained, *Empagran* stands for the proposition that the FTAIA bars foreign-based claims where U.S.-based anticompetitive conduct gives rise to domestic and foreign harms that are independent of one another. 542 U.S. at 164. That is the situation alleged here—Apple's anticompetitive conduct harmed U.S.- and France-based developers, but the harm caused to French developers, and their foreign customers, was not in any way caused by the harm imposed on domestic developers and their domestic customers. Even if the evidence is similar, they can be independently analyzed. Nothing in the FTAIA's legislative history, which *Empagran* dissected in part, compels a different result. *See id.* at 163, 169. As the Supreme Court noted in *Empagran*, Congress meant to exclude "transactions within . . . other nations" as "foreign transactions" under which there is presumptively "no American antitrust jurisdiction." 542 U.S. at 163 (citing the relevant House of Representatives report).

---

[4] As the Supreme Court's decision in *Empagran* is based on principles of international comity, the Court need not further address the issue. Moreover, because plaintiffs' arguments regarding the FTAIA for their state claims and federal claims are the same, and plaintiffs do not posit any authority to the contrary in response to Apple's submission, the Court finds that plaintiffs' antitrust state claims are barred by the FTAIA for the same reason.

7

### 3. Export Exception

Second, FTAIA's export exception applies where antitrust conduct causes "injury to export business in the United States," or in other words, to "a person engaged in such a trade or commerce in the United States." 15 U.S.C. § 6a(1)(B). Plaintiffs argue that, because Apple designates foreign apps sold on the App Store as U.S. exports subject to U.S. laws, the FTAIA's export exception applies. (FACAC ⁋ 244.)

The Court disagrees. Apple's designation of all apps as U.S. exports for its internal purposes does not transform all French app developers into U.S. exporters for purposes of the FTAIA. In so finding, the Court finds persuasive the Second Circuit's opinion in *Lotes*. There, the Second Circuit rejected a similar argument that the FTAIA's substantive requirements could be waived by contract. *Lotes, supra,* 753 F.3d at 408. It did so, first, because the substantive provisions of the FTAIA likely cannot be waived by contractual agreement. *Id.* (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945)). Moreover, such contractual provisions merely affirm that U.S. laws, like the FTAIA, apply. In providing that U.S. export laws apply to the DPLA, Apple did not waive its right to argue that the FTAIA applies as well. *See id.* at 409 (so holding in that case).

\* \* \*

For those reasons, the Court finds that plaintiffs' claims based on foreign sales are barred, without exception, under the FTAIA. This is not a defect that can be cured by amendment. The Court therefore **GRANTS** Apple's motion to dismiss plaintiffs' foreign-based claims **WITH PREJUDICE.**

### B. STANDING FOR ATT CLAIMS

Apple argues that all of plaintiffs' claims on its ATT program are barred. Specifically, Apple contends that, because there are no allegations that any plaintiff engages in or has profited from targeted advertising to its app customers, plaintiffs have not pled an injury in fact sufficient to support Article III or statutory standing.

The Court agrees. Plaintiffs' references to the FACAC do not so plead. (*See* FACAC ¶¶ 199–202.) All the FACAC alleges is that the ATT program is "implemented in such a way that they

are unfairly robbed of their ability to monetize their work by fair use of consumer data for targeted advertising." (*Id.* ¶ 199.) It does not allege that Apple's ATT feature has stopped plaintiffs' customers from sharing their data which, in turn, has left plaintiffs unable to engage in targeted advertising. Pure speculation is insufficient. As pled, plaintiffs have not suffered an injury in fact that is attributable to Apple.

For the same reason, plaintiffs have not sufficiently pled an injury in fact as to support standing under the UCL or Cartwright Act. For standing under the UCL, a plaintiff must have suffered an injury in fact which results in lost money or property. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320–21 (Cal. 2011). Under the Cartwright Act, a plaintiff must plead an antitrust injury for standing. *Ahn v. Stewart Title Guaranty Co.*, 93 Cal.App.5th 168, 183 (Cal. 2023). Because the FACAC does not plead what injury the ATT feature caused plaintiffs, they have not established standing for their statutory claims either.

For those reasons, Apple's motion to dismiss on this ground is **GRANTED WITH LEAVE TO AMEND.**

  **C. LE GESTE'S STANDING**

    **1. Article III Standing**

      **a. Le Geste's Individual Standing**

First, Apple argues that Le Geste lacks standing to sue in its own right because it has not alleged that it itself, rather than its members, suffered a concrete injury. Le Geste responds that, because Apple's anticompetitive conduct caused it to divert resources, and that diversion has significantly interfered with its mission, Le Geste was collaterally injured.

In general, "[o]rganizations can assert standing on behalf of their own members or in their own right." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (citing cases). An organization "has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purposes." *Id.* at 663. That does not mean that an organization "can manufacture the injury by incurring litigation or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake*

9

*Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id*.

In *East Bay Sanctuary Covenant*, the Ninth Circuit analyzed whether various immigration organizations had individual standing to challenge an immigration policy. 993 F.3d at 663. The organizations there had pled various injuries. For example, in response to the new immigration policy, the plaintiff organizations had spent a significant portion of their resources sending staff to the southern border to provide care for unaccompanied children. *Id*. Their funding, the Ninth Circuit held, was also jeopardized by the new policy given that they stood to "lose a significant amount of business and suffer a concomitant loss of funding" due to a loss of clients, who were now categorically ineligible for asylum. *Id.* (internal citation and quotations omitted). In summary, the Ninth Circuit held, each organization would have lost clients seeking refuge in the United States had they not diverted resources to counteracting the effect of the new immigration policy. *Id.* at 664. For that reason, the Ninth Circuit concluded the organizations had direct standing. *Id*.

Here, Le Geste claims that it has suffered economic injury as a result of Apple's anticompetitive conduct (FACAC ¶ 62), but the specificity required is lacking. Le Geste states it is "pro-publisher; content produced by its members enlighten, edify, and entertain the public. It advocates generally for competitive markets for online publishers." (*Id.*) It claims that "Apple's behavior has proven to be particularly deleterious and demanding of attention." (*Id.*) Because of Apple's anticompetitive conduct, Le Geste alleges it was "forced to divert, and diverted and devoted, person-power, and financial and other resources, to research, investigate, and analyze" Apple's behavior. (*Id.*) In fact, Le Geste continues, "for many months now, including many months before this suit was filed, all four of Le Geste's permanent employees have spent hours and hours investigating, analyzing, and addressing Apple's anticompetitive prices, often on a near-daily basis, which has drained critical resources." (*Id.* at ¶ 63.) "Due to this diversion of resources," Le Geste states, it has postponed activities that are central to its mission. (*Id.*) None of this was done, Le Geste concludes, "for litigation purposes." (*Id.* ¶ 62.)

Unlike in *East Bay Sanctuary Covenant*, Le Geste does not allege what injury it would have suffered had it not diverted its resources to study Apple's allegedly anticompetitive conduct against

10

app developers. Without more, the bald statement that its diversion of resources was not for litigation purposes is insufficient.

For those reasons, the Court cannot find that Le Geste has sufficiently pled it had individual standing. To that extent, Apple's motion to dismiss is **GRANTED WITH LEAVE TO AMEND**.

### b. Le Geste's Associational Standing

Apple next argues that Le Geste lacks Article III standing to sue on behalf of its members. Plaintiffs disagree.

For the federal claims, an association has standing to bring claims on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)

The *Hunt* requirements are met by Le Geste.[5] First, two of Le Geste's members, including Figaro and L'Equipe, have standing to pursue the antitrust claims brought. Apple does not contest this. Instead, Apple argues that, because Figaro and L'Equipe are challenging its anticompetitive conduct for their own behalf, Le Geste cannot sue on their behalf as well. Apple's argument is devoid of legal authority. An association may "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). Indeed, the Ninth Circuit has found that the first *Hunt* factor is satisfied by an organization even when one of its members is a named plaintiff. *See Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003) (holding that the first prong of *Hunt* was satisfied because "the individual plaintiff," a member of the organization, "had standing to sue"). Rather than addressing this caselaw, Apple resorts to what it calls an argument in equity. By including its members who allegedly suffered antitrust injuries at Apple's hand—here, Figaro and L'Equipe—as individual plaintiffs rather than relegating them to testimonial affidavits, Apple contends that Le Geste has rendered itself duplicative. This is not the case—Le Geste is not only representing

---

[5] As to the third point, neither the antitrust federal and state claims or the injunctive remedy sought here requires "individualized proof." *Hunt*, 432 U.S. at 344. Apple does not dispute this.

individual plaintiffs; it is also representing all its members who have developed apps to sell on the App Store.

Second, the interests Le Geste seeks to protect in this case are germane to its purpose. Le Geste is an "association of publishers of online content" that "advocates generally for competitive markets for online publishers." (FACAC ¶¶ 56, 62.) Here, it is suing to stop Apple's allegedly anticompetitive conduct which has harmed online publishers with iOS apps, including Figaro and L'Equipe. That the putative classes also include French-resident app developers that are not online publishers does not mean that this litigation has nothing to do with that purpose, as Apple argues.[6] So holding would confuse the question of whether Le Geste is an adequate representative to the putative class as a whole (a question not before this Court) rather than whether Le Geste is an adequate representative to its members in particular.

For those reasons, the Court finds that Le Geste has associational standing.[7] Apple's motion to dismiss on this basis is **DENIED**.

### 2.     Statutory Standing

Apple also argues that Le Geste lacks statutory standing for either its federal or state claims. Plaintiffs disagree.

#### a.     Federal Claims

To start, Apple argues that associational standing does not apply where the Sherman Act is concerned. Apple, again, does not cite to anything for this proposition. Instead, relying on a Sixth

---

[6] Apple also argues that Le Geste lacks associational standing because this lawsuit presents a conflict of interest between it and one of its members, Google. It does so based on the FACAC's comparison of the commission rates between Apple's App Store and Google's Play Store. (*See, e.g.,* FACAC ¶ 116.) To start, it is not clear whether any conflict exists: Le Geste is suing Apple not Google. Passing mention of Google's Play Store for comparison does not necessarily create a conflict. More importantly, in the case on which Apple relies, the Ninth Circuit rejected the argument that *Hunt* "require[s] that no actual or potential conflict exist between the organization's members." *Associated General Contractors of California, Inc. v. Coal. for Economic Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991).

[7] Because the Court here finds that Le Geste's associational standing arises from a competitive harm to its members, rather than a diversion of resources to itself, and Le Geste has alleged that Apple's monopolistic conduct will continue, the Court finds that Le Geste has associational standing for prospective relief only.

12

Circuit opinion, Apple criticizes the idea that an association could have standing through its members' injuries rather than its own; in other words, the very idea of associational standing. The Sixth Circuit's holding does not extend as far as Apple argues.

In *Ass'n of Am. Physicians & Surgeons v. United States Food and Drug Admin.*, the Sixth Circuit opined that courts should "vigilantly ensure that an association's members have incurred a personal injury." 13 F.4th 531, 534 (6th Cir. 2021). Because there, plaintiffs had "failed to plausibly plead that any member [had] been injured," the court found that the representative association lacked standing. *Id.* Here, there is no dispute that at least two of Le Geste's members—Figaro and L'Equipe—adequately alleged that they suffered personal injury. Given that, the Court declines Apple's invitation to find that associational standing simply does not apply for Sherman Act claims.[8] *See Coal. for ICANN Transparency Inc. v. Verisign, Inc.*, 464 F.Supp.2d 948, 956 (N.D. Cal. 2006) (finding that associational standing applied for antitrust harms).

For those reasons, the Court **DENIES** Apple's motion to dismiss on the basis of Le Geste's statutory standing to pursue its federal claims.

### b.     State Claims

As alleged, however, Le Geste does not have standing to pursue its UCL and Cartwright claims. Recently, the California Supreme Court confirmed that "under the UCL as it was amended in 2004 by Proposition 64, a membership organization . . . may not base standing to sue on injuries to its members, but only on those to the organization itself." *California Medical Ass'n v. Aetna Health of California Inc.*, 14 Cal.5th 1075, 1082 (Cal. 2023). It did, however, hold that "the UCL's standing requirements are satisfied when an organization, in furtherance of a bona fide, preexisting mission, incurs costs to respond to perceived unfair competition that threatens that mission, so long as those expenditures are independent of costs in UCL litigation or preparations for such litigation." *Id*. In doing so, the California Supreme Court cited to diversion-of-resources caselaw from the

---

[8] Apple is correct that, in dicta, the Sixth Circuit criticized the Supreme Court's holding in *Hunt*. Given the lack of Supreme Court or Ninth Circuit precedent to the contrary, the Court will proceed as ordered and should binding precedent be articulated, the Court can address the issue at that juncture.

13

Ninth Circuit, including *East Bay Sanctuary Covenant. Id.* at 1099. Given that, the Court finds that Le Geste lacks standing to pursue its UCL claim for the same reason it lacks standing to pursue its individual federal claim. Notwithstanding its conclusory allegation, it has not sufficiently alleged facts from which the Court can determine that the resources it diverted to respond to Apple's antitrust conduct were independent of the costs it took on to prepare for litigation.

Though the California Supreme Court did not expressly say its opinion extended beyond the UCL, this Court finds that its reasoning in *California Medical Ass'n* applies to the Cartwright Act. Much like the UCL, which as amended reads that, to sue, a "person" must have suffered an "injury in fact," the Cartwright Act also states that only a "person who is injured in [their or its] business or property" by anticompetitive conduct may sue. *Compare* court's citation to Cal. Bus. & Prof. Code § 17204 (UCL) *with* Cal. Bus. & Prof. Code § 16750(a) (Cartwright Act). For standing purposes, the Court finds the two statutes similarly require an organizational plaintiff to point to an injury it suffered from illegal business practices, rather than an injury suffered by its members. Accordingly, because Le Geste has not sufficiently averred an individual injury, the Court finds that it lacks standing for its Cartwright Act claim as well.

For those reasons, the Court **GRANTS** Apple's motion to dismiss as to Le Geste's statutory standing to pursue its state claims **WITH LEAVE TO AMEND**.

### D.   STATUTE OF LIMITATIONS AND DOCTRINE OF LACHES

It is undisputed that a four-year statute of limitations applies to all of plaintiffs' claims. *See Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (noting there is a four-year statute of limitations under the Sherman Act); *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179 (2000) (four-year statute of limitations under the UCL); Cal. Bus. & Prof. Code § 16750.1 (same for Cartwright Act claims).

Apple argues that, because plaintiffs allege that Apple's anticompetitive conduct against them started back in 2009, when Figaro and L'Equipe signed the DPLA, their claim is untimely. Plaintiffs disagree on the grounds that the continuous-violation doctrine applies.

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria:

(1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Samsung Elecs.*, 747 F.3d at 1202. (citing *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). "This standard is meant to differentiate those cases where a continuous violation is ongoing—and an antitrust suit can therefore be maintained—from those where all the harm occurred at the time of the initial violation." *Id.* Put differently, "each time a plaintiff is injured by an act of the defendant a cause of action accrues." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).

At this stage, the Court finds that plaintiffs have plausibly alleged a continuing violation. Although plaintiffs originally signed the DPLA, with its offending commission rate, back in 2009, plaintiffs contend that each year they are forced to renew their agreement with Apple and pay a fee to sell through the App Store. (FACAC ¶¶ 37, 47.) The DPLA cannot be viewed in a vacuum and the FACAC alleges changes to the DPLA. Furthermore, Plaintiffs have alleged that every time they are forced to pay Apple's anticompetitive commission rate—when a customer signs up for a subscription to Figaro through its app, for example—they suffer a new injury. (FACAC ¶ 1 n.2.) Not all the harm resulting from Apple's anticompetitive conduct, plaintiffs allege, occurred at the moment they signed the DPLA; rather each renewal leads to new and accumulating offenses. As Judge Alsup noted, "most other cases to address this question have concluded that continued overcharges constitute a continuing violation." *In re Glumetza Antitrust Litig.*, 611 F.Supp.3d 848, 861 (N.D. Cal. 2020) (collecting cases). Given this background, the Court cannot dismiss plaintiffs' claims without a more fulsome record.[9]

Apple then argues that, under the doctrine of laches, plaintiffs' claims for injunctive relief are untimely for the same reason as their damages claims. For the same reason, the Court disagrees.

Apple's motion to dismiss based on the statute of limitations and doctrine of laches is therefore **DENIED.**

---

[9] Apple argues that, even if the Court were to find that the continuous violation doctrine applies, plaintiffs can only recover damages for conduct that occurred in the last four years. Plaintiffs fail to respond directly to this point and are therefore deemed to concede it. The Court finds that plaintiffs are limited to seeking damages for harms that occurred within the four-year statute of limitations.

### E. RESTITUTION

The parties dispute whether plaintiffs may claim restitution under the UCL.

*Sonner v. Premier Nutrition Corp.* is instructive. There, the Ninth Circuit held that a plaintiff must establish that an adequate remedy at law is lacking "before securing equitable restitution for past harm under the UCL." 971 F.3d 834, 844 (9th Cir. 2020). The Ninth Circuit recently expanded on *Sonner*, holding that plaintiff had an adequate remedy at law, and therefore no equitable remedy, even though plaintiff's damages remedy was time-barred. *Guzman v. Polaris Industries Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022). Some courts have found that "*Sonner* will rarely (if ever) require" a court to dismiss a plaintiff's equitable restitution claim at the motion to dismiss stage. *Johnson v. Trumpet Behavioral Health, LLC*, No. 3:21-cv-3221-WHO, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022); *see also*, post-*Guzman*: *Milstead v. General Motors* LLC, 2023 WL 4410502, at *8 (N.D. Cal. July 6, 2023) (finding that "*Guzman* does not address what *Sonner* requires at the pleading stage.") Others have disagreed, reading *Sonner* to create heightened pleading requirements for equitable claims. *See, e.g., Ramos v. Wells Fargo Bank*, 2023 WL 5310540, at *3 (S.D. Cal. Aug. 17, 2023) (finding that *Sonner* requires dismissal of a UCL claim where the operative complaint did not allege that plaintiff lacked an adequate legal remedy).

Apple argues restitution is unavailable because damages would adequately address any injury suffered by plaintiffs. Plaintiffs respond that, at this early stage, they should be allowed to proceed with restitution as an alternative remedy. The Court agrees. Neither *Sonner* nor *Guzman* address the pleading requirements of a restitution claim. Moreover, plaintiffs seek restitution *in the alternative*; in other words, they seek restitution only if there is not an adequate remedy at law. Given that, the Court sees no reason to deprive plaintiffs of their restitution claim at this early stage.

Apple's motion to dismiss on this ground is **DENIED.**

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Apple's motion to dismiss the FACAC. In particular, the Court finds:

- The FTAIA bars plaintiffs' claims based on foreign sales. Plaintiffs are not given leave to amend the FACAC in this regard;

16

- Plaintiffs have not stated a claim against Apple's ATT feature. Plaintiffs may amend this claim;

- Le Geste lacks individual standing to sue under Article III but has associational standing through its members. Le Geste also has statutory standing to pursue its federal claims but, as alleged, lacks standing to pursue its state ones. It is given leave to amend; and

- The motion to dismiss on statute of limitations and laches and as to restitution is denied.

To the extent plaintiffs seek to amend, they shall do so within twenty-one (21) days of this Order and shall comply with this Court's Standing Order in Civil Cases ¶ 13 regarding amended complaints. Defendant shall respond within twenty-one (21) days thereafter and is precluded from raising any issues resolved by this Order or any issues which could have been raised in the first instance unless referenced herein.

This terminates Dkt. No. 61.

**IT IS SO ORDERED**.

Date: **September 13, 2023**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**